IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| DAVID CAUDLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. _____ |
| vs. | ) | |
| | ) | |
| NIELSEN HOLDINGS PLC, and NIELSEN | ) | |
| MEDIA RESEARCH, INC. | ) | Hon. |
| | ) | |
| Defendants. | ) | |

## **COMPLAINT**

PLAINTFF, DAVID CAUDLE ("Mr. Caudle"), by and through his attorneys, Carla D. Aikens, P.C., submits the following Complaint against DEFENDANTS NIELSEN HOLDINGS PLC, and NIELSEN MEDIA RESEARCH, INC.  ("Defendants" or "Defendant-Employer").

## **JURY DEMAND**

COMES NOW PLAINTIFF, DAVID CAUDLE, and hereby makes his demand for trial by jury.

## **JURISDICTION**

1.     At all times relevant to this action, Plaintiff was a resident of Wayne and Oakland Counties in the State of Michigan.

2.     Defendant Nielsen Holdings PLC is an international corporation, which has its American headquarters in New York, New York.

3.     Defendant Nielsen Media Research, Inc. is a Delaware corporation with its continuous and systematic place of business at 27600 Northwestern Hwy # 120, Southfield, MI

48034.

4.   All relevant actions giving rise to this complaint took place in Wayne and Oakland Counties in Michigan.

5.   This action is brought in this Court on the basis of federal question jurisdiction, pursuant to Title VII of the Civil Rights Act of 1964, 42 USC 2000e et seq.

6.   Pursuant to 28 U.S.C. §1367, this Court has supplemental jurisdiction over Mr. Caudle's state law claims.

## VENUE

7.   Venue is proper in the Eastern District of Michigan pursuant to Section 706(f)(3) of Title VII, 42 U.S.C. § 2000e-5(f)(3), because the unlawful employment discrimination giving rise to Mr. Caudle's claims occurred in this District.

## STATEMENT OF FACTS

8.   Mr. Caudle was hired by Defendants as a Field Representative in May of 2012.

9.   Defendants' field representatives are responsible for attaching Defendants' equipment to each television ("metering"), and if possible, all streaming devices within each of their individual client's homes.

10.   Defendants' field representatives are further encouraged to persuade their existing customers into allowing Defendants to meter their internet connection ("PC metering").

11.   Mr. Caudle was successful at his job.

12.   Mr. Caudle had been named Employee of the Month over five times while working for Defendants.

13.   Mr. Caudle suffers from the disease sickle cell anemia.

14. During Mr. Caudle's employment with Defendants, his direct manager, Mr. Ryan Dinsmore, made passing comments that he had grown tired of Mr. Caudle constantly taking medical leave.

15. In 2013, Mr. Caudle was required to miss a short period of time due to his disease.

16. Mr. Caudle, per company policy, used his sick and absent days first, and promptly returned to work.

17. Defendants require their field representatives to have a certain percentage of their properties PC metered.

18. In 2014, Mr. Caudle's percentage of PC metered properties was below what was required.

19. Upon information and belief, no field representative met the requisite percentage.

20. However, during this time, Mr. Caudle and Mr. Dinsmore went out to dinner discussed how Mr. Caudle was seeking to improve his percentage of PC metered properties.

21. After this discussion, Mr. Caudle and Mr. Dinsmore created and signed a performance improvement plan for Mr. Caudle.

22. However, upon information and belief, Mr. Caudle was the only field representative who faced a negative employment consequence due to the percentage of his customers who were not PC metered properties.

23. Importantly, in Mr. Caudle's 2014 Nielsen Performance Evaluation, Mr. Dinsmore gave Mr. Caudle a very favorable review.

24. Specifically, Mr. Dinsmore opined, "I truly believe that your responsiveness to the needs of your market and members of your team as well as your ability to work well with all of the members of your team are areas that you will always do well."

25. Mr. Dinsmore went on to say, "You are a team player that is willing to help out at any time.  You are always willing to learn and you are very open to any suggested improvements that you can make... You are capable of high levels of performance which you have demonstrated in the past, just need to demonstrate that again in 2015."

26. In November of 2015, Mr. Caudle injured his back while working for Defendant.

27. Mr. Dinsmore had instructed Mr. Caudle to dismount a glass front plasma TV and fix Defendants' attached meter because it was malfunctioning.

28. Mr. Dinsmore did not assist Mr. Caudle with this task, and Mr. Caudle hurt his back which required him to endure three months of physical therapy on his back.

29. Because Mr. Caudle had exhausted his vacation and sick days, he was forced to seek his leave pursuant to the Family Medical Leave Act ("FMLA").

30. While on leave, Mr. Dinsmore contacted Mr. Caudle and told him he needed to hurry up and return to work because Mr. Dinsmore could not hold his job.

31. In 2014, Mr. Caudle also went through an annual audit review.

32. During an audit review, Defendant "randomly" selects a certain number of customer-houses and reviews the property to ensure that all televisions and streaming devices are properly metered.

33. Because the sample size is randomly selected, a field representative could have zero properties audited.  However, during Mr. Caudle's employment, the average was about 2-4 homes per field representative, per year.

34. In Mr. Caudle's 2014 audit review, he had thirteen properties "randomly" selected.

35. Eleven of these thirteen properties were eventually audited, and Mr. Caudle passed inspection for every one of them.

36.   Recognizing that having thirteen of his houses "randomly" selected amounted to a statistical impossibility, Mr. Caudle asked the audit review department why so many of his properties were chosen.

37.   The audit review department informed him that Mr. Dinsmore instructed the department to select all of Mr. Caudle's properties.

38.   In 2015, as in prior years, Mr. Caudle's 2015 Performance Evaluation was also positive.

39.   Mr. Dinsmore stated, "[y]ou certainly are a team player who is always willing to help a teammate whenever they ask for it – even if it means working the weekend or a late night.  Even if it means travelling to another market that is need – you have demonstrated that you will be [sic] whenever the help is needed and that is an admirable quality.  Your Nielsen homes tend to really like you a lot which is why I am never surprised when I hear 'Dave is such a good representative of your company' and I have heard that more than a few times…"

40.   Mr. Dinsmore went on to praise Mr. Caudle, stating that "[a]s said repeatedly already, you are a team player, [y]ou do take advice very well as you have stated, [y]ou are dependable, [n]ot afraid of OT – working as much as it takes to get the job done, [w]ork well with the MRs and the office staff, [w]illing to help others learn."

41.   In the early part of 2016, Mr. Caudle and his fiancée moved from Detroit to Farmington Hills, and Mr. Caudle made his transfer request to Mr. Dinsmore, per company policy.

42.   Defendants' policy pertaining to which geographic region each field representative would be assigned was based on the residence of the representative.

43.   However, in spite of this policy, Mr. Dinsmore denied Mr. Caudle's transfer request with no review.

44.     When Mr. Caudle questioned the fairness of the denial of the transfer request, Mr. Dinsmore told Mr. Caudle that some people aren't accustomed to dealing with "people like that."

45.     When Mr. Caudle further inquired as to what was meant by "people like that," Mr. Dinsmore explained that he liked his field representatives to deal with their "own people."

46.     Mr. Caudle, being African-American and having worked in a geographic region that catered to predominantly African-American clients, understood Mr. Dinsmore to be clearly referring to his race.

47.     Despite Mr. Dinsmore's denial of Mr. Caudle's single request, other employees were allowed to transfer geographic regions at their whim, with some having been granted as many as three transfer requests.

48.     In approximately April or May of 2016, Mr. Caudle applied, and began to interview, for an internal promotion to Defendants' audit review department.

49.     In June of 2016, Mr. Caudle was asked by Defendants to complete a survey that was only sent to employees that were African-American.

50.     Mr. Caudle refused to fill out this survey and notified his superiors that he felt the survey was inappropriate because the exclusive qualification to be a part of the sample was his race.

51.     In June of 2016, Mr. Caudle earned his promotion to the audit review department and was set to begin his new position in October 2016.

52.     However, in August of 2016, Mr. Caudle was unable to work due to his sickle cell anemia.

53.   Mr. Caudle had exhausted his vacation days and sick days, so per company policy, he was forced to seek leave pursuant to the Family Medical Leave Act ("FMLA").

54.   In late August of 2016, after consulting his doctors and providing Defendants with proper notice, Mr. Caudle began his FMLA leave.

55.   While on leave, a temporary out-of-town field representative named "Brian" filled in for Mr. Caudle in his geographic region.

56.   One of Mr. Caudle's customers stated that "Brian…began asking insulting questions, like if [Mr. Caudle] had ever offered us money or if [Mr. Caudle] had ever asked us if we had any televisions we didn't want metered."

57.   After consultation and release from his medical professionals, Mr. Caudle returned to work in late September or early October of 2016.

58.   Upon Mr. Caudle's return to work, Mr. Dinsmore told Mr. Caudle that his fellow employees were getting tired of covering his shifts.

59.   Mr. Caudle took it upon himself to gather his fellow employees and apologize to them if he was causing any additional strain.

60.   That same day, Mr. Caudle's coworker informed him that while he was on FMLA leave, the co-worker overheard Mr. Dinsmore complaining about Mr. Caudle's continued leaves of absence.

61.   On October 7, 2016, Mr. Caudle was placed on suspension pending an investigation because Defendants had accused Mr. Caudle of not metering all of the devices in three of his properties.

62.   However, Mr. Caudle had no knowledge of any "non-metered" devices in any of the rooms to which he was permitted access in those homes.

63.     Upon information and belief, this exact situation was found in many homes during the 2016 audit review, but these field representatives faced no repercussions.

64.     Furthermore, upon information and belief, none of the homes that were alleged to have "non-metered" devices were ever contacted by Defendants prior to Mr. Caudle being suspended nor during the investigation.

65.     Moreover, on October 10, 2016, one of Mr. Caudle's customers sent multiple emails to Defendants' high ranking officials, expressing the customer's dissatisfaction with the way Defendants treated her and her home after Mr. Caudle was suspended, and indicated that the family no longer wished to have their televisions and internet capable devices metered by Defendants.

66.     The customer wrote in the email that "[t]he only redeeming person we deal with was our service tech, [Mr. Caudle]. [Mr. Caudle] dutifully came to our home every time Nielsen's equipment malfunctioned, which was ALL THE TIME. [Mr. Caudle] did his job well and was exceptionally respectful of our schedules, our home, our children, and our pets."

67.     Subsequent to this e-mail, Mr. Dinsmore personally drove out to this customer's residence and picked up Defendants' equipment.

68.     Moreover, Mr. Dinsmore offered the customer $700 in gift cards because of the customer's dissatisfaction.

69.     Upon information and belief, $700 was an unprecedented amount for a client who was cancelling service.

70.     On October 12, 2016, Mr. Caudle was informed by a representative from HR that the investigation was finished and that he was terminated.

71.     When Mr. Caudle received his employee file, he noticed a changed and **unsigned** version of the alleged July 2014 performance improvement plan.

72.     In the new, unsigned performance improvement plan, there are five additional incidents mentioned.  However, the one Mr. Caudle signed only referred to the July 2014 PC meter rate.

73.     This unsigned performance improvement plan further contained a number of other irregularities:

    a.   The new performance improvement plan was signed by neither Mr. Dinsmore nor Mr. Caudle, despite the fact that, before that day, the only performance improvement plan Mr. Caudle had ever received was signed;

    b.   The document is dated "07/07/14"; however, the document speaks of an incident that occurred ten days in the future;

    c.   The document states that the date of occurrence was: "12/01/12-11/30/13".  This is three months before Mr. Caudle even began working for Defendants. Moreover, there are no listed incidents falling within any of these dates;

    d.   The additional alleged violations were negligible, such as checking the wrong gender box for a customer and incorrectly stating VCR and DVD players instead of VCR/DVD combo.

74.     Also concerning regarding Mr. Caudle's employment file was the fact that there was no evidence that any of the customers who owned the properties where the alleged violations took place had ever been contacted.

75.   To wit, one of the owners of the properties where Mr. Caudle allegedly incurred a violation reached out to Defendants multiple times expressly corroborating Mr. Caudle's account of the situation.

76.   When Mr. Caudle questioned human resources regarding this discrepancy, the representative inquired as to how Mr. Caudle could have known that Defendants had not contacted any of the customers regarding the alleged incident that lead to his termination.

77.   After Mr. Caudle explained that he had been in contact with them, the human resources representative remarked that it was inappropriate for Mr. Caudle to be contacting customers while he was on suspension.

78.   When he pressed further about the issue, Mr. Caudle was informed that his suspension had been handled by Mr. Dinsmore, and human resources did not play a large role.

79.   On or about October 24, 2016, Mr. Caudle filed a charge of discrimination with the Detroit office of the Equal Employment Opportunity Commission ("EEOC") on the basis of (1) retaliation; (2) disability; and (3) race.

80.   During the EEOC investigation, despite the fact that Mr. Caudle was terminated for alleged issues with three properties, Defendants took the position that there were only two properties that he failed to meter in accordance with company policy.

81.   On August 18, 2017, the EEOC issued a Notice of the Right to Sue letter, dated August 18, 2017.  **Exhibit A – Right to Sue Notice**.

82.   Mr. Caudle requests relief as described in the Prayer for Relief below.

## COUNT I

### RETALIATION IN VIOLATION OF TITLE VII

83.   Mr. Caudle incorporates by reference all allegations in the proceeding paragraphs.

84.     At all material times, Defendants were an employer covered by, and within the meaning of, Title VII of the Civil Rights Act of 1964 (Title VII), as amended.

85.     At all material times, Mr. Caudle was an employee covered by, and within the meaning of, Title VII of the Civil Rights Act of 1964 (Title VII), as amended.

86.     Defendants' conduct, as alleged herein, violated Title VII of the Civil Rights Act of 1964, which makes it unlawful to harass or retaliate against an employee for engaging in protected activity.

87.     A respondeat superior relationship existed because Mr. Dinsmore had the ability to undertake or recommend tangible decisions affecting Mr. Caudle or the authority to direct Mr. Caudle's daily work activity, as alleged in the statement of facts.

88.     Mr. Caudle engaged in protected activity when he took the following actions, including but not limited seeking treatment for his multiple workplace injuries and seeking and then receiving time off pursuant to the FMLA.

89.     Defendants, through their employees, had knowledge that Mr. Caudle engaged in protected behavior because Mr. Caudle gave direct notice to his supervisors.

90.     After Mr. Caudle engaged in protected activity, Defendants' agents thereafter harassed Mr. Caudle and took several adverse employment actions against Mr. Caudle because of that activity, as alleged in the statement of facts and herein, subjecting Mr. Caudle to severe or pervasive retaliatory harassment by a supervisor, including but not limited to suspending and subsequently terminating Mr. Caudle because he engaged in protected activity.

91.     Defendants and their agents' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Mr. Caudle's rights.

92.     Mr. Caudle notified Defendants and their agents of the unwelcomed conduct or communication and Defendants failed to remedy the unwelcomed conduct or communication.

93.     As a proximate result of the Defendants' discriminatory actions, Mr. Caudle has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

94.     As a result of those actions and consequent harms, Mr. Caudle has suffered such damages in an amount to be proved at trial.

95.     Mr. Caudle requests relief as described in the Prayer for Relief below.

## COUNT II
## RETALIATION IN VIOLATION OF THE ELLIOT-LARSEN CIVIL RIGHTS ACT ("ELCRA")
## (Reprisal of Allegations in Count I)

96.     Mr. Caudle incorporates by reference all allegations in the proceeding paragraphs.

97.     At all material times, Mr. Caudle was an employee, and Defendants were an employer covered by, and within the meaning of, the Michigan Elliott-Larsen Civil Rights Act, MCL 37.2101 et seq.

98.     Defendants' conduct, as alleged herein, violated the Michigan Elliott-Larsen Civil Rights Act, MCL 37.2101 et seq., which makes it unlawful to retaliate against an employee who has engaged in protected activity.

99.     A respondeat superior relationship existed because Mr. Dinsmore had the ability to undertake or recommend tangible decisions affecting Mr. Caudle or the authority to direct Mr. Caudle's daily work activity, as alleged in the statement of facts.

100.    Mr. Caudle engaged in protected activity when he took the following actions including

but not limited to seeking treatment for his multiple workplace injuries and seeking and then receiving time off pursuant to the FMLA.

101.	Defendants, through their employees, had knowledge that Mr. Caudle engaged in protected behavior because Mr. Caudle gave direct notice to his supervisors.

102.	After Mr. Caudle engaged in protected activity, Defendants' agents, including Mr. Dinsmore, thereafter harassed Mr. Caudle and took several adverse employment actions against Mr. Caudle because of that activity, as alleged in the statement of facts and herein, subjecting Mr. Caudle to severe or pervasive retaliatory harassment by a supervisor, including but not limited to suspending and subsequently terminating Mr. Caudle because he engaged in protected activity.

103.	Defendants and their agents' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Mr. Caudle's rights.

104.	Mr. Caudle notified Defendants' agents of the unwelcomed conduct or communication and Defendants failed to remedy the unwelcomed conduct or communication.

105.	As a proximate result of Defendants' discriminatory actions, Mr. Caudle has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

106.	As a result of those actions and consequent harms, Mr. Caudle has suffered such damages in an amount to be proved at trial.

107.	Mr. Caudle requests relief as described in the Prayer for Relief below.

## COUNT III
## RETALIATION IN VIOLATION OF THE FMLA

108.	Mr. Caudle incorporates by reference all allegations in the proceeding paragraphs.

109.    At all material times, Defendants were an employer covered by, and within the meaning of, 29 U.S.C § 2601 et seq.

110.    At all material times, Mr. Caudle was an employee covered by, and within the meaning of, 29 U.S.C. §2601 et seq.

111.    Mr. Caudle has worked for Defendants for over a year.

112.    Defendants' conduct, as alleged herein, violated the FMLA because Mr. Caudle was disciplined and then terminated from his place of employment because he took FMLA leave.

113.    A respondeat superior relationship existed because Mr. Dinsmore had the ability to undertake or recommend tangible decisions affecting Mr. Caudle or the authority to direct Mr. Caudle's daily work activity, as alleged in the statement of facts.

114.    In late September, Mr. Caudle availed himself to the protection of the FMLA statute when Mr. Caudle applied and qualified for FMLA leave based on his serious health condition of sickle cell anemia which causes powerful sudden pains in his chest, joint pain, dizziness, and fatigue, which made Mr. Caudle unable to perform an essential function of his job.

115.    Defendants had actual notice that Mr. Caudle applied and qualified for FMLA leave.

116.    Exactly three days after returning from FMLA leave, citing a complaint from a customer in which that customer denies making, Mr. Caudle was terminated from his steady employment of the last five years by Mr. Dinsmore, establishing a causal connection.

117.    Mr. Caudle requests relief as described in the Prayer for Relief below.

<u>**COUNT IV**</u>
**DISABILITY HARRASMENT-DISCRIMINATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT OF 1990 ("ADA")**

118.    Mr. Caudle incorporates by reference all allegations in the proceeding paragraphs.

119.    At all material times, Mr. Caudle was an employee, and Defendants were an employer, covered by and within the meaning of the ADA, 42 U.S.C. 42 U.S.C. § 12101 et seq.

120.    Mr. Caudle has a disability within the meaning of the ADA because he has sickle cell anemia.

121.    Defendants and their agents, including Mr. Dinsmore, knew that Mr. Caudle had a disability.

122.    A respondeat superior relationship existed because Mr. Dinsmore had the ability to undertake or recommend tangible decisions affecting Mr. Caudle or the authority to direct Mr. Caudle's daily work activity, as alleged in the statement of facts.

123.    Mr. Caudle's disability under the ADA is qualified, meaning that, with reasonable accommodation, he can perform the essential functions and duties of his job.

124.    Because of Mr. Caudle's disability, he was terminated from his employment, in violation of the ADA.

125.    Mr. Caudle requests relief as described in the Prayer for Relief below.

<u>**COUNT V**</u>
**DISABILITY HARRASMENT-DISCRIMINATION IN VIOLATION OF THE MICHIGAN PERSONS WITH DISABILITY ACT ("PWDCRA")**
<u>**(Reprisal of Allegations in Count IV)**</u>

126.    Mr. Caudle incorporates by reference all allegations in the proceeding paragraphs.

127.    At all material times, Mr. Caudle was an employee, and Defendants were an employer, covered by and within the meaning of the PWDCRA, MCL 37.1201 et seq.

128.   Mr. Caudle has a disability within the meaning of the PWDCRA because he has sickle cell anemia.

129.   Defendants and their agents, including Mr. Dinsmore, knew that Mr. Caudle had a disability.

130.   A respondeat superior relationship existed because Mr. Dinsmore had the ability to undertake or recommend tangible decisions affecting Mr. Caudle or the authority to direct Mr. Caudle's daily work activity, as alleged in the statement of facts.

131.   Mr. Caudle's disability is qualified, meaning that, with reasonable accommodation, he can perform the essential functions and duties of his job.

132.   Because of Mr. Caudle's disability, he was terminated from his employment, in violation of the PWDCRA.

133.   As a proximate result of Defendant's discriminatory actions, Mr. Caudle has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

134.   As a result of those actions and consequent harms, Mr. Caudle has suffered such damages in an amount to be proven at trial.

135.   Mr. Caudle requests relief as described in the Prayer for Relief below.

## <u>COUNT VI</u>
## RETALIATION IN VIOLATION OF THE PWDCRA

136.   Mr. Caudle incorporates by reference the allegations set forth above as if alleged herein.

137.   At all material times, Mr. Caudle was an employee, and Defendants were an employer, covered by and within the meaning of the PWDCRA, MCL 37.1201 et seq.

138.   The PWDCRA prohibits an employer from retaliating or discriminating against an

employee because they engaged in protected activity under the Act. MCL § 37.1602 Sec. 602 (f).

139.   A respondeat superior relationship existed because Mr. Dinsmore had the ability to undertake or recommend tangible decisions affecting Mr. Caudle or the authority to direct Mr. Caudle's daily work activity, as alleged in the statement of facts.

140.   Defendants violated the PWDCRA, MCL § 37.1602 Sec. 602 (f), when they engaged in the following actions, including, but not limited to, terminating Mr. Caudle's employment for an alleged violation of policy that was never investigated.

141.   Defendants' unlawful employment practices against Mr. Caudle were intentional.

142.   Defendants' unlawful employment practices were done with malice or with reckless indifference to Mr. Caudle's state and federally protected rights.

143.   As a proximate result of Defendants' discriminatory actions, Mr. Caudle has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

144.   As a result of those actions and consequent harms, Mr. Caudle has suffered such damages in an amount to be proven at trial.

145.   Mr. Caudle requests relief as described in the Prayer for Relief below.

<u>**COUNT VII**</u>
**HARRASMENT-DISCRIMINATION ON THE BASIS OF RACE**
**IN VIOLATION OF TITLE VII**

146.    Mr. Caudle incorporates by reference all allegations in the proceeding paragraphs

147.    At all material times, Defendants were an employer covered by, and within the meaning of, Title VII of the Civil Rights Act of 1964 (Title VII), as amended.

148.   At all material times, Mr. Caudle was an employee covered by, and within the meaning

of, Title VII of the Civil Rights Act of 1964 (Title VII), as amended.

149.    Defendant's conduct, as alleged herein, violated Title VII of the Civil Rights Act of 1964, which makes it unlawful to harass or retaliate against an employee for engaging in protected activity.

150.    A respondeat superior relationship existed because Mr. Dinsmore had the ability to undertake or recommend tangible decisions affecting Mr. Caudle or the authority to direct Mr. Caudle's daily work activity, as alleged in the statement of facts.

151.    Mr. Caudle, as an African-American, is a member of a protected class.

152.    Mr. Caudle was subjected to offensive communication or conduct on the basis of his membership in this protected class.

153.    The Defendant and its agents' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Mr. Caudle's rights.

154.    Mr. Caudle notified Defendant and its agents of the unwelcomed conduct or communication and Defendant failed to remedy the unwelcomed conduct or communication.

155.    The unwelcomed conduct or communication was intended to or in fact did substantially interfere with Mr. Caudle's employment and created an intimidating, hostile, or offensive work environment, as alleged in the statement of facts.

156.    As a proximate result of the Defendants' discriminatory actions, Mr. Caudle has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

157.    As a result of those actions and consequent harms, Mr. Caudle has suffered such damages in an amount to be proven at trial.

158.    Mr. Caudle requests relief as described in the Prayer for Relief below.

## COUNT VIII
## HARRASMENT-DISCRIMINATION ON THE BASIS OF RACE
## IN VIOLATION OF THE ELCRA
## (Reprisal of Allegations in Count VII)

159.    Mr. Caudle incorporates by reference all allegations in the proceeding paragraphs.

160.    At all material times, Mr. Caudle was an employee, and Defendants were an employer covered by, and within the meaning of, the Michigan Elliott-Larsen Civil Rights Act, MCL 37.2101 et seq.

161.    Defendants' conduct, as alleged herein, violated Michigan, Elliott-Larsen Civil Rights Act MCL 37.2101 et seq., which makes it unlawful to harass an employee because of their national origin.

162.    A respondeat superior relationship existed because Mr. Dinsmore had the ability to undertake or recommend tangible decisions affecting Mr. Caudle or the authority to direct Mr. Caudle's daily work activity, as alleged in the statement of facts.

163.    Mr. Caudle, as an African-American, is a member of a protected class.

164.    Mr. Caudle was subjected to offensive communication or conduct on the basis of his membership in this protected class.

165.    The communication and conduct was unwelcomed.

166.    The unwelcomed conduct or communication was intended to or in fact did substantially interfere with the Mr. Caudle's employment or created an intimidating, hostile, or offensive work environment as alleged in the statement of facts.

167.    Mr. Caudle notified Defendants of the unwelcomed conduct or communication and Defendants failed to remedy the unwelcomed conduct or communication.

168.     As a direct and proximate result of the Defendants' wrongful acts and omissions, Mr. Caudle has sustained loss of earnings, earning capacity, and fringe benefits and has suffered mental anguish, emotional distress, humiliation and embarrassment, and loss of professional reputation.

169.     Mr. Caudle requests relief as described in the Prayer for Relief below.

<div align="center">

**COUNT IX**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

</div>

170.     Mr. Caudle incorporates by reference the allegations set forth above as if alleged herein.

171.     A respondeat superior relationship existed because Mr. Dinsmore had the ability to undertake or recommend tangible decisions affecting Mr. Caudle or the authority to direct Mr. Caudle's daily work activity, as alleged in the statement of facts.

172.     Defendants or their agents knew or reasonably should have known that the conduct described herein would and did proximately result in physical and emotional distress to Mr. Caudle.

173.     At all relevant times, Defendants or their agents had the power, ability, authority, and duty to stop engaging in the conduct described herein and/or to intervene to prevent or prohibit said conduct.

174.     As a direct and proximate result of Defendant's unlawful conduct, Mr. Caudle has suffered and continues to suffer severe emotional distress, humiliation, anguish, emotional and physical injuries, as well as economic losses and compensatory damages in an amount to be proven at trial.

175.     As such, Mr. Caudle is entitled to relief as set forth below

## **RELIEF REQUESTED**

PLAINTIFF, RICHARD CAUDLE, RESPECTFULLY REQUESTS that this Court enter judgment against Defendant as follows:

1.  Compensatory damages in whatever amount to which Mr. Caudle is entitled;

2.  Exemplary damages in whatever amount which Mr. Caudle is entitled;

3.  An award of lost wages and the value of fringe benefits, past and future;

4.  An award of interest, costs, and reasonable attorney fees; and

5.  An order awarding whatever other equitable relief appears appropriate at the time of final judgment.


## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.


Dated:  November 16, 2017

<div style="margin-left: 40%;">

Respectfully Submitted,

/s/ Carla D. Aikens_____
Carla D Aikens (P69530)
Carla D. Aikens, P.C.
Attorneys for Plaintiff
615 Griswold Ste. 709
Detroit, MI 48226
carla@aikenslawfirm.com

</div>