IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| DAVID CAUDLE, | ) | |
|---|---|---|
| PLAINTIFF, | ) | |
| | ) | CIVIL ACTION NO. 17-cv-13737 |
| VS. | ) | |
| | ) | |
| THE NIELSEN COMPANY (U.S.), L.L.C. | ) | |
| | ) | HON. MARK A. GOLDSMITH |
| DEFENDANT. | ) | |
| | ) | |
| | ) | |

## **COMPLAINT**

PLAINTFF, DAVID CAUDLE ("Mr. Caudle"), by and through his attorneys, CARLA D. AIKENS, P.C., submits the following Complaint against DEFENDANT, THE NIELSEN COMPANY (U.S.), L.L.C.

## **JURY DEMAND**

COMES NOW PLAINTIFF, DAVID CAUDLE, and hereby makes his demand for trial by jury.

## **JURISDICTION**

1. At all times relevant to this action Mr. Caudle was a resident of the State of Michigan.

2. Defendant is a corporation, which has a continuous and systematic place of business at 27600 Northwestern Hwy # 120, Southfield, MI 48034.

3. All relevant actions giving rise to this complaint took place in Wayne County, Michigan.

4. This action is brought in this Court on the basis of federal question jurisdiction, pursuant to Title VII of the Civil Rights Act of 1964, 42 USC 2000e et seq.

1

5. Pursuant to 28 U.S.C. §1367, this Court has supplemental jurisdiction over Mr. Caudle's state law claims.

## VENUE

6. Venue is proper in the Eastern District of Michigan pursuant to Section 706(f)(3) of Title VII, 42 U.S.C. § 2000e-5(f)(3), because the unlawful employment discrimination giving rise to Mr. Caudle's claims occurred in this District.

## STATEMENT OF FACTS

7. Mr. Caudle was hired by Defendant as a Field Representative in May of 2012.

8. Defendant's field representatives are responsible for attaching Defendant's equipment to each television ("metering"), and if possible, all streaming devices within each of their individual client's homes.

9. Also, Defendant's field representatives are encouraged to persuade their existing customers into allowing Defendant to meter their internet connection ("PC metering").

10. Mr. Caudle was successful at his job.

11. Mr. Caudle had been named employee of the month over five times while working for Defendant-Employer.

12. During Mr. Caudle's employment with Defendant, his direct manager, Mr. Ryan Dinsmore ("Mr. Dinsmore"), made passing comments that he was sick of all the sick leave.

13. Mr. Caudle suffers from the disease sickle cell anemia.

14. In 2013 Mr. Caudle was required to miss a short period of time due to his disease.

15. Mr. Caudle, per company policy, used his sick and absent days first, and returned to work promptly.

16. Defendant requires its field representatives to have a certain percentage of their properties PC metered.

17. Mr. Caudle's percentage was below what was required from a field representative in 2014.

18. Mr. Caudle and Mr. Dinsmore went out to dinner discussed how Mr. Caudle sought to improve this aspect of this employment.

19. After this discussion, the two men created a performance improvement plan and **signed** the document.

20. Upon information and belief, no field representative met the requisite percentage.

21. However, upon information and belief, Mr. Caudle was the only field representative that faced a negative employment consequence because of this.

22. Mr. Caudle is specifically aware of numerous field representatives that did not meet the requisite percentage in 2014.

23. In Mr. Caudle's 2014 Nielsen Performance Evaluation Mr. Dinsmore gave Mr. Caudle a very favorable review.

24. Specifically, he opined, "I truly believe that your responsiveness to the needs of your market and members of your team as well as your ability to work well with all of the members of your team are areas that you will always do well."

25. Mr. Dinsmore went on to say, "You are a team player that is willing to help out at any time. You are always willing to learn and you are very open to any suggested improvements that you can make… You are capable of high levels of performance which you have demonstrated in the past, just need to demonstrate that again in 2015."

26. In November of 2015 Mr. Caudle injured his back while working for Defendant.

27. Mr. Dinsmore told Mr. Caudle to dismount a glass front plasma TV and fix Defendant's attached meter because it was malfunctioning.

28. Mr. Dinsmore did not assist Mr. Caudle with this task and Mr. Caudle hurt his back and required Mr. Caudle to endure three months of physical therapy on his back.

29. Mr. Caudle had exhausted his vacation and sick days so he was forced to seek his leave pursuant to the Family Medical Leave Act ("FMLA").

30. While on leave, Mr. Dinsmore contacted Mr. Caudle and told him he needed to hurry up and get back because Mr. Dinsmore could not hold his job.

31. In 2014, Mr. Caudle had thirteen of his properties "randomly selected" for the annual field representative audit review.

32. Mr. Caudle passed the inspection for every property.

33. During an audit review, Defendant inspects "randomly selected" properties to see whether the property's field representative has every television and streaming device metered.

34. Generally, for the duration of Mr. Caudle's employment, each field representative would have two-four of their properties' randomly selected.

35. Recognizing that having thirteen of his houses "randomly selected" amounted to almost a statistical impossibility, Mr. Caudle asked the audit review department why so many of his properties were chosen.

36. Mr. Thompson was informed by an employee in the audit review department that Mr. Dinsmore instructed the department to pull every one of Mr. Caudle's properties.

37. Like every year of Mr. Caudle's employment with Defendant, Mr. Caudle's 2015 Performance Evaluation was also positive.

38. Mr. Dinsmore stated, "[y]ou certainly are a team player who is always willing to help a teammate whenever they ask for it – even if it means working the weekend or a late night. Even if it means travelling to another market that is need – you have demonstrated that you will be [sic] whenever the help is needed and that is an admirable quality. Your Nielsen homes tend to really like you a lot which is why I am never surprised when I hear 'Dave is

4

such a good representative of your company' and I have heard that more than a few times…"

39. Mr. Dinsmore went on to bullet point some of Mr. Caudle's attributes and stated, "[a]s said repeatedly already, you are a team player, [y]ou do take advice very well as you have stated, [y]ou are dependable, [n]ot afraid of OT – working as much as it takes to get the job done, [w]ork well with the MRs and the office staff, [w]illing to help others learn."

40. Defendant's policy pertaining to which geographic region each field representative is assigned is based on where that specific representative resides.

41. In the early or middle of 2016, Mr. Caudle and his fiancé moved to Farmington Hills and Mr. Caudle made his transfer request to Mr. Dinsmore per company policy.

42. Mr. Dinsmore denied Mr. Caudle's transfer request with no review.

43. When Mr. Caudle questioned the fairness of that decision, Mr. Dinsmore responded by explaining to Mr. Caudle some people aren't accustomed to dealing with people like that.

44. When Mr. Caudle further inquired, Mr. Dinsmore went on to explain that he liked his field representatives to deal with their own people.

45. Mr. Caudle being African-American, and in a geographic region that catered to predominantly African-American clients, understood Mr. Dinsmore to be clearly referring to his race.

46. Other employees were allowed to transfer geographic regions at their whim.

47. For instance, upon reason and belief, Mr. James Hardy had requested, and been granted, a transfer of location three separate times.

48. Around April or May of 2016, Mr. Caudle applied, and began to interview, for an internal promotion to Defendant-Employer's audit review department.

49. In June of 2016, Mr. Caudle was asked to complete a survey that was only sent to employees that were African-American.

50. Mr. Caudle refused to fill out this survey and notified his superior's that he felt the survey was inappropriate because the exclusive qualification to be a part of the sample was his race.

51. In June of 2016, Mr. Caudle earned his promotion to the audit review department and was supposed to begin in October.

52. In August of 2016, Mr. Caudle's disease kept him from working.

53. Mr. Caudle had exhausted his vacation days and sick days, so per company policy, he was forced to seek leave pursuant to the Family Medical Leave Act ("FMLA").

54. In late August, after consulting his doctors and providing Defendant with proper notice, Mr. Caudle began his FMLA leave.

55. While on leave, a temporary out-of-town field representative named Brian filled in for Mr. Caudle in his geographic region.

56. "Brian…began asking insulting questions, like if [Mr. Caudle] had ever offered us money or if [Mr. Caudle] had ever asked us if we had any televisions we didn't want metered."

57. After consultation and release from his medical professionals, Mr. Caudle returned to work in late September or early October.

58. Upon Mr. Caudle's return to work, Mr. Dinsmore told Mr. Caudle that his fellow employees were getting sick of covering his shifts.

59. Mr. Caudle took it upon himself to gather his fellow employees and apologize to them if he was causing any additional strain.

60. The overwhelming reaction was that this was the case.

61. That same day, a co-worker of Mr. Caudle's informed him that while he was on FMLA leave, the co-worker overheard Mr. Dinsmore complaining about Mr. Caudle's leaves.

62. On October 7, 2016, Mr. Caudle was placed on suspension pending an investigation.

63. Defendant accused Mr. Caudle of not metering all of the devices in three of his properties.

64. The properties were the households of the Rusanchins, the Mills, and the Carvajos.

65. Mr. Caudle does not deny the possibility of this occurrence, however, maintains that if this were the case he had no knowledge of the devices and did not have access to the rooms they were in.

66. Upon information and belief, this exact situation was found in many homes during the 2016 audit review, however, Mr. Caudle was the only person terminated.

67. A representative from all each family confirmed this to Mr. Caudle directly.

68. Moreover, October 10, 2017, Ms. Rusanchin confirmed this fact directly to twenty of Defendant's high-ranking officials via multiple e-mails.

69. The e-mail went on to emphatically express her dissatisfaction with the way Defendant treated her and her home, and her wishes to no longer have her televisions and internet capable devices metered by Defendant.

70. Important to note in the e-mail was the glowing evaluation of Mr. Caudle.

71. Ms. Rusanchin wrote, "[t]he only redeeming person we deal with was our service tech, [Mr. Caudle]. [Mr. Caudle] dutifully came to our home every time Nielsen's equipment malfunctioned, which was ALL THE TIME. [Mr. Caudle] did his job well and was exceptionally respectful of our schedules, our home, our children, and our pets."

72. Subsequent to this e-mail, Mr. Dinsmore personally drove out to Ms. Rusanchin's residence and picked up her equipment.

73. Moreover, Mr. Dinsmore offered Ms. Rusanchin $700 dollars in gift cards because of her dissatisfaction.

74. Upon information and belief, $700 was an unprecedented amount for a client who was cancelling her service.

75. On October 12, 2016, Mr. Caudle was informed by a representative from HR that the investigation was finished and that he was terminated.

76. When Mr. Caudle received his employee file, inside his employment documents was a changed and **unsigned** version of the alleged July 2014 performance improvement plan.

77. In the new unsigned performance improvement plan, there are five additional incidents mentioned, however, the one Mr. Caudle signed only referred to the July 2014 PC meter rate.

78. This document had a few other peculiarities.

79. First, the new performance improvement plan was not signed by either Mr. Dinsmore nor Mr. Caudle despite the fact that, before that day, the only performance improvement plan Mr. Caudle had ever been a party to was signed.

80. Second, the document is dated "07/07/14", however, the document speaks of an incident that occurred ten days in the future.

81. Third, the document states that the date of occurrence was: "12/01/12-11/30/13". This is three months before Mr. Caudle began working for Defendant.

82. Lastly, the additional alleged violations were negligible, such as, checking the wrong gender box for a customer and incorrectly stating VCR and DVD players instead of VCR/DVD combo.

83. Also concerning, despite already being terminated, none of the customers who owned the properties where the alleged violations took place were contacted.

84. Moreover, one of the owners of one of the three properties, Ms. Rusanchin, reached out to Defendant multiple times expressly corroborating Mr. Caudle's account of the situation.

85. Mr. Caudle questioned human resources as to this very fact.

86. Instead of answering his question, the representative of human resources inquired as to how Mr. Caudle could have known that Defendant not contacted any of the customers regarding the alleged discrepancy that lead to his termination.

87. Mr. Caudle explained that he had been in contact with them.

88. The representative of human resources then remarked that it was inappropriate for Mr. Caudle to be contacting customers while he was on suspension.

89. When he followed up on that point Mr. Caudle was informed that his suspension had been handled by Mr. Dinsmore, and human resources did not play a large role.

90. On or about October 24, 2016, Mr. Caudle filed a charge of discrimination with the Detroit office of the Equal Employment Opportunity Commission ("EEOC") on the basis of (1) retaliation; (2) disability; and (3) race.

91. Interesting enough, during the EEOC investigation, Mr. Dinsmore took the position that there were only two properties that were not metered pursuant to company policy.

92. The EEOC issued a Notice of Mr. Caudle's Right to Sue, dated August 18, 2017.  **Exhibit A – Right to Sue Notice**.

Mr. Caudle requests relief as described in the Prayer for Relief below.

## COUNT I
## RETALIATION IN VIOLATION OF TITLE VII

93. Mr. Caudle incorporates by reference all allegations in the proceeding paragraphs.

94. At all material times, Defendant was an employer covered by, and within the meaning of, Title VII of the Civil Rights Act of 1964 (Title VII), as amended.

95. At all material times, Mr. Caudle was an employee covered by, and within the meaning of, Title VII of the Civil Rights Act of 1964 (Title VII), as amended.

96. Defendant's conduct, as alleged herein, violated Title VII of the Civil Rights Act of 1964, which makes it unlawful to harass or retaliate against an employee for engaging in protected activity.

97. A respondeat superior relationship existed because Mr. Dinsmore had the ability to undertake or recommend tangible decisions affecting Mr. Caudle or the authority to direct Mr. Caudle's daily work activity, as alleged in the statement of facts.

98. Mr. Caudle engaged in protected activity when he took the following actions including but not limited seeking treatment for his multiple workplace injuries and seeking and then receiving time off pursuant to FMLA.

99. Defendant, through its employees, had knowledge that Mr. Caudle engaged in protected behavior because Mr. Caudle gave direct notice to his supervisors.

100. After Mr. Caudle engaged in protected activity, Defendant's agents thereafter harassed Mr. Caudle and took several adverse employment actions against Mr. Caudle because of that activity, as alleged in the statement of facts and herein, subjecting Mr. Caudle to severe or pervasive retaliatory harassment by a supervisor, including but not limited to suspending and subsequently terminating Mr. Caudle because he engaged in protected activity.

101. Defendant and its agents' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Mr. Caudle's rights.

102. Mr. Caudle notified Defendant and its agents of the unwelcomed conduct or communication and Defendant failed to remedy the unwelcomed conduct or communication.

103. As a proximate result of the Defendant's discriminatory actions, Mr. Caudle has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

104. As a result of those actions and consequent harms, Mr. Caudle has suffered such damages in an amount to be proved at trial.

105. Mr. Caudle requests relief as described in the Prayer for Relief below.

### COUNT II
### RETALIATION IN VIOLATION OF THE
### ELLIOT-LARSEN CIVIL RIGHTS ACT
### ("ELCRA")
### (Reprisal of Allegations in Count I)

106. Mr. Caudle incorporates by reference all allegations in the proceeding paragraphs.

107. At all material times, Mr. Caudle was an employee, and Defendant was an employer covered by, and within the meaning of, the Michigan Elliott-Larsen Civil Rights Act, MCL 37.2101 et seq.

108. Defendant's conduct, as alleged herein, violated the Michigan Elliott-Larsen Civil Rights Act, MCL 37.2101 et seq., which makes it unlawful to retaliate against an employee who has engaged in protected activity.

109. A respondeat superior relationship existed because Mr. Dinsmore had the ability to undertake or recommend tangible decisions affecting Mr. Caudle or the authority to direct Mr. Caudle's daily work activity, as alleged in the statement of facts.

110. Mr. Caudle engaged in protected activity when he took the following actions including but not limited to seeking treatment for his multiple workplace injuries and seeking and then receiving time off pursuant to FMLA.

111. Defendant, through its employees, had knowledge that Mr. Caudle engaged in protected behavior because Mr. Caudle gave direct notice to his supervisors.

112. After Mr. Caudle engaged in protected activity, Defendant's agents thereafter harassed Mr. Caudle and took several adverse employment actions against Mr. Caudle because of that activity, as alleged in the statement of facts and herein, subjecting Mr. Caudle to severe or

pervasive retaliatory harassment by a supervisor, including but not limited to suspending and subsequently terminating Mr. Caudle because he engaged in protected activity.

113. Defendant and its agents' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Mr. Caudle's rights.

114. Mr. Caudle notified Defendant's agents of the unwelcomed conduct or communication and Defendant failed to remedy the unwelcomed conduct or communication.

115. As a proximate result of Defendant's discriminatory actions, Mr. Caudle has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

116. As a result of those actions and consequent harms, Mr. Caudle has suffered such damages in an amount to be proved at trial.

117. Mr. Caudle requests relief as described in the Prayer for Relief below.

## COUNT III
## RETALIATION IN VIOLATION OF THE FMLA

118. Mr. Caudle incorporates by reference all allegations in the proceeding paragraphs.

119. At all material times, Defendant was an employer covered by, and within the meaning of 29 U.S.C § 2601 et seq.

120. At all material times, Mr. Caudle was an employee covered by, and within the meaning of, 29 U.S.C. §2601 et seq.

121. Mr. Caudle has worked for Defendant for over a year.

122. Defendant's conduct, as alleged herein, violated the FMLA because Mr. Caudle was disciplined and then terminated from his place of employment because he took FMLA leave.

123. A respondeat superior relationship existed because Mr. Dinsmore had the ability to undertake or recommend tangible decisions affecting Mr. Caudle or the authority to direct Mr. Caudle's daily work activity, as alleged in the statement of facts.

124. In late September, Mr. Caudle availed himself to the protection of the FMLA statute when Mr. Caudle applied and qualified for FMLA leave based on his serious health condition of sickle cell anemia which causes powerful sudden pains in his chest, joint pain, dizziness, and fatigue, which made Mr. Caudle unable to perform an essential function of his job.

125. Defendant had actual notice that Mr. Caudle applied and qualified for FMLA leave.

126. Exactly three days after returning from FMLA leave, citing a complaint from a customer in which that customer denies making, Mr. Caudle was terminated from his steady employment of the last five years, establishing a causal connection.

127. Mr. Caudle requests relief as described in the Prayer for Relief below.

## COUNT IV
### DISABILITY HARRASMENT-DISCRIMINATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT OF 1990 ("ADA")

128. Mr. Caudle incorporates by reference all allegations in the proceeding paragraphs.

129. At all material times, Mr. Caudle was an employee, and Defendant was an employer, covered by and within the meaning of the ADA, 42 U.S.C. § 12101 et seq.

130. Mr. Caudle has a disability within the meaning of the ADA.

131. Mr. Caudle's disability under the ADA is qualified, meaning that, with reasonable accommodation, he can perform the essential functions and duties of his job.

132. Because of Mr. Caudle's disability, he was terminated from his employment, in violation of the ADA.

133. Mr. Caudle requests relief as described in the Prayer for Relief below.

## COUNT V
### DISABILITY HARRASMENT-DISCRIMINATION IN VIOLATION OF THE MICHIGAN PERSONS WITH DISABILITY ACT ("PWDCRA")
### (Reprisal of Allegations in Count IV)

134. Mr. Caudle incorporates by reference all allegations in the proceeding paragraphs.

135. At all material times, Mr. Caudle was an employee, and Defendant was an employer, covered by and within the meaning of the PWDCRA, MCL 37.1201 et seq.

136. Mr. Caudle has a disability within the meaning of the PWDCRA.

137. Mr. Caudle's disability is qualified, meaning that, with reasonable accommodation, he can perform the essential functions and duties of his job.

138. Because of Mr. Caudle's disability, he was terminated from his employment, in violation of the PWDCRA.

139. As a proximate result of Defendant's discriminatory actions, Mr. Caudle has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

140. As a result of those actions and consequent harms, Mr. Caudle has suffered such damages in an amount to be proven at trial.

141. Mr. Caudle requests relief as described in the Prayer for Relief below.

## COUNT VI
## RETALIATION IN VIOLATION OF THE PWDCRA

142. Mr. Caudle incorporates by reference the allegations set forth above as if alleged herein.

143. At all material times, Mr. Caudle was an employee, and Defendant was an employer, covered by and within the meaning of the PWDCRA, MCL 37.1201 et seq.

144. The PWDCRA prohibits an employer from retaliating or discriminating against an employee because they engaged in protected activity under the Act. MCL § 37.1602 Sec.602 (f).

145. Defendant violated the PWDCRA, MCL § 37.1602 Sec. 602 (f), when it engaged in the following actions, including, but not limited to, terminating Mr. Caudle's employment for an alleged violation of policy that was never investigated.

146. Defendant's unlawful employment practices against Mr. Caudle were intentional.

147. Defendant's unlawful employment practices were done with malice or with reckless indifference to Mr. Caudle's state and federally protected rights.

148. As a proximate result of Defendant's discriminatory actions, Mr. Caudle has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

149. As a result of those actions and consequent harms, Mr. Caudle has suffered such damages in an amount to be proven at trial.

150. Mr. Caudle requests relief as described in the Prayer for Relief below.

## COUNT VII
## HARRASMENT-DISCRIMINATION ON THE BASIS OF RACE IN VIOLATION OF TITLE VII

151. Mr. Caudle incorporates by reference all allegations in the proceeding paragraphs.

152. At all material times, Defendant was an employer covered by, and within the meaning of, Title VII of the Civil Rights Act of 1964 (Title VII), as amended.

153. At all material times, Mr. Caudle was an employee covered by, and within the meaning of, Title VII of the Civil Rights Act of 1964 (Title VII), as amended.

154. Defendant's conduct, as alleged herein, violated Title VII of the Civil Rights Act of 1964, which makes it unlawful to harass or retaliate against an employee for engaging in protected activity.

155. A respondeat superior relationship existed because Mr. Dinsmore had the ability to undertake or recommend tangible decisions affecting Mr. Caudle or the authority to direct Mr. Caudle's daily work activity, as alleged in the statement of facts.

156. Mr. Caudle, as an African-American, is a member of a protected class.

157. Mr. Caudle was subjected to offensive communication or conduct on the basis of his membership in this protected class.

158. The Defendant and its agents' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Mr. Caudle's rights.

159. Mr. Caudle notified Defendant and its agents of the unwelcomed conduct or communication and Defendant failed to remedy the unwelcomed conduct or communication.

160. The unwelcomed conduct or communication was intended to or in fact did substantially interfere with the Mr. Caudle's employment and created an intimidating, hostile, or offensive work environment, as alleged in the statement of facts.

161. As a proximate result of the Defendant's' discriminatory actions, Mr. Caudle has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.

162. As a result of those actions and consequent harms, Mr. Caudle has suffered such damages in an amount to be proven at trial.

163. Mr. Caudle requests relief as described in the Prayer for Relief below.

## COUNT VIII
## HARRASMENT-DISCRIMINATION ON THE BASIS OF RACE IN VIOLATION OF THE ELCRA
### (Reprisal of Allegations in Count VII)

164. Mr. Caudle incorporates by reference all allegations in the proceeding paragraphs.

165. At all material times, Mr. Caudle was an employee, and Defendant was an employer covered by, and within the meaning of, the Michigan Elliott-Larsen Civil Rights Act, MCL 37.2101 et seq.

166. Defendant's conduct, as alleged herein, violated Michigan, Elliott-Larsen Civil Rights Act MCL 37.2101 et seq., which makes it unlawful to harass an employee because of their national origin.

167. A respondeat superior relationship existed because Mr. Dinsmore had the ability to undertake or recommend tangible decisions affecting Mr. Caudle or the authority to direct Mr. Caudle's daily work activity, as alleged in the statement of facts.

168. Mr. Caudle, as an African-American, is a member of a protected class.

169. Mr. Caudle was subjected to offensive communication or conduct on the basis of his membership in this protected class.

170. The communication and conduct was unwelcomed.

171. The unwelcomed conduct or communication was intended to or in fact did substantially interfere with the Mr. Caudle's employment or created an intimidating, hostile, or offensive work environment as alleged in the statement of facts.

172. Mr. Caudle notified Defendant of the unwelcomed conduct or communication and Defendant failed to remedy the unwelcomed conduct or communication.

173. As a direct and proximate result of the Defendant's wrongful acts and omissions, Mr. Caudle has sustained loss of earnings, earning capacity, and fringe benefits and has suffered mental anguish, emotional distress, humiliation and embarrassment, and loss of professional reputation.

174. Mr. Caudle requests relief as described in the Prayer for Relief below.

## COUNT IX
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

175. Mr. Caudle incorporates by reference the allegations set forth above as if alleged herein.

176. Defendant, or the Defendant's agents, knew or reasonably should have known that the conduct described herein would and did proximately result in physical and emotional distress to Mr. Caudle.

177. At all relevant times, Defendant, or Defendant's agents had the power, ability, authority, and duty to stop engaging in the conduct described herein and/or to intervene to prevent or prohibit said conduct.

178. As a direct and proximate result of Defendant's unlawful conduct, Mr. Caudle has suffered and continues to suffer severe emotional distress, humiliation, anguish, emotional and physical injuries, as well as economic losses and compensatory damages in an amount to be proven at trial.

As such, Mr. Caudle is entitled to relief as set forth below

## **RELIEF REQUESTED**

PLAINTIFF, DAVID CAUDLE, RESPECTFULLY REQUESTS that this Court enter judgment against Defendant as follows:

1. compensatory damages in whatever amount above $25,000 to which Mr. Caudle is entitled,
2. exemplary damages in whatever amount above $25,000 which Mr. Caudle is entitled,
3. an award of lost wages and the value of fringe benefits, past and future,
4. an award of interest, costs, and reasonable attorney fees, and
5. an order awarding whatever other equitable relief appears appropriate at the time of final judgment.

Dated:  April 13, 2018

        Respectfully Submitted,

        /s/ Carla D. Aikens
        Carla D Aikens (P69530)
        Connor Gallagher (P82104)
        Carla D. Aikens, P.C.
        Attorneys for Mr. Caudle
        615 Griswold Ste. 709
        Detroit, MI 48226
        carla@aikenslawfirm.com