1

# In the Matter Of:

## CAUDLE vs THE NIELSEN COMPANY (US), LLC

## DAVID CAUDLE

May 15, 2019

*Prepared for you by*



**Bingham Farms/Southfield • Grand Rapids**

Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw • Troy

CAUDLE, DAVID
05/15/2019                                                                    Pages 57–60

| | Page 57 |
|---|---|
| 1 | because you were going to be terminated? |
| 2 | MR. GALLAGHER:  Object to the form of that |
| 3 | question. |
| 4 | MS. NORRIS:  Well, he can answer.  If they |
| 5 | said we're going to fire you and he said he quit, he |
| 6 | knows if that happened or not.  He can answer. |
| 7 | MR. GALLAGHER:  I'm not telling him not to |
| 8 | answer. |
| 9 | A.   Not that I know of, no. |
| 10 | BY MS. NORRIS: |
| 11 | Q.   Okay.  Have you ever had your own business? |
| 12 | A.   No. |
| 13 | Q.   Did you file taxes in 2015, 2016 and 2017? |
| 14 | A.   I believe so. |
| 15 | Q.   Okay.  I'm not suggesting you didn't, don't look -- |
| 16 | you looked at me like I'm accusing you of something. |
| 17 | I'm just entitled to see what documents exist and |
| 18 | that's one of my questions. |
| 19 | When did you first apply for a position |
| 20 | with Nielsen? |
| 21 | A.   I don't remember when I first applied. |
| 22 | Q.   Did you apply more than once? |
| 23 | A.   Not that I know of. |
| 24 | Q.   What did you have to do to get the job?  What was the |
| 25 | process? |

| | Page 58 |
|---|---|
| 1 | A.   I met Ryan Dinsmore at the Marriott in Southfield, |
| 2 | Michigan with a room full of other people. |
| 3 | Q.   Was it some kind of job fair? |
| 4 | A.   No, it wasn't a job fair.  It was a testing and it was |
| 5 | different test questions you have to answer.  And he |
| 6 | asked questions and depending on how you answered the |
| 7 | questions while doing the test, if he felt you were |
| 8 | customer relatable to someone he would want to hire |
| 9 | and not someone that was single-minded, that would -- |
| 10 | like knew another customer -- if they were talking to |
| 11 | you, if they were home, he hired you. |
| 12 | Q.   So it's your understanding that Ryan based his |
| 13 | decision, in part, on how you did on the test and, in |
| 14 | part, on how you related? |
| 15 | A.   That's what he told me. |
| 16 | Q.   Okay.  Was anybody else involved in that other than |
| 17 | Mr. Dinsmore? |
| 18 | A.   I don't know. |
| 19 | Q.   As far as you know, did Ryan Dinsmore make the |
| 20 | decision to hire you? |
| 21 | A.   I believe so. |
| 22 | Q.   And did Mr. Dinsmore tell you that that was why he |
| 23 | hired you when he made the offer? |
| 24 | A.   Yes. |
| 25 | Q.   Did he make the offer there on site or did you have to |

| | Page 59 |
|---|---|
| 1 | wait? |
| 2 | A.   I had to wait.  I found all that information out |
| 3 | later.  I was not told any of that during the testing. |
| 4 | Q.   Throughout your employment with Nielsen, did |
| 5 | Mr. Dinsmore compliment you and give you good reviews |
| 6 | on your relationships with your homeowners? |
| 7 | A.   Yes. |
| 8 | Q.   Did you have to provide a resumé of any kind? |
| 9 | A.   Yes. |
| 10 | Q.   Do you know what that resumé showed about your prior |
| 11 | employment? |
| 12 | A.   I can't recall. |
| 13 | Q.   Do you know if it showed the gaps in the employment |
| 14 | that we've talked about? |
| 15 | A.   Yes. |
| 16 | Q.   Other than talking to Mr. Dinsmore at the Marriott, |
| 17 | did you have to talk to anybody else before you got |
| 18 | the job? |
| 19 | A.   I think I talked to someone in HR once. |
| 20 | Q.   Was that after the Marriott issue? |
| 21 | A.   I'm not sure if it was before or after. |
| 22 | Q.   And do you remember who that was? |
| 23 | A.   No. |
| 24 | Q.   Do you remember what they said? |
| 25 | A.   It was a brief -- I think it was asking me if I was |

| | Page 60 |
|---|---|
| 1 | interested in a job and then a couple of questions |
| 2 | about it. |
| 3 | Q.   Okay.  When you talked to Mr. Dinsmore at the |
| 4 | Marriott, I'm not familiar with this process, so |
| 5 | you're in a hotel conference area? |
| 6 | A.   Yes. |
| 7 | Q.   And there are many people; is that right? |
| 8 | A.   Yes. |
| 9 | Q.   Are all those people looking for jobs? |
| 10 | A.   Yes. |
| 11 | Q.   Are there people other than Mr. Dinsmore talking to |
| 12 | them? |
| 13 | A.   No. |
| 14 | Q.   So Mr. Dinsmore is kind of running this application |
| 15 | process; is that right? |
| 16 | A.   Yes. |
| 17 | Q.   And do you go up to a desk, are you sitting at a |
| 18 | table -- |
| 19 | A.   Tables. |
| 20 | Q.   All right.  And then does he come around to you? |
| 21 | A.   No, he was sitting in front. |
| 22 | Q.   He's in the front? |
| 23 | A.   Yes. |
| 24 | Q.   And when -- he's in the front and you're taking a test |
| 25 | while he's doing this? |

CAUDLE, DAVID
05/15/2019                                                    Pages 61–64

Page 61

1   A.   Yes.
2   Q.   What kind of things are on that test?
3   A.   Problem solving questions.  I can't remember
4        everything.  Most of them was problem solving from
5        what I can remember.
6   Q.   Can you give me a kind of example?
7   A.   You were in a situation, blah, blah, blah, what would
8        you do, how would you react.
9   Q.   Okay.  Situational issues?
10  A.   Yes.
11  Q.   And then he's in the front.  Is he asking questions of
12       everybody or is he singling people out, are you
13       raising your hand, how is that working?
14  A.   I think he was just asking everybody questions and,
15       you know, then depending on how friendly you were and
16       personable he responded back.  Some people didn't talk
17       at all.
18  Q.   Okay.  But how did you know that it was your time to
19       talk, like did he say, okay, Mr. Dinsmore (sic),
20       here's a question for you or did he say here's a
21       general question and people shouted out or what did he
22       do?
23  A.   Just asked -- I think he just asked me a question
24       while I was taking the test.
25  Q.   While he was sitting up front?

Page 62

1   A.   Yes.
2   Q.   Then he asked other people questions?
3   A.   Uh-huh.  And they would ask questions about the test,
4        like if they didn't understand something, things like
5        that.
6   Q.   Okay.  Any other interview process before you got an
7        offer?
8   A.   No.
9   Q.   Did you have to go through a background check?
10              MR. GALLAGHER:  Objection, form.
11  A.   I believe so.
12  BY MS. NORRIS:
13  Q.   Did you have to take a drug test?
14  A.   No.
15              MR. GALLAGHER:  Same objection.
16  BY MS. NORRIS:
17  Q.   In the application process, did Mr. Dinsmore or HR or
18       anybody else in the application process say anything
19       to you to suggest that they had a problem with your
20       race?
21              MR. GALLAGHER:  Objection, form.
22              MS. NORRIS:  What's the objection to
23       whether they said anything about his race?
24              MR. GALLAGHER:  I mean --
25              MS. NORRIS:  What's the problem with the

Page 63

1        form?
2               MR. GALLAGHER:  Somebody else saying
3        something.
4               MS. NORRIS:  To him.
5               MR. GALLAGHER:  Okay.
6               MS. NORRIS:  Did anybody -- read my
7        question back.
8               MR. GALLAGHER:  That's fine, sorry, I
9        misheard you.
10              (The following requested portion of the
11       record was read by the reporter at
12       10:31 a.m.:
13       Q.  In the application process, did
14       Mr. Dinsmore or HR or anybody else in the
15       application process say anything to you to
16       suggest that they had a problem with your
17       race?)
18              MR. GALLAGHER:  I stand corrected.
19  A.   No.
20  BY MS. NORRIS:
21  Q.   In the application process, was there any discussion
22       about your medical condition?
23              MR. GALLAGHER:  Objection, form.
24              MS. NORRIS:  Fair enough.
25  BY MS. NORRIS:

Page 64

1   Q.   Was there any discussion with you about your medical
2        condition?
3   A.   I don't remember.
4   Q.   Is that something you would remember if it had come
5        up?
6   A.   Not sure.  I can't remember.
7   Q.   Is there anything that would help you remember?
8   A.   I can't remember.  I guess if somebody said something,
9        you know, hurtful to me or something like that, maybe,
10       but I don't remember anything being --
11  Q.   Okay.
12  A.   Can't remember.
13  Q.   In the application process, other than submitting a
14       resumé, did you have any discussion with Mr. Dinsmore
15       or HR or anybody else about your prior employment
16       experience?
17  A.   Yes.
18  Q.   Okay.  Who did you talk to about that?
19  A.   Other than Mr. Dinsmore?
20  Q.   No, including Mr. Dinsmore.  Did you talk to anybody
21       else?
22  A.   No, not during the hiring process, no.
23  Q.   Okay.  What did you tell Mr. Dinsmore about your prior
24       employment?
25  A.   He just asked me about my background with AT&T

**Page 65**

1  installing cable and he was telling me how it related
2  to Nielsen, how they had to do the multi-units and
3  things like that so I could catch on to it. And
4  having to meter a VCR or TV, Nintendo, Xbox, if I had
5  experience doing that.
6  Q.  Did Mr. Dinsmore indicate to you that he thought that
7  the work that you did at AT&T and the work you did at
8  Dish would be helpful to your work at Nielsen?
9  A.  Yes.
10 Q.  Do you know if Mr. Dinsmore had your resumé?
11 A.  Yes.
12 Q.  Do you still have a copy of that resumé?
13 A.  I doubt it because it's so outdated.
14 Q.  Do you know if that resumé indicated that you had been
15     terminated?
16 A.  I'm not sure, I don't have it.
17 Q.  Okay.  Do you know if Mr. Dinsmore asked if you had
18     been terminated?
19 A.  I don't know if he asked that question.
20            MARKED FOR IDENTIFICATION:
21            DEPOSITION EXHIBIT 2
22            10:33 a.m.
23 BY MS. NORRIS:
24 Q.  You've been handed Deposition Exhibit 2, which is a
25     letter dated May 23, 2012.  Is this how you found out

**Page 66**

1  that you were getting an offer?
2  A.  No.
3  Q.  Okay.  How did you find out?
4  A.  Ryan called me.
5  Q.  Before you got this letter?
6  A.  Yes.
7  Q.  And what did he tell you?
8  A.  He told me -- asked me how my day was going, was
9  like -- we talked a little bit.  He said, well maybe I
10 can help your day go a little bit better and he told
11 me that he wanted to bring me aboard on Nielsen.  And
12 I was very -- I was in the car actually and I was very
13 excited.
14 Q.  Did you accept on the phone?
15 A.  Yes, I told him I was very excited, but I believe HR
16 called to make it official.
17 Q.  Did you receive this letter that's Exhibit 2?
18 A.  Yes, I did.
19 Q.  This letter lays out what your job would be, what your
20 pay would be, what your starting date would be, that
21 sort of thing; is this accurate?
22            MR. GALLAGHER:  Read that over before --
23 BY MS. NORRIS:
24 Q.  Yeah, take your time and look at it.
25 A.  Yes.

**Page 67**

1  Q.  The letter is signed by Lori, L-E-V-E-I-L-L-E?
2  A.  Yes.  She was the one that called me, yes.
3  Q.  Okay.  So she's the one that called you and confirmed
4  this?
5       She's also the person that you talked to
6  during the hiring process?
7  A.  Yes.
8  Q.  Okay.  Seeing her name here, do you remember anything
9  else about what she said to you?
10 A.  No.
11 Q.  Do you know whether anybody other than Mr. Dinsmore
12 was involved in the hiring process, in terms of making
13 the decision?
14 A.  No, I don't know.
15 Q.  Did you start working full time on May 29, 2019
16 (sic) --
17 A.  Yes.
18 Q.  -- as a field representative?
19 A.  Yes.
20 Q.  What is Nielsen's product?  What does it sell?
21 A.  It sells data, the TV ratings.
22 Q.  And who does it sell it to?
23 A.  To the TV companies and to people that want to buy ad
24 time like to the Super Bowls or commercials.
25 Q.  So if I'm NBC and I want to know how my show is doing,

**Page 68**

1  Nielsen is one of the places I go to find out whether
2  my show is doing well or not?
3  A.  Yeah.  If your show -- is the demographic that you
4  had, if it hit what your show is supposed to be
5  targeting, you want to know if it hit that mark, that
6  demographic, reached that ratio.  Nielsen would tell
7  you if it hit that demographic, what age group, what
8  nationality was watching mostly.
9  Q.  And if I'm an advertiser and I want to advertise on
10 the Super Bowl, I want to know if certain people are
11 watching the Super Bowel; is that right?
12 A.  The people that were buying.
13            MR. GALLAGHER:  Objection to form.
14 A.  Ask it again.
15 BY MS. NORRIS:
16 Q.  If I'm advertising on the Super Bowl, I would want to
17 know if the people I'm interested in are watching the
18 Super Bowl?
19 A.  I can't answer that.  It was more so if you were doing
20 an ad, you wanted to make sure you put it in a time
21 slot where people were watching what you were buying,
22 more so than if people were watching during your ad.
23 You want to make sure you had the right time slot for
24 your commercial so the people would watch it.
25 So you understood that accurate data was very

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

CAUDLE, DAVID
05/15/2019                                              Pages 69—72

Page 69

1    important?
2    A.   Yes.
3    Q.   Because that's what Nielsen is selling, right?
4    A.   Uh-huh.
5    Q.   You have to say yes or no.
6    A.   Yes.
7    Q.   Do you know what happened if the data was wrong?
8    A.   Nielsen had to pay a rebate.
9    Q.   So it had to inform its customers and then pay money
10        back?
11   A.   After they did research to make sure it was their
12        fault, yes.
13   Q.   Do you know what it cost to do the research to
14        determine if the data was accurate or not?
15   A.   No.
16             MARKED FOR IDENTIFICATION:
17             DEPOSITION EXHIBIT 3
18             10:38 a.m.
19   BY MS. NORRIS:
20   Q.   You've been handed what's been marked as Deposition
21        Exhibit 3, which is a job profile for field
22        representative.  Have you ever seen this document
23        before?
24   A.   Just reading it to make sure.
25   Q.   Yeah.

Page 70

1    A.   Yes, I think -- I believe I remember seeing this.
2    Q.   Do you think this accurately represents the job that
3         you were doing as a field representative?
4    A.   Yes, more or less.
5    Q.   Did you get this during some kind of orientation when
6         you were hired?
7    A.   Yes.
8    Q.   Is there anything -- I know you haven't had a chance
9         to read it line-by-line, you just glanced at it, but
10        you said accurate more or less.  Is there anything
11        that jumped out at you as being inaccurate?
12   A.   No, I mean, it just doesn't show everything that you
13        do at the job so --
14   Q.   Okay.  So there might be more that you did that's not
15        here?
16   A.   Yes.
17   Q.   Can you give me an example?
18   A.   Calling a customer and trying to get in at dinnertime
19        and smooth talking them or buying them dinner or doing
20        whatever it took to get in to fix a fault.
21   Q.   Okay.  So some of the techniques for getting into the
22        home?
23   A.   Yes, like some of the things you didn't know you had
24        to do.
25   Q.   And am I correct that during your employment with

Page 71

1    Nielsen, Mr. Dinsmore complimented you and gave you
2    favorable evaluations on your ability to get into the
3    homes?
4    A.   Yes.
5    Q.   Boiling everything that's in this long job profile
6         down, at its core what was it that you were supposed
7         to be doing for Nielsen?
8             MR. GALLAGHER:  Objection; form,
9    foundation.
10   A.   My lawyer said objection.
11   BY MS. NORRIS:
12   Q.   Yeah, but he didn't tell you not to answer and he will
13        if you're not supposed to answer, he'll tell you not
14        to answer the question.
15             MR. GALLAGHER:  Form and foundation
16        objections you can answer, if you know the answer.
17        But anything I say privilege-wise, that's when you
18        need to just stop.
19   A.   Ask the question again.
20   BY MS. NORRIS:
21   Q.   Sure.  At its core, what was it that you were doing
22        for Nielsen?
23   A.   Upholding the Nielsen values.
24   Q.   Right.  Is it fair to say that your job was to make
25        sure that what Nielsen had in the homes was working

Page 72

1    and accurate so that the Nielsen data was correct?
2    A.   That was part of the job, yes.
3    Q.   Okay.  If you were assigned to a home, was part of
4         your job to go in and see -- well, let me back up.
5             Am I right that people sign up to be a
6    Nielsen family?
7    A.   Yes.
8    Q.   And Nielsen wants to have Nielsen families of various
9         demographics, right?
10   A.   Yes.
11             MR. GALLAGHER:  Objection, form and
12        foundation.
13   BY MS. NORRIS:
14   Q.   And Nielsen -- in your training did Nielsen talk to
15        you about what it was trying to accomplish?
16   A.   They gave us a broad idea.
17   Q.   Okay.  And so Nielsen needed to make sure that
18        homes -- that you knew equipment was in the homes; is
19        that right?
20   A.   Yes.
21   Q.   And Nielsen needed to make sure that the equipment was
22        working; is that right?
23   A.   Yes.
24   Q.   And Nielsen needed to make sure that the equipment was
25        accurately reflecting who was watching what, correct?

CAUDLE, DAVID
05/15/2019                                                                    Pages 73—76

Page 73

1  A.  Correct.
2  Q.  And then if something went wrong, you needed to get
3      into the home and figure it out; is that right?
4  A.  Correct.
5          MR. GALLAGHER:  Objection, form and
6      foundation.
7  BY MS. NORRIS:
8  Q.  And am I correct that you got reports every day if
9      there was a fault someplace, you knew something wasn't
10     working in a home?
11 A.  Correct.
12 Q.  Did you also, in addition to fixing faults, did you
13     also periodically just try to visit each of your homes
14     and check things out?
15 A.  Only if they called saying they got something new.
16     You didn't periodically just go to a house for no
17     reason.
18 Q.  So you went to a house if there was a change or if
19     there was a problem?
20 A.  Yes, or if there was a review, the yearly review
21     needed.
22 Q.  Like an audit or something?
23 A.  Not an audit.  It was -- I guess it was an audit.  It
24     was just a yearly review to make sure whatever they
25     signed up for was still the same standards.

Page 74

1  Q.  So even if there was no problem and even if you hadn't
2      been told about any change, once a year you were
3      supposed to see each home?
4  A.  Uh-huh.
5  Q.  You have to say --
6  A.  Yes, I'm sorry.
7  Q.  If you were assigned to home, were you required to
8      meter all of their devices?
9  A.  That were meterable, yes.
10 Q.  Is a television meterable?
11 A.  If it works.
12 Q.  So a working TV.  How about computers?
13 A.  Well, a working TV or a TV that they had stored.  If
14     you had a TV that just -- you just wasn't using, it
15     was somewhere, you didn't hook that up because it
16     wasn't being used.
17 Q.  Okay.  Who told you you don't do anything if a TV is
18     just stored?
19 A.  That was Nielsen protocol.  You tagged it and then you
20     put it in the notes that it was stored.
21 Q.  Okay.  So Nielsen would have a record of every device
22     in the house and would also know which ones are
23     working and which ones are not; is that right?
24 A.  A majority of the time.
25          MR. GALLAGHER:  Objection to foundation.

Page 75

1  BY MS. NORRIS:
2  Q.  Is that what was supposed to happen?
3  A.  A majority of the time that was supposed to happen.
4  Q.  Was there ever a time when that wasn't supposed to
5      happen?
6  A.  People lie.
7  Q.  Sure.  So Nielsen might not know that something is in
8      the attic?
9  A.  Correct.
10 Q.  Okay.  But if you were aware that a TV was not in use,
11     if you saw a TV not in use or they told you there was
12     a TV not in use, you were supposed to tag that so it
13     would still show as existing but not in use?
14 A.  Yes.
15 Q.  Okay.  Other than televisions, any other devices?
16 A.  I can't remember everything.  VCRs, video games, DVD
17     players.
18 Q.  Computers?
19 A.  Computers.
20 Q.  Tablets?
21 A.  I think towards the end when I was there there was
22     tablets.  All tablets, I don't believe we were doing
23     it like that, didn't have the software.
24 Q.  Okay.  Was Ryan Dinsmore your supervisor when you
25     started?

Page 76

1  A.  He's my manager.
2  Q.  Was his title field manager?
3  A.  Yes.
4  Q.  Did you have a supervisor between him and you?
5  A.  Yes.
6  Q.  Who?
7  A.  Dave Demmon.
8  Q.  Can you spell his last name, if you know?
9  A.  D-E-M-M-O-N, I believe.
10 Q.  And what was his title?
11 A.  Supervisor, field supervisor.
12 Q.  So your immediate supervisor was Dave Demmon and then
13     Ryan Dinsmore was above Dave?
14 A.  Yes.
15 Q.  Okay.  Did Dave Demmon ever say anything to you that
16     suggested he had any problems with race?
17 A.  No.  Dave was just a flat-out guy, he just said things
18     the way it was.  If it hurt your feelings, it hurt
19     your feelings, but --
20 Q.  Did he ever say anything suggesting he had a problem
21     with your medical condition?
22 A.  Not that I know of.
23 Q.  Sure, he could have said something to somebody else,
24     but you're not aware of it?
25 A.  Uh-huh.

CAUDLE, DAVID
05/15/2019

Pages 77–80

| | Page 77 |
|---|---|
| 1 | Q.   Is that correct? |
| 2 | A.   Correct. |
| 3 | Q.   But nobody ever told you that he did that; is that |
| 4 | right? |
| 5 | A.   Right, to my knowledge. |
| 6 | Q.   Do you know who Ryan Dinsmore reported to? |
| 7 | A.   I'm not sure. |
| 8 | Q.   Do you know who Josh Hummel is? |
| 9 | A.   Yes, but there was somebody before Josh Hummel that |
| 10 | Ryan actually reported to that I couldn't remember his |
| 11 | name, but, yes, Josh Hummel was the last guy and I |
| 12 | believe when I left it was somebody else. |
| 13 | Q.   And do you know what Josh Hummel's title was? |
| 14 | A.   Regional manager, I think, or area manager.  I'm not |
| 15 | sure, can't remember. |
| 16 | Q.   But Mr. Hummel was in that position at the time you |
| 17 | were terminated? |
| 18 | A.   I believe so. |
| 19 | Q.   Did you ever have any conversations or communications |
| 20 | with Mr. Hummel? |
| 21 | A.   Yes. |
| 22 | Q.   How often? |
| 23 | A.   Not too often. |
| 24 | Q.   Did he ever say anything to suggest that he would |
| 25 | discriminate on the basis of race? |

| | Page 78 |
|---|---|
| 1 | MR. GALLAGHER:  Objection; form, |
| 2 | foundation. |
| 3 | A.   I can't recall. |
| 4 | BY MS. NORRIS: |
| 5 | Q.   Would you recall that, if he said something racial to |
| 6 | you would you remember that? |
| 7 | A.   Yes. |
| 8 | Q.   And if somebody else came and told you he said |
| 9 | something racist, would you remember that they told |
| 10 | you that? |
| 11 | A.   Yes. |
| 12 | Q.   Okay.  Those never happened, right? |
| 13 | A.   No. |
| 14 | Q.   Okay.  Did he ever say anything to you to suggest that |
| 15 | he had a problem with your medical condition, |
| 16 | Mr. Hummel? |
| 17 | A.   No. |
| 18 | Q.   Did your immediate supervisor ever change from Dave |
| 19 | Demmon to anybody else? |
| 20 | A.   Yes. |
| 21 | Q.   To who? |
| 22 | A.   Raul Mata. |
| 23 | Q.   And do you know when that change was? |
| 24 | A.   After Dave got fired. |
| 25 | Q.   What was Mr. Demmon fired for? |

| | Page 79 |
|---|---|
| 1 | A.   He was running my field area and not running calls |
| 2 | and -- I don't remember the full reason, I just |
| 3 | remember CliffsNotes that people told me. |
| 4 | Q.   What do you mean by not running calls? |
| 5 | A.   My area had field faults that were scheduled, quality |
| 6 | reviews, things that had to be done, and he |
| 7 | wouldn't -- he would reschedule them because he didn't |
| 8 | feel like running them.  There was too many faults, he |
| 9 | didn't feel like doing all that work.  So when I came |
| 10 | back I had over 200 faults that I was quoted as it was |
| 11 | my responsibility to do when I came back to the |
| 12 | market. |
| 13 | Q.   And when was that, when you came back to the market? |
| 14 | You mean when you started with the company or when you |
| 15 | came back from a leave? |
| 16 | A.   No, the market sent me to New York to test GTAM.  It |
| 17 | was a new software they were coming out with and there |
| 18 | was a test market area of New York, Washington -- |
| 19 | well, the DMV area and Pennsylvania.  So I was gone |
| 20 | for four months from November until I think February. |
| 21 | Q.   What year? |
| 22 | A.   I want to say it was 2014. |
| 23 | Q.   And you came back and it was a mess and it was because |
| 24 | of Mr. Demmon? |
| 25 | A.   Yes. |

| | Page 80 |
|---|---|
| 1 | Q.   And do you know who made the decision to fire him? |
| 2 | A.   I think it might have been Mark Greenly. |
| 3 | Q.   Who is Mark Greenly? |
| 4 | A.   Mark Greenly.  I don't -- I think that was the |
| 5 | supervisor over Josh at the time.  All I remember was |
| 6 | we were at a scheduled lunch, team lunch.  Ryan got a |
| 7 | phone call saying he had to go to Demmon's house to |
| 8 | pick up his car and Matt Bennett, I believe that was |
| 9 | his last name, was the other manager that was already |
| 10 | there to let Dave know he had been fired. |
| 11 | Q.   Do you know if Mr. Hummel had anything to do with the |
| 12 | termination? |
| 13 | A.   I do not know. |
| 14 | Q.   Do you know if Mr. Dinsmore had anything to do with |
| 15 | the termination? |
| 16 | A.   From what I recall Ryan didn't know about it. |
| 17 | Q.   Until he was told to go do something? |
| 18 | A.   Yes. |
| 19 | Q.   Okay.  Mr. Demmon is white, I may have asked you that, |
| 20 | I don't recall? |
| 21 | A.   Yes. |
| 22 | Q.   And then your immediate supervisor is Raul Mata? |
| 23 | A.   Uh-huh. |
| 24 | Q.   Yes or no? |
| 25 | A.   Yes. |

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

CAUDLE, DAVID
05/15/2019                                                                    Pages 81–84

Page 81

1   Q.   That's okay.  Did Mr. Mata ever say anything to
2        suggest that he would discriminate against you on the
3        basis of your race?
4   A.   No.
5   Q.   Did he ever say anything to suggest he had a problem
6        with your medical condition?
7             MR. GALLAGHER:  Objection; form,
8        foundation.
9   A.   I heard that him and Ryan talked about me.
10  BY MS. NORRIS:
11  Q.   Okay.  What did you hear?
12  A.   That I was sick all the time.  And then when I got
13       hurt because of Ryan and my back got thrown out, Raul
14       had made a statement saying, did he take off last
15       November and December last year?  Why does he always
16       do that?
17  Q.   Okay.  Who did you hear that from?
18  A.   They don't want their name disclosed, but two people
19       on the team.
20  Q.   I'm entitled to ask you and you have to answer that
21       question.
22  A.   They don't want their names disclosed.
23  Q.   They can not want it all they want.  I'm entitled to
24       know what evidence you have of discrimination in this
25       lawsuit and you've told me that two people accused

Page 82

1        somebody of making comments?
2   A.   I heard it once from -- what was his name?  Damen, he
3        was the warehouse guy.  And I heard it again from --
4        trying to think of his name.  Shermir.
5   Q.   Okay.  When did you hear this, what year?
6   A.   2015.
7   Q.   Okay.  So anything else that made you think that
8        Mr. Mata might have problems with your medical
9        condition?
10  A.   I don't believe Mr. Mata had a problem with it, he was
11       just in a conversation with Ryan because he was his
12       number two.
13  Q.   So you think Mr. Dinsmore had a problem and not
14       Mr. Mata?
15  A.   Uh-huh.
16  Q.   You have to say yes.
17  A.   Yes.
18  Q.   Okay.  Did Damen or Shermir tell you who was saying
19       what?
20  A.   They said Ryan and Raul were in the warehouse and Ryan
21       was talking to Raul saying it and then Raul made the
22       comment, did he take off last year at the same time?
23  Q.   Okay.  Did Mr. Mata remain your immediate supervisor
24       for rest of your employment?
25  A.   Yes.

Page 83

1   Q.   And did Mr. Dinsmore remain your field manager for the
2        rest of your employment?
3   A.   Yes.
4   Q.   And did Mr. Hummel, after he took over from the
5        previous person, did he remain --
6   A.   Yes.
7   Q.   -- the regional or area manager for the rest of your
8        employment?
9   A.   Yes.
10  Q.   Okay.  According to your offer letter you were paid
11       $17.50 an hour when you started.  Did that pay rate
12       ever change?
13  A.   Yes.
14  Q.   Do you know what it was when you were terminated?
15  A.   No.
16  Q.   If I said that you were making about $41,000 a year at
17       the time of your termination, does that sound about
18       right?
19  A.   Might be, I can't --
20  Q.   Not sure?
21  A.   Yes, not sure.
22  Q.   Okay.  Do you know what percentage raises you got each
23       year?
24  A.   I believe the highest you could get was a 4.  The
25       majority of the time I got a 3.

Page 84

1   Q.   Do you know who made that decision?
2   A.   Ryan Dinsmore.
3   Q.   Do you know who got higher?
4   A.   No.
5   Q.   Do you know who got lower?
6   A.   No.  Guys weren't -- we weren't supposed to talk about
7        that so -- and nobody really wanted to admit they got
8        a 1 or a 2 so --
9   Q.   Do you know if people did get 1s or 2s?
10  A.   No, because nobody admitted it and Ryan didn't tell
11       us.
12  Q.   Did you get benefits?
13  A.   Yes.
14  Q.   What benefits did you get?
15  A.   Full benefits.
16  Q.   Healthcare?
17  A.   Yes.  Medical, eye, dental.
18  Q.   Did you have to pay a portion of that?
19  A.   I believe it was free.  Actually, no, it wasn't free
20       because we had the health exam we took every year.
21       You would get money off your -- well, if you've passed
22       it.
23  Q.   When you went to work for Prezio, what were you paid
24       there?
25  A.   $14 an hour.

CAUDLE, DAVID
05/15/2019                                                               Pages 85–88

| | |
|---|---|
| 1 | Q. | Did you get benefits there? |
| 2 | A. | No. |
| 3 | Q. | Before you were hired by Nielsen, did you know |
| 4 | | anything about the company's employment policies? |
| 5 | A. | I had never heard of the company before. |
| 6 | Q. | After you were hired, were you given information about |
| 7 | | the company's policies? |
| 8 | A. | Yes. |
| 9 | Q. | Were you given a handbook? |
| 10 | A. | Yes. |
| 11 | Q. | Were you given a hard copy or just something online or |
| 12 | | both? |
| 13 | A. | Something online. |
| 14 | Q. | Okay.  Do you remember getting a hard copy of the |
| 15 | | policies? |
| 16 | A. | I think we got one when we were out of town, but I |
| 17 | | don't remember if they let us keep it. |
| 18 | Q. | But your understanding was that all of the policies |
| 19 | | were available online? |
| 20 | A. | Yes. |
| 21 | Q. | Did you ever go online and look at the policies? |
| 22 | A. | No, because we looked at them in training class so |
| 23 | | much I really didn't have a need to. |
| 24 | Q. | Did you go through an orientation at the beginning of |
| 25 | | your employment? |

1  A.  Yes.
2  Q.  And were policies reviewed at that time?
3  A.  Not that I remember because it was more in-depth out
4      of town because we had our laptops and we could pull
5      up stuff and they did like a tutorial.
6  Q.  What do you mean by out of town?
7  A.  They sent us out of town for training in Florida.
8  Q.  Was that when you were first hired or later?
9  A.  That was when I was first hired.  Two weeks after I
10     was hired they sent me out of town.
11 Q.  And in Florida were there a number of new employees
12     there?
13 A.  Yes.
14 Q.  And they went through everything; is that right?
15 A.  Yes.
16 Q.  And that included how to do your job?
17 A.  Yes.
18 Q.  Your expectations, your job duties, all those sorts of
19     things?
20 A.  Yes.
21 Q.  And it also included policies and procedures?
22 A.  Yes.
23 Q.  And you were there for two weeks or how long?
24 A.  I think it was six weeks.
25 Q.  So everything you needed to know about the job,

1      including policies, right?
2  A.  It wasn't everything you needed to know, but it was
3      enough to get you going.  And everything else you was
4      supposed to just catch on with or the other field reps
5      would help you out.
6  Q.  After that intensive six-week training at the
7      beginning of your job, did you have any additional
8      training at Nielsen?
9  A.  No.  Well, yes, when I did GTAM.
10 Q.  Okay.  You talked a little bit about GTAM before.  You
11     went to New York for that?
12 A.  Yeah, New York, Pennsylvania and the DMV.
13 Q.  And what were you learning to do?
14 A.  I learned how to install GTAM, how to fix it because
15     it had kinks in it because it was new software.  And
16     we got on the phone with engineering every night and
17     told them what issues we were having and they would
18     give us an update each week to update the system to
19     try to fix the problems.
20 Q.  So was this a new product?
21 A.  Yes.
22 Q.  And so it was being developed and you were kind of
23     learning it and testing it out and then giving
24     feedback?
25 A.  Yes, in the test market.

1  Q.  Okay.  And then it would be revised and you'd test
2      that out?
3  A.  Uh-huh.
4  Q.  Yes or no?
5  A.  Yes, sorry.
6  Q.  And what was it that GTAM did?
7  A.  GTAM did the same thing that the old multiunit did,
8      but it was supposed to be a sleeker, smaller version
9      and faster so --
10 Q.  How long were you in New York and Pennsylvania doing
11     this?
12 A.  I believe three or four months.
13 Q.  Do you remember what year?
14 A.  I believe it was the end of 2014, going into 2015.
15 Q.  Any other training?
16 A.  No.
17         MS. NORRIS:  All right.  We're going to do
18 a bunch of exhibits hopefully quickly here.
19         (Off the record at 10:58 a.m.)
20         MARKED FOR IDENTIFICATION:
21         DEPOSITION EXHIBITS 4-8
22         10:58 a.m.
23         (Back on the record at 11:02 a.m.)
24 BY MS. NORRIS:
25 Q.  If you would look at Exhibit 4, please?

CAUDLE, DAVID
05/15/2019

Pages 89—92

Page 89

1   MR. GALLAGHER: You're going to let him
2   look at the document, right?
3   MS. NORRIS: Well, you don't know what I'm
4   going to ask him yet?
5   MR. GALLAGHER: Exactly. He gets an
6   opportunity to read a document.
7   MS. NORRIS: If there's something he needs
8   to read to answer the question, he can have all the
9   time he needs to read it. You don't even know what
10  I'm asking yet.
11  MR. GALLAGHER: That's not fair.
12  MS. NORRIS: Well, it's totally fair.
13  BY MS. NORRIS:
14  Q.  Could you look at Exhibit 4, please?
15  A.  Sure.
16  MR. GALLAGHER: You're asking about a
17  document he hasn't even read.
18  BY MS. NORRIS:
19  Q.  Okay. Exhibit 4, the cover says U.S. Employee Guide
20      to Nielsen Policies and Procedures; is that right?
21  A.  Yes.
22  Q.  If you look at Exhibit 4, it is not all of the pages.
23      You can see that the first page behind the cover is
24      number 5, the second page behind the cover is
25      number 9 --

Page 90

1   A.  Uh-huh.
2   Q.  -- this is not all the pages.
3       So I'm not telling you that this is all the
4       pages. Do you recall in orientation or at any time
5       reviewing, either online, on your laptop or in hard
6       copy or some other way, something that was called the
7       U.S. Employee Guide to Nielsen Policies and
8       Procedures?
9   A.  Yes, we briefly went over it.
10  Q.  Okay. Did you keep a copy of that?
11  A.  I'm not sure. They told us to look it up online.
12  Q.  Is this something that you reviewed when you were in
13      orientation?
14  A.  Yes.
15  Q.  Did you ever ask anybody, either in orientation or
16      later in your employment, did you ever ask anybody any
17      questions about any of the policies or procedures that
18      were in the U.S. Employee Guide to Nielsen Policies
19      and Procedures?
20  A.  Yes, holidays and vacation time. Because when I was
21      hired a holiday was coming up and I was trying to
22      figure out if I got paid.
23  Q.  Okay. Who did you ask about holidays and vacation
24      times?
25  A.  The examine instructor.

Page 91

1   Q.  So this is during your orientation?
2   A.  Yes.
3   Q.  Do you remember what you were told?
4   A.  He had to look and make -- he had to find out.
5   Q.  Then did he give you an answer?
6   A.  I believe he told me that somebody would be calling me
7       to let me know for sure because --
8   Q.  And did that ever happen?
9   A.  Yes.
10  Q.  Okay. So you got the answer that you needed?
11  A.  Yes.
12  Q.  Do you remember asking anybody any other questions
13      about the U.S. Employee Guide to Nielsen Policies and
14      Procedures?
15  A.  No.
16  Q.  Okay. If you look at Exhibit 5 -- your attorney keeps
17      showing you something.
18          I'm just asking him if he asked people
19      questions. He doesn't need to look at anything to
20      answer that.
21          MR. GALLAGHER: Absolutely. This is made
22      in 2014, so I -- these aren't even all the pages and
23      he wasn't --
24          MS. NORRIS: I told him that they were not
25      all the pages. I'm not asking him anything about any

Page 92

1   specific document behind this. I'm asking if they
2   reviewed such a document in orientation. He said yes.
3   I asked if he kept a copy of what he got. He said no,
4   they were available --
5       MR. GALLAGHER: Do you understand though
6   how that's not really fair when you give him a
7   document that's not complete, it's maybe 20 percent
8   and then you say did you review this?
9       MS. NORRIS: I didn't ask if he reviewed
10  what's in front of him. I asked, very clearly, if in
11  orientation they reviewed a document called what this
12  title is called, that's what I asked. And I asked if
13  he still has what he got, because I don't know what he
14  got. And he said no, that they were online. And I
15  asked if he had any questions about what they
16  reviewed. And he said yes and he told me what they
17  were. None of that requires looking at anything other
18  than the cover page and the title.
19      MR. GALLAGHER: I mean, it does.
20      MS. NORRIS: It does not.
21      MR. GALLAGHER: It absolutely does. I
22  think you're asking him if he reviewed something
23  called this and there's things in there --
24      MS. NORRIS: I didn't ask if he saw any of
25  these particular pages, and in fact told him that many

CAUDLE, DAVID
05/15/2019

Pages 93—96

Page 93

1  of the pages are not there.
2          MR. GALLAGHER:  I get it, but like -- so --
3          MS. NORRIS:  So you can conduct your
4  depositions the way you want.  This is the question
5  I'm asking him and he's answered them and he's
6  answered them clearly.
7          MR. GALLAGHER:  Again, I'm just trying to
8  be fair for him because it doesn't seem like a fair
9  thing when you throw six documents in front of him.
10          MS. NORRIS:  I could have gone through them
11  one by one so to -- put all the other ones aside and
12  just look at the one and then we'll go to others.  I
13  mean, I'm just trying to be efficient.
14          MR. GALLAGHER:  And I don't think that's a
15  fair representation of this document so -- okay,
16  continue.
17  BY MS. NORRIS:
18  Q.  Okay.  Could you look at Exhibit 5, please?
19  A.  Okay.
20  Q.  Exhibit 5, again, is a document that I'm not
21      purporting has all of the pages and I haven't asked
22      you if you've gotten this yet.  I'm looking at the
23      cover.  This is entitled Your Guide to Time Away from
24      Work.  Do you recall reviewing a document with that
25      title during orientation?

Page 94

1  A.  Yes.
2  Q.  Do you recall receiving in hard copy that document at
3      any time during your employment?
4  A.  I guess.  I think we had it at training class --
5  Q.  Okay.
6  A.  -- but then we got our laptops and we looked at where
7      we can go get it online.
8  Q.  Okay.  And do you, sitting here today, remember
9      anything about the policies and procedures that you
10      reviewed in the Your Guide to Time Away from Work?
11  A.  Do I remember it as in?
12  Q.  So let me ask the question differently in response to
13      your attorney's objections.  Do you know or would you
14      know, like if I gave you an hour to read everything,
15      would you know if what I've attached as part of
16      Exhibit 5 or attached as part of Exhibit 4, if those
17      are the same policies you reviewed or not; would you
18      know one way or the other?
19  A.  Maybe.  I mean, in Exhibit 4 some of this says 2014
20      and I started in 2012 so I don't know if it was
21      amended or changed around, but for the most part,
22      yeah.
23  Q.  If policies were changed online, would you get
24      notification that they were changed online or would
25      they just be changed and the next time you went to

Page 95

1  look at something you'd see the current policy?
2  A.  I never received an update saying something was
3      changed that I can recall.
4  Q.  Okay.  So do you know if policies were changed over
5      time?
6  A.  Of course.
7  Q.  And you were just told, go online and you can see the
8      policies, right?
9  A.  I don't believe we were told just to go online and
10      look, but -- at least it wasn't told to us to do it.
11  Q.  Well, what were you told?  When you were in
12      orientation I thought you were told you can find these
13      online?
14  A.  They didn't say anything about updates, they just said
15      they can be found and read online.
16  Q.  Okay.  Do you understand policies were updated from
17      time to time?
18  A.  Yes.  I never thought about it.
19  Q.  Okay.  And I believe you told me that you didn't get
20      an announcement of any kind, correct?
21  A.  Not that I know of.
22  Q.  Okay.  Exhibit 6 is entitled Policy Regarding
23      Discrimination, Harassment, Retaliation and Workplace
24      Relationships.  Do you recall seeing this policy?
25          MR. GALLAGHER:  Give him a moment to read

Page 96

1  this.  You're asking about this specific policy?
2          MS. NORRIS:  Yes, I am.
3  A.  From what I remember about this policy, it was -- just
4      talked about sexual harassment, that was it.  It
5      was -- that was it.  That's all they really touched on
6      and they moved.
7  BY MS. NORRIS:
8  Q.  Okay.  So when you were discussing the policies, you
9      remember them talking about sexual harassment?
10  A.  That's the only thing they wanted to touch on and that
11      was the main issue that they wanted to put on.
12  Q.  Okay.  Did you see this written policy?
13  A.  Yes, they -- well, I can't say it was this exact one,
14      but I remember something like this.
15  Q.  So there was a written policy and it looked like
16      Exhibit 6, but you don't know if Exhibit 6 is exactly
17      it; is that correct?
18  A.  Yes.
19  Q.  Okay.  Do you remember asking anybody questions about
20      the discrimination, harassment, retaliation policy?
21  A.  It really wasn't a Q & A.  They wanted to get through
22      it because we had so much to cover in a day.  So it
23      was -- they targeted -- I remember them targeting
24      sexual harassment, telling us what was a no-go and
25      what the procedures were and then they moved on and

CAUDLE, DAVID
05/15/2019                                                              Pages 97–100

Page 97

1   said you can look at everything else at your leisure
2   online.
3   Q.   Do you recall during your employment asking anybody
4        any questions about the discrimination, harassment and
5        retaliation policy?
6   A.   Yes.
7   Q.   Okay.  Who?
8   A.   Ryan.
9   Q.   What did you ask?
10  A.   He gave me an unfair write-up and I told him I felt
11       like I was being discriminated against and I asked him
12       about it.  And he told me that it wasn't that, it was
13       because of my low PC percentage that he was writing me
14       up and it wasn't him, it was the people above him that
15       told him he had to do it and it was something that I
16       could come back from.
17  Q.   Okay.  When was this?
18  A.   I can't recall when he did it, to be honest.  I don't
19       know if it was 2013 or 2014.  I don't remember, to be
20       honest.
21  Q.   Early in your employment?
22  A.   Actually I don't know if it was early in my -- I know
23       it was after Dave Demmon got fired.
24  Q.   Okay.  But you think this was sometime in 2013 or
25       2014?

Page 98

1   A.   It could have been, I'm not sure.  I know it was after
2        Dave Demmon got fired, that's all I do remember,
3        because I felt like he was targeting me for Dave
4        Demmon being fired.
5   Q.   What was the write-up?
6   A.   It was a PIP.
7   Q.   So this was when you were placed on the PIP?
8   A.   Yes.
9   Q.   Did you specifically refer to the policy or did you
10       just say I think I'm being discriminated against?
11       MR. GALLAGHER:  Objection; form,
12       foundation.
13       MS. NORRIS:  I asked if he specifically
14       referred to something, how is there a form, foundation
15       question to that?
16       MR. GALLAGHER:  The policy -- and you
17       pointed to this policy and it's been -- half of these
18       policies were created after the dates we're talking
19       about.
20       MS. NORRIS:  But we're talking about the
21       discrimination, harassment and retaliation policy.
22       MR. GALLAGHER:  The one with 2016 on the
23       cover?
24       MS. NORRIS:  No, we're talking about the
25       discrimination, harassment and retaliation policy,

Page 99

1   that's the one he and I have been talking about, it's
2   the one right in the front of him and I asked if he
3   specifically referred to the policy --
4        MR. GALLAGHER:  May 2016, like I said.
5        MS. NORRIS:  I'm asking if he specifically
6   referred to the discrimination, harassment --
7        MR. GALLAGHER:  That wasn't in place at the
8   time?
9        MS. NORRIS:  -- policy -- we talked about
10  policies change.
11       He said the policy he saw looked like this,
12  he didn't know if this was exactly it, but this more
13  or less looked like it.
14  BY MS. NORRIS:
15  Q.   Is that correct, Mr. Caudle?
16  A.   Yes.
17  Q.   Okay.  So did you specifically refer to the policy,
18       did you say this is in violation of the harassment
19       policy or anything like that, or did you say it the
20       way you worded it to me, did you simply say I think
21       I'm being discriminated against?
22  A.   In a conversation, yes, I said it like that.
23  Q.   Like what I just said?
24  A.   Yes, I said it like that.  I asked him -- I feel like
25       I'm being discriminated against because of Dave Demmon

Page 100

1   being fired in my area.
2   Q.   Okay.  Do you recall asking anybody any questions
3        about the time-away-from-work policy, other than what
4        you told me before about how vacation pay and sick
5        days work?
6   A.   I was talked to about it by HR when I had to go on
7        short-term disability and they explained it to me.
8   Q.   Okay.  When you talked to Mr. Dinsmore about what you
9        thought was discrimination, did you say why you
10       thought it was discriminatory?
11  A.   Yes.
12  Q.   What did you say?
13  A.   I told him that I thought he was discriminating me
14       after Dave Demmon got fired for being in my field
15       area.
16  Q.   Did you say why you thought that?
17  A.   Because the minute after Dave Demmon got fired, he
18       became grossly invested in me more than anybody else.
19  Q.   What do you mean by that?
20  A.   A month or two months after that, during our E&Y
21       audits, I had 16 homes audited.  That was the most out
22       of everybody in the area and they're supposed to be
23       random.  Then I was told that Ryan, from the E&Y
24       audit, has selected the home -- because I had to be at
25       each home.

CAUDLE, DAVID
05/15/2019

Pages 101–104

**Page 101**

1   And the E&Y auditor said well, Ryan chose
2   this home because they had -- they went to a home
3   where they called a home and the home said they
4   wouldn't be there.  So they had to pick an alternative
5   and Ryan called this home.  And they said well, Ryan
6   chose the home, he called, they said we could get in
7   and it happened to be my home every time.
8   Q.   Okay.  So did you tell Mr. Dinsmore that you thought
9   you were being discriminated against because of your
10   race?
11   A.   That came later.
12   Q.   Okay.  So when -- I'm talking right now about when you
13   got the PIP and you said you thought you -- you
14   thought the write-up was unfair, you thought you were
15   being discriminated against because of Dave Demmon
16   being terminated.  Did you say what kind of
17   discrimination you thought this was at that time?
18   A.   I thought it was because he didn't do that to anybody
19   else.
20   Q.   Okay.  So you thought you were being treated
21   differently?
22   A.   Yes.
23   Q.   Did you say to him you thought you were being treated
24   differently because of your race?
25   A.   Yes.

**Page 102**

1   Q.   At the time of the PIP?
2   A.   Yes, because there were other people that were
3   performing low, as me, that didn't get put on PIP and
4   they were white.
5   Q.   Okay.  Did you raise that with him or did you just say
6   I'm being treated differently than other people?
7   A.   No, I said that exact question to him.  He told me I
8   was being insubordinate and told me that it wasn't
9   him, it was somebody higher up than him that told him
10   he had to write me up and --
11   Q.   Okay.  What was the exact question he just said?
12       MR. GALLAGHER:  Let him finish, please.
13   A.   He said that --
14   BY MS. NORRIS:
15   Q.   No, I'm asking what you said?
16       MR. GALLAGHER:  He gets to talk.
17   BY MS. NORRIS:
18   Q.   I'm asking what you said?
19   A.   I told him, when he put me on PIP, I asked what
20   the PIP was for.
21   Q.   Okay.  And he gave you an answer?
22   A.   He said it was for --
23       MR. GALLAGHER:  He gets to talk.
24       MS. NORRIS:  No, I get to ask the question.
25       MR. GALLAGHER:  And he gets to answer it

**Page 103**

1   how he sees fit.
2   BY MS. NORRIS:
3   Q.   No, my question is what you said?
4       MR. GALLAGHER:  And he's explaining that.
5   BY MS. NORRIS:
6   Q.   No, I'm not asking for any explanation.  I'm asking
7   what did you say.  So you told me --
8       MR. GALLAGHER:  Without explaining
9   yourself, tell her what you said.
10       MS. NORRIS:  Listen, if I want to ask for
11   explanations, I can.  If I don't, I don't have to.
12       MR. GALLAGHER:  Well, how do you explain
13   yourself, like how do you explain something that
14   happened without explaining yourself?
15       MS. NORRIS:  I've not asked for any
16   explanation, I've asked for words that were said.
17       MR. GALLAGHER:  And he's giving you that.
18       MS. NORRIS:  Correct.  And then he starts
19   to tell me what Mr. Dinsmore said and I said I'm not
20   interested in that and that's my right.
21       MR. GALLAGHER:  Okay.  He gets to talk.  He
22   gets to finish his --
23   BY MS. NORRIS:
24   Q.   Okay.  Let me try this again.  You've got the PIP,
25   correct?

**Page 104**

1   A.   Correct.
2   Q.   And you said something to Mr. Dinsmore?
3   A.   Correct.
4   Q.   To the best of your memory, what did you say to
5   Mr. Dinsmore?
6   A.   I asked him why was I getting put on PIP.
7   Q.   Okay.  Then did Mr. Dinsmore give you a response to
8   that question?
9       MR. GALLAGHER:  He's going --
10   A.   Yes.
11       MR. GALLAGHER:  -- to have to be able to
12   answer the question, like full --
13   BY MS. NORRIS:
14   Q.   And what did you say -- please don't talk over me.
15   What did you say after he answered your
16   question?
17   A.   I asked him why.
18   Q.   And did he give you an answer to that?
19   A.   A roundabout -- a roundabout answer.
20   Q.   Okay.  And what did you then say?
21   A.   I got irritated and I asked him, has anybody else been
22   put on PIP for the same exact reason?  Because there
23   was other people that was suffering and they're not on
24   PIP.
25   Q.   Okay.  And what answer did he give you to that?

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

CAUDLE, DAVID
05/15/2019

Pages 113–116

---

Page 113

1    faults that were hurting the market the most.  You
2    would try to get into that home, fix the faults, get
3    your market back up.  If not, you had installs or
4    de-installs you were doing or helping on.
5    Q.   Am I correct that you had scheduled visits with your
6         homeowners?
7    A.   Yes.
8    Q.   Did you generally go through this on your own or were
9         you working in tandem with another field
10        representative?
11   A.   They had the ROC (phonetic) that would help you
12        sometimes.  They would be able to call the homes if
13        you couldn't call all of them or if the home called in
14        and they had a fault or something already pending they
15        would try to make the appointment for you.
16   Q.   And did you ever have a supervisor go with you to a
17        home?
18   A.   Yes.
19   Q.   Was that regular or certain circumstances?
20   A.   It wasn't regular.
21   Q.   Okay.  When Mr. Demmon was your supervisor, about how
22        often did he go to a home with you?
23   A.   He started off training me, so he was there pretty
24        regularly.  Then after that, maybe -- I don't know,
25        maybe five times.  I can't really count.

---

Page 114

1    Q.   Okay.  And Mr. Mata, how often did he go to a home
2         with you?
3    A.   I can't really count.  I mean, a lot.
4    Q.   All right.  How often did Mr. Dinsmore go to a home
5         with you?
6    A.   I was there almost four years, a lot.
7    Q.   And do you know how often he went to other people's
8         homes?
9    A.   I can't recall.
10   Q.   Do you know if it was more or less or the same?
11   A.   At the time he was messing with me, I was there more
12        because you had to put it in N-gage what you were
13        doing so his name was attached to mine a lot more than
14        anybody else's.
15   Q.   Okay.  Explain to me what that means, let's start with
16        at the time he was messing with me?
17             MR. GALLAGHER:  He has to be able to talk.
18             MS. NORRIS:  I'm allowed to break down what
19        he just said.
20             MR. GALLAGHER:  You're not allowed to
21        interrupt him in the middle of when he's talking,
22        which you've done repeatedly here.
23   BY MS. NORRIS:
24   Q.   Let's start with at the time he was messing with me,
25        what time was that?

---

Page 115

1             MR. GALLAGHER:  Finish what you were saying
2         first.
3    A.   During the time of -- after I was upset about the PIP,
4         Ryan started to come to my homes more.  He started to
5         say he was coming to help me to get it done quicker
6         and just coming by and then doing the Q&R audits while
7         he was there.
8    BY MS. NORRIS:
9    Q.   And how long did that last?
10   A.   He said it was because I was under the PIP so it was a
11        corrective action so he wanted to make sure I was
12        doing everything right.  So I think that lasted maybe
13        two months.
14   Q.   Okay.  And then you said that his name was attached to
15        N-gage.  Am I right that N-gage is the letter N and
16        then G-A-G-E?
17   A.   Yes.
18   Q.   And is N-gage a scheduling function or something else?
19   A.   Scheduling function.
20   Q.   So when you made your own appointment with a home on
21        your own, are you supposed to put that in N-gage?
22   A.   It has to be in N-gage.  Well, it's supposed to be in
23        N-gage, sometimes it's not, then you have to update it
24        later.  You put in N-gage what you're doing so they
25        don't schedule something else there.

---

Page 116

1    Q.   Right.  And if the ROC makes an appointment for you,
2         that's supposed to go in N-gage?
3    A.   Yes.
4    Q.   So you indicated that Mr. Dinsmore's name was
5         attached?
6    A.   Yes, to show what he was doing for that day.
7    Q.   Okay.  So I'm trying to understand what that means.
8         Let's say that you had an appointment and Mr. Dinsmore
9         said I'm coming with you.  You're on the PIP, I'm
10        going to come with you.  Did his name then show up in
11        N-gage along with yours?
12   A.   Yes.
13   Q.   And did he put that there or did you or somebody else?
14   A.   He had to put it there.  I didn't have the power to.
15   Q.   Okay.  After the approximately two months on the PIP,
16        did Mr. Dinsmore's home visits with you decrease to
17        what they had originally been?
18   A.   Yes, somewhat.  That was -- E&Y audits were coming up.
19   Q.   And E&Y audits, my understanding is that Ernst & Young
20        performed outside audits on homes?
21   A.   Yes.
22   Q.   And am I -- do I understand that there's also internal
23        audits, where auditors from Nielsen decide what homes
24        are going to be audited?
25   A.   They just started that, the -- that wasn't done when I

---

CAUDLE, DAVID
05/15/2019

Pages 117–120

Page 117

1     was there.
2   Q.   That's more recent?
3   A.   Yes.
4   Q.   All right.  So when you were there it was the Ernst &
5     Young audits?
6   A.   Yes.
7   Q.   And what do you know about how homes were chosen in
8     those audits?
9   A.   They were all supposed to be randomly selected and it
10     was supposed to be broken up into all the field reps.
11     Some guys might not get selected, but most of the
12     homes, it was supposed to be divided equally between
13     all the reps.
14   Q.   So did Ernst & Young have all territories?
15          MR. GALLAGHER:  Objection, form and
16     foundation.
17   A.   I don't know.
18          MS. NORRIS:  He can say he doesn't know,
19     that fine.
20   A.   I don't know.
21 BY MS. NORRIS:
22   Q.   Okay.  So do you know when -- do you know who, like
23     where -- was it an Ernst & Young person, a Nielsen
24     person, whatever, do you know who actually put the
25     homes on the list?

Page 118

1   A.   No.  E&Y audits, I know they selected the homes and
2     then once it was selected, the home was locked.  You
3     were no longer able to look at the home in the laptop
4     MSM, I think that's what it was called, or you could
5     not go to the home.  You couldn't call the home or
6     anything.
7   Q.   So, in other words, if I'm a Nielsen family and my
8     home got chosen in an audit, nobody can come in and
9     clean it up ahead of time or anything, the auditors
10     are going to come in and do their thing first?
11   A.   Yes.  But you don't know an audit is coming, they
12     don't tell you that you've been chosen to be an audit
13     home.
14   Q.   Right.  But Nielsen knows?
15   A.   Yes.
16   Q.   And so if that's one of your homes, you're told you
17     can't go there?
18   A.   Right.
19   Q.   Because the Ernst & Young people are going to
20     there?
21   A.   Right.
22   Q.   All right.  So you indicated that there had been a
23     change, something had happened where a home wasn't
24     available, correct?
25   A.   Correct.

Page 119

1   Q.   So then it ended up being one of your homes; is that
2     right?
3   A.   Yes.
4   Q.   And it originally was not one of your homes?
5   A.   Correct.
6   Q.   Do you know how it ended up being one of your homes?
7   A.   Yes.
8   Q.   And how do you know that?
9   A.   The E&Y auditor told me that Ryan called the homes
10     they had selected as alternatives and the home he
11     selected was my home and they called and he got in.
12   Q.   All right.  So who selected the homes as alternatives?
13   A.   Ryan would call and if the home is available, it's
14     first available.  So if he calls the home -- he
15     selects the home and they call and say, yeah, you can
16     come at 6:00, that's it.
17   Q.   I'm trying to figure out who the she is with
18     everything, so let's back up a minute.
19     Who is the she?
20   A.   So Ernst & Young has a list of, let's say 20 homes
21     that are going to get audited?
22   Q.   Okay.
23   A.   And those homes are locked?
24   A.   Yes.  Then they have a list of alternative homes in
25     case those homes can't be -- they're not available or

Page 120

1     something happens.
2   Q.   Okay.  And does Ernst & Young come up with that list
3     of alternative homes?
4          MR. GALLAGHER:  Objection, form and
5     foundation.
6 BY MS. NORRIS:
7   Q.   If you know?
8   A.   I don't know.  I guess so.
9   Q.   So you don't know if Ernst & Young says here's our
10     list A --
11   A.   I would say they would because they were in control of
12     all of the audits, so I would say they would come up
13     with the alternatives so --
14   Q.   Okay.  So Ernst & Young has a list of homes that are
15     locked.  Ernst & Young has a list of alternative
16     homes, are they also locked?
17   A.   No.
18   Q.   Okay.  So only if they actually end up getting chosen?
19   A.   Yes.
20   Q.   All right.  And then the Ernst & Young auditor, if I
21     understand you correctly, said that Mr. Dinsmore chose
22     which of the homes off of the alternative list were
23     going to replace a particular home; is that right?
24   A.   Yes.  They were in the car together.
25   Q.   Okay.  And do you know who the Ernst & Young auditor

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

CAUDLE, DAVID
05/15/2019

Pages 125–128

Page 125

1    race?
2  A.  This one time he got irritated with me.
3  Q.  Okay.  Tell me about that?
4  A.  Nielsen sent out an e-mail asking if Nielsen was a
5      nice place for African-Americans to work.  And I
6      showed him the e-mail and I told him like why should I
7      fill this out, this sounds sort of racist?  And he
8      told me, you know, just fill it out, it's no big deal.
9      And I said well, it sort of is.  If it said is Nielsen
10     an okay place for Indians or any ethnicity, why does
11     it say African-American?  Why are they just singling
12     out one race?  It didn't make much sense to me.
13          He said, Dave, why do you have to make
14     everything such a big issue?  He was like, you know,
15     I'm tired of you when you do that.  Just, you know,
16     fill out the survey or don't fill it out, I don't
17     really care.  He was like, you know, just do it or
18     don't do it.
19  Q.  About when was this?
20  A.  I can't remember when the e-mail came out.
21  Q.  Do you know what year?
22  A.  Probably was 2014.
23  Q.  Okay.  So he just wanted you to do whatever you were
24     going to do with the e-mail, but not bother him about
25     it?

Page 126

1           MR. GALLAGHER:  Objection, form.
2  BY MS. NORRIS:
3  Q.  Is that --
4  A.  His body language and anger was something different.
5  Q.  Okay.  Describe as best you can in words?
6  A.  He made the comment, you know, why you got to make
7      such a big deal about it, like you're the only person
8      that gives me this problem?  And I laughed and I said
9      I'm just asking a question.  And he said, you know, I
10     swear, you always ask a question like you're entitled.
11     And I laughed and I said I'm just asking for
12     clarification why Nielsen is just asking about just
13     black people.
14          And he said should it say you people or
15     what, what would make you feel more happy and he
16     giggled.  And I told him, I don't feel like that's
17     funny, like what does you people mean?  And he just
18     told me, he was like I'm not trying to be that way.
19     He said I'm just trying to say.  I said so why would
20     you make a joke like that?  If we're talking about it,
21     why would you say, you know, you people?  And you told
22     me, you know, you just make a big deal out of -- about
23     everything, either do it or don't do it, I don't
24     really care.
25  Q.  Okay.  Anything else that he did to suggest that he

Page 127

1      would discriminate on the basis of race?
2  A.  Not towards me, but what I saw.  I moved to my
3      fiancée's apartment in Farmington Hills.  And
4      according to the Nielsen standards when you move into
5      a new area, your field area is supposed to switch to
6      closer to your home.  He wouldn't switch my field
7      area.  He kept me in Detroit, in the same area, 6272.
8          But James Hardy, he switched his field area
9      three times.  Once because he cried because a guy
10     whipped his son, an African-American male whipped his
11     son in front of him and he said he wasn't raised that
12     way, he couldn't watch something like that.  So he
13     switched him out of Detroit.  Then when he had Oak
14     Park, he said he was driving too far from his home so
15     he switched him to -- no, it was Royal Oak, sorry.  He
16     switched him out of Royal Oak to closer to where he
17     was, but he wouldn't switch me any closer to my home.
18  Q.  Okay.  When did you make the request for the change?
19  A.  As soon as I -- as soon as we moved in together.  I
20     had to update the Nielsen -- I called him, asking him
21     how do I update my address change because I was moving
22     from the 21441 Cambridge home to the apartment in
23     Farmington Hills, I think that was --
24  Q.  Okay.  Of the addresses you gave me, you didn't give
25     me one in Farmington Hills?

Page 128

1  A.  I'm sorry.  In 2015 I moved in with my fiancée in
2      Farmington Hills.
3  Q.  Okay.  I thought you told me that you moved to
4      Cambridge in 2016?
5  A.  I moved back after I moved out from her.
6  Q.  So 2015 -- where were you living in 2014?
7  A.  Cambridge.
8  Q.  And then in 2015 you moved out to live with your
9      fiancée?
10  A.  Yes.
11  Q.  And what was that address?
12  A.  I don't remember the address.  Independence Drive.
13  Q.  In Farmington Hills?
14  A.  Yes.
15  Q.  And was that a home or apartment?
16  A.  Apartment.
17  Q.  And were you renting or buying?
18  A.  It was an apartment, was renting.
19  Q.  How much were you paying in rent?
20  A.  I think it was $1,100, not sure.
21  Q.  And then you moved out of there back to Cambridge in
22     2016?
23  A.  Yes.
24  Q.  All right.  So when you moved from the Cambridge
25     address to Farmington Hills in 2015 is when you asked

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

CAUDLE, DAVID
05/15/2019

Pages 129–132

Page 129

1    for a change of territory?
2  A.  Yes.
3  Q.  And he said no?
4  A.  Yes.
5  Q.  Okay.  Did he tell you why?
6  A.  He couldn't give me a reason why.  He said -- no, he
7    told me he would have to change everybody's -- what
8    everybody was doing and it would be too hard to do at
9    the time.
10  Q.  Other than Mr. Hardy, are you aware of any other
11    people who moved and did not have their territory
12    changed -- or, I'm sorry, who moved and did have their
13    territory changed other than Mr. Hardy?
14  A.  Yeah.
15  Q.  Who else?
16  A.  Brian Burkhardt moved and he got his changed.
17  Q.  Anybody else?
18  A.  Anybody else?  I don't know if they moved, so I can't
19    really say.
20  Q.  Where in Detroit is Cambridge Avenue, 21441?
21  A.  Seven Mile and Lahser area.
22  Q.  Northwest side?
23  A.  Yes.
24  Q.  Okay.  And when you moved to Farmington Hills, where
25    did you move in Farmington Hills, not the address, but

Page 130

1    like physically?
2  A.  Off of Grand River and Halsted.
3  Q.  Okay.  Do you know where Mr. Hardy lived?
4  A.  Not off the top of my head.  I think he lived in --
5    what's that place called next to Inkster?  It starts
6    with a G.  I can't remember the name of it.
7  Q.  And where was his territory?
8  A.  His territory was up in Detroit, Royal Oak, that area.
9    Then he asked for something near -- he moved further
10    out, like towards Ecorse or Pinckney or somewhere and
11    he asked for an area out that way.  Like his area
12    touched Chicago -- or not Chicago, Ohio border.
13  Q.  Okay.  And where was Mr. Burkhardt's territory and
14    where did he ask to be moved?
15       MR. GALLAGHER:  Objection, form and
16    foundation.
17  A.  Brian, I think he stayed in Detroit and then he
18    asked -- he was up towards Port Huron next, out that
19    way.
20  BY MS. NORRIS:
21  Q.  Anything else that Mr. Dinsmore did to suggest he
22    would discriminate on the basis of race?
23  A.  Not that I know of, no.
24  Q.  Okay.  Anything Mr. Dinsmore did to suggest he would
25    discriminate on the basis of your medical condition?

Page 131

1       MR. GALLAGHER:  Objection, form and
2    foundation.
3  A.  Yeah.
4  BY MS. NORRIS:
5  Q.  Okay.  Tell me?
6  A.  He -- when I was sick, he would always call for
7    updates.  And the one time I was out sick, he was
8    calling me, asking me if I could call my homes to get
9    guys in because they weren't answering.  But he
10    specifically told me I can't contact my homes while
11    I'm out.
12       And I made the comment that if I'm not
13    supposed to call my homes, period, why do you want me
14    to call them now to get somebody in?  He said it's
15    helping the market.  And I felt like it wasn't fair,
16    you know.  You don't want me to call my homes while
17    I'm out, have any contact with them, but to help you
18    out, do it -- you know, do me this favor.
19       And the next day he called and he was like
20    so do you know when you're coming back?  And I was
21    like no, I'm going to the doctor.  And he was like
22    okay.  And when I called and told him, I was like I
23    might be able to come back next week.  He was all like
24    oh, good, because me and Josh were talking and we
25    might have had to look for somebody else to fill the

Page 132

1    position if you weren't coming back.  And I said how,
2    if I'm on long-term disability?  And he just was like,
3    you know, you've been out so long, you know, we have
4    to have somebody here.
5  Q.  Okay.  You've given me three things so far.  You've
6    given me that he called for updates when you were out
7    sick, that he asked about having you call the homes to
8    get people in even though you weren't supposed to have
9    to do that when you were out and he asked about when
10    you were coming back and said they might have to look
11    for somebody to fill the position.
12       Anything else that he did to suggest that
13    he would discriminate on the basis of your disability?
14  A.  The other things were just what I heard through other
15    people.
16  Q.  Okay.  I'll come to those in a minute, but I want to
17    talk about these three first, all right?
18       How many times did you go out -- during
19    your employment with Nielsen did you go out on like a
20    leave of absence; in other words, not just I'm off
21    sick for a day, but you were going to be off for a
22    number of days?
23  A.  I don't know.
24  Q.  More than one?
25  A.  Yes.

CAUDLE, DAVID
05/15/2019                                                                           Pages 133–136

Page 133

1   Q.   More than five?
2   A.   I don't know the exact number.
3   Q.   Can you give me a range?
4   A.   To be honest, to give a fair amount, I don't know the
5        exact number, but I know it was kept track of.  I know
6        it was within my Nielsen allotted time off.
7   Q.   Okay.  In general, am I correct that if you were out
8        on a leave you weren't supposed to have to work?
9   A.   Correct.
10  Q.   And you were told that you shouldn't work, correct?
11  A.   Yes.
12  Q.   Okay.  How many times did he ask you to call to get
13       somebody in the home?
14  A.   A lot.  Detroit was a major market and he wanted demos
15       filled.  Since I had the majority of Detroit, it
16       needed to be addressed.
17  Q.   Do you know if you had homes where the people would
18       say they wouldn't deal with anybody but you?
19  A.   I had some homes like that.
20  Q.   And so if you were out that was a problem, right,
21       because those homes needed to be serviced?
22            MR. GALLAGHER:  Objection, form and
23       foundation.
24  A.   I don't think so because if I was out, they knew I
25       couldn't come.  They had other Nielsen reps that were

Page 134

1        there.  I had homes that liked me because they knew
2        me.  They didn't like strangers in their homes.  But
3        there was times when -- like everybody had faults they
4        couldn't get to and other guys ran them for them so
5        another Nielsen guy was in a home.  So they would send
6        probably that person, somebody that had been to the
7        home previously.
8   BY MS. NORRIS:
9   Q.   Do you know if you had homes that refused to let
10       anybody in?
11  A.   To my knowledge, one.
12  Q.   Okay.  When was the leave where Mr. Dinsmore said we
13       might have to look for somebody to fill the position?
14  A.   That was the beginning of 2016, I think.
15  Q.   And how long had you been out?
16  A.   A month.
17  Q.   Do you know how much leave time you had left?
18  A.   Actually that one was workers' comp and it was sort of
19       Ryan's fault so I don't think that counted towards my
20       leave.
21  Q.   Do you know that?
22  A.   Do I know what?
23  Q.   If it counts towards your leave?
24  A.   I heard it was workers' comp so it was handled
25       differently.  It was handled through a different group

Page 135

1        so I don't -- it was told to me that it was a vacation
2        and it turned over to workers' comp, but there was
3        something different than short-term and long-term
4        disability when they called me.
5   Q.   Do you know how long a company is required to allow
6        you to stay out?
7   A.   I did not know that.
8   Q.   Okay.  Do you know whether a company is allowed to
9        replace you at some point in time even if you're out
10       on a legitimate medical reason?
11  A.   I believe it's longer than a month.
12  Q.   Okay.  Do you know what that length of time is?
13            MR. GALLAGHER:  Object to all these legal
14       conclusions being asked.
15  A.   I don't know.
16  BY MS. NORRIS:
17  Q.   Okay.  When Mr. Dinsmore would call and ask you if you
18       could call the home and get somebody in, what did you
19       do?
20  A.   I asked him why first.  And he told me it was -- they
21       were really hard to get in touch with and that the
22       market was hurt.  And I was a team player so I told
23       him, you know, I have no problem calling and I would
24       get them in the home.
25  Q.   Okay.  You said before, that happened a lot.  Can you

Page 136

1        give me some range of what a lot is?
2   A.   Every time I was out at the market -- when I went out,
3        my market dropped, the Detroit market.  And it was one
4        of the main things that the customer looked at, the
5        clients.  They would call having questions about why
6        the demos have dropped, so it was important to have
7        the demos up.  So if power faults need to be fixed and
8        it was in my area and I had the majority of Detroit,
9        they need to be fixed.  So literally every time I was
10       off, he was calling me.  He asked me, you know, can
11       you get us in this home, we tried calling and we
12       haven't been successful.
13  Q.   Do you know if he was telling the truth when he said
14       that?
15  A.   I have no idea.
16  Q.   Okay.  Am I correct that you received annual
17       performance reviews when you were at Nielsen?
18  A.   Yes.
19  Q.   All right.
20            MARKED FOR IDENTIFICATION:
21            DEPOSITION EXHIBIT 9
22            11:58 a.m.
23  BY MS. NORRIS:
24  Q.   You've been handed Deposition Exhibit Number 9.  I
25       believe that this is a performance review for the 2012

CAUDLE, DAVID
05/15/2019                                                      Pages 137–140

Page 137

1    calendar year.  Is that what it looks like to you?
2 A.  Yeah.
3 Q.  And this was given to you in February of 2013; is that
4    right?
5 A.  Yes.
6 Q.  Who gave you this review?
7 A.  Ryan.
8 Q.  And how did you receive it, do you receive it online
9    or in the mail or in person?
10 A.  We set down at a restaurant.
11 Q.  Do you know if that's what he did with other people
12    when he was doing reviews?
13 A.  That's what he liked to do.  I don't know if he could
14    do it with everybody.
15 Q.  Okay.  The first section under objectives, it talks
16    about sets and persons.  Am I correct that sets are
17    televisions, VCRs, those other things that we talked
18    about?
19 A.  Yes.
20 Q.  Okay.  And so when it says in tab minimums maintained,
21    what does that mean?
22 A.  Under objectives?
23 Q.  Under objectives on the first page.
24 A.  Everybody had to be at 92.5 percent for the market to
25    stay balanced.

Page 138

1 Q.  But what does -- 92.5 percent of what, what does that
2    mean?
3 A.  That would be 92.5 percent of out of 100.
4 Q.  You know what you're talking about and I don't know so
5    I'm probably not asking the question well.  I'm trying
6    to understand, what is it that's being measured,
7    what --
8 A.  Out of all your homes, all your homes need to be
9    logged in and recording daily.
10 Q.  Okay.  So if something is down, it goes against that
11    number?
12 A.  Yes.
13 Q.  All right.  And then when it says persons, what's
14    that?
15 A.  Someone is not logging in.  So I have a home where
16    someone cut the TV on and just started watching TV and
17    never logged in, so we don't know who's watching.
18 Q.  Okay.  And the sets/person split, what's that?
19 A.  That was an average they came up with to sort of
20    balance things out.
21 Q.  Am I correct that during this 2012 period you went
22    through an audit?
23 A.  I am not sure if I did because I didn't come on until
24    like later on in that year.  I believe that -- I think
25    I did do an audit, but I'd never been in a home so it

Page 139

1    was sort of like -- it didn't count against me, if I
2    could say that much, because I'd never been in a home.
3    It was just coaching for the future.
4 Q.  This was your first evaluation, right?
5 A.  Yes.
6 Q.  If you look at page 2, down near the bottom you see
7    the paragraph that says AP and PC flag?  Do you see
8    that paragraph?
9 A.  On page 2?
10 Q.  Page 2.
11 A.  Okay.  Bottom of the paragraph?
12 Q.  Yeah.  And if you look just sort of right after that
13    line, it says this past year our market went through
14    the internal audit process.  Do you see that?
15 A.  Yeah.
16 Q.  So that's not an Ernst & Young audit, that's internal,
17    correct?
18 A.  I'm guessing so, yes.
19 Q.  Do you know who chooses the homes for the internal
20    audit?
21 A.  I have no idea.
22 Q.  And this says that your homes went well, correct?
23 A.  I believe so, yes.
24 Q.  And you also received good comments for your working
25    relationships with your team, right?

Page 140

1 A.  Yes.
2 Q.  And you got a 3.0, meets expectations, overall
3    evaluation; is that right?
4 A.  Yes.
5 Q.  Did anybody else -- was anybody else present when you
6    and Mr. Dinsmore met?
7 A.  No.
8 Q.  Did Mr. Dinsmore say anything to you other than what's
9    on this form when he gave you the evaluation?
10 A.  He basically asked me what goals did I have for the
11    next year.  This had been my first year, so sort of
12    rocky.  And he said that it takes a whole year for
13    somebody to get to know everything about the job so
14    don't get overwhelmed.  There was a lot going on with
15    me coming into a market that was really bad.  The
16    market I took over was really, really bad.  So there
17    was a lot going on that first year so he just told me
18    that, you know, keep my head up and keep doing the
19    things I was doing.
20 Q.  And did you have any problem with any part of this
21    review?
22 A.  Since it was my first review and I was sort of still
23    trying to find my feet, no.
24 Q.  Okay.  Did you complain to anybody about it?
25 A.  No.

Page 145

1  Q.  You're not questioning the statistics that are in this
2      evaluation, are you?
3  A.  No.
4  Q.  Okay.
5  A.  What I'm questioning is during -- it was -- it's all
6      in one year and it counts time that I wasn't there so
7      it was -- it was, you know --
8  Q.  It counts time when you were on a leave?
9  A.  It counts the whole year.  So when I was in Oklahoma
10     City, when I was helping out at GTAM, all that goes
11     into effect.
12 Q.  Okay.  It says that your CCE was the lowest in the
13     group.  What is CCE?
14 A.  I don't remember.
15 Q.  Okay.  And it says you did a good job coaching your
16     households, right?
17 A.  Uh-huh.
18 Q.  You have to say yes or no.
19 A.  Yes.
20 Q.  Did you take any leave in 2013?
21 A.  I'm not sure.  I know I was gone working, but --
22 Q.  Yes, in the places we talked about, right?
23 A.  Yes.  But I'm not sure if I was sick during the time
24     or not.
25 Q.  It says that you fell short in your PC co-op rate?

Page 146

1  A.  Yes.
2  Q.  And your PCs metered?
3  A.  Uh-huh.
4  Q.  Now what's the PC co-op rate?
5  A.  The number of people that join the computer sample,
6      getting their PC metered with the Nielsen software,
7      which at the time most people thought that was
8      intrusive.
9  Q.  Some people didn't want their computers on?
10 A.  Well, they didn't know what we were looking at and we
11     didn't have exactly a pamphlet saying what we were
12     metering.  So people watching things they didn't want
13     others knowing or banking information.
14 Q.  Do you know how these numbers compared to other
15     people?
16 A.  Again, no.
17 Q.  Then it says that your FA -- this is the last bullet
18     in this section that we've been looking at.  Your FA
19     saw the highest amount of PTO.  What's that?
20 A.  Turnover.
21 Q.  Mr. Dinsmore also talked to you about overtime
22     management, correct?
23 A.  Yes.
24 Q.  But you got a meets expectations, 3.0 rating, the same
25     as the year before; is that right?

Page 147

1  A.  Yes.
2  Q.  Did you have any problems with that evaluation?
3  A.  No, because we talked about it.  And he told me that
4      me not being there and he can only gauge it on the
5      time I was there, so that's what he gave me the 3 for.
6  Q.  So even though you had a number of numbers low, he
7      recognized that there were factors that played into
8      that and gave you a meets expectations evaluation; is
9      that right?
10 A.  Yes, because the areas just calculated for the whole
11     year doesn't show what field rep did what, it just
12     spits out the number.
13 Q.  Okay.  Did you complain to anybody about this
14     evaluation?
15 A.  No.
16 Q.  Do you know how this evaluation compared to anybody
17     else?
18 A.  No.
19             MARKED FOR IDENTIFICATION:
20             DEPOSITION EXHIBIT 11
21             12:13 p.m.
22 BY MS. NORRIS:
23 Q.  You've been handed Exhibit 11.  This is the PIP that
24     we talked about earlier; is that right?
25 A.  Yes.

Page 148

1  Q.  And this was issued on July 7th, 2014; is that right?
2  A.  That sounds about right.
3  Q.  Did you understand that you were being put on this PIP
4      because of the July 3rd incident regarding the gender
5      discrepancy?
6  A.  No.
7  Q.  Mr. Dinsmore never told you that was the main thing?
8  A.  He told me it was because of my PC performance.
9  Q.  And the PC performance is what's reflected at the
10     bottom of the first page; is that right?
11 A.  Yes.
12 Q.  When did he tell you that?
13 A.  When he brought it up that he had to put me on PIP.
14     He took me out to lunch.  He came to the home, helped
15     me finish the home, then said let's go have lunch.  We
16     went to have lunch and then he brought up that he had
17     to put me on PIP.  He was sad he had to do it and
18     telling me because of my PC numbers that were the
19     lowest out of everybody, they need to come up.  That
20     was the reason he had to put me on PIP.
21 Q.  Did he tell you that anybody else told him to do it?
22 A.  He told me that it was coming down from higher-ups.
23     His bosses told him to do it, after I asked.
24 Q.  If you would read to yourself the paragraph about the
25     July 3rd incident?

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

CAUDLE, DAVID
05/15/2019                                                          Pages 149–152

Page 149

1   A.   Uh-huh.
2   Q.   And then my question at the end of that is going to be
3        is there anything inaccurate in what was stated there?
4   A.   Yeah.
5   Q.   Okay.  What do you disagree with?
6   A.   I told him that -- because they played a joke on me.
7        When you go into N-gage -- or when you go to MSM to
8        make your contacts, it shows the female of the house
9        as Delmar.  So I said if they told me that her name --
10       they reversed the names on me and I select that name,
11       the female of the house who I was talking to, how
12       would I not know that it's the wrong name?
13  Q.   So I'm asking what's incorrect about what's written
14       here?
15  A.   What's incorrect is that he said that in -- inaccuracy
16       reporting the gender of any of your household members
17       is a huge mistake -- well, first, he said it looks
18       like that all your prior phone contacts in this
19       household were with Delmar, which leads me to believe
20       that you knew that Delmar was the lady of the house.
21            And I told him no.  Because when you click
22       on -- filling out your appointment is just a click
23       button.  You click to talk to the female and if it's
24       already populated that that female is Delmar --
25       because they played a joke on me saying well, yeah,

Page 150

1        Delmar is the female.
2   Q.   The household played a joke on you?
3   A.   Yes.  It was an elderly couple.  And I said okay.  I
4        didn't think much of it because we were just asking
5        questions.  If you tell me this is your name, okay,
6        who am I to question?
7   Q.   But did you understand that in fact the names were
8        incorrect in N-gage?
9   A.   I did not know that.
10  Q.   No, I'm asking when you got this PIP, did you
11       understand that in fact the names were incorrect in
12       N-gage?
13  A.   They were changed by the time I got this PIP.
14  Q.   Because somebody learned that they were wrong?
15  A.   Because the ROC had called and then they had told them
16       and they told them that they had made a joke, laughing
17       about it.  And then they made me go out to the home
18       and make the adjustments.
19  Q.   Right.  My question though is do you agree that what
20       you put in was incorrect?
21  A.   No.  What I put in was right at the time because I was
22       going off what I knew.
23  Q.   I'm not asking if it was because they played a joke on
24       you or because the household was telling you something
25       different.  I'm asking if in fact what you put in in

Page 151

1        N-gage for who was the male and who was the female was
2        not correct?
3             MR. GALLAGHER:  Asked and answered.
4   A.   I mean, I'm basing the answer off what I'm telling
5        you.  So basing off what I put in N-gage, it was
6        correct under my knowledge.
7   BY MS. NORRIS:
8   Q.   Okay.  Let me ask this --
9   A.   Now --
10  Q.   Now you know it's different?
11  A.   Now I know it's different.
12  Q.   Okay.  So let me ask the question differently.  I'm
13       not asking if you knew when you put it in that it was
14       wrong, that's not my question.
15            My question is in fact what you put in, the
16       statistics that were being generated, the data that
17       was being generated, was incorrect, right?
18  A.   Correct, correct.
19  Q.   Okay.  And then after the fact you learned the
20       household had given you the wrong names?
21  A.   Yes.
22  Q.   Okay.  Anything else that you think is incorrect here?
23            MR. GALLAGHER:  I'm not sure he finished
24       the first thing.
25            Did you finish?

Page 152

1             MS. NORRIS:  That will fall within anything
2        else.  He can tell me anything else that he thinks is
3        wrong.
4             MR. GALLAGHER:  Well, if he hasn't
5        finished --
6             MS. NORRIS:  I haven't limited him in any
7        way, except not to repeat what he already told me.
8             MR. GALLAGHER:  I mean, that's just not the
9        case, but okay.
10            MS. NORRIS:  What do you mean, it's not the
11       case?
12  A.   Yes, June 17th --
13            MR. GALLAGHER:  All day, he can't talk.
14            MS. NORRIS:  Just wait just a minute,
15       Mr. Caudle.
16            Counselor, I asked if there's anything he
17       thought was incorrect.  He identified something that
18       he thought was incorrect.  I asked him questions about
19       that issue.  I asked is there anything else you think
20       is incorrect and you're telling me I cut him off, he
21       wasn't finished with that one.  He told me one.  I
22       asked him about one.  Now I'm asking anything else.
23            MR. GALLAGHER:  Sure, we can go back there.
24       No, he didn't finish because he was in the middle of
25       talking about how when he put it in and it was already

CAUDLE, DAVID
05/15/2019

Pages 153–156

---

**Page 153**

1  in there, the lady of the house every time since --
2  that when it came to Ryan being -- believe that you
3  knew that Delmar was the lady of the house, he was in
4  the middle of explaining something.
5      MS. NORRIS:  No, he told me that he thought
6  that was wrong.
7      MR. GALLAGHER:  Yeah, and then he's in the
8  middle of explaining there and then you cut him off
9  and you went somewhere else.
10     MS. NORRIS:  He told me what he thought was
11 wrong.
12     MR. GALLAGHER:  And he was in the middle of
13 the explanation.
14     MS. NORRIS:  So this is the thing, I can
15 ask for explanations or not.
16     MR. GALLAGHER:  And he can give you them in
17 the middle of --
18     MS. NORRIS:  No.
19     MR. GALLAGHER:  Yes, he can.  He can
20 testify how he wants.  I believe it was you that
21 jumped off at me about -- last week saying you can't
22 say yes or no, right?  He can --
23     MS. NORRIS:  I didn't ask him to say yes or
24 no.
25     MR. GALLAGHER:  He can explain himself.

---

**Page 154**

1      MS. NORRIS:  I did not ask --
2      MR. GALLAGHER:  That is a fair testimony.
3  He's allowed to put his testimony forward.  He cannot
4  be tricked into testifying other ways.
5      MS. NORRIS:  I'm not trying to trick him at
6  all, I'm asking him what the issues are.
7  BY MS. NORRIS:
8  Q.  Have you identified anything else that you think is
9      incorrect in Exhibit 11?
10 A.  The June 17th.  There was multiple people in the home
11     helping me meter the home.  What Ryan found that was
12     wrong, it wasn't done by me.  And when he told me to
13     go look for it to fix it, it was at the wrong site.
14     So when he went back in and fixed it, I told him, I
15     said, no, you told me it was in this bedroom.  He said
16     either way, you should have checked it and found it.
17         I said how would I check and find it if
18     everything was considered right?  Because we had
19     checkmarks if everything was connected correctly and
20     is green-lighted.  I said how would I know to look for
21     it if you're telling me to go look in X, Y, Z and it's
22     not there and I call you, you just go fix it and you
23     don't tell me?
24 Q.  Okay.  So I have a few follow-up questions about this
25     one.  So the -- when it refers to the field manager,

---

**Page 155**

1  that's Mr. Dinsmore; is that right?
2  A.  Yes.
3  Q.  And it says Mr. Dinsmore found some errors in devices.
4      Is it correct that he found some errors?
5  A.  Yes.
6  Q.  Okay.  And is it your testimony that other people made
7      those errors?
8  A.  On the second one?
9  Q.  We're looking at the June 17th entry.
10 A.  Yes.
11 Q.  Is it your testimony that other people made those
12     errors?
13 A.  Yes.
14 Q.  And who were those other people?
15 A.  I don't know who was in the home at the time helping
16     me meter, but we had went over it.  And he told me
17     since it was my install, that I should have made sure
18     it's correct.  And at this time when it had happened,
19     it was the first time it ever happened to me so I was
20     asking for clarification.  And I told -- when he told
21     me what room to look at, when I went to that room
22     nothing was wrong.  I called him about it and instead
23     of telling me no, it was this room, he just went and
24     fixed it so it could be updated.
25 Q.  Okay.  Anything else you think is incorrect?

---

**Page 156**

1  A.  Well, I feel like that was correct because he said he
2      had to go in N-gage and fix it and clarify it, when he
3      could have just told me and I could have did it.  And
4      I feel like that was wrong because I was asking him
5      for the info, so instead he did it and then chalked me
6      up for it.  And I'm like look, you gave me
7      misinformation and I'm asking you so I can go fix it
8      because I didn't see it.
9  Q.  Okay.
10 A.  He was just like well, I had to fix it because you
11     didn't do it and it needed to be done.  And I was like
12     well, we were doing it at the same time.  But for him
13     it was just like getting it done and getting it over
14     with.
15 Q.  Anything else?
16 A.  On that issue, no.
17 Q.  Okay.  Anything else on the first page of this
18     exhibit?
19 A.  The June 8th, about complete -- we had an issue with
20     N-gage because I was working more overtime than
21     everybody else.  So me doing my paperwork was done
22     late at night, so N-gage resolutions were done late.
23     And I told him if I'm working, I don't get home until
24     9:00, 10:00, I shower.  You know, I got to sleep
25     before I get up and start working at 8:00, it's hard

---

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

CAUDLE, DAVID
05/15/2019

Pages 157–160

Page 157

1    to do everything.
2    And he was telling me I need to work on my
3    overtime.  And I was telling him that I need to work
4    on the homes, had a lot of homes that were squatters
5    and, you know, people that just up and left Detroit.
6    So it was hard tracking down faults.  And I told him
7    it was hard for me to find a balance and we never
8    worked on a plan to find that balance.
9  Q.  Okay.  Anything else?
10 A.  The PC co-op rate I didn't know anything about.  So I
11   asked him -- that was the main thing he told me I was
12   getting wrote up for, then these other things popped
13   up.  So that was the main one I was upset about and
14   that's when I brought up that I felt like I was being
15   discriminated against.
16 Q.  That's the conversation we talked about earlier,
17   correct?
18 A.  Yes.
19 Q.  Anything else that you think is wrong here?
20 A.  No.  I have an issue because it seems like it's the
21   same thing on July 7th that was on June 8th and I
22   don't know about that.  I can't -- I don't recall that
23   being on here, but okay.
24 Q.  Did you actually sign the PIP?  The one in front of
25   you is not signed --

Page 158

1  A.  No, because I didn't agree with it.
2  Q.  Okay.
3  A.  So to my knowledge I don't believe I ever signed it.
4  Q.  Was the document that was presented to you the same as
5    the document that's in front of you right now?
6  A.  Yes.
7  Q.  Okay.
8  A.  But it didn't -- I remember asking him what PIP meant
9    and it wasn't written on here like you would lose your
10   bonus and all this other stuff, so that was something
11   else.
12 Q.  Do you know if anybody has ever been terminated for
13   having the demographic information incorrect?
14 A.  They said somebody had been, but, no, because I know
15   plenty of field reps that made that mistake.
16 Q.  Who said people have been terminated for this?
17 A.  Ryan.  You know, that's a typical scare tactic to tell
18   everybody.  You know, guys have been fired for doing
19   this and, you know, we've got to make sure we don't do
20   this.
21 Q.  Who else made the mistake?
22 A.  Tim Franklin.  James Hardy.  Shermir told me he made a
23   mistake before.  Matt Bradley said he got dinged on a
24   house before.  I think Dave Shock told me it happened
25   to him once.

Page 159

1  Q.  Anybody else?
2  A.  Off the top of my head, that's all I remember.
3  Q.  Do you know what Tim Franklin mixed up?
4  A.  No.
5  Q.  Do you know what Shermir mixed up?
6  A.  No.  They just told me that -- when I was talking to
7    them about it, they said don't take it too hard, you
8    know, households have a tendency to lie.  And
9    sometimes they think without really talking, like they
10   don't listen to you, so don't worry about it.
11 Q.  You said that Matt Bradley got dinged for it?
12 A.  It happened to him is what I meant.
13 Q.  Okay.  Did he tell you if anything happened as a
14   result?
15 A.  No.  He said that Ryan was tagging along with him and
16   he did an audit and Ryan caught it and that was it.
17 Q.  Am I correct that you took a leave of absence in the
18   beginning of -- I'm sorry, late in 2014?
19 A.  Late, yes.
20 Q.  Okay.  This was for a work-related injury?
21 A.  Yes.
22 Q.  Am I correct that your leave started around
23   November 19th, 2014?
24 A.  Yes.
25 Q.  And am I correct that you hurt your back when you were

Page 160

1    turning while you were holding a TV?
2  A.  That's not how I hurt my back.
3  Q.  Tell me how you hurt your back?
4  A.  Well, first off, Ryan was at the house prior to.  It
5    was a TV that needed two people to lift.  And the TV
6    needed to be opened up to be metered, the speakers
7    needed to be metered on the inside.  It was upstairs
8    in the master bedroom.  And it was a Sony TV, like a
9    38-inch with the metal plates at the bottom with
10   old -- with the tube on the back, the heavy ones.
11   Ryan knew that the entertainment stand that
12   it was on was wobbly and he said that's the reason why
13   he didn't take it down and try to meter it when he was
14   up there.  So he scheduled Raul to go out there and do
15   it.  Raul didn't want to do it because he had hockey.
16   He put me on it.  And when I went out there to do it,
17   I lifted the TV up, put it on the floor, opened it up
18   and metered it.  When I went to put it down, the stand
19   wobbled and the TV almost fell.  So I caught the TV so
20   it wouldn't smash my foot and I threw my back out.
21   I immediately called Ryan because I was
22   laying on the floor for like 15 minutes.  The lady
23   asked me if I was okay.  When I was able to get up, I
24   got to my car, called Ryan and told him I had hurt my
25   back at the house.  He asked what happened.  I told

CAUDLE, DAVID
05/15/2019

Pages 161–164

Page 161

1    him.  He said oh, man, that TV was heavy, I guess
2    there should have been two of you guys.
3            Then he said what are you going to do?  I
4    said I think I'm about to go to the hospital because
5    I'm feeling numb and my legs are feeling numb.  He
6    said okay, tell me what happens.  I went to the
7    hospital, told them it was work related.  Then Ryan
8    called me back saying -- no, Ryan didn't call me back.
9    Nielsen called me back and wondered why Ryan didn't do
10   an incident report at the time.
11           Ryan called me back like four days later to
12   do an incident report about what happened.  He didn't
13   do it right then and there.  Then they sent me to
14   Concentra to get checked out by their personnel and
15   they deemed that my back was messed up and that I was
16   on workers' comp and I had to go back and forth with
17   them getting treatment.
18   Q.   Did the company contest your workers' comp in any way?
19   A.   No.
20   Q.   Were you paid workers' comp?
21   A.   Yes.
22   Q.   Am I correct that you were originally scheduled to
23        return to work on November 26th?
24   A.   Yes.
25   Q.   And you did not return then, did you?

Page 162

1    A.   No.
2    Q.   Your leave was extended to December 1st?
3    A.   Yes.
4    Q.   You did not return on December 1st either, did you?
5    A.   No.  At that point Nielsen had a nurse coming to me --
6         to my appointments and the nurse saw how bad my back
7         was and said I couldn't come back to work.
8    Q.   Am I correct that you finally returned on
9         January 13th, 2015?
10   A.   That was the week before, where Ryan threatened,
11        saying they were going to find somebody else to
12        replace me because I was out.
13   Q.   Your doctor released you to return to work with
14        restrictions; is that right?
15   A.   Yes.  And there were no restrictions -- Nielsen didn't
16        have light duty.
17   Q.   So Nielsen found a position for you that met your
18        restrictions, didn't they?
19   A.   Ryan created a position that wasn't supposed to be
20        there.
21   Q.   What do you mean, it wasn't supposed to be there?
22   A.   Nielsen doesn't have light duty.  So Ryan created me
23        helping Damen, a part-time worker, in a position that
24        shouldn't have been there.  It allowed me to come in
25        and help, but I -- according to him, it wasn't a

Page 163

1         company position.
2    Q.   But it met your restrictions, correct?
3    A.   Correct.
4    Q.   Are you saying he shouldn't have done that, he
5         shouldn't have let you come back to work?
6    A.   According to what he told me, yes.
7    Q.   No, I'm asking --
8    A.   Yes.
9    Q.   Did you want to go back to work?
10   A.   If they met my restrictions, but at the time he told
11        me they didn't so he came up with that.
12   Q.   Right.  But the job that he gave you did meet your
13        restrictions, right?
14   A.   Yes.
15   Q.   Okay.  How long did you stay in that modified
16        position?
17   A.   I don't remember.  I think it was two weeks, something
18        like that.
19             MARKED FOR IDENTIFICATION:
20             DEPOSITION EXHIBIT 12
21             12:30 p.m.
22   BY MS. NORRIS:
23   Q.   You've been handed Deposition Exhibit Number 12, which
24        is an e-mail exchange.  If you go to the second page,
25        you'll see that there's an e-mail from Mr. Dinsmore to

Page 164

1         you that says hi, Dave, your return to work is
2         effective and goes on with what the duties will be and
3         what your restrictions are; is that right?
4    A.   Uh-huh.
5    Q.   You have to say yes or no.
6    A.   Yes.
7    Q.   And then he told you that you could not work outside
8         your restrictions; is that right?
9    A.   Correct.
10   Q.   And then you responded, all caps, I fully agree, with
11        a bunch of explanations points and a bunch of thumbs
12        up emojis; is that right?
13   A.   Correct.
14             MARKED FOR IDENTIFICATION:
15             DEPOSITION EXHIBIT 13
16             12:31 p.m.
17   BY MS. NORRIS:
18   Q.   I've handed you Deposition Exhibit Number 13, which is
19        your performance review for the year 2014; is that
20        right?
21   A.   Yes.
22   Q.   And you got this in February of 2015; is that right?
23   A.   Yes.
24   Q.   Was this, again, at a restaurant with Ryan?
25   A.   Yes.

CAUDLE, DAVID
05/15/2019

Pages 173–176

Page 173

1     given to you in February of 2016?
2  A.  Yes.
3  Q.  And is this, again, at a restaurant with Ryan?
4  A.  Yes.
5  Q.  It looks like the company moved to a different
6     evaluation format; is that right?
7  A.  I think it was still the same, they just printed out
8     different.
9  Q.  Okay.  If you go to page 4, it looks like that's where
10    the comments are, correct?
11  A.  Okay.
12  Q.  Mr. Dinsmore commended you for assisting in Dayton and
13    Columbus, didn't he?
14  A.  Yes.
15  Q.  What had happened in those areas?
16  A.  Josh came to me and asked me if I would be willing to
17    go to Dayton to help the guys out there that were --
18    some of the new techs weren't catching on.  The faults
19    were getting high.  And he asked if I would go out
20    there and show them how I was doing my faults because
21    I was handling it at such a high rate and
22    quality-wise.
23  Q.  So people needed some training, some additional
24    training?
25  A.  Yes.

Page 174

1  Q.  And when you say Josh, you mean --
2  A.  Josh Hummel.
3  Q.  Thank you.  That was what I was going to ask.  How
4    long were you in Dayton and Columbus?
5  A.  I went back and forth so I think I went there almost a
6    month altogether.
7  Q.  And you went into other people's homes at that time?
8  A.  Yes.
9  Q.  Did you go with the other techs or on your own or
10    both?
11  A.  I shadowed the techs the first time to see what they
12    were doing and then I actually went on calls by myself
13    to try to fix faults to get them -- the market back
14    up.  So my job was to watch them and train them in
15    what they were doing, the way they were interacting
16    with the customer, things they weren't catching
17    because they weren't paying attention.
18  Q.  Did you have any difficulty getting into any of the
19    homes?
20  A.  No.
21  Q.  Did you ever have any problems with Mr. Hummel?
22  A.  No, never really ran into Josh.
23  Q.  Mr. Dinsmore also recognized that you'd improved on a
24    number of your metrics, correct?
25  A.  Correct.

Page 175

1  Q.  And that your homes really liked you, correct?
2  A.  Yes.
3  Q.  And you acknowledge that you needed to cut down on
4    overtime, right?
5  A.  Yes.
6  Q.  And you needed to get your PC number into the green,
7    correct?
8  A.  Yes.
9  Q.  What does that mean?
10  A.  That's what he was talking about the last month about
11    my PC numbers not being as high.  The green means
12    you're acceptable.
13  Q.  So it just is on the spectrum --
14  A.  Yes.
15  Q.  -- green is you're good enough, yellow is not quite so
16    good and red is bad?
17  A.  Correct.
18  Q.  Okay.  Even though you were on a leave at the
19    beginning of this year, you got your overall rating
20    back up to 3.0, correct?
21  A.  Yes.
22  Q.  Did you have any problems with this review?
23  A.  No.  I asked him how it was a little different.
24  Q.  What do you mean?
25  A.  He took into consideration me being out on my back

Page 176

1    injury, everything.  But when I was -- the previous
2    review when I was out, he didn't take consideration
3    for it.
4  Q.  So you thought he should have done so before and you
5    said that and then in this one he did?
6  A.  Yeah.
7  Q.  Okay.  You were pleased with that, right?
8  A.  Yeah, because at this point I thought me and him had a
9    good relationship.
10  Q.  And you did not complain to anybody about this, did
11    you?
12  A.  No.  I was told from the day I started that 4s are
13    rarely given out, so a 3 was like one of the best
14    things you could get.  I did have one critique on this
15    one.
16  Q.  Which was what?
17  A.  He said my strength was -- I wasn't afraid of working
18    overtime, working as much as it takes to get the job
19    done, but then he critiqued me on working too much
20    overtime at the same time.  So I told him it was a
21    sandwich comment.
22  Q.  What do you mean by that?
23  A.  You can't ding me saying I work too much overtime and
24    say it's one of my strengths that I do it.
25  Q.  Is it possible he meant that he thought you had a

CAUDLE, DAVID
05/15/2019

Pages 177–180

Page 177

1    ready good work ethic, but he also thought you needed
2    to not have so much overtime?
3          MR. GALLAGHER:  Objection; form,
4    foundation.
5 BY MS. NORRIS:
6 **Q.**   Yeah, you can --
7 **A.**   **When I asked him to it, he told me that he liked it**
8      **because it helped the market and it showed my drive,**
9      **but at the same time, you know, he still dinged me on**
10     **it.**
11 **Q.**   Am I correct you took another leave of absence in
12      2016?
13 **A.**   **I did.**
14 **Q.**   And what was that for?
15 **A.**   **I think that was for my arm.**
16 **Q.**   What happened to your arm?
17 **A.**   **Actually I hurt it putting a TV into a customer's**
18      **entertainment stand and then I sort of woke up putting**
19      **pressure on it, you know, put your hand down to push**
20      **yourself up, and I dislocated the bone in it so I had**
21      **to put a cast on.**
22 **Q.**   Was this workers' comp or was this something else?
23 **A.**   **No, because it happened at home so they can't call it**
24      **workers' comp.**
25 **Q.**   Okay.  You were doing -- you were doing this on your

Page 178

1    own TV?
2 **A.**   **No, I hurt it at the customer's house, but I never**
3      **reported it.  It's like you smash something, you're**
4      **like ouch and as a guy you shake it off, it didn't**
5      **feel like it was hurt.  Then when I -- the next day**
6      **when I was at home, I was pushing up off the bed and**
7      **literally putting the pressure on my hand to push**
8      **myself up, I injured my arm.**
9 **Q.**   So this was treated as a disability, but not workers'
10     comp?
11 **A.**   **Yes.**
12          MARKED FOR IDENTIFICATION:
13          DEPOSITION EXHIBIT 16
14          12:47 p.m.
15 BY MS. NORRIS:
16 **Q.**   You've been handed Deposition Exhibit 16, which is --
17      it looks to me like it's a letter from MetLife to you
18      saying that your leave is approved starting May 10th;
19      is that right?
20 **A.**   **Correct.  That's the address I was living at.**
21 **Q.**   The Farmington Hills address?
22 **A.**   **Yes.**
23 **Q.**   And this was treated as leave under the Family Medical
24      Leave Act; is that right?
25 **A.**   **Yes.**

Page 179

1    For Nielsen, if you had a nonworkers' comp injury, if
2    you --
3 **A.**   **You know what, this is May, this is sickle cell.**
4 **Q.**   You think this one is sickle cell?
5 **A.**   **Uh-huh.**
6 **Q.**   What makes you think that?
7 **A.**   **Looking at the date.**
8 **Q.**   Okay.  Do you know when the other -- the issue with
9      your arm was compared to this?
10 **A.**   **I can't remember.**
11 **Q.**   You don't know if it was before or after?
12 **A.**   **It might have been before because it's getting close**
13      **to the time I got let go so -- to be honest, it could**
14      **be that time.**
15 **Q.**   Okay.  Let me ask you this because you don't have to
16      guess.  When you hurt your arm, about how long were
17      you off for that?
18 **A.**   **I want to say -- I think it was a month or two months.**
19 **Q.**   And that was in 2016?
20 **A.**   **Yeah, I'm pretty sure.**
21 **Q.**   And when you went out for sickle cell in 2016, was
22      that the first time you'd taken leave for sickle cell
23      at Nielsen?
24 **A.**   **Leave, no, I had been off sick.  I don't think I**
25      **took -- I was -- yeah, that was the first time I took**

Page 180

1    **off for that because the other times I just used sick**
2    **days.**
3 **Q.**   Okay.  So when you took the leave for sickle cell in
4      2016, how long were you off for that?
5 **A.**   **I think it was the end of August until -- I think it**
6      **was September-something when I came back and then Ryan**
7      **suspended me or was it October?**
8 **Q.**   So the sickle cell leave was the last leave you took?
9 **A.**   **Yeah.**
10 **Q.**   Okay.
11 **A.**   **The day I came back is the day Ryan suspended me.**
12 **Q.**   All right.  So for right now, looking at Exhibit 16,
13      I'm not going to guess which of those leaves it was,
14      okay?
15          Am I correct that the leave was also
16      covered by the Family Medical Leave Act?
17 **A.**   **Uh-huh.**
18          MR. GALLAGHER:  Objection; form,
19      foundation.
20 BY MS. NORRIS:
21 **Q.**   You have to say --
22 **A.**   **Yes.**
23 **Q.**   Okay.  And was the process -- if you had a leave of
24      absence that was not work related, so it's something
25      personal, whether it's your arm or sickle cell or

CAUDLE, DAVID
05/15/2019

Pages 181–184

Page 181

1    whatever, but it's not workers' comp, am I correct
2    that the process was that you would go through
3    MetLife?
4  A.  Yes.
5  Q.  Okay.  Did you apply to anybody at the company or did
6    you just contact MetLife directly?
7  A.  MetLife was part of our disability, that was already a
8    part of Nielsen.  They had a contract with them so --
9  Q.  Were you required to notify anybody at Nielsen or did
10    MetLife take care of that?
11       MR. GALLAGHER:  Objection to form and
12    foundation.
13  A.  I contacted somebody in HR and they would tell me to
14    contact the person at MetLife and they took over the
15    case.
16  BY MS. NORRIS:
17  Q.  All right.  When you contacted somebody in HR, do you
18    know who you spoke to?
19  A.  No.
20  Q.  Did you tell them what the medical issue was or just
21    that --
22  A.  Yes.
23  Q.  -- you needed leave?
24  A.  I told them the medical issue.
25  Q.  Okay.  So whichever one it was in May, you would have

Page 182

1    told them about it?
2  A.  Yes, because they had to document it.
3  Q.  Once you contact MetLife for leave, do you know what
4    information MetLife provides Nielsen?
5  A.  No.
6  Q.  Do you know who decides if the leave is granted?
7  A.  No.
8  Q.  And this leave was granted, correct?
9  A.  Yes.
10  Q.  The letter, Exhibit 16, says it's granted through
11    June 6th.  Do you know if you returned on June 7th?
12  A.  I'm not sure.
13       MARKED FOR IDENTIFICATION:
14       DEPOSITION EXHIBIT 17
15       12:51 p.m.
16  BY MS. NORRIS:
17  Q.  Okay.  Exhibit 17 is also a MetLife letter.  This one
18    is dated August 17th, 2016 and this talks about a
19    leave starting August 8th, 2016.  Do you think that
20    was your last leave?
21  A.  No.
22  Q.  Okay.  So you think there was another one after this?
23  A.  Or was continuing.
24  Q.  What do you mean?
25  A.  It was extended after the date.

Page 183

1  Q.  Okay.  I'm not asking if this ended when this letter
2    says it ended --
3  A.  I'm not sure if this is the only one I had or if there
4    was another one, I just know --
5  Q.  Okay.  Between Exhibit 16 and Exhibit 17, do you think
6    we covered both your arm and sickle cell?
7  A.  I believe so.
8  Q.  All right.  And I think you told me that your arm was
9    one to two months; is that right?
10  A.  I believe so.
11  Q.  All right.  And you think that sickle cell was your
12    last leave; is that right?
13  A.  Yes.
14  Q.  All right.  Exhibit 17 initially says that the leave
15    is granted from August 8th through August 28th?
16  A.  Uh-huh.
17  Q.  Is that what you asked for at the time?
18  A.  No.
19  Q.  What did you ask for?
20  A.  I didn't ask for anything.
21  Q.  What do you mean, you just said I need to be out?
22  A.  It was a doctor's note and then it was approved by
23    MetLife.  It was nothing that I went to them and said
24    I need time off.
25  Q.  Okay.  So it was just whatever the doctor's note said?

Page 184

1  A.  Yeah.
2  Q.  Did you come back on August 28th?
3  A.  I'm not sure.
4  Q.  Do you recall taking more than one leave for sickle
5    cell in 2016?
6  A.  I'm not sure if I took another one, like I said, if it
7    was extended.  I'm not sure.
8  Q.  Okay.  Did you understand that while you were out
9    Brian Molnar from Jacksonville came to Michigan to
10    help?
11  A.  Yes.  I didn't know his last name, but I knew his
12    first name.
13  Q.  And you thanked Brian for that; is that right?
14  A.  No, he lied on me.
15       MARKED FOR IDENTIFICATION:
16       DEPOSITION EXHIBIT 18
17       12:54 p.m.
18  BY MS. NORRIS:
19  Q.  I've handed you Deposition Exhibit 18, which, again,
20    is an e-mail.  There's an e-mail dated September 9th
21    from Ryan Dinsmore telling people that Brian Molnar
22    was coming and then there's an e-mail from you saying
23    thanks a lot, Brian; is that right?
24  A.  I didn't know what he did.  This was with him coming in
25    and I told him thank you, yes.  He was supposed to be

CAUDLE, DAVID
05/15/2019

Pages 185–188

Page 185

1    handling my field area.

2  Q.  Okay.  What did he lie about?

3  A.  He went to a home and asked them if I ever asked them

4    to lie about TVs not being metered, if there was any

5    un-metered devices in the home and something else.

6  Q.  So what did he lie about?

7  A.  He went to the home saying that -- first he said I

8    told the home that he could come there.  And he said

9    well, I just need to check -- you know, Dave needs to

10    know, is there any un-metered TVs in the home, that's

11    the first question he asked.

12  Q.  Okay.  Is that a lie?

13  A.  Yes, because I hadn't talked to him.  Other than this

14    e-mail, I didn't know him, so I didn't ask him to go

15    to any home.

16  Q.  Okay.

17         MR. GALLAGHER:  Can you please let him

18    finish talking?

19  BY MS. NORRIS:

20  Q.  Go ahead.

21  A.  The household called me, asking me did they -- did I

22    know this guy because he kept calling asking these

23    questions.  And I told them I was off sick.  And they

24    asked me if I knew a Brian.  I said yes, he's coming

25    in, he's supposed to be checking my field area.

Page 186

1          Then she said well, he's asking me these

2    questions about TVs in the home, if you ever lied, did

3    you ask us did we not have any TVs metered on purpose

4    and that she knew about.  And she said that she kept

5    asking like why would you ask me this if you're from

6    out of town?  And she said the manager -- he said that

7    the manager told him to ask these questions, and that

8    was Ryan.

9  Q.  Do you know if Ryan did that?

10  A.  I have no idea.  I know that the lady of the house

11    called the head of Nielsen field reps.  She e-mailed

12    them and she wrote something on the Better Business

13    Bureau about the situation.  When I came back to work,

14    I set a fault date to go to that home.  When I went to

15    that home -- or when I was on the way to that home,

16    Ryan took that home out of sample.  The lady of the

17    house got upset and at that time I found out I was

18    suspended later on that day.  And Ryan went back to

19    that home and gave them $700 for the incident because

20    he was wrong for it and he apologized for it.

21         MARKED FOR IDENTIFICATION:

22         DEPOSITION EXHIBIT 19

23         12:57 p.m.

24  BY MS. NORRIS:

25  Q.  I'm handing you Deposition Exhibit 19.  Is this the

Page 187

1    e-mail that the woman sent?

2  A.  Yeah, I guess, yes.

3  Q.  Okay.  If you go down about two-thirds, there's a

4    sentence that starts, we began getting harassing

5    calls.  Can you find that for me?

6  A.  Yes.

7  Q.  Do you see that?

8  A.  Yes.

9  Q.  It says we began getting harassing calls and texts

10    when Dave was out on leave.  A person named Brian

11    called and texted relentlessly attempting to gain

12    access to my home because one of our televisions, he

13    said, was not reporting.

14         Do you know if it is true that one of their

15    televisions was not reporting?

16  A.  I don't know because I wasn't supposed to be looking

17    at company stuff, so I was on a sick leave.

18  Q.  Okay.  All right.  She next says we unplugged all our

19    appliances, including Nielsen equipment, to protect it

20    during a storm and one of our children hadn't plugged

21    it back in.

22         If that's true, in other words, if they

23    unplugged everything and then they didn't plug

24    something back in, would that show that it was not

25    reporting?

Page 188

1  A.  Yes.

2  Q.  All right.  And that would be a problem, correct?

3  A.  It would be a problem to that date and it would fix

4    itself the next day.

5  Q.  Then it says Brian continued harassing us and finally

6    said Dave told him to call us and text us.

7         And your testimony, as I understand, is I

8    never talked to Brian, I didn't tell him to do

9    anything; is that right?

10  A.  Brian never called me.  And the lady of the house said

11    did you give Brian the okay to come over?  And I told

12    her that I was out sick and I haven't contacted

13    anyone, that's the only thing I told her.  And then

14    she said that --

15  Q.  Okay.  But just -- I haven't asked what she said,

16    except what I just read.

17         You told me, and I understand your

18    testimony to be that the statement that you told Brian

19    to call her was false, right?

20  A.  Yes.

21  Q.  All right.  And then when she says he claimed Dave was

22    the one who sent him specifically, that's false --

23  A.  Correct.

24  Q.  -- correct?

25    Okay.  She then says I called Dave and

CAUDLE, DAVID
05/15/2019                                                          Pages 193–196

Page 193

BY MS. NORRIS:
2   Q.   So if in fact she said she thought she was being
3        cheated out of her benefits, would there be any
4        violation of policy of any kind to give her the
5        benefits to take away that claim?
6             MR. GALLAGHER:  Objection, foundation.
7   A.   Nielsen doesn't give any home $700 a month, so I don't
8        know how that would equal in value and I don't think
9        the home was even getting $100 a month.  So the
10       monetary value doesn't add up.
11            I've never seen a Nielsen home, unless it
12       was a basic, get that amount of money, and I'm saying
13       $100.  No home has ever gotten $700 for being
14       canceled.  So in this situation, I'm the outside guy.
15       When I found out everything that was going on and my
16       name was being used and that Ryan had sent an outside
17       rep who didn't know me and asked him to ask certain
18       questions about me, I'm looking puzzled.
19            And this is just by her conversation, then
20       she told me she e-mailed the Nielsen VP guy and then
21       she told me that Ryan was on the way out to her house
22       to pick up the equipment and offered her the Visa gift
23       cards for inconvenience and told her that he was very
24       sorry for everything that happened.
25  BY MS. NORRIS:

Page 194

1   Q.   Could you go to -- back to Exhibit 14 for me?
2   A.   Okay.
3   Q.   This is your complaint.  Could you go to paragraph 13
4        on page 2?
5   A.   Okay.
6   Q.   It says that you suffered from sickle cell anemia and
7        then paragraph 14 says you were -- in 2013 you were
8        required to miss a short period of time due to
9        disease.  Do you know how much time that was?
10  A.   I think it was two weeks, I'm not sure.
11  Q.   And do you think you just did that with sick days?
12  A.   Yes, I'm sure.  I had to use all my sick days up first
13       before anything kicked in.
14  Q.   Do you know when in 2013 that was?
15  A.   No.
16  Q.   Did you ever request a leave of absence from Nielsen
17       and have it denied?
18  A.   No.
19  Q.   We've talked -- I asked earlier whether Mr. Dinsmore
20       ever said anything to suggest he had problems with
21       your medical condition and you told me about some
22       specific conversations you had with him and you also
23       told me about some conversations that were related to
24       you by other people.
25            Is there anything else that he did to

Page 195

1        suggest that he had a problem with you being on leave
2        that you haven't already told me about?
3   A.   He made a joke about -- we were all at a breakfast and
4        somebody was sick and he was, oh, don't cough by Dave,
5        you know, he'll be sick and be out and then you guys
6        will have to cover.
7   Q.   When was that?
8   A.   It was sometime in 2015.  And the guys said, you know,
9        yeah, y'all know we don't like covering for Dave.
10       Because it meant them taking away their job to
11       cover for mine.  Because Brian was the only time --
12       one of the only times they called somebody in to
13       actually cover my field area.  So all the other times
14       those guys had to do their work, plus mine.
15  Q.   I'm asking right now about comments specifically that
16       Mr. Dinsmore made.  So you just related one to me,
17       that he said don't cough by Dave or you'll be out,
18       correct?
19  A.   And he said don't cough around me or I'll be out.
20  Q.   Like Dave?
21  A.   You know how Dave is.  He said don't cough around Dave
22       or Dave will be out, you know how Dave is.
23  Q.   Any other comments by Mr. Dinsmore that you haven't
24       told me about?
25  A.   Not that I can think of offhand, not that he made

Page 196

1        directly towards me.
2   Q.   Who did you tell at Nielsen that you had sickle cell
3        anemia?
4   A.   Ryan and Dave Demmon when I first called off, told
5        them why I needed to be off.
6   Q.   In 2013?
7   A.   Yes.
8   Q.   Other than time off, did you ever request an
9        accommodation for sickle cell anemia?
10  A.   No.
11            MR. GALLAGHER:  Off the record.
12            (Recess taken at 1:07 p.m.)
13            (Back on the record at 1:16 p.m.)
14  BY MS. NORRIS:
15  Q.   Mr. Caudle, I'd like to go back for a few minutes
16       about -- and talk about the transfer request that we
17       talked about earlier?
18  A.   Okay.
19  Q.   Am I correct that this request -- you made this
20       request in mid 2016?
21  A.   No, 2015.
22            MR. GALLAGHER:  I'm sorry, could you
23       clarify, are you talking about geographic area or work
24       position?
25            MS. NORRIS:  When he wanted to move to a

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

CAUDLE, DAVID
05/15/2019

Pages 213–216

Page 213

1   Q.   You've been handed Deposition Exhibit Number 22.  Take
2        a look at this packet?
3   A.   Okay.
4   Q.   Do you have any memory of this event?
5   A.   Yes, I do.
6   Q.   What do you remember about this?
7   A.   There was a back room of a home.  The lady had
8        somebody moving in, they were supposed to be bringing
9        a TV.  So I kept the equipment at the entertainment
10       stand.  When the lady called, I was either sick or on
11       vacation.  I believe I was sick at this time.
12             So she -- me and Ryan did the call and they
13       found everything in the middle of the room.  And the
14       lady told me she was painting so it wasn't -- I didn't
15       leave it in the middle of the room.  So Ryan had an
16       issue with it, but I told him it was something not in
17       my power because we leave equipment in homes all the
18       time.
19   Q.   Where did you leave the equipment when you left it?
20   A.   Behind the entertainment stand where the old TV was.
21   Q.   Was it hooked up when you left?
22   A.   It was not hooked up because there was no TV there.
23       The lady's friend that was moving in was bringing a
24       TV, that's why I left the equipment there.  She said
25       she would be moving in within a week, then I got sick,

Page 214

1        so the equipment stayed there.
2   Q.   In Ryan's e-mail, which is on the second page, he says
3        that there was equipment behind the TV, but that the
4        sites were messy.  Do you know if that's true?
5             MR. GALLAGHER:  Objection; form,
6        foundation.
7   A.   I don't know because somebody moved out and somebody
8        was moving in.  So I don't know if they junked it up
9        and moved my stuff around.  I have no intake (sic) on
10       if somebody is moving out or what they did prior to me
11       being there.
12   BY MS. NORRIS:
13   Q.   So you said we leave equipment in the homes all the
14       time?
15   A.   Yes.  If you have equipment and we sometimes run short
16       of equipment and you know -- let's say today is Monday
17       and next Tuesday they're buying a new TV, you're not
18       going to bring up -- take out that old equipment and
19       then bring in new equipment that Tuesday and have to
20       meter everything all over again.  You leave that
21       equipment in and you take it out the site, but you
22       leave the equipment there and then you just hook it
23       back up because it makes it easier on you, less time
24       in the home and you can get to more field calls.
25   Q.   When you left the equipment, did you know when they

Page 215

1        were going to have the new TV to hook it up?
2   A.   She told me, the lady of the house, was moving in
3        within a week or so, so I was going under the
4        impression that within seven days.  But then, again, I
5        got sick, so I don't know how long this is behind
6        that.
7   Q.   If you leave equipment in the home does that get
8        registered somewhere?
9   A.   Yes.  We leave it in the site drawing and say it's
10       out, like it's not hooked up to anything, but it's in
11       the home.
12   Q.   Do you know if this was registered?
13   A.   Yes.
14                  MARKED FOR IDENTIFICATION:
15                  DEPOSITION EXHIBIT 23
16                  1:40 p.m.
17   BY MS. NORRIS:
18   Q.   Exhibit 23 is another set of e-mails, also
19       September 7th.  Take a minute and look at these?
20   A.   Okay.
21   Q.   Do you have any reason to dispute what Mr. Mata says?
22   A.   I don't know what he's talking about.  I mean, he says
23       master bedroom, he doesn't say what home.  I -- I
24       don't know, it could be anything.  But he's not
25       talking to me, he's talking to Ryan so --

Page 216

1   Q.   I'm asking --
2             MR. GALLAGHER:  Can he please finish his --
3   A.   I'm trying to understand.  Like you asked me do I know
4        anything about this.  I was never told about it, so I
5        don't know what it's talking about.
6   BY MS. NORRIS:
7   Q.   Okay.  So you don't know if it's right or wrong?
8   A.   Right.  I was never contacted about it.
9   Q.   What is Mr. Mata's race?
10   A.   Mexican, Mexican-American.  But I would like to bring
11       up --
12   Q.   Go ahead.
13   A.   I'm seeing all these comments, but I was never like
14       brought up like, Dave, you need to fix this, this and
15       that.  It's -- it's talk, but it's never anything set
16       up to say, Dave, we need you to -- there's questions
17       asked, but it's never, Dave, you need to do this.
18   Q.   Were you on a leave on September 7th, 2016?
19   A.   I'm not sure.
20   Q.   Reading the first page, what Mr. Mata says --
21   A.   Yeah, I was because the last page was September 7th
22       and it is Shermir and Ryan at the house and I was on
23       leave at that time, that's why Shermir was doing the
24       call.
25   Q.   Okay.  So you wouldn't expect to be contacted to tell

CAUDLE, DAVID
05/15/2019
Pages 225–228

Page 225

1    hardcore to say something is tagged. That's
2    admissible to say you tagged it.
3 Q. Do you know whether when Mr. Dinsmore got this, the
4    records reflected that it was tagged or not?
5 A. It should have said that it was tagged, but I have no
6    idea what it says now. Because N-gage, your notes can
7    be deleted, it can be erased, you can amend them at
8    will.
9 Q. Do you have any evidence that anybody tampered with
10    the records?
11 A. I did not have access to Nielsen to check my work to
12    say that so -- I know that for a fact I tagged the TV.
13    I know for a fact when I talked to the lady of the
14    house there was no channels and that's the whole
15    reason why the lady called Nielsen. She didn't call
16    me -- she didn't wait for me to come back, she did
17    exactly as she was coached. She called up Nielsen,
18    let them know that her TV went out and that she had a
19    TV in the back that started working and that's when
20    somebody came out.
21 Q. If you look at the last paragraph, it says --
22        MR. GALLAGHER: Okay. He was in the middle
23    of talking again.
24 BY MS. NORRIS:
25 Q. If you look at the last paragraph, it says the

Page 226

1    contacts showed that Dave Caudle was at the home on
2    7-13 and 7-16, but the lady of the house said he was
3    only there once that week.
4        Do you know if you were in fact at the home
5    both days?
6 A. I did a drive-by and that's what Nielsen does when you
7    go to the home, trying to see if the customer is
8    there. You ring the doorbell. Then we're supposed to
9    log in by N-gage by Wi-Fi to show that we're there.
10 Q. All right. Does N-gage differentiate between whether
11    you stopped by the home and whether you actually gain
12    entry?
13 A. No, but it shows us accessing the system. Because you
14    have to access the system to send a call out to say
15    that you're there.
16 Q. But there's no difference between I actually visited
17    the home and I was out front?
18        MR. GALLAGHER: Objection, form and
19    foundation.
20 A. You put the notes in there that you did a drive-by.
21 BY MS. NORRIS:
22 Q. Okay. And do you know what notes you put in on this
23    date?
24 A. I do not know because when HR called, Ryan made a
25    comment about it and I'd told him that that didn't

Page 227

1    sound right. And since I was locked out, I couldn't
2    see it.
3        MR. GALLAGHER: Were we provided the other
4    string of this? It looks like it's a message
5    forwarded to himself?
6        MS. NORRIS: That's all I have.
7        MR. GALLAGHER: Okay. Well, that doesn't
8    make sense, right? Forward it to himself, that means
9    it's coming from somewhere?
10        MS. NORRIS: I think he could be like
11    writing it on his phone and sending it to his work
12    computer or something like that. I mean, I do that.
13    I did that --
14        THE WITNESS: But usually when it's
15    something from a phone, it says sent from an iPhone at
16    the bottom.
17        MS. NORRIS: I mean, he could just be
18    making a note to himself. I don't know that this is a
19    chain, I think he's --
20        THE WITNESS: I mean, at this point when
21    this happened, this was when Ryan was making a paper
22    trail trying to get me fired.
23        MS. NORRIS: I don't think it's part of a
24    chain. I think Mr. Dinsmore is making a note to
25    himself, but I haven't specifically asked him that.

Page 228

1    But it doesn't look like a chain to me, it looks --
2        MR. GALLAGHER: I don't know. Yeah, it
3    seems like it's coming from somewhere if he sent it to
4    himself, but, okay, nonetheless. It just seems like
5    there's more e-mail to this. That seems like a very
6    odd thing to just e-mail yourself out of nowhere a
7    conversation with somebody else.
8        MS. NORRIS: I do it all the time. So I
9    might be odd, but I do it all the time.
10        MR. GALLAGHER: I know I am so --
11        MS. NORRIS: That's a way to keep a record.
12        MR. GALLAGHER: While we're on the
13    subject -- I can wait, sorry.
14 BY MS. NORRIS:
15 Q. When you returned to work, am I correct you returned
16    to work on October 5th, 2016?
17 A. I believe that's right.
18 Q. Am I correct that you were suspended pending
19    investigation as soon as you came back?
20        MR. GALLAGHER: Objection; form,
21    foundation.
22 A. Yes.
23 BY MS. NORRIS:
24 Q. Who told you that?
25 A. Ryan called me. I talked to him earlier, telling him

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

CAUDLE, DAVID
05/15/2019                                                    Pages 229–232

Page 229

1     when I was coming back to work.  Then he called me
2     after I was about to run a call to the Rusnichan
3     house.  I called him to ask him why the house was
4     taken out of sample.  He couldn't give me an answer.
5     He said let me call to find out what happened.
6         Then I called to let them know I wasn't
7     going to be able to come out so they could free up
8     their time.  And then the next thing I know Ryan
9     called to let me know that I was suspended, called me
10    back to let me know that I was suspended, with HR on
11    the phone.
12 Q.  Okay.  So you had actually started working, you
13    started going to a home --
14 A.  Yes.
15 Q.  -- and you were told never mind, you're suspended?
16 A.  No.  I went to the home -- on my way to the home and
17    when I pulled it up, to try to see what was going on
18    in the home, I noticed that the home said taken out of
19    sample.  So I called Ryan, like I just made this
20    appointment yesterday, so why is the home taken out of
21    sample?  He said I don't know who did it, let me find
22    out.
23         So I was like okay.  I called Ms. Rusnichan
24    to let her know that I wouldn't be coming out because
25    the home was taken out of sample, there was no reason,

Page 230

1     so to free up her time.  I told her.  She was very
2     upset.  I told her, I'll find out what's going on,
3     I'll call you back.  The next time I got a phone call,
4     it was Ryan and HR, and he let me know that I was
5     suspended pending an investigation.
6 Q.  Who at HR was on the phone, if you know?
7 A.  Denise-something and somebody else.
8 Q.  Do you think there were two other people?
9 A.  Yes, I believe so.
10 Q.  Did you ever clear errors without investigating the
11    issue at the house?
12 A.  What house.
13 Q.  Any house.  Did you ever clear an error without
14    actually going to look at it?
15         MR. GALLAGHER:  Objection; form,
16    foundation.
17 A.  We -- all field techs have, depending on what the
18    error was.
19 BY MS. NORRIS:
20 Q.  Under what circumstances would you clear an error
21    without going to look at it?
22 A.  Let's say the MU just needs to be rebooted.  You pull
23    up to the home, you force a reboot, then everything
24    goes green, everything is working and you do checkouts
25    and everything passes.

Page 231

1 Q.  Okay.
2 A.  At that point, you would clear the error saying that
3    it was a malfunction of the equipment.  You didn't
4    have to bother the household because they weren't
5    there and you fixed it.
6 Q.  But am I correct in that case you went to the house
7    and fixed it from outside?
8 A.  Yes.
9 Q.  Okay.  Would there ever be a situation where you would
10    clear an error without going to the house at all?
11 A.  Depending if the error was old.  Let's say the error
12    was three days ago and the error hasn't happened since
13    then, you could clear it.
14         Or if the error was already a
15    household-known behavior.  Say somebody fell asleep
16    watching the TV and it was the man of the house.  And
17    you saw the man of the house watching TV and then it
18    was two hours of just nobody watching, nobody was
19    logged in, but the last person there was the man of
20    the house at 10:00 p.m.  So you know his known
21    behavior was watching TV, falling asleep with it on.
22    So you would write, known behavior, man of the house
23    fell asleep watching TV.
24 Q.  Okay.  So you would write that down?
25 A.  Yes.  It's already noted, you talked to the household

Page 232

1     to let you know.
2 Q.  How many homes did you try to see in a day when you
3    were making your calls?
4         MR. GALLAGHER:  Objection; form,
5    foundation.
6         MS. NORRIS:  What's wrong with that?
7 A.  I don't know.
8         MS. NORRIS:  What's wrong with how many
9    homes would you see in a day when you were making your
10    calls?  What form and what foundation is the problem?
11         MR. GALLAGHER:  Foundation?
12         MS. NORRIS:  Yeah.
13         MR. GALLAGHER:  That he would -- okay.
14    Foundational?
15         MS. NORRIS:  Yeah.  He's making the calls.
16    I'm asking him, how many homes would you see in a day
17    when you were making the calls.  What is wrong with
18    that question?
19         MR. GALLAGHER:  Okay.  Yeah,
20    foundational-wise?
21         MS. NORRIS:  Yeah.
22         MR. GALLAGHER:  We haven't established that
23    he makes these calls, we haven't established that he
24    goes every day, we haven't established --
25         MS. NORRIS:  I haven't said anything every

CAUDLE, DAVID
05/15/2019                                                                    Pages 237–240

Page 237

1   A.   That was the call beforehand, him telling me I was
2        suspended.
3   Q.   All right.  So the day that you came back?
4   A.   The 5th, yes.
5   Q.   Right.  And the day that you came back when he told
6        you about problems in homes, how many homes did he
7        tell you about?
8   A.   Two.  The Mills home that you just talked about and
9        then -- I can't remember -- Carbajo home.
10  Q.   Do you know who made the decision to terminate you
11       other than what Mr. Dinsmore said to you on the phone?
12  A.   He didn't tell me.  The way he made it sound, like it
13       was his decision.
14  Q.   Okay.  The reason I keep asking is that you're saying
15       things like basically and the way he made it sound
16       like and I'm trying to get to the best of your
17       memory --
18  A.   When he said --
19  Q.   -- exactly what he said?
20  A.   I remember him saying it's my decision, I have to let
21       you go.  So I didn't hear him say anything about Josh
22       and, blah, blah, blah, and me and this person in HR
23       had decided to let you go.
24  Q.   Okay.  Do you know if Mr. Dinsmore terminated anybody
25       else?

Page 238

1   A.   Not while I was -- wait.  Not while I was there that I
2        know of.
3   Q.   Do you know who made the decision to terminate
4        Mr. Demmon?
5   A.   I know it wasn't Ryan.
6   Q.   How do you know that?
7   A.   Because Ryan told everybody it was a surprise to him
8        when he got the phone call.  And I was told that
9        Demmon was doing all this stuff under Ryan's
10       management and Ryan didn't do anything about it, so
11       the call was made from upper management to fire Demmon
12       for not running calls and everything else.
13  Q.   Earlier today we talked about a conversation you had
14       with Mr. Dinsmore around the time of your PIP where
15       you thought that it was discrimination?
16  A.   Yes.
17  Q.   Other than that conversation, did you complain to
18       anybody at Nielsen about race discrimination before
19       you were terminated?
20  A.   No.  Because, like I said, me and Ryan were back on
21       good footing and I thought everything was okay.  Like
22       I said, my reviews were good.  Me and him never had
23       any altercations, any other write-ups, any other real
24       instances other than the ones where I was sick or when
25       I brought up the African-American survey.

Page 239

1   Q.   Prior to your termination, did you ever complain to
2        anyone at Nielsen about disability discrimination?
3   A.   No, because --
4   Q.   Did you ever request an accommodation from Nielsen
5        that was not granted?
6   A.   No, because I didn't need one.
7   Q.   Did you ever complain to anybody at Nielsen about
8        retaliation before you were terminated?
9   A.   No, because at the time after -- like I said, talking
10       to Ryan, I didn't feel like it was -- I thought we got
11       past the situation so I thought it was okay.  So I
12       didn't think it was like a two-year span of things
13       going on.
14  Q.   Am I correct that after you were terminated with
15       Nielsen you had several communications with HR?
16  A.   Yes.
17  Q.   And am I correct that the first one was on
18       October 12th with Denise Fantarella?
19  A.   Yes.  She told me if I had anything to say, to give
20       her a call.
21  Q.   And did you do that?
22  A.   Yes.  I asked her that -- out of all the times I was
23       out, it's funny to me that a relative of Ryan's will
24       find something wrong with two of my homes and those
25       are the two homes I'm supposedly getting fired over

Page 240

1        but there's no evidence.  And that nobody called the
2        lady of the house to talk to her to get her statements
3        in a suspension that I was going on.  And the lady of
4        the house, Ryan bantered (sic) her into an asthma
5        attack and she told him to de-install the equipment.
6             They didn't even get a chance to install
7        the TVs.  I said in both cases the ladies of the house
8        called Nielsen, per policy, telling them the Nielsen
9        protocols, doing what was supposed to be done by
10       coaching.  So I said how could I be wrongdoing, if
11       people are doing what they're coached to do?  And they
12       said okay, duly noted and why do you feel this way?
13       And I went on about how I felt like I was treated
14       unfairly and all these things that had been going on
15       prior to, now this, it was too much.
16            MARKED FOR IDENTIFICATION:
17            DEPOSITION EXHIBIT 26
18            2:06 p.m.
19  BY MS. NORRIS:
20  Q.   You've been handed Deposition Exhibit 26.  Are these
21       e-mails that you had back and forth with Denise
22       Fantarella?
23  A.   Yes, that's when Ms. Rusnichan was -- called me back,
24       trying to figure out why she was taken out of the
25       sample.  I told her that I was let go, I couldn't give

**Page 241**

1   her any information.  And I found out what she had did
2   on her end and I let her know.  And how was that fair,
3   because that was one of the things Ryan mentioned on
4   the call about something I did.  So told them it was
5   like a witch hunt and this was evidence of such.
6   Q.   What makes you think it was a witch hunt?
7   A.   How does an out-of-town rep know my name and go to a
8        customer's home asking if I unplugged devices, if I
9        asked him to lie about anything?  And then the two
10       homes I'm fired for are the exact same things he asked
11       that home about.
12   Q.   What makes you believe that's a witch hunt as opposed
13       to somebody trying to figure out what's going on?
14   A.   Because it was weeks apart.  So you're telling me you
15       have an out-of-town rep go to a customer's house,
16       bring up a field rep's name, ask them if he ever lied
17       about -- had you lie about unhooking a TV or lie about
18       the devices to the point where this household is upset
19       and is calling the head of the field rep division and
20       making a report to the Better Business Bureau and then
21       two weeks later you have your, quote/unquote,
22       brother-in-law go into a home and he finds something
23       in one home and in the other home he goes into that
24       has Direct TV and it shows how many TVs are hooked up
25       to the DVR and that's the only reason he knew that the

**Page 242**

1   customer had other TVs in the home and the customer
2   lets him know, ==never let Dave== go upstairs or in the
3   basement because we only wanted the TVs on the main
4   floor metered, so nobody has been in the basement or
5   upstairs --
6   Q.   So if -- if a house has TVs in the basement and
7        they're not tagged, they're in the basement, they
8        exist, they're not tagged, aren't you supposed to go
9        down there and find the TVs?
10  A.   ==If I don't know a TV is in the basement, I don't have==
11       ==access to the basement, I can't go down there.  The==
12       ==lady of the house, when I got the home from the==
13       ==marketing rep and we did the install, there were only==
14       ==two TVs; in the living room and in the front room.==
15       ==They said that's the only TVs they had in their house.==
16       ==They didn't allow us to go upstairs or downstairs.==
17       ==They said these are the only TVs we have, so that's==
18       ==the only area we had access to.  So that's the only==
19       TVs I metered.
20            When Dave Shock went out to the home to
21       install the new cable box, he went to the living room.
22       The DVR, he noticed that more TVs were hooked up to
23       the DVR.  He asked her if she had any more TVs.  The
24       lady of the house said yes, we have TVs upstairs,
25       downstairs.  We never told Dave about them.  This is

**Page 243**

1   what she told him verbatim.  Dave Shock said I do not
2   have the equipment for this, so I have to come back.
3        Dave Shock left.  He waited two weeks --
4   no, three weeks from that time to the point where I
5   came back from sick leave to go back out to that home
6   on that day and suspend me when I went to that home.
7   So to me, that sounds like a witch hunt when they
8   could have went out two days later, three days later
9   when they had the equipment.
10       He waited until I came back off sick leave
11  to go to that home to get a first-eye look at it and
12  then say okay, Dave, you did this.  Even on a call
13  when he suspended me, he said, Dave, there's a TV in
14  the basement, I think you knew about it.  I said no, I
15  didn't know about it.  He said well, how did the TV
16  get moved in the basement?  I said the family must
17  have moved it in the basement.  He said well, are you
18  sure you didn't know about it?  I said no.
19       He said how did it get documented in
20  the basement?  I said the ROC had called the house,
21  the ROC could have updated and said it got moved in
22  the basement.  There's no evidence saying I did it or
23  I knew about it.  He said I think you knew about it.
24  I said no, sir, I didn't.  He said Dave, well, I think
25  you did.  I saw it.

**Page 244**

1        I said you only saw it because the lady of
2   the house told you.  She did not tell me and she told
3   you she didn't tell me.  Because her and the man of
4   the house didn't want those TVs metered, so how is it
5   my fault when customers lie all the time?  He said oh,
6   okay, that's hard for me to believe.
7   Q.   Okay.  If you would look at Exhibit 26, the second
8        page?  Up at the top is an e-mail from you to Denise
9        Fantarella and you say hi, Denise, question for you.
10       I do not know Nielsen policy on this matter, and then
11       you relate an incident.
12            What policy are you -- do you not know
13       about?
14  A.   Ryan said that per Nielsen policy, if something is
15       un-metered, it's automatic termination.  That's what
16       he used to fire me.  In this instance, Dave Demmon
17       was -- while I was out of town, installed a home in
18       Oak Park.  It was him, Chavonne and Ranie.  There was
19       a TV in the front room that was not noticed.  It
20       wasn't metered.  They came in through the garage, back
21       door.  They didn't come in through the front door.
22            Later on when the quality review was done,
23       Dave Shock went out there, but he came in through the
24       front door.  When you come in through the front door,
25       you can see the TV.  He asked about the TV.  They