**27**

Case 2:17-cv-13737-MAG-MKM ECF No. 36-28, PageID.620 Filed 06/27/19 Page 2 of 18

Spraggins v. Lakepointe Senior Care and Rehab Center, L.L.C.; Not Reported in...

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by Wilson v. Budco, E.D.Mich., January 6, 2011

2010 WL 3927769

Only the Westlaw citation is currently available.

United States District Court,

E.D. Michigan,

Southern Division.

Karri SPRAGGINS, Gwendolyn McCoy,
Kimberly Johnson, and Tamika Seals, Plaintiffs,

v.

LAKEPOINTE SENIOR CARE
AND REHAB CENTER, L.L.C., a
Michigan Corporation, Defendant.

No. 08–14074.
|
Oct. 4, 2010.

**Attorneys and Law Firms**

Kathleen L. Bogas, Brian E. Koncius, Law Offices of
Kathleen L. Bogas, PLLC, Bingham Farms, MI, for
Plaintiffs.

Karen B. Berkery, Kitch, Drutchas, Detroit, MI, for
Defendant.

**OPINION AND ORDER**

LAWRENCE P. ZATKOFF, District Judge.

**I. INTRODUCTION**

 *1 This matter is before the Court on the four Motions
for Summary Judgment filed by Defendant, with one
motion filed with respect to each of the four Plaintiffs:
Gwendolyn McCoy (Docket # 22), Kimberly Johnson
(Docket # 23), Tamika Seals (Docket # 24) and Karri
Spraggins (Docket # 25). The applicable Plaintiff has
filed a response to the summary judgment motion that
pertains to her, and Defendant has filed a reply with
respect to each such response. The Court finds that
the facts and legal arguments pertinent to the motions
are adequately presented in the parties' papers, and the
decision process will not be aided by oral arguments.
Therefore, pursuant to E.D. Mich. Local R. 7.1(f)(2), it

is hereby ORDERED that the motions be resolved on
the briefs submitted, without this Court entertaining oral
arguments. For the reasons that follow, all of Defendant's
motions for summary judgment are GRANTED.

**II. BACKGROUND**

In this case, the four Plaintiffs, each of whom is African–
American, allege that Defendant Lakepointe Senior Care
and Rehab Center, L.L.C. ("Defendant"), a long-term
care facility located in Clinton Township, Michigan,
by and through its administrators, harassed them and
discriminated and retaliated against them on the basis
of race. The Court must view all facts in a light most
favorable to the non-moving party when considering
a summary judgment motion. *See* Section III, *infra.*
Accordingly, to the extent that any facts are in dispute, the
facts set forth in this Opinion and Order reflect the
Plaintiffs' versions of the events at issue.

**A. The Plaintiffs**

Plaintiff Tamika Seals ("Seals") is a Certified Nurses
Assistant ("CNA") with over 11 years of experience. Seals
obtained her CNA certificate in 1994 and finished her
Licensed Practical Nurse ("LPN") program in April 2007.
Seals was hired by Defendant as a floor nurse on April
9, 2007. Seals worked as a floor nurse for approximately
1–2 months, but when it was discovered that state law
prohibited her from working as a nurse until she received
her license, she was moved to wound care, where she
trained under and assisted Plaintiff Karri Spraggins for
another 1–2 months.

When Seals obtained her LPN license in July 2007,
she applied for a Unit Manager position. On July 15,
2007, Seals was promoted to A–Wing Unit Manager
for the standard 90–day probationary period by the
administrative team in place at Defendant's facility at
that time: Assistant Director of Nursing ("ADON") Barb
Forbis, Administrator Sheryl Amos ("Amos"), and the
Director of Nursing ("DON") Demetria Gross ("Gross").
According to Seals, she received some training from a
former Unit Manager, Miss Nevans. Seals claims she
received good feedback on her job performance from
DON Gross, ADON Forbis and Administrator Amos.
According to Gross, who observed Seals in that capacity

Case 2:17-cv-13737-MAG-MKM ECF No. 36-28, PageID.621 Filed 06/27/19 Page 3 of 18

Spraggins v. Lakepointe Senior Care and Rehab Center, L.L.C.; Not Reported in...

for about one month, Seals was a "wonderful unit manager."

Plaintiff Kimberly Johnson ("Johnson") is an experienced CNA and staffing coordinator ("scheduler") with a long-term career in nursing homes. Johnson obtained her CNA certification in 1994, and she was hired by Defendant as a CNA in March 2003. In December 2005, Johnson was promoted to scheduler. Johnson's duties included creating, posting, and updating master work schedules for nurses and CNAs, as well as updating and making changes to daily staffing sheets. Johnson also tracked attendance and overtime and ensured that Defendant's facility was correctly staffed and within the state-required hours per patient day ("PPD") ratio. Johnson had supervisory duties for the dining room staff and worked as a rotating weekend supervisor, a position created by Defendant.

**\*2** When Johnson was promoted to scheduler, she became a member of the nurse management team and attended the daily nurse management meetings. At such meetings, she reported on staffing issues, resident care and PPD compliance. Johnson worked closely with Shirley Schester ("Schester"), the Director of Human Resources at Defendant's facility. Johnson was directly supervised by ADON Forbis and received other supervision from DON Gross, ADON Hala Elian ("Elian") and Administrator Amos. None of these supervisors ever criticized Johnson's performance as scheduler. Gross has testified that Johnson did her job well and was able to cut overtime.

Plaintiff Karri Spraggins ("Spraggins") is an experienced CNA and LPN. She obtained her CNA certificate in 1998, her LPN degree in 2000 and did her direct care training in 2002. In her career, Spraggins has worked as a CNA, LPN, and wound care nurse in a hospital, in home care nursing and in nursing homes. In December 2005, Spraggins began her employment with Defendant as a charge nurse. In April 2006, she was promoted to Wound Care/Restorative Nurse. Spraggins' job duties included holding weekly rounds, managing residents' treatments and paperwork, running the Restorative Department, supervising wound care nurses and CNAs, meeting with families, consulting with the Dietary Department, consulting with doctors, and consulting with other management personnel such as the DON(s), the ADONs, the Administrator(s), and the Unit Managers. Spraggins reported to the ADON, was a member of the Nurse Management Team and attended daily Nurse Management meetings.

Plaintiff Gwendolyn McCoy ("McCoy") is an LPN with over 21 years of experience in patient care and management. In summer 2007, Spraggins informed McCoy of an opening for Unit Manager at Defendant's facility. Spraggins told McCoy "that she liked [working for Defendant] and that it would be a great opportunity for [McCoy]." On June 25, 2007, McCoy was hired by Defendant as the north side C-wing Unit manager. When she began her employment, McCoy reported to Gross and Forbis, who were then the DON and ADON, respectively. McCoy received one verbal counseling from Gross but, overall, McCoy states that Gross and Amos told her she was doing a good job in the two months they supervised her.

**B. Conduct of Campbell and Harriman**
On August 13, 2007, Sheryl Madson–Campbell ("Campbell") started working for Defendant as the Administrator. Campbell, who is Caucasian, replaced Amos, an African–American. On September 4, 2007, Campbell hired Nancy Harriman ("Harriman"), a Caucasian, to replace Gross, an African–American, as the DON.

According to Plaintiffs, the atmosphere at the Defendant's facility immediately changed. Harriman and Campbell repeatedly yelled at plaintiffs and other African–American employees. As Seals testified: "[Harriman] never could talk to me, ... everything she said she yelled about it." Harriman's demeaning comments were constant. According to Seals, "every day it was something [with Harriman]; it could be something small, but it would be made to be something big." For example, after falsely alleging that Seals had failed to feed a resident, Harriman asked "how would you like if somebody didn't feed your Mama?" Seals said Harriman's comment made it "seem like [Seals,] as a human being [did not] care about another human being." On another occasion, after Seals answered Harriman's question, Harriman told her "it just seems like you're not getting it."

**\*3** Plaintiffs claim that Harriman and Campbell repeatedly called Plaintiffs (and other AfricanAmerican employees) certain derogatory names, such as incompetent, liar and stupid. As Johnson testified, Harriman repeatedly called Johnson a liar, stating that it was "one of [Harriman's] favorite lines; oh, you're a liar." Harriman never called Johnson by her name and called

Johnson, Spraggins and Seals "you people" on multiple occasions. In contrast, Plaintiffs claim that Harriman never called Caucasian employees "you people" and always referred to Caucasian people by their given names. Harriman made these remarks in the office, in the hallway and "wherever she felt like saying something." According to Gross, Campbell also referred to African–American employees as "you people." Gross said Campbell was talking about "the black people....[B]ecause she was really really mean to us. To some of us ... from what I witnessed[,] she was harsh in her tone when she spoke and the language she used when she spoke to certain people." This allegedly was different than how Campbell spoke to Caucasian employees, as "[Campbell] didn't say much to others." Harriman and Campbell also allegedly said that Plaintiffs and other African–Americans could not do their jobs.

Plaintiffs state that Harriman also interacted with Caucasian employees differently than she interacted with African–American employees. When Harriman spoke to Caucasians, she was calmer, she was not sarcastic and she did not yell. Likewise, with respect to Caucasian employees, Harriman simply requested that they perform tasks. With respect to African–American employees, however, Harriman ordered them to perform tasks and did so in an abrupt and rude manner. Harriman was rude and disrespectful to Plaintiffs, yelling and throwing her hands up in people's faces. Harriman threw papers at Johnson, prompting Johnson to tell Harriman that she would "go have a cigarette and when [she came] back, [she hoped] that things will be better ... because this ain't right." When Spraggins was working on-call as a charge nurse, she brought medical concerns to Harriman's attention regarding two residents. One was a resident who had fallen and not received proper care, and the second was a resident who had not been given her medication in three days. In response to Spraggins expressing those concerns, Harriman told Spraggins to "mind [her] own business and do [her] own job[.]" On another occasion, Harriman went into Spraggins' office, went through her desk, and put a post-it with the word "Karri" (Spraggins' first name) written on it on Spraggins' statuette of an African–American nurse. When Spraggins told Harriman that labeling the statuette was inappropriate, Harriman simply laughed and walked away.

Plaintiffs also state that the actions of Harriman and Campbell interfered with the Plaintiffs' abilities to do their jobs. For example, Seals said that when she began

her employment with Defendant, she went to ADON Forbis, her direct supervisor, with questions and concerns about her job. In addition, prior to Harriman's arrival, Campbell: (1) told Seals that she was doing a good job, (2) asked Seals to do things because she knew Plaintiff was responsible, (3) always gave Plaintiff compliments, and (4) never told Plaintiff she was lacking in her job. Seals states that, after Harriman arrived, Campbell's and Forbis' demeanor and behavior changed. Seals could no longer get answers to her questions and her concerns. "[I]f you went to somebody with something, you may have got an answer back or you may not." Though Seals continued to try bring up issues and concerns, she got nowhere and felt like "everybody was against [her]."

**\*4** Harriman and Campbell went through Johnson's desk, and when Johnson asked them about it, Campbell told Johnson she had no right to question them. Harriman made changes to the schedule without telling Johnson and told nurses to talk to her and not discuss it with Johnson. As a result, Johnson states that she did not know who was working or what shift they were on and there was escalating confusion as nurses did not know when or where they were working. Harriman took Johnson's work papers and kept them in her office, such that Johnson had to retrieve them to do her job. Johnson complained to Harriman several times that Harriman was not letting her do her job, but Harriman's response was to smirk, laugh and walk away from Johnson while Johnson was talking to her. On at least one occasion, Spraggins witnessed Harriman yelling at Johnson after Johnson asked Harriman to just leave her alone, give her things back and let her do her job.

Harriman allegedly would not allow supply clerk Ebony Thurmand ("Thurmand") to order supplies Spraggins needed to comply with new wound care protocols. Spraggins had to "battle back and forth" with Harriman, and Spraggins never did get the supplies. Harriman also ordered Spraggins to put all residents with wounds on low air-loss mattresses, which Spraggins contends is contrary to wound care guidelines. In addition, because the extra mattresses were not covered by insurance, Harriman had to call corporate to have them paid for, for which Spraggins claims Harriman never did. Spraggins states that she constantly asked Harriman "to call ... [corporate] and get new mattresses in, [Harriman] kept saying she would take care of it but during the same time she was constantly yelling at [Spraggins] that these residents were not on

Case 2:17-cv-13737-MAG-MKM ECF No. 36-28, PageID.623 Filed 06/27/19 Page 5 of 18

Spraggins v. Lakepointe Senior Care and Rehab Center, L.L.C., Not Reported in...

the proper mattresses." Despite having no reason to possess Spraggins' paperwork, Harriman took Spraggins' wound care logs and other paperwork, holding on to it "for hours" and only returned it at the end of the day, when Spraggins was ready to go home. Spraggins had to continually ask Harriman to return her logs because, without them, she was not able to fax her paperwork to corporate, review documents or make changes.

Spraggins also states that Harriman gave extra duties to Spraggins which were not part of her Wound Care/ Restorative Nurse duties. Harriman required Spraggins to check residents' oxygen tubes and required her to take on-call as a charge nurse because ADONs Forbis and Elian, who were Caucasian and of Middle Eastern descent, respectively, did not want to, even though they shared on-call duties. Harriman was able to do this because she never made an on-call schedule and no one knew who was supposed to be on-call. When Spraggins could not do the extra duties along with her normal duties, Harriman took away Spraggins' Restorative Nurse duties and gave them to ADON Elian, a transition that was scheduled to occur on October 27, 2007, the last day Spraggins worked at Defendant's facility.

 **\*5** Harriman likewise allegedly assigned extra duties to McCoy. According to Seals, Harriman "gave [McCoy] so many duties to do that [it] was really unrealistic[.]" Among other things, Harriman required McCoy to take on her own duties and the duties of the south side C–Wing Unit Manager Mona Rutkowski ("Rutkowski"), who is Filipina. Harriman continued to harass McCoy, telling her that she should step down or find someplace else to work and blaming her for anything that went wrong on C–Wing, regardless of the fact that Rutkowski ran half the wing. McCoy was being belittled by Harriman every day, and McCoy was reduced to tears many times.

On September 28, 2007, Harriman gave Johnson a letter which contained allegations about Johnson's job performance, allegations that Johnson contends were false. Harriman characterized it as a performance improvement plan. Contrary to Harriman's letter, Johnson states that she was already informing Harriman about staffing, maintaining the call log, interviewing CNAs, using front desk personnel to do call-ins, and keeping a daily log. In addition, Johnson states that the attendance cards were updated by October 5, 2007, as requested. After Harriman went through Johnson's

desk and retrieved old schedules destined for the trash and a draft schedule that had never been posted, Harriman told Johnson her schedules were a mess and confusing, even though Johnson had already given her the correct schedule. Despite her complaints, Harriman never gave Johnson any direction about how she wanted the schedules done, and Harriman never told Johnson why the schedules were allegedly confusing. When Johnson tried to talk to Harriman about the schedules, Harriman would "just throw her hands up or she'd just say something mean."

Harriman accused Spraggins of failing to provide wound treatment for a resident, thereby resulting in an infection. In this instance, Harriman berated Spraggins, called Spraggins incompetent and said Spraggins was not doing her job. When Spraggins asked to see the resident's chart, Harriman refused to show it to her. When Spraggins followed up on the resident, she found that: (1) the wound was not infected, (2) the doctor had never prescribed antibiotics, (3) there were no new orders, and (4) everything was in place. Spraggins states that Harriman also: (a) falsely accused Seals of lying about putting cream and a diaper on a resident, (b) falsely told Seals that resident's family member complained about missing items, and (c) falsely accused Seals of not feeding a resident.

Harriman allegedly went to McCoy's floor every day, "looking for things" and nitpicking. Harriman berated McCoy for being at her desk and filling out reports, but when McCoy went out on the floor and assisted her nurses, Harriman told her, "you have work that you need to be doing." Harriman also berated McCoy when other departments, such as housekeeping, failed to do their jobs. Instead, McCoy states that Harriman was "making it all [McCoy's] fault that things were like they were without making housekeeping take some responsibility also with their staff and with them taking care of the things that they're being paid to do." When one of Rutkowski's residents had an outdated dressing, Harriman never spoke to Rutkowski about the outdated dressing. Harriman harassed McCoy so continuously that the nurses asked McCoy how they could help keep Harriman off McCoy's back.

 **\*6** Plaintiffs state that when they attempted to defend themselves against the allegations, Harriman berated them further. For example, when:

Case 2:17-cv-13737-MAG-MKM   ECF No. 36-28, PageID.624   Filed 06/27/19   Page 6 of 18

Spraggins v. Lakepointe Senior Care and Rehab Center, L.L.C., Not Reported in...

- Seals attempted to defend herself against the false cream/diaper allegation, Harriman yelled "You people are a bunch of liars."

- Seals attempted to explain that she had not failed to feed a resident, Harriman told Seals that she did not want to hear what Seals had to say, that Seals needed to be quiet and that Seals was not capable of doing her job.

- Johnson attempted to explain to Harriman that Harriman was using the wrong schedules, Harriman's response "was nothing nice."

- McCoy attempted to explain that she was not responsible for an outdated dressing because the person was not her resident, Harriman berated her.

- McCoy tried to respond to an accusation that a resident had not been given water, Harriman walked away while McCoy was speaking.

Plaintiffs further state that when they complained of this treatment to other managers and corporate employees, they were similarly dismissed or ignored, as noted below.

**C. Plaintiffs' Complaints to Defendant**

Defendant's Employee Handbook states that employees who believe they have experienced discriminatory conduct "should report the incident to any of the following individuals: their immediate supervisor, the Director of Human Resources, the Administrator, or the corporate Director of Human Resources." Mike Hicks ("Hicks"), Harriman and Schester each testified that employees could complain to their immediate supervisor (*i.e.,* Harriman, the DON), Campbell (Administrator), Hicks (corporate director of human resources), Schester (director of human resources at Defendant's facility), and/or the Regional Director of Operations, Henry Boutros ("Boutros"). Plaintiffs state that they complained about Harriman (and Campbell) to all of these individuals.

After Harriman accused Seals of lying about the cream and diaper, Seals complained to Campbell, telling her that Harriman called her a liar and that she had been treated unfairly. Johnson states that she made multiple complaints. Less than a week after Harriman was hired, Johnson complained to Schester about Harriman's and Campbell's conduct and told Schester she thought both

Harrison and Campbell were prejudiced. Johnson next complained to Boutros, Hicks and Nurse Consultant Michelle Scicluna, who worked at the corporate offices, on at least six occasions. Johnson told them about Harriman's and Campbell's rude and disrespectful conduct and Harriman's interference with her job. In particular, following her complaint to Schester, Johnson had a "long conversation" with Boutros. Boutros told Johnson that everybody was calling him, and Boutros asked her what was going on. Johnson states that she told Boutros that she did not think Harriman or Campbell "wanted black people to work with them that closely because they treated each and every last one of us with total disrespect." Johnson also told Boutros about Harriman's yelling, name calling, and the note Harriman put on Spraggins' statuette. Johnson states that Boutros' response was that Johnson should try to work with them and call him back if she had any more problems. Boutros recalled speaking to Johnson two to three times, but he could not recall specifics. Boutros believed the conversations were about job duties and that he told Johnson to work it out with Harriman and Campbell.

**\*7** Johnson also spoke to Hicks. Hicks took notes of a call from Johnson on September 14, 2007, which he understood Johnson to be complaining that Harriman and Campbell were "out to get her." Johnson testified that that she complained about the way "we [were] being treated in the building," rude and disrespectful conduct by Harriman, and that Harriman was preventing her from doing her job. Johnson states that Hicks promised he would call Campbell. Hicks testified that he would have called Campbell "in an instance like this," but there is no evidence that he conducted any further investigation of Johnson's complaints. Johnson complained to Boutros about Harriman and Campbell again on October 12, 2007. Later that day, Harriman, Campbell and Schester called Johnson and told her to report to the administrator's office when she came into work, at which time they issued Johnson an Employee Disciplinary Warning.

Spraggins complained to Harriman, saying on separate occasions that she did not appreciate Harriman's conduct and that labeling the statuette "Karri" was inappropriate, but Harriman just laughed off the complaints. On October 17, 2007, after Spraggins submitted her resignation and her two-week notice, Spraggins called Defendant's corporate offices, but no one answered the telephone. Plaintiff states that she left voice messages for Hicks and

Case 2:17-cv-13737-MAG-MKM ECF No. 36-28, PageID.625 Filed 06/27/19 Page 7 of 18

Spraggins v. Lakepointe Senior Care and Rehab Center, L.L.C., Not Reported in...

Nurse Consultants Joyce Kenyon and Michelle Sicluna, telling all three of them: (1) she had resigned because she "couldn't take it anymore," (2) she did not want to resign, (3) she "was being harassed ... because [she is] African–American," and (4) she wanted to discuss what was happening. According to Spraggins, no one called her back. Spraggins also tried to complain on October 18, 2007, when she came to Defendant's facility, but she was told she had to fill out a form from the corporate offices. When she called the corporate offices, once again no one returned her calls.

After she said that she was resigning on September 20, 2007, McCoy complained about Harriman via telephone and fax to Holly Titus ("Titus"), a risk manager at the corporate offices. McCoy told Titus that Harriman was: (a) harassing her, (b) accusing her of things that were not true, and (c) trying to push her out and replace her with Christine Crosby ("Crosby"), the head of MDS. Titus told McCoy she would give the message to Hicks and get back to her. No one ever got back to McCoy.

Campbell knew that "[s]everal employees had talked to Mr. Boutros," including McCoy and Johnson because Boutros told her. Boutros also told Campbell that many employees had talked to him. Campbell also knew that employees were complaining to corporate because Schester and other members of the management team told her.

**D. Cessation of Plaintiffs' Employment**
McCoy's last day of work was September 20, 2007, and she submitted a resignation letter on September 21, 2007. McCoy testified that Harriman "just started in again about this wasn't right, that wasn't right, this needs to be done, you need to this." In her letter, McCoy noted that "nothing positive was said" to staff and that staff needed to be treated as adults. McCoy also said that: (1) Harriman's conduct had really upset her, (2) McCoy "was being torn apart for something that [she] was doing to get the job done," and (3) she had never been told that there was a problem. McCoy concluded her letter by stating that she wanted to be a Unit Manager but "was being set up to fail" and "was not given the best chance to do the best job" she could do. Harriman got McCoy's resignation letter on September 21, 2007. Campbell, Harriman, and Schester discussed McCoy's resignation letter and Campbell and Harriman agreed to offer McCoy a demotion to charge nurse. After McCoy

declined the demotion to charge nurse, she received a termination letter. McCoy was temporarily replaced as Unit Manager of C–Wing by Crosby, who is Caucasian, and then by two African–American managers.

**\*8** Seals began looking for a new job in the fall of 2007 because Harriman's harassment was so bad. Before Seals could find a new position, Campbell ordered Seals removed as Unit Manager on October 15, 2007, and Seals was called into a meeting with Harriman, Forbis and Campbell. After yelling at Seals, Campbell stormed out, telling Harriman and Forbis to deal with Seals. Harriman and Forbis told Seals that she was no longer Unit Manager because "they didn't feel [she] met [her] job duties," but they told her she could stay as a charge nurse. When Seals asked why she was being demoted and pointed out that she had had no complaints and no one had told her she was not meeting job expectations, Harriman and Forbis told Seals that they could not give her a full-time position and began discussing available shifts. Seals told them she would have to get back to them about which shift she could take. Harriman told Seals to think about it and let her know the next day.

Seals began working for another nursing home the next day, October 16, 2007. Nonetheless, Seals states that she called Harriman, Campbell, and Forbis the next day and left messages that she wanted the midnight shift. When no one called her back, Seals says she spoke to Forbis when she went to pick up her pay check. Forbis told Seals to talk to Campbell. Campbell yelled at Seals and told her to talk to Harriman. Harriman told Seals she did not have time to talk to her. Seals then called the corporate offices four or five times, leaving messages for Boutros and Hicks, but no one returned her calls. Seals subsequently received a termination letter dated October 29, 2007, which stated that she had been terminated for failing to call in or show up on October 16, 17, and 18. Seals was replaced by Lee Houle, who is Caucasian.

Harriman terminated Johnson on October 17, 2007, relying on an Employee Disciplinary Case Warning dated October 12, 2007 (the "Warning"), which was the day of Johnson's final complaint to Boutros. According to Johnson, the Warning was filled with inaccuracies and relied on an infraction that had occurred in February and April 2007. Although Johnson admits she falsified signatures at issue, she notes that: (1) the infraction took place before Harriman and Campbell were hired, and (2)

Case 2:17-cv-13737-MAG-MKM ECF No. 36-28, PageID.626 Filed 06/27/19 Page 8 of 18

Spraggins v. Lakepointe Senior Care and Rehab Center, L.L.C.; Not Reported in...

Johnson was disciplined by Gross, Amos, and Schester, in consultation with the corporate office. Johnson was replaced at first by a contingent employee, Ms. Moore, an African–American, who resigned very shortly thereafter. A Causasian employee, Ms. Maniaci, replaced Ms. Moore for a brief period, but she was terminated for poor performance in January 2008. Stormie Anderson, African–American, was placed into the position but she resigned by March 2008, at which time Pablito Dequito, Jr., race unknown, was placed in the position until he/she resigned by May 2008. Since 2008, Ms. Whitner, an African–American, has held the position.

On October 17, 2007, Harriman yelled at Spraggins down the length of a hallway, stating that Spraggins was "stupid" for allegedly missing a resident in C Wing. Spraggins sent her wound care team ahead and tried to discuss the situation with Harriman. Although Spraggins repeatedly asked Harriman who the resident was, what kind of wound it was, and to let her see the paperwork, Harriman refused to provide Spraggins with any information. Instead, Harriman called Spraggins incompetent, told Spraggins she (Harriman) would deal with Spraggins later and walked away. For Spraggins, who had been publicly berated and embarrassed in front of her wound care team, this was the final straw. She wrote a resignation letter that said she was giving Defendant two-weeks notice. When Spraggins gave this letter to Harriman, Harriman said "good, okay" and told Spraggins she did not have to go to C–Wing because it had been a "mistake."

 *9  Spraggins states that she then went back to work and, 10 minutes later, ADON Forbis told Spraggins that Harriman was giving her the option of a demotion to floor nurse. Spraggins asked why Harriman would offer her a position if she felt Spraggins was incompetent and stupid. Forbis told Spraggins to go home and think about it. Spraggins finished her wound rounds and began preparing to go home because she was feeling ill. As she was packing up her personal items, Spraggins slipped and fell. Spraggins told ADON Elian to tell Harriman that she would be back in the morning to train her replacement. After leaving Defendant's facility, Spraggins called the corporate office, to no avail, as discussed in Section II.C. above.

Spraggins returned to Lakepointe the next day (October 18, 2007) to pick up paperwork so that she could be treated

for injuries from her slip and fall. Because she was going to the clinic, Spraggins was not dressed for work. Harriman told Spraggins that she was terminated because Spraggins had "self-terminated" the day before. Spraggins was replaced by Rochelle Saldana, who is Caucasian. Schester testified that Defendant sent Spraggins a termination notice dated October 29, 2007, wherein it stated that Spraggins was terminated for walking out of the facility on October 17, 2007.

### E. Other African–American Nurse Managers

Prior to Campbell's hiring, the nurse management team consisted of 22 persons, 11 of whom (50%) were Caucasian; 9 of whom (41%) were African–American, and 2 of whom (9%) were Filipina. Between August 13, 2007, the date Campbell was hired, and October 18, 2007, Seals' termination date, seven of the nine (78%) African–American nurse management employees quit or were terminated. In addition to the four Plaintiffs, (1) DON Demetria Gross was terminated by Campbell, (2) ADON Andrea Pillow resigned on September 7, 2007, because she was treated poorly by Campbell, and (3) after she was accused of not doing her job, her request to go back to charge nurse was denied, and she heard rumors that Campbell and Harriman were "trying to get of all of us," Thurmand quit and found a new job. Plaintiff states that five of those seven African–American nurse managers were replaced by Caucasians, four of whom were new hires by Campbell and/or Harriman: (1) Gross was replaced by Harriman, who was hired by Campbell; (2) Pillow was replaced by Elian, who was hired as ADON on September 21, 2007, by Harriman; (3) McCoy was replaced by Crosby, who was moved laterally from MDS to Unit Manager; (4) Spraggins was replaced by Rochelle Saldana, who was hired on November 5, 2007; (5) Seals was replaced by Lee Houle, who had been hired by Harriman as a contingent nurse on October 1, 2007. No Caucasian managers were terminated or quit during that period.

### III. LEGAL STANDARD

As recently stated by the Sixth Circuit:

> Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c) (2). In considering a motion for summary judgment,

Case 2:17-cv-13737-MAG-MKM ECF No. 36-28, PageID.627 Filed 06/27/19 Page 9 of 18

Spraggins v. Lakepointe Senior Care and Rehab Center, L.L.C.; Not Reported in...

we must draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc. .,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**\*10** *Spees v. James Marine, Inc.,* —— F.3d ——, Case No. 09–5839, 2010 WL 3119969, at \*6 (6th Cir., August 10, 2010).

## IV. ANALYSIS

Plaintiffs filed their complaint on September 23, 2008, and filed an amended complaint on October 1, 2008. Plaintiffs' amended complaint contained four counts: (1) Count I–Violation of Title VII–Racial Discrimination; (2) Count II–Violation of the Elliot–Larsen Civil Rights Act–Racial Discrimination (including claims of both race discrimination and racial harassment); (3) Count III–Violation of Title VII–Retaliation; and (4) Count IV–Violation of the Elliot–Larsen Civil Rights Act–Retaliation. The Court retained jurisdiction over Counts I and III, but declined to exercise supplemental jurisdiction over Counts II and IV. The Court now addresses Defendant's Motions for Summary Judgment with respect to Counts I and III.

### C. Count III—Plaintiffs' Title VII Claims of Retaliation
In order to establish a Title VII retaliation claim, a plaintiff must prove that: (1) she was engaged in a protected activity, (2) defendant knew of her protected activity, (3) defendant subjected her to an adverse employment action, and (4) there is a causal connection between the protected activity and the adverse employment action. *Ford v. General Motors Corp.,* 305 F.3d 545, 552–53 (6th Cir.2002) (citations omitted).

#### 1. McCoy
The only instance of retaliation alleged by McCoy was that she received the Notice of Termination letter dated October 29, 2007. This Notice of Termination, however, was prepared and mailed over one month after: (a) McCoy told Harriman that she quit (September 20, 2007),

(b) McCoy left a letter of resignation for Harriman (September 21, 2007), and (c) Harriman offered McCoy a charge nurse position on the day shift, which position McCoy rejected (September 26, 2007). Moreover, the Notice of Termination stated that McCoy's employment was terminated on September 20, 2007, as a result of her verbal resignation that day. Accordingly, as McCoy had quit her employment with Defendant a month before receiving the Notice of Termination, the Notice of Termination did not constitute an adverse employment action.

The Court also finds that McCoy's retaliation claim is deficient as a matter of law because there is no evidence that she was engaged in a protected activity or that Defendant knew of her protected activity. McCoy has not, at any time during or subsequent to her employment, made any complaints of race discrimination or harassment to anyone associated with Defendant. McCoy did not make any claim of retaliation for a race-based reason when she: (1) submitted her letter of resignation, (2) spoke to Titus, the risk manager at corporate, after she quit, (3) spoke to Harriman a week after she quit, (4) informed the unemployment agency of her reason for resigning, and (5) was deposed in this matter. McCoy asserts that when she spoke to Harriman and Titus, she stated that she felt Harriman was harassing her and trying to push her out so that Harriman could replace McCoy with Crosby. Crosby is Caucasian, but McCoy did not express that she felt Harriman was seeking to push McCoy out because she was African–American so that Harriman could replace here with someone who is Caucasian. In addition, these complaints were made after McCoy had resigned. As McCoy engaged in no protected activity prior to the time she separated her employment, Defendant could not have been aware of any protected activity by McCoy such that Defendant could retaliate against her.

**\*11** Accordingly, the Court concludes that there is no genuine issue of material fact to support McCoy's claim of retaliation pursuant to Title VII.

#### 2. Seals
Seals contends that when she complained to Campbell that Harriman called her a liar and treated her unfairly regarding the cream/diaper incident with a resident, she was engaged in protected activity because it was an implicit claim of race discrimination. The Court finds,

however, that such a comment does not constituted protected activity in the context of a Title VII retaliation claim based on race because absolutely nothing about that complaint could be construed as having any racial connotation. Rather, it is simply a complaint about being treated unfairly by a supervisor. Accordingly, the Court concludes that there is no genuine issue of material fact to support Seals' claim of retaliation pursuant to Title VII.

*3. Johnson*

Johnson stated that she told Schester that she believed her supervisors (Harriman and Campbell) were prejudiced, but she did not elaborate on what that meant. Johnson did not mention this conversation in Plaintiffs' Complaint, nor did she reference the conversation with Schester in her Equal Employment Opportunity ("EEOC") filing. Johnson also states that, during her employment, she contacted the corporate offices, specifically Scicluna (to whom Johnson complained that Harriman was very rude) and Buotros (to whom she also complained about Harriman's rudeness, tone, attitude and approach). Johnson also states that she complained to Buotros: (a) that she did not think Harriman or Campbell "wanted black people to work with them that closely because they treated each and every last one of us with total disrespect," (b) about Harriman placing the "Karri" post-it note on Spraggins' statuette, and (c) about how "we [were] being treated in the building." Johnson maintains that harassment by Campbell and Harriman increased their harassment thereafter and that Campbell refused to talk to her.

The Court finds that none of the complaints made by Johnson demonstrate that she was complaining of race-based conduct by any of Defendant's representatives, namely Harriman and Campbell. None of the complaints identifies any comments or actions that were based on race. Rather, Johnson simply offered her opinion that Harriman and Campbell were prejudiced, without offering any evidence to support that opinion. Likewise, the fact that Johnson "thought" Harriman and Campbell did not want to work closely with African–Americans because they did not treat African–Americans with respect was made without identifying any particular or conduct which would exemplify that conclusion. Self-serving conclusory statements such as these do not, however, demonstrate that the comments or actions of Harriman and Campbell were in any way related to race. *See, e.g., Crawford v. Medina,* 96 F.3d 830, 836 (6th

Cir.1996). Finally, even if Johnson's alleged comments to Buotros regarding the "Karri" post-it incident regarding Spraggins' statuette are considered race-based (which the Court concludes they are not), it is but an isolated, stray remark and that does not suffice to support a Title VII race discrimination or retaliation claim. *See* Section IV. C.1., *infra.*

**\*12** Accordingly, the Court concludes that there is no genuine issue of material fact to support Johnson's claim of retaliation pursuant to Title VII.

*4. Spraggins*

The Court concludes that Spraggins cannot establish a prima facie case of Title VII retaliation for two reasons. First, the Court finds that Spraggins did not engage in protected activity prior to the cessation of her employment, *i.e.,* when she submitted her letter of resignation and two-week notice on October 17, 2008. A plaintiff engages in protected activity when she opposes activity which she reasonably believes is discriminatory. *Johnson v. University of Cincinnati,* 215 F.3d 561, 579 (6th Cir., 2000). Such opposition can include "complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices." *Id.* Although the range of protected activity is broad, "the manner of [a plaintiff's] opposition must be reasonable ." *Id.* at 580. Likewise, the EEOC has determined that "[a] complaint about an employment practice constitutes protected opposition only if the individual explicitly or implicitly communicates a belief that the practice constitutes unlawful employment discrimination." EEOC Compliance Manual § 4.10. The Compliance Manual provides the following illustrative example:

> CP complains to her foreman about graffiti in her workplace that is derogatory toward women. Although CP does not specify that she believes the graffiti creates a hostile work environment based on sex, her complaint reasonably would have been interpreted by the foreman as opposition to sex discrimination, due to the sex-based content of the graffiti.

Her complaint therefore constitutes "opposition."

*Id.*

Prior to submitting her letter of resignation, the only activity that Spraggins contends was protected was her complaint to Harriman that it was inappropriate for Harriman to put the post-it note with "Karri" written on it on the statuette. Spraggins contends that her comments to Harriman constituted an implicit complaint of racial harassment. The Court does not agree. Spraggins admits that she made no mention of race or race discrimination whatsoever with respect to the statuette incident and merely said it was inappropriate. A complaint of inappropriate behavior, especially in this context, is not synonymous with complaining of a violation of civil rights laws. *See, e.g., Comiskey v. Automotive Indus. Action Group,* 40 F.Supp.2d 877 (E.D.Mich.1999). Moreover, unlike the example in the EEOC Compliance Manual, where the graffiti was sex-based because it was "derogatory toward women," there was no race-based activity here, as evidenced by the lack of such an allegation by Spraggins.

Plaintiff also contends that her complaints to corporate officials via voicemails on October 17, 2007, after she left Defendant's facility, constitute protected activity. Even assuming: (1) Spraggins engaged in protected activity when she left voicemail messages for Defendant's corporate administrators on October 17, 2007, and (2) Plaintiff suffered an adverse action on October 18, 2007, however, the Court finds that Spraggins has produced no evidence that either Campbell or Harriman knew Spraggins left the messages for Defendant's corporate administrators prior to Harriman's interaction with Spraggins on October 18, 2007. There is no evidence that any corporate administrator ever discussed Spraggins' messages with Harriman or Campbell, and Hicks testified that he never discussed any racial issues regarding Spraggins with Harriman. Plaintiff has produced no evidence to contest that material fact.

**\*13** Therefore, the Court concludes that there is no genuine issue of material fact to support Spraggins' claim of retaliation pursuant to Title VII.

*S. Conclusion*

For the reasons set forth above, the Court holds that Plaintiffs' claims of Title VII retaliation must be dismissed, as a matter of law. Accordingly, the Court grants Defendant's Motions for Summary Judgment with respect to Count III of Plaintiffs' Amended Complaint.

**B. Count I–Race Discrimination Claims**

Title VII of the Civil Rights Act of 1964 makes it an unlawful employment practice for an employer to discriminate against any individual because of such individual's race. 42 U.S.C. § 2000e–2(a)(1). To establish a prima facie case of race discrimination, a plaintiff must demonstrate that: (1) she is a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment decision; and (4) she was replaced by a person outside the protected class or treated differently (less favorably) than similarly situated non-protected employees. *Arendale v. City of Memphis,* 519 F.3d 587, 603 (6th Cir.2008); accord *Clay v. United Parcel Serv., Inc.,* 501 F.3d 695, 703 (6th Cir.2007). In order to satisfy the "treated differently" prong of the fourth element of a prima facie case, a plaintiff must show that the person who was treated more favorably was similarly situated to the plaintiff in all respects. *Clayton v. Meijer, Inc.,* 281 F.3d 605, 610–11 (6th Cir.2002). Ultimately, "[t]he key question is always whether, under the particular facts and context of the case at hand, the plaintiff has presented sufficient evidence that he or she suffered an adverse employment action under circumstances which give rise to an inference of unlawful discrimination." *Macy v. Hopkins County Sch. Bd. of Educ.,* 484 F.3d 357, 365 (6th Cir.2007).

In the event that a plaintiff establishes a prima facie case of race discrimination, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for taking the adverse action against the plaintiff. *Abdulnour v. Campbell Soup Supply Co., LLC,* 502 F.3d 496, 501–02 (6th Cir.2007) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *DiCarlo v. Potter,* 358 F.3d 408, 414–15 (6th Cir.2004)). If the defendant proffers a legitimate reason for taking the adverse employment action against the plaintiff,

the burden shifts back to Plaintiff 'to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were

Case 2:17-cv-13737-MAG-MKM ECF No. 36-28, PageID.630 Filed 06/27/19 Page 12 of 18

Spraggins v. Lakepointe Senior Care and Rehab Center, L.L.C., Not Reported in...

not its true reasons, but were a pretext for discrimination.' [*DiCarlo,* 358 F.3d at 414)) (emphasis omitted) ] Plaintiff may establish that Defendants' proffered reason is mere pretext by establishing that it: (1) had no basis in fact; (2) did not actually motivate Plaintiff's termination [or other adverse employment action]; or (3) was insufficient to warrant Plaintiff's termination [or other adverse employment action]. *Manzer [v. Diamond Shamrock Chems. Co.,* 29 F.3d 1078, 1084 (6th Cir.1994) ].

**\*14** *Abdulnour,* 502 F.3d at 502. *See also Zambetti v. Cuyahoga Community College,* 314 F.3d 249, 258 (6th Cir., 2002). An employer's business judgment may not be questioned as a means of establishing pretext because the issue is not whether the decision was wrong or mistaken but, rather, whether the decision was discriminatory. *Hartsel v. Keys,* 87 F.3d 795, 801 (6th Cir.1996) ("The law does not require employers to make perfect decisions, nor forbid them from making decisions that others may disagree with.").

Defendant concedes that all of the Plaintiffs are members of a protected class.

### *1. McCoy*

McCoy contends that she was constructively discharged. If McCoy was constructively discharged, that would suffice to demonstrate an "adverse employment action" for purposes of establishing her prima facie case. *See Jones v. Metro. Butler Housing Authority,* 40 Fed. Appx. 131, 136 (6th Cir.2002); *Logan v. Denny's, Inc.,* 259 F.3d 558, 568 (6th Cir., 2001) (a constructive discharge is an adverse employment action). A constructive discharge claim has two elements: "1) 'the employer ... deliberately create[d] intolerable working conditions, as perceived by a reasonable person,' and 2) the employer did so with the intention of forcing the employee to quit.' " *Logan,* 259 F.3 at 568–69. As such, a constructive discharge analysis requires an inquiry "into both the objective feelings of the employee and the intent of the employer." *Yates v. Avco Corp.,* 819 F.2d 630, 636 (6th Cir.1987). Stated differently, in order to maintain an action for constructive discharge, a plaintiff must show that "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Kocsis v. Multi–Care Management, Inc.,* 97 F.3d 876, 887 (6th Cir.1996). However, "[d]issatisfaction with work assignments, a feeling of being unfairly criticized,

or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." *Smith v. Henderson,* 376 F.3d 529, 534 (6th Cir.2004) (quoting *Carter v. Ball,* 33 F.3d 450, 459 (4th Cir.1994)).

McCoy has contended that Harriman: (1) was "making it all [McCoy's] fault that things were like they were without making housekeeping take some responsibility ...," (2) micro-managed McCoy, (3) utilized a crisis-management style, (4) was constantly on McCoy's back, always "rude and gruff" toward McCoy, and constantly nitpicking, berating and belittling her about something, and (5) loaded McCoy with extra duties. McCoy states that this conduct continued up to the day she resigned and was intended to make her quit. The Court concludes that the foregoing conduct, even if completely true, does not create a genuine issue of material fact that a reasonable person in McCoy's shoes "would have felt compelled to resign." *See, e.g., Kocsis, supra.* The Court also notes that McCoy said nothing about race discrimination in her resignation letter, did not mention race discrimination in her conversation with Titus and did not mention anything about race when she talked to Harriman several days after she quit.

**\*15** For the foregoing reasons, the Court concludes that McCoy's claim of race discrimination is not viable, as a matter of law.

### *2. Seals*

Defendant first contends that Seals was not qualified for the position of Unit Manager. In order to satisfy the second element of a Title VII race discrimination claim, *i.e.,* that she is qualified for the position, a plaintiff must show that she was performing her job at a level that met her employer's legitimate expectations. *See, e.g., Ang v. Procter & Gamble Corp.,* 932 F.2d 540, 549 (6th Cir.1991) (citation omitted); *McDonald v. Union Camp Corp.,* 898 F.2d 1155, 1160 (6th Cir.1990). Seals became a Unit Manager, in essence, at the same time she became a LPN, *i.e.,* she had graduated from nursing school only three months earlier and had not even worked as a licensed nurse prior to becoming a Unit Manager. Moreover, Seals had no nurse management experience upon becoming a Unit Manager, only one month before Campbell became Administrator and two months before Harriman became the DON. The Court also notes that McCoy's position as Unit Manager was probationary for the first 90 days. For these reasons, the Court concludes that Seals was not qualified for the position of Unit Manager.

Case 2:17-cv-13737-MAG-MKM ECF No. 36-28, PageID.631 Filed 06/27/19 Page 13 of 18

Spraggins v. Lakepointe Senior Care and Rehab Center, L.L.C., Not Reported in...

In reaching that conclusion, the Court recognizes that some administrators at Defendant had selected Seals as a Unit Manager and that she held that title for almost three months. Nonetheless, based on the testimony of Seals and Gross (the DON at the time Seals was selected to serve as Unit Manager), it is undisputed Gross and Seals were friends and Seals had no experience when selected. Likewise, it is undisputed that the administrative team in place at Defendant after September 4, 2007, did not feel that Seals was performing her job at a level that met their expectations. As such, the Court concludes Seals has not shown that there is a genuine issue of material fact "that she was performing her job at a level that met her employer's legitimate expectations." *See Ang, supra* .

Alternatively, even if there is a genuine issue of material fact whether Seals was qualified for the Unit Manager position (and Seals never returned to a floor nurse position before she resigned), Defendant has offered a legitimate, non-discriminatory reason for removing Seals from the Unit Manager position and demoting her to floor nurse, as well as for terminating her employment. Defendant states that Seals was demoted from the Unit Manager position because she was not qualified, as well as her failure to make sure a resident was fed and then lying to Harriman about having fed the resident, though the Court notes that Seals disputes that she failed to make sure the resident was fed (and, therefore, did not lie). Defendant further states that Seals was terminated from her employment when she was a no-call/no-show for three consecutive days after being offered a floor nurse position, a contention that Seals also disputes.

**\*16** A plaintiff can refute the legitimate, non-discriminatory reasons articulated by Defendant for her demotion and termination. *See Abdulnour, Manzer* and *Zambetti, supra.* Although Seals has disputed that she failed to feed the resident or that she lied about that incident, the Court finds more significant Seals' inconsistent answers related to her termination. At one point, Seals testified that she called in and/or stopped in at Defendant's facility on October 16–18, 2007, however, she did so only after she stated that she had not called in on those days. In addition, Seals admitted that she began working for a different nursing home (at which Gross was the DON) on October 16, 2007. Accordingly, as to her termination for violation of the no-call/no-show policy, the Court finds that Seals is barred from contesting that

she was in violation of the no-call/no-show policy, a policy that provided for termination in the event it was violated. Accordingly, Seals cannot establish that the proffered reasons for her termination were pretextual.

For these reasons, the Court concludes that the race discrimination claim must be dismissed, as a matter of law, as it pertains to Seals.

*3. Johnson*

Defendant contends that Johnson was not qualified for her job as scheduling coordinator because she was not performing her job at a level that met Defendant's legitimate expectations. *See Ang, supra.* The Court, however, finds that a genuine issue of material fact exists as to whether Johnson was qualified for her job. Most signifcantly, Johnson had been performing the job for almost two years before Harriman began as the DON and had performance evaluations of "Outstanding" and "Above Average." Accordingly, the Court concludes that Johnson has established a genuine issue of material fact that she was qualified to perform as a scheduler.

Defendant asserts that it had two legitimate, nondiscriminatory reasons for terminating Johnson. First, Harriman concluded that Johnson did not meet Defendant's expectations, that Johnson was told of such deficiencies and placed on a performance improvement plan. Defendant asserts that, despite the performance improvement plan, Johnson still failed to do what she was asked and continued to perform below expectations, including failing to provide Harriman with a corrected schedule and not updating and keeping accurate attendance cards. Johnson acknowledges that she was subject to a performance improvement plan and that a person on the schedule she prepared no longer worked at Defendant's facility. Second, subsequent to the date Johnson was issued the Warning but prior to Johnson's termination, Campbell's review of Johnson's personnel file revealed that Johnson had falsified several employment documents in April 2007, transgressions that Defendant considered grounds for termination. Johnson acknowledges such falsifications occurred and, despite her contentions that she had been disciplined for such transgressions, no disciplinary action was noted in her file.

**\*17** The Court finds that Johnson has not set forth that Defendant's proffered reason is mere pretext. Johnson not only acknowledged that she did not satisfy the

performance improvement plan, she acknowledged that she falsified documents. Second, Johnson has not set forth any evidence that demonstrates that Defendant's decision to terminate her was not motivated by her deficient performance immediately prior to her termination or because of the documents she falsified. Third, Johnson has not demonstrated that Defendant's reasons were insufficient to justify Johnson's termination. The Court also notes that Johnson was immediately replaced by an African–American, thus precluding Johnson from satisfying the fourth element of the prima facie case.

Accordingly, the Court concludes that Johnson's race discrimination claim against Defendant must be dismissed as a matter of law.

### 4. Spraggins

Spraggins contends that she was constructively discharged, which, if true, would suffice to demonstrate an adverse employment action for purposes of establishing a prima facie case. *See Jones, supra* . For the reasons that follow, however, the Court concludes that there is no objective evidence that would compel a person in Spraggins' position to resign. Prior to submitting her letter of resignation and two-week notice on October 17, 2007, the only act by anyone associated with Defendant that Spraggins complained about was the placement of the "Karri" post-it note on her nurse statuette. Even now, Spraggins identifies only the statuette incident and the following occurrences as reasons she contends she felt compelled to resign: (1) Harriman's directive to use low air loss mattresses and/or Harriman's failure to order them, (2) Harriman called Spraggins stupid, liar, or incompetent on two occasions, and (3) Harriman accused Spraggins of failing to see a resident with a wound. Although Plaintiff contends that the preceding events made her working conditions difficult, the law in the Sixth Circuit is clear that Spraggins' working conditions were not so intolerable that a reasonable person in her position would resign. *See Kocsis* and *Henderson, supra.*

Likewise, to the extent that Spraggins was terminated on October 18, 2007 (as opposed to having resigned the previous day), her testimony and the testimony of Harriman indisputably show that Spraggins was told she "self-terminated" because she left Defendant's facility on October 17, 2007, *i.e.,* she quit. In addition, when Spraggins stopped by Defendant's facility on October 18, 2007, a day she was scheduled to work, she was not dressed

for work, which suggested that she did not intend to fulfill the two-week notice period. These are a legitimate, non-discriminatory reasons for terminating Spraggins. The Court also concludes that, to the extent Spraggins was terminated, the reason was not pretextual because there was a basis for her termination (*i.e.,* she quit one day and was not dressed for work when she came into Defendant's facility the next day), Spraggins has not established that her termination was motivated by anything other than her actions, and her actions were sufficient to warrant her termination.

**\*18** For the foregoing reasons, the Court concludes that the race discrimination claim filed by Spraggins must be dismissed, as a matter of law.

### 5. Conclusion

Accordingly, and for the reasons set forth above, the Court holds that Plaintiffs' claims of race discrimination are not viable.

### C. Count I—Racial Harassment Claims

To establish a claim of racial harassment, a plaintiff must establish that (1) the plaintiff was a member of a protected class; (2) the plaintiff was subjected to unwelcome racial harassment; (3) the harassment complained of was based on race; (4) the harassment had the effect of unreasonably interfering with the plaintiff's work performance and creating an intimidating, hostile or offensive work environment; and (5) there existed respondeat superior liability. *See Clay v. UPS,* 501 F.3d 695, 706 (6th Cir.2007); *Haffod v. Seidner,* 183 F.3d 506, 512 (6th Cir.1999). Defendant concedes that all Plaintiffs are members of a protected class.

### 1. McCoy

McCoy testified that Harriman: (a) told McCoy she needed to get her act together and constantly nitpicked and berated her, (b) verbally abused her, (c) picked on her for patient care issues that were not her responsibility, *i.e.,* for the things that were housekeeping issues, (d) micromanaged her and used a crisis-management style, (e) was very rude and gruff to her, (f) implied that McCoy was lying on one occasion, (g) gave McCoy extra duties, and (h) blamed McCoy for things the other C–Wing Manger (Rutkowski) was responsible for. None of these "complaints," however, have anything to do with race.

As such, the circumstances in this matter, particularly as they pertain to McCoy, pale in comparison to cases where the Sixth Circuit has concluded that a racial harassment cause of action may proceed. *See, e.g., Jordan v. City of Cleveland,* 464 F.3d 584, 597 (6th Cir.2006) (in a case involving racial insults, isolation, segregation and other indignities, the court stated it was "an understatement to say that the jury could reasonably have found [the plaintiff] was harassed based on his race"). *See also, Quanex, supra.*

In this case, the facts as they pertain to McCoy do not even rise to the level of other cases where the Sixth Circuit has held that plaintiff *failed* to set forth a viable claim of racial harassment. *See, e.g., Crawford v. Medina,* 96 F.3d 830, 836 (6th Cir.1996) (in a case where, apart from two comments that were objectively indicative of age-based animus, there was virtually no evidence that the hostility was in any way related to age (other than the plaintiff's self-serving conclusions), the court stated, "unquestionably there was hostility and abusiveness in the working environment, but the evidence suggests that the atmosphere stemmed from a simple clash of personalities"). *See also Harrison v. Metropolitan Gov't,* 80 F.3d 1107, 1118 (6th Cir.1996) (evidence that the plaintiff's supervisor had used a racial epithet and that the plaintiff had been subjected to a Ku Klux Klan incident were insufficient to establish a case of racial harassment); *Walk v. Rubbermaid Inc.,* No. 94–4306, 1996 WL 56203, at *2 (6th Cir. Feb.8, 1996) (even though supervisor frequently used foul and abusive language against a female subordinate, the court held that plaintiff failed to establish that she had been harassed on the basis of her sex because the only sex-based comment made by the supervisor was that he did not have time for "you or your fucking menopausal bitches" and this comment was made at most three times); *Davis v. Monsanto Chem. Co.,* 858 F.2d 345, 348–49 (6th Cir.1988), *cert. denied,* 490 U.S. 1110, 109 S.Ct. 3166, 104 L.Ed.2d 1028 (1989) (plaintiff must show that she was subjected to "repeated slurs" that constituted unreasonably abusive or offense work-related environment or adversely affected the reasonable employee's ability to perform her job).

**\*19** Accordingly, the Court concludes that McCoy's claim of racial harassment fails, as a matter of law.

*2. Seals*

Seals has set forth even less of a basis for a viable claim of racial harassment than McCoy. Seals testified that Harriman: (a) berated her regularly, (b) yelled at her failing to do her job on a couple of occasions, (c) called Seals a liar on one occasion, (d) told Seals she was incapable of doing the Unit Manager job, and (e) belittled Seals when she asked "how would you like it if somebody didn't feed your Mama?" None of these instances involve conduct based on race. And, even if any of the instances could be considered race-based, such conduct does not rise to the level required by the Sixth Circuit to establish a claim for racial harassment, as discussed in Section IV.C.1., *supra.* In addition, Seals fails to demonstrate that any of Harriman's behavior affected her ability to perform her job; in fact, Seals testified that she capably handled her position at all times.

For the foregoing reasons, the Court concludes that, as a matter of law, Seals has failed to set forth evidence to support a racial harassment claim.

*3. Johnson*

Johnson alleges that Harriman: (a) was rude and disrespectful to her, (b) went through her desk, (c) threw papers at Johnson, (d) never called her by her name, and (e) called her the following names or directed the following terms at her: incompetent, liar and "you people." After consulting various dictionaries, the Court finds that incompetent and liar are race-neutral terms. Moreover, Johnson could not identify an occasion when Harriman called her incompetent. The Court also notes that Johnson is not alone in being called these names, as other nurses employed at Defendant's facility (including Caucasian nurses such as Crosby and former ADON Forbis, who resigned in December 2007 because she didn't like how Harriman treated her) have expressed that Harriman is strict and makes them feel incompetent, even when they believe they are performing satisfactorily. Moreover, "you people" is not, on its face, a term that is race-based. *See, e.g. Arnold v. Marous Bros. Const., Inc.,* 211 Fed.Appx. 377, 380 (6th Cir.2006) (citations omitted) ("ambiguous reference to 'you people' ... [is] not [an] example[ ] of direct evidence," even though the comment was made "directly in relation to [the plaintiff's] dismissal"); *Johnson v. Kroger Co.,* 319 F.3d 858, 865 (6th Cir.2003) ("direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected

Case 2:17-cv-13737-MAG-MKM ECF No. 36-28, PageID.634 Filed 06/27/19 Page 16 of 18

Spraggins v. Lakepointe Senior Care and Rehab Center, L.L.C., Not Reported in...

group"); *Michigan Dept. of Civil Rights ex rel. Burnside v. Fashion Bug of Detroit,* 473 Mich. 863, 867, 702 N.W.2d 154 (2005) (Taylor, C.J., concurring) (noting that "the hearing officer, the commission, the circuit court, and the Court of Appeals did not find the 'you people' comment to be direct evidence of discrimination," particularly in light of the fact that the complainant did not find the term to be racially motivated). Likewise, Johnson testified at her deposition that she did not understand what "you people" meant. In other words, as with McCoy and Seals, the facts as they pertain to Johnson do not even rise to the level of other cases where the Sixth Circuit has held that the plaintiff *failed* to set forth a viable claim of racial harassment. *See, e.g., Crawford* and *Harrison, supra.*

**\*20** Accordingly, the Court holds that, as a matter of law, Johnson's racial harassment claim must be dismissed.

#### 4. Spraggins

Spraggins asserts that Harriman harassed her: (a) verbally by calling her incompetent, stupid and a liar, (b) by holding onto wound care logs until the end of the day, (c) by moving around low air loss mattresses without Plaintiff's knowledge, and (d) by failing to approve the ordering of supplies. Even if all of these things are true, however, none of them involves any racial connotation. Rather, the "harassment" of which she complains was general harassment, not harassment based on her race, and is not actionable under Title VII. *See Bradshaw v. Golden Road Motor Inn,* 885 F.Supp. 1370, 1381 (D.Nev.1995) ("personal hostility is not the same thing as 'hostility' within the meaning of Title VII"). In fact, the only conduct directed at Spraggins (or any of the Plaintiffs, for that matter) that arguably had a race-based connotation was placing the "Karri" post-it note on Spraggins' statuette. Even if that act was based on race, however, such an isolated act is not sufficient to survive summary judgment. *Rabidue v. Osceola Ref. Co., Div. of TexasAmerica* Petrochemicals, 805 F.2d 611, 620 (6th Cir.1986), *cert. denied,* 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987). *See also Crawford, Harrison, Walk* and *Monsanto, supra.* Accordingly, the Court holds that Spraggins' claim for racial harassment shall be dismissed, as a matter of law, as it does not rise to the level of other cases where the Sixth Circuit has held that the plaintiff *failed* to set forth a viable claim of racial harassment.

#### 5. Plaintiffs' Totality of the Circumstances Argument

In addition to addressing the merits of each of the Plaintiffs' claims for racial harassment, the Court also considers Plaintiffs' contention that a hostile work environment existed at Defendant's facility. Plaintiffs correctly state that a cause of action for racial harassment based on a hostile work environment is viable where the complained of conduct was "sufficiently severe or pervasive 'to alter the conditions of (the victim's) employment and create an abusive working environment.' " *Jackson v. Quanex Corp.,* 191 F.3d 647, 658 (6th Cir., 1999) (quoting *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). However, the conduct must be severe or pervasive enough to create an environment that a reasonable person "in the plaintiff's position, considering 'all the circumstances' " would find hostile or abusive. *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (quoting *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).

To determine whether the complained of conduct was severe or pervasive, the court must consider the "totality of the circumstances" and, as such, courts should not "carve the work environment into a series of discrete incidents and then measure the harm occurring in each episode." *Quanex,* 191 F.3d at 660. Further, the court should consider all the circumstances including "the frequency of the *discriminatory* conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." *Id.* at 658 (quoting *Harris,* 510 U .S. at 23 (1986)) (emphasis added). No single factor is dispositive. *Harris,* 510 U.S. at 23. As *Harris* reflects, however, the plaintiff needs to show at least a question of fact that the harassment was based on discriminatory conduct. For example, "a showing of the use of racial epithets in a work environment may 'create an inference that racial animus motivated other conduct as well.' " *Quanex,* 191 F.3d at 662 (internal citations omitted). Likewise, the "corporate culture" of discrimination may provide circumstantial evidence of particularized discrimination against a plaintiff. *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 356 (6th Cir.1998).

**\*21** In this case, Plaintiffs argue that Defendant disaggregates the hostile environment experienced by Plaintiffs by suggesting that each offensive act should be considered in isolation from the others, *i.e.,* considered

as a discrete event standing alone. Based on a review of Defendant's briefs, the Court disagrees. More significantly, however, *the Court* has not disaggregated the alleged offensive acts in determining the merits of each Plaintiff's case in ruling on Defendant's motions. Rather, the Court has, as it must, utilized the totality of the circumstances standard, such that "the incidents [have not been robbed] of their cumulative effect[.]" *Jackson*, 191 F.3d at 660 (citation omitted). As described below, however, even when considering the totality of the circumstances, the Court concludes that the evidence of discriminatory conduct supplied by Plaintiffs cannot, as a matter of law, support a viable hostile work environment claim under Title VII.

Plaintiffs have described Defendant's workplace as populated by an Administrator and DON who yell and scream and are rude. This is supported by the testimony of Plaintiffs, as well as several other persons who have worked there and some who still work there. Significantly, however, even accepting all of Plaintiffs' testimony and allegations as true, there is a conspicuous absence of racebased conduct attributable to Defendant and its representatives. Moreover, even if Harriman and Campbell repeatedly yelled at Plaintiffs and other African–American employees, called them derogatory names and said they were stupid, incompetent and liars, such comments are not racebased and do not demonstrate any racial animus on their face. This is especially true when such language and management style was directed at persons of all races and ethnicities, as evidenced by the testimony of Forbis, Scott and Crosby. Likewise, even if Campbell and Harriman referred to Plaintiffs as "you people," this term is not considered direct evidence of race discrimination. The fact that Johnson did not understand the term to refer to "African–Americans" or "black people" is illustrative of that. *See Burnside, Arnold* and *Kroger, supra.*

Plaintiffs also argue that McCoy and Spraggins were treated disparately as compared to similarly situated Caucasian employees. More specifically, they contend that: (a) McCoy was required to perform extra duties, including some of Rutkowski's duties, and reprimanded for Rutkowski's poor job performance, and (b) Spraggins was required to perform on-call duties while Caucasian ADONs Forbis and Elian were not. In doing so, Plaintiffs erroneously argue that Rutkowski and Elian are Caucasian when, in fact, they are Filipina and of Middle–

Eastern descent, respectively. Nonetheless, Plaintiffs have identified two instances where an African–American has been assigned different duties than a co-worker. Plaintiffs have not, however, demonstrated that the other employees were similarly situated, as they have the burden of doing. *See Clayton*, 281 F.3d at 610–11.

**\*22** Plaintiffs also have testified that Harriman's and Campbell's harassment was specifically directed at African–American members of the nurse management team in the sense that Campbell and Harriman interacted with Caucasian employees less harshly than they interacted with AfricanAmerican employees. As set forth above, Plaintiffs have testified that Campbell was mean to African–American employees, as evidenced by a harsh tone and different language, whereas she "didn't say much to others." Likewise, Plaintiffs offered evidence that: (1) Harriman was calmer when she spoke to Caucasian employees, (2) did not yell or direct sarcasm at them, and (3) requested that Caucasian employees perform tasks but ordered African–Americans to perform tasks and did so in an abrupt and rude manner. Again, having reviewed the evidence, the Court finds that many witnesses, African–American and otherwise, testified that Campbell and Harriman were indiscriminate in their loud, rude and disrespectful treatment of employees and members of the nurse management team.

Plaintiffs also direct the Court to the "disparate pattern of African–American employees being terminated and/or quitting after Campbell's hiring." More specifically, Plaintiffs note that seven African–American managers were terminated, constructively discharged, or quit within a twomonth period after Campbell and Harriman were hired. Most, if not all, of them cited the behavior of Campbell and Harriman as the key factor to the end of their employment (and four of whom are Plaintiffs in this action). During the limited two-month period set forth by Plaintiffs, that statement may be true but it is an extremely brief period to measure, particularly where there had been a complete overhaul of the administrative team—and that administrative team was making significant changes in the manner the Defendant's facility operated because of repeated problematic visits from regulators of the State of Michigan.

Similarly, Plaintiffs seek to rely on Defendant's hires between September 1, 2007, and January 30, 2008, as evidence of discriminatory practices. During that period,

Spraggins V. Lakepointe Senior Care and Rehab Center, L.L.C., Not Reported in...

Case 2:17-cv-13737-MAG-MKM ECF No. 36-28, PageID.636 Filed 06/27/19 Page 18 of 18

Defendant hired 15 Caucasian employees, four African–American employees, and one Asian employee. The Court fails to see how Defendant's hiring during that period reflects discrimination, however, because those numbers reflect that 20% of the employees hired by Defendant during that time period were AfricanAmerican. The percentage of persons who are African–American (or black) in this country is approximately 13% (12 .9% according to the 2000 Census, as reported by the U.S. Department of Commerce, Economics and Statistics Administration, U.S. Census Bureau), and Plaintiffs have not demonstrated that the percentage of African–Americans in the nursing population is greater than that. Thus, the fact 20% of the employees hired by Defendant between September 1, 2007 and January 30, 2008, does not demonstrate that Defendant engaged in discriminatory conduct.

**\*23** Finally, the Court's review of the cases relied upon by Plaintiffs provide no support for finding a race-based hostile work environment in this case. In fact, those cases generally undercut the arguments of the Plaintiffs. For example, Plaintiffs heavily rely on the *Quanex* decision to support their argument. In *Quanex,* the plaintiff presented the following evidence of racial harassment (which is only a fraction of the six pages of race-based conduct that was set forth in the Sixth Circuit opinion): (1) a supervisor had called the plaintiff a "nigger bitch" and physically assaulted her; (2) on her first day of work, the plaintiff overheard two supervisors discuss their desire to fire minority employees; (3) a supervisor referenced African–American employees as "colored;" (4) there were frequent references to African–Americans as "niggers" and like words or terms were consistently used; (5) there was racist graffiti throughout the plant; and (6) the plaintiff and other African–Americans were often harassed by derogatory racial comments. *Id.* at 651–56. Likewise, in *Aman v. Cort Furniture Rental Corp.,* 85 F.3d 1074 (3d Cir.1996), the plaintiffs: (a) endured inherently racist remarks in their workplace for *six years* on a near daily basis (as opposed to about *six weeks* the Plaintiffs worked under Harriman), (b) were told not to touch or steal anything, and (c) were treated and paid differently than white employees. *Id.* at 1082.

Accordingly, based on the Court's review of the totality of the circumstances, including the allegations and testimony of the harassment directed at all of the Plaintiffs, the Court finds, as a matter of law, that the complained of racial harassment was not "sufficiently severe or pervasive 'to alter the conditions of [the Plaintiffs'] employment and create an abusive working environment.' " *Quanex,* 191 F.3d at 658.

*6. Conclusion*

For the reasons set forth above, the Court holds that Plaintiffs' claims of racial harassment are not viable.

**D. Conclusion**

For the reasons set forth in this Section IV, the Court concludes that Plaintiffs' Title VII claims of racial harassment, race discrimination and retaliation on the basis of race must be dismissed, as a matter of law. Accordingly, the Court shall grant Defendant's Motions for Summary Judgment and dismiss Counts I and III of Plaintiffs' Amended Complaint. As there are no remaining claims before the Court, Plaintiffs' cause of action shall be dismissed with prejudice.

**V. CONCLUSION**

Accordingly, and for the reasons set forth above, the Court hereby GRANTS Defendant's Motions for Summary Judgment (Docket # s 22, 23, 24 and 25). IT IS THEREFORE ORDERED that Plaintiffs' cause of action be, and hereby is, DISMISSED WITH PREJUDICE. Judgment shall be entered accordingly.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 3927769

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.