**<u>Exhibit B</u>**

### UNITED STATES DISTRICT COURT FOR THE
### EASTERN DISTRICT OF MICHIGAN SOUTHERN DIVISION


**DAVID CAUDLE,**

                    Plaintiff,                    Case No.: 17-CV-13737
                                                  HON. MARK A. GOLDSMITH


-vs-

**THE NIELSEN COMPANY (US), L.L.C.,**

             Defendant.
_____/


### DEPOSITION OF RYAN DINSMORE

     Taken by Plaintiff at the Law Offices of Miller, Canfield,
Paddock and Stone, P.L.C., 150 West Jefferson, Suite 2500,
Detroit, MI 48226, on Friday, May 10, 2019, commencing at 10:00
a.m.


**APPEARANCES:**

 For the Plaintiff:          **CONNOR GALLAGHER (P82104)**
                             615 Griswold Street, Suite 709
                             Detroit, MI 48226
                             (844) 835-2993


 For the Defendant:          **MEGAN P. NORRIS (P39318)**
                             **JESSICA PASK (P82212)**
                             150 W. Jefferson, Suite 2500
                             Detroit, MI 48226
                             (313) 963-6420


 **RECORDED BY:**                **REGENCY COURT REPORTING**
                             3133 Union Lake Road, Ste. A
                             Commerce Township, MI 48382
                             (248) 360-2145

1

**TABLE OF CONTENTS**

2 **WITNESS:**                                                    **PAGE**

3 **RYAN DINSMORE**

4     Direct Examination by Mr. Mr. Gallagher        04

5     Cross-Examination by Ms. Norris                145

6

7

8

9

10

11 **EXHIBITS:**

12     EXHIBIT ONE                                    46

13     EXHIBIT TWO                                    62

14     EXHIBIT THREE                                  89

15     EXHIBIT FOUR                                   96

16     EXHIBIT FIVE                                   129

17

18

19

20

21

22

23

24

25

```
 1          Detroit, Michigan
 2          Friday, May 10, 2019 - 10:15 a.m.
 3                    COURT REPORTER:  Sir, if you would
 4          please raise your right hand?
 5                    Do you swear or affirm the testimony
 6          you're about to give will be the truth, the whole
 7          truth, and nothing but the truth?
 8                    MR. DINSMORE:  Yes, I do.
 9                    COURT REPORTER:  Thank you.
10                    MR. GALLAGHER:  Good morning, sir.  My
11          name's Connor Gallagher.  We met a little bit ago.
12          I'm -- my client's -- has a lawsuit right now against
13          a company that you work at, I believe.  Have you ever
14          taken a deposition before?
15                    MR. DINSMORE:  No.
16                    JUDGE HOVEY:  Okay.  Can we go over a
17          couple ground rules?  Very easy.  I'm gonna ask
18          questions today.  This is not a normal conversation,
19          unfortunately, so while it would very normal in every
20          day's world to just like nod when you agree with
21          something.
22                    MR. DINSMORE:  Sure.
23                    MR. GALLAGHER:  We're not in the
24          normal world, so I need verbal responses just so --
25          so obviously the transcript can read well.  So, do
```

1          you understand that?

2                         MR. DINSMORE:  Yes.

3                         MR. GALLAGHER:  Awesome.  We're off to

4          a great start.  I am not here to trip you up.  I'm

5          not here to confuse you.  I'm just trying to get a

6          clean transcript to see the allegations and where

7          they stand.  At any point today you don't understand

8          anything I say or any part of my question, just ask

9          me to rephrase, or reword or something.  That's

10         totally acceptable.

11                        MR. DINSMORE:  Okay.

12                        MR. GALLAGHER:  So, with that

13         understanding, if you answer yes or no, I'm gonna

14         take that as you understand the question and you're

15         answering.

16                        MR. DINSMORE:  Yes.

17                        MR. GALLAGHER:  Okay.  Cool.

18                              RYAN DINSMORE

19         HAVING BEEN CALLED AND SWORN, TESTIFIED AS FOLLOWS:

20                          DIRECT EXAMINATION

21    BY MR. GALLAGHER:

22    Q    Can you state your name, please, sir?

23    A    Ryan John Dinsmore.

24    Q    Okay.

25                        MR. GALLAGHER:  Also, one more thing

                                                              4

```
 1          that I didn't go over with you.  So, today your --

 2          your Counsel is gonna object to some things, and

 3          outside of your attorney/client communications, I

 4          don't want to know anything about what you guys

 5          talked about ever.  So, even when you're thinking

 6          about your answers, don't even tell me.  But other

 7          than that, as long as you know the answer, you're

 8          allowed to -- you -- you still have to answer the

 9          question.

10                    THE WITNESS:  Okay.

11                    MS. NORRIS:  I'll tell you whether

12          you're supposed to answer or not.  But he's correct,

13          generally privilege is the only reason I would give

14          you for not answering.

15                    MR. GALLAGHER:  And I'll obviously

16          default to your Counsel to give you whatever advice

17          she wants.

18                    THE WITNESS:  Okay.

19                    MS. NORRIS:  Yeah.  Don't take your

20          legal advice from the opponent.  Just a rule of

21          thumb.

22                    MR. GALLAGHER:  That's great legal

23          advice.  I would consult with her.  Okay.  So, back

24          on track.

25    BY MR. GALLAGHER:
```

```
 1   Q    Sorry, let's just start over.  Can you state your

 2        name, please, sir?

 3   A    Ryan John Dinsmore.

 4   Q    Can you spell that for the record, please?

 5   A    R-Y-A-N J-O-H-N D-I-N-S-M-O-R-E.

 6   Q    Okay.  And where do you work, Ms. Dinsmore?

 7   A    The Nielsen Company.

 8   Q    Okay.  And what's your position there?

 9   A    Field Manager.

10   Q    And what does a Field Manager at the Nielsen Company

11        do?

12   A    A Field Manager manages the techs who install and

13        maintain the equipment that's used to find out what's

14        being watched on TV.

15   Q    Okay.  So, sorry.  You --

16   A    I manage the field employees.

17   Q    Okay.  About how many employees?

18   A    Sixteen.

19   Q    Is that an exactly number?  Do you know?

20   A    Yes.

21   Q    Okay.  And are all of them techs, as you call them?

22   A    Fourteen are techs or Field Reps, one's a market

23        training and support specialist, which is a trainer,

24        and one is a part-time Field Rep.

25   Q    Okay.  So, does the part-time Field Rep, do they do
```

```
 1          the same things that a regular Field Rep would do?
 2    A     No.
 3    Q     Okay.  What -- can you explain the difference for me?
 4    A     They manage our storage site.  They work in a small
 5          storage site.
 6    Q     Okay.
 7    A     Each person --
 8    Q     Different responsibilities?
 9    A     Yes.
10    Q     What would the responsibilities of a part-time be?
11    A     He builds the computers that we then take and install
12          in Nielsen homes.
13    Q     Okay.  So, what would the responsibilities of a Field
14          Tech be?
15                    MS. NORRIS:  The regular one?
16                    MR. GALLAGHER:  Field -- absolutely.
17          Sure.  So, I'm gonna call that one part-time Field
18          Tech, just that one we just went over, for the rest
19          of the day if I have to ask questions.
20                    THE WITNESS:  Sure.
21                    MR. GALLAGHER:  And I'm gonna refer to
22          the 14 employees that you oversee as Field Techs.
23                    THE WITNESS:  Sure.
24                    MR. GALLAGHER:  Is that okay?
25                    THE WITNESS:  Yes.
```

```
 1                        MR. GALLAGHER:  Okay.  Cool.

 2   BY MR. GALLAGHER:

 3   Q    So, what -- what are the responsibilities of a Field

 4        Tech?

 5   A    They install, maintain, and coach our homes how to

 6        use the equipment to find out what's being watched on

 7        television.

 8   Q    Okay.  Do you oversee a geographic area?

 9   A    Yes.

10   Q    What is your geographic area?

11   A    Southeast Michigan.  The Detroit Local People Meter

12        Market.

13   Q    Southeast Michigan?

14   A    Yes.

15   Q    I'm sorry.  I didn't hear what you said after that.

16   A    It's -- the market's called the -- the Detroit Local

17        People Meter Market.

18   Q    Okay.  Was that Detroit metro area essentially or --

19   A    More or less.  It's a little larger than your tri-

20        county area, but --

21   Q    Yeah.

22   A    -- more or less, yes.

23   Q    Could you give me -- describe to me the best you can

24        what your geographic area is.

25   A    I always tell people it's -- it's down to the
```

```
 1           Michigan/Ohio border, as far as out as on the west
 2           side as Saline, Pinkney, on the north end we go into
 3           the thumb some distance, but not quite all the way up
 4           to Caseville, and then back along the water as -- as
 5           far north as Lexington and then -- and back all the
 6           way down to -- to Ohio.
 7    Q      Okay.  Okay.
 8    A      It's a large area.
 9    Q      Yeah.  Roughly how many homes do you have?
10    A      Over 800.  Over 800 homes.  860 homes right now.
11    Q      Is that split up over the 14 Field Techs?
12    A      Yes.
13    Q      So, I'm gonna just repeat.  So, is it how many homes
14           divided by 14 Field Techs, and that's how many they
15           have?
16    A      More or less.  It's not -- they don't all have the
17           same amount.
18    Q      Okay.  About how many is like the most and how many
19           is the least?
20    A      Because it's -- it's a mixture of two different types
21           of markets.  So, about 70 to 75 per rep.
22    Q      Okay.  You said there's two different markets.  Could
23           you explain?
24    A      Well, it's two different types.  We have traditional
25           and homes that just have internet.  We usually don't
```

9

1      count the homes that just have internet in that total

2      overall count.

3   Q   Okay.  Did you include homes that just have internet

4      in --

5   A   Yes.

6   Q   -- that 860?

7   A   Yes.

8   Q   Okay.  Why are you differ -- sorry, I'll learn to

9      talk today, I promise.  Why are you have a different

10     -- why are you differentiating traditional and just

11     internet homes?

12  A   That's what our clients do, so we look at it that

13     way.

14  Q   Okay.  Okay.  So, you said install is one of the

15     responsibilities of a Field Tech.  Can you explain

16     that?

17  A   Can you rephrase?

18  Q   Yeah, sure.  I asked you the responsibilities and --

19     let's just go back to that.  Can you think of any

20     other -- earlier you said responsibilities were -- of

21     a Field Tech were to install, maintain, and coach.

22  A   Right.

23  Q   Is there anything else you can think of?

24  A   Well, there's a long list of -- of tasks that a Field

25     Rep -- that -- so they -- they also schedule --

```
 1            they're responsible for scheduling the work in their

 2            field area, maintaining certain levels of performance

 3            and quality, as well.

 4    Q       Okay.  What is that level of performance and quality?

 5    A       There are many measures.

 6    Q       Okay.

 7    A       For both.

 8    Q       Okay.

 9    A       But -- so one of the primary measures is a person's

10            performance, where they're required to meet or exceed

11            91 percent INTAB performance.

12    Q       I'm sorry.  I misheard.

13    A       They're required to meet or exceed INTAB performance.

14            INTAB means of the homes they have in their field

15            area, how many are we able to use the information

16            from on a given day.

17    Q       Okay.  And what -- what is required to use the

18            information?

19    A       The equipment must -- must be properly installed,

20            functioning properly without errors, which we call

21            faults.  And the home must login to the meter when

22            watching TV.

23    Q       So, what do you mean by properly installed?

24    A       Properly.  So, we have rules in regards to how the

25            equipment should be installed and what TVs need to
```

```
 1              have our equipment installed on them.  If we have
 2              faults, we cannot use the information in the ratings
 3              for that home until we get out and fix it.
 4     Q        Okay.  And what would -- what are the faults that
 5              would appear?
 6     A        If our equipment fails.  Like if you had a
 7              thunderstorm and your toaster stops working.  We
 8              install electronic equipment, so the equipment can do
 9              the same thing.  It can -- it can fail just like any
10              other piece of electronic equipment.  If someone were
11              to unplug our equipment or any given piece, someone
12              added something without telling us to their
13              television setup.
14     Q        So, no matter the reason, they ask you for a 91
15              percent rate?
16     A        Yes.  Ninety-one percent is the target, so -- of
17              their 70 homes.  Ninety-one percent of them, we have
18              to be able to use the information from on any given
19              day.
20     Q        How are you aware of a fault?
21     A        We have daily email reports, daily performance
22              reports that we -- we get.  We also have a couple
23              different programs that we're able to use to see our
24              performance on any given day or over date ranges, as
25              well.
```

```
 1  Q    Okay.  What programs?

 2  A    MSM, which is one of them.

 3  Q    Do you know what that stands for?

 4  A    Metered Sample Management.

 5  Q    And what's that do?

 6  A    It's the primary database where our data is stored,

 7       changed.

 8  Q    Okay.  So, it's just a database though?

 9  A    Yes.

10  Q    Does it run a function --

11  A    Yes.  Well, you can make changes in it and you can

12       update things.  You can add contact reports --

13  Q    Sure.

14  A    -- and --

15  Q    Does it add -- oh, I'm sorry.  Does it have a

16       function to be able to see faults?

17  A    Yes.

18  Q    Oh.

19  A    You can search faults or will come up as service

20       requests in a household folder.  Each household has a

21       folder.

22  Q    How does the service request be entered into the

23       folder?

24  A    So, if we're talking about a fault, if a fault is

25       generated in the home because of a error in the way
```

13

```
 1              the equipment's working or set up, it will realize
 2              that there's a problem and generate a fault service
 3              request, so that we know we need to go fix that
 4              problem.  Another way is if we know there's a
 5              problem, we know we shouldn't use the information
 6              from that home, we, ourselves as Field Reps, will
 7              generate the service request so that we don't use the
 8              information, 'cause we know it will be wrong.
 9    Q    Okay.  So, outside of -- through the function of the
10              database and outside of someone entering the service
11              request, are there any other ways a service is put
12              into this -- is put in?
13    A    No.
14    Q    Okay.
15    A    Well, yes.  We have certain conditions that need to
16              be met in regards to the data that we collect from
17              the home.  And if the data is not being met in a
18              certain way, the system will automatically generate
19              that service request.  So, it's similar to the first
20              method, but --
21    Q    What would be the difference there than the first
22              method we talked about?
23    A    The difference is in the first method we know
24              something's wrong.
25    Q    Okay.
```

```
 1   A   And the second method, we think it looks like
 2       something's wrong, but we're not sure.  So, we err on
 3       the side of quality and -- and withhold the homes,
 4       that we don't use the information, the ratings, until
 5       we check it out.
 6   Q   Okay.  So, out of the 14 reps -- 14 Field Techs, I
 7       apologize, how many are currently above 91 percent?
 8   A   Can you be more specific?
 9   Q   Yeah.  If you explain to me how -- yeah.
10   A   We look at performance daily, weekly, monthly --
11   Q   Okay.
12   A   -- yearly.  Today all but maybe two or three are
13       above 91 percent.
14   Q   So, you review the 91 percent quite often?
15   A   Daily.
16   Q   Okay.  So, what is the mo -- what's -- as far as you
17       can remember, as far as you can recall, what's the
18       most you remember not being at the 91 percent?
19   A   On a given day?
20   Q   Yeah.
21   A   All but one or two.  So, if we have a really big
22       storm come through here and knocks everyone's power
23       out, we may lose --
24   Q   Everybody's out.
25   A   -- yeah -- we may lose, you know, 20 -- 10, 20
```

```
 1              percent of our sample overnight just because of a big

 2              storm.

 3     Q        Okay.  So, currently with two or three not over the

 4              91, that would be considered a lot then?

 5     A        No.

 6     Q        Okay.  What --

 7     A        It can --

 8     Q        Sorry.

 9     A        -- it can change from day-to-day.

10     Q        Yeah.  Absolutely.  So, my question is, what's the

11              most you can remember not being up to par in the 91

12              percent?

13     A        On a daily basis?  So, it -- it depends on what the

14              measurement -- if you're looking at a month -- on a

15              month, any given month --

16     Q        Sure.

17     A        -- or if you're looking at a year, it's different

18              than if you're asking about a day.

19     Q        Yeah.  That's what --

20     A        It can change from day-to-day.

21     Q        So, let's start with the day.

22     A        The most?

23     Q        Yeah, the most.

24     A        Zero above 91.

25     Q        Okay.
```

```
 1   A    And if you recall the blackout that we had years ago

 2        --

 3   Q    I do.

 4   A    -- nobody had power for five days, so.

 5   Q    I grew up here, but I just moved back, so.

 6   A    There you go.  Yeah.  Then you might remember that.

 7                      MS. NORRIS:  (Inaudible).

 8                      THE WITNESS:  I -- I didn't work for

 9        five days, 'cause I had no --

10                      MR. GALLAGHER:  That's why my --

11                      THE WITNESS:  -- no power, no phone,

12        nothing.

13   BY MR. GALLAGHER:

14   Q    Okay.  I wasn't talking about a catastrophic event

15        like that.  Can you think of -- what's the most you

16        can remember that anybody's not been in the 91

17        percent?

18   A    All but a couple or all but a few.

19   Q    Okay.  So --

20   A    So, you could --

21   Q    -- four or --

22   A    -- you could have -- if we have -- if tonight we have

23        big thunderstorms and you're watching these

24        thunderstorm warnings, and then tomorrow we have, you

25        know, even just a small amount of homes that don't
```

```
 1           have power, then it'll negatively affect --
 2    Q      Okay.
 3    A      -- us.  Some certain part of the area, certain part
 4           of the market.
 5    Q      Okay.
 6    A      Or a whole portion of the market.
 7    Q      So --
 8    A      Daily is tough to measure.
 9    Q      -- when Field Techs report -- I'm sorry, I should
10           have asked this question.  Do you feel the tech's
11           report those outages?  How -- how do those outages --
12    A      They show up as faults.
13    Q      Okay.
14    A      In the MSM database.
15    Q      Okay.  How?
16    A      So -- so, in an instance where there's a storm and
17           the -- the power's out, or the cell tower's out, our
18           computer can't send the data down to Florida because
19           there's no power to the computer, wherever it might
20           be.  Once the phone call doesn't make it to the
21           database in Florida, we know that we weren't able to
22           use the information from the home in the readings,
23           and that shows up as a -- as a fault.  Fault service
24           request --
25    Q      Okay.
```

| | | |
|---|---|---|
| 1 | A | -- will generate in the household folder. |
| 2 | Q | Okay.  Okay. |
| 3 | A | The point is to make sure that we're not including |
| 4 | | ratings data when we know the -- the data is |
| 5 | | incorrect.  Always. |
| 6 | Q | Okay.  So, you said just a few.  Can you give me a |
| 7 | | number?  Can you guess?  Not guess, but put -- what |
| 8 | | do you mean by a few? |
| 9 | A | A few of what? |
| 10 | Q | Oh, I'm sorry.  I'll move back then.  You said on a |
| 11 | | daily basis, outside of the catastrophic event, the |
| 12 | | most you can think of is a few.  Can you just |
| 13 | | estimate a number to a few? |
| 14 | A | I'd say 10 or 12. |
| 15 | Q | Okay. |
| 16 | A | Were not -- were not at 91 percent or better. |
| 17 | Q | Okay. |
| 18 | A | On a given day. |
| 19 | Q | Okay.  What about a month?  And let's just exclude |
| 20 | | the catastrophic event stuff for the -- for the rest |
| 21 | | of these. |
| 22 | A | We're still talking about worst performance? |
| 23 | Q | Yeah.  We'll get to the best though, I promise. |
| 24 | A | Right.  Yeah.  I was gonna say, even the best markets |
| 25 | | are gonna have really bad days some days.  Worst. |

```
 1            Worst is going to be December and January.  We call
 2            that holiday recovery.  Just about everybody buys
 3            something new that they want to have hooked up to
 4            their televisions, and we can't use the data until we
 5            get out there and set it up properly.  So, that time
 6            of year for a monthly, maybe half of the team isn't
 7            above 91 percent that month.
 8      Q     Okay.  Is that -- that's usual in the months of
 9            November and December.
10                        MS. NORRIS:  He said December,
11            January.
12                        MR. GALLAGHER:  Sorry.
13      BY MR. GALLAGHER:
14      Q     (Talking over) --
15      A     (Talking over) yeah.
16      Q     Okay.  And that's usual?
17      A     Typical, kind of, yeah.  Yeah.
18      Q     Okay.  Does Black Friday play a role?
19      A     Yeah.  That sure does.
20      Q     Yeah.
21      A     That's when -- that's when the holiday recovery
22            period starts.
23      Q     Okay.  So like November too?
24      A     Yeah.  November -- well, November performance isn't
25            quite as bad, no.
```

```
 1   Q    Okay.  But (Inaudible) I see what you're saying.

 2   A    It starts, but --

 3   Q    Probably like a snowball effect.  I -- I can't

 4        imagine.  I don't know.  I've never worked at

 5        Nielsen, so I'll just to listen.  Well, what about a

 6        year?  Well, what's the worst you can remember in

 7        working at Nielsen that you can remember in a year?

 8   A    In a year?  Best guess would be four or five.

 9   Q    And just to be clear, the month and the years, those

10        are just averages?  So, we're saying they're not over

11        91 percent on average for the year and for the month,

12        right?

13   A    (No verbal response)

14   Q    Okay.  Was there ever -- you -- you said the primary

15        one's inter-web (phonetic); is that correct?

16   A    INTAB.

17   Q    INTAB.

18   A    INTAB performance.

19   Q    Sorry.  INTAB.

20   A    That person's performance.  Right.

21   Q    Okay.  Is there any other performance measures that

22        you can think of?

23   A    There are many.  There are many, like many -- many.

24        That's the primary measure, but there are many in

25        regards to performance.  There's also --
```

```
 1   Q   I'm sorry.  You're saying performance is its own?

 2   A   Yes.  So, performance -- there's performance and

 3       there's quality.  In -- in performance we have the

 4       primary metric, which is INTAB performance, which is

 5       a person's performance, which is what we just talked

 6       about.

 7   Q   Okay.

 8   A   There's also sets performance, which is specific to

 9       equipment.  There's what's called a sets and persons

10       split, which is the difference between the sets

11       performance and the person's performance.  Sets

12       performance is specific to whether or not the

13       equipment is set up and working properly.  Persons is

14       also including whether or not people are logging in

15       properly.

16   Q   I'm sorry.  You said sets performance is whether the

17       equipment is set up and working.  And then what was

18       whether it's logging in?

19   A   Uh --

20   Q   Or is that also sets?

21   A   It's persons performance, includes both.

22   Q   Okay.

23   A   Of the equipment that's -- of the homes where we have

24       equipment's working properly --

25   Q   Uh huh.
```

22

1    A    -- and the people logged in properly --

2    Q    Okay.

3    A    -- what percentage of those homes we can use the data

4         from.

5    Q    Okay.  So, what's the performance quality measure

6         there?

7    A    So, there isn't -- there is a -- there isn't a

8         specific target for sets performance anymore.  The --

9         the -- the metric for the difference between sets and

10        persons should be 2.5 percent or better, as a best

11        practice, or 3 percent or better, as a -- on your

12        annual objective.

13   Q    Okay.  And the quality?  You said those are

14        different.  Quality and performance, right?

15   A    Right.

16   Q    So, what -- can you explain quality for me?  Just --

17   A    So, quality -- so, integrity is a big -- big part of

18        what we do.

19   Q    Right.

20   A    We work individually in homes, and it's important

21        that we follow all the established guidelines,

22        procedures that are out there.  So, if our equipment

23        should have it on it, have -- our equip -- if that TV

24        should be metered because it meets our guidelines, is

25        it?  You know, so we have guidelines and measures

```
 1              that we follow and that managers fill out.  They're

 2              called Field Quality Review Rep -- Reports.  And

 3              they're measured, measure there, whether or not we

 4              did everything we were supposed to.  We also have

 5              audits.

 6   Q    So, is there anything else other than the Field

 7              Quality Review Reports and audit that measures

 8              somebody's quality?

 9   A    Timely completion of -- of our work by scheduled

10              deadlines or -- you know, established deadlines, I

11              should say.

12   Q    Okay.  Who -- who establishes those -- who

13              establishes those deadlines?

14   A    Most of them are preset by the service request type.

15              So, the different service requests will have

16              different -- different established deadlines.

17   Q    Or the Quality Review Reports you said, what --

18   A    Yeah.

19   Q    -- what exactly are those?

20   A    It's when the manager visits a home with a Field Rep.

21              The manager will go through a checklist to determine

22              whether or not the work was done properly by the rep

23              the last time they were there.  And to also measure

24              the -- the quality of the work the rep is doing

25              during that day's visit.  The manager will also look
```

```
 1              at the data they enter afterwards into MSM and make

 2              sure that that was correct after that field visit.

 3    Q    Okay.  Okay.  So, that would be you in your position?

 4    A    Yeah.  Yes.

 5    Q    Got it.  How many of these Field Quality -- let me

 6              just see if I understand this first.  You visit the

 7              home with a tech after he had his original visit to

 8              inspect his work to see if that work was done

 9              correctly.

10    A    Right.

11    Q    Okay.  So, how many of the Field Quality Reports do

12              you do a year?

13    A    Our target is -- I believe it's two per rep per

14              quarter.

15    Q    Okay.  So, eight per rep per year; is that fair?

16    A    Approximately, yes.

17    Q    How many did you do this year?

18                        MS. NORRIS:  2019 or 2018?

19 BY MR. GALLAGHER:

20    Q    Let's go with the last full year, 2018.

21    A    I don't know an exact number.  I don't know.

22    Q    Sure.  Can you give me a roundabout?

23    A    Thirty to 40.

24    Q    Usually that's about average for a year?

25    A    No.  I think some more, some less.  So, it's -- it's
```

1    tough depending on the year.  Last year was a very

2    busy year.

3  Q    Okay.  So, average 30, 40.  Some years some more,

4    some years some less?

5  A    Sure.

6  Q    Okay.  Audits.  Can you explain the audit process for

7    me?

8    So, in audits is when we visit a home, either with an

9    in -- internal audit or an external audit, or -- to

10    verify the quality of our work, make sure that we're

11    auditing whether or not the equipment was set

12    properly, whether or not the demographic information

13    that we collected from the home the last time was

14    accurate, and to make sure that the household knows

15    how to log in correctly.

16  A    Okay.  Who's getting audited?

17  Q    We are.  The company is.  We're -- the audit -- there

18    are different types of audits, and I kind of consider

19    anytime I go to a home with a rep, it's my own little

20    audit, right, for my market.

21  A    That's fine.  Internal auditing, we'll look at our

22    homes to audit the rep in the market.  Right.  So,

23    it's to verify the quality of the -- of the data

24    we're getting from the market itself.  If it's an

25    external audit, an Ernst and Young audit, it's the --

```
 1          the market and the -- the company itself that's being

 2          audited.

 3     Q    Okay.  So, in the external audit, are people actually

 4          going to homes?

 5     A    Yes.

 6     Q    Okay.  Are Field Techs judged -- judged or graded in

 7          the external audit?

 8     A    Yes.

 9     Q    Okay.  How many external audits do you guys generally

10          have; is it per year, bi-yearly?

11     A    The way I understand it, Nielsen pays Ernst and Young

12          to surprise us randomly from market to market.

13     Q    Okay.

14     A    So, they're not scheduled.  We don't know -- we don't

15          -- we can't control when we get chosen.  Sometimes

16          it's every other year, sometimes it's -- it might go

17          three years.

18     Q    Okay.  And who is getting audited then in the

19          external?  I understand you said, "It's all of us",

20          but are you talking about your -- your geographic

21          market, your -- the State of Michigan?

22     A    The external is market level.  They will select a

23          market at a time.  Sometimes several markets at once

24          --

25     Q    Oh.
```

27

```
 1   A     -- but they're providing reports on one market at a

 2         time.

 3   Q     Okay.  Is it the -- internal audit, are you doing the

 4         same thing?

 5   A     It looks the same.

 6   Q     Okay.

 7   A     It looks the same to us.

 8   Q     Can you explain that to me?

 9   A     Can you rephrase the question or -- or --

10   Q     Sure.  You said there's internal and external.  Is --

11         you differentiated it.  Is the only difference Ernst

12         and Young or what is -- what -- 'cause then you said

13         it looks the same.  I'm just trying to get those two

14         squared, I guess.

15   A     Sure.  Internal, we -- we do things -- we try to do

16         things the same way.  The external audit would -- my

17         external auditor would do things so that we can get

18         the same result, one, from our results and im --

19         improve on them.

20   Q     Okay.  So, what is your process for an internal

21         audit?

22   A     An auditor will visit a home with either the -- the

23         manager or the -- let's back up a bit.  The -- do you

24         want -- do you want -- where do you want to start?

25         Do you want to start with the selection process or do
```

```
 1              you want to start with the actual in-home process?
 2    Q    Uh --
 3    A    Scheduling process?
 4    Q    I just want to -- yeah, that's true.  Let's go back
 5         to the selection process of who's getting audited.
 6    A    Okay.  So, external --
 7    Q    Well --
 8    A    -- or I'm sorry, internal.
 9    Q    Yeah.  Let's just keep -- you probably can't speak to
10         what Ernst and Young does, so let's just --
11    A    I guess we can't.
12    Q    -- let's talk about -- so save you some time -- save
13         your Counsel some time, as well.
14    A    Right.  And I'm not sure who decides what markets are
15         being audited and when.  I don't -- I don't know how
16         that decision is made or who makes it.  But generally
17         speaking, when a market is selected, the manager
18         finds out about it.  Sometimes less than a week --
19         well, sometimes a week or two prior to this -- the
20         very first home being audited.
21    Q    Okay.  Who -- who tells you?
22    A    We have an internal quality group that will notify
23         myself and my manager.
24    Q    Okay.  Who's like -- who's your contact at the --
25         with this internal quality group?
```

```
 1    A    It just changed, so Wyatt Brewer (phonetic).

 2    Q    Or who was it before Wyatt?

 3    A    David Filer.

 4    Q    David Filer.

 5    A    F-I-L-E-R.

 6    Q    Was he the internal quality person when my client was

 7         employed?

 8    A    I don't know.

 9    Q    Do you remember who the person was before that?

10    A    No.  No, I don't.

11    Q    Okay.  But there would be some sort of, you know,

12         communication from this person to you explaining

13         who's getting audited and what not?

14    A    Yeah.  Usually it's from that -- that team.  Someone

15         within that team.  A lot of times it's coming from

16         the auditor themselves, the person -- the employee

17         that's the auditor.

18    Q    All right.

19    A    Schedule a conference call and let us know what the

20         process is.

21    Q    Would the auditor be someone different than the

22         person -- the internal quality control person you're

23         speaking with?

24    A    Yes.

25    Q    Okay.  So, who's this auditor?
```

```
1    A    We have -- we have several.

2    Q    Okay.

3    A    We have several internal auditors.

4    Q    Okay.  And that's just for positions?

5    A    Yeah.

6    Q    Okay.

7    A    Yes.

8    Q    So, how many audits -- internal audits do you do or

9         that are done a year?

10   A    I don't -- I don't know.

11   Q    I'm sorry.  I'll rephrase that.  Just with your Field

12        Techs, how many internal audits are done?

13   A    Okay.  So, that could be the same, once every other

14        year, once every three years.

15   Q    Oh, okay.

16   A    Sometimes two years in a row.  It all depends on --

17   Q    And how is --

18   A    -- however they decide to choose their markets and

19        how often.

20   Q    Sure.  And how is -- and are all of your Field Techs

21        then audited?

22   A    They go through -- they don't go through a selection

23        process to make sure they choose homes from each rep.

24        They choose just like external does, where they'll

25        want a random sample of the market.
```

1    Q    Okay.

2    A    They have some way that they somehow randomly select

3         homes to be audited.

4    Q    Have you ever inquired about how they select?

5    A    Do I ever inquire about it?

6    Q    Have you ever?

7    A    No.  I don't know that Ernst and Young would give us

8         --

9    Q    I'm talking all internal stuff right now.

10   A    Internal?  Oh, okay.

11   Q    Yeah.

12   A    I thought you were talking about -- okay.

13   Q    Sorry.  Just all of this line of questioning --

14   A    Right.

15   Q    -- was --

16   A    So external -- or I'm sorry -- internal audits.

17        Right.  Same -- same.  I don't know how they select.

18   Q    Have you ever asked anybody how they're selected?

19   A    Yeah, but I --

20   Q    Okay.  And who's that

21   A    Well, usually I'm in the car with the auditor when we

22        -- when these homes are being audited, and we're

23        going from home to home meeting the rep at each home.

24        And there's a lot of time for discussion in those

25        cars.

1    Q    So --

2    A    I don't know which I would have asked that question

3         over the years.  But I don't remember ever getting a

4         real clear answer.  I don't know that the auditor

5         actually chooses the homes either.  I believe the

6         auditor's boss or group somehow chooses that home --

7         those homes, and the auditor's just handed a list of

8         homes to audit.

9    Q    What's the most -- I -- your reps only I'm talking

10        about.  So, the only thing that you would have

11        knowledge of.  What is the most homes in a single

12        audit you've seen one of your reps get audited?

13                       MS. NORRIS:  Are you -- are you

14        talking about a particular rep and how many homes

15        they have, or how many homes that auditor is auditing

16        at that time?

17                       MR. GALLAGHER:  One rep, one cycle of

18        audits.

19   BY MR. GALLAGHER:

20   Q    What's the most you've seen?

21   A    I think -- I think it was Dave Caudle.

22   Q    Okay.

23   A    How many was it?

24   Q    I don't recall.

25   A    Okay.

1   Q   Do you remember about how many?

2   A   Ten, 11.

3   Q   And did that -- that -- did that seem odd to you?

4   A   You don't realize it at the time, you know, like

5       looking at it by field area.

6   Q   Sure.

7   A   So just --

8   Q   When did it come to your attention that he had 10 or

9       11 houses chosen in that single audit?

10  A   Towards the end of the audits, you know, when I'm

11      building my report.  Just noticing, you know --

12      tracking how well my team's doing and --

13  Q   Did that seem a lot --

14  A   -- what our -- pardon?

15  Q   Did that -- did it seem odd to you that he had 10 or

16      -- or 11 houses chosen in that audit?

17  A   No.  'Cause it could be -- I mean, you could be

18      chosen -- I mean, however they choose them.  So, just

19      -- it's more like luck than anything else.  Just

20      could be anywhere, 'cause you could ask all the reps

21      that don't get any chosen.

22  Q   Sure.  What's the second most you've seen in one

23      audit?

24  A   Probably six or seven for one rep.

25  Q   Do you remember who that rep was?

 1   A   Yeah.  I believe it was Dave Shock (phonetic).

 2   Q   Do you remember when that was?

 3   A   It would have been before that.  A year or two before

 4       that probably.

 5   Q   Do you remember anything about how David did in those

 6       10 or 11 houses that were chosen then during that

 7       audit?

 8   A   Really well.

 9   Q   I'm gonna back up.  I'm sorry.  I forgot to ask this

10       stuff originally.  When -- when did Nielsen hire you?

11   A   2002.

12   Q   And what were you hired in as?

13   A   Field Rep.  Field Representative.

14   Q   Okay.  And were you promoted at any point?

15   A   Yes.

16   Q   What was your promotion from Field Rep to the next

17       position?

18   A   Senior Rep.  Then I became a Trainer.

19   Q   Do you remember when that was?

20   A   I think 2004 or 2005.

21   Q   Okay.  And did you get a promotion after that?

22   A   Yes.

23   Q   What position was that?

24   A   Field Supervisor.

25   Q   Okay.  Do you remember when that was?

```
 1   A     2006.

 2   Q     Were you then promoted to Field Manager?

 3   A     Job titles changed --

 4   Q     I got ya.

 5   A     -- here and there.

 6   Q     So, essentially you're the same --

 7   A     Essentially --

 8   Q     -- (talking over)?

 9   A     -- (talking over) yeah.

10   Q     Cool.  Where did you come from before you started

11         working at Nielsen?

12   A     I worked for Lear Corporation.

13   Q     Lear?

14   A     Lear, L-E-A-R, Automotive Supplier.

15   Q     What did you do with Lear?

16   A     I was an Electronics Technician.  And so, I was the

17         only one there that had a chauffer's license that

18         could drive a truck, so I moved parts around for them

19         too when they needed it.

20   Q     Best ability to (Inaudible).

21   A     There you go.

22   Q     When were you hired there?  When did you start

23         working there?

24   A     I don't recall.

25   Q     Okay.
```

1    A    It was so long ago.

2    Q    Did you leave there to go work at Nielsen?

3    A    I was laid off from there.

4    Q    Okay.

5    A    Yeah.

6    Q    In 2002?

7    A    No.  It would have been 2001.

8    Q    Okay.  Education, where did you go to high school?

9    A    Troy Athens High School.

10   Q    Good baseball team.  What year did you graduate?

11        What year --

12   A    '95.

13   Q    Any college?

14   A    Some.

15   Q    Okay.  Where?

16   A    Oakland Community College.

17   Q    Years?

18   A    Years?  '96 to '98.  And prior to '97, something like

19        that.

20   Q    Okay.  Are you still in your position as Field

21        Supervisor or Field Manager?

22   A    Yeah.  Yeah.

23   Q    Okay.

24   A    Yup.

25   Q    So, outside the audit, did you have any contact with

1        these auditors?

2    A   No.  No.

3    Q   So, do you remember doing any Field Quality Review

4        Reports with my client, David Caudle?

5    A   Well, I know I did -- I know I did, but I don't -- I

6        don't recall any specific ones besides the -- the one

7        that we have -- we have one or two that we've

8        discussed so far -- or not that we've discussed, but

9        --

10   Q   I don't want to hear about --

11                   MS. NORRIS:  He doesn't need to know

12       what -- what you talked to us about.

13                   THE WITNESS:  Okay.

14                   MS. NORRIS:  So, he can -- he can ask

15       you about the reports, but he -- he doesn't get to

16       know what conferred about.

17                   MR. GALLAGHER:  Yeah.  Sure.

18   BY MR. GALLAGHER:

19   Q   So, what -- what do the Quality -- What reports do

20       you remember?  Or -- yeah, that you have knowledge of

21       dealing with Dave Caudle.

22   A   I don't recall which specific homes they were, that

23       we -- that I did for quality review.  But the -- the

24       ones I actually recall -- all right, so -- I know I

25       did them, is what I'm saying, but I don't recall

```
 1              specifically what the homes were, what the situations

 2              were off the top of my head right now.

 3    Q    Sure.  How do you know you did them?

 4    A    Well, like I said, I do several with --

 5    Q    Other than any conversations --

 6    A    -- (talking over) throughout every year, so --

 7    Q    Do you have any recollection of ever -- do you have

 8         any specific recollection of ever doing a Field

 9         Quality Review Report with my client?

10                   MS. NORRIS:  Do you -- do you mean

11         specific recollection as in he remembers that he did

12         one, or do you mean specific recollection as in when,

13         and when, and the details?

14                   MR. GALLAGHER:  Both.

15                   MS. NORRIS:  Okay.

16                   THE WITNESS:  Well, I know I did lots

17         of them with him, yes.

18    BY MR. GALLAGHER:

19    Q    Oh, specific instances?

20    A    No.  I don't remember any specific instances.

21    Q    Okay.

22    A    Off the top of my head, no.  It was three years ago

23         or -- that -- that would have been the most recent

24         one.

25    Q    So, do you document those?
```

```
 1    A     Yes.

 2    Q     Every time?

 3    A     Yes.

 4    Q     Did you view any documents through your Quality

 5          Review Reports with my client recently?

 6                    MS. NORRIS:  You mean -- are you

 7          asking if he's reviewed them with your client or

 8          reviewed reports about your client recently?

 9                    MR. GALLAGHER:  Reports with -- well,

10          a Field Quality Report that he's done with my client.

11                    MS. NORRIS:  Right.  So, in other

12          words, have you recently looked at any of them?

13                    THE WITNESS:  Yeah.  Yes, I did.

14                    MR. GALLAGHER:  Okay.

15    BY MR. GALLAGHER:

16    Q     About how many?

17    A     I think one.

18    Q     Do you remember when that one was?

19    A     No.

20    Q     Do you remember what year?

21    A     It would have been 2016.

22    Q     My client was with you?

23    A     Always.  If I'm doing a Field Quality Review, it's

24          because I'm with the -- the rep, or that was the last

25          rep that was in the home.
```

```
 1   Q    Okay.  Cool.  I did not mean was there with you

 2        reviewing.  I --

 3   A    Oh, yeah.  Yeah.  Yup.

 4   Q    You understood my question?

 5   A    Oh, absolutely.

 6   Q    Good.  I see that.  Never mind.  Did you ever look

 7        for old Review Reports -- Quality Review Reports of

 8        -- for my client?  Situations in which you and my

 9        client went and did a house?  Did you ever search for

10        them?

11   A    You mean in preparation for this or?

12   Q    Sure.  In preparation for this.

13   A    Yes.

14   Q    Okay.  And could you find any other ones than the

15        one?

16   A    No.

17   Q    Is there a reason that those are -- are you saying

18        that there are more that you just couldn't find?

19   A    We -- we switched to a different program to track

20        them, so I can only look back so far.

21   Q    Okay.  What program did you switch from?

22   A    Well, it was the same program.  It's -- there was new

23        forms that were created so we could track quality

24        even better than we were able to before.  But they're

25        different forms.  They didn't allow us to -- you
```

```
 1            know, when these -- when these -- these were -- so,

 2            the old database, the forms that were all stored in

 3            the old database are no longer accessible when the

 4            completely new revised format -- forms were starting

 5            to be used by the managers.

 6   Q    Okay.  And when you say they're not accessible, are

 7            you talking about accessible to you?

 8   A    Right.

 9   Q    Okay.  Are they still accessible to somebody?

10   A    I don't -- I -- I don't believe so, but I don't know

11            for sure.

12   Q    When was that switch made?

13   A    I believe it was before -- let's see, it -- it would

14            have been sometime in 2016.  Maybe early, maybe mid.

15            But I'm not 100 percent sure.  That's my best guess.

16   Q    Okay.  I'm just gonna go back one more time.  I'm

17            trying to understand this.  Different forms.

18   A    Sure.  Yeah.  Go ahead.

19   Q    So, the 91 percent INTAB rating, is there anything

20            else -- you said -- I know -- can you just explain to

21            me what -- what standards of performance are?  I got

22            the 91 percent INTAB, and I don't fully understand

23            the sets -- sets and persons split.

24   A    You don't fully understand that?

25   Q    No.
```

1    A    Okay.

2    Q    Could you -- but let's move to -- so that -- are

3         there anything other than those two things that you

4         used to measure performance?

5    A    Yes.

6    Q    Okay.  And what else would that be?

7    A    So, I'm not sure if we have a form that we can review

8         for -- but we have maybe 15 metrics or so that we'll

9         -- that we'll look at.  So, we'll look at the

10        percentage of people that we've coached in a home.

11        We'll -- we'll review the percentage of people

12        coached -- been coached within the first two weeks,

13        within the first six weeks, within the first six

14        months.  We'll -- we have metrics for PCU recruiting

15        and our -- our success doing that.  So, we have -- we

16        -- we recruit homes to -- to allow us to measure

17        their internet activity.  And if they say yes to at

18        least one computer, that is how we measure Cooperate

19        -- PC Cooperate.  And then we have eligible PCUs

20        metered, which is of the homes that said yes, you can

21        meter one computer.  What percentage of actually --

22        of their computers are actually installed with our

23        software.

24   Q    Okay.  And everybody gets a score on this?

25   A    Oh, yeah.

```
 1    Q    What happens if someone's deficient on all these

 2         scores?

 3    A    We work on -- work on improving to get to where we

 4         want to be or we should be.

 5    Q    Okay.  So, I think at one point you wrote up my

 6         client for a PC meter thing, right?  A little issue

 7         with his PC meter.  Attempted to write him up or --

 8         use your words.  What happened there?

 9    A    No.  I -- I -- well, so, I wrote him up for a -- for

10         a pretty severe policy violation.

11    Q    Okay.  What was that severe policy violation?

12    A    It was a situation where -- first off, the

13         demographic information that we collect from our

14         homes is greatly important.  Greatly important.  If

15         we don't get the demographic information correct,

16         then it really doesn't matter for finding out

17         accurately what a home watches on TV if we don't get

18         the who part right.  So, in one particular situation

19         he visited a that had two household members, one male

20         and one female.  He had the genders of these two

21         household members swapped.

22    Q    Okay.

23    A    You and your wife in this particular home, girlfriend

24         in this particular home, then --

25    Q    Take it easy with those words.
```

```
 1   A    While you're watching TV, we would have you listed as

 2        a female.

 3   Q    Okay.

 4   A    And whatever you would watch on TV gets reported in

 5        the ratings as a female watching.

 6   Q    Okay.

 7   A    And when she watches TV, she would be reported as a

 8        male.

 9   Q    So, my (Inaudible) document.  Just so we're on the

10        same page.  Is this the write up we're both talking

11        about?

12   A    Yes.  This is it.

13   Q    Okay.

14   A    Yeah.

15                  MR. GALLAGHER:  Okay.  If you give me

16        a Bates number, you can keep that.  But I can -- I

17        have one here actually.

18                  MS. NORRIS:  000329.

19                  MR. GALLAGHER:  Okay.

20                  MS. NORRIS:  Are we making this an

21        exhibit or no?  Just talking about it?

22                  MR. GALLAGHER:  Oh, not yet.

23                  MS. NORRIS:  Okay.

24                  MR. GALLAGHER:  We may.  Let's see

25        where it takes us.  Yeah, might as well mark it.  It
```

```
 1              would just be easier to reference.  Gonna mark that

 2              as Exhibit One.  Is that okay?

 3                          (WHEREUPON, Exhibit Number One was

 4              marked for the record at 11:10 a.m.)

 5    BY MR. GALLAGHER:

 6    Q    So, I just handed you and your Counsel -- I'm sorry.

 7                          MR. GALLAGHER:  Did you say 3339?

 8                          MS. NORRIS:  329.

 9                          MR. GALLAGHER:  Okay.  Let's go off

10              the record for a second --

11                          MS. NORRIS:  Sure.

12                          MR. GALLAGHER:  -- while I try to find

13              this.

14                          (WHEREUPON, a brief recess in the

15              proceeding took place at 11:10 am.)

16                          MR. GALLAGHER:  Okay.  Thank you for

17              being patient with me.

18    BY MR. GALLAGHER:

19    Q    I did find the Performance Improvement Plan that we

20              had marked as Exhibit One.  So, if I reference

21              Exhibit One, that's just what I'm referring to.  We

22              just do that so I don't have to trip over my words.

23              So, what else did you include in this plan?

24    A    What else did I include?  So, I included some other

25              issues that we were having at the time.
```

46

1    Q    Okay.

2    A    One was a -- an issue of not completing Ngage

3         resolutions in a timely manner.  So, End-Gauge

4         (phonetic) Resolutions.  End-Gauge is our scheduling

5         program where you -- as a Field Rep you would look at

6         your schedule, review your schedule, where you're

7         going --

8    Q    Okay.

9    A    -- over the next couple weeks.  And as you complete

10        calls, you go into End-Gauge and you document whether

11        or not that call was completed, whether it was

12        rescheduled, postponed, whatever it might be.

13   Q    Uh huh.

14   A    That was tied to our bonus structure at the time for

15        the Field Reps, whether or not they were completing

16        the calls or not.  Since he wasn't regularly entering

17        those resolutions, it was impacting the potential

18        amount of money that you could get in this -- in

19        these bonuses.  The next thing that I added was a

20        home that I worked with Dave.  We found some errors

21        in what we had -- that would -- between what was in

22        the home versus what we had in our MSM database.  So,

23        in the home we do all the things that we do to take

24        notes and document the changes that need to take

25        place so we can transpose into the MSM database to

1      make sure that it's all correct.  He didn't render

2      all those changes until (Inaudible) afterwards when I

3      checked his paperwork later.  So, the next thing that

4      I added was a conversation -- these are counseling

5      records.  These are -- so, this was a conversation

6      about more -- so on June 8th we -- I talked with him

7      about End-Gauge Resolutions.  On July 7th I'm still

8      talking with him about End-Gauge Resolutions.  And

9      then June 17th (sic) it says here, "PC Cooperate was

10     currently low."

11  Q   I'm sorry.  You said June 7th?

12  A   I'm sorry.  July 17th.  I apologize.  Yeah.  "Your PC

13     Cooperate's currently 36 percent", so which -- which

14     was low because the target for that was 65 percent.

15     And the eligible PCs metered performance is 65.5

16     percent.  And the tar -- and that target's 80

17     percent.  As you can see, the next sentence says --

18     it said, "This is (Inaudible) performance

19     improvements need to be made" (Inaudible) that -- but

20     the -- the meat and potatoes of this Performance

21     Improvement Plan is the issue that occurred on July

22     3rd, which is the very serious issue.  These other

23     things that were added are things that were important

24     for him to work on.

25  Q   Are these usually signed by employees?

1   A   Yes.

2   Q   Do you know why this one is not?

3   A   This is the one that I had printed from -- I would

4       have printed this, taken it to him.  So, this came --

5       this is an original.  This is from before he had

6       signed it.

7   Q   So, you -- do you know if a signed copy exists?

8   A   I don't know.  I would normally always have these

9       signed, but I don't have proof of that.

10  Q   Okay.  Can you tell me why the occurrence says 2012

11      to 2013 on the front of Exhibit One?

12  A   Yeah.  It's probably because I used in bold -- you

13      know, I always update from an old form and change the

14      data.  So, it might have been a different employee's

15      Performance Improvement Plan, and I changed their

16      name to Dave Caudle, I changed today's date to the

17      7/7, which would have probably been the day I started

18      writing this.  I changed the -- you know, wherever I

19      needed to.  So, I wasn't starting from a blank.  I

20      was probably starting from someone else's.  So, I for

21      -- looks liked like I forgot to change that

22      obviously.

23  Q   Do you know -- do you know if Dave was -- David was

24      the only one that did not have his PC Cooperate above

25      80 percent?  Or between 65 and 80 percent or above --

49

```
 1              above 65 percent?  I'm sorry.  Strike that.  I'll
 2              just repeat this question for you.  Do you know if
 3              there were any other employees that did not meet the
 4              PC Coop rating standard?
 5       A      I'm sure there were others that didn't meet that PC
 6              Coop rate, or eligible PCs metered, or just one or
 7              the other.  But I'd say that particular target is a
 8              stretch goal.  It's like a -- it's like something at
 9              the end of the year that if you were to be reviewed,
10              it's -- it's really not gonna change your rating or
11              anything like that.  It's -- it's something we're
12              striving to improve on.
13       Q      How many Performance Improvement Plans have you
14              filled out, let's say, in the last year?
15       A      Three or four maybe.  Three or four.
16       Q      Would you say that's average for the year?
17       A      Yeah.  Yeah.
18       Q      Can you remember a time you've written up anybody
19              else for -- included in their Performance Improvement
20              Plan, PC Cooperating that was not on par?
21       A      Not specifically, no.  But I -- I'm sure I probably
22              did.  Like I said, usually when you write up a
23              Performance -- when I write up a Performance
24              Improvement Plan, it's usually for one thing at the
25              same time.  If there are other areas of their
```

50

```
 1              performance that I'd like to work together with them

 2              to help them improve, I'll add those to it so we can

 3              all -- we can focus on multiple areas, not just the

 4              one major thing that was the reason why we needed to

 5              go with that.

 6    Q    Okay.  So, we talked kind of at abstract about my

 7         client and your interaction.  But do you know my

 8         client, David Caudle?

 9    A    Yeah.

10    Q    Okay.  What's your general opinion of David?

11    A    I like Dave.

12    Q    (Inaudible)?

13    A    Pardon me?

14    Q    (Inaudible)?

15    A    Yeah.  I -- so I was -- I actually told them earlier

16         --

17                   MS. NORRIS:  You can -- just tell them

18         what you think, but don't ever tell him what you told

19         us.

20                   THE WITNESS:  Okay.

21                   MS. NORRIS:  Just tell him what you

22         think.

23                   THE WITNESS:  I was -- I was actually

24         looking forward to seeing him today if he were to

25         show up.  It would have been nice to have seen him.
```

```
 1              Of course not under the circumstances, right, but you

 2              know, it's -- it would have been nice to see him.  I

 3              like -- I did like Dave a lot.

 4     BY MR. GALLAGHER:

 5     Q    Okay.  Did you have anything to do with hiring him?

 6     A    Yeah.

 7     Q    Okay.  What did you have to do with his hiring?

 8     A    I hired him.

 9     Q    Okay.  Do you remember when he hired?

10     A    Not specifically, no.  But he worked here for three

11          or four years, so --

12     Q    Okay.  So, May of 2012 sounds about right?

13     A    Yeah.

14     Q    I won't hold you to that date or anything.  Okay.

15          What did you see in Dave when you hired him that made

16          you want to hire him?

17     A    He's -- he's outgoing, he's -- he's fun.  He had good

18          experience, you know, prior to, and most of it I felt

19          was relevant.  I can't remember if he worked for AT&T

20          Universe or if it was DirectTV, but he was a -- he

21          was a cable installer prior to -- and we hire a lot

22          of people that -- that come from that type of

23          background, 'cause the job's very different but

24          similar in a way, I think.  So, he was just that type

25          of person that you would invite into your house over
```

1      and over again.  The type of person that you kind of

2      look forward to seeing if he was your service tech

3      unlike a random cable technician that you might meet

4      once and never see again.  Probably did make a big

5      impression on ya.

6  Q    How do you explain Dave's employment at Nielsen as a

7      hold?

8             MS. NORRIS:  What do you mean by how

9      do you explain?

10            MR. GALLAGHER:  How would you explain?

11            MS. NORRIS:  Right.  But --

12            MR. GALLAGHER:  Yeah.

13            MS. NORRIS:  -- how -- how do you

14      describe it?  How would he explain why he's there?  I

15      don't understand, how would you explain --

16            MR. GALLAGHER:  His general

17      employment.

18  BY MR. GALLAGHER:

19  Q    What do you think of his employment there?

20            MS. NORRIS:  Okay.

21            THE WITNESS:  So, his general

22      employment, so I'm taking that as was he a good

23      employee; is that what you're asking?  Or is -- are

24      you asking --

25            MR. GALLAGHER:  Yeah.  Sure.

```
 1   BY MR. GALLAGHER:

 2   Q     Was Dave a good employee?

 3   A     Yeah.

 4   Q     Okay.

 5   A     Yeah.  So, he was -- he had some really good first

 6         few years, and obviously there were some issues and

 7         some things changed.  But overall, he was someone

 8         that was -- he was fun to work with, he helped others

 9         on the team, and he got along with everything, and he

10         worked hard.  He worked a lot of hours.  He would

11         pick up calls when others asked for help.  He was --

12         he was a team player.

13   Q     Okay.  You said, "Obviously things changed", I think.

14         What changed?

15   A     We started running into issues with his -- with his

16         -- with the quality of his work.

17   Q     Okay.  What were those issues?

18   A     So, finding -- finding equipment that he had left

19         behind in homes that he was supposed to have removed,

20         taken with him.

21   Q     Okay.  And when did that happen?

22   A     2016.  In 2016.  It would have been late in 2016.

23         Mid to late 2016.  It's hard to say.  It could have

24         happened -- some of these things could have happened

25         before then.  But started running into issues with
```

54

```
 1          the data he was entering being accurate or not being

 2          accurate.

 3   Q      Okay.  How many issues did you run into?

 4                      MS. NORRIS:  Specifically, on the

 5          data?

 6                      MR. GALLAGHER:  Yeah.

 7                      MS. NORRIS:  Receipt of the data?

 8                      THE WITNESS:  Well, that's hard to --

 9          that's -- I don't -- there's no way -- like I

10          wouldn't keep like an accurate -- I wouldn't be

11          keeping a count of -- on this -- on this problem on

12          this day.  So, as you had -- as you find these

13          issues, you know, we have discussions, and Dave and I

14          would have talked through each one of these issues.

15          Or while we're working together, we would have talked

16          through each of those.  But I don't have like a

17          specific running tal -- tally on --

18                      MR. GALLAGHER:  Okay.

19                      THE WITNESS:  -- that.

20   BY MR. GALLAGHER:

21   Q      Oh, okay.  Anything else?

22   A      So, are you still asking about Dave being a -- a good

23          employee?  You know, as a --

24   Q      You said, "Obviously, things changed", and then I

25          asked you what that meant, and then you listed, "We
```

```
 1              found equip -- we found equipment left in a home" and

 2              "We found issues with his inputting data."  Or I was

 3              just wondering if there's anything else that you --

 4              that you would consider things changed?

 5     A   I'd say that his -- his behavior changed a bit.

 6     Q   Okay.  How so?

 7     A   Well, he, knowing, was counted on for -- for, you

 8              know, quality data, not -- not quite as many errors

 9              as we started running into.  And he always seemed to

10              be very focused.  And then you know, closer to his

11              termination in that last year the phones started to

12              decline, as you can -- you can see in the Performance

13              Evaluations.  Yeah.

14     Q   So, my client -- well, my client took a lot of time

15              off here and there.  Do you remember any longer

16              periods of time off that my client had to take?

17     A   Yeah.  He -- he had -- not specific date ranges or

18              anything like that, but he had Sickle Cell Anemia,

19              which is really challen -- a real big challenge for

20              him.  And before -- before I worked with Dave, I

21              didn't know anything about it.  But he told me all

22              about it.  It's -- it's a really tough -- was a

23              really tough situation for him.  Something that, you

24              know, was gonna be an ongoing -- something he was

25              gonna be challenged with -- with his whole life.  So,
```

```
 1        he would -- you know, he would have to go out and he
 2        -- 'cause he had these kind of random attacks from
 3        time-to-time.  And you know, when he did -- when he
 4        -- when he would go out, you know, we would cover his
 5        -- his work for him.  And you know, because, you
 6        know, his -- he had his field area that would now be
 7        an open, unassigned field area, we'd have to have
 8        other reps working.  But that was the thing, you
 9        know.  We -- we all understood that it's a challenge
10        that Dave had and that, you know, we -- you know,
11        we'd pitch in when he went out.
12     Q  Okay.
13     A  So, it was like -- it was -- it was okay.  This was
14        just, you know, who Dave was.
15     Q  Did you ever tell Dave that his other coworkers are
16        getting tired of picking up his slack --
17     A  No.
18     Q  -- or something of the sort?
19     A  No.  Never.  No.
20     Q  Did you ever mention his illness or anything around
21        the -- around the area, around the workers?
22     A  Well, no, it was very common knowledge that he had --
23        you know, he had Sickle Cell Anemia and that, you
24        know, he would be out.  Everybody was like -- the --
25        the groups were all like friends and family than it
```

57

```
 1              is coworkers that don't know much about each other.

 2              Everybody knows pretty much everything about

 3              everybody there.

 4    Q    Okay.

 5    A    Yeah.  So, you know, people comment and question, or

 6              stuff like that, but yeah.  Typically, I don't talk

 7              about one employee with other employees.

 8    Q    Okay.

 9    A    That's inappropriate.

10    Q    Would -- would the coworkers give grief if they had

11              to pick up these extra shifts?  I mis-stepped.

12              Sorry.  I'm gonna clarify what I said earlier.

13              Earlier I asked you if you communicated that to Dave.

14              I'm asking you now if that was the fact, if the other

15              employees would, in fact, kind of get tired of

16              picking up shifts for Dave?

17    A    Yeah.  Yeah, they did.  They did.  Well, because it's

18              -- it's a heavy weight to carry.  So, at the time we

19              had the -- or I'm sorry, we were staffed with 10 reps

20              at the time, and I think we had 8 or 9 reps in the

21              field.  So, with one or two field areas open at any

22              given time, it's -- it's challenging for the rest of

23              the reps to pick up that work and -- and carry that

24              work.

25    Q    Sure.
```

```
 1    A    I don't think it was -- they weren't frustrated that
 2         they had to cover the work because he was out dealing
 3         with this -- this issue.  I think they became -- I
 4         think they became frustrated because between Dave
 5         telling them when he was coming back to work and me
 6         telling them, "Hey, guys, you know, where you're
 7         gonna be out -- Dave's gonna be out until it looks
 8         like Monday the 3rd of whatever month", and that day
 9         would get close and they'd be like, "All right.
10         We're gonna be able to go back to just, you know,
11         doing our own work", and then that day would be
12         pushed back, you know, another month.  And I'd say,
13         "All right, guys.  You know, Dave's coming back.
14         We're gonna have a good shot to get our numbers up",
15         and then, you know, I'd have to communicate to the
16         team that, you know, it's -- it's gonna be maybe
17         another few weeks at this point.  So, it was more or
18         less that was what they were frustrated with, not
19         Dave.
20    Q    So, correct me if I'm mistaken, so staffed for 10,
21         you had 8; is that what you said?
22    A    Yeah.
23    Q    Okay.
24    A    The --
25    Q    So --
```

```
 1   A     -- well, it depends throughout those couple of years,

 2         few years.  At the time I think we were staffed from

 3         10 or 11 or -- it depends, and our staff, head count

 4         level changed.

 5   Q     Okay.

 6   A     But I think it's -- in 2016 I think we were staffed

 7         for 10, and we were understaffed because I think

 8         someone got a promotion and -- I don't recall.  We

 9         were understaffed.

10   Q     Fair enough.

11   A     Yeah.  So, we were also coordinating help from other

12         markets to come into our market to help cover the

13         work too.

14   Q     Okay.  Sure.  So, you were ever -- did you ever have

15         any conversations with any of the upper management

16         about Dave's illness?

17   A     Yes.

18   Q     Okay.  What was that?

19   A     Well, you've got your status updates, where are we at

20         with head count so that we can get our numbers back

21         to where they need to be, market level, or do we need

22         to -- to coordinate assistance from outside the

23         market to come in and help.  "Oh, and by the way, the

24         -- the -- you know, the date that the employee was

25         supposed to come back is now changed."  Now you're
```

```
 1            talking about bringing more help in, things like

 2            that.  So, yeah, we would have communications about

 3            -- about Dave's -- Dave being out.

 4   Q    Okay.

 5   A    Those conversations occur, by the way, anytime

 6            anyone's out on a leave or an absence, or even if

 7            someone's gonna be gone for a long vacation.

 8   Q    Sure.  Do you think you treated Dave any differently

 9            because of him being out a few times a month?

10   A    He wasn't out a few times a month -- a few times a

11            month every year.  You mean just a few times per

12            year; is that what you're asking?

13   Q    Well, you know, you referenced my client as, "The guy

14            out a few times a month every year", so --

15                    MS. NORRIS:  I don't believe that's

16            what the email said.

17                    MR. GALLAGHER:  I'll --

18                    THE WITNESS:  No.  He didn't miss that

19            much work.

20                    MR. GALLAGHER:  I could be incorrect.

21            I'm gonna read this email and then hand it to you.

22                    MS. NORRIS:  That's fine.

23                    MR. GALLAGHER:  We'll get it squared

24            up.  Shuffle papers.  That's -- I'll just (Inaudible)

25            it to you.  I think you know what it is probably.
```

```
 1                         COURT REPORTER:  Are we marking this

 2          one or no?

 3                         MR. GALLAGHER:  Sure.

 4                         COURT REPORTER:  Okay.

 5                         MR. GALLAGHER:  Let's mark that as

 6          Exhibit Two, for reference in the future.

 7                         (WHEREUPON, Exhibit Number Two was

 8          marked for the record at 11:34 a.m.)

 9                         THE WITNESS:  Oh, I see.  It's right

10          at the top.

11                         MR. GALLAGHER:  Uh huh.

12                         THE WITNESS:  Yeah.  Yeah.  I remember

13          this.  That was with Amanda Culver.  Yup.

14     BY MR. GALLAGHER:

15     Q    So, did you reference him as, "The guy out a few

16          times a month a year"?

17     A    A few months --

18                         MS. NORRIS:  I'm just saying that's

19          not what it says.

20                         THE WITNESS:  It says, "A few months

21          per year", not a few times a month.

22                         MR. GALLAGHER:  Sure.  Sorry.  Yeah.

23                         THE WITNESS:  Yeah.  Yeah, he didn't

24          miss -- he wasn't -- he wasn't out any month -- any

25          -- every month.  He was -- so, yeah.  And -- and that
```

```
 1            was probably more or less to clarify which of my

 2            employees I was talking about at the time.  I could

 3            have probably had, you know, another person on PIP,

 4            or I could have had, you know, a person or two on a

 5            coach plan, or something like that. So, that was more

 6            or less to let her know which person I was referring

 7            to.

 8   BY MR. GALLAGHER:

 9   Q    So, is that the most identifiable thing about him you

10        could think of at that time?

11   A    It might have been based on a recent conversation,

12        because Amanda Culver deals with -- well, at that

13        time I believe she was the HR Business Partner for

14        half of -- half of -- more than half of -- of the

15        field organization, which is hundreds of Field Reps.

16   Q    Do you think that's inappropriate information to give

17        somebody who doesn't know the person before they make

18        -- while they're making a termination decision?

19                  MS. NORRIS:  Well, just -- I'm just

20        gonna object.

21                  MR. GALLAGHER:  That's fine.  Go

22        ahead.  You can answer though.

23                  MS. NORRIS:  But I -- I'm gonna

24        object.  His statement's in response to a question.

25                  MR. GALLAGHER:  It's stated.  That
```

```
 1           would be foundation, please.

 2                    THE WITNESS:  Because I was using that

 3           to -- to explain which person it was.  And if I would

 4           have just said, "Dave Caudle", she wouldn't -- may

 5           not have remembered which person it was until I

 6           clarified what -- what we might have talked about in

 7           our -- our most recent discussion.

 8   BY MR. GALLAGHER:

 9   Q   So, are you saying that by referencing him as -- as

10       you referenced him, that's how she can identify him?

11   A   Well, not -- that wouldn't be the only way.  She --

12       that's not -- so --

13   Q   (Talking over) --

14   A   -- that wouldn't be the way that I would say who he

15       was every time I talked with her.

16   Q   Sure.  But that's what you said there, so I'm trying

17       to figure out why you said it there.

18   A   Because I may have had, you know, a couple other

19       employees that I was talking with her about.  This is

20       this person's situation that I'm dealing with, this

21       is this person's situation.  Or this is the -- the

22       person whose leave just got extended in this

23       particular case, or -- or whatever it might be.

24   Q   Sure.  My question is, so that's how she identified

25       Dave Caudle?
```

```
 1   A    That would bring familiarity, I guess, to it.  This
 2        was just a quick email response to her, just to say
 3        remind me as to who is this -- which -- which person
 4        this is, you know.
 5   Q    Okay.
 6   A    Yeah.
 7   Q    Can I see that (Inaudible) that back for me?
 8                    MS. NORRIS:  Are we marking it?
 9                    MR. GALLAGHER:  Yeah. I'll give it to
10        you and we'll mark it.  I just gotta get to the page.
11   BY MR. GALLAGHER:
12   Q    So, when employees are out, does that put more stress
13        on you in your job?
14   A    Yes and no.
15   Q    Okay.  How does it?
16   A    Yes, because there's work that -- that -- that needs
17        to be covered and I have less people to do it.  But
18        no, because that's just life, right?  You're gonna
19        have -- life happens, and when it happens to -- to
20        our employees, they get -- have to take care of
21        themselves.  And as a manager, I know I'll never work
22        in an environment where I won't have employees that
23        need to take leaves for various reasons.  So, it's
24        just kind of part of your job.  But you have to
25        manage it, right?
```

1    Q    (Inaudible) manage that?

2    A    Yeah, you do.  It takes some coordinating, especially

3         since we build schedules.  I mean, if someone's

4         expected to return from leave and you make that

5         person to be scheduled on work -- homes are expecting

6         a Nielsen rep to show up to their house at that

7         scheduled time and -- and date.  We still need to be

8         there at that time, so I'll need to figure out a

9         different way to make that appointment still happen.

10        That's the stress.  It's just covering that work.

11   Q    Okay.  How many of your Field Techs have you

12        terminated in the last year?  Well, just 2018.  In

13        2018.

14   A    In 2018?  Two or -- two.

15   Q    Okay.  And they were both techs?

16   A    Yes.

17   Q    What were their names?

18   A    Rob Roney (phonetic).  Robert Roney.

19   Q    And the second one?

20   A    I can't recall -- recall if it was last year or not.

21        Chris Carlos (phonetic).

22   Q    Okay.  And what about 2017?

23   A    I don't recall.

24   Q    Okay.  Can you think of any?

25   A    I usually don't equate it to the year, but --

```
 1    Q    Sure.  And I won't hold you to those year things, but
 2         I'm just trying to differentiate it for you.  But --
 3    A    I had more people get promoted recently, so I'm not
 4         -- I'm not -- I'm struggling here.  I had to hire a
 5         bunch for an expansion.  I don't really recall.
 6    Q    All right.  About how many have you fired in your
 7         term as a Field Manager?
 8    A    How many in 14 years?
 9    Q    About.
10    A    (No verbal response)
11    Q    Let's try it this way.  How many have you fired since
12         my client?
13    A    I'll tell you, if I was able to get out my computer
14         and look at it, I'd be able to give you a really good
15         number.  But I don't -- off the top of my head, I --
16         I couldn't tell you.  My mind's just absolutely
17         drawing a blank right now.
18    Q    So, other than Rob Roney and Chris Carlos, are there
19         -- can you think of any other people that you fired
20         in the last five years other than my client?
21    A    It's the thing, I know I have.
22              MS. NORRIS:  Just tell him what you
23         remember.
24              THE WITNESS:  I just think only Chris
25         Carlos and Rob Roney, now that I think about it.  But
```

67

```
1              I'm not 100 percent sure.

2                        MR. GALLAGHER:  Okay.  That's fine.

3    BY MR. GALLAGHER:

4    Q     And what did Rob Roney do?

5    A     (No verbal response)

6    Q     What was the cause of his termination?  I'll

7          rephrase.

8    A     Rob Rowing had a lot of -- a lot of quality issues, a

9          lot of paperwork issues.  There were visits that I --

10         I don't believe he was making, but he was putting

11         them in the schedule.  He was making a lot of -- a

12         lot of -- a lot of paperwork mistakes.  He wasn't

13         doing his -- his paperwork on time for his calls, his

14         field calls.  We -- we found some pretty serious

15         quality infractions with him in his work too.

16   Q     Okay.  How did you find those?

17   A     By going into the homes with -- working with him.

18   Q     He was there?

19   A     Was he there?  In -- in some cases, yeah, in some

20         cases, no.

21   Q     Okay.  What about Chris Carlos?

22   A     Chris Carlos, same thing.  He was making a lot of

23         paperwork mistakes.  We were running into some pretty

24         serious quality issues with his -- his -- his homes

25         too.  Quality data that -- that -- that we were
```

```
 1           getting.  Whether or not sites were metered that
 2           should have been, that -- that -- that weren't.
 3   Q   So, the same thing as far as your quality inspection,
 4           he was there sometimes and he was not there others?
 5   A   From memory, that -- I -- I don't -- I don't recall.
 6           I mean, when we do Field Quality Reviews, when I'm
 7           looking -- when I identify these areas, these issues,
 8           sometimes it's me that identifies the situation
 9           because I'm in the home.  Maybe Chris was the last
10           person that was in the house, but now I'm in the
11           house with a different rep and I can see the work
12           that was performed before we got there, whether or
13           not it met our standards or not.  Sometimes I'm with
14           Chris and the work wasn't -- that he was doing wasn't
15           up to par or he didn't do the paperwork correctly
16           afterwards.  That sort of thing.
17   Q   Sure.  And what ethnicity is Mr. Roney?
18   A   He's -- he's Caucasian.
19   Q   Okay.  What about Mr. Carlos?
20   A   Pardon me?
21   Q   What about Mr. Carlos?
22   A   He's Hispanic.
23   Q   Okay.  Do you remember what area of -- what
24           geographic area Mr. Carlos was assigned?
25   A   Southfield.  His area -- the center of his area was
```

```
 1            probably in Southfield.

 2    Q      Okay.  Okay.  Now, what did you -- why did you decide

 3            to terminate my client?

 4    A      I don't know that I actually, you know, made the --

 5            the decision because it was something that I -- I

 6            wanted to do.

 7    Q      Sure.  So, why did you want to terminate my client?

 8                        MS. NORRIS:  I -- I'm not sure that's

 9            what he meant.  But you can explain.

10                        MR. GALLAGHER:  Oh, I'm sorry.

11                        THE WITNESS:  Yeah.  No.  I actually

12            --

13    BY MR. GALLAGHER:

14    Q      I thought you said, "It was something I wanted."

15    A      No.  Not that -- not that it was -- it wasn't

16            something that I -- there are some -- some --

17    Q      I misheard it.  I apologize.

18    A      Right.  So, there's some situations where, you know,

19            if we make certain mistakes or if we make certain

20            choices, we can't -- we don't -- as a manager, even I

21            don't get a chance to say, "Well, no.  Let's just --

22            let's just keep him.  That's -- that's fine."  So,

23            overall, the performance -- his -- his performance,

24            his -- the measurable metrics in regards to the

25            person's performance really wasn't a -- a problem.
```

1       They weren't exactly where they needed to be, or

2       where he would have wanted or we would have wanted

3       them to be.  That's not why.  It was the quality of

4       the work that he was doing while he was here.  That

5       was the reason why he was separated from the company.

6    Q  Okay.  So, what does that mean?

7    A  What does that mean?  That means -- so, in order to

8       manage a successful market, in order to be a

9       successful Field Rep, you have to be able to meet the

10      performance metrics --

11   Q  Uh huh.

12   A  -- right, while following the rules, while acting

13      with integrity, while doing the right thing.  We felt

14      the quality -- the performance metrics don't really

15      mean a whole lot.  You can -- as a Field Rep -- and

16      I'm just speaking in general, not about Dave -- as a

17      Field Rep you can kind of cheat the system in a way

18      that allows you to have a better performance metric.

19      Right?  But now the data that we're collecting is --

20      is not accurate anymore.  In the event that we're

21      audited, especially by an external auditing firm,

22      they'll audit the market, they'll randomly select

23      homes, they'll go out to those homes, they find out

24      if Nielsen's doing the job in which -- in the way in

25      which they promised their clients.  And then they

```
 1            report the results of what they find directly to our

 2            clients and say, "You know, you're paying all this

 3            money and this is what you're getting."  You know,

 4            most of the time they're following the rules, but in

 5            these instances they weren't.  And these are the

 6            situations that we found.  Right?  So, as a manager,

 7            I have to protect the integrity of the sample itself,

 8            and as a company we have to protect the integrity of

 9            the sample itself.

10    Q     Sure.  But what -- but what specific instances caused

11            the termination of Dave Caudle?

12    A     So, the -- the -- it's all the instances that add up

13            to a point where you have, this has happened, this

14            has happened, this has happened.  Now we can't --

15            there's nothing else we can do.  We have to -- we

16            have to do something.  We have to make a decision.

17            Right?  So, a lot of it starts with the Performance

18            Improvement Plan, things that had happened, you know,

19            over the prior year or two.  Right?  So, you

20            establish a performance -- the quality problems that

21            may have occurred in the past, and you work your way

22            through a Performance Improvement Plan hopefully

23            successfully.

24    Q     I'm gonna ask you to look at Exhibit One, which is

25            the Performance Improvement I believe you're
```

```
1              referencing.

2     A        Uh huh.

3     Q        Are you -- you saying some of these issues were the

4              same things that you based your termination on for

5              David?

6     A        No.  This is -- well, first of all, this one on July

7              3rd, 2014, this is something that Field Reps can be

8              terminated first occurrence.

9     Q        Sure.

10    A        Right off the bat.

11    Q        Sure.  I'm sorry.  Just your testimony made it seem

12             that some of these issues were reoccurring problems

13             in Exhibit One.  Is that what you're saying?

14    A        Some of the other ones were, yes.

15    Q        Okay.  So, what was reoccurring?

16    A        So, June 8th, July 7th, these were both issues where

17             Ngage resolutions, the paperwork problems, weren't --

18    Q        I'm sorry.  I'll clear it up.  I could be wrong, but

19             I thought your testimony was saying that tiers of

20             issues that were not fixed led to his termination

21             essentially.  Is that what -- your testimony or no?

22    A        Can you rephrase the question?

23    Q        Is there any -- like did any of these issues in

24             Exhibit One, were any of those the cause -- were any

25             of those claims the cause of my client's termination?
```

```
 1                         MS. NORRIS:  Can I just clarify?  Are
 2            you talking about whether those -- whether he was
 3            terminated for what happened in Exhibit One, or are
 4            you -- are you asking did those kinds of things
 5            reoccur later and -- and lead to the termination?
 6                         MR. GALLAGHER:  Both.
 7                         MS. NORRIS:  Okay.
 8                         THE WITNESS:  So, yes.  So, the
 9            quality -- so, this -- this -- some of the instances
10            here are demonstrations of -- of quality issues.
11                         MR. GALLAGHER:  Sure.
12                         THE WITNESS:  And -- and -- and so we
13            continued to see quality issues in -- in the work.
14    BY MR. GALLAGHER:
15    Q    Were any of these specific in -- issues saw again?
16    A    No.
17    Q    Okay.  Thank you.  And you're -- you're referring to
18         Exhibit One, right?
19    A    Yes.
20    Q    Thank you.  So, why -- what instances -- what
21         specific instances led to my client's termination?
22    A    So, we had the instance with the Rauschkin (phonetic)
23         home.  That was something that had happened after, I
24         believe, we already -- had already made the -- the
25         decision to -- to terminate.  There was a situation
```

74

```
 1              with the home where they had a TV that the household

 2              members were told not to use.

 3   Q    Who -- do remember (Inaudible) that was?

 4   A    I don't remember the name.

 5   Q    Okay.  So, you said the Rauschkin home.  The

 6              situation happened after you already made the

 7              decision to terminate Dave?

 8   A    Yeah.

 9   Q    So, when did you make that decision to terminate

10              Dave?

11   A    Like I said, I -- I didn't -- so, I had to consult

12              with our human resources and legal, as these -- as we

13              were identifying different issues.

14                        MS. NORRIS:  Okay.  Just -- just a

15              second.  You can tell him what conversations you had

16              with HR that did not involve legal.  You can't tell

17              him what conversations you had with legal or what you

18              were told about what legal was saying.  But I think

19              the -- the questions -- I think there are two

20              questions kind of on the table.  One is when.  Just -

21              - just simply when, and you probably don't know a

22              date.

23                        MR. GALLAGHER:  Okay.

24                        MS. NORRIS:  But you can say

25              chronologically these are what --
```

1              MR. GALLAGHER:  Please don't answer

2      the questions.  This is a lot of coaching going on.

3              MS. NORRIS:  Well, I'm -- I'm trying

4      to actually help you get --

5              MR. GALLAGHER:  You said, "You

6      probably don't know when."  That's awful.  That's

7      literally awful.

8              MS. NORRIS:  So, fair enough.  So --

9              MR. GALLAGHER:  That's awful.

10             MS. NORRIS:  -- so you -- you should

11     tell him what you know about when, but -- but also

12     you could tell him why without worrying about sort of

13     everything else that might have led up.  He's just

14     trying to figure out what happened.

15             THE WITNESS:  Right.  So, before he

16     even went out on -- on leave --

17             MR. GALLAGHER:  Please stop speaking

18     objections though.

19             MS. NORRIS:  Yeah.  I --

20             MR. GALLAGHER:  It's really

21     (Inaudible).

22             MS. NORRIS:  -- I'm sorry.  I -- I was

23     trying to be helpful.  And if it's not, then I will

24     stop.  Yes.  I -- I thought the questions were

25     compound and unclear, and I was trying to help.

```
 1                        MR. GALLAGHER:  And that's fine.

 2                        MS. NORRIS:  But I'm happy to stop --

 3                        MR. GALLAGHER:  But he was testifying.

 4                        MS. NORRIS:  Yup.  Go right ahead.

 5                        THE WITNESS:  So, there were

 6            performance -- there were -- there were issues that

 7            came up before he went -- he went on leave, and then

 8            there were issues that while he was on leave, we were

 9            identifying.  And -- and then a lot of that -- a lot

10            of -- a lot of that comes from, you know, if you're -

11            - if you're out on leave, and then other reps or

12            other people are -- are covering the work for you.

13            So, they go on into your homes and in some cases

14            they're finding quality problems, quality issues.

15            And one of the very specific instances I had a rep,

16            Dave Shock, who went into one of the homes --

17    BY MR. GALLAGHER:

18    Q    And which home?

19    A    I wish I could remember the name off the -- right off

20            the top of my head.  I don't remember the name.  I

21            remember the situation though.  The situation was --

22            was an elderly woman who Dave -- she had called into

23            the office and said their cable or satellite, or

24            whatever it would have been, was shut off.  And so we

25            thought, oh, no.  We're gonna lose a home from the
```

```
 1           sample because without cable or satellite you can't
 2           be a Nielsen home, right, without a signal, without
 3           an antenna or anything, you -- you can't be a Nielsen
 4           home.  So, the Field Rep went out to the home -- Dave
 5           Shock went out to the home to -- to remove our
 6           equipment.  And we -- part of the process, we ask
 7           them how they're going to watch television in the
 8           future.  And she said, "Well, just, you know, if it's
 9           okay, I'll start using the TV in my bedroom again."
10           And the TV had a -- an antenna.  But she had told the
11           rep that Dave had previously told her not to use that
12           TV.  And it -- and she was really frustrated.  She
13           was upset.  And she hadn't been able to use this TV
14           for quite some time.
15      Q    So, she wasn't using that TV?
16      A    She wasn't using that TV.  The reason --
17      Q    So, wouldn't that affect the Nielsen numbers?
18      A    Oh, absolutely.
19      Q    Okay.  How --
20      A    It would affect the Nielsen numbers.  All right.  So,
21           you have a TV in the living room that has cable, and
22           a TV in the bedroom that has bunny ears, right, over
23           the air --
24      Q    Sure.
25      A    -- antenna.  We are not allowed to bias the sample in
```

1      any way, shape, or form.  So, what that means is if

2      you now have -- if we walk into your home and you

3      have the ability to watch TV in the living room, and

4      your ability to watch TV in the -- in the bedroom, we

5      cannot change that.  Right?  We have to have both of

6      those TVs metered.  By saying, "Don't use that TV",

7      now channels like Channel 2, Channel 4, Channel 7,

8      20, 50, 56, they're not gonna get any ratings there

9      from that TV because we told them not to use that TV.

10     She can no longer watch TV in her bedroom.  All the

11     shows she would have normally watched in her bedroom

12     are no longer getting counted in the ratings.

13 Q   Okay.

14 A   So, we just completely skewed the ratings data

15     because we biased it and told her not to.

16 Q   Okay.  So, outside of that, were there any other

17     situations that you can remember that led to his

18     termination?  Specific instances?

19 A   That situation actually gets worse, because he had

20     unplugged the equipment, because he wasn't able to

21     get it to work.  He was supposed to come back.

22 Q   Okay.  How do you know he unplugged the equipment?

23 A   Because it wasn't plugged and she told us that she --

24     he had unplugged it, and that she couldn't get to

25     access where it was plugged in.

1   Q   Okay.

2   A   He said that he had returned to the home to fix the

3       problem, but she told us that he did not come back to

4       the house to fix the problem.

5   Q   Say that one more time.  I'm sorry.  I didn't hear.

6   A   He had put in MSM a contact report that said that he

7       went back to the home to fix the problem on Saturday.

8   Q   Okay.

9   A   But he did not return to the house on that Saturday

10      and actually fixed the problem.  Did not get -- did

11      not access her home, did not get into her home to fix

12      the problem.

13   Q   Okay.  The entry says that the problem was fixed?

14   A   Yes.  That's what he said.  He said that he fixed the

15      problem.

16   Q   When did he say that?

17   A   He said that he replaced a 7-port hub, which is a

18      piece of equipment that would be attached to that

19      computer.

20   Q   Okay.

21   A   So, she said that he was only at her house once that

22      week, not twice.  But we did see that he removed that

23      TV from our system in MSM when he went back that

24      second day, which we're assuming is from the street

25      because she said he didn't get into the house.  You

```
 1           can access the computer through Wi-Fi, your laptop

 2           and connect to our network that's in the home.

 3    Q      That's terrifying.

 4    A      Through Wi-Fi.  Well, it's only our network.  It

 5           doesn't connect to yours.

 6    Q      Well --

 7    A      But so --

 8    Q      -- I'm sure that's a --

 9    A      -- from the -- well, yeah -- no, it's not.  It's --

10           it's not -- it's not a scary, evil thing. But so from

11           the home you could -- you can -- I'm sorry, from the

12           -- from the street or from the driveway.  Say, he

13           knocked on the door, maybe she wasn't there.  Now I'm

14           developing a story for this small section of the --

15           but he could have removed that from the system and

16           now it's not going to fault anymore and hurt his

17           performance.

18    Q      Okay.

19    A      So, he told her that he was going to follow up and go

20           back, but he never did.

21    Q      Well, it sounds like he did go back, right, you're

22           saying?  If he connected from the Wi-Fi.  He might

23           not have got in, but it sounds like he went back.

24    A      Yeah.

25    Q      Okay.
```

| | | |
|---|---|---|
| 1 | A | He -- he could have, yeah.  It looks like he did. |
| 2 | Q | Okay. |
| 3 | A | But he didn't put it in the schedule, he didn't put |
| 4 | | it in our scheduling program. |
| 5 | Q | Okay. |
| 6 | A | And as a Field Rep, you wouldn't do that.  You |
| 7 | | wouldn't go to a call on a Saturday -- |
| 8 | Q | Well -- |
| 9 | A | -- and not show that you didn't go.  You would want |
| 10 | | to take credit for that call that you ran on a |
| 11 | | weekend, which we don't usually do. |
| 12 | Q | I'm sorry.  I'm confused.  So, you're saying he |
| 13 | | didn't put the call on the scheduling for that? |
| 14 | A | No.  He didn't put it in the schedule. |
| 15 | Q | So, what implication are you talking about? |
| 16 | A | That the pro -- the pro -- process and procedure was |
| 17 | | not followed. |
| 18 | Q | Okay.  Is that a terminable offense? |
| 19 | A | Yes. |
| 20 | Q | Okay. |
| 21 | A | Yes.  Absolutely. |
| 22 | Q | So, not putting in the schedule is a terminable |
| 23 | | offense? |
| 24 | A | No. |
| 25 | Q | Okay.  Okay.  Did you learn anything else at that |

```
 1              house?  You said the --

 2   A    No.

 3   Q    -- Rauschkin was -- was after?

 4   A    Yes.

 5   Q    All right.  So, when were you informed that Dave was

 6        being terminated?

 7   A    Either before or after he had returned -- either just

 8        before or just after.  Right around the time that he

 9        returned from leave.

10   Q    Who informed you?

11   A    It would have been a discussion that I had with my

12        manager and with -- with HR.

13   Q    Okay.  Who's your manager?

14   A    My manager at the time was Josh Hummel.

15   Q    And who was HR?

16   A    At the time, Amanda Culver was HR.

17   Q    Okay.  What did this con -- what did this

18        conservation consist of -- consist of?

19   A    I don't remember exactly.

20   Q    Sure.  Just --

21   A    It would have been a combination of -- of

22        conversations that I either had with my manager --

23   Q    I'm sorry.  I don't think I understand what you said.

24        I must -- I think I just misheard you.

25   A    So, my manager and I were talking quite a bit about,
```

```
 1         you know, these -- as these ongoing issues keep

 2         popping up and we keep seeing them in --

 3    Q    Sure.  Sorry.  I don't mean to cut you off, but what

 4         other -- I thought -- what other issue other than the

 5         house that Dave Shock went into?  'Cause you said the

 6         Rauschkin was after he was fired.  So, what other

 7         issue led to the termination?  Specific instances

 8         that led to his termination?

 9    A    Sorry.  Under the pressure, my mind just keeps going

10         to -- to a blank.

11    Q    No, you're fine.

12    A    Yeah.  I'm -- all my reference stuff, that all of the

13         stuff that I usually have, all the -- my emails and

14         all my -- everything that I can go back through and

15         go, ding, ding, ding.  I'm having a hard time

16         remembering.

17    Q    Sure.  You created something for this?

18    A    No, I didn't.

19    Q    Okay.  I'm sorry.  I mis -- misunderstood.

20                   MS. NORRIS:  We've produced the

21         documents he's talking about.

22                   MR. GALLAGHER:  Cool.

23                   THE WITNESS:  Yeah.  I just don't

24         remember --

25                   MS. NORRIS:  Right.  So, you can show
```

1      -- you can show him too or he can -- he can rely on

2      his memory, which he --

3              MR. GALLAGHER:  Yeah.  Well, I'm

4      sorry.

5              MS. NORRIS:  Yes.  He's -- and he's --

6              THE WITNESS:  Well, yeah.  So, this is

7      the one that I -- that I just was talking about

8      where, you know, he said he went to the house, that

9      he told the -- the lady of the house not to use the

10     television.

11             MR. GALLAGHER:  Okay.

12             THE WITNESS:  And so that's -- that's

13     this specific example here that we talked about.

14  BY MR. GALLAGHER:

15  Q    So, can you think of anymore?

16  A    Like I said, under the pressure I'm just drawing a

17     blank right now.  Yeah.  There was another situation

18     -- so, there's another situation that I went into a

19     home and it was a -- it was another really tough

20     situation where we had -- I went out to the household

21     with Shamir Chappell (phonetic), and this was

22     something that not only had I seen before, and I

23     don't recall what -- the homes, but the rest of the

24     team had been seeing and been bringing it to my

25     attention that they've been doing into homes, which

1    was that Dave was leaving extra equipment in the

2    homes.  He wasn't taking -- removing all of the

3    equipment from the homes when he needed to.  So, for

4    example, if -- we -- we set up a computer behind

5    every television.  And those computers will track

6    what's being watched.  So, every once in a while,

7    either a piece that's attached to this computer fails

8    and we can take that piece off and put a new one on,

9    or the computer itself fails, in which case we'd take

10   the whole thing out and put a whole new one in.  He

11   was putting a new one in, but leaving the other one

12   there, which it's a large, kind of oddly looking

13   computer.  You don't want two of them behind your

14   television.  Very ugly.  Not the level of customer

15   service that we provide.  He was leaving those in the

16   homes.  We needed that equipment too.  It's very

17   expensive.  We needed it to put in other homes.  In

18   this particular instance, he had left two of them.

19   There were two computers behind the living room

20   television.  And then in another room there was

21   another one of them, but this one had been sitting

22   there for a long time.  More than months.  And it was

23   -- it was also a serious vio -- policy violation,

24   because the people meter has every -- all the

25   household members' names on it was outdated, which

1    means that -- in the remote control, as well.  Which

2    means that there are different household members in

3    the home now than there were then.  This computer was

4    sitting there on the ground.  The people meter was --

5    there wasn't a TV there.  So, we should have taken

6    that equipment with us.  Dave had been to that home

7    two times since that TV had left the home.  So, he

8    had an opportunity when that TV left the home to take

9    the equipment.  He had an opportunity two other times

10   to take the equipment.  And when Shamir and I went

11   there, and now we're finding equipment sitting there

12   that shouldn't have been sitting there for a very

13   long amount of time -- not only that, but the people

14   meters were mislabeled.  If they were to grab that

15   remote control and used it in the other room, the

16   household members are in a different order now.  When

17   they hit button 1, button -- button 1 is no longer

18   Steve.  It's now Mike, but it says Steve.  So, it

19   could cause a pretty serious problem with mis-

20   crediting in the ratings.  Very similar to this

21   instance on July 3rd, 2014, in that -- where you have

22   household gender discrepancies, which requires

23   recalculation of our data.  It can cost hundreds --

24   hundreds of thousands of dollars to be sent --

25   reprocessed and sent back to our client saying, "We

```
 1            made a mistake.  We made it this long ago.  You have

 2            to reprocess all the ratings data.  This was the

 3            correct ratings data."  But they already made

 4            decisions, just other advertising on the incorrect

 5            data, which can sometimes lead to them having to

 6            repay their clients.  So, we found that in this --

 7            this particular home.  It didn't take us long to fix

 8            the problem, and it was work that should have been

 9            done right the first time, and the second time, and

10            the third time.

11    Q     Okay.  Do you remember the name of the household?

12    A     I don't remember the name of that household.

13    Q     Okay.  So, I'm gonna call it the -- you said you were

14            there with Shamir?

15    A     Yes.

16    Q     I'm gonna call that the house with Shamir, and I'm

17            gonna refer to the first one as the house of Dave

18            Shock.

19    A     Yes.

20    Q     So, outside of the house with Dave Shock and the

21            house with Shamir, are there any other things that

22            went into the termination of my client, specific

23            instances?

24    A     I don't recall.

25    Q     Okay.
```

```
 1                          MR. GALLAGHER:  Let's go off the
 2              record for a second.
 3                          MS. NORRIS:  Yes.
 4                          (WHEREUPON, a brief recess in the
 5              proceeding was taken at 12:10 p.m.)
 6    BY MR. GALLAGHER:
 7    Q    Okay.  I believe before we took a short break --
 8         before we took a short break, we were discussing
 9         about houses that had issues.  You said the Rauschkin
10         house was found out after Dave was decided to be
11         terminated?
12    A    Yeah, I believe so.
13    Q    Okay.  So, you remember anything about the Better
14         Business Bureau complaint Ms. Rauschkin filed?  Or --
15    A    Do I know anything about the complaint?  I know she
16         said she filed a complaint.
17    Q    Okay.  Do you remember what was she claiming, at
18         least?  Here, I'll give you this email.  I'll let you
19         review this, if you'd like.  I mean, just the
20         contents of her email from -- that was -- sorry.
21                          COURT REPORTER:  Are we marking it?
22                          MR. GALLAGHER:  Sure.
23                          (WHEREUPON, Exhibit Number Three was
24              marked for the record at 12:30 p.m.)
25                          THE WITNESS:  This isn't the whole
```

89

```
 1              thing, but yeah.

 2                        MR. GALLAGHER:  Okay.

 3    BY MR. GALLAGHER:

 4    Q     So, there was more?

 5    A     Yeah.  There's more to that -- that Better Business

 6          Bureau complaint.

 7    Q     Okay.

 8                        MR. GALLAGHER:  What's the Bates

 9          number on that?

10                        MS. NORRIS:  The --

11                        MR. GALLAGHER:  293?

12                        MS. NORRIS:  Yeah.  293.

13                        MR. GALLAGHER:  I'm too mixed up right

14          now.  I --

15                        MS. NORRIS:  That's all right.

16    BY MR. GALLAGHER:

17    Q     But does it -- but does that refresh -- that

18          refreshes your memory --

19    A     Oh, yeah.

20    Q     -- (talking over)?  Okay.  I'm not gonna drill or go

21          too hard, but -- so what essentially does she point

22          out?

23    A     So, the -- the situation here is that she was --

24          well, so I -- I guess I can rewind a little bit

25          further.  This home had been faulting for a long
```

90

1    time, and that means that we were unable to use the

2    data from his home in the ratings, which you know, of

3    course that -- you don't want to have a home that's

4    -- where -- installed that you can't use the

5    information from, and it hurts the market level

6    performance.  And so this was a call that was very

7    important for us to get into because if it faults --

8    if a home faults for 60 days, and this one was

9    getting close to it, the home automatically falls out

10    of our sample and was no longer a Nielsen home.

11  Q    Okay.

12  A    We weren't able to use the data for 60 days or more.

13    So, we were trying to get in touch with this home.

14    We were calling and texting, and weren't getting

15    responses from the home.  And so at some point in

16    time we have to start doing what we call drop-in

17    appointments, where we'll knock -- when we're in the

18    neighborhood, we'll knock on the door and see if

19    they're home, and then try to interact with them at

20    the door to either come back, show them our ID badge,

21    that sort of thing.  Maybe they'll just let us in and

22    fix it.  So, we -- as I said, while Dave was out, we

23    -- sometimes we'll have to bring people from out of

24    the market into the market to help.  And in this

25    particular situation it was a Field Rep from -- from

1    Florida named Brian Mollner (phonetic).  So, Brian --

2    before Brian came out, I sent an email to everyone

3    saying, "Hey, Brian Mollner is coming in from

4    Jacksonville to help us out.  He's gonna be running

5    Dave Caudle's field area until he gets back, or until

6    he has to go back to Florida."  And then, you know,

7    Dave responded to -- to him saying, "Thank you very

8    much, Brian.  Appreciate it."  So, this was one of

9    the homes he was trying to get into.  The household

10   apparently didn't appreciate him -- all the attempts

11   that he was trying to get into.  I think what they

12   didn't know was that we were trying to keep them in

13   sample, keep them from dropping out.  So, the other

14   part of the story here is that -- and -- and before

15   we were trying to get out to this home, we had

16   realized that we had six sites of equipment scanned

17   into this household that -- in -- in our inventory

18   system, which suggests that there are six TVs here.

19   But we only had four TVs listed in our MSM database,

20   which is a huge discrepancy.  That means we either

21   have two extra TVs in the -- with equipment on them

22   that aren't in the system, or it's just equipment

23   that's just sitting in the home.  This email says

24   that -- from the lady of the house says that, "All --

25   all of our TVs have cable channels offered by cable

```
 1        by multiple web-based streamings."  It says, "And a
 2        television in five rooms."  We only had four listed
 3        in our -- in our -- our program, in our MSM.  So
 4        there was one TV in that house that we didn't even
 5        have listed, which goes back to the other home that
 6        we had where there was a home that had the OTA
 7        antenna that we -- they were told not to use, and the
 8        equipment wasn't plugged, and had been removed from
 9        the system.  That's what we -- that was what was most
10        likely happening here.  But, when Dave finally --
11   Q    What -- I'm sorry.  What leads you to that
12        conclusion?
13   A    'Cause the -- there's equipment in the home --
14        because she said that she had five TVs that had cable
15        or some sort of -- some sort of reception.  In our
16        computer system we had only four TVs that had our
17        equipment on them.  And so that means there was one
18        TV in that house that they were using that should
19        have been monitored by our equipment that wasn't
20        being.
21   Q    Okay.
22   A    And it did have our equipment sitting behind it.  And
23        she had verified that with me when -- when we talked.
24   Q    Okay.  So, you talked to her?
25   A    Yes.
```

```
 1   Q    When did you talk to her?

 2   A    After she filed this complaint, I got on the phone

 3        with her.

 4   Q    What did you guys discuss?

 5   A    That day -- pretty much everything.  Mostly it was --

 6        it was the whys.  The whys behind all the attempts to

 7        contact her home, to explain to her that, you know,

 8        if we -- you know, Brian was going out there in order

 9        to help Dave, help manage Dave's field work, so that

10        when Dave returns back to work he'll have -- he won't

11        have to work so hard to get caught back up.  He'll --

12        this one particular home will be back online, and

13        fixed, and all that other stuff.  And -- and -- and

14        also to explain all of -- all of these -- basically,

15        each of these points that she had -- she had written

16        in this note, I -- I wanted to talk with her about.

17   Q    Okay.

18   A    Yeah.

19   Q    Did you give her anything after the culmination of

20        that conversation?

21   A    Yeah.

22   Q    Okay.  What --

23   A    I had to run out to her house and give her incentives

24        that she was expecting to -- to get.

25   Q    Okay.  What were those?
```

1    A    So, our Nielsen homes get ongoing panel incentives.

2    Q    Is that pail?

3    A    Panel incentives.  It's like a -- a -- a reoccurring

4         gift that -- that Nielsen homes get for

5         participating.

6    Q    Okay.

7    A    Yeah.  So -- so she had -- she was upset that this

8         whole thing had happened.  Upset enough that she was

9         reaching out to the Better Business Bureau.  Right?

10        So, she's upset.  So, she said that she thought that

11        their home was a great home, a perfect family, and

12        that they should -- there would be no reason why we

13        would have removed, in her opinion -- removed them

14        from our sample, that that wasn't fair, and that it

15        was -- she had thought that maybe it was a way of us

16        getting out of paying her the panel incentives that

17        she actually had coming to her until she would have

18        hit her two-year mark and then come out.  So, she

19        pretty much demanded that I give her the panel

20        incentives that she would have received had they

21        stayed on as a Nielsen home rather than, "Sorry.  You

22        don't get any more money from us and you're done",

23        kind of thing.

24   Q    Okay.

25   A    So, I --

```
 1    Q    What did you give her?

 2    A    Pardon me?

 3    Q    What did you give her?

 4    A    Yeah.  What the amount that she had set in her head

 5         that it was going to be, I believe it was between

 6         $400 and $600, something like that.  And so rather

 7         than argue with her about it, you know, I just gave

 8         her, you know -- gave her the incentives.

 9    Q    Okay.  After the -- after that happened, was she a

10         Nielsen house after that?

11    A    No.

12    Q    Okay.

13    A    No.  Because her home had dropped out of sample.  And

14         I believe, if I remember correctly, we had replaced

15         her home with another home already.  I don't think --

16         I don't -- I don't believe she wanted to stay on

17         after that either, if I remember correctly.

18                    MS. NORRIS:  This is Number Four?

19                    MR. GALLAGHER:  Yeah.  Sure.

20                    COURT REPORTER:  Yup.

21                    (WHEREUPON, Exhibit Number Four was

22         marked for the record at 12:40 p.m.)

23                    THE WITNESS:  I remember this one.

24                    MS. NORRIS:  We'll just write down the

25         exhibit so -- she can't take down her notes.
```

                                                              96

```
 1                              THE WITNESS:  Sorry.

 2                              MS. NORRIS:  That's all right.

 3                              THE WITNESS:  I will slow down.

 4                              MS. NORRIS:  It's okay.

 5                              MR. GALLAGHER:  Okay.

 6    BY MR. GALLAGHER:

 7    Q    So, you said you remember this?  Why don't you give

 8         me a basic explanation of what I just handed you,

 9         marked as Exhibit Four?

10    A    Yeah.  This one made me really nervous.  And that was

11         because, you know, he -- he had called into the

12         office and he told them that they'd got in a car

13         accident and that he was in the hospital.

14    Q    When you say, you're referring to?

15    A    Dave Caudle called the -- our -- our ROC, our -- our

16         schedulers in -- in -- in the office in Florida, and

17         said that he -- he let them know that he -- he'd got

18         in some sort of car accident and that he was in the

19         hospital.

20    Q    Okay.

21    A    And --

22    Q    And how do you know that that's what he said?

23    A    They sent me an email or -- and -- and tried calling

24         me, I believe.  I think I was off that night or

25         whatever.  I don't think I got it 'til the next day.
```

1      And I reached out to Dave saying, "Hey, I just, you

2      know, I just heard you got in a car accident and

3      you're in the hospital.  Are you okay?"  And he said,

4      "What are you talking about?  What the heck?  I

5      wasn't in any kind of car accident.  I don't -- I

6      don't know what you're referring to."  But he was in

7      the hospital.  So, that was just very

8      uncharacteristic of Dave.  And so I didn't -- I kind

9      of didn't know what was going on.  And it made me a

10     bit nervous.  Because that kind of followed the

11     pattern that we had -- had -- had seen up until that,

12     and there was -- he was working when he was on leave,

13     and I had to tell him not to.  Because he was calling

14     the homes and setting appointments, and not putting

15     them in the schedule, and the houses would call and

16     say, "Hey, nobody's here."  And we'd look in the

17     schedule and there's no appointments to go there.

18     And they'd say they had talked with Dave.  But -- so

19     there was like -- there were some weird -- weird

20     things that were happening.  And I -- and -- so you

21     -- you know Dave, and -- and you know he's a pretty

22     sharp guy, so when that started popping up I -- I

23     started getting a little bit worried and wondering,

24     you know, what do we need to do -- what do we need to

25     do here?  Do we need -- maybe we need to look into

```
 1              this because it's just -- just not like him.

 2    Q    What was not like him exactly?

 3    A    I mean, to have someone call and say that I was in a

 4         car accident, and then for me to ask him about it the

 5         next day and have him tell me, "I don't know what

 6         you're talking about", that's enough right there to

 7         -- that was like a big, red flag for me to say what

 8         can I do, what should I do here.  You know, I'm a

 9         little worried about this guy.

10    Q    Sure.  Did you ever follow back up with -- I believe

11         you called it the ROC?

12    A    Yeah.  The ROC, Regional Operations Center.

13    Q    Did you ever follow up with them regarding this?

14    A    No, I don't -- I don't -- I don't know if I did or

15         not, to tell you the truth.

16    Q    Okay.

17    A    I wouldn't -- I wouldn't -- I would have just --

18    Q    I'm gonna -- I think Page 3 there, top of the page, I

19         think.

20    A    Okay.

21    Q    It said, "I don't know where the boundaries are

22         here."

23    A    Yeah.

24    Q    What did you mean by that?  So, I'm sorry.  I'm gonna

25         -- I'll give you -- I'll read your sentence in full.
```

```
 1              "I don't what the boundaries are here, so I want to

 2              be careful with my response."  What did you mean by

 3              that?

 4    A         Yeah.  So, I'm a manager trying to ask for help from,

 5              you know -- from not just HR, but also from our legal

 6              group or whatever, but -- and even copied my manager

 7              on it trying to -- to try to figure out what do I

 8              need to do here.  Is there -- you know, obviously I'm

 9              worried about this guy.  You know, it -- are -- are

10              there -- are there laws, are there things that I

11              can't ask, are there things that I can ask for

12              someone who's out on leave.  You know what I mean?

13              Is -- is there -- I don't want to do something that's

14              the wrong this, so you know, these are some of the --

15              the issues that are -- are -- have happened and --

16              and now there's this.  I don't know what to do.  And

17              it's just -- that last sentence says, "I'm not -- I'm

18              not sure exactly what to take away from all this.

19              When I -- when he returns, I'll manage him the same

20              way that I do others, unless I'm told otherwise."

21              And that's because I was to treat everyone the same

22              way.  Right?  Un -- until -- unless there's some

23              particular reason why -- why you're not supposed to.

24              So, I was looking for guidance.

25    Q         Sure.  So, Page 5 is then --
```

```
 1    A    Uh huh.

 2    Q    -- the next time that you -- your response to that.

 3         So, who were you adding on there?

 4    A    I don't why -- why I'm not able to see that.  Was

 5         that probably up here.  I'm not sure of the order of

 6         these emails here.  So, we have -- it's like I

 7         remember sending something to somebody, and they

 8         usually forwarded it to somebody else.  I'm not sure.

 9         So, this would have been the original.

10    Q    It's (Inaudible) particular --

11    A    Right.  So, what are you -- what -- can you repeat

12         the question?  I was --

13    Q    I thought I saw somewhere that it had, but I could be

14         mistaken.  Who is that -- who is Patricia --

15    A    Veath (phonetic)?

16    Q    -- Veath?

17    A    She's our -- our Leave Administrator, I believe.

18    Q    Okay.

19    A    Our HR Leave Administrator. I think that's her job

20         title.

21    Q    And what does she do?

22    A    When employees are out on medical or personal, short-

23         term disability, FMLA-type leave, they will -- or

24         even Workers Comp leave, I think, they would -- they

25         -- they handle that, I guess.  Yeah.  And any
```

```
 1              communications in regards to it, I believe.

 2    Q     Okay.  So, just read the last four sentences there.

 3          Or three sentences.  I'm sorry.  Starting with, "At

 4          this point."

 5    A     "At this point, we, again, do not know when Dave

 6          Caudle will be back to work.  Typically, he misses

 7          two to three months a year due to illness or injury

 8          for the past few years.  If we have a way to

 9          investigate, we should."

10    Q     What exactly are you asking them to investigate?

11    A     Well, again, this -- this all starts from going --

12          that this particular leave was a little different

13          than the leave he had had before.  That -- and

14          especially with this new car accident, because this

15          will follow the other emails that I had sent that we

16          were just referencing about --

17    Q     (Inaudible) on the back.

18    A     Right.  About the -- the situation with him calling

19          in the car accident.  Yeah.  So, the sentence before

20          that said, "Just yesterday I asked him if he was in a

21          car accident and he had no idea what I was talking

22          about."  Again, I've an employee that I'm concerned

23          about at this point in time and I need to find out

24          what's going on.

25    Q     Sure.  So, what was the pertinence of him missing two
```

```
 1              to three months a year due to illness or injury?

 2    A    (No verbal response)

 3    Q    I'm sorry.  Do you need me to repeat the question?

 4    A    Yeah.  One more time.

 5    Q    What was the pertinence of adding that he misses two

 6              to three months a year due to illness or injury for

 7              the last few years?

 8    A    Yeah.  So, I'm trying to put myself back in my shoes

 9              that's -- at this point in time to try to figure out

10              why I would have gone in that -- in that direction I

11              did.  But again, this is -- this is a person that had

12              -- he -- he had just told me that something was off.

13              Or he didn't just tell me.  I -- I knew that

14              something was off with him in regards to the last

15              conversation that I had.

16    Q    So, did you follow up with ROC about what he said?

17    A    I -- if they sent me an email saying he just called

18              in saying that he had got in a car accident, I don't

19              know that I would have called -- I probably called

20              him, but you know, I -- I can't remember --

21    Q    Did you ever say it was a miscommunication between

22              the two?  Did you investigate --

23    A    No, I wouldn't.  Yeah.  I would have called -- I

24              would -- I'm sure I would have called the ROC and

25              just said, "Hey, that's -- I got your message.  I'll
```

```
 1              call him", or something like that.  I'm sure I would

 2              have done at least that.

 3    Q    So, did you call them back when he said that he was

 4              not in a car accident to clarify things?

 5    A    NO.  I wouldn't have done that.  I wouldn't have

 6              called them back to say that he wasn't in a car

 7              accident afterwards.

 8    Q    What are you asking to investigate?

 9    A    If -- if -- like what -- if -- if I had -- to check

10              in on the welfare of the employee, is what we need to

11              look into.  That's what I'm talking about here.

12    Q    Okay.  And why did you add, "Typically, he misses two

13              to three months a year due to illness or injury for

14              the last few years"?

15    A    It might have been because this -- this last

16              particular absence he kept getting added to.

17    Q    Or why is that --

18    A    I don't --

19    Q    -- pertinent?

20    A    Because I -- I don't remember if this particular

21              instance was adding to the leave or not.

22    Q    Sure.  Why would that be pertinent?

23    A    I actually don't know why I would have written that

24              into there.  It could be again to remind the people

25              I'm communicating with that -- of -- of who we're
```

```
 1            talking about, but I'm not sure.

 2   Q   So, Page 6 is -- do you have any medical background?

 3   A   No.

 4   Q   Me either.  (Inaudible) not.  No judgment.  So, what

 5       basis were you judging the doctor's note that he

 6       submitted to you?

 7   A   The -- how I've been getting -- I get a lot of

 8       doctor's notes.  As a manager I've been getting doc

 9       -- I get doctor's notes for years and years and

10       years.  And usually they're -- you know, they're in

11       some sort of formal doctor's note with a letterhead,

12       and usually look a certain way.

13   Q   Okay.

14   A   I don't recall what this one looked like or -- or how

15       it was written, you know, off -- off the top of my

16       head at this -- in this case.

17   Q   But it was enough to bring you to the conclusion that

18       you think David was committing fraud?

19   A   Potentially.  But that's not my job to determine

20       that.

21   Q   Sure.

22   A   It would have been potentially my job to bring that

23       up to somebody else for them to be able to make that

24       determination.  We have folks in --

25   Q   Was that determination made?
```

```
 1   A   Well, I wouldn't have known that.  I believe that's

 2       handled by people -- the same people that deal with

 3       the short-term disability, or the -- that communicate

 4       back and forth with the doctors, and return to work

 5       dates, that sort of thing.

 6   Q   So, Page 4.

 7   A   Yup.

 8   Q   So, what was the determination there?

 9   A   I'm sorry?

10   Q   Was a determination made?

11   A   Was a determination made?

12   Q   Of whether or not David was committing fraud.

13   A   Well, see again, I -- see, I wouldn't know that

14       because Patricia Veath, again, is our -- is our leave

15       administrator.  She's the one that would communicate

16       with Met-Life.  That's not a Field Manager's job.

17   Q   Yeah.  Sure.  I'm not saying whether you not -- made

18       the determination.  But based on this email, it seems

19       as though that determination's been made; no?

20   A   Based on the sentence that says they said that

21       medical information definitely substantiates the need

22       for leave?  Is that what you're asking?

23   Q   Yeah.  Do you think that's deter -- do you think that

24       sentence makes his leave substantiated?

25   A   Yeah.  It would look like it.
```

1    Q    Okay.  Is there another way you can interpret that

2         sentence?

3    A    No.  I mean, if she's telling me that based on what

4         she found and -- and what -- it just looks like

5         Patricia's determination, not -- not mine.

6    Q    Okay.  Yeah.

7    A    Yeah.

8    Q    Did you take determination or did you push back?

9    A    No.  I wouldn't -- I wouldn't believe I would have

10        pushed back.  That's something that's outside of my

11        --

12   Q    So, the first page, this is your response email, it

13        looks like.

14   A    Right.  'Cause she was telling me that she -- that --

15        that Met-Life has the doctor's notes, or whatever it

16        might be.  And then I'm telling her that there's

17        another problem, this car accident.  This is really

18        odd.

19   Q    So -- but you never called ROC to confirm that that's

20        actually the case?  That characterization wasn't

21        cleared up either?

22   A    No.  I may have called -- I may have called the ROC.

23   Q    Okay.

24   A    I --

25                      MS. NORRIS:  It's been asked and

```
 1            answered.
 2   BY MR. GALLAGHER:
 3   Q    So, who's they?  Who was saying there's a mental
 4        health issue?
 5   A    Because Patricia Veath told -- said they can't share
 6        specific diagnoses with me, but I got the impression
 7        it was related to mental health, and that he was
 8        hospitalized.
 9   Q    Okay.  So, you got that interpretation from that?
10   A    I -- I couldn't imagine who else they would have
11        been.
12   Q    So, "They can't share specific diagnoses, but I got
13        the impression it was related to mental health."  You
14        read that as them saying David had a mental health
15        issue?
16   A    Possibly.  Maybe.  I don't know.
17   Q    Well, you said that in the affirmative in this email;
18        is that correct?
19   A    Maybe that's why they are saying, yeah.  I mean
20        that's --
21   Q    Okay.
22   A    -- it's like a -- kind of like --
23   Q    So --
24   A    I could have added the word maybe to it, but yeah.  I
25        mean, that's --
```

1   Q    Okay.

2   A    -- like a casual --

3   Q    Okay.  What different way would you -- did you think

4        you were supposed to manage David if he did have a

5        mental health issue?

6   A    That's what I wouldn't -- that's what I wouldn't

7        know, 'cause I --

8   Q    Okay.

9   A    -- I don't know if I -- if there is a mental health

10       -- health issue with anybody in my team.  Is there --

11       you know, how should I handle that as a manager?  I

12       need the advice of human resources and --

13   Q    What was that advice that you got?

14   A    Well, I don't believe there was any advice yet.  He

15       wasn't -- he wasn't back to work.  This is -- this is

16       me making I do the right thing here.

17   Q    Sure.

18   A    For an employee that I cared about.

19   Q    Right before that you sent an email of, I think --

20       and correct me if my timeline's wrong.  But on Page 3

21       --

22   A    Uh huh.

23   Q    -- "I don't know the boundaries" -- or "I don't know

24       where the boundaries are here, so I want to be

25       careful with my response."

1  A    Uh huh.

2  Q    Okay.  "Dave -- Dave has mentioned having a high

3       temp, Sickle Cell attack, throwing up, and now most

4       recently told me that he is diagnosed diabetic."

5       What pertinence does that have to this email?

6  A    So, he went out for this reason, it turned into this

7       reason, it turned into this reason, it turned into

8       this reason, and now there's a car accident.  So,

9       there are several in a row on the same leave that

10      keeps getting extended, from this to this to this --

11 Q    Did Dave ever tell you he was in a car accident?

12 A    Did Dave tell me he was in a car -- no.

13 Q    Okay.

14 A    Dave did not tell me there was a car accident.

15 Q    Are you aware of -- are you aware of any point when

16      -- after the first time, ROC confirmed that -- that

17      that's the case?

18 A    I'm sorry?

19 Q    So, originally you got the voicemail or email that

20      says car accident.  Outside of that, are you aware of

21      any other times that the ROC told you that, yeah,

22      that's the case?

23 A    That was the only time that they told me that he got

24      into a car accident.

25 Q    Okay.  Thank you.  So, what pertinence -- so -- okay.

                                                              110

1              Do you think David has a mental health issue?

2    A    Well, no.  If you were to ask me that straight

3         outright, no, I don't think he -- he has a mental

4         health issue.

5    Q    Did you think David had a mental health issue on May

6         26th, 2016?

7    A    I was concerned there was the possibility, yes.

8    Q    Did you think that?

9    A    Yeah.  I was worried about it, obviously.  'Cause I

10        was asking for help.

11   Q    So, you thought he had a mental health issue?

12                   MS. NORRIS:  Objection.  Asked and

13        answered.  That wasn't the testimony.

14                   THE WITNESS:  I didn't know.

15   BY MR. GALLAGHER:

16   Q    Okay.  What did you think?  I'm not asking you what

17        you knew.

18   A    So, I had an employee acting very odd, very strange.

19        And I had had employees in the -- in the past that

20        had abused -- I -- I'm not saying that he did this.

21        I'm saying that I have had employees in the past that

22        have abused medications or alcohol.  And then when I

23        would talk to them, their behavior was very different

24        than what it was when they were not on that type of

25        thing.  When I talked with -- or when -- when all

```
 1            this was happening, it was uncharacteristic of Dave,

 2            so I was concerned.  Since I have experience in

 3            possibly identifying these types of issues, that I

 4            might have the opportunity to do the same here with

 5            Dave.  So, if there's an issue, and I wasn't 100

 6            percent sure that there was, what can I do?

 7   Q    Well then what percent sure were you there was?

 8        We'll do it that way.  You just said you weren't 100

 9        percent sure there was.  What percent sure were you?

10   A    Yeah, I guess 100 percent sure is the same.  I wasn't

11        sure.  I wasn't sure if there was a problem or not.

12   Q    I get that.  But what did you think?  That's a

13        different question.  I'm not trying to trip you up.

14                    MS. NORRIS:  Yeah.  It's --

15                    MR. GALLAGHER:  Did you think --

16                    MS. NORRIS:  -- asked and answered.

17                    MR. GALLAGHER:  -- that?  No, it has

18        not.  It hasn't been answered.  It's been asked, but

19        --

20                    MS. NORRIS:  It's perfectly -- yes, it

21        has.

22                    MR. GALLAGHER:  Okay.

23                    MS. NORRIS:  You don't want me to make

24        speaking objections, so I'll just say asked and

25        answered.  But it's been asked and answered, and I
```

```
 1              can recite the testimony back to you.

 2                        MR. GALLAGHER:  Oh.

 3                        MS. NORRIS:  Well, I do.

 4                        MR. GALLAGHER:  You can answer, sir.

 5                        MS. NORRIS:  Asked and answered.

 6                        MR. GALLAGHER:  Are you instructing

 7         him not to respond?

 8                        MS. NORRIS:  You can say again what

 9         you said before.

10   BY MR. GALLAGHER:

11   Q    So, what did you think?  Did you think; yes or no?

12                        MS. NORRIS:  He -- he doesn't have to

13         give you a yes or no answer.  He's told you what he

14         thought repeatedly.

15                        MR. GALLAGHER:  He's told me how --

16                        MS. NORRIS:  He said repeated, "I

17         wasn't sure."  You can look at the transcript.

18         You'll find at least seven references to, "I wasn't

19         sure."

20                        MR. GALLAGHER:  Okay.

21                        MS. NORRIS:  So, you'll -- he -- asked

22         -- saying it has to be a yes or no answer --

23                        MR. GALLAGHER:  I never said that.  He

24         told me what --

25                        MS. NORRIS:  You just did.  Yes or no.
```

1              MR. GALLAGHER:  -- what it said.

2      You're the only one that said he doesn't have to

3      answer that.  Right.  Now will you please stop?

4      Thank you.

5              MS. NORRIS:  I did.  Asked and

6      answered.

7              MR. GALLAGHER:  Okay.  Thank you.

8              MS. NORRIS:  You don't have to answer

9      it.

10             MR. GALLAGHER:  Okay.  I'm just gonna

11     let you know then that's a perfectly reasonable

12     question, so in -- in case necessary, I'm gonna

13     concern my --

14             MS. NORRIS:  Okay.  So -- so -- so, if

15     you're gonna do that, tell me what it is you think is

16     the perfect --

17             MR. GALLAGHER:  No, we can move on.

18             MS. NORRIS:  -- question?

19             MR. GALLAGHER:  It's okay.

20             MS. NORRIS:  No.  'Cause -- 'cause

21     your last question was yes or no.

22             MR. GALLAGHER:  No.  It's -- that was

23     an option of answers.  Yeah.  Sure.  Then you're the

24     only one that jumped down my throat.  It's okay. I'll

25     just reserve my record.

```
 1                         MS. NORRIS:  You do that.

 2    BY MR. GALLAGHER:

 3    Q     Okay.  Thank you.  I did.  So, in the future if we

 4          have to, we'll come back and do this again.  At any

 5          point did Dave ask to switch territories?

 6    A     Territories?  He -- he might have asked to switch

 7          field areas and --

 8    Q     Okay.  Did you allow him to switch?

 9    A     He did not switch field areas, so if that did happen,

10          I -- I'm sure -- not sure.  No, he didn't switch

11          field areas.

12    Q     Okay.  At any point did you tell him or -- did you

13          imply or tell him that the reason he can't switch is

14          'cause you like him to be working with other black

15          people?

16    A     No.  Absolutely not.

17    Q     Okay.  Why did you laugh?

18    A     I laughed 'cause it's just -- it's an absurd, to me,

19          statement.  That's all.

20    Q     Were you aware of a survey that was sent to only

21          African American employees (Inaudible)?

22    A     No.

23    Q     No.  So, if Dave said that he told his supervisor,

24          that wouldn't be you?

25    A     If he told his supervisor what?
```

115

```
 1   Q    That he was being asked to fill out a survey that was

 2        only responsive for African Americans.

 3   A    So, you're asking if there is a survey that was sent

 4        to African American employees --

 5   Q    Just --

 6   A    -- and would have told me about?

 7   Q    No.  I'm -- I'm sorry.  I'll -- I'll clear it up.

 8        So, I'm asking you -- first I asked you if you were

 9        aware of the survey that existed for Afri -- that was

10        sent to only African Americans.  You said you were

11        not aware.  So, I'm saying if Dave's claiming that he

12        made one of his supervisors aware of that, that --

13        that wouldn't be you, right?  Dave never made you

14        aware of this?

15   A    Not that I'm aware of, no.

16   Q    Okay.  Did you ever -- ever talk to Dave about FMLA?

17   A    Well, I would have, I'm sure.  Because, you know,

18        once you're out for so long, short-term disability

19        only lasts for so long, and with the amount of time

20        off that he needed for work, I'm sure we would have

21        talked about it, yeah.

22   Q    Sure.  During any of those conversations, did you

23        ever say something along the lines of, "Hurry up.  We

24        need you.  Get back soon", stuff like that?  That

25        would imply that he needs to get back to work?
```

116

1   A   No.  Not in a -- not in the -- not like -- or I'm

2       sorry, I didn't specifically.  What way are you

3       asking?

4   Q   So, it's not -- did you ever ask -- tell -- did you

5       ever ask him to get back to work essentially?

6   A   No.

7   Q   "Hurry up.  We're -- we're missing you here."

8   A   Well, I mean a friendly kind of fun way I might have

9       said, "Hey, buddy.  You know, whenever you're ready

10      to come back to work" kind of thing.  But not -- not

11      like, you know, pressuring, "You need to get back by

12      this certain time or whatever."

13  Q   Sure.  How would you handle when the other employees

14      voiced their displeasure to you about having to cover

15      Dave's area?

16  A   You know, it's just -- that's just how it is.  We --

17      when we have people go out, we all cover for each

18      other.  And when you go to help Chicago for three,

19      four weeks because they're a man down, we're gonna

20      have people in your area covering your work.  So --

21  Q   Sure.

22  A   -- and -- and I wouldn't have had to do a whole lot

23      of that because the guys all cover each other's work

24      --

25  Q   Okay.

117

```
 1    A    -- pretty well.

 2    Q    So, what were some of the displeasures that they --

 3         that they showed?

 4    A    Just the increase in the hours that they're working

 5         per week.

 6    Q    And how would they show that they were mad about

 7         that?

 8    A    Well, they're generally not mad, but you know, they

 9         -- 'cause they can't wait 'til somebody gets back to

10         work so they can get back to their regular amount of

11         hours and have more time to focus on their workload.

12    Q    Sure.  And how would you know that?

13    A    Well, it would probably just be a verbal

14         conversation, if that's what you're asking.

15    Q    Sure.  Do you remember when Dave got back to work

16         before his suspension pending investigation?

17    A    Yeah, I do.

18    Q    Okay.  When was that?

19    A    Roughly about -- I don't remember the specific date.

20    Q    Oh, no.

21    A    I don't remember a specific date, no.

22    Q    Okay.  Okay.  Do you remember the month?

23    A    No.  It would probably have been October.

24    Q    Okay.

25    A    Would be my best guess.
```

```
1   Q   Do you know when he was placed on suspension pending

2       investigation?

3   A   Just a matter of days afterwards, I would imagine.

4   Q   Were you waiting for him to return to work so you

5       could --

6   A   We knew that we had -- that the decision had already

7       been made to potentially terminate him based on what

8       we had found in the homes that he -- that we visited

9       that we -- we've discussed earlier here.  And when he

10      got back to work, we were gonna need to talk with him

11      about it and find out what happened.

12  Q   Okay.  So, a decision had been made to potentially

13      terminate him?

14  A   Well, it's all -- it's all pending until you -- you

15      know, you actually talk with the employee.  And then

16      the suspension starts, and that's when we will make a

17      decision, and all that stuff, so.

18  Q   Okay.  So, what was the investigation that entailed?

19  A   That was the first time that Nielsen had -- that --

20      in -- in my market that -- that was the decision to

21      do that.

22  Q   What do you mean by that?

23  A   So, it just -- my experiences prior to that were that

24      if the -- the decision is made to terminate, you --

25      you know, you meet with the employee and talk through
```

```
 1            the situations that led to the decision to terminate

 2            the person.  And then at that point we would usually

 3            terminate the person and -- and determine when to get

 4            -- retrieve the assets.

 5     Q    Okay.  And that's not how it was handled this time,

 6            you're saying?

 7     A    Right.  This -- this time was -- this time was

 8            different.  Nielsen had changed the way they handled

 9            these -- these interactions, the -- the terminations

10            and that.

11     Q    Okay.  What changed?  I'm sorry.

12     A    What changed?

13     Q    Yeah.

14     A    That they would -- that we would let the rep know

15            that we had run into this, this, and this, whatever

16            the situation was, and then you're not to work while

17            we follow up, or have discussions, or whatever it

18            might be.  It was my first time experiencing that.

19     Q    And when did that change?

20     A    Prior to that and since the last time I had

21            terminated someone.

22     Q    Okay.

23     A    I really don't know.

24     Q    Was it --

25     A    It was like a formal announcement that went out to
```

```
 1              all the managers that we're gonna do these things --

 2              this thing differently at that point.

 3    Q    Oh, but you said there was not a formal announcement

 4         you're saying?

 5    A    The -- pardon?

 6    Q    I just missed what you said.  There was not --

 7    A    No.  I don't know that there was an -- like an email

 8         that went out to -- or like maybe it was -- it's

 9         possible it might have been talked about at a

10         manager's -- a monthly manager's call, or something

11         like that.  I just don't recall at this point.

12    Q    Okay.  Have you seen any literature on it?  Any

13         paperwork on this is the process since?

14    A    No.

15    Q    Okay.  Is that how you handled those terminations you

16         talked about earlier?  I think Roney and Carlos?

17    A    I don't recall if those type of situations were made

18         in the same way or not.

19    Q    Do you recall if either of those received a

20         suspension pending investigation?

21    A    If it did, it was just a day or two.  I -- I don't --

22         honestly, I don't remember.

23    Q    Can you think of any other employee that -- that was

24         suspending pending investigation?

25    A    No.  'Cause we -- usually we don't get to that.  I
```

```
 1           don't -- I don't get to that point unless very, very
 2           sure that, you know, this is the direction I'm gonna
 3           go.
 4    Q      What do you mean by that, if this is the direction
 5           you want to go?
 6    A      I don't take terminating someone lightly.
 7    Q      Okay.  So, you're saying the decision to terminate
 8           had been made when he was suspended pending
 9           investigation?
10    A      Right.  And I think -- well, no.  So, can you -- you
11           rephrase the question?  I -- I'm sorry.
12    Q      Did --
13    A      You --
14    Q      -- (talking over) you said you have to be very sure
15           to put somebody suspended pen -- pend -- pending --
16           suspension pending investigation.
17    A      No.  I -- what I -- if I said that, I said that
18           incorrectly.
19    Q      Sure.
20    A      What I mean is, when -- when we get to the point
21           where we're deciding to terminate someone, they're
22           usually -- usually, for me, there isn't anything left
23           to investigate.
24    Q      Okay.  So, at what point where you became -- did you
25           become aware that my client was terminated -- would
```

```
 1           be -- (Inaudible) be terminated?
 2   A     Are you saying -- are you asking me how soon after
 3           our suspension meeting?
 4   Q     Sure.  If it was soon after or --
 5   A     Yeah.
 6   Q     So, the suspension -- sorry, I'll just strike this.
 7           But the suspension meeting was -- can you -- what was
 8           the suspension meeting?  What did that entail?
 9   A     I believe that was myself and Amanda and possibly
10           Denise letting him know what we -- what issues we had
11           -- had identified, and that he was not to work until
12           we looked into these things further.  And I believe
13           what that meant was that -- well, actually I'm not
14           really sure to tell you the truth.
15   Q     Okay.  What do you mean?  You're -- what part aren't
16           you sure about?  What --
17   A     So, based on what we had -- based on the decision
18           that was made, is this something that we should move
19           forward with?  And the -- the decision we terminate
20           to be -- when we follow through on that.
21   Q     Okay.  So, when was that decided, that you would
22           follow through on termination?
23   A     I don't know.  I -- I wouldn't know the -- I wouldn't
24           -- I wouldn't be able to give a date or anything like
25           that, or even tell you if it was day later.
```

```
 1   Q    So, who told you?

 2   A    I believe I would have received confirmation from --

 3        from HR and legal.

 4   Q    Oh.

 5   A    Whether or not we would move to terminate based on,

 6        you know, what we had found.  And we had issues that

 7        were originally, you know, again brought up with

 8        Dave.

 9   Q    So, what investigation was had after you suspended my

10        client?

11   A    It wasn't a further investigation of any of the homes

12        or anything like that.

13   Q    Okay.

14   A    I believe it was just making sure that we could move

15        forward with the termination from a legal

16        perspective.

17   Q    Okay.  Have you ever -- do you know what an Affidavit

18        is?

19   A    No.

20   Q    I can't ask you if you ever signed one if you don't

21        know what it is.  Yeah, I think it's a Court

22        document, or it is a document that could be used

23        anywhere, especially in Court.  They're prevalent.

24        Generally speaking, what makes them particularly

25        important is the signature of somebody is
```

```
 1              authenticated essentially by a authenticator.  And

 2              there's a seal on it.  Does that sound familiar at

 3              all?

 4   A    Not that I've ever seen one, if that's what you're

 5        asking.

 6   Q    Yeah.  I was gonna ask you if you think you ever

 7        signed something like that?

 8   A    No.  (Inaudible).

 9   Q    Okay.  Fair enough.  Did you participate in the EEOC

10        investigation at all or (Inaudible) investigation?

11                   MS. NORRIS:  What do you mean by

12        participate?

13   BY MR. GALLAGHER:

14   Q    Did you have any dealings with it?

15   A    I'm unaware of -- I'm not sure what you're referring

16        to.

17   Q    Sure.  So, my client, he filed a -- a -- accusations

18        with the Equal Enforcement Opportunity Commission, I

19        believe, or the State -- or the State Court

20        Alternative, I'm not positive.  I'm not sure.  I

21        don't have (Inaudible).  I think it was the State

22        Court alternative.  I think it was (Inaudible).

23        Yeah, did you have any dealings with them?

24   A    Not that -- no.  So, I -- I found out that -- that I

25        needed to move all of my emails to a folder and not
```

125

```
 1        delete anything.  But outside of that, I don't

 2        believe I was involved in anything else.

 3   Q    Okay.  When did you find that out?

 4   A    Probably -- my best guess -- my best guess --

 5   Q    Sure.

 6   A    -- would be about a month or so after Dave was

 7        terminated.

 8   Q    Okay.

 9   A    Maybe it was longer than that.  I don't know.

10   Q    Okay.

11   A    Best guess.

12   Q    Was there any explanation that David could have

13        entered with the suspension meeting that would have

14        justified not terminating him?

15   A    Not -- not that I'm aware of, no.

16   Q    Are you aware of other employees that -- any other

17        Field Techs that may be -- did something similar that

18        we were talking about earlier, like the gender

19        discrepancy or the -- is that a common problem, you

20        said?

21   A    No.  It's definitely not a common problem.  So, I

22        know that right before this, before the -- the

23        original 2014 there was a gender discrepancy flipped

24        a couple different times.  There was an employee

25        somewhere in -- in the field, you know, 'cause the
```

126

```
 1              managers were made aware of how big of a deal this

 2              was, and how this is a terminable offense.  It was

 3              not in my market.  But at that time, I decided I

 4              didn't want to terminate him, that we would go with a

 5              -- the PIP instead.

 6    Q    Okay.

 7    A    So, yeah, there was before that.

 8    Q    That's all to your --

 9    A    Yeah.

10    Q    Okay.  How about not -- how about mis-metering a

11         house?

12    A    Mis-metering in a house?

13    Q    Yeah.  Like we were talking about earlier where

14         there's either too many units -- I don't think that's

15         possible now that I say it out loud -- or probably

16         not enough units --

17    A    Right.  Yeah.  So, we don't typically see extra

18         equipment left in the home.  It's just something we

19         just don't do.

20    Q    Okay.

21    A    It's a decision that when you make it, you know

22         you're making the wrong choice, so we just don't make

23         the wrong choices.  So, we don't typically see that.

24         I do see metering issues and -- and which sometimes

25         are accidents or lack of knowledge.
```

```
 1   Q    What would you say is the bigger problem, a mis-
 2        metering issue or a leftover equipment issue?
 3   A    The mis-metering is -- is a bigger issue.
 4   Q    Okay.  When you were a Field Tech, did you ever have
 5        a house that was mis-metered, not metered correctly?
 6   A    Of mine?
 7   Q    Yes.
 8   A    Yeah.  Yeah, I did have one.
 9   Q    Were you put on a Performance Improvement Plan for
10        that?
11   A    No.  I called my manager immediately afterwards and
12        told him that I think I had made a mistake.  He
13        verified that I did, (Inaudible) withhold like I
14        should have, and I went back the next day and fixed
15        it.
16   Q    Okay.  What about Dave Shock, has he ever had any
17        houses that were not metered correctly?
18   A    No.
19   Q    Never?
20   A    Not that I'm aware of.  Not that I recall.
21   Q    Okay.  Do you have any relation to Dave Shock?
22   A    Yes.  No.  No.  So, his -- his sister, I -- she was
23        my girlfriend a long time back.
24   Q    Oh, okay.
25   A    We had a -- we had a kid together, so --
```

```
 1    Q    Oh.

 2    A    -- but never got married or anything like that.

 3    Q    Gotcha.  Any other familial relationships you had at

 4         Nielsen?

 5    A    No.  Oh, yeah.  My brother works -- he's a manager in

 6         -- my brother is a manager in -- in a different

 7         market.

 8    Q    Okay.  What market is that?

 9    A    He has -- it's called MPM Mid-East One.  It covers

10         Michigan, Indiana, Illinois, Wisconsin, Ohio.

11         There's a national sample of a much larger area.

12    Q    Okay.

13                        MR. GALLAGHER:  Let's go off for a

14         bit.

15                        (WHEREUPON, a brief recess in the

16         proceeding was taken at 1:22 p.m.)

17                        So, at some point did you become aware

18         that -- I don't need the back.  I'm only giving you

19         the front there.

20                        COURT REPORTER:  That's fine.  We're

21         on Number --

22                        MR. GALLAGHER:  That's Five.

23                        COURT REPORTER:  -- Five.  Yup.

24                        (WHEREUPON, Exhibit Number Five was

25         marked for the record at 1:31 p.m.)
```

```
 1   BY MR. GALLAGHER:

 2   Q    So, at some point did you become aware that there's a

 3        harassment complaint leveled against you?

 4   A    Yeah.

 5   Q    Okay.  And when did you become aware?

 6   A    Harassment complaint, I knew that there was a com --

 7        that Dave was -- was challenging being terminated.  I

 8        knew that.

 9   Q    Okay.

10   A    If that's what you're -- I don't know if it's the

11        same thing or that it's different.

12   Q    Sure.

13   A    That's -- that's what I was made aware of.  Yeah.

14   Q    Okay.  Sure.

15   A    That -- that -- that Dave was gonna challenge in

16        Court -- or potentially challenge legally his -- his

17        termination.

18   Q    Okay.  How did you take that?

19   A    Well, I was, you know, a little bummed out, I guess,

20        just because, you know, Dave's a good guy and, you

21        know, I unfortunately had to terminate him and, you

22        know --

23   Q    Okay.  Did you have to do anything, provide any

24        information to people in -- anybody in regards to

25        what I just handed you, Exhibit Five?
```

```
 1   A   I was sent an email, some sort of email saying that,

 2       again, I had to put any emails or documents into a

 3       shared file, and that I wasn't to delete anything.

 4       That's all I remember.

 5   Q   Okay.

 6   A   As far as notification goes, if -- if anything.

 7   Q   Okay.  So, the -- I'm not sure -- there's never -- no

 8       formal meeting or anything held about the

 9       allegations, the investigation?

10                   MS. NORRIS:  With him?

11   BY MR. GALLAGHER:

12   Q   That you were -- that you were present at.

13   A   No.  Not until we came here for this.

14   Q   Fair enough.  Fair enough.

15   A   Okay.

16   Q   So, when a tech visits a house, what do you do if a

17       -- a homeowner decides -- bars you from a certain

18       area of the house?

19   A   Well, it depends.  So, if -- if there's work that

20       needs to be done in that home and you're not able to

21       verify, then we shouldn't be using the information

22       from that home until we get back into that room and

23       -- and -- to make sure the equipment's working

24       properly or to meter it the correct way, or whatever

25       that might be.
```

1   Q   So, is it possible -- strike that.  What if I'm the
2       homeowner and I say you're not allowed in the
3       basement?
4   A   Sure.  If you're the homeowner and -- and you say
5       that, then -- and I'm the Field Rep, I would, you
6       know, of course do my best to convince you to let me
7       in if there's work that I needed to do down there.
8       But if I -- if I wasn't able to do that, then I would
9       try to set -- do my best to set a return appointment
10      and -- and complete the work when -- when you'll
11      allow me to.  And in the meantime, if there's
12      anything that I need to do in regards to make sure
13      that we should or shouldn't be using the data, I'm
14      either gonna put the home on withhold so we don't use
15      the information from the home until I can get back
16      in, or I know that I don't need to based on our
17      conversation, and I just note in a contact report
18      what we talked about.
19  Q   Sure.  So, I say there's nothing down there that
20      needs to be metered.  "You're not allowed down
21      there."
22  A   Yeah, then -- then I take your word for it.  I'm not
23      gonna force my way past you and run down your stairs.
24  Q   I appreciate (Inaudible).  Okay.  What about this
25      transferring geographic regions?  We discussed very

| 1  |   | briefly about if Dave re -- at one point requesting |
| 2  |   | -- |
| 3  | A | Sure. |
| 4  | Q | -- that.  Is that commonplace with your Field Techs? |
| 5  | A | When reps request transfers? |
| 6  | Q | Yeah. |
| 7  | A | To the different field areas?  It's -- I wouldn't say |
| 8  |   | it's commonplace. |
| 9  | Q | Okay.  What would you say? |
| 10 | A | Every once in a while, a -- a Field Rep will say, |
| 11 |   | "Hey, I currently live in this field area, yet I |
| 12 |   | drive 45 minutes each day to that field area.  If the |
| 13 |   | field area that I live in ever opens up, can -- can I |
| 14 |   | get it?"  You know, and if -- if that day comes, |
| 15 |   | there are a whole variety of things I need to look at |
| 16 |   | before I'm able to -- to make that decision to give |
| 17 |   | that -- that person that field area. |
| 18 | Q | Okay. |
| 19 | A | So, but once you usually -- once you get to the point |
| 20 |   | where you have your field area, one of the last |
| 21 |   | things you want to do is move to a different field |
| 22 |   | area.  Because if you do, you're no longer gonna know |
| 23 |   | your -- all your household members that well.  You're |
| 24 |   | not gonna know their habits, you're not gonna know |
| 25 |   | what they're doing, sites looks like, you're not |

133

```
 1              gonna know why that fault or flag just popped up,

 2              'cause you've never been to that home and you don't

 3              know what to ask them about when you call them on the

 4              phone.  You will take a performance hit when you take

 5              a new field area.

 6   Q   Sure.

 7   A   You will work more.  You will -- there's lots of

 8       things.

 9   Q   What is -- so based on just your experience

10       obviously, about what percentage of those are

11       granted?

12   A   They're not that common and they're not granted that

13       often.

14   Q   More than half or less than half?

15   A   Less than half.  Less than half.

16   Q   Usually declined?

17   A   Usually declined, yeah.

18   Q   Okay.  James Hard (phonetic).

19   A   James Hard?  Yeah.

20   Q   Did he request, and was it accepted, a relocation?

21   A   Yes.  He -- he did switch field areas.  Yup.

22   Q   More than once?

23   A   No, not that I'm aware of.  No.  He had Field Area

24       6264 and then he moved to the Field Area 6263.  6264

25       was an area that he lived in, and -- and he lived in
```

1       Garden City, and then he moved out to the west --

2       southwest corner of our market, and he then lived in

3       6263.  So, when that field area became available,

4       rather than have him drive an hour and 15 minutes

5       every day, the decision was made to give him that

6       field area.  It made sense, 'cause we had to hire

7       someone new.  And that field area ran pretty well, so

8       --

9  Q    Sure.  Were you aware that my client moved to

10      Farmington Hills at some point during his employment?

11 A    Yeah.

12 Q    Okay.  Did that switch his field area that he lived

13      in?

14 A    No.

15 Q    No.

16 A    No, that didn't switch his field area.

17 Q    Okay.  Okay.  So, he still lived in the field area

18      that he was representing?

19 A    I think he may have lived inside the field area, but

20      more than likely he had to drive about 15 minutes to

21      get to his field area.  'Cause I think his field area

22      started in one -- yeah, his field area started just

23      on the other side of -- of I-75, from where he lived.

24      The problem at that time though is we had five or six

25      guys that all lived in a very small area, in like

```
 1              that 696 and Gratiot area.  So --
 2   Q    (Talking over) --
 3   A    -- (talking over) out of there away from their house
 4        to get to their area to work.
 5   Q    So, do you remember who got that open area that he
 6        wanted?
 7   A    I don't remember what area was open.
 8   Q    Okay.  You said you look at a few things when -- what
 9        else do you look at?
10   A    Yeah.  So, I -- so, if there's an open field area --
11        like right now, if I had an open field area that pops
12        up, somebody gets promoted and they -- they move away
13        or whatever, then I typically hire someone new.  All
14        right.  So, we hire someone new to replace that one.
15        The idea is put that person in the field area.  If I
16        were to take someone out of their current field area,
17        move them to this one, and then hire someone new and
18        put them in this other one, first off, I don't want
19        to do that at all.  Because if I do, that person that
20        was running the area that they currently have, they
21        know their homes very well, they spent two years
22        installing all of their homes and building
23        relationships with them, getting to know the
24        equipment, and it's set up exactly the way that it
25        needs to be for them to -- to manage the field very
```

```
 1           well.  Now they're gonna go into a new field area

 2           that's completely strange to them and they're gonna

 3           have to learn the homes, they're gonna have to

 4           rebuild their relationships. Which if you don't have

 5           a relationship built with a family yet, it makes it

 6           hard for you to get into their home when you need to,

 7           and they may not have your phone number, or you don't

 8           know the situations.  Your performance will go down

 9           in the short term.  Short term being six to eight

10           months.

11    Q      That's all the same issues that you guys were having

12           when you were trying to get into Dave's houses?

13    A      Yes.  Well -- sure.  Yeah.  Anytime it's not the

14           original person, it's not as easy, 'cause this

15           strange guy from Nielsen is about to start calling

16           you.  You might only be familiar with this other guy,

17           so you might be more hesitant.

18    Q      What (Inaudible) --

19    A      (Talking over) --

20    Q      -- (talking over) would skyrocket and those things.

21           Were you aware that Mr. Caudle was applying for an

22           internal promotion or to -- essentially -- or maybe

23           (Inaudible) position, but just essentially so he's no

24           longer going to be a Field Tech?

25    A      I recall that he interviewed for a position and then
```

```
 1              told me about it afterwards.  Or applied and told me

 2              about it afterwards, which wasn't procedure.  The

 3              procedure would have been for him to have made me

 4              aware of it first and then to -- right.  And I was

 5              kind of surprised that he had submitted a -- or

 6              interviewed -- tried to interview for the position.

 7    Q     Do you remember what the position was?

 8    A     I believe it was an auditor position.

 9    Q     Okay.  Yeah.  Did they -- did you ever -- did anybody

10              ever call you with like a recommendation or like to

11              speak on your behalf about the position?

12    A     (Talking over) --

13    Q     Nobody ever called you about the position ever?

14    A     Not that I'm aware of, no.  No, I don't -- I don't

15              recall anybody calling me.

16    Q     Okay.  What about contacting you in any other way?

17    A     Not -- no, not that I'm aware of.  I don't even

18              recall how I found out that he had applied, but maybe

19              he told me, but I'm not sure.

20    Q     Okay.  Outside the three people we've talked about

21              today, can you remember terminating anybody else

22              while -- while you were in your position you are

23              currently at Nielsen?

24    A     Out of the whole time I've been --

25    Q     Yeah.
```

| | | |
|---|---|---|
| 1 | A | Yeah, I've term -- terminated lots of people over my |
| 2 | | years, 14 years, quite a few people. |
| 3 | Q | Sure.  Can you remember any of their names besides |
| 4 | | the three we've talked about? |
| 5 | A | Paul Riddle (phonetic).  Paul Riddle.  And he was a |
| 6 | | -- was one that was not too far before that. |
| 7 | Q | Why did you terminate Paul? |
| 8 | A | Paul was making some really poor-quality decisions. |
| 9 | | Go -- we were going into his homes and finding |
| 10 | | issues, and with the -- how he had the equipment set |
| 11 | | up.  He was also putting in his time tracks that he |
| 12 | | was going to homes, but he actually -- he actually |
| 13 | | wasn't.  He wasn't going to those homes.  He was |
| 14 | | pandering his time from home, saying that he was |
| 15 | | somewhere else at the same time.  And I went to a |
| 16 | | couple of appointments that he had in his schedule, |
| 17 | | he didn't show that -- that I was there.  So -- |
| 18 | Q | So -- |
| 19 | A | -- you just kinda knew.  Yeah.  Jim Fee (phonetic). |
| 20 | | He was doing a lot of the same things.  Also not |
| 21 | | going to the appointments as he said he was.  That |
| 22 | | was -- that was really frustrating, but -- yeah. |
| 23 | Q | I'm not asking -- I'm gonna ask you this question, |
| 24 | | not Nielsen.  You personally.  Have your actions ever |
| 25 | | been -- resulted in allegations of wrongful |

```
 1           termination in the past?

 2   A    No.  Are you asking have I ever been fired from a job

 3        or that I -- from a job that maybe I shouldn't have

 4        been; is that what you're saying?

 5   Q    No.  I'm asking you if the actions of you terminating

 6        someone else has ever resulted in the allegation that

 7        they wrongfully terminated based on law or some sort?

 8                    MS. NORRIS:  Other than this case.

 9   BY MR. GALLAGHER:

10   Q    Other than this case.

11   A    Okay.  So, somebody I fired that --

12   Q    Did anybody ever accuse you of essentially what we're

13        accusing you for, when you terminated him?

14   A    Yes.

15   Q    Who?

16   A    Paul Riddle.

17   Q    What did he say?

18   A    Well, he had -- he had -- I guess he didn't have much

19        to say.  He didn't show up for the -- he didn't show

20        up.  I went to Court to -- in front of a magistrate

21        and he didn't show.  The Court then -- the magistrate

22        reviewed the -- the documents that I brought into --

23   Q    So, you handled that by yourself?

24   A    Yeah.

25   Q    Okay.  So, did he -- did he sue you in your
```

```
 1            individual capacity, if you know?
 2    A     No.  I was -- I guess I was supposed to have a -- a
 3            Nielsen lawyer there, but they couldn't make it, or
 4            something like that.
 5    Q     Okay.  Any other ones that you can think of?
 6    A     Not that I ever -- no, not that ever came up legally
 7            afterwards, no.
 8    Q     What about not legally?  What about just allegations?
 9    A     No, I -- no, I haven't had anyone reach out to me
10            afterwards at all.  The only ones I ever heard back
11            from afterwards were -- were Dave Caudle and -- and
12            -- and Paul Riddle.
13    Q     All right.  So, you -- have you spoken to my client
14            since he's been terminated?
15    A     No.
16    Q     Okay.  Have you contacted him at all?
17    A     No.
18    Q     Do you remember what the allegations were from Paul
19            Riddle?  If you know.
20    A     Yeah.  He was trying to say that I was wrong, that he
21            wasn't -- that he actually was going to those homes,
22            and that he -- I -- I assume he was somehow
23            challenging the -- the quality issues that I -- I
24            identified in some of his homes.  But you know --
25    Q     Outside of a -- I didn't call -- you gave the name
```

```
 1            earlier -- it's like a Quality Review --

 2    A       Field Quality Review?

 3    Q       Field Qual -- Field Quality Reviews.  Is there a

 4            reason for you to go to this individual -- a tech's

 5            house?

 6    A       To go to one of the -- one of the homes in a Nielsen

 7            -- in -- in --

 8    Q       Yeah.

 9    A       -- in his field area?

10    Q       Your tech, yeah.

11    A       Yeah.  'Cause I don't go to the tech's house.

12    Q       Yeah.  Well, a house that belongs to the tech in his

13            area.

14    A       Okay.

15    Q       That -- yeah.

16    A       Yeah.  Yeah.  So, we -- you know, as -- as Field

17            Managers, we -- it's -- that's our job, that we -- we

18            hire people, we train them, we show them how to be

19            successful, and then we go out to calls with them and

20            -- and make sure they're doing everything the right

21            way, that they're efficient, they're effective, and

22            that the home's always audit ready when we leave, and

23            -- and the home's been coached properly, and -- and

24            all that.  Yeah.

25    Q       So, when do you go to the homes in the area of your
```

```
 1          techs -- when would you go there to one of those

 2          outside of the Field Review Report?

 3    A     Outside of the Field Review Report?  Every time I go

 4          to a home, I have the option to do a Field Quality

 5          Review Report.  It's not like a formal thing.  Like,

 6          if I go to a home with you, I may submit a Field

 7          Quality Review.

 8    Q     So, how many homes a week -- maybe this is better --

 9          how many homes do you see a week?

10    A     Depending on the week, it could be anywhere from, you

11          know, five or six, down to, you know, zero to two.

12    Q     Okay.

13    A     Depending on the week.

14    Q     Did you check those numbers of how many you go to?

15    A     Not necessarily, no.  But I -- I could probably go

16          back through our scheduling program and count them if

17          I wanted to go back through and take a look.

18    Q     Okay.

19    A     A lot of my job has changed over the years.  It's

20          turned into more administrative.

21    Q     Okay.  When did you start seeing that change?

22    A     Just in the last couple years.

23    Q     Okay.  Would there ever be a reason -- would there

24          ever be a reason for you to go to a house without a

25          tech?
```

```
 1   A    It doesn't happen very often, no.  But if -- if a

 2        tech wants me to cover something for them and it's

 3        simple enough and easy enough that I can handle it

 4        without the trunk stocked with equipment that they

 5        have and I don't, and that sort of thing, I may try

 6        to cover a call for them.  Or if we're having trouble

 7        getting in touch with a home and, you know, I want to

 8        take a crack at it myself, I might drive out to the

 9        house.

10   Q    Okay.

11   A    But otherwise, no.

12   Q    Can you give me a estimate of how many times you do

13        that --

14   A    That I go out to home --

15   Q    Yeah.

16   A    -- without a rep?  Two or three times a year maybe.

17        It's not very often at all.

18   Q    Okay.  Do you have any conversation with Dave Shock

19        about this?

20   A    No.  No.

21   Q    Okay.  Do you guys speak?

22   A    Not really, no.  Outside of work, no.  Definitely not

23        outside of work, no.

24   Q    Okay.  Did you speak to anybody other than your

25        attorneys about this situation?
```

144

1    A    No.

2    Q    Okay.  Nobody -- you didn't tell anybody you were

3          gonna be here today outside your attorneys and your

4          work?

5    A    Well, my boss -- my attorneys and work.  No.  I'm

6          surprised I didn't even tell my dad.  I told the guy

7          that lives across the street that -- that I was gonna

8          go on my very first deposition.

9    Q    What's his name?

10    A    That's about it.

11    Q    (Inaudible).

12                       MR. GALLAGHER:  I think that is all I

13          have for you, Ms. Dinsmore.  I appreciate your time

14          and patience, and thank you so much for showing up

15          today.  And --

16                       MS. NORRIS:  I just have one question.

17                    CROSS-EXAMINATION

18  BY MS. NORRIS:

19    Q    Did you know whether the proceeding that you went to

20          regarding Paul Riddle that was in front of the

21          magistrate, do you know if that was an unemployment

22          hearing?

23    A    I don't know.

24    Q    Okay.

25                      MS. NORRIS:  I don't have any other

1          questions.

2                         MR. GALLAGHER:   Thank you for your

3          time.

4                            (Proceedings concluded at 1:50 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    STATE OF MICHIGAN)

 2    ) SS

 3    COUNTY OF OAKLAND)

 4

 5                          C E R T I F I C A T E

 6

 7                    I hereby certify that this foregoing

 8            testimony and proceedings, consisting of one hundred

 9            forty-seven (147) typewritten pages, was mechanically

10            recorded at the time and place hereinbefore set

11            forth; was thereafter reduced to typewritten form;

12            and that the foregoing is a full, true, and correct

13            transcript of the recording so taken.

14

15

16                          _Sheila L. Boensch_____
                            Sheila L. Boensch, CER #7075
17                          Certified Electronic Reporter
                            3133 Union Lake Road
18                          Commerce Twp., Michigan 48324
                            (248) 360-2145
19

20            Dated:  July 22, 2019

21

22

23

24

25
```