# Exhibit G

## UNITED STATES DISTRICT COURT FOR THE
### EASTERN DISTRICT OF MICHIGAN SOUTHERN DIVISION

**DAVID CAUDLE,**

        Plaintiff,               Case No.: 17-CV-13737
                                    HON. MARK A. GOLDSMITH

-vs-

**THE NIELSEN COMPANY (US), L.L.C.,**

        Defendant.
_____/

### DEPOSITION OF DENISE FANTARELLA

    Taken by Plaintiff at the Law Offices of Carla D. Aikens, P.C., 615 Griswold Street, Suite 709, Detroit, MI 48226, on Wednesday, May 15, 2019, commencing at 1:00 p.m.

**APPEARANCES:**

For the Plaintiff:        **CONNOR GALLAGHER (P82104)**
                          615 Griswold Street, Suite 709
                          Detroit, MI 48226
                          (844) 835-2993

For the Defendant:       **MEGAN P. NORRIS (P39318)**
                          150 W. Jefferson, Suite 2500
                          Detroit, MI 48226
                          (313) 963-6420

**RECORDED BY:**          **REGENCY COURT REPORTING**
                          3133 Union Lake Road, Ste. A
                          Commerce Township, MI 48382
                          (248) 360-2145

1

**TABLE OF CONTENTS**

2 **WITNESS:**                                                    **PAGE**

3 **DENISE FANTARELLA**

4     Direct Examination by Mr. Gallagher            03

5     Cross-Examination by Ms. Norris                122

6     Redirect Examination by Mr. Gallagher          125

7     Recross-Examination by Ms. Norris              130

8     Redirect Examination by Mr. Gallagher          133

9

10

11

12

13

14

15

16 **EXHIBITS:**

17     EXHIBIT ONE                                    75

18     EXHIBIT TWO                                    98

19     EXHIBIT THREE                                  107

20

21

22

23

24

25

```
 1            Detroit, Michigan

 2            Wednesday, May 15, 2019 - 3:22 p.m.

 3                      COURT REPORTER:  Ma'am, would you

 4            please raise your right hand?

 5                      Do you solemnly swear or affirm the

 6            testimony you're about to give will be the truth, the

 7            whole truth, and nothing but the truth?

 8                      MS. FANTARELLA:  I do.

 9                      COURT REPORTER:  Thank you.

10                      MR. GALLAGHER:  Good morning.

11                      MS. FANTARELLA:  Hello.  Good

12            afternoon.

13                      MR. GALLAGHER:  Oh, thank you.  Thank

14            you.  Yes.  Been here a little while now.

15                      DENISE FANTARELLA

16         HAVING BEEN CALLED AND SWORN, TESTIFIED AS FOLLOWS:

17                      DIRECT EXAMINATION

18   BY MR. GALLAGHER:

19   Q    Would you please state your name and spell it for the

20        record, please?

21   A    Denise Fantarella, D-E-N-I-S-E F, as in Frank, A-N-T-

22        A-R-E-L-L-A.

23   Q    Okay.  Fantarella.  And thank you for coming today

24        and being a part of this.  What is your profession?

25   A    Human resources.
```

3

```
 1    Q    Okay.  And who do you work for?

 2    A    Nielsen.

 3    Q    How long have you worked for them, for Nielsen?

 4    A    Thirty-one years.

 5    Q    And what is your title?

 6    A    HR Business Partner.

 7    Q    What's that entail?

 8    A    All human resource functions.  Partnering with the

 9         business, understanding the business.

10    Q    Okay.  Do you have any subordinates in your role?

11    A    No.

12    Q    Okay.  And who's your supervisor, direct superior?

13    A    Uh --

14    Q    Who do you report to?

15    A    Sandee Crossley.

16    Q    And what's Sandee's position?

17    A    Director, U.S. Field.

18    Q    Is that Director of HR or Director?

19    A    Director of HR.

20    Q    Okay.  Okay.  And did you go -- where did you go to

21         school?

22    A    Southern Connecticut State University.

23    Q    Any grad school?

24    A    No.

25    Q    BA, BS?
```

4

1 A BS.

2 Q Okay.

3 A Business Administration.

4 Q Do you know what year you graduated?

5 A 1984ish.

6 Q Okay.  So, you're working for Nielsen for 31 years.

7   What -- do you remember what year that was that you

8   hired?  If I could just do the math, I would have

9   suggested one, but --

10 A '87.

11 Q Okay.  And what were you hired in as?

12 A A research analyst.

13 Q And how long did you work in that position?

14 A Six to eight months.

15 Q Where did you go after that?

16 A Senior research analyst.

17 Q Okay.  When did you move over to HR?

18 A About 15 years ago.

19 Q Okay.  It's a lot of (Inaudible)?

20 A Yeah.

21 Q Okay.  What position were you coming from?

22 A Operations Manager.

23 Q Okay.  What was your first position in HR?

24 A The -- I was -- what was my title?  My title was

25   Business Manager.

```
 1   Q    Okay.  Was this more of a HR role?

 2   A    Yeah.

 3   Q    Okay.  When were you put in the position you're

 4        currently in?

 5   A    Supporting the field?

 6   Q    HR Business Partner, the title, when were you --

 7   A    Probably about four or five years ago.

 8   Q    Okay.  That's good enough for me.  Why did you switch

 9        from Operations to HR?

10   A    It just seemed like a natural progression to what I

11        was going.  I was managing a -- a multi-shift

12        operation of about 250 people.  We ran seven days a

13        week, 365 days a year.  So, I had dealt with a lot of

14        the personnel issues --

15   Q    Okay.

16   A    -- entry level personnel issues.

17   Q    Was that your suggestion or somebody at Nielsen?

18   A    There was a position open and I applied for it.

19   Q    Okay.  How did you apply?

20   A    I believe I verbally told my manager at the time.

21   Q    Everything else just happened?

22   A    I -- I was interviewed by, again, my direct manager

23        and her manager.

24   Q    Sure.  Who was your manager at the time that you

25        told?
```

6

```
 1    A    Kathy Bock, B-O-C-K.

 2    Q    And that's commonplace when a lot of positions just

 3         open up, and Nielsen employees were the first people

 4         to get dibs on them, or how does that go?

 5    A    Generally, yes.  Yeah.

 6    Q    So, currently do you have a -- where do you work out

 7         of?

 8    A    There's a small office in Shelton, Connecticut.

 9    Q    Okay.  (Inaudible)

10    A    Sixty-five.

11    Q    So, majority in HR or --

12    A    No.  Operations.

13    Q    Okay.  And that oversees the entire country of

14         Nielsen or --

15    A    I don't -- no.

16    Q    No.

17    A    That's a small segmented business within Nielsen.

18    Q    Okay.  What is that segmented business?

19    A    Ad Intel.

20    Q    That's its own corporation?

21    A    No.  It's part of Nielsen.  It's just a separate

22         business.

23    Q    Okay.  It's like a wing off --

24    A    Yeah.  Yes.

25    Q    Okay.  So, who are you a H -- HR -- who are you an HR
```

```
 1            Business Partner for?  I know Nielsen, but I'm

 2            talking about, like, who are the -- the -- the

 3            supporting -- like, who do you oversee?

 4   A        The field group.

 5   Q        Okay.  How many groups?

 6   A        How many total or how many am I supporting?

 7   Q        How many do you oversee or support?

 8   A        Probably about 600, 650.

 9   Q        Different field groups?

10   A        People.

11   Q        Okay.  Thank you.  Do you know, how is that divided

12            up?  If -- if you're confused, please --

13   A        No.  I'm not sure what you're asking.  Like, what --

14            what areas do I support?

15   Q        Yeah.  Sure.

16   A        Okay.

17   Q        Thank you.

18   A        So, I support U.S. Fields East, which includes

19            Membership Reps and Field Reps.  I support the South,

20            which again is Field Reps and Membership Reps.  And I

21            support the ROC, which is the Regional Operations

22            Center.

23   Q        Okay.  What's the difference between a Field Rep and

24            a Membership Rep?

25   A        A Membership Rep is -- goes out to recruit the home
```

```
 1              and sign the home.  Once they sign the home, the

 2              Field Rep takes over.

 3    Q    So how big is U.S. Field East?

 4    A    Um --

 5    Q    Well, what's it include or any kind of geographical

 6         --

 7    A    It's probably about 200.

 8    Q    People?

 9    A    Yeah.  People.

10    Q    Okay.  Is there an area that it covers or --

11    A    Yeah, but I can't -- I can't tell you the areas off

12         the top of my head.

13    Q    Okay.

14    A    I mean, East is, I could tell you, Rhode Island,

15         Connecticut --

16    Q    Okay.  Which one of those -- U.S. Field -- would U.S.

17         Field East include Michigan then?

18    A    No.

19    Q    Okay.  How did -- do you oversee Michigan?

20    A    Not right now, no.  That was a temporary -- I was

21         helping out the fields, um, back in 2016, so to get

22         the Midwest group.

23    Q    Okay.  Why -- why is it temporary?  Why were you

24         overseeing that temporarily?

25    A    I think there was somebody on a leave of absence, an
```

```
 1  ||       HR person that was on a leave of absence, so they
 2  ||       asked me to help out.
 3  || Q    Okay.  How long were you overseeing it?
 4  || A    Probably about six or seven months.
 5  || Q    Do you remember the months?
 6  || A    I think I started end of September, beginning of
 7  ||       October, 2016, and maybe went to February, March,
 8  ||       2017.
 9  || Q    Okay.  So, some literature earlier that we discussed
10  ||       and (Inaudible) I marked this as an exhibit.  I'm
11  ||       just gonna -- so you know what I'm talking about.
12  ||       Different Nielsen -- seems to be employment guides of
13  ||       sorts.  Are you familiar with those?
14  || A    Yes.
15  || Q    Okay.  I'm not gonna ask you anything really
16  ||       particular about them, just so you know what I'm
17  ||       talking about.  Do the dates appear on them?  Do you
18  ||       know when -- how often these are made or remade?
19  || A    I mean, no, I have no idea.  The dates on them would
20  ||       reflect the last date.
21  || Q    Okay.  Do you know the process that goes into why
22  ||       they're changed?
23  || A    I don't know the process, but they could be changed
24  ||       because policies changed.
25  || Q    Okay.  So, why do policies change?
```

1    A    You know, recent -- more recently the -- the vacation

2         policy changed, so that would be updated.

3    Q    Okay.  What about the harassment policy specifically;

4         do you remember the last time that was changed?

5    A    No.  No.  I -- I know the core of it would be pretty

6         much the same.  I don't know what details they would

7         change on it.

8    Q    Are they -- what happens to the old policies once the

9         new ones are made?

10   A    These are online, so I don't know if they keep track

11        of the changes.

12   Q    Okay.

13   A    The maintain the -- you know, have a copy of the old

14        policy and the new policy.

15   Q    So, they're not given to employees?

16   A    I'm just trying to think of the new hire training

17        class.  I -- I don't think they're given out.  I

18        think they're directed to the online right now.

19   Q    Okay.

20   A    Currently.

21   Q    Sure.  So, does a complaint of harassment have to be

22        submitted in a certain form for Nielsen to

23        investigate and take action against it?

24   A    No.

25   Q    Okay.  What's the policy on harassment at Nielsen, in

1        general?  Per your understanding.

2    A   Zero tolerance for harassment and retaliation.

3    Q   Okay.  By zero tolerance you mean?

4    A   It's not something Nielsen condones, supports,

5        encourages.

6    Q   So, if an ex-employee made an allegation of

7        harassment and that -- and that was found to be true,

8        what would happen?

9    A   It would depend on the issue.  I mean, action would

10       be taken, but it -- it would depend on the issue.

11   Q   So, however (Inaudible), what's zero tolerance means

12       then?  To me, zero tolerance, in my whole life of

13       using the -- the term, zero tolerance is zero

14       tolerance.  So, action, reaction, zero difference.

15       Is that how you're using the term or no?

16   A   I -- if harassment was to be founded, if an ex-

17       employee made a claim and harassment was -- would be

18       founded, some -- depending on what it was, some

19       action would be taken, whether you know -- if it was

20       a claim against the manager or a coworker, you know,

21       depending on the issue, some action would be taken.

22   Q   Sure.  The issue's harassment, so what would that

23       action be?  And if it's different actions, can you

24       give me a -- you can give me a spectrum too, and

25       that's fine.

```
 1   A   I can't honestly tell you because I really haven't

 2       been involved in --

 3   Q   So, you've never been involved in a harassment

 4       investigation or --

 5   A   I've been involved in investigations, but not --

 6   Q   So, you've never found harassment being founded?

 7   A   No.  Not in what I've investigated.

 8   Q   How many have you -- how many -- and obviously I'm

 9       not gonna hold you to this, but if you can give me --

10       you can give me a roundabout answer, if you'd like,

11       but about how many harassment complaints have you --

12       have you investigated?

13   A   I've really only dealt with harassment complaints in

14       the year that I've -- I've not dealt with, but I've

15       seen harassment complaints in the year that I've been

16       in the field.  It's been one or two.

17   Q   So, is that --

18   A   In the groups that I support.

19   Q   Sure.  Is that including the complaint that my client

20       alleged?  A complaint that my client alleged?

21   A   (No verbal response).

22   Q   Do you know who my client is?  Sorry.

23   A   Yeah.  Yeah.  Yes.  Yes.

24   Q   Who is my client?

25   A   David Caudle.
```

 1   Q    Okay.  So, does that include the complaint of

 2        harassment that -- did you investigate a complaint of

 3        harassment that my client alleged?

 4   A    Yes.

 5   Q    Okay.  And you found it not to be the case?

 6   A    Correct.

 7   Q    What brought you to that decision?

 8   A    An investigation based on the facts that were

 9        presented, conversations with Ryan Dinsmore.

10   Q    Okay.  Out -- outside of a conversation with Ryan

11        Dinsmore, what did the investigation, based upon the

12        facts that were alleged, entail?

13   A    I don't recall.

14   Q    Can you recall anything other than a conversation you

15        had with Ryan Dinsmore that would encompass this

16        investigation that you made?

17   A    I would need to look at my documentation.

18   Q    Sure.  Are there documents that exist?

19   A    There should be, yes.

20   Q    What documents?

21   A    It's an investigation file that I worked on with

22        Amanda Culver at the time.

23   Q    Okay.  But outside of the conversation you had with

24        Ryan Dinsmore, can you think of any other things that

25        would be in this investigation packet that you're

14

```
 1            referencing?
 2   A    (No verbal response)
 3   Q    Anything that you or Amanda even.  That you --
 4                     MS. NORRIS:  Just -- just to be clear,
 5        are you asking -- are you -- well, I'll -- I'll just
 6        -- I won't speak, you know -- objection.  Compound
 7        question.
 8                     MR. GALLAGHER:  I think you're just
 9        smarter than --
10                     MS. NORRIS:  Objection.  Compound
11        question.
12                     THE WITNESS:  I'm sorry.
13                     MR. GALLAGHER:  Sure.
14   BY MR. GALLAGHER:
15   Q    Do you have any personal knowledge of anything,
16        outside of what you already said, the conversation
17        with Ryan Dinsmore, that was part of the
18        investigation that you said?
19   A    Not that I -- not that I think right now, no.
20   Q    Okay.  Did you talk -- did you talk to David?
21   A    David Caudle?
22   Q    Yeah.
23   A    No.
24   Q    Do you know if Amanda talked to David?
25   A    I believe she was on the phone call with David and
```

15

```
 1              Ryan Dinsmore.
 2    Q    His termination conversation you're talking about?
 3    A    Suspension.
 4    Q    Okay.  Yeah.  Sure.  I'm talking about the claim of
 5         harassment that --
 6    A    Okay.
 7    Q    So separate and different?
 8    A    Uh huh.
 9    Q    Are you aware of any conversation that happened with
10         Dave regarding his harassment?  Like a follow-up or
11         -- I don't --
12    A    Yeah.
13    Q    -- there had to be like an original complaint, so
14         obviously some sort of --
15    A    No.
16    Q    -- communication after.  Okay.  Is there any formal
17         policy on how to handle harassment and retaliation
18         complaints by employees or ex-employees?
19    A    It's online.  I can't speak to it specifically.  I --
20    Q    Okay.  So, you don't know it?
21    A    I -- I don't know it and I would have to refer to it.
22    Q    Okay.
23    A    There -- there's an Integrity Officer.  There --
24         there's different points of contact.  You know, if
25         you can't speak to your manager, you know, go here.
```

1    Q    So, who would know that?

2    A    It would be online, documented online.  So, if I was

3           sitting --

4    Q    So, employees call you and says, "I have a complaint

5           that I have to -- that I want to allege", you just --

6           you refer them to the online literature?

7    A    Well, I take as much information as I can, and you

8           know, start an investigation from that point.  If

9           they're -- if they're not comfortable talking to me,

10       then there's an integrity hotline.

11    Q    Okay.  So, what's that investigation entail

12       generally?

13    A    Getting the information from the person who's

14       bringing the claim forward, speaking to, uh, people

15       that, um, that person brought up or named, reviewing

16       policies and procedures.

17    Q    Did you ever -- the -- do you ever speak to a client

18       -- like a customer (Inaudible) about the allegation?

19    A    Not generally, no.

20    Q    Okay.  When's the first time you met Dave Caudle?

21    A    Met him face-to-face or --

22    Q    Yeah, sure.  We'll start face-to-face.

23    A    Today.

24    Q    Okay.  When was the first time you talked to Dave

25       Caudle via phone or some sort of telecommunication

```
 1        device?

 2   A    It was probably the separation phone call.

 3   Q    Okay.  When was the first time you had email contact

 4        with him?

 5   A    It was either the day of the separation or the day

 6        after the separation.

 7   Q    Okay.  So, it's safe to say that you had never -- you

 8        had never communicated with him in any way until he

 9        was terminated?

10   A    Correct.

11   Q    So, who makes the decision to terminate Dave -- who

12        made the decision to terminate Dave?

13   A    There were numerous people involved, so Ryan

14        Dinsmore, Josh Hummel, Amanda Culver.

15   Q    Where's Amanda work?

16   A    She's left Nielsen.  I -- I don't know where she's

17        working right now.

18   Q    Sorry.  I mean geo -- that was a bad question.

19        Geographic location, and at the time of this.

20   A    Arlington, Texas.

21   Q    Okay.  What about Josh Hummel?

22   A    Josh was in the mid-west.  I'm not exactly sure where

23        he lived, but he was in the mid-west region.

24   Q    Who -- to a certain point, a consensus had to be

25        made.  Who made the decision that he was going to --
```

```
 1           that David was going to be terminated?

 2   A    It would have been those three people.

 3   Q    Okay.  Were you on the conversation when this

 4        happened?

 5   A    When the -- when the decision was made?

 6   Q    Yes.

 7   A    No, I don't believe so.

 8   Q    Okay.  So, when did you first become aware that David

 9        was being terminated?

10   A    I mean, I would have been aware either the day that

11        we separated him or the day before the final decision

12        was made.

13   Q    Okay.  What's a final decision?

14   A    Just looking at the situation, looking at the facts

15        of -- of the -- the policy violation and, um,

16        determining how to best handle that in -- in relation

17        to the policies.

18   Q    Who makes that final decision?

19   A    What final?

20   Q    Using your words.

21                 MS. NORRIS:  Asked and answered.

22                 MR. GALLAGHER:  I'm asking in general,

23        not in the specific.

24                 THE WITNESS:  So, again it was -- it

25        was Ryan that was having the conversation with Josh
```

                                                              19

```
 1           Hummel.  Ryan Dinsmore, Josh Hummel, and Amanda.
 2    BY MR. GALLAGHER:
 3    Q     Sure.  I'm -- I'm kind of confused.  So, you said you
 4          were not in there, in that con -- conversation
 5          though, right?
 6    A     The -- the final conversation?  No, I was not.
 7    Q     How are you aware that that happened?
 8    A     Amanda let me know.
 9    Q     Okay.  What did Amanda tell you?
10    A     They were moving forward with separation of David.
11    Q     Okay.  When did Amanda tell you that?
12    A     I don't know for sure.  I would have been probably
13          the day before we separated him or that day, um, that
14          we did the separation.
15    Q     Sure.  So, I asked you previously, like just
16          specifically to Dave's situation.  Now, I'm asking
17          you more in general.  Generally speaking, who makes
18          that final determination?
19    A     Of any separation?
20    Q     Yeah.  Let's say of any Field Rep.  We'll just be
21          real --
22    A     Okay.  So, generally how it works is a manager will
23          bring forward an issue, whether it's an issue that,
24          you know, we've been working on, like a performance
25          issue.  They'll escalate it to -- to HR.  From that
```

```
 1            point, HR reviews all the documents, the

 2            conversations that have been had, reviews the

 3            policies.  It gets escalated to -- and let me speak

 4            to you about current titles, because back then I'm

 5            not sure what the titles are.  So, for a Field Rep

 6            position it would be the Field Director that would

 7            have to have approval, and my manager, Director of

 8            HR, would have to approve it.

 9   Q    Okay.  So, taking how that backtracks into the

10            situation I have here, correct -- please correct me

11            if anything I'm saying isn't accurate, is -- is not

12            the case.  But Josh Hummel would have -- the manager

13            would have been Ryan bringing the situation to your

14            boss, Amanda, and then the Director, Josh.  And then

15            they make the consensus decision?

16   A    Yes.

17   Q    Okay.

18   A    Yes.

19   Q    So, safe to say the manager is the only person that

20            has actual knowledge of that -- sorry, I'll strike

21            that.  Is it safe to say the actual Field Manager is

22            the only person that has -- that knows this

23            individual rep?

24   A    Not necessarily.

25   Q    Okay.
```

1    A    It depends on the situation.  If it's something that

2         HR has been working on and -- and is aware of, like a

3         performance issue.  Somebody's been on a performance

4         improvement plan.

5    Q    Okay.  Sure.  Day-to-day working with, would the

6         manager be the only person that had day-to-day

7         interaction with the rep?

8    A    Yes.

9    Q    Okay.  So, Josh Hummel does not have day-to-day

10        interaction with David, in our specific example?

11   A    Yes.  Correct.  He -- he does not have.  Sorry.

12   Q    I get it.  Trust me.  It's very -- I'm just trying to

13        get the -- the case.  So, what can you tell me about

14        David, in general?  What -- before today, what was

15        your opinion of Dave Caudle?

16   A    I didn't -- I didn't have an opinion.

17   Q    Okay.  Had you had any conversations with Ryan

18        Dinsmore about Dave Caudle?

19   A    Yes.

20   Q    Okay.  What was that conversation?

21   A    I mean, at the time of the separation, it -- he was

22        explaining to me what he had found and what was

23        happening.  I met Ryan for the first time Friday, so

24        we chat -- we did chat a little bit.

25   Q    Okay.  What did you guys chat about on Friday?

```
 1   A    A lot of things, but he talked with David Caudle
 2        being a nice guy, you know, good to work with.
 3   Q    What else?
 4   A    We talked about the fields in general, we talked
 5        about his -- his past with Nielsen.  You know, we
 6        talked a little bit along that line.
 7   Q    Sure.  Did Ryan Dinsmore make any other comments
 8        about Dave too?
 9   A    At any time?
10   Q    Friday.
11   A    Again, just that he was a nice guy and, you know,
12        team player, and good to work with.
13   Q    Did you ask him why he's alleging these things -- why
14        David was alleging these things?
15   A    No.
16   Q    At any point?
17   A    No.
18   Q    Okay.  That was the first time you've ever talked to
19        Ryan Dinsmore?  Spoken.
20   A    Spoken face-to-face?  I -- I mean I talked to him in
21        2016, you know, as we were going through this, but
22        Friday was the first day I met him face-to-face.
23   Q    Okay.  2016, Friday, any contact in between between
24        you and Ryan Dinsmore?
25   A    No, not direct contact.  He might have been on an
```

```
 1          email that I was on, you know, related to the fields,
 2          but no.  No contact.  No.
 3   Q     So, when was the first time you heard about this
 4          situation, the lawsuit, not the termination?  Sorry.
 5          That was confusing.
 6                    MS. NORRIS:  The -- the lawsuit
 7          itself?
 8                    MR. GALLAGHER:  Yes.
 9                    THE WITNESS:  I don't know if it was
10          the lawsuit or the EE -- EEOC claim, but years ago,
11          like 2 -- 2017.
12                    MR. GALLAGHER:  Sure.
13   BY MR. GALLAGHER:
14   Q     And what were you made aware?  And just so we don't
15          -- nothing -- I don't want to hear anything to do
16          with any conversations that you had with your
17          attorney.  I'm not trying to backdoor that by any
18          stretch of the imagination, and so please don't tell
19          me.  I'll -- I'll try (Inaudible) but usually that
20          doesn't work, so.
21   A     So, re-ask your question.
22   Q     Sure.  When was the first time you heard about the
23          lawsuit?  And then we'll get there.  I think I asked
24          in con -- how did you hear about the EEOC or the
25          lawsuit?  And --
```

```
 1   A    I don't remember when I was -- when I knew about the

 2        lawsuit.

 3   Q    Okay.  Were you asked to prepare anything ever?  Did

 4        you prepare anything ever for the lawsuit?

 5                   MS. NORRIS:  I'm gonna object to -- to

 6        a work product.

 7                   MR. GALLAGHER:  Yes.

 8  BY MR. GALLAGHER:

 9   Q    That was not with your attorney.  Did you prepare

10        anything?

11                   MS. NORRIS:  Just -- let me make my

12        objection clear.

13                   MR. GALLAGHER:  Sure.  Sure.

14                   MS. NORRIS:  I'm instructing you not

15        to answer.  He is not asking you questions about

16        communications you had directly with Counsel, whether

17        it's Nielsen Counsel or outside Counsel.  You can

18        answer anything he asks you about the process of the

19        complaint, you know, Mr. Caudle's complaint.  But if

20        you were asked to gather documents for the lawsuit,

21        for example, if -- if we asked you to gather things,

22        he's not entitled to know what we're asking you to go

23        look into.  And I would instruct you not to answer

24        those.

25                   MR. GALLAGHER:  Just to make a point,
```

1          and obviously your attorney will correct me if I'm

2          wrong, but if those documents are relevant in a

3          different way they come up, then they're fair game.

4                    MS. NORRIS:  Sure.  And I can -- I can

5          clarify that for you.  If you gave us documents in --

6          in the context of the lawsuit and, for example, he's

7          asking you about the complaint that Mr. Caudle made

8          and you were looking at those documents at that time,

9          you can tell him all about that.  The -- the

10         documents are not hidden or -- or -- he's -- he's

11         allowed to ask you about the documents.  What he's

12         not allowed to know is what we think is important and

13         were telling you to look at

14                   MR. GALLAGHER:  Okay.  So, after we

15         got product --

16                   MS. NORRIS:  Yeah.

17                   MR. GALLAGHER:  -- out of the way, we

18         will continue.

19    BY MR. GALLAGHER:

20    Q    Okay.  So, 2016, when the termination to today, I

21         believe you testified there were no conversations in

22         the middle of that between you and Ryan Dinsmore

23         about this whole situation; is that correct?

24    A    (No verbal response)

25    Q    And by the situation I mean termination of David and

                                                              26

```
 1             the lawsuit, and everything.
 2   A    No.
 3   Q    Okay.  No emails back and forth?
 4   A    No.
 5   Q    Okay.  No phone call?
 6   A    No.
 7   Q    Okay.  What about with Amanda Culver?
 8   A    No.
 9   Q    No.  How often do you speak with Amanda Culver?
10   A    She left the company about six, eight months ago, so
11        I haven't spoken to her in a long time.
12   Q    Sure.  Who's in her role now?
13   A    Sandee Crossley, my manager.
14   Q    Thank you.  Have you had any conversations with
15        Sandee about this?
16   A    Yes.
17   Q    Okay.  What did you guys talk about?
18   A    She came out here initially, so my questions were on
19        -- more on what to expect.
20   Q    Okay.  What did you ask her?
21             MS. NORRIS:  He's allowed to know any
22        conversations you and Sandee had that weren't with
23        the lawyers.  He's not allowed to know what Sandee
24        tells you that the lawyers were directing her.
25             THE WITNESS:  Okay.  My questions --
```

```
 1                        MS. NORRIS:  She was out here for the

 2            settlement conference.  So, when she says she was out

 3            here and we talked about it, much of that is -- is

 4            about the actual settlement discussions that Sandee

 5            was with the lawyer on.  Are -- I mean, are you

 6            disputing whether that's --

 7                        MR. GALLAGHER:  I'm just trying to

 8            think here.  No, I'm not --

 9                        MS. NORRIS:  That's okay.

10                        MR. GALLAGHER:  -- I'm not trying to

11            say yes or no.  I'm just trying to think.  Because it

12            seems to be hearsay in there where -- I don't know.

13            I'm not saying you're wrong by any stretch.  I'm just

14            really -- I -- I don't know, so --

15                        MS. NORRIS:  I -- I -- I can say where

16            I think the line is, and you can disagree with me.

17            Both of these people are people that have been

18            involved in support of the lawsuit.  In other words,

19            these people who are gathering documents, gathering

20            information --

21                        MR. GALLAGHER:  Sure.

22                        MS. NORRIS:  -- that sort of thing,

23            for the lawsuit.  So, there are communications that

24            they would have that are, "Here's what the lawyers

25            are telling us", 'cause they're both the client, if
```

28

1    you will, in the context of this lawsuit.

2              MR. GALLAGHER:  Yeah, sure.  And

3    that's kind of shading towards almost a breaking --

4    really exceeding privilege in my -- in my mind.  I

5    don't know where that line is either.  I'm not saying

6    it's there, but I am saying that if a lawyer was in

7    there and this was for the purpose of the lawsuit and

8    trying to brief you, I get it.  But if we're just

9    having --

10             MS. NORRIS:  IF we're just chit-

11   chatting --

12             MR. GALLAGHER:  -- just having

13   martinis and we're talking about what the lawyers

14   say, I don't think that's privileged whatsoever.

15             MS. NORRIS:  I -- I agree with that.

16   So --

17             MR. GALLAGHER:  And I think that that

18   kind of leans that way here, 'cause there's no

19   lawyers present, there's nothing.  They're just

20   having a conversation.

21             MS. NORRIS:  So, if what you were

22   doing is just chit-chatting, if you will, unrelated

23   to what you're being asked to do in your job, I agree

24   with him, that's something you can answer.  If what

25   you're doing is something related to the furtherance

```
 1          of the lawsuit, then I'm instructing you not to

 2          answer.

 3                          MR. GALLAGHER:  Sure.

 4   BY MR. GALLAGHER:

 5   Q    Were there lawyers present when you and Sandee talked

 6        about this lawsuit?

 7   A    No.

 8   Q    Okay.  Were you on company time?

 9   A    Yes.

10   Q    Okay.  What time was it?

11   A    I don't -- I have no idea.

12   Q    How do you know you were --

13   A    Because I don't generally talk to Sandee after six

14        o'clock in the evening.

15   Q    Okay.  So, do you remember when this conversation was

16        had?

17   A    About the timeframe that she came out here, and I

18        don't remember what that date was.

19   Q    Sure.  Was it over the phone?

20   A    Yeah.  Probably.  Yes.

21   Q    Work phone or a personal cell phone?

22   A    Probably through the computer.  We have -- we have

23        video chat.

24   Q    Okay.  So, I'm sorry.  That just seems like a very

25        specific thing that you're recalling then, if it's a
```

```
 1              Skype session.  Did you -- do you recall this or are

 2              you saying that's probably what it was?

 3    A    It would have been a Skype session, and it would have

 4         -- I asked her about the process.

 5    Q    What did you ask her?

 6    A    Just how the process works.  What's the process and

 7         -- and if I was coming out here, what to expect.

 8    Q    Okay.  And what did she say?

 9    A    I -- I don't recall.

10    Q    Do you recall anything about that conversation, the

11         contents of it?

12    A    I mean, I knew she told me there wasn't a settlement.

13         She told me that she would expect me to have to come

14         out here, and that's really all I recall.

15    Q    So, you were just okay with coming out here?

16    A    Yeah.

17                   MS. NORRIS:  That was question was

18         asked as if she had a choice.

19                   MR. GALLAGHER:  Well, I'm sorry.

20         There's a point there.

21    BY MR. GALLAGHER:

22    Q    It just -- it -- it seems that if you Skype somebody,

23         to me, to get information on a process, if she just

24         tells you you're gonna have to go, there would be

25         some follow-up.
```

| | | |
|---|---|---|
| 1 | A | There -- there wasn't. |
| 2 | Q | Okay.  Fair enough.  That's your testimony.  Quick |
| 3 | | call then? |
| 4 | A | Yeah.  It would have been in the con -- we have a |
| 5 | | regular stand-up meeting every morning, so it might |
| 6 | | have been brought up in that, how the trip went. |
| 7 | Q | Okay.  Any other conversations with Sandee about this |
| 8 | | law -- lawsuit?  And obviously, as your Counsel |
| 9 | | already suggested, saying things -- |
| 10 | A | No. |
| 11 | Q | Okay.  Are you married? |
| 12 | A | Yes. |
| 13 | Q | Okay.  Since? |
| 14 | A | Pardon me? |
| 15 | Q | When did you get married? |
| 16 | A | 1990. |
| 17 | Q | Okay.  Do you have any children? |
| 18 | A | Yes. |
| 19 | Q | How many? |
| 20 | A | Three. |
| 21 | Q | What age? |
| 22 | A | Twenty-three, 17, and 15. |
| 23 | Q | Sure.  Twenty-three year old.  What's your 23-year |
| 24 | | old's name? |
| 25 | A | Courtney (phonetic). |

1    Q    Same last name?

2    A    Yes.

3    Q    And what's her profession?

4    A    She works in medical records, Children's Hospital in

5         Hartford.

6    Q    Have any conversations with Courtney about this

7         situation?

8    A    No.

9    Q    Does she know you're here right now?

10   A    She knows I'm in Detroit.

11   Q    Does she know why you're here?

12   A    No.

13   Q    How often do you talk to Courtney?

14   A    Every day.

15   Q    Were you under the understanding -- did -- were you

16        under the understanding that you are not allowed to

17        tell people that you were here for a deposition?

18   A    I wouldn't talk about it.

19   Q    Why's that?

20   A    It's not pertinent to any family conversations I

21        have, or outside of --

22   Q    You're here, right?

23   A    Pardon me?

24   Q    She knows you're here?

25   A    She knows I'm in Detroit.

1    Q    Did she ask why?

2    A    She may have.  I just told her it's a HR thing.

3    Q    Okay.

4    A    She was more concerned about me being in Detroit.

5    Q    Oh, so (Inaudible) police protection (Inaudible).

6         (Inaudible) the best.  Doorman leaves at six though,

7         so you might want to -- just joking.  I was born and

8         raised.  I love it.  They tried to make me move to

9         Pennsylvania.  I wouldn't do it.  Three and a half

10        years and I had to come back.  I (Inaudible) little

11        more (Inaudible).  So, Josh Hummel --

12   A    Yes.

13   Q    -- how long was he employed?  Or is he -- is he still

14        employed?

15   A    Yes.

16   Q    Okay.  How often do you communicate with him?

17   A    Not regularly, no.

18   Q    Okay.  Have you talked -- so, in between today and

19        termination day of my client, have you talked to Josh

20        about anything to do with this?

21   A    No.

22   Q    Okay.  Have you talked to anybody since the day of

23        termination, again, not including Counsel, to today

24        about this?

25   A    About the actual case?  This?

```
 1    Q    About my client's termination, about the deposition,

 2         about the case, yes.

 3    A    Not specifically about the case, no.

 4    Q    I asked more than that.  So, about the termination.

 5         Not -- you know, not -- not saying anything

 6         factualized, did you talk to anybody about the dep --

 7         your deposition, my client's termination, or the

 8         lawsuit/EEOC?

 9    A    No.

10    Q    Okay.  Nobody?

11    A    No.

12    Q    Okay.  So, whose job was it to look into my client's

13         allegations of harassment and retaliation?

14    A    He gave -- he gave me that information.  David Caudle

15         called me with that information.

16    Q    Okay.  And what happens after though?  Like, whose

17         job is it to look into these things?

18    A    I looked into it.

19    Q    Okay.  What -- so correct me if I'm wrong, was there

20         anything else done besides -- you said you discussed

21         it with Ryan Dinsmore.

22    A    Correct.

23    Q    Anything else?

24    A    Again, I'd have to look at my -- my notes.

25    Q    Okay.  So, nothing else comes to mind though?
```

```
 1  A    No.

 2  Q    If nothing else, if -- if no one else was contacted,

 3       do you think that's a fair investigation?

 4  A    Yes.

 5  Q    It is?  Why?

 6  A    Because Ryan Dinsmore went to the house and saw the

 7       violation.  There were unmetered TVs.  That was my

 8       understanding at the time.

 9  Q    Sure.  Are there any reason that a met -- that a TV

10       might be -- might be unmetered and not be in

11       violation?

12  A    Not that I'm aware of.

13  Q    Okay.  So, I believe earlier today my client listed a

14       few different people that had unmetered units,

15       correct?

16  A    If that's what he testified.

17  Q    Sure.  Yeah.  And not saying the voracity of those

18       statements -- not putting you on that, but if that

19       was the case would there be a disciplinary situation

20       for those people, as well?

21  A    (No verbal response)

22  Q    I'm just trying to square what you said.  I'm not

23       trying to trick you up.  Two seconds ago, you said --

24       a little bit ago you said there's no reason that a TV

25       should not be -- unmetered.
```

```
 1    A    Right.

 2    Q    My client testified that there were unmetered TVs in

 3         other people's.  So, putting those two statements

 4         together --

 5    A    Right.  And -- and what I want to say is that I can't

 6         -- I -- I wasn't there at the time.  I -- I wasn't

 7         involved in those situations, so I don't know the

 8         determination, the reasons for the term --

 9         terminations.  I -- I -- I just don't have access to

10         that information.  If there -- not terminations, but

11         whatever actions were taken or not taken against

12         those people.

13    Q    So, correct me if I'm wrong -- I'm sorry -- but there

14         are situations where an unmetered TV might not be

15         reprehensible?

16    A    I'm -- currently right now in the year that I've been

17         supporting the field directly, I'm not aware of a

18         situation where that would be allowed.

19    Q    Okay.  Sure.  So, hypothetically speaking, if a bunch

20         of people had unmetered units, that would be

21         reprehensible, based on that statement, correct?

22    A    Correct.

23    Q    Okay.  And there would be discipline that follows?

24    A    Correct.

25    Q    Are you aware of any other -- in the short time that
```

37

```
 1          you were in the -- I'm sorry, I just don't the exact

 2          dates that you testified to earlier, but not a big

 3          difference to the question -- did you deal with any

 4          other terminations?

 5   A      Yes.

 6   Q      Who got terminated?  Well, strike that.  Who -- whose

 7          termination did you deal with?

 8   A      Deshaun McGee.

 9   Q      And who fired Mr. McGee?

10   A      I can't remember the manager at the time, but it

11          would have been the manager and myself.

12   Q      Okay.  But it was not Ryan Dinsmore?

13   A      No.

14   Q      How do you know that?

15   A      'Cause I don't remember speaking to him.  I don't

16          remember it was him.

17   Q      Okay.  Why did you handle the termination with the

18          manager in this instance, in -- in the --

19   A      It was part of my responsibility with the manager to

20          do a separation.

21   Q      Sure.  Why wasn't it not -- why was it not part of

22          your responsibility with David Caudle?

23   A      I was on the separation phone call with David Caudle.

24   Q      Okay.  Earlier you testified that you -- so, maybe

25          I'm probably --
```

```
 1    A    I'm sorry.

 2    Q    There's a very good chance I'm confused here and it's

 3         fine.  So, what conversation were you not in that

 4         Amanda told you about?

 5    A    I believe there was a phone call with Amanda, Ryan,

 6         and Josh Hummel to review the specific instances with

 7         the unmetered households, the unmetered TVs in -- in

 8         the households.  I was not part of that conversation.

 9         After that conversation they made the decision to

10         separate.  And then Amanda told me the next day or

11         the morning of the separation that we were moving

12         forward with separation.

13    Q    And then you were part of the separation --

14    A    I was part of the separation, yes.

15    Q    That was you -- who was in that separation call?

16    A    It was just -- I believe it was just Ryan and myself.

17    Q    Okay.  So, was there a meeting of the minds, if you

18         will, between the three people that we discussed

19         earlier in Mr. McGee's termination?

20    A    I don't recall that Josh Hummel was involved.  Amanda

21         was certainly involved.

22    Q    Is it rare that Josh Hummel would be involved in a

23         termination?  Odd?

24    A    Not odd, but not typical, 'cause he wasn't a -- a

25         direct manager.
```

39

1  Q    I usually -- I just think of those two words as

2       antonyms, so it's kind of hard to say not one or the

3       -- but the --

4             MS. NORRIS:  You don't have to agree

5       with his characterization of the words as antonyms.

6             MR. GALLAGHER:  Yeah.  No.

7             THE WITNESS:  If -- if the direct

8       manager couldn't make it, Josh would step in.  I -- I

9       haven't had that experience.

10 BY MR. GALLAGHER:

11 Q    Sure.  That makes sense, except in this situation the

12      direct manager is available so -- and Josh still

13      stepped in, which is what's confusing me.

14 A    You just confused me.

15 Q    It seems to me that the case -- that the direct

16      manager, Ryan, was available, correct?

17 A    Right.

18 Q    And Josh also still stepped in, correct?

19 A    I don't believe Josh was on the separation phone

20      call.  Josh was not on the separation phone call.

21 Q    Okay.  Sure.  Maybe -- he was in the determination --

22 A    Yes.  Yeah.

23 Q    So, was there a determination phone call with Mr.

24      McGee?

25 A    I don't recall that because of the violation.

```
 1   Q    What was the violation?

 2   A    Fraud.

 3   Q    Okay.  What did he do?

 4   A    Stole a lot of money.

 5   Q    It's always a good idea until you get caught.

 6   A    Yeah.  $15,000.

 7   Q    So, what was the investigation into Mr. McGee?

 8   A    So, the first thing that came to our attention was at

 9        the time there was a differential paid.  It might

10        have been a regional differential paid.  The

11        operations team that keyed it in -- and -- and don't

12        hold me to these amounts --

13   Q    I won't.  I promise.  Roundabouts are fine and I

14        expect to (Inaudible) decimals.

15   A    Yeah.  If -- if it was -- it was something crazy,

16        like it was supposed to be $50 a pay period, but they

17        did -- they keyed it in as $500 a pay period.  So, he

18        was significantly overpaid.

19   Q    Okay.  And how did he -- what did he do that was a

20        violation there?  Just received money and not

21        reported it?

22   A    Received the money, not reported it, not willing to

23        pay us back.  Right after we had that conversation,

24        he went off the radar screen, and then we started to

25        investigate his T and E expense.
```

1    Q     His -- I'm sorry?

2    A     T and E.

3    Q     What's T and E?

4    A     Travel and entertainment.

5    Q     And what was there -- did you find something?

6    A     Yeah.  A cruise, real estate classes, something --

7          many things not typical of a Field Rep.

8    Q     So, was that the basis of his termination?

9    A     Ultimately, yes.

10   Q     So, did the overpayment have to do with his

11         termination or it just led to the investigation?

12   A     It led to the investigation.

13   Q     So, in the -- I'm sorry.  I'm just confused right

14         now.  Was there any -- was there any impropriety in

15         the receiving the money and not giving it back seen

16         by Nielsen?

17   A     Yeah.  He -- it was money he was not entitled to.

18   Q     I'm not the -- this is -- this is why I'm just --

19         sure, I agree with you.  Fine.  I have no reason to

20         disagree with you.  That's not how much you agreed to

21         pay him.  What I'm asking, I guess, is that, in

22         itself -- we'll just pretend that the T -- the T and

23         E, you called it, right -- that expense, she -- it's

24         fine -- is that -- was that offense of just the

25         overpayment, that alone, is there -- is there

```
 1              something wrong with that?
 2                        MS. NORRIS:  Asked and answered.
 3                        THE WITNESS:  In -- it goes to
 4              integrity.  If he didn't tell us about it and wasn't
 5              willing to talk to us about paying it back.
 6                        MR. GALLAGHER:  Sure.
 7    BY MR. GALLAGHER:
 8    Q    Okay.  So, is that a terminable offense?
 9    A    Probab -- no, because if he's employed, we would just
10         dock his pay if -- if we could arrange for a payment
11         plan, repayment plan.
12    Q    Okay.  Anybody else other than Mr. McGee and Mr.
13         Caudle?  While you were in Michigan that you -- see
14         I'll -- I'll ask the question -- so, anybody else
15         that you terminated while you were in the mid-west
16         region?
17    A    No.
18    Q    Dealt with the termination?
19    A    No.  Just those two.
20    Q    Now I believe I asked earlier -- I'm sorry, I'm
21         obviously asking again because it's -- I need a
22         little bit of testimony here -- but you said you've
23         only dealt with two harassment complaints in your
24         time at Nielsen?
25    A    (No verbal response)
```

43

```
 1    Q    Or how many harassment complaints have you dealt with
 2         in -- in your time at Nielsen?
 3    A    Probably only a couple, and it's been within the last
 4         year in the field.
 5    Q    Can you just say the last part one more time?
 6    A    Probably only a couple and only within the last year
 7         that I have been in the -- supporting the field.
 8    Q    Okay.
 9    A    The previous groups I supported from an HR
10         perspective, I never encountered harassment claims.
11    Q    Okay.  So, within the last year you've seen a couple?
12    A    Yes.
13    Q    Before that, outside of my client's, you can't recall
14         another one?
15    A    No.
16    Q    Okay.  Do you find that odd in the business?
17    A    That I didn't -- define odd.
18    Q    Sure.
19    A    'Cause --
20    Q    Do you find it odd that in your -- you said you
21         worked there 31 years, and 30 of those 31 years, not
22         one harassment complaint you saw?
23              MS. NORRIS:  I'm just gonna object.
24         There's no testimony that she was involved in HR that
25         would know about those complaints for all of those
```

```
 1            years.
 2                      MR. GALLAGHER:  Yeah.  Sure.  I'm
 3            saying she didn't see them either way though.  That's
 4            fine.
 5                      THE WITNESS:  No.  I didn't see.  No.
 6   BY MR. GALLAGHER:
 7   Q     You don't think that's odd?
 8   A     If there's nothing to complain about, no.
 9   Q     Okay.  Okay.  Based on your HR experience, would you
10         -- in your understanding of HR, would you say that
11         nobody -- you know, a company with 1,000 employees,
12         do you think for a 30-year period not one person gets
13         harassed; would you find that to be odd?
14   A     Across the whole entire company of Nielsen?
15   Q     Just I'll call it as 1,000 employees.
16   A     Yeah.
17   Q     You think somebody would be harassed at some point?
18   A     I -- I would think there would be a complaint.
19   Q     Okay.  So, in the 15 years that you worked in HR --
20         maybe 14, I'm sorry, not including the last one, but
21         you did -- not seeing a com -- a -- a -- a single
22         harassment complaint, did you find that odd?
23   A     In the groups that I supported, there was not a
24         single harassment complaint.
25   Q     Sure.  And do you think that's odd that not one
```

| 1 | | person submitted a harassment complaint to HR in 14 |
| 2 | | years?  In your groups. |
| 3 | A | I don't -- in the groups I supported, no, I don't |
| 4 | | think it's odd. |
| 5 | Q | Okay.  Were retaliation -- were there any retaliation |
| 6 | | complaints? |
| 7 | A | Pardon me? |
| 8 | Q | Were there any retaliation complaints? |
| 9 | A | No. |
| 10 | Q | Okay.  So, we can -- per the previous testimony, we |
| 11 | | can just group retaliation and harassment together? |
| 12 | A | Yes. |
| 13 | Q | Okay.  So, in your experience with Mr. McGee, we -- |
| 14 | | based -- would you say based on something you found, |
| 15 | | HR decided to investigate more -- further? |
| 16 | A | Yes. |
| 17 | Q | Okay.  And what exactly was it that you found again? |
| 18 | | I'm sorry.  I'm trying to get it very clear. |
| 19 | A | (No verbal response) |
| 20 | Q | That was the premise for the investigation. |
| 21 | A | I'm trying to think back.  I'm -- I'm -- |
| 22 | Q | Take your time, please.  Water and coffee if you need |
| 23 | | it, please, too.  I'm not trying to brow beat you or |
| 24 | | do anything like that. |
| 25 | A | So, if I remember correctly, so it was the |

```
 1            conversation -- we tried to have a conversation with

 2            him about the overpayment.  That took a couple of

 3            days to get him on the phone.  He was unwilling to

 4            talk to us.  I think he hung up on us.  At that

 5            point, we continued to try and get in touch with him,

 6            and he was not communicating with us.  So, we

 7            suspended his company credit card and started to look

 8            into the charges on the credit card.

 9   Q   Okay.  At any point did you reach out to his manager

10            to discuss this with him?

11   A   The manager was involved.  I don't remember who it

12            was.

13   Q   Sure.  Did you try to get him to talk to him -- to

14            Deshaun?

15   A   Oh, yes.

16   Q   Okay.  What happened?

17   A   He wasn't answering his manager, wasn't

18            communicating, wasn't responding.  We would have

19            tried phone calls, texts, emails.

20   Q   How many different -- when you're in the mid-west,

21            how many different managers are there?  And I'm not

22            gonna hold you to an exact number.  Just give me a

23            base estimate if you could.

24   A   I -- I don't know how many.  I didn't -- I didn't

25            support the whole entire mid-west.  It was just
```

| | | |
|---|---|---|
| 1 | | Josh's region and maybe one other group, and I don't |
| 2 | | remember who that was. |
| 3 | Q | So, just Josh's region? |
| 4 | A | Yeah. |
| 5 | Q | And what was Josh's region? |
| 6 | A | Whatever the mid-west territory was.  I don't -- I |
| 7 | | don't know the areas. |
| 8 | Q | Okay.  Do you remember about how many -- so, we |
| 9 | | figured out it's not Ryan.  I'm just trying to figure |
| 10 | | out how many managers possibly this could have been. |
| 11 | | I understand completely that it's more than likely -- |
| 12 | A | I can't even give you an estimate. |
| 13 | Q | Okay. |
| 14 | A | You know, 'cause I was just kind of thrown in.  And |
| 15 | | plus, I had the other groups that I was supporting, |
| 16 | | so. |
| 17 | Q | Sure.  What about in the -- what about the east right |
| 18 | | now; how many managers? |
| 19 | A | (No verbal response) |
| 20 | Q | And again, I'm not trying to stake you to an exact |
| 21 | | number.  If you can just give me an estimate, that's |
| 22 | | fine. |
| 23 | A | Twenty, 25. |
| 24 | Q | Okay. |
| 25 | A | Maybe a little bit more. |

```
 1   Q    And would you say the mid-west is about the same size

 2        as the east, below, a little bigger, little smaller?

 3   A    Probably bigger.

 4   Q    Okay.  Okay.  Do you remember any geographic

 5        locations about Mr. McGee, where he was or anything?

 6   A    I'm not sure.

 7   Q    Okay.  Okay.  So, what -- you said you investigated

 8        the T and E with Mr. McGee.  And what does that mean?

 9        Like, how did you do that?

10   A    We requested a -- a report through specialized

11        services, who monitors the corporate credit cards for

12        the field group.  And we got a listing of the charges

13        that he had on his card.

14   Q    And did you -- at any point did you bring the

15        allegations to Deshaun or did you just terminate him?

16   A    We tried to, but we -- we couldn't reach him.

17   Q    Okay.

18   A    He just was off the radar screen.

19   Q    So, the next contact that Nielsen had with Mr. McGee

20        was termination?

21   A    It -- a separation letter, yeah.

22   Q    Okay.

23   A    Yeah.

24   Q    How often do you fire people in your role right now?

25   A    Maybe one or two a month.
```

1   Q   And that's with the south (Inaudible) and east?

2   A   Yes.

3   Q   Is there a specific protocol that you follow in

4       termination?

5   A   As far as the actual termination?

6   Q   Process.

7   A   Of the termination?

8   Q   Yes.

9   A   We set up a call with -- with the associate, HR, and

10      the manager.  The manager is responsible for

11      communicating a separation and the reason why the

12      separation is happening.  I would jump in as HR and

13      go over benefits information, and then turn it back

14      to the manager for the questions to be asked.

15  Q   Okay.  So, what about before termination has been

16      decided, is there a protocol or a process that you

17      follow to come to that decision?

18  A   Performance planning, yes.

19  Q   And by that you mean?

20  A   Coaching, there's a performance process.

21  Q   Okay.  You're talking about the PIP that we

22      discussed.

23  A   Yeah.

24  Q   Performance Improvement Plans.

25  A   Uh huh.

1    Q    How long does a -- how long -- so you've been there

2         since 19 -- since 19 -- how long until a Performance

3         Improvement Plan is no longer part of the

4         determination factors into termination?  So, if you

5         had a Performance Improvement Plan from 1990 would

6         that still come into --

7    A    No.

8    Q    Okay.

9    A    No.

10   Q    Do you see what I'm trying to ask?

11   A    Yes.

12   Q    How long until the Performance Improvement Plan no

13        longer makes any difference in this guy's work ethic?

14   A    So, if -- if the behavior is repeated, the same

15        behavior is repeated, that the associate was on a

16        Performance Plan for, we can make a decision to

17        separate at any time after that Performance Plan.

18   Q    Okay.  So, if there is not a Performance Improvement

19        Plan in place at the time, you can't separate?

20                   MS. NORRIS:  No, that's not what she

21        testified.

22                   MR. GALLAGHER:  Sure.  I'm not --

23        sorry.  I'm --

24   BY MR. GALLAGHER:

25   Q    It just seems like -- if the Performance -- you said

| | | |
|---|---|---|
| 1 | | -- correct me, please.  Your testimony was if there |
| 2 | | is an Performance Improvement Plan in, and then |
| 3 | | something else happens again, we can terminate, |
| 4 | | correct? |
| 5 | A | If it's the same behavior.  So, if it's -- |
| 6 | Q | Sure. |
| 7 | A | -- if it's -- |
| 8 | Q | So, now the logical antecedent of that would be that |
| 9 | | not there, can't; if yes, no. |
| 10 | | MS. NORRIS:  That's a question? |
| 11 | | MR. GALLAGHER:  I'm just trying to -- |
| 12 | | honestly, there's not really a question.  I was more |
| 13 | | like agreeing that -- I'll strike this whole -- this |
| 14 | | whole line if -- if necessary.  I'm just trying -- |
| 15 | | I'm trying to be very clear with you and not trick or |
| 16 | | (Inaudible) you. |
| 17 | | MS. NORRIS:  Yeah, so that's -- |
| 18 | | MR. GALLAGHER:  We're maybe doing the |
| 19 | | opposite. |
| 20 | | MS. NORRIS:  She's looking confused. |
| 21 | | MR. GALLAGHER:  Yeah. |
| 22 | | THE WITNESS:  Yeah. |
| 23 | | MR. GALLAGHER:  Maybe you -- |
| 24 | | THE WITNESS:  So -- so if I was put on |
| 25 | | a Performance Plan of sheet quality of my work -- |

```
 1                        MR. GALLAGHER:  Sure.

 2                        THE WITNESS:  -- okay, and I improved

 3           my quality -- so, after three months I'm technically

 4           off the Plan.  But in month four if I go back to the

 5           same poor quality, we can have a discussion about

 6           separation at that point and not go through the

 7           process again.

 8                        MR. GALLAGHER:  Okay.  Sure.  Thank

 9           you.  Thank you.

10   BY MR. GALLAGHER:

11   Q    So, this is a question.  I'm not telling you.  If

12        that Plan is not in place, can you still terminate?

13   A    Yes.

14   Q    Okay.  For any reason?

15   A    Um --

16   Q    I'll rephrase.  Is it terminable offenses without --

17        first time strikes, no --

18   A    Yes.

19   Q    -- real zero tolerance --

20   A    Yes.

21   Q    Okay.  What are those?

22   A    Having to do with integrity of the household.

23   Q    Can you elaborate?  I'm sorry.

24   A    So, the integrity of the panel data has to be

25        accurate.  And panel data is the households that are
```

```
 1          hooked up to the meters.

 2    Q     Okay.  So, anybody that has -- this is a question

 3          again.  Are you saying anybody that has -- does not

 4          have -- that there's questions in their integrity for

 5          their panel data, they are terminated?

 6    A     (No verbal response)

 7    Q     And you can answer that in your own -- in your own

 8          phrasing, if you'd like.  However you'd like.  I'm

 9          not -- like again, I'm not trying to trip you.

10    A     Generally, yes.  But if the facts don't align -- I've

11          encountered a situation in which we didn't move

12          forward with separation.

13    Q     Okay.  I'm gonna ask you a couple things about that.

14          First, what situation are you talking about?

15    A     (No verbal response)

16    Q     You said, "I encountered a situation."

17    A     Yes.

18    Q     Which situation?

19    A     So, it was a situation where the household told us

20          that the membership rep provided an antenna, which

21          the policy.  It's influencing the sample because

22          you're changing what they view.  So, in that

23          situation, the man of the house wavered.  It wasn't

24          clear on whether the rep actually gave it to him or

25          what the situation was.  So, we questioned the -- the
```

1        rep.  And because we didn't feel comfortable with

2        what the man of the house was saying, we didn't move

3        forward with separation.

4    Q   Okay.  I'm gonna -- if I have to reference that, I'm

5        gonna add -- I'm just gonna reference that as the

6        antennae house.

7    A   Yes.

8    Q   In the future.

9    A   Yes.

10   Q   I don't know if I will, but just --

11   A   Yeah.

12   Q   So, and by facts don't align, that -- is that what

13       you said -- generally if the facts don't align, then

14       is -- what do you mean by that, if the facts don't

15       align?  Are you --

16   A   Well, we questioned the -- the rep --

17   Q   Okay.

18   A   -- and they didn't come forward and say that they

19       provided the antennae.  And when we went back to

20       question the man of the house, he was not as

21       committed to what he was saying.  So, we didn't feel

22       that we could go forward with separation.  There

23       might have been some kind of warning notice or -- or

24       something like that, I think we did.

25   Q   Okay.  Is that protocol to go to the rep and then go

```
 1          to the cli -- customer if there's like a factual

 2          dispute between the two?

 3    A     Yes.

 4    Q     Okay.  Would you say that my client had a factual

 5          dispute between the customer and yourself?

 6    A     (No verbal response)

 7    Q     I'll strike that.  Isn't it true Dave said -- Dave --

 8          David told you that he had no idea those T -- those

 9          TV were downstairs?

10    A     Yes.  That's what he said.

11    Q     Okay.  Isn't it true that the client, the -- the

12          household actually told you that David did not have

13          knowledge of those TVs?

14    A     I believe that's what the client said.

15    Q     Okay.  Did you not believe the client?

16    A     It -- it's not -- it's not that I didn't believe.

17          It's the facts that Ryan came back with and said you

18          walk right down the stairs and there's a TV.

19    Q     Sure.  So, wouldn't that add to someone's allegations

20          of harassment or retaliation?

21    A     What, with --

22    Q     A fact that it's two against one kind of thing.  Ryan

23          saying, yes, yes, yes.  Wouldn't that add credence to

24          David's allegation of harassment and retaliation by

25          this specific individual, Ryan Dinsmore?
```

1    A    No, I don't think so.

2    Q    No?  Why not?

3    A    Because it was fact the TV was in plain sight

4         downstairs and it was unmetered.

5    Q    Okay.  How -- how do you know it's fact?

6    A    Based on what Ryan said.

7    Q    Okay.  And what did the client tell you though?

8    A    I don't recall.

9    Q    Did the client tell you that Dave had any knowledge

10        of that TV?

11   A    I believe in that paperwork it says that, yes.  But

12        it's also part of the Field Rep's job to get into all

13        areas of the household to make sure there is no TVs

14        or devices that --

15   Q    Sure.  Okay.

16   A    -- should --

17   Q    Are you saying -- I'm sorry.  I didn't mean to cut

18        you off --

19   A    Sorry.

20   Q    No, no, no, no.  My -- it's definitely my fault.  Are

21        you done?  Do you have anything else to say?

22   A    Yeah.  Yeah.

23   Q    Thank you.  So, if I was the house -- home owner, are

24        you saying it's part of the Field Rep's job to -- if

25        I do not allow him in the basement, are you saying

| | | |
|---|---|---|
| 1 | | it's part of the Field Rep's job to get in the |
| 2 | | basement? |
| 3 | A | Yes.  But you do it in a way that's not -- you talk |
| 4 | | them through why it's important, why it's needed. |
| 5 | Q | Okay.  And still you did that, you -- say -- pretend |
| 6 | | my coaching, uh -- my fine coaching is excellent, in |
| 7 | | the 95 percentile we'll say, just you know -- |
| 8 | A | Uh huh. |
| 9 | Q | -- I did that.  Still not allowed in the basement. |
| 10 | | Are you saying it's part of his job to go in the |
| 11 | | basement still? |
| 12 | A | Not to force his way in, no. |
| 13 | Q | Okay.  So, I'm just having trouble squaring that |
| 14 | | then.  So, at any point did the client tell you that |
| 15 | | Dave had knowledge of those -- those TVs? |
| 16 | A | I never spoke to the client, so no. |
| 17 | Q | Who did? |
| 18 | A | Ryan was at the house. |
| 19 | Q | Okay.  Anybody else besides Ryan have any direct |
| 20 | | contact with anybody involved? |
| 21 | A | The -- the other people that were named that went |
| 22 | | with Ryan.  I don't -- I don't -- |
| 23 | Q | Sure.  I'll say it like -- anybody -- I'll rephrase. |
| 24 | | Anybody besides Ryan or his subordinates have any |
| 25 | | involvement with anybody involved in these |

```
 1           allegations?

 2   A       No.

 3   Q       And you just took his word?

 4   A       Took --

 5   Q       And -- sorry.  You, as HR -- not you personally, but

 6           HR just took Ryan's word?

 7   A       Yes.

 8   Q       And you might not have been involved in this region,

 9           but do you remember Dave Diamond (phonetic) was

10           fired?

11   A       No.

12   Q       Okay.  Do you have any knowledge of Dave --

13   A       No.  This is the first time I heard his name.

14   Q       Is it safe to say that before -- let's say, you know

15           -- before this whole -- before you've had any

16           knowledge of this EEOC situation, the only knowledge

17           of Dave Caudle you've had was through Ryan Dinsmore?

18   A       Yes.

19   Q       Okay.  What about -- do you know if Amanda Culver had

20           any knowledge of David Caudle besides through

21           statements and things Ryan Dinsmore said?

22   A       Amanda was the HR Director, so she would have been

23           privy to any information related to David.

24   Q       Sure.

25   A       Can I just get a water?
```

```
 1   Q    Yeah.  Yeah.  Please, please, please, please.  And I

 2        don't -- we didn't go through the -- the big list of

 3        everything, but if you ever need a break at any

 4        point, just please answer the question on the table

 5        and please have a break.  Also, I'll just -- since I

 6        already started, have you ever taken a deposition

 7        before?

 8   A    (No verbal response)

 9   Q    Have you ever taken a deposition before?  I kind of

10        mumbled there.  Sorry.

11   A    No.

12   Q    Okay.  I'll -- I'll start over with some ground

13        rules.

14   A    I heard them.

15                  MS. NORRIS:  It's a little late.

16                  THE WITNESS:  I'm okay.

17                  MR. GALLAGHER:  Just if you have any

18        -- if you're confused at any point, please just ask

19        me to rephrase or re-ask.

20                  THE WITNESS:  I think I have.

21                  MR. GALLAGHER:  Cool.  And then -- so

22        any answered questions, I'll take them as you

23        understand it.

24   BY MR. GALLAGHER:

25   Q    Have there been any questions so far that you've been
```

```
 1        confused that you need me to go over or anything?

 2   A    I -- I think I've asked you.

 3   Q    Okay.

 4   A    Yeah.

 5   Q    In your opinion, your is -- is this panel data, like

 6        how accurate is it?

 7   A    I think it depends on the moment in time.

 8   Q    Okay.  Average moment in time?

 9   A    Generally good.

10   Q    Okay.  What do you mean by good?

11   A    Meaning the standards that we need to meet.

12   Q    What are those standards?

13   A    I don't know the numbers off the top of my head.

14        It's a percentage that have to be in a market that

15        are working and performing.

16   Q    In your opinion, does Nielsen give an accurate

17        representation of a market's viewership?

18   A    I -- I believe so.

19   Q    Why do you think so?

20   A    There's a whole data compliance group behind the

21        field that determines the households that they're

22        really looking for.

23   Q    Sure.  But you don't know if there's an accurate

24        representation of a viewership in a market?

25   A    I -- I'm -- I wouldn't know 100 percent.
```

```
 1    Q    Okay.  Do you think -- no, strike that.  So, about

 2         how long after the termination of David did you close

 3         the investigation into Ryan Dinsmore (sic)?

 4    A    Within a couple -- less than a couple weeks, I think.

 5    Q    Okay.  Do you know anything about (Inaudible)?

 6    A    Along -- I believe I couldn't find anything to

 7         substantiate David's allegations.

 8    Q    Do you remember what his allegations were?

 9    A    Retaliation, harassment.

10    Q    Do you remember anything specific or factual about

11         them?

12    A    I think yes and no.

13    Q    And you're saying -- it's one of two that you ever

14         received?

15    A    (Inaudible) yes.

16    Q    I'm not --

17    A    Yeah.

18    Q    -- tripping you up or anything --

19    A    Yes.

20    Q    -- I'm just making sure that we're still -- that that

21         applies to the wo that you said earlier.  Do you

22         remember anything about the other one that you

23         received?

24    A    Not off the top of my head, no.

25    Q    Do you take retaliation and harassment allegations --
```

```
 1            do you take them seriously?
 2    A       Absolutely.
 3    Q       Okay.  And you understand the brevity of the
 4            situation?
 5    A       Absolutely.
 6    Q       So, it would be something you should remember?
 7    A       Not necessary.  I support 650 people, so --
 8    Q       Sure.  But there's only been two harassment
 9            allegations --
10    A       Yeah.  I --
11    Q       -- (talking over).
12    A       -- I don't remember the specific instance now.
13    Q       Yeah.  Sure.  My question was do you find it odd that
14            you don't remember that then concerning the brevity
15            and --
16    A       No.
17    Q       Okay.  Do you remember when the other one was or
18            around?
19    A       It would have been in the last year.
20    Q       Okay.  Were you aware of my client's illness?  I'll
21            strike that and rephr -- during the termination
22            process, were you aware of my client's illness?
23    A       Yes.
24    Q       Okay.  And what relevance did that play?
25    A       I was just aware that this was unfolding as he was
```

```
 1            coming back from a leave of absence.

 2    Q       Okay.  Do you find that pertinent to his allegations?

 3    A       No.

 4    Q       Okay.  So, you don't think it's -- so, if there are

 5            things in a house that are not correct, and you're

 6            finding out that this person's not been in this

 7            house, you know, since his absence, you don't think

 8            that's pertinent?

 9    A       Say that again.

10    Q       Sure.  Absolutely.  So, my question was, you found

11            out -- you -- you knew of his illness because you

12            knew he was coming back from leave.  And then I asked

13            you did you find the leave to be pertinent in the

14            investigation.  You said no.  So, I'm just trying to

15            clarify.  You don't think that the status of this

16            house that -- the -- the fact that he was just coming

17            back from leave on an illness has any pertinence into

18            the -- what you call it -- the integrity of his panel

19            data?

20    A       No.  Because it's the way he left the houses, his

21            homes, these homes, these two homes in question.

22    Q       Okay.  How do you know it was how he left it?

23    A       Just by Ryan's information.

24    Q       Okay.  So, if I told you that other rep techs had

25            been in the house, that would be news to you?
```

```
 1    A    I mean, I'm aware by his testimony that there were

 2         other reps.  I don't know of the timing of that.

 3    Q    Yeah.  But -- but we know that it was in the time in

 4         between leave and termination, correct?

 5    A    Uh huh.

 6    Q    And then you said that's how he left it, so that's

 7         why it doesn't matter.  That would change that,

 8         right?  If other reps had been in the house, that

 9         would change that's how -- your answer to that's how

10         he left it, right?

11    A    My understanding is that the other reps found these

12         issues with Ryan.  They were going to the household

13         and they found unmetered TVs.

14    Q    Okay.  And what's your understanding based on?

15    A    Conversation, you know, just --

16    Q    So, it's every -- I'm sorry.  Maybe this -- maybe

17         this is -- and I'll just ask this question.  Is

18         everything you're talking about right now based upon

19         the conversation you had with Ryan Dinsmore?

20    A    About the household?

21    Q    Yes.

22    A    Yes.

23    Q    And David Caudle?

24    A    Yes.

25    Q    Okay.  So, if a tech leaves a -- are you saying if a
```

```
 1              tech leaves a house and then in the process of him

 2              getting sick, it is no longer up to -- the integrity

 3              panel data goes, it is still his fault because he got

 4              sick?  Or please explain.

 5    A    No.  No.  Not because he got sick.

 6    Q    No.  Please explain.  I'm just kind of confused right

 7              now.

 8    A    So, if somebody -- so, if somebody goes out on a

 9              leave and the manager or somebody goes into the house

10              and finds things wrong or not according to policy,

11              the Field Rep was the last one there technically.

12    Q    Okay.  Sure.  Do you remember why my client's, coming

13              back from break, coming -- break -- coming back from

14              time off, why it was brought up in the first place?

15    A    Why what was brought up?

16    Q    How -- why you became aware of the information.  You

17              said during this investigation -- and correct me

18              anytime I'm wrong -- I'm sorry, I know I sound like a

19              dead -- beating a dead horse, but please at any point

20              correct me if I'm wrong -- you said that you were

21              aware of his illness because you became aware that he

22              was just coming off of a extended break, extended

23              leave; is that the case?

24    A    That's about the time that I was brought into the

25              field to -- to temporarily support this group.  So,
```

```
 1            there was conversation about how do we handle this,

 2            he's coming back from leave.  What -- what's the

 3            process?

 4    Q     Okay.  What do you mean by that?

 5    A     Like, do we allow him to come back to leave (sic)?

 6            Do we ask questions?  What do we do?  And that's

 7            where Amanda was mostly involved in.

 8    Q     Okay.  Ask questions as to?

 9    A     What happened at the household, what's going on, you

10            know, this is what -- what we found.  Can you

11            explain?  I was not part of that conversation, and I

12            don't know if that happened.

13    Q     So, you don't even know if that conversation happened

14            or --

15    A     I was -- no, I wasn't part of -- I wasn't part of the

16            call in which they put him on a suspension.

17    Q     Okay.  Ryan Dinsmore testified that the decision to

18            terminate had already been made by the time they put

19            him on suspension.  Are you saying that's not the

20            case?

21                  MS. NORRIS:  I'm gonna just object to

22            the characterization of Mr. Dinsmore's testimony.

23            But you can answer his -- his -- his question.

24                  THE WITNESS:  I mean, I think -- I

25            believe in Ryan's mind that's the direction that it
```

67

```
 1            was going.  I don't know what David Caudle could have

 2            said to make it not happen that way.

 3   BY MR. GALLAGHER:

 4   Q    Do you remember what David Caudle said?

 5   A    I wasn't on the phone call.

 6   Q    No.  I'm talking about like right now.  Do you -- do

 7        you know what David Caudle said in response to Ryan's

 8        allegations?

 9   A    I don't recall.

10   Q    You sat here through his deposition testimony?

11   A    Pardon me?

12   Q    You -- were you here during his deposition testimony?

13   A    Yeah.  But I've been sitting here for hours.

14   Q    It seems like kind of an important part in this

15        course for a guy's life.

16                    MS. NORRIS:  Objection.

17                    MR. GALLAGHER:  Stricken.  I'm sorry.

18        I apologize.  I'm gonna get a drink of water.

19   BY MR. GALLAGHER:

20   Q    So, I'm gonna ask that question.  I think I'm just

21        gonna ask it again.  If -- and your Counsel's

22        objection can stand.  I don't think I got an answer.

23        If it is the testimony of Ryan Dinsmore that when

24        David was placed on suspension pending investigation,

25        the termination decision was already made.  Are you
```

68

```
 1              saying that's not true or are you saying he's --
 2              whatever you want to say.  I'm just asking.  Is that
 3              the case?
 4    A    If that's what Ryan believes, I have no reason to
 5              question what he believes.
 6    Q    So, I'm not asking you to take his belief.  I'm
 7              asking you this statement.  If that's what he said,
 8              is Ryan right?
 9    A    In this situation?
10    Q    Yeah.
11    A    Yes.
12    Q    Okay.  So, if Ryan said the decision to terminate was
13              made the day that the -- already, when they placed
14              him on suspension, that's the case?
15    A    If that's what -- yes.  That -- yes.
16    Q    Okay.  So, when did that conversation between -- the
17              one you were not in -- was that before or after
18              suspension pending investigation?  I'm sorry about
19              the timeline here.  Sorry.
20    A    I'm sorry.  Say it one more time.
21    Q    No problem.  So, there was a -- testimony that there
22              was a conversation between the four of you, correct?
23              And then there was test -- there was a conversation
24              you were not a part of, correct?
25    A    I don't believe I was part of the call in which they
```

```
1              suspended him.

2    Q         Okay.

3    A         I don't recall that, so I don't believe I was on

4              that.

5    Q         To the best of your knowledge, how many conversations

6              were there with Mr. Caudle and --

7    A         I don't know.

8    Q         Could you give me -- maybe it -- could you just give

9              me an abstract timeline of how you understand the

10             series of events that went down with termination, Mr.

11             Caudle, and HR?  Just that --

12                       MS. NORRIS:  Starting from when she's

13             brought in?

14                       MR. GALLAGHER:  Please.

15                       THE WITNESS:  So, probably the -- the

16             minute I was brought in, there were emails about this

17             -- these discrepancies found in David Caudle's house.

18             There was communication, maybe email, you know, just

19             -- I don't remember there being a discussion that

20             David was on a leave of absence.  You know, how

21             should that be handled?  He is expected back in a few

22             days.  So, the decision was made to make the -- let

23             him come back to work, to have that conversation with

24             him about the discrepancies.  Again, I wasn't part of

25             that, in which he was put on a suspension.
```

```
 1                          MR. GALLAGHER:  Okay.

 2    BY MR. GALLAGHER:

 3    Q    Okay.  So -- okay.  And you have knowledge of the

 4         conversation because Amanda -- so, I'll strike that.

 5         I believe you testified earlier, and please correct

 6         me, you said you knew that that conversation happened

 7         because Amanda told you that we were going forward?

 8    A    Right.

 9    Q    So, are you just assuming that the conversation --

10         that they must have talked about it or did she make

11         any statements that particularize that there had been

12         further discussion?  Does that make sense?

13    A    I don't -- I don't know what discussions were have --

14         were had.  I got the word -- I -- I was informed that

15         we were going forward with separation.

16    Q    Okay.  Okay.  So, you -- I'm very confused now.  I'm

17         sorry.

18    A    I was really -- honest and truly, I was brought in,

19         you know, from supporting completely different

20         groups, with different policy -- not different

21         Nielsen policies, but they just operated differently.

22         Field has more structured policies because it's

23         related to the sample.  So, I was really brought in,

24         you know -- Ryan had already found information in

25         which there were discrepancies in the household.  And
```

71

```
 1           the bottom line is, I was there just basically,

 2           ultimately to do the separation.  And then I got

 3           David's phone call after it.  That's -- that's the

 4           truth.

 5    Q      Do you think David was retaliated against?

 6    A      No.

 7    Q      Do you think he was given an opportunity to explain

 8           himself?

 9    A      About the incident that he was separated for?

10    Q      Yeah.

11    A      I don't know if in the suspension call there was a

12           discussion with David.

13    Q      Okay.  So -- okay.  So, in this -- I'll give you my

14           copy.  You can like -- so (Inaudible) relating to its

15           relation to your 26 that --

16    A      Yes.

17    Q      I'm just giving it back to you.  So, I think you have

18           a copy.

19    A      I do.  Thank you.

20    Q      Sure.  (Inaudible) yourself.  There's some more on

21           the back, so take your time.  So, I think (Inaudible)

22           make representations that (Inaudible) send any

23           witnesses or any information to you (Inaudible)?

24    A      Yeah.  I think I responded.

25    Q      Yeah.  Did he?
```

```
 1    A    He may have.  That may -- yeah, he sent me another

 2         situation.  Yeah.

 3    Q    So, is it your testimony that everything in there was

 4         looked into?

 5    A    Yes.  Based on the information that I received from

 6         Ryan.

 7    Q    And it's also your testimony that -- hold on.  So,

 8         that's separate information that you received from

 9         Ryan, right?

10    A    Define that.

11    Q    Not the same.

12              MS. NORRIS:  Well, define that.  You

13         said, "That's separation information from Ryan."

14         She's saying --

15              MR. GALLAGHER:  Twenty-six.

16  BY MR. GALLAGHER:

17    Q    The document I just handed to you.

18    A    Right.

19    Q    Sure.  That is separate information --

20    A    Uh huh.

21    Q    -- then?  What -- what Ryan gave you; is that the

22         case?

23    A    Well, I believe Ryan talked about the Wer -- Wershone

24         (phonetic) -- I'm not saying that name correctly, but

25         --
```

```
 1    Q    Well, yeah, that's fine.  Sure.  But the actual --
 2         like we can both agree that if Ryan and Dave agreed
 3         that that happened, Dave would have been fired,
 4         right?
 5    A    Uh huh.  Yes.
 6    Q    So, that's different information than Ryan gave you,
 7         correct?
 8    A    (No verbal response)
 9    Q    It's not the same.  And please read it over.  I'm not
10         trying to trip you.
11                   MS. NORRIS:  When you get a chance,
12         can we take a break?  You can wait -- you can get the
13         answer, of course.
14                   MR. GALLAGHER:  Just let me finish
15         this --
16                   MS. NORRIS:  Yes.  That's fine.
17                   MR. GALLAGHER:  -- string and then we
18         will.
19                   THE WITNESS:  Okay.  So, what was your
20         question again?
21    BY MR. GALLAGHER:
22    Q    So, you said you investigated, I believe -- you
23         investigated based on information that Ryan gave you.
24    A    Uh huh.
25    Q    I'm asking you, is that different information than
```

1          Ryan gave you?

2                         MR. GALLAGHER:   Would you mark that

3          too?  Would you mark it?  Thank you.

4                         I'm gonna mark that as Exhibit One, if

5          that's okay with you.

6                         MS. NORRIS:  You want to mark it --

7          marked as an exhibit in this dep?  That's fine.

8          Yeah.  Sure.

9                         (WHEREUPON, Exhibit Number One was

10         marked for the record at 4:58 p.m.)

11                        THE WITNESS:  It's different

12         information.

13  BY MR. GALLAGHER:

14  Q    Okay.  Would you say it's vastly different or kind of

15        similar?

16  A    Somewhere in that it's related to the -- you know,

17        the same household.

18  Q    Sure.  But how about the factual information actually

19        involved there?  The series of events and slash

20        (Inaudible) would you say that is vastly different or

21        sim -- or similar to Ryan's?

22                        MS. NORRIS:  Or any other

23        characterization that you think is appropriate.

24  BY MR. GALLAGHER:

25  Q    Sure.  And please explain that characterization.

1    A    I mean, they just have different versions of things.

2    Q    Yeah.  Absolutely.  And that's all I'm trying to get.

3         I'm not trying to -- so they're different versions of

4         -- okay.  Are they close to each other or are they

5         vastly different?  And that's just your opinion, you

6         know.

7                        MS. NORRIS:  Again, you don't --

8         you're not limited to the two choices he gives you.

9                        MR. GALLAGHER:  Absolutely not.  It's

10        a spectrum between.  You can say anything in between

11        there too.

12                       THE WITNESS:  So, from my perspective

13        --

14                       MR. GALLAGHER:  That's all I can ask.

15                       THE WITNESS:  Okay.  So, from my per

16        -- perspective, Ryan's focused on the -- the -- I'm

17        sorry, I can't even think anymore --

18                       MR. GALLAGHER:  I'm sorry.

19                       THE WITNESS:  -- Ryan's focused on the

20        devices that are not metered.  Okay.  That's my

21        perspective.  David brings up other things, like the

22        amount of money that was given to the household, the

23        fact that he's asking us to speak to these

24        households.  So, they're about the same subjects, but

25        they're different.

1                    MR. GALLAGHER:  Sure.

2    BY MR. GALLAGHER:

3    Q    And in there does he explain why those aren't

4         metered, those two -- those weren't metered?

5    A    I mean, according to what he's writing in here, she

6         admitted to lying about how many TVs she had.

7    Q    And that would be an explanation of why something was

8         not metered?  That's a question.  Sorry.  And would

9         that be an explanation as to why something is not

10        metered?

11   A    Yes.

12   Q    Okay.  I'm gonna bring you back real quick.  You just

13        said essentially -- and I'm gonna paraphrase your

14        testimony, so please again.  You -- you said Dave's

15        essentially focused on things that Nielsen or Ryan

16        were doing, and then Ryan was more focused on these

17        weren't metered; is that a fair statement of your

18        testimony?

19   A    Dave was focused on a few things.  Ryan, in my

20        opinion, is more focused on the unmetered TVs.

21   Q    Sure. And could I -- would -- in your opinion, is it

22        a fair reason for that, that this was in response

23        specifically to Ryan -- complaining about retaliation

24        or harassment from Ryan?

25   A    I'm sorry.  Say that one more time.

```
 1    Q    Sure.  You -- so Ryan's test -- Ryan was focused on
 2         metered TVs and then termination.
 3    A    Right.
 4    Q    This was retaliation and harassment.
 5    A    Right.
 6    Q    Does that -- is that -- does that square that to you?
 7         Does that make sense to you then, why they'd be
 8         different in that case, in the paraphrase of your
 9         paraphrasing?
10    A    Yes.  Yes.
11    Q    Okay.
12    A    Yes.
13    Q    So, these -- these different allegations, were these
14         ever looked into or was it just Ryan's that were
15         looked into?
16    A    I'd have to go back to my notes.
17    Q    Okay.  But off the top of your head, can you remember
18         any of those allegations ever looked into?
19    A    (No verbal response)
20    Q    From your memory in preparation for this deposition.
21    A    I can tell you we did not call the household.
22    Q    Any of the households?
23    A    The two main ones in question.
24    Q    You did not?
25    A    We did not.
```

1    Q    Why?

2    A    I did not.  I did not.

3    Q    Okay.  Did you ever call Dave?

4    A    No.  Well, I'm sorry.  I may have returned a phone

5         call.

6    Q    Okay.  Do you remember that phone call?

7    A    I -- vaguely.  I -- I mean I think he called and left

8         a message, a very long message, and I called him back

9         --

10   Q    Sure.

11   A    -- and asked him to email me any details.

12   Q    Okay.  Did you ever make representations to Dave that

13        Ryan handled termination?

14   A    I don't know what -- that Ry -- Ryan handled the

15        termination?  I don't know what that means.

16   Q    Sure.  Did you ever make -- do you remember making

17        any representation to Dave that Ryan was in charge of

18        this termination?

19   A    I don't -- I don't believe so.  I don't think I would

20        have done that.

21   Q    Okay.  Do you think calling the households would have

22        been important to -- just to square their two

23        allegation -- their two different stories?

24   A    Again, being kind of thrown into the field, I was

25        working with Amanda and I was not instructed to call

1          the households.

2    Q     Sure.  That's all I'm asking.

3    A     Okay.

4    Q     I'm asking you, based on your experience as a HR

5          person, if you have a story here and a story here,

6          and the allegations are -- are different based on a

7          household, do you -- do you think it's important that

8          that person should have been called?

9    A     As a last resort.  We generally don't call the

10         households.  As a last, last, last resort.

11   Q     So, termination is a resort before you call the

12         household?

13   A     (No verbal response)

14   Q     I -- I --

15   A     In this situation, yes.

16   Q     Do you think that it would have been useful to talk

17         to the -- the homeowners?

18   A     At the time, in my newness to the field, I didn't

19         think twice about it.  So, it wasn't -- it wasn't a

20         course of action for me.

21   Q     Do you think it would have been in the investigation?

22   A     In the decision of termination?

23   Q     In either investiga -- in -- I'm not sure that we've

24         established there was any sort of investigation into

25         the termination, so I'm talking about harassment

```
 1            right now.  I don't know.

 2    A       Do you think it would have been unhelpful?

 3    Q       If he's claiming harassment and retaliation by Ryan,

 4            I don't know what information the household would

 5            have provided.

 6    A       Sure.

 7    Q       Do you think the fact that Ryan gave -- if Ryan gave

 8            $850 to a -- to a customer to make them happy, do you

 9            think that's pertinent to a harassment and

10            retaliation claim if -- I'll strike that.  Let me

11            start over.  I'm sorry.  So, do you think it is

12            pertinent if Ryan gave $850 to a client that he

13            kicked off of Nielsen's demographic that was also a

14            main complainant -- complainant against Dave in

15            termination?  Do you think that information would be

16            relevant to his harassment complaint?

17    A       I don't know.  Me being new to the field, I don't --

18            I didn't know at the time what amounts were

19            appropriate or inappropriate.

20    Q       Sure.  Did you ask anybody?

21    A       I may have asked Amanda, but I don't recall.

22    Q       Okay.  Is $850 appropriate?

23    A       Today?  With policies and procedures today?

24    Q       Ever.  In Nielsen's history.

25    A       I don't know that.
```

1    Q    Today?

2    A    To be honest with you, I don't know what the

3         households get on a regular basis.

4    Q    Okay.  So, how does your newness to the field that

5         you explained, that you didn't know before, because

6         your newness to the field -- how does that --

7    A    I wouldn't think to question that.

8    Q    I thought you just -- so, did you ask Amanda Culver

9         or no?

10   A    I think I -- I -- I -- I honestly don't recall.

11                   MS. NORRIS:  I'm still ready for my

12        break.

13                   MR. GALLAGHER:  Yeah.  Sure.  I would

14        -- thought we could have got one too.  I just -- I

15        gotta get through this.

16                   MS. NORRIS:  Okay.

17                   MR. GALLAGHER:  I'm sorry.

18   BY MR. GALLAGHER:

19   Q    So, okay.  I'll try again.  Do you think that it

20        would be relevant information that the person that

21        they're complaining of pays $850 to a client who he

22        also kicks off the demographic in a retaliation and

23        harassment complaint?  I mean, that person that they

24        kicked off the demographic was one of the -- one of

25        the households that the complaint -- that was in the

```
 1              complaint (inaudible) complaint.  Do you think that's

 2              relevant information?

 3    A    So, I'm gonna ask it my way, 'cause I don't know what

 4              you're trying to get at.

 5    Q    Please do.

 6    A    Are you trying to say that Ryan bribed the household?

 7              Is that what you're trying to say?

 8    Q    No.  I'm trying to say if Ryan bribed the household,

 9              would that be relevant?

10                        MS. NORRIS:  Well, that -- that

11              assumes a fact not in evidence regarding the $840.

12                        MR. GALLAGHER:  Sure.  Over $700,

13              we'll say.

14                        MS. NORRIS:  You can --

15                        MR. GALLAGHER:  (Inaudible) --

16                        MS. NORRIS:  -- you can -- you can

17              answer the question of if he bribed the household,

18              without assuming that the act at issue is bribing the

19              household.

20                        MR. GALLAGHER:  I'm not gonna -- let's

21              strike that.  'Cause bribery im -- imputes other

22              things --

23                        MS. NORRIS:  Yes.  Exactly.

24                        MR. GALLAGHER:  So --

25                        THE WITNESS:  Sorry.
```

```
 1                        MR. GALLAGHER:  -- it's not my word
 2            and I don't know -- please don't --
 3                        THE WITNESS:  I'm just trying to
 4            understand what -- what you're getting at.
 5                        MR. GALLAGHER:  No doubt.
 6                        THE WITNESS:  I don't understand.
 7    BY MR. GALLAGHER:
 8    Q    So, this is what I'm trying to say.  Essentially, you
 9         didn't -- none of these households were called.  You
10         said you didn't know if that had anything --
11    A    I did not call the households.  I -- I -- I don't --
12         I didn't call the households.
13    Q    Sure.  And then you said that you didn't know -- or
14         you -- I'll just ask you again then and we'll see if
15         you -- do you think that there's information in there
16         that would have been relevant if you would have
17         called the households to either the termination or
18         the harassment and retaliation?
19    A    And I think I'm gonna say the same thing.  I don't
20         know.  Okay.  I mean, I was working with Amanda under
21         -- Amanda guiding me, and I wasn't guided down that
22         avenue.
23    Q    Okay.  So, then this is how we got here last time,
24         but I'll ask you again.  So, you -- do you think that
25         it would have been unhelpful to call the households?
```

```
 1   A   Again, I think I'm gonna say the same thing.  If

 2       there -- if -- if there's a retaliation and

 3       harassment -- I'm getting confused, so bear with me.

 4   Q   No, that's fine.

 5   A   I don't know.  I don't know what the households are

 6       provided.  I just don't know.

 7   Q   Doesn't -- isn't that reason to find out?  Wouldn't

 8       that be a reason to call the household and find out

 9       what they could provide?

10   A   I -- I -- at the time I don't know -- I didn't know

11       the standard protocol to call the household or not.

12   Q   Sure.

13   A   So, do you want me to say yes?  I'll say yes.  I

14       don't know.

15                   MS. NORRIS:  No, don't -- don't --

16                   THE WITNESS:  I don't --

17                   MS. NORRIS:  -- do that.  Do not give

18       --

19                   THE WITNESS:  -- I don't know --

20                   MS. NORRIS:  Stop.  Stop.  Wait.  It's

21       not your job to figure out what he's getting at, and

22       it's also not your job to make him happy or unhappy

23       with your answer.  It's your job to answer it

24       directly.

25                   MR. GALLAGHER:  Let's take a break.
```

```
 1            Let's take five.

 2                        MS. NORRIS:  Okay.

 3                        MR. GALLAGHER:  Is that fine?

 4                        MS. NORRIS:  That's fine.

 5                        MR. GALLAGHER:  Please -- I'm really

 6        not trying to be --

 7                        THE WITNESS:  I know.

 8                        MR. GALLAGHER:  -- I'm really not.

 9                        MS. NORRIS:  Can you tell me where the

10        restroom is?  I have not --

11                        MR. GALLAGHER:  Yeah.  Come on.

12                        MS. NORRIS:  -- made that trip.

13                        (WHEREUPON, a brief recess in the

14        proceeding was taken at 5:11 p.m.)

15   BY MR. GALLAGHER:

16   Q    All right.  Sorry to bring us back here.  I'm -- I'm

17        sure you (Inaudible) time.

18   A    Yup.

19   Q    And I'm just gonna try to get a clean, straight-line

20        record on this and we'll move on.  So, I think it's

21        been established, do you agree, there are different

22        allegations in there compared to the allegations that

23        Ryan gave you, correct?

24   A    Correct.

25   Q    Okay.  Now, do you think that in your opinion, just
```

```
 1            your opinion, based on everything you know today as

 2            an HR -- as -- 15 years in HR, right now, do you

 3            think it would have been helpful to contact the --

 4            the homeowners?

 5    A      Regarding what situation?  Because we agreed that --

 6    Q      Let's start regarding the termination first.

 7    A      No.

 8    Q      Okay.  Why is that?

 9    A      Because Ryan had detailed information on what he

10            found in the household.

11    Q      Okay.  And do you think that you could have

12            corroborated that information by contacting the

13            homeowners?

14    A      I think -- I didn't feel the need to because Ryan was

15            very clear on what he found.

16    Q      Okay.  And did Dave, at any point, make allegations

17            that were not consistent with Ryan's?

18    A      (No verbal response)

19    Q      Maybe in Exhibit One, for instance?

20    A      He has different information in there, yes.

21    Q      Sure.  So, do you think that it would have been

22            useful to corroborate Ryan's allegations?

23    A      Ryan's allegations?

24    Q      Yes.

25    A      Of the unmetered TVs.  Is that what you're asking?
```

```
 1   Q     These allegations for the basis of termination. We've
 2         established that --
 3   A     No.  It was clear.
 4   Q     Okay.
 5   A     There were unmetered TVs.  It's -- it's an impact to
 6         the sample, which causes Nielsen a lot of money, and
 7         penalties, and reprocessing.
 8   Q     Okay.  So, even to find out if their TVs were, in
 9         fact, unmetered?
10   A     I'm sorry.  Say that again.
11   Q     To -- so corroborate means to confirm essentially?
12   A     Right.
13   Q     So, to confirm the allegations that Ryan put forward,
14         would it have been useful to contact the homeowners?
15                    MS. NORRIS:  Asked and answered.
16                    MR. GALLAGHER:  I'm not --
17                    MS. NORRIS:  Asked and answered.
18                    MR. GALLAGHER:  I don't think it was,
19         but --
20                    THE WITNESS:  I'm gonna say no,
21         because Ryan's information was clear.
22   BY MR. GALLAGHER:
23   Q     Okay.  Sure.  So, that's fine.  And -- so your
24         testimony is it does not help to confirm something by
25         contacting the person that is -- that is at issue.
```

```
 1   A    (No verbal response)

 2   Q    Okay.  Why do you think that would not be helpful?

 3   A    Because of what Ryan found, that there were unmetered

 4        TVs.

 5   Q    Sure.  So --

 6   A    He -- he supplied enough information, enough

 7        specifics.  He brought it forward.  The -- there was

 8        an integrity issue.

 9   Q    Okay.  And so you don't think it would be -- it would

10        be un -- so do you think it would be unhelpful if

11        more information was gathered?

12   A    No.  Because it's a yes or no question.  If -- if the

13        TVs are metered or not metered -- if they're not

14        metered, that's -- that's a reflection of the

15        integrity of the data of the panel.

16   Q    Sure.  But we've already -- you've -- you've

17        testified that there are situations where an

18        integrity issue might not be a terminable offense,

19        correct?

20   A    Yes.

21   Q    So, I -- I'm confused as to your answer, I guess.

22   A    This is back and white.  Either it's metered and

23        plugged in or it's not.

24   Q    But see, that goes against what you just said right

25        before.
```

89

```
 1                              MS. NORRIS:  Objection.

 2                              MR. GALLAGHER:  Okay.  That's fine.

 3    BY MR. GALLAGHER:

 4    Q    So, there are situations where integrity issues are

 5         not terminable offenses?

 6    A    Yes.

 7                              MS. NORRIS:  Asked and answered.

 8                              MR. GALLAGHER:  Okay.

 9    BY MR. GALLAGHER:

10    Q    Is that an integrity issue that you -- that Ryan

11         alleged?

12    A    Yes.

13    Q    Okay.  Now, it -- what specifically about that

14         integrity issue that Ryan alleged makes it a one-time

15         terminable offense?

16                              MS. NORRIS:  Objection.  Assumes facts

17         not in evidence.

18                              THE WITNESS:  The unmetered TVs.

19    BY MR. GALLAGHER:

20    Q    Okay.  So, is there any situation where a TV might

21         not be metered and it is not a terminable offense?

22    A    Not that I could say that I know of.

23    Q    Sure.  So, when we talked earlier, I don't let -- we

24         -- we did that whole thing about me not letting

25         someone in the basement.  If there was a TV down
```

```
 1            there, the person would get fired?  Is that your

 2            testimony?

 3   A    Are you asking would they or could they?

 4   Q    Would they?

 5   A    Yes.

 6   Q    Okay.  So, despite the fact Ryan -- so, if I told you

 7            Ryan Dinsmore testified last week that you -- that

 8            people can't go down -- if -- if you're not allowed

 9            to go downstairs, they don't -- they cannot force

10            their way down there, and there's nothing -- there's

11            no -- there's no performance issues in that

12            situation.  You're saying Ryan's wrong?

13   A    Say that again.

14   Q    Sure.  If I told you that Mr. Dinsmore testified last

15            week that there is no way to -- that there's no

16            performance issues when -- if a homeowner is refusing

17            to allow somebody downstairs, you're saying Ryan is

18            incorrect?

19   A    I believe if they can't confirm either way if there's

20            no TVs, I'm not sure that it would be part of the

21            sample.

22   Q    Sure.  But you just said it's a terminable offense.

23            It's -- it's a terminable offense.

24   A    Because he found TVs that were not metered.  He was

25            able to go downstairs along with somebody else.
```

91

1    Q    Who was?

2    A    Ryan went downstairs.  One -- there's one household

3         in which she speaks of.  He went straight down the

4         stairs and there was a TV sitting right there

5         unmetered.

6    Q    Okay.  What household is that?

7    A    I -- I don't -- I don't know.  One of these.

8    Q    Okay.  Who told you that?

9    A    Ryan.

10   Q    Did you corroborate that statement in any way with

11        anybody?

12   A    No.

13   Q    You took what he said as true?

14   A    Yes.

15   Q    And you don't think it would have been useful to call

16        the homeowner to corroborate that statement --

17   A    No.

18   Q    -- when someone is -- I'm gonna repeat that.  So, you

19        don't think it would have been useful to call the

20        homeowner to corroborate that statement when someone

21        is alleging the opposite?

22   A    No.

23   Q    There's no situation you can think of in the world

24        where an unmetered TV would not be a terminable

25        offense?

```
 1   A      Not that I'm aware of or I have come across.

 2   Q      So, what -- in our hypothetical earlier and I own the

 3          house, and I tell you don't -- you're not allowed

 4          downstairs, what does Nielsen suggest you do?

 5   A      I'm not trained as a Field Rep or a Membership Rep,

 6          so I don't know.  It's a -- I -- I would only be

 7          guessing.

 8   Q      Sure.  But consistent with your earl -- with your

 9          testimony I think two questions ago, about 20 seconds

10          ago, if I'm the homeowner and I say, "You cannot go

11          downstairs", and there is a TV down there, that is a

12          terminable offense?  That person gets terminated?

13                      MS. NORRIS:  There's a difference

14          between a terminable offense and a person getting

15          terminated.

16                      MR. GALLAGHER:  Sure.

17                      THE WITNESS:  If the TV's unmetered

18          and it's -- should be part of the sample, yes.

19   BY MR. GALLAGHER:

20   Q      That person gets terminated?

21   A      Yes.

22   Q      Even though they're not allowed in the basement?

23   A      Yes.  It's affecting the sample.

24   Q      Okay.  And if I told you that Ryan Dinsmore testified

25          to the opposite of that, you would be telling me that
```

93

```
 1              Ryan Dinsmore's incorrect?

 2    A    In my current experience, in my role right now, I --

 3         that's the information I'm providing you.

 4    Q    Okay.  So, you're train -- so are you trained that

 5         anytime anything's not metered, to terminate?  Is

 6         that what you're saying?  I'm sorry.

 7    A    If it's supposed to be metered and it's not metered,

 8         yes.

 9    Q    When would it not supposed to be metered?

10    A    I don't -- I don't know.

11    Q    Don't you think that's important to know if you're in

12         charge of termination?

13                   MS. NORRIS:  There's no testimony that

14         she's in charge of termination.

15                   MR. GALLAGHER:  Sure.

16  BY MR. GALLAGHER:

17    Q    In HR, is one of your roles to terminate?

18                   MS. NORRIS:  She's testified about

19         what role is.  She's testified quite a bit --

20                   MR. GALLAGHER:  So then --

21                   MS. NORRIS:  -- about what her role is

22         and where she fits --

23                   MR. GALLAGHER:  -- (Inaudible) --

24                   MS. NORRIS:  -- in the decision, and

25         what she said on the call.
```

```
 1                        MR. GALLAGHER:  Sure.

 2    BY MR. GALLAGHER:

 3    Q     So, in HR, is one of your roles to terminate people?

 4    A     Separations, yeah.

 5    Q     Okay.  Thank you.  So, don't you think that knowing

 6          the rules of what -- when and when not to meter

 7          something would be important in your role?

 8    A     I haven't come across a situation where an unmetered

 9          TV is okay.  I -- I haven't been confronted with the

10          circumstance that it would be okay.

11    Q     Sure.  Has anybody -- in your role as HR, do people

12          ever come to you with okay situations?

13    A     I think we talked about the antennae issue.

14    Q     Okay.  So, the only time you can think of that

15          somebody came to you and they were not terminated?

16    A     In my experience in my year in the field, yes.

17    Q     Year in the field.  About 15 years in HR.

18    A     I wasn't part of the field, so --

19    Q     What's the difference there?

20    A     So, the field is responsible for the same that feed

21          into the ratings.  Nielsen has other businesses, like

22          the Ad Intel business, the entertainment business.

23          That doesn't -- it -- it -- there are more operations

24          that I supported.

25    Q     So, when did you get put in the field?
```

```
 1                        MS. NORRIS:  Asked and answered.

 2                        THE WITNESS:  A year ago.

 3   BY MR. GALLAGHER:

 4   Q    So, you went -- you went in the field when you had

 5        involvement with my client in his termination?

 6   A    I was temporarily put in the field to help out in a

 7        situation where somebody was on a leave of absence.

 8   Q    Is this your first experience in the field?

 9   A    Yes, it was.

10   Q    Do you have any training to go to the field?

11   A    (No verbal response)

12   Q    You're basing -- your testimony is that the reason

13        that a lot of things, you didn't have experience in

14        the field.  So, did you have any training in the

15        field?

16   A    Training on field policies and procedures or training

17        -- HR training?

18   Q    Training.

19                        MS. NORRIS:  Well, she --

20                        THE WITNESS:  I don't know what you --

21                        MS. NORRIS:  You're not gonna tell her

22        which?

23                        MR. GALLAGHER:  Either.  Both.

24        Training.

25   BY MR. GALLAGHER:
```

```
 1   Q    Specifically, for this position, you're saying you

 2        filled in a temporary role that was not part of your

 3        position essentially, because you just started the

 4        field a year ago.  So, I'm asking you if you had any

 5        training to facilitate that transition?

 6   A    I had high level training on where policies and

 7        procedures were, but I worked closely with Amanda --

 8   Q    Sure.  What exactly were those policies and

 9        procedures?

10   A    They're specific field policies --

11   Q    Name one.

12   A    Know -- I don't --

13   Q    So, what high level training did you have?

14   A    Just where the policies and procedures were.

15   Q    And where are they?

16   A    Online, yes, now.

17   Q    So, what training?  They just sat you down and said,

18        "Go online.  This is where the policies are"?  What -

19        - what happened.  Tell me.

20   A    Well, they -- they directed me to field policies and

21        procedures.  And the bottom line is I worked side-by-

22        side with Amanda.

23   Q    Sure.  So, was there any training?

24   A    Other than direct me to policies and procedures, no.

25   Q    So, what's the difference between field and not
```

```
 1          field?  So, like what kind of training -- I believe

 2          you asked me -- you answered a bit ago that, "I've

 3          only been in the field a year."  So, what information

 4          in this year have you gained that you wouldn't be

 5          able to answer other -- the other questions now?

 6   A      So, more familiar with specific field policies and

 7          procedures.  I am aware of, you know, some of the

 8          training process, you know, specialized services, in

 9          which we give the reps cars to use in their jobs.

10   Q      So, can you name one of those policies?

11   A      No.

12   Q      Take a second, look that over.

13                     MS. NORRIS:  Are we marking this one

14          or not?

15                     MR. GALLAGHER:  Yeah.  This is gonna

16          be Exhibit Two.

17                     (WHEREUPON, Exhibit Number Two was

18          marked for the record at 5:41 p.m.)

19   BY MR. GALLAGHER:

20   Q      So, are you familiar with this document?

21   A      Yes.

22   Q      And what is it?

23   A      Investigation Summary.

24   Q      Is this part of the document you referenced earlier

25          that you'd have to reference is you wanted to --
```

1  A   Yes.

2  Q   Is there any other documents that you would want to

3      reference?

4  A   (No verbal response)

5  Q   So, can you tell me if you looked anything at all in

6      your investigation into my client's harassment and

7      retaliation claim besides speak with Ryan Dinsmore?

8  A   That was it.

9  Q   What was the conclusion?

10 A   There were no findings.

11 Q   And what did you base your conclusion on?

12 A   The information that I gathered in this document.

13 Q   And just to be clear, that was -- what information

14     did you gather?  And I'll just strike that.  So, to

15     be clear, you're referring to the conversation you

16     had with Ryan Dinsmore?

17 A   Yes.

18 Q   Nothing else?

19 A   Nothing else.

20 Q   So, I'm just gonna reference you to Exhibit One.  Can

21     you -- sorry, I didn't mean to -- empty water bottles

22     -- can you -- what's the date on the -- on the most

23     recent email Dave sent you?

24 A   Uh --

25 Q   It's the first page.

```
 1   A   This -- most recent?

 2   Q   Or --

 3   A   October 18th.

 4   Q   I apologize.

 5   A   Yeah.

 6   Q   If I said it wrong.  But just --

 7   A   October 18th, 2016.

 8   Q   Okay.  Was any of that information included in this?

 9   A   No.

10   Q   Did you go back to supplement any kind of documents

11       or anything with that information he provided you?

12   A   No.

13   Q   Did you ask him for witnesses and anything?

14   A   I believe I asked him for additional information.

15   Q   Okay.  Did you plan to supplement this or -- why did

16       you ask him for information if you didn't plan on

17       using it or --

18   A   I mean, it's just standard.  If he has any additional

19       -- anybody has any additional information, to send it

20       to me.

21   Q   Yeah, he did though.  He sent it to you.  What did

22       you do with that information?

23   A   I don't recall.  This situation from one and a half

24       years ago prior to this?

25   Q   No.  The first page is -- I'm talking about this --
```

1         Exhibit B, it seems like it was traded or something

2         here on 10/12.  It seems like he followed up with

3         some supplemental information with you.  And it

4         doesn't seem like any of that information made it

5         (Inaudible).  I'm just wondering if you could explain

6         why.

7   A   I don't know why.

8   Q   Do you think you gave him a fair shot?

9   A   For the separation?  Yes.

10   Q   What about the harassment and retaliation?

11   A   I don't know.

12   Q   Why don't you know?

13   A   Because I don't recall what was done, and I don't

14         recall the findings.

15   Q   So, that -- that just doesn't -- that's not

16         consistent with your earlier testimony.  Your earlier

17         testimony was that there was a document that you

18         needed to reference to figure out what was done with

19         your work on it.  That's this.  Then there's further

20         testimony that that was this document.  And then

21         other -- there were no other documents, right?

22         That's what you just testified to.

23   A   This is the only document that I'm aware of.  So, at

24         the time of that question then, I might have gotten

25         the separation confused with these other issues.

```
 1   Q   Sure.  So, is there another document that --

 2   A   Not -- not that -- not to my knowledge.

 3   Q   Okay.  So, do you think you gave him a fair shot?

 4       And I don't understand how -- everything you need is

 5       front of you, based on your own testimony.

 6   A   A fair shot on the separation?  Yes.

 7   Q   Fair shot on everything; term -- on harassment and

 8       retaliation?

 9   A   Yes.

10   Q   Okay.  Why?

11   A   Because what Ryan found was factual.  It was found by

12       somebody else.  He got into the home, he metered the

13       TVs --

14   Q   So --

15   A   -- the TVs were unmetered.  I --

16   Q   -- that's -- that's all pertinent to her harassment

17       and retaliation claim?

18   A   I -- I don't understand where there's retaliation.

19   Q   Did you ask Dave?

20   A   I don't recall.

21   Q   Well, did you contact him?

22   A   I did contact him.

23   Q   Okay.

24   A   But I don't remember if we discussed that.

25   Q   Did you write it down?
```

```
 1   A   I think I wrote that there was a phone call, but --

 2   Q   Where's that?

 3   A   I don't know.

 4   Q   If you can find that on there, let me know.  I'll

 5       wait.

 6   A   I -- I'm not readily seeing it.  That I -- I -- I'm

 7       not readily seeing it.

 8   Q   Oh, I can wait until you read the whole thing then.

 9   A   I don't see it.

10   Q   Would a phone be something you -- would that be

11       something you memorialize in -- in a document such as

12       this?

13   A   Probably, yes.

14   Q   Okay.  And it's not in this?

15   A   Correct.

16   Q   So, I think you talked about the termination.  But

17       did you -- this is just for the harassment and

18       retaliation.  Did you contact anybody at all

19       whatsoever, including the Pope all the way down to

20       your preschool consultant about anything to do with

21       David's complaint of harassment and retaliation

22       besides Ryan Dinsmore?

23   A   No.

24   Q   Okay.  And you think that's a fair shot con -- and

25       you think Dave -- you gave Dave a fair shot
```

```
 1            considering the antagonist in -- in David's complaint

 2            is the person that you got every piece of information

 3            from in your investigation?

 4    A       Yes.

 5    Q       Okay.  (Inaudible)?

 6    A       Pardon?

 7    Q       (Inaudible) a crime?

 8    A       No.

 9    Q       If you were accused of a crime, would you want

10            somebody other than the person accusing you of that

11            to testify?

12    A       Yes.  Of -- depending on the circumstances.  Yes.

13    Q       Okay.  Can you think of a circumstance where that's

14            what you would want?

15    A       A witness?  I don't know.

16    Q       No.  I'm saying where you would only want the person

17            accusing you of something to testify.  You said

18            depend -- depending on the circumstances, so.

19    A       Oh.  I -- I can't think of a situation.

20    Q       Okay.  Does anybody (Inaudible) about this, about why

21            you're here today?  Not -- everything that we talked

22            about with (Inaudible) so far, all day.

23    A       Right.

24    Q       The rest of your life actually.  So, this -- use that

25            as common knowledge, but --
```

```
 1   A    Specifically, a deposition?

 2   Q    About the deposition.

 3   A    No.  I --

 4   Q    No one knows why you're here?

 5   A    No.  They know I'm in Detroit for field rea --

 6        reasons.

 7   Q    Okay.  Did you talk to anybody in Connecticut about

 8        this case, about --

 9   A    No.

10   Q    You didn't tell your husband?

11   A    No.

12   Q    Why's that?

13   A    Because his ears tune out when I talk about my job.

14        So, I -- I stopped talking about my job a long time

15        ago.

16   Q    Do you watch any YouTube videos or anything --

17   A    No.

18   Q    -- to prepare for this deposition in any way?  Not

19        including stuff you did with your attorney.

20   A    No.

21   Q    Okay.  Okay.  Who booked your flight?

22   A    Me.

23   Q    You did it by yourself?

24   A    Yeah.

25   Q    Company credit card?
```

1   A      Yeah.

2   Q      Who gave you -- who told you to book a flight?  And

3          again --

4                        MS. NORRIS:  I'm gonna object because

5          it involves communications with Counsel.

6                        MR. GALLAGHER:  If it's Counsel,

7          that's fine.

8                        MS. NORRIS:  Yeah, it involves

9          communication with Counsel.

10  BY MR. GALLAGHER:

11  Q      Here, let me rephrase that then.  Did anybody

12         internally at Nielsen tell you --

13                        MS. NORRIS:  Nielsen has its own

14         Counsel.

15  BY MR. GALLAGHER:

16  Q      Anybody non -- did anybody besides Nielsen's in-house

17         Counsel tell you to book a flight?

18  A      No.

19  Q      Okay.  Have you ever been disciplined at -- by --

20  A      No.

21  Q      What was your action to the Better Business Bureau

22         complaint and (Inaudible) email to it seems like

23         everybody that ever worked for Nielsen?

24  A      I mean, I -- I don't know what -- how to answer that

25         question.  I -- I mean I read, I saw it, you know.

```
 1   Q    I don't -- that's all I'm asking.  I really don't
 2        know.  What was your reaction to it?
 3   A    I'd never seen anything before like this, so I -- I
 4        don't know that I had a reaction other than to read
 5        it and understand what was happening.
 6   Q    Sure.  So, did that raise any red flags?
 7   A    No.
 8   Q    Why?  You though that normal practice in business?
 9   A    Because I know people when they get unhappy they've
10        made complaints, whether it be to something like the
11        Better Business Bureau or on up the corporate chain.
12   Q    Would you say that's how -- that's the attitude you
13        have in relation to all complaints you get?
14   A    No.
15   Q    Okay.  So, what differentiated Ms. Rauschkin's
16        complaint?
17   A    I -- I don't know what my thoughts were at the time.
18   Q    But you've never seen another one?
19   A    Another?
20   Q    Complaint to the Better Business Bureau.
21   A    No, I have not.
22   Q    That didn't strike you as odd?
23   A    No.
24                   (WHEREUPON, Exhibit Number Three was
25        marked for the record at 6:00 p.m.)
```

```
 1  BY MR. GALLAGHER:

 2  Q    I only have one of these.  I don't have one myself,

 3       so if you don't mind.  I think that's the complete --

 4       this might be after.  I'm not sure.  But -- oh, can

 5       you can explain what I just handed you?  Marked as --

 6       marked as Exhibit Three.  I don't have a stapler

 7       though.

 8  A    It looks like an email from Amanda saying that we

 9       need to have a call for a game plan basically.

10  Q    So, if I understand your testimony, is it the case

11       that you're saying that that -- that call did not

12       happen?

13  A    I don't recall being on the call.  They might have

14       had it without me.

15  Q    So, I'm sorry.  I'm just trying to be clear.  So, is

16       it your testimony that either the call happened and

17       it happened without you or you don't recall?  I just

18       -- either one.  I just need an answer though.

19                  MS. NORRIS:  Asked and answered

20       several times today.  You can answer it though.  It's

21       a fair objection.  I'm allowed to say it.

22                  MR. GALLAGHER:  I'm sorry.

23                  THE WITNESS:  I don't recall being

24       part of this phone call.  I can only make an

25       assumption it did happen.
```

108

```
 1   BY MR. GALLAGHER:

 2   Q    You can only make an assumption that it did happen

 3        without you or that it happened and you don't recall

 4        it and you were on it?  Do you see what I'm saying?

 5        I'm not trying -- I'm just trying to see what --

 6   A    Aren't you saying the same thing?

 7   Q    No.  So, the -- the -- the difference there would be

 8        that you -- you're assuming that it happened and you

 9        were there, but you just don't remember, or that it

10        happened and you were not involved.

11   A    It -- I can't tell you 110 percent that it did

12        happen.  I can tell you I was not involved in that

13        call.

14   Q    Okay.  So, if it happened, you were not involved?

15   A    Yes.  Yes.

16   Q    Cool.

17   A    Sorry.

18   Q    Oh, no.  Not at all.  This is very, very -- do you

19        remember the date of this -- of my client's

20        termination?

21   A    October.

22   Q    Do you remember when he was put on suspension pending

23        investigation?

24   A    That, I'm not sure of.

25   Q    But you're sure you contacted -- you -- you're sure
```

```
 1              you talked to Ryan Dinsmore?

 2    A    Yes.

 3    Q    Okay.  And that was over the phone?

 4    A    Yeah.

 5    Q    Okay.  How long about was that conversation?

 6    A    I don't know.

 7    Q    Can you guess?

 8    A    I -- I can't -- I -- I don't know.  It wasn't an

 9         hour.  I -- I don't know.

10                        (WHEREUPON, Exhibit Number Four was

11         marked for the record at 6:04 p.m.)

12  BY MR. GALLAGHER:

13    Q    I'll hand you this.  (Inaudible) order, and I don't

14         have a stapler.  Just take your time.  So, were you

15         part of that call, or was that the same call?  Or can

16         we -- I'm sorry.  Let's strike that.  Can you explain

17         to me what I've just handed you?

18    A    So, it looks to be an email from Ryan, October 6th,

19         about the conversation that was going to be had with

20         -- when David returned.

21    Q    Okay.  And where is David returning from?

22    A    His leave of absence.

23    Q    It is possible those bullet points are the only time

24         you talked to Ryan?  First, I'll strike that.  Is it

25         possible that those -- that you're basing your --
```

```
 1            this entire thing on the bullet points attached to
 2            this email?
 3     A      Basing the entire what on this?
 4     Q      The termination and the -- and your investigation of
 5            the harassment.
 6     A      Well, it was through conversations with Amanda and --
 7            and -- and emails from Ryan, and this, as well.
 8     Q      Sure.  But can you remember specifically any specific
 9            conversations?
10     A      No.
11     Q      So, is it possible the only factual information that
12            you got from this was that bullet-pointed email?
13     A      No.
14     Q      Okay.  So, what specific other factual allegations
15            did Ryan specifically give you other than that, that
16            you had knowledge of, that you remember?
17     A      (No verbal response)
18     Q      And if you're confused, please me to clarify 'cause
19            it's a little bit -- it -- it -- I understand this
20            question can be kind of confusing.
21     A      So, ask me one more time.
22     Q      Sure.  So, earlier -- I believe it was your testimony
23            that you thought you talked to him on the phone.  You
24            don't remember the specifics of the conversation or
25            if you specifically had a conversation.  And then
```

111

1           earlier also you testified that the only information

2           for both you got only from Dinsmore, for both the

3           retaliation and harassment and the termination.  So,

4           can you remember any other specific instances, other

5           than the email I just handed you, where Ryan was

6           giving you, and communicating to you in any way,

7           factual allegations against my client?

8                       MS. NORRIS:  You mean other than the

9           phone call she's testified about?

10                      MR. GALLAGHER:  Well, no.  That's --

11          and if she -- if she can clarify --

12                      MS. NORRIS:  She's clearly testified

13          there was a phone call.

14                      MR. GALLAGHER:  She said she thinks

15          there's a phone call --

16                      MS. NORRIS:  No.  She did not say --

17                      MR. GALLAGHER:  -- but she does not

18          remember --

19                      MS. NORRIS:  -- she did not say she

20          thinks there's a phone call.

21                      MR. GALLAGHER:  I just asked -- I

22          literally just asked, "Do you remember specifics of

23          that", and she said no.

24                      MS. NORRIS:  Specifics of the call and

25          whether there was a call are entirely different

1          questions.

2                              MR. GALLAGHER:  Sure.

3     BY MR. GALLAGHER:

4     Q     Whether other than the phone call that you know that

5          you had and everybody was on it together.

6                              MS. NORRIS:  That's not what she

7          testified.

8                              MR. GALLAGHER:  Okay. I'll start the

9          lien over again.  That's fine.  Strike all that.

10                             MS. NORRIS:  I mean, in my deposition

11         today, you insulted me about the way I asked

12         questions on the record.  You insulted me.  You told

13         me it was a horrible question.

14                             MR. GALLAGHER:  I didn't say -- I

15         didn't say it was horrible --

16                             MS. NORRIS:  Well, you -- you did.

17         And you can read the transcript and see what you said

18         about my questions.

19                             MR. GALLAGHER:  A dollar says it

20         wasn't horrible.

21                             MS. NORRIS:  You can read it and see

22         what it says about my questions.  This witness has

23         been testifying she was involved in a very limited

24         time in this case.  She's been testifying for hours.

25         You've asked her about phone conversations directly

1          with Ryan, you've asked her about the phone

2          conversation with all the decision-makers.  You've

3          asked those repeatedly.  And now you've just told her

4          that she didn't do anything other than read an email.

5                    MR. GALLAGHER:  I'm not telling her

6          anything.  I'm asking questions.

7                    MS. NORRIS:  And you did, and she

8          answered them.

9                    MR. GALLAGHER:  No, I didn't.

10                   MS. NORRIS:  And then you asked

11         questions that mischaracterized.

12                   MR. GALLAGHER:  Can I talk?

13                   MS. NORRIS:  Yes.

14                   MR. GALLAGHER:  Thank you.  It's just

15         like earlier, that -- that when I start talking, you

16         start talking over me.  That's not what happened.

17         I'll start the line over.  That's fine, and then we

18         can get a clear record.  But the problem is, that

19         this -- the testimony's not consistent.  That's been

20         the problem.

21                   MS. NORRIS:  I disagree.

22                   MR. GALLAGHER:  That's fine.  And I

23         don't imagine we agree on much.  So, like I don't get

24         what that has to do with anything.  Cool.  We'll --

25                   MS. NORRIS:  I can say asked and

1          answered when the question's been asked and answered.

2                         MR. GALLAGHER:  And if that's all you

3          did here, we wouldn't be talking right now.

4                         MS. NORRIS:  You've been doing that a

5          lot.

6                         MR. GALLAGHER:  I think you did it

7          maybe three times.  Well, this has nothing to do --

8          all this is doing is keeping this testimony of your

9          client, who's been involved in a very limited role,

10         keep her here longer.  So, we can talk all day, Ms.

11         Morris, if that's what you choose.  I have better

12         things to do.  I'm not sure about you.  I -- probably

13         your client does.  But if you'd rather us just have a

14         conversation on the record, that's fine.

15                         MS. NORRIS:  I've made my objection.

16                         MR. GALLAGHER:  No, you didn't.  You

17         just said something like for 20 minutes and we had to

18         listen to you.  I'll start this string over.

19    BY MR. GALLAGHER:

20    Q    So, can you remember, outside of the group

21         conversation that we talked about earlier, any

22         specific phone calls that you had with Mr. Dinsmore?

23    A    I don't recall whether they're conversations or

24         emails.  There were multiple conversations leading up

25         to Caudle coming back from leave and the allegations

| | | |
|---|---|---|
| 1 | | that Ryan found. |
| 2 | Q | Sure.  So, unlike your Counsel just stated, it -- |
| 3 | | it's not the clear testimony -- you -- you don't |
| 4 | | remember any specific instances of a phone call with |
| 5 | | just you and Mr. Dinsmore, correct? |
| 6 | A | I believe there was a phone call with Ryan to get |
| 7 | | this information to put this investigation summary |
| 8 | | together. |
| 9 | Q | Okay.  And that was just between you and Ryan? |
| 10 | A | Yes. |
| 11 | Q | Okay.  And what cell phone provider do you use? |
| 12 | A | (No verbal response) |
| 13 | Q | Who's your cell phone provider? |
| 14 | A | I don't remember (Inaudible). |
| 15 | Q | Oh, okay.  It was a work phone? |
| 16 | A | Yeah. |
| 17 | Q | Okay.  It wasn't -- it -- it was a phone call though. |
| 18 | | You're sure? |
| 19 | A | It's a phone call and it probably wouldn't have been |
| 20 | | my cell phone.  It might have been the office phone. |
| 21 | Q | So, there would be a phone record of that |
| 22 | | conversation? |
| 23 | A | Yeah. |
| 24 | Q | Okay. |
| 25 | A | Or it could have been a meeting. |

116

```
 1   Q    See, this is the exact problem.

 2                     MS. NORRIS:  Well, that's a

 3        conversation to me.

 4                     MR. GALLAGHER:  No, I get it.  But

 5        see, and that's fine -- to you that's fine, but I'm

 6        asking a very specific question.

 7                     THE WITNESS:  Okay.  So, and again --

 8                     MR. GALLAGHER:  Okay.

 9                     THE WITNESS:  So, a meeting is a

10        conversation.

11   BY MR. GALLAGHER:

12   Q    But I asked you a phone call.  I said phone call.

13        I've been saying phone call this whole line.

14   A    Okay.  And --

15   Q    And that's why --

16   A    -- I -- I -- I --

17   Q    I'm not --

18   A    -- just interpret it differently.

19   Q    Sure.

20                     MR. GALLAGHER:  Let's take a five.  Is

21        that okay?

22                     MS. NORRIS:  Uh huh.

23                     MR. GALLAGHER:  Let's breathe.

24                     (WHEREUPON, a brief recess in the

25        proceeding was taken at 6:11 p.m.)
```

```
 1   BY MR. GALLAGHER:

 2   Q    I'm just gonna ask this a different way.  Maybe this

 3        will help.  Other than the attachments -- oh, I'm

 4        sorry.  Second page of Exhibit Two.  Sorry.  Other

 5        than at the bottom there where it says attachments,

 6        can you recall specifically, matter of factly,

 7        anything else that was relied on when coming to the

 8        conclusion here in this -- in -- in the harassment

 9        and retaliation complaint?

10   A    Other than what's in the rest of the exhibit?

11   Q    You know, and the talking point summary.

12                    MS. NORRIS:  All right.  So, you're

13        asking -- like not counting what's in the rest of the

14        exhibit?

15                    MR. GALLAGHER:  I don't think she used

16        the exhibit to create the exhibit.

17                    MS. NORRIS:  Okay.  That -- those are

18        two different questions then.  That's why I'm asking

19        to clarify.  Create -- you may be right.  So, you

20        could -- that's a fine question.  I'm not arguing

21        with that question.  The way you worded the question

22        is did she consider anything else, and there's

23        information in the rest of the document --

24                    MR. GALLAGHER:  Okay.

25                    MS. NORRIS:  -- that came from
```

```
 1              someplace.

 2     BY MR. GALLAGHER:

 3     Q    Did you use anything else other -- other than those

 4          three attachments listed at the bottom there to come

 5          up with the information inside of this document?

 6     A    No.

 7     Q    Okay.  Thank you.  So, that was -- did you write that

 8          conclusion?  Sorry, strike that.  As you can see

 9          there's a redaction box over the conclusion part

10          there.  Is that your -- did -- do you also prepare

11          parts of (Inaudible)?

12     A    I believe so, yes.

13     Q    Do you recall what that says?

14                    MS. NORRIS:  I'm gonna object.  It's

15          redacted for a reason.  We gave you a privilege law.

16                    MR. GALLAGHER:  Sure.  I don't

17          understand how it could be work product in

18          anticipation of litigation --

19                    MS. NORRIS:  Well --

20                    MR. GALLAGHER:  -- necessarily.

21                    MS. NORRIS:  -- 'cause there are

22          lawyers involved when people get terminated.  We gave

23          you a privilege law.

24                    MR. GALLAGHER:  Sure.

25     BY MR. GALLAGHER:
```

```
 1    Q    Were there any lawyers involved at this point in
 2         time?  Just their involvement.  I don't want to know
 3         anything.  Just --
 4    A    At what point in time?
 5    Q    The investigation on 10/12/16, while you were in
 6         preparation of making this document.  Sorry, the
 7         Exhibit Two in front of you.  I'm sorry.
 8    A    That I'm aware of?
 9    Q    To your knowledge, yes.
10    A    To my knowledge, I don't know.  Not to my knowledge.
11         I never interacted with a -- a lawyer.
12    Q    Okay.  So, in the preparation of this -- of preparing
13         -- of making this document, you never interacted with
14         a lawyer; is that your testimony?
15    A    Correct.
16    Q    Thank you.  And I'm not speaking about the boxes out
17         there.  Okay.  And after this -- after this document
18         was -- sorry, strike that.  So, I'm gonna preface
19         this as I'm not telling you -- I'm not talking about
20         my client's actions, I'm not talking about the EEOC
21         he filed, I'm not talking about the complaint he
22         filed.  Is there any action after this investigation
23         summary related to my client that is with regard to
24         his allegations of wrongful termination and
25         harassment -- or harassment and/or retaliation?
```

```
 1   A    (No verbal response)

 2   Q    I can rephrase that.  I understand it was -- do you

 3        want me to rephrase it again?  No problem.  So --

 4   A    Yes.

 5   Q    -- outside of my client's actions, was there any --

 6        to your knowledge, was there any internal -- or

 7        external, I guess, I don't know -- was there any

 8        Nielsen action in regards to my client's allegations

 9        of wrongful termination and/or harassment and/or

10        retaliation?

11   A    (No verbal response)

12   Q    Did Nielsen do anything after this for my client's

13        allegations?

14   A    I'm not aware.

15   Q    Okay.  Is it safe to say that your -- your

16        interaction with both situations, one, wrongful

17        termination, two, harassment and retaliation, ended

18        after this -- after Exhibit Two -- after you

19        completed Exhibit Two?

20   A    Yes.

21   Q    Okay.  So, if any -- if Nielsen did anything, it

22        didn't involve you, is that --

23   A    Correct.

24              MR. GALLAGHER:  Okay.  And I think

25        that's all I have for this witness.  Thank you so
```

```
 1              much.

 2                        MS. NORRIS:  I have just a few

 3              questions.

 4                        MR. GALLAGHER:  Sure.

 5                        CROSS-EXAMINATION

 6    BY MS. NORRIS:

 7    Q    I just want to be clear on one issue, 'cause there's

 8         been quite a bit of questioning about this, and I'm

 9         not sure it is clear.  In the course of your

10         investigation of the discrimination complaint, did

11         you communicate directly -- and by directly I mean

12         not just email, so on the phone, on a Skype, in

13         person, something other than just sending written

14         documents back and forth -- with Ryan Dinsmore?

15    A    Yes.

16    Q    Do you know how you communicated?

17    A    Probably through a Skype meeting where our group will

18         (Inaudible) him.

19    Q    Okay.  Is -- is that -- when you had that meeting, is

20         he in a different place than you are?  Is he in

21         Michigan and you're in Connecticut?

22    A    Yes.

23    Q    Okay.  And can you hear each other?

24    A    Yes.

25    Q    Can you see each other?
```

```
 1   A     In Google, yes.  I don't -- I don't think we were

 2         (Inaudible).

 3   Q     Okay.

 4                   MR. GALLAGHER:  I'm sorry.  Can you --

 5         I just missed that last part.

 6                   THE WITNESS:  I don't -- I don't

 7         believe that Ryan and I were on video.

 8   BY MS. NORRIS:

 9   Q     Does human resources need to sign off on a

10         termination?

11   A     Yes.

12   Q     So, if Mr. Dinsmore had made up his mind that he

13         thought there should be a termination, did he need

14         someone else's approval?

15   A     Yes.

16   Q     At any time in your communications with Mr. Caudle,

17         whether it was when you spoke to him on the phone, or

18         whether you were emailing, or however -- however,

19         what's a mischaracterization --

20                   MR. GALLAGHER:  I don't think there's

21         testimony that she spoke with him on the phone for

22         sure.

23                   MS. NORRIS:  Uh, I believe there is.

24         Could you pull up your -- your Exhibit One, please?

25   BY MS. NORRIS:
```

```
 1    Q    Would you look at the second page down near the

 2         bottom?  Do you have a copy of it?  Second page, down

 3         near the bottom.  You see there's an entry, October

 4         12th, 2016?  Can you read that to me?

 5    A    "Thank you for speaking with me.  Nielsen takes all

 6         complaints seriously and investigates them in

 7         accordance with company policy, and will review your

 8         complaint and make inquiries into the situations you

 9         mentioned.  I will follow up with you directly

10         regarding the conclusion."

11    Q    Okay.  Who spoke with whom there?

12    A    I spoke with David.

13    Q    Okay.  Was that on the phone or in person, or

14         something else?

15    A    That's -- that was on the phone.

16    Q    Okay.

17    A    Telephone.

18    Q    All right.  So, at any time in your communications

19         with Mr. Caudle, whether written, whether on the

20         phone, whether in-person, however they were, at any

21         time did Mr. Caudle tell you all of the TVs were

22         metered, they were wrong when they said I hadn't

23         metered a TV?

24    A    No.

25    Q    At any time when Mr. Caudle was speaking to you in
```

```
 1        any way, whether regarding his termination or

 2        regarding his discrimination complaint, did Mr.

 3        Caudle tell you that the -- the information that was

 4        being relayed by Ryan Dinsmore about what was in the

 5        home was inaccurate?

 6   A    No.

 7   Q    Mr. Caudle's Counsel has been using different words

 8        to describe what the complaint was.  Did Mr. Caudle

 9        ever use any word to you other than discrimination?

10   A    No, he did not.

11   Q    And did he ever tell you what kind of discrimination

12        he thought it was?

13   A    No.

14                  MS. NORRIS:  I don't have anything

15        else.

16                  REDIRECT EXAMINATION

17   BY MR. GALLAGHER:

18   Q    So, I believe it's your -- just a couple things

19        obviously.  I believe your testimony that -- sorry.

20        Did you just say that David never said that Ryan was

21        lying?

22                  MS. NORRIS:  I didn't ask that

23        question and she didn't answer that.

24                  MR. GALLAGHER:  Sure.

25                  MS. NORRIS:  Not broadly.  I asked
```

```
 1          about specific things.
 2                      MR. GALLAGHER:  Sure.  Can we -- can
 3          you just read that?  I'm sorry.
 4                      UNIDENTIFIED SPEAKER:  Yeah.
 5                      MR. GALLAGHER:  The questions.
 6                      (WHERUEPON, the recording was played
 7          back into the record at 6:26 p.m.)
 8   BY MR. GALLAGHER:
 9   Q    Okay.  So, I believe your Counsel asked you if Dave
10          had ever -- my client had ever claimed that Ryan was
11          lying about things in the home (Inaudible)?
12   A    Right.
13   Q    Okay.  Did you make that differenti -- did -- well,
14          first let me ask you; did my client ever accuse Ryan
15          of lying?
16   A    (No verbal response)
17   Q    If you just read the last sentence, it is --
18   A    Uh huh.  Yeah.
19   Q    And I think your Exhibit Two too, your investigation
20          summary, I believe, has the --
21   A    "My firing was based on false words from Ryan
22          Dinsmore."
23   Q    Sure.  Did you make that differentiation yourself,
24          that the false words were coming outside of the house
25          versus inside the house?
```

126

1    A    I'm not sure I understand what you're asking.

2    Q    Sure.  So, your Counsel -- your Counsel specifically

3         said that -- I believe -- I'm not gonna add any sort

4         of -- impute any sort of why behind it, but

5         essentially she's asking you if -- it's admitted that

6         my client's saying that Ryan lied.  Specifically, as

7         to things inside of a house, I'm not sure if that's

8         the case or not.  But I'm asking you, did you ever

9         make that differentiation 'til today?

10   A    Are you asking me if I felt Ryan was lying?

11   Q    No.  I'm asking you if you ever made a

12        differentiation of -- okay.  So, it's not whether or

13        not Ryan's lying at all.  It's -- it's an admitted

14        fact that my client accused Ryan of lying, correct?

15   A    Right.

16   Q    Sure.  And you just testified that nothing -- he --

17        he did not accuse Ryan of lying about anything inside

18        the house.  That's what you said, right?

19   A    (No verbal response)

20   Q    Unless you want to correct that testimony.  I'm just

21        trying to get it clear.

22   A    So, based on reading this email, he's saying that

23        Ryan lied.

24   Q    Okay.  So, my question here is -- are you saying that

25        your test -- previous testimony is not the case?

1          'Cause does -- okay.  Did you just testify that Ryan

2          -- that David never accused Ryan of lying about

3          anything inside the house?

4                        MS. NORRIS:  I didn't even say inside

5          the house.  The question was very specific about

6          certain things in the house, and the question was

7          answered.

8                        MR. GALLAGHER:  Sure.  Let's replay it

9          again.  I just have to hear your exact wording again.

10                       MS. NORRIS:  Not your

11         characterization, but go ahead.

12                       MR. GALLAGHER:  Sure.

13                       (WHEREUPON, the recording was played

14         back into the record at 6:33 p.m.)

15  BY MR. GALLAGHER:

16  Q    Okay.  So, you testified that -- is that still your

17       testimony?  At no point Mr. Caudle told you that the

18       information being relayed by Ryan Dinsmore about what

19       was in the home was inaccurate?

20  A    I mean, based on the email he sent, he -- he's

21       saying, I -- "My firing, based on false words from

22       Ryan Dinsmore."

23  Q    Okay.  I'm really not trying to -- I'm just trying to

24       see if -- does that change your testimony that you

25       just made?

1  A    I'm so confused at this point.  I don't know.

2  Q    I -- I'll ask you the exact question your Counsel

3       asked you.  At any time in your communications with

4       Mr. Caudle, did Mr. Caudle tell you the information

5       that was being relayed by Ryan Dinsmore, that was in

6       the home, was inaccurate?  Did Mr. Caudle ever at any

7       point in time tell you that the information being

8       relayed by Ryan Dinsmore about what was inside the

9       home was inaccurate?

10 A    No.

11 Q    Okay.  Well, how do you justify that with Exhibit

12      One?

13 A    I don't know how to answer your question.

14 Q    Are you confused by it?  I don't know how else to ask

15      it.  I'm asking you literally the exact same question

16      that your Counsel asked you, and then saying how you

17      justify that with that exhibit.  So, do you not

18      understand the -- the question your Counsel asked

19      you?

20 A    The -- what she asked me is if David Caudle told me

21      anything was -- I don't even remember at this point.

22 Q    We're very close to the end.  I apologize for any

23      inconvenience, but this is very important obviously

24      to my client and to a lot of people here.  So, if

25      you'd just bear with us for a few more moments, I'd

```
 1              really appreciate it.  I'm just trying to see if

 2              after reading that email if that changed your

 3              testimony or if you could justify your testimony with

 4              that email.  Either way.  It -- it -- I'm just trying

 5              to see --

 6    A    Okay.

 7    Q    -- for the record.

 8    A    I -- I need your -- if she can play the question

 9              again, 'cause I -- the wording is pertinent.

10    Q    Sure.

11                        (WHEREUPON, the recording was played

12              back into the record at 6:41 p.m.)

13  BY MR. GALLAGHER:

14    A    Based on this email, David Caudle is saying that

15              Ryan's information is incorrect.

16    Q    Okay.  So, that changes your previous answer.

17    A    Yes.

18    Q    Thank you.

19                        MR. GALLAGHER:  That's all I have.

20              Thank you.

21                        RECROSS-EXAMINATION

22  BY MS. NORRIS:

23    Q    What information was Mr. Caudle saying was incorrect?

24    A    I -- I mean, in the Carbaho (phonetic) situation, she

25              said she told him how would David know about my TVs
```

```
 1            if I didn't tell him or invite him into --
 2   Q    Okay.  So, she --
 3                    MR. GALLAGHER:  Will you let your --
 4            can you let your own client answer --
 5                    MS. NORRIS:  Well, actually I'll let
 6            her answer another follow-up question on this
 7            particular piece.
 8   BY MS. NORRIS:
 9   Q    Did -- did you -- I'm gonna give you two choices.
10            Did you interpret that as -- as him saying Ryan was
11            lying about what the customer or the household said,
12            or did you interpret that as Ryan was lying about the
13            status of the equipment, or something different?
14                    MR. GALLAGHER:  I'm gonna object to
15            the form of that.  Need foundation actually.
16                    THE WITNESS:  I interpret that as Ryan
17            lying about the status of the equipment.
18   BY MS. NORRIS:
19   Q    And how so?  What do you think the lie was?
20   A    That --
21   Q    Or the alleged lie.
22   A    That basically -- about the TV being in the basement.
23            That David wouldn't know.  She -- she said she told
24            him, "How would David know about my TVs if I didn't
25            tell him or invite him into the upstairs or
```

```
 1              basement."
 2    Q    Right.  So, my question is, do you interpret that as
 3         her saying there's a dispute about whether Mr. Caudle
 4         knew about something, or do you interpret that as --
 5                        MR. GALLAGHER:  Asked and answered.
 6                        MS. NORRIS:  -- a dispute about
 7         whether there's actual --
 8                        MR. GALLAGHER:  That's been asked and
 9         answered.  If you didn't like the answer, that's
10         fine.  But it has been answered literally the exact
11         question.  So --
12    BY MS. NORRIS:
13    Q    You can answer the question.
14    A    What was the question?
15    Q    Did you interpret that as --
16                        MR. GALLAGHER:  Asked and answered.
17                        MS. NORRIS:  -- Ryan's lying about
18         whether Mr. Caudle knew, or did you interpret that as
19         Ryan is lying about whether there was a television in
20         the basement?
21                        MR. GALLAGHER:  Asked and answered.
22         You didn't like the answer, but that stands.
23    BY MS. NORRIS:
24    Q    You can answer the question.
25                        MR. GALLAGHER:  No, you can't.
```

```
 1                        THE WITNESS:  I interpret it as it --

 2           David knew about the TVs.

 3                        MS. NORRIS:  I don't have anything

 4           else.

 5                        REDIRECT EXAMINATION

 6   BY MR. GALLAGHER:

 7   Q     Where did you -- oh, I do.  What -- I'm sorry, ma'am.

 8   A     That's okay.

 9   Q     My client's life though, and everything, it's kind of

10           important.  What changed your mind in the 10 seconds

11           between the different -- the different answers?

12   A     Rereading this.

13   Q     You -- so you read the entire email in between your

14           answers?

15   A     I read the last paragraph.

16   Q     Okay.  And what changed?

17   A     Her words.

18   Q     Her words changed?

19   A     Not her words changed, but just reading her words.

20   Q     Okay.  It completely changed your mind?

21   A     Yes.

22   Q     Did you ever follow up with anybody in there?

23                        MS. NORRIS:  Objection.  Outside the

24           scope.

25                        MR. GALLAGHER:  It's not.
```

1          MS. NORRIS:  It is.  I didn't ask any

2     questions --

3          MR. GALLAGHER:  Yes --

4          MS. NORRIS:  -- about that in my

5     redirect.  Not one.

6          MR. GALLAGHER:  You -- she said the

7     name of the household even, so we can listen if you

8     want or we can just deal with this.

9          THE WITNESS:  A follow up with who and

10    when?

11  BY MR. GALLAGHER:

12  Q    Anybody about his termination.  Fact witnesses I'm

13       speaking about though.

14  A    No.

15  Q    Do you think that would be important when there's a -

16       -

17          MS. NORRIS:  I'm gonna object --

18          MR. GALLAGHER:  -- when there's a --

19          MS. NORRIS:  -- outside the scope.

20          MR. GALLAGHER:  -- when there is a

21       factual dispute, two people claiming different

22       things?  Do you think it's important to contact a

23       third party that has the information?

24          MS. NORRIS:  Objection.  Outside the

25       scope.

```
 1                              THE WITNESS:  Not in this situation.

 2    BY MR. GALLAGHER:

 3    Q    Okay.  What about this situation -- what do you think

 4         about this situation makes it not helpful?

 5                              MS. NORRIS:  I continue my objection.

 6                              THE WITNESS:  Let me go back to what I

 7         said before.  The facts that Ryan found, TVs that

 8         weren't metered.

 9    BY MR. GALLAGHER:

10    Q    Okay.  And that matters to a harassment complaint and

11         a retaliation complaint?

12                              MS. NORRIS:  Objection.

13                              THE WITNESS:  The -- the separation

14         was founded.  It was -- it was supported.

15                              MR. GALLAGHER:  So --

16                              THE WITNESS:  So, it wasn't a -- an

17         issue of retaliation.  It was a terminable --

18    BY MR. GALLAGHER:

19    Q    Do you think if somebody has -- for cause for

20         termination they can't be harassed or retaliated

21         against?

22                              MS. NORRIS:  Objection.  Outside the

23         scope.  This whole line of questioning is outside the

24         scope of any of my redirect.

25                              THE WITNESS:  Ask the question again.
```

```
 1  BY MR. GALLAGHER:

 2  Q     Are you claiming that if there's cause for a

 3        termination, that person cannot be retaliated or

 4        harassed?

 5  A     I -- I imagine it does happen, yeah.

 6  Q     So, does that change your answer to the previous

 7        question, when I asked you if the third party -- if

 8        there -- a -- a -- I'm sorry.

 9  A     That's okay.  That's okay.

10  Q     I'm (Inaudible) questions over your groans of not

11        wanting to be here.  I don't either.

12  A     Oh, I want to be here.  It's just, you know, you keep

13        asking me the same things over and over again.

14  Q     And your testimony keeps changing.

15  A     I'm exhausted.

16                    MS. NORRIS:  Objection.

17                    MR. GALLAGHER:  I'm sorry.  I just

18        need real answers to --

19                    THE WITNESS:  Okay.

20                    MR. GALLAGHER:  -- (Inaudible) out of

21        here.

22  BY MR. GALLAGHER:

23  Q     So, you said there was cause for termination.

24  A     Yes.

25  Q     And because of the cause for termination you did not
```

```
 1              think it would be necessary or helpful to get the

 2              third-party households as a factual input on what --

 3              on the facts?

 4   A   Correct.

 5   Q   And at the same time you're admitting that while

 6              somebody that has a cause for termination can still

 7              be harassed and retaliated against?

 8   A   It's possible.  I don't know of a situation.

 9   Q   Okay.  I'm just confused as to what -- okay.  I'm

10              good.

11                        MS. NORRIS:  I don't have any further

12              questions.

13                        (Proceedings concluded at 6:53 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25
```

137

1   STATE OF MICHIGAN)

2   ) SS

3   COUNTY OF OAKLAND)

4

5                    C E R T I F I C A T E

6

7                    I hereby certify that this foregoing

8         testimony and proceedings, consisting of one hundred

9         thirty-eight (138) typewritten pages, was

10        mechanically recorded at the time and place

11        hereinbefore set forth; was thereafter reduced to

12        typewritten form; and that the foregoing is a full,

13        true, and correct transcript of the recording so

14        taken.

15

16

17                              *Sheila L. Boensch*
                                Sheila L. Boensch, CER #7075
18                              Certified Electronic Reporter
                                3133 Union Lake Road
19                              Commerce Twp., Michigan 48324
                                (248) 360-2145
20

21        Dated:  July 22, 2019

22

23

24

25

138