# EXHIBIT A

**Page 1**

```
1              IN THE UNITED STATES DISTRICT COURT
2                  EASTERN DISTRICT OF MICHIGAN
3                       SOUTHERN DIVISION
4
5    DAVID CAUDLE,
6                 Plaintiff,
7          vs.                    Case No. 2:17-cv-13737
8                                 Hon. Mark A. Goldsmith
9    THE NIELSEN COMPANY (US), LLC,
10                Defendant.
11   _____
12
13        The Deposition of DAVID CAUDLE,
14        Taken at 615 Griswold Street, Suite 709,
15        Detroit, Michigan,
16        Commencing at 9:25 a.m.,
17        Wednesday, May 15, 2019,
18        Before Becky L. Johnson, CSR-5395.
19
20
21
22
23
24
25
```

**Page 2**

```
1    APPEARANCES:
2
3    CONNOR GALLAGHER
4    Carla D. Aikens, P.C.
5    615 Griswold Street
6    Suite 709
7    Detroit, Michigan  48226
8    (844) 835-2993
9    connor@aikenslawfirm.com
10       Appearing on behalf of the Plaintiff.
11
12   MEGAN P. NORRIS
13   Miller, Canfield, Paddock & Stone, P.L.C.
14   150 West Jefferson Avenue
15   Suite 2500
16   Detroit, Michigan  48226
17   (313) 963-6420
18   norris@millercanfield.com
19       Appearing on behalf of the Defendant.
20
21   ALSO PRESENT:
22   Denise Fantarella
23
24
25
```

**Page 3**

```
1                     TABLE OF CONTENTS
2
3    WITNESS                             PAGE
4    DAVID CAUDLE
5
6    EXAMINATION
7    BY MS. NORRIS:                        5
8    EXAMINATION
9    BY MR. GALLAGHER:                   252
10   RE-EXAMINATION
11   BY MS. NORRIS:                      261
12
13                       EXHIBITS
14
15   EXHIBIT                             PAGE
16   (Exhibits attached to transcript.)
17
18   Deposition Exhibit 1                 25
19   Deposition Exhibit 2                 65
20   Deposition Exhibit 3                 69
21   DEPOSITION EXHIBIT 4                 88
22   Deposition Exhibit 5                 88
23   Deposition Exhibit 6                 88
24   Deposition Exhibit 7                 88
25   Deposition Exhibit 8                 88
```

**Page 4**

```
1    Deposition Exhibit 9                136
2    Deposition Exhibit 10               141
3    Deposition Exhibit 11               147
4    Deposition Exhibit 12               163
5    Deposition Exhibit 13               164
6    Deposition Exhibit 14               171
7    Deposition Exhibit 15               172
8    Deposition Exhibit 16               178
9    Deposition Exhibit 17               182
10   Deposition Exhibit 18               184
11   Deposition Exhibit 19               186
12   Deposition Exhibit 20               209
13   Deposition Exhibit 21               211
14   Deposition Exhibit 22               212
15   Deposition Exhibit 23               215
16   Deposition Exhibit 24               218
17   Deposition Exhibit 25               235
18   Deposition Exhibit 26               240
19   Deposition Exhibit 27               248
20   Deposition Exhibit 28               249
21
22
23
24
25
```

CAUDLE, DAVID
05/15/2019                                                    Pages 5–8

---

Page 5

1   Detroit, Michigan
2   Wednesday, May 15, 2019
3   9:25 a.m.
4
5               DAVID CAUDLE,
6       was thereupon called as a witness herein, and after
7       having first been duly sworn to testify to the truth,
8       the whole truth and nothing but the truth, was
9       examined and testified as follows:
10               EXAMINATION
11  BY MS. NORRIS:
12  Q.  Good morning, my name is Megan Norris, I'm the
13      attorney for Nielsen that's taking your deposition
14      today.  You just gave your name to the court reporter.
15      Am I correct that your full name is David Marcus
16      Caudle?
17  A.  Yes, ma'am.
18  Q.  And is it Caudle or Caudle?
19  A.  Caudle.
20  Q.  Thank you.  I'm going to ask you your date of birth
21      and Social Security number, but I'd like to do that
22      off the record so that if we file anything with the
23      court that doesn't become public.
24               (Off the record at 9:25 a.m.)
25               (Back on the record at 9:26 a.m.)

Page 6

1   BY MS. NORRIS:
2   Q.  Have you ever had your deposition taken before?
3   A.  No.
4   Q.  Okay.  Today is my opportunity to ask you questions
5       that are related to your lawsuit against Nielsen.  I'm
6       going to be asking questions out loud.  It's important
7       that you answer out loud.  If you shrug your shoulder,
8       nod your head, something like that, you and I will
9       know what the answer was, but it won't show up in the
10      record, okay?
11  A.  Okay.
12  Q.  If you can stay away from uh-huh and huh-uh.  Again,
13      we both know what those are when we hear them, but I
14      don't know how either one is spelled, so when it shows
15      up in the record it's not clear if it was a yes or no,
16      all right?
17  A.  Okay.
18  Q.  I will try very hard, and I will undoubtedly sometimes
19      fail, to let you finish each answer before I jump in
20      with my next question.
21  A.  Okay.
22  Q.  Sometimes I might think you're finished and you just
23      paused to take a breath and I started talking.  Just
24      tell me, I'm not finished, but I will try to do that.
25      If you would try to let me finish my question before

Page 7

1       you answer, we can make sure you're answering the
2       question that I'm actually asking as opposed to the
3       one you thought I might be asking.  But also the court
4       reporter is taking down everything we say and it's
5       difficult if we're both talking, all right?
6   A.  Okay.
7   Q.  There may be times when you don't understand my
8       question; it's not clear what I was asking, you were
9       still thinking of the last question, you're thinking
10      you need to take a break, whatever and so you're not
11      exactly sure what I just said.  Please stop and ask me
12      to clarify the question or restate the question
13      because whatever shows up on the record, we're going
14      to say that's your answer to the question.  So we want
15      to make sure that you knew what the question was, all
16      right?
17  A.  Okay.
18  Q.  I tend to talk pretty quickly, which court reporters,
19      it is tough on them.  If I go too fast and you miss
20      something, just say, I'm sorry, you're going to have
21      to slow down and I'll try to do that.
22  A.  Okay.
23  Q.  Now, finally, I don't know how long this is going to
24      take today, it depends in large part on what you have
25      to say, but if you need a break at some point, you

Page 8

1       want to talk to your attorney, you want to use the
2       restroom, you just want to stretch your legs, whatever
3       it might be, I'll ask that you finish up whatever
4       question we're on and then you can take the break.
5       This is not meant to be an endurance contest where we
6       just hold you captive here.  If you need a break at
7       some point, just let me know, all right?
8   A.  Okay.
9   Q.  Are you currently married?
10  A.  No.
11  Q.  Have you ever been married?
12  A.  No.
13  Q.  Do you have any children?
14  A.  Yes.
15  Q.  How many?
16  A.  One.
17  Q.  What's that child's name?
18  A.  Janden, J-A-N-D-E-N, Ivory Caudle.
19  Q.  And how old is Janden?
20  A.  17.
21  Q.  And where does Janden live?
22  A.  With her mother.
23  Q.  And who is her mother?
24  A.  Brenda Burger.
25  Q.  And when did whatever relationship you have with

CAUDLE, DAVID
05/15/2019

Page 9

1    Ms. Burger other than her being the mother of your
2    child end?
3  A.  When my daughter was two.
4  Q.  Okay.  So am I correct you haven't lived with
5    Ms. Burger for approximately 15 years?
6  A.  Yes.
7  Q.  Does Ms. Burger know anything about the events at
8    issue in this lawsuit against Nielsen other than what
9    you might have told her?
10  A.  I haven't told her anything.
11  Q.  Okay.  And does your daughter know anything other than
12    what you might have told her?
13  A.  I haven't told her anything.  They stay out of state
14    so --
15  Q.  Okay.  Your current address?
16  A.  22850 Inkster Road, Southfield, Michigan  48033.
17  Q.  And is that a house or an apartment?
18  A.  House.
19  Q.  And are you purchasing it or renting it?
20  A.  I'm actually living there with my mother and
21    grandmother right now.
22  Q.  Okay.  How long have you been at that address?
23  A.  Just moved there three months ago -- two months ago --
24    what is this June?  I moved in February.
25  Q.  February of 2019?

Page 10

1  A.  Yes.
2  Q.  Prior to that where did you live?
3  A.  21441 Cambridge Avenue.
4  Q.  And how long did you live at the Cambridge address?
5  A.  After I moved out with my fiancée, so that was
6    November 2016.
7  Q.  And was that a house or an apartment?
8  A.  Apartment -- the 21441?
9  Q.  Yes.
10  A.  That was a house, sorry.
11  Q.  And were you purchasing or --
12  A.  Owned it.
13  Q.  Okay.  Do you remember what the mortgage was?
14  A.  No, because my grandmother -- well, my
15    great-grandfather bought the house and it was just --
16  Q.  So it was paid for probably?
17  A.  Yes.
18  Q.  Okay.  At the current address, 22850, does anybody
19    other than your mother and grandmother live there?
20  A.  No.
21  Q.  Are you paying any rent or anything to them?
22  A.  Yes.
23  Q.  Okay.  What do you pay?
24  A.  I pay the cable bill, which is like $250.  And try to
25    give them rent when I can and it goes -- that

Page 11

1    fluctuates because of my income.
2  Q.  So you chip in when you have the money?
3  A.  Yes.
4  Q.  At the 21441 Cambridge address, did anybody else live
5    there with you?
6  A.  My mother sort of did.  She had moved to Florida to
7    take care of my grandmother and then she was living
8    with her boyfriend.  So basically I was there, but
9    when she came back --
10  Q.  So she was sometimes living there, but not all the
11    time?
12  A.  Yes.
13  Q.  Okay.  Did anybody else live with you at the 2144 --
14  A.  No.
15  Q.  -- 1 address?
16         All right.  Prior to 21441 where did you
17    live?
18  A.  That would be my daughter's mother in Erie,
19    Pennsylvania.  The address was 2327 Prospect Avenue.
20  Q.  In Erie?
21  A.  Yes.
22  Q.  How long did you live there?
23  A.  Four and a half years.
24  Q.  When you started working for Nielsen were you living
25    at the Cambridge address?

Page 12

1  A.  Yes.
2  Q.  Okay.  And did you move to the Cambridge address
3    because your relationship with your daughter's mother
4    ended?
5  A.  Yes.
6  Q.  You came back to Michigan with your family?
7  A.  Yes.
8  Q.  Why did you decide to move from the Cambridge address
9    to the Inkster address?
10  A.  My grandmother moved back from Florida, my grandfather
11    had passed away.  She wanted to be around family and
12    she wanted to sell the home and move into a home with
13    family and because of my income I didn't really have a
14    choice.
15  Q.  What's your mom's name?
16  A.  Debra Caudle.
17  Q.  All right.  Does your mother or your grandmother know
18    anything about this case other than what you've told
19    them?
20  A.  No.
21  Q.  Have you ever served in the military?
22  A.  No.
23  Q.  Okay.  Have you ever been involved in any other
24    lawsuits?
25  A.  No.

CAUDLE, DAVID
05/15/2019

Pages 13–16

1  Q.  And have you ever filed a lawsuit against anybody
2      else?
3  A.  No.
4  Q.  Has anybody ever filed a lawsuit against you?
5  A.  Yes.
6  Q.  Okay.  How many times?
7  A.  I've had my wages garnished twice.  That was it.
8  Q.  All right.  Do you remember approximately when the
9      first time your wages were garnished?
10 A.  Last year by the State of -- Detroit, the City of
11     Detroit.
12 Q.  So sometime in 2018?
13 A.  Yes.
14 Q.  And when was the second time?
15 A.  That would be two years ago from Beaumont Hospital for
16     unpaid hospital bills.
17 Q.  So 2017?
18 A.  Yes.
19 Q.  Do you remember how much the Beaumont Hospital bills
20     were?
21 A.  I don't remember the total amount.  I think they
22     offered me a settlement of $4,000-something.
23 Q.  Did you settle?
24 A.  I wasn't able to settle.  I didn't have that much
25     money.

1  Q.  Did they get a judgment against you?
2  A.  They're trying to, but I'm on Social Security so they
3      can't really garnish it.
4  Q.  Okay.  So they have a judgment, but they can't get the
5      money?
6  A.  Yes, right.
7  Q.  Okay.  Do you know what the total amount they are
8      trying to get was?
9  A.  I'd have to look it up.  I don't know off the top of
10     my head.
11 Q.  Was it something more than $4,000, if they were trying
12     to settle for 4?
13 A.  Yes, it was -- I know it was more than $100,000.
14 Q.  And the City of Detroit, do you know how much that one
15     was?
16 A.  No.
17 Q.  Was that for taxes?
18 A.  Yes.
19 Q.  And what happened with that one?
20 A.  That was -- I never received a notice from it and then
21     it showed up that it was behind.  It was due when --
22     after I filed and it went into judgment.
23 Q.  So did they have a judgment against you?
24 A.  Yeah, saying I owed.  Gave me -- when I finally got
25     the notice, I think it was a ten-day notice to pay.

1  Q.  I've had one of those.  The City of Detroit is very
2      aggressive.
3  A.  But when I got it, it was a month later.
4  Q.  Yep, or more, yes, I understand that one.  And am I
5      correct they haven't been able to collect that either?
6  A.  Yes.
7  Q.  Did you ever have any action brought against you by
8      Cash Now X?
9  A.  Yes.
10 Q.  Okay.  Do you remember about when that was?
11 A.  That was, I want to say 2008, 2007.
12 Q.  Okay.  And what was that for?
13 A.  I had a loan.  I took a loan out because I was behind
14     on child support.
15 Q.  And how much did they get a judgment against you?
16 A.  They did a judgment.  It was messy because I paid a
17     check to pay it off and they said they never received
18     it.  I couldn't find the receipt so it went in their
19     favor and I don't remember how much it was.  It ended
20     up being paid off.  They took my taxes to pay it off.
21 Q.  Do you know about how much it was, was it in the
22     hundreds or in the thousands or in the ten thousands?
23 A.  I think it was like 6 or $700.  I wasn't allowed to
24     take more than $600 out, so I think with interest it
25     was like that.

1  Q.  Okay.  And did you ever have anything brought against
2      you by Approved Cash Advance?
3  A.  Approved Cash Advance?  Yes.
4  Q.  Do you remember what that was for?
5  A.  That was a cash loan I took out for my father and I
6      was told it was paid off and it wasn't.
7  Q.  Did that get garnished as well?
8  A.  I think so because I was working at AT&T and I was out
9      of town so I didn't get any mail so it was missed and
10     I was told it was paid, so between everything --
11 Q.  Do you still pay child support?
12 A.  Yes.
13 Q.  How much?
14 A.  It's two times.  It's $543 and then she gets money
15     because I'm on Social Security.
16 Q.  Okay.  So she gets her own Social Security money
17     through you?
18 A.  Yes.
19 Q.  Right.  So, in other words, Social Security pays that,
20     but it's because you're on Social Security?
21 A.  No, she gets paid a certain amount.  She gets paid
22     $750 from Social Security and then she gets $543 from
23     my Social Security.
24 Q.  They just take it out of your check?
25 A.  Yes, so she gets two.

CAUDLE, DAVID
05/15/2019

Page 17

1   Q.   Thank you, that makes sense.  And does that stop when
2        she turns 18?
3   A.   No, because when she's 18 I believe she's still in
4        high school.  I have to check to make sure, but I
5        believe it still goes on because she's in high school.
6   Q.   You think it ends when she graduates?
7   A.   Yes, I believe that's the new law that was passed a
8        couple years ago.
9   Q.   So in another year maybe?
10  A.   Yes.
11  Q.   Other than the matters we just talked about, have you
12       ever testified in court?
13  A.   No.
14  Q.   Have you ever testified in any other kind of
15       proceeding, like an unemployment proceeding or
16       workers' comp or anything like that?
17  A.   No.
18  Q.   Have you ever been convicted of a crime?
19  A.   No.
20  Q.   You mentioned that you are on Social Security.  When
21       did you first apply for Social Security?
22  A.   Last year.
23  Q.   Sometime in 2018?
24  A.   What is this, 2019?  Yes.  It was October.
25  Q.   And was your claim granted the first time you applied

Page 18

1        or --
2   A.   Yes.
3   Q.   -- did you have to appeal it?
4   A.   No, it was granted.
5   Q.   What was your disability?
6   A.   My sickle cell.
7   Q.   And did you have to submit some medical information
8        explaining what your disability was and why you
9        couldn't work?
10  A.   Yes, and I had a doctor's appointment.
11  Q.   And did that indicate that you're incapable of working
12       anyplace in any capacity?
13  A.   Yes, as of right now it is.
14  Q.   Do you know -- do you know how -- like what would have
15       to happen for your Social Security to be cut off?
16            MR. GALLAGHER:  Object to the form and
17       foundation of that.
18            MS. NORRIS:  He can answer if he knows.
19  A.   I don't know.
20  BY MS. NORRIS:
21  Q.   Okay.  At what point were you unable to work at all?
22            MR. GALLAGHER:  Same objection.
23            MS. NORRIS:  Well, he knows when he
24       couldn't work.
25  BY MS. NORRIS:

Page 19

1   Q.   You can answer the question.
2   A.   Technically, it was right after I left Nielsen.
3   Q.   Okay.  And why didn't you apply for Social Security
4        then?
5   A.   Because I didn't know what was going on.
6   Q.   Medically?
7   A.   Yes.
8   Q.   Okay.  So right after you left Nielsen your condition
9        worsened?
10  A.   No, it was -- internally I guess my body was worsened
11       through Nielsen through stress.
12  Q.   Did your physician tell you that it was because of
13       stress?
14  A.   Yes.
15  Q.   And who told you that?
16  A.   My hematologist, Dr. Zekman, Z-E-K-M-A-N.
17  Q.   How much do you get from Social Security?
18  A.   $1,500.
19  Q.   That's a month?
20  A.   Yes.
21  Q.   Okay.  Other than Social Security and the housing and
22       general support provided by your mother and your
23       grandmother, do you get any other support from anybody
24       else?
25  A.   No.

Page 20

1   Q.   Have you ever applied for any support that you did not
2        receive?
3   A.   No.
4   Q.   Have you ever applied for unemployment?
5   A.   Yes.
6   Q.   Okay.  When did you apply for unemployment the first
7        time?
8   A.   The very first time?
9   Q.   Well, let me ask differently.  First, how many times
10       have you applied for unemployment?
11  A.   I think four times.
12  Q.   Okay.  Was that at the end of four different jobs?
13  A.   Yes.
14  Q.   And did you apply for unemployment after Nielsen?
15  A.   Yes.
16  Q.   All right.  We'll go through your job history in a
17       bit, you can just tell me which ones you applied for
18       unemployment after that.
19  A.   Okay.
20  Q.   Do you have a personal e-mail account?
21  A.   Yes.
22  Q.   Have you used that account to communicate with anybody
23       about anything in this lawsuit other than
24       communications with your lawyers?
25  A.   No.

CAUDLE, DAVID
05/15/2019
Pages 21-24

| | Page 21 |
|---|---|
| 1 | Q.  Do you have a Facebook account? |
| 2 | A.  Yes. |
| 3 | Q.  How many? |
| 4 | A.  One. |
| 5 | Q.  Some people have many. |
| 6 | A.  That's too much work. |
| 7 | Q.  Some people have personal ones, professional ones, |
| 8 | group ones, whatever.  Does anybody have access to the |
| 9 | password of your Facebook account other than you? |
| 10 | A.  No.  I can't remember it, so it gets changed monthly. |
| 11 | Q.  Do you have an account on Twitter, LinkedIn, Instagram |
| 12 | or Snapchat? |
| 13 | A.  Yes. |
| 14 | Q.  Which ones? |
| 15 | A.  All of them. |
| 16 | Q.  Okay.  And does anybody have those passwords other |
| 17 | than you? |
| 18 | A.  No. |
| 19 | Q.  Do you have a blog or website? |
| 20 | A.  No. |
| 21 | Q.  What's your e-mail address? |
| 22 | A.  dacaudle@icloud.com. |
| 23 | Q.  dacaudle@icloud.com? |
| 24 | A.  Yes. |
| 25 | Q.  And what's your Facebook, is it just David Caudle? |

| | Page 23 |
|---|---|
| 1 | MR. GALLAGHER:  Can you put a time frame in |
| 2 | there?  Ever? |
| 3 | BY MS. NORRIS: |
| 4 | Q.  Since -- let's say since January 2016? |
| 5 | A.  Things that people posted on my page that I didn't |
| 6 | like, yeah. |
| 7 | Q.  So something that somebody else posted you might have |
| 8 | taken down? |
| 9 | A.  Yes. |
| 10 | Q.  Have you deleted anything that you put up there? |
| 11 | A.  No. |
| 12 | Q.  Okay.  Did you review any documents to get ready for |
| 13 | today? |
| 14 | A.  No. |
| 15 | Q.  Other than your lawyers, and I don't want you to tell |
| 16 | me anything that you said to your lawyers, have you |
| 17 | talked to anybody about this case? |
| 18 | A.  No. |
| 19 | Q.  Prior to hiring Ms. Aikens and Mr. Gallagher, did you |
| 20 | talk to any other lawyers? |
| 21 | A.  The EEOC. |
| 22 | Q.  Okay.  Anybody else? |
| 23 | A.  No. |
| 24 | Q.  And when did you first retain an attorney in this |
| 25 | matter? |

| | Page 22 |
|---|---|
| 1 | A.  No, it's David Porter. |
| 2 | Q.  Okay.  And why is it David Porter? |
| 3 | A.  That's my father's last name. |
| 4 | Q.  Twitter, what's your account name? |
| 5 | A.  I'll check.  I believe it's the same thing because |
| 6 | Facebook bought them, I'm not sure. |
| 7 | Q.  So you think it's also David Porter? |
| 8 | A.  I can tell you in one second. |
| 9 | Q.  Okay. |
| 10 | A.  I'm not on there much. |
| 11 | Q.  That's all right, you're not required to do research |
| 12 | for me.  Just tell me what you -- |
| 13 | A.  I don't know off the top of my head. |
| 14 | Q.  Okay. |
| 15 | MR. GALLAGHER:  These walls are not going |
| 16 | to get service, old building. |
| 17 | BY MS. NORRIS: |
| 18 | Q.  LinkedIn, is that under David Caudle? |
| 19 | A.  I believe so, I'm not 100 percent sure. |
| 20 | Q.  And how about Snapchat? |
| 21 | A.  I think they gave me a user name.  I'm not sure what |
| 22 | that is.  I haven't really used that.  My daughter set |
| 23 | it up for me. |
| 24 | Q.  Okay.  Have you deleted anything from any of your |
| 25 | social media accounts? |

| | Page 24 |
|---|---|
| 1 | A.  I don't remember. |
| 2 | Q.  Do you remember what year? |
| 3 | A.  I think it was 2017, maybe the end of 2016.  I'm not |
| 4 | sure. |
| 5 | Q.  So did you have an attorney when you went to the EEOC? |
| 6 | A.  No. |
| 7 | Q.  So it was sometime after that? |
| 8 | A.  Yes, when they told me I had a right to sue. |
| 9 | Q.  Okay.  Have you asked anybody to be a witness in this |
| 10 | matter? |
| 11 | A.  No. |
| 12 | Q.  Have you talked to anybody who currently works or used |
| 13 | to work at Nielsen about this case? |
| 14 | A.  No. |
| 15 | Q.  Did you keep notes of any of the events that occurred |
| 16 | when you worked for Nielsen? |
| 17 | A.  Yes. |
| 18 | Q.  Okay.  Did you keep those notes as things happened or |
| 19 | is this something that you wrote down afterwards? |
| 20 | A.  Some were during, the rest were afterwards when the -- |
| 21 | when they asked me about them. |
| 22 | Q.  When who asked about them? |
| 23 | A.  HR. |
| 24 | Q.  Okay.  So at the point when you're talking to HR you |
| 25 | wrote down some more notes? |

Page 25

1   **A.**  **Yes.**
2   Q.  Do you still have those notes?
3   **A.**  **I think so, I'm not sure.**
4   Q.  Did you bring them with you today?
5   **A.**  **No.**
6   Q.  Have you ever kept a diary or journal?
7   **A.**  **No.**
8   Q.  Do you maintain a calendar that you write notes on
9     about what you're doing?
10   **A.**  **No.**
11   Q.  Did you ever record any conversations between yourself
12     and anybody at Nielsen?
13   **A.**  **No.**
14           MARKED FOR IDENTIFICATION:
15           DEPOSITION EXHIBIT 1
16           9:48 a.m.
17 BY MS. NORRIS:
18   Q.  Mr. Caudle, I'm handing you what's been marked as
19     Deposition Exhibit Number 1, which was the notice for
20     today's deposition which was originally scheduled for
21     Monday at 10:00 and then was adjourned until today.
22     Previously there was an earlier notice when this
23     deposition was scheduled to take place in January and
24     the attorneys agreed to adjourn it -- the discovery at
25     that time.

Page 26

1           Have you ever seen this document?
2   **A.**  **No.**
3   Q.  Okay.  Has anybody asked you to look for the documents
4     that are listed here?
5           MR. GALLAGHER:  Objection.
6           MS. NORRIS:  Okay.  What's the basis for
7     your objection?
8           MR. GALLAGHER:  If there's any
9     attorney/client communication within the answer --
10           MS. NORRIS:  Okay.  Then you can say
11     object, attorney/client privilege, and then I'll know.
12           MR. GALLAGHER:  Sure.
13           MS. NORRIS:  Okay.  I'll address this to
14     you, Mr. Gallagher.  This deposition was originally
15     noticed in January.  It was noticed again in May.  My
16     understanding is that the witness has not brought any
17     of the documents he was supposed to bring to the
18     deposition?
19           MR. GALLAGHER:  Okay.
20           MS. NORRIS:  So I'm entitled to have those
21     documents and I'm entitled to have those documents
22     here today.  So what I'll do is I'll continue my
23     questioning and I'll ask that you produce those
24     documents immediately and if I need to ask follow-up
25     questions as a result, I will reserve my right to do

Page 27

1     that.  Generally it's not necessary, usually the
2     documents speak for themselves, but he says that he
3     has notes and I don't have those notes.
4           MR. GALLAGHER:  I don't think that was his
5     testimony.  I think his testimony was at one point
6     that he kept notes.  He's not sure if they still
7     exist.  I don't think there's been any testimony that
8     a certain document exists actually yet.
9           MS. NORRIS:  Okay.  Then we can go through
10     each line-by-line and I can determine what exists or
11     you can --
12           MR. GALLAGHER:  I mean, sure, like if
13     that's -- like you said, it's your deposition, you can
14     handle it how you'd like.  I will -- I'm more than
15     happy to produce anything we can for you in a timely
16     manner though, I'm not trying to update that, but
17     particularized to the notes, we're not sure if those
18     exist.
19           MS. NORRIS:  Okay.  That's fine.  These
20     were due now, so a timely manner would be soon and I
21     reserve my right to bring the witness back, if
22     necessary, to answer any questions that might be
23     raised by those documents.  As I said, generally
24     that's not necessary, generally documents speak for
25     themselves, but I'll reserve that right.

Page 28

1           MR. GALLAGHER:  Sure.
2 BY MS. NORRIS:
3   Q.  Have you ever been seen by a psychologist or
4     psychiatrist?
5   **A.**  **No.**
6   Q.  Have you ever had counseling with a priest, social
7     workers or other counselors?
8   **A.**  **No.**
9   Q.  Have you been hospitalized at all in the last
10     15 years?
11   **A.**  **Yes.**
12   Q.  Okay.  My understanding is that you have sickle cell
13     anemia; is that correct?
14   **A.**  **I have sickle cell SC, yes.**
15   Q.  Okay.  Do you have any other medical conditions other
16     than sickle cell anemia?
17   **A.**  **Yes.**
18   Q.  Okay.  What other conditions do you have?
19           MR. GALLAGHER:  Do you mind, Counsel, if I
20     put a standing objection to any kind of testimony that
21     might be elicited where he's not a medical expert?
22           MS. NORRIS:  No, that's a fine objection.
23 BY MS. NORRIS:
24   Q.  In other words, I'm not asking you to play doctor, I'm
25     asking you what your understanding is of your medical

Page 29

1  conditions and that's all that you can give.
2          So, yes, your standing objection is noted,
3  that's fine.
4          MR. GALLAGHER:  Thank you.
5  BY MS. NORRIS:
6  Q.  So other than sickle cell anemia, are you aware of any
7      other medical conditions that you have other than just
8      waking up with a cold or a sore throat or something
9      like that?
10 A.  **Sleep apnea and type 2 diabetic, controlled diabetic.**
11 Q.  Other than sickle cell anemia, sleep apnea and type 2
12     controlled diabetes, anything else?
13 A.  **No.**
14 Q.  When were you first diagnosed with diabetes?
15 A.  **2014.**
16 Q.  Okay.  And when were you first diagnosed with sleep
17     apnea?
18 A.  **2015.**
19 Q.  And when were you first diagnosed with sickle cell
20     anemia?
21 A.  **At birth.**
22 Q.  So that's something you've been living with?
23 A.  **Yes.**
24 Q.  All right.  So let's start with type 2 diabetes.  Have
25     you ever been hospitalized as a result of diabetes?

Page 30

1  A.  **No.**
2  Q.  Have you ever been hospitalized as a result of the
3      sleep apnea?
4  A.  **No.**
5  Q.  Have you ever been hospitalized as a result of sickle
6      cell anemia?
7  A.  **Yes.**
8  Q.  Approximately how many times?
9  A.  **Can't count.**
10 Q.  More than you can count?
11 A.  **Yes.**
12 Q.  All right.  Let's start with -- can you tell me how
13     many times in the last 15 years or is that also more
14     than you can count?
15 A.  **More than I can count.**
16 Q.  Okay.  Can you tell me how often in the last ten
17     years?
18 A.  **More than I can count.**
19 Q.  Last five years?
20 A.  **More than I can count.**
21 Q.  Last year?
22 A.  **Four times.**
23 Q.  And was last year, in terms of the amount of times
24     that you were hospitalized, about the same, more or
25     less than the previous few years?

Page 31

1  A.  **No, I'm sorry, I'm thinking of last year.  It's 2019.**
2  Q.  So four times in 2019?
3  A.  **Yes.**
4  Q.  Do you know about how many times in 2018?
5  A.  **To be honest, no.**
6  Q.  Again, more than you can count?
7  A.  **Yes.**
8  Q.  When's the last time you were hospitalized?
9  A.  **Last week.  That's why I couldn't make it Monday.**
10 Q.  Okay.  From when to when last week were you
11     hospitalized?
12 A.  **I want to say the 4th until the 10th.**
13 Q.  When you've been hospitalized since you've been back
14     in Michigan, so I'm not talking about when you were in
15     Erie, Pennsylvania or before that, but since you've
16     been back in Michigan have you gone to the same
17     medical treaters for this?
18 A.  **No.**
19 Q.  Okay.  Let's start, again, with your diabetes.  Who is
20     your current doctor for your diabetes?
21 A.  **Dr. Abigail Deland.**
22 Q.  Deland?
23 A.  **Deland.**
24 Q.  Can you spell --
25 A.  **D-E-L-A-N-D.**

Page 32

1  Q.  And where is Dr. Deland?
2  A.  **She's -- Farmington West Village on Grand River in**
3      **Farmington Hills.**
4  Q.  What kind of doctor is Dr. Deland, if you know?
5  A.  **She's my internal medicine doctor.**
6  Q.  Okay.  And has she sent you to anybody else for your
7      diabetes?
8  A.  **No.**
9  Q.  Who is your doctor for your sleep apnea?
10 A.  **I don't remember her name.  I only see her once a year**
11     **to get, what you call it, a script to get my supplies.**
12 Q.  Okay.  Is there someplace you could look to find that
13     name?
14 A.  **Yeah, she's part of Beaumont, I know that much.**
15 Q.  At which Beaumont?
16 A.  **Just Beaumont, period.  I'm not going to get reception**
17     **to --**
18 Q.  No, that's okay, you're not required to do homework
19     during the exam.  I can follow up with questions to
20     your attorney later.
21          Sickle cell anemia, who is your primary
22     treater for that?
23 A.  **Dr. Richard Zekman.**
24 Q.  Z-U-C-K?
25 A.  **Z-E-K-M-A-N.**

CAUDLE, DAVID
05/15/2019

Pages 33—36

Page 33

```
1   Q.  You did that earlier, thank you.  And where is
2       Dr. Zekman?
3   A.  He's on Grand River in Farmington Hills, Michigan.  I
4       forget the name of the office.
5   Q.  Is he at the same place as Dr. Deland is?
6   A.  They're across the street.  They're right next door to
7       each other.
8   Q.  Okay.  Any other regular treating physicians?
9   A.  No.
10  Q.  When you go the hospital where do you go?
11  A.  Beaumont Royal Oak.
12  Q.  Do you have a clinic that you go to when you need
13      something but it doesn't require going to the
14      hospital?
15  A.  No.
16  Q.  Other than the sleep apnea doctor that's at Beaumont
17      but you're not sure where, Dr. Zekman, Dr. Deland and
18      Beaumont Royal Oak Hospital, have you been to any
19      other medical facilities for treatment since you came
20      back to Michigan?
21  A.  Beaumont Farmington Hills.
22  Q.  Anyplace else?
23  A.  My old doctor, Dr. Meyers.
24  Q.  Is Dr. Meyers still around?
25  A.  Yes.
```

Page 34

```
1   Q.  Okay.  Where is Dr. Meyers?
2   A.  He's on Northwestern Highway in Millennium-something.
3   Q.  Do you know his first name?
4   A.  Dr. Jeffrey Meyers.
5   Q.  And what kind of doctor is he?
6   A.  Internal medicine.
7   Q.  Anybody else?
8   A.  No.
9   Q.  When you were in Pennsylvania, did you have a
10      different treating physician out there?
11  A.  Yes.
12  Q.  Okay.  Who was that?
13  A.  I don't remember.
14  Q.  All right.  Do you know whether when you came back to
15      Michigan your Michigan doctors got your Pennsylvania
16      records?
17  A.  I don't believe they asked for them.
18  Q.  Okay.  When you were in Michigan, before you went to
19      Pennsylvania, did you have different doctors than the
20      ones you've described for me here?
21  A.  Yes.
22  Q.  Do you remember who they were?
23  A.  Not really.
24  Q.  Okay.  Are you currently on any medication?
25  A.  Yes.
```

Page 35

```
1   Q.  How many different kinds?
2           MR. GALLAGHER:  Can you explain what you
3       mean, currently?
4   BY MS. NORRIS:
5   Q.  Do you have a prescription now that when you get up in
6       the morning you're supposed to take medication or once
7       a week you're supposed to take medication or something
8       like that?  Not this very moment sitting here
9       necessarily, but do you currently have prescribed
10      medication?
11  A.  Yes.
12  Q.  How many different things?
13  A.  Four.
14  Q.  And what are they?
15  A.  Lyrica.  Folic acid.  Jesus, what's the name of that
16      one?  It's Robaxin.
17  Q.  And the fourth?
18  A.  Dilaudid.
19  Q.  What's the Lyrica for?
20  A.  When I was in the hospital I got diagnosed with Bell's
21      palsy.
22  Q.  Okay.  So did you just get started -- prescribed the
23      Lyrica?
24  A.  Yes.
25  Q.  And was that your most recent hospitalization?
```

Page 36

```
1   A.  Yes.
2   Q.  And are you seeing any doctor for that other than one
3       of the doctors we've already talked about?
4   A.  No.
5   Q.  What's the folic acid for?
6   A.  Sickle cell.
7   Q.  And the Robaxin?
8   A.  Sickle cell.
9   Q.  And the Dilaudid?
10  A.  Sickle cell, to contain the pain.
11  Q.  In the last year have you been prescribed any drugs
12      other than the ones you just told me?
13  A.  Yes.
14  Q.  Okay.  What else?
15  A.  I can't name them.
16  Q.  Do you know what they were for?
17  A.  Different treatments of the sickle cell, cold,
18      various --
19  Q.  Okay.  Sickle cell, cold -- you don't need to tell me
20      about colds and sore throats and the flu.  Any other
21      conditions other than the sickle cell that you've had
22      and regular sort of transient --
23  A.  The diabetes, as far as control, I had insulin that I
24      was getting.
25  Q.  When were you on insulin?
```

CAUDLE, DAVID
05/15/2019                                                                    Pages 37–40

Page 37

1   A.   From 2014 when I first got diagnosed until I want to
2        say the end of 2014, then I got put on pills and then
3        it went to being controlled after the middle of 2015.
4   Q.   So by the middle of 2015 you no longer needed any
5        medication?
6   A.   No -- yes.
7   Q.   Okay. Any other medications since 2014 that we
8        haven't talked about?
9   A.   I can't be sure.
10  Q.   Okay. Am I correct, to get Social Security you have
11       to show that you are unable to do any work of any
12       kind?
13  A.   Yes.
14  Q.   And when did a doctor first tell you that you were
15       unable to do any work of any kind?
16  A.   First time it was told to me?
17  Q.   Yeah.
18  A.   I'm going to say beginning of 2017.
19  Q.   Did you graduate from high school?
20  A.   Yes.
21  Q.   When and where?
22  A.   Henry Ford, 1998.
23  Q.   And did you go to college?
24  A.   I went to O.C.C.
25  Q.   Oakland Community College?

Page 38

1   A.   Yes.
2   Q.   When --
3   A.   And ITT. I went 1999 and 2000.
4   Q.   And did you go to ITT at the same time?
5   A.   I went to O.C.C. in 1999 and ITT in 2000.
6   Q.   And how long did you remain at O.C.C.?
7   A.   A semester.
8   Q.   And did you ever go back?
9   A.   No.
10  Q.   How long did you remain at ITT?
11  A.   A semester.
12  Q.   And did you ever go back there?
13  A.   No.
14  Q.   When you were at O.C.C., were you taking any
15       particular kinds of courses or just general ed?
16  A.   General.
17  Q.   When you were at ITT, were you doing anything
18       specific?
19  A.   Computer engineering, computer programming.
20  Q.   Why did you stop going to O.C.C.?
21  A.   Couldn't afford it at the time.
22  Q.   And why did you stop going to ITT?
23  A.   My girlfriend at the time got pregnant.
24  Q.   And that's when your daughter was born?
25  A.   Born 2001.

Page 39

1   Q.   Any formal education since O.C.C. in 1999 and ITT in
2        2000?
3   A.   No.
4   Q.   Have you had any other type of formal training that
5        gets you a certificate or a license or anything like
6        that?
7   A.   Job certificates, but --
8   Q.   Are you talking about like when you're on the job and
9        you get a certificate for completing --
10  A.   Yes.
11  Q.   -- something?
12            Okay. Anything by any license or anything
13       like that?
14  A.   No.
15  Q.   Am I correct you are not currently employed?
16  A.   Correct.
17  Q.   And am I correct that you're not currently looking for
18       another job?
19  A.   Correct.
20  Q.   And that's because you can't work, right?
21  A.   Correct.
22  Q.   When is the last time you looked for work?
23  A.   Last year.
24  Q.   Sometime in 2018?
25  A.   Yes.

Page 40

1   Q.   What kind of work were you looking for?
2   A.   Field rep, anything at the time.
3   Q.   When in 2018 is the last time you were looking for
4        work?
5   A.   Last time?
6   Q.   Yes.
7   A.   December.
8   Q.   Of 2018?
9   A.   Yes.
10  Q.   And what did you do to look for that work?
11  A.   I went on Indeed, Monster, CareerBuilders, Career
12       Fairs. There was another, ZipRecruiter. Any and
13       everything I could try to jump because I had child
14       support to pay.
15  Q.   And at that time in 2018 you mentioned you were
16       looking for field rep jobs. Any other kind of
17       employment?
18  A.   I was just looking for anything that somebody would
19       hire me.
20  Q.   Can you give me examples of the kind of things you
21       were trying for?
22  A.   Entry level, best way to explain it.
23  Q.   Okay. Were you looking in a particular geographic
24       area?
25  A.   No.

Page 41

1  Q.  Were you looking in a particular pay area?
2  A.  No.
3  Q.  In 2018 when you were looking for work, were you
4      ready, willing and able to work at that time?
5  A.  The times I was looking, yes.
6  Q.  Were there periods in 2018 when you could work and
7      periods when you could not?
8  A.  Technically I couldn't work at all, I just didn't
9      know.  I wanted to work.
10 Q.  Okay.  When you say you just didn't know, what do you
11     mean?
12 A.  I found out medically I couldn't work and that's why
13     they told me to go for disability.
14 Q.  Okay.  We talked earlier, I believe you told me that
15     you found out medically you could not work in late
16     2018; is that right?
17 A.  Yes.
18 Q.  All right.  So earlier in 2018 you had the same
19     medical problems, but you were not aware that you
20     shouldn't be working; is that right?
21 A.  Yes.
22 Q.  So up until you applied for disability, were you
23     looking for work throughout 2018?
24 A.  Yes.
25 Q.  Okay.  Do you know how many jobs you applied for in

Page 42

1      2018?
2  A.  No.
3  Q.  Did you get any offers?
4  A.  Can't remember.  2018?
5  Q.  Yeah.
6  A.  Yes.
7  Q.  Okay.
8  A.  Yes.
9  Q.  How many offers did you get?
10 A.  One.
11 Q.  Where?
12 A.  Aerotek.
13 Q.  Doing what?
14 A.  Medical repair technician.
15 Q.  Where would that have physically been?
16 A.  At Prezio Health in Novi.
17 Q.  Do you know what that would have paid?
18 A.  $14 an hour.
19 Q.  Did you accept that offer?
20 A.  Yes.
21 Q.  And then did you go to work there?
22 A.  Yes.
23 Q.  Okay.  We'll talk about that in a few minutes.  In
24     2017 were you looking for work?
25 A.  Yes.

Page 43

1  Q.  Same kinds of jobs?
2  A.  Yes.
3  Q.  Looking in the same places?
4  A.  Yes.
5  Q.  Did you get any offers in 2017?
6  A.  2017?  Trying to think.  I know I was on unemployment.
7  Q.  Were you on unemployment for a period of time after
8      you left Nielsen?
9  A.  Yes.
10 Q.  After you got off unemployment do you remember getting
11     any offers in 2017?
12 A.  No, because if you got offers they kicked you off for
13     not taking it.
14 Q.  Did you stay on your unemployment and not look for
15     work until your unemployment expired, so that -- for
16     that reason?
17 A.  No, they made you look for jobs, unemployment.  You
18     had to submit it each week.
19 Q.  Okay.  And did you get any offers through any of that?
20 A.  No.  If you got any offers, they kicked you off
21     unemployment for not taking it.
22 Q.  Right.  So does that mean you weren't really trying to
23     get offers?
24 A.  No, I submitted every offer I got.  So if a job said
25     they offered it and they called and they found out I

Page 44

1      didn't accept it, I would have got kicked off.  So I
2      was looking.
3  Q.  All right.  I'm trying to find out if you actually got
4      offers?
5  A.  No, I didn't get offers.
6  Q.  Okay.  Okay.  I want to go back to when you graduated
7      from high school.  You went to O.C.C.  Were you
8      working while you were at O.C.C.?
9  A.  I don't remember.
10 Q.  Then you went to ITT.  Do you remember if you were
11     working after ITT?
12 A.  After ITT?
13 Q.  I'm sorry, thank you.  While you were at ITT?
14 A.  No, because I was concentrating on going, just getting
15     back to school.
16 Q.  Okay.  And then you found out that your girlfriend was
17     pregnant.  Did you go to work then?
18 A.  No, I moved to Erie, then I went to work.
19 Q.  Okay.  So when you moved to Erie where did you go to
20     work?
21 A.  Target.
22 Q.  Was that in Erie, Pennsylvania?
23 A.  Yes.
24 Q.  What did you do there?
25 A.  Stock.

CAUDLE, DAVID
05/15/2019

Pages 45–48

1  Q.  And am I correct we're in about 2001; is that about
2      right?
3  A.  No -- yeah, 2000.
4  Q.  Okay.  And how long did you remain there?
5  A.  Maybe a year.
6  Q.  Why did you leave that job?
7  A.  Started working at Coca-Cola.
8  Q.  And was this also in Erie?
9  A.  Yes.
10  Q.  How long were you at Coca-Cola?
11  A.  Three years.
12  Q.  So until about 2004?
13  A.  Yeah.
14  Q.  Approximately?
15  A.  Approximately.
16  Q.  What did you do there?
17  A.  Stock loader.  I loaded the trucks that went out to
18      the stores and made the pallets for the grocery
19      stores.
20  Q.  Why did you leave that job?
21  A.  Me and my fiancée broke up and I moved back to
22      Michigan.
23  Q.  And when you came back to Michigan where did you go to
24      work?
25  A.  I'm not exactly sure.

1  Q.  Do you remember the first job you had in Michigan when
2      you came back?
3  A.  I'm not sure.
4  Q.  Okay.
5  A.  I can't be certain.
6  Q.  That's okay.  What's the first job you remember?
7  A.  I think it was the Star Theater, movie theater in
8      Southfield, Michigan.
9  Q.  What did you do there?
10  A.  Everything.
11  Q.  Take tickets, sell popcorn, clean?
12  A.  Yes.  Clean the theater, sell popcorn, sell the
13      tickets.
14  Q.  How long were you there?
15  A.  Maybe a year.
16  Q.  Why did you leave that job?
17  A.  Lack of pay.
18  Q.  Did you have another job when you left?
19  A.  I don't remember if I had one exactly when I left.
20  Q.  Did you leave Star Theater voluntarily or were you
21      terminated?
22  A.  Voluntarily.
23  Q.  What's the next job you had?
24  A.  A company called Product Action.
25  Q.  What did Product Action do?

1  A.  They did the dirty work for the Big Three, the
2      automotive company.
3  Q.  What do you mean by the dirty work?
4  A.  We counted parts.  If something was broken, we went
5      and looked at it.  The things that they didn't want to
6      give their workers overtime for.  I was --
7  Q.  Where was that, where did you go to work?
8  A.  That was in Warren, Michigan.
9  Q.  How long were you at Product Action?
10  A.  I think it was two years.
11  Q.  Why did you leave that job?
12  A.  The company closed.
13  Q.  All right.  How long were you unemployed -- did you
14      get unemployment after Product Action closed?
15  A.  Yes.
16  Q.  Was that the first time you got unemployment?
17  A.  No.
18  Q.  Okay.  Where was the first time you got unemployment?
19  A.  When I left Erie.
20          MR. GALLAGHER:  I'm sorry?
21  BY MS. NORRIS:
22  Q.  You said when you left Erie?
23  A.  When is the first time I got unemployment?
24  Q.  Yes.
25  A.  I had unemployment when I left Erie.

1  Q.  Okay.  Did you get terminated from your Erie job?
2  A.  No.
3  Q.  So how did you get unemployment?
4  A.  I was -- no, actually I called off and -- because me
5      and my fiancée were arguing.  Yes, I did get
6      terminated, yes.
7  Q.  Okay.  Then you collected unemployment and moved back
8      to Michigan?
9  A.  Yes.
10  Q.  Okay.  After Product Action where is the next place
11      you went to work?
12  A.  MotorCity Casino.
13  Q.  All right.  What did you do there?
14  A.  I put the coins in slot machines.
15  Q.  And how long were you there?
16  A.  Six or eight months.
17  Q.  Why did you leave that job?
18  A.  We were laid off because they went to tickets instead
19      of coins.
20  Q.  And did you get unemployment then?
21  A.  Yes.
22  Q.  The next job?
23  A.  AT&T.
24  Q.  What did you do at AT&T?
25  A.  I was an outside apprentice tech.

CAUDLE, DAVID
05/15/2019

Pages 49–52

Page 49

1  Q.  What does that mean?
2  A.  I installed U-verse cable in the customers' homes, I
3      ran telephone lines and I ran Internet.
4  Q.  Okay.  Did you have to get any special training for
5      that?
6  A.  They trained us, yes.
7  Q.  Did you get any license or certificate or anything as
8      a result of that training?
9  A.  No, because the -- it was a union job, the union
10     workers didn't want us in the contract so we were left
11     outside the contract.  So we didn't get officially --
12     we didn't get official certification or anything for
13     it.
14 Q.  Got it.  How long were you at AT&T?
15 A.  Two years, three years.
16 Q.  Okay.  So you think you were at AT&T for two to three
17     years?
18 A.  Yes.
19 Q.  Okay.  Are we in the mid 2000s now?
20 A.  Yes.
21 Q.  Okay.
22 A.  2007, 2009.
23 Q.  Why did you leave that job?
24 A.  I was let go.
25 Q.  What for?

Page 50

1  A.  I was told I did something I didn't do on a job.
2  Q.  And what were you told that you did -- what were you
3      accused of doing?
4  A.  Refusing to find a grounded outlet in a home.
5  Q.  So you were supposed to find a grounded outlet and
6      they said you did not?
7  A.  Yes.
8  Q.  Okay.  But actually you did?
9  A.  No, there wasn't one.  The home unit had to be in a
10     grounded outlet to keep it from doing an electrical
11     fire in the home.  And it was an old home on the east
12     side of Detroit, they didn't have grounded outlets
13     because it wasn't updated.
14 Q.  But you were terminated?
15 A.  Uh-huh.
16 Q.  You have to say yes or no.
17 A.  Yes.
18 Q.  Okay.  Did you file a charge with the EEOC or Michigan
19     Department of Civil Rights after that termination?
20 A.  I'm not sure if I did or didn't.
21 Q.  Did you file a lawsuit?
22 A.  No.
23 Q.  Did you get an attorney?
24 A.  No.
25 Q.  About how long -- did you get unemployment after you

Page 51

1      left AT&T?
2  A.  Yes.
3  Q.  Do you know if AT&T contested your unemployment?
4  A.  They did and I won.  It was a wrongful termination.
5  Q.  On what basis was it wrongful, according to
6      unemployment?
7  A.  They didn't -- they couldn't show proof of why they
8      terminated me.
9  Q.  Okay.  Where did you go to work next?
10 A.  Don't remember without looking at a resumé.  I do
11     remember -- I think Nielsen comes to mind, but I
12     thought I went to somewhere before that.
13 Q.  Did you work at Dish Network at some point?
14 A.  Yes.
15 Q.  Okay.  Was that after AT&T?
16 A.  Yes.
17 Q.  All right.  What did you do there?
18 A.  I installed the Dish -- the satellite dishes in the
19     home and Internet.
20 Q.  How long were you there?
21 A.  Six or eight months, I think.
22 Q.  And why did you leave that job?
23 A.  I quit because of pay and hours.  They cut my hours to
24     15 or 20 hours a week and I couldn't survive off of
25     that.

Page 52

1  Q.  Did you get unemployment when you quit?
2  A.  I'm not sure.
3  Q.  Did you quit voluntarily?
4  A.  Yes.
5  Q.  Did you have another job lined up?
6  A.  At the time, no, but I couldn't afford to pay for gas
7      to get out there and keep the job.
8  Q.  Where did you have to go -- when you were at AT&T
9      where physically were you?
10 A.  Southfield, Michigan.
11 Q.  Okay.  And when you were at Dish where were you?
12 A.  Warren, Michigan.
13 Q.  All right.  How long were you unemployed after you
14     left Dish?
15 A.  I'm not sure, maybe a month or two.  I'm not sure.
16 Q.  Could it have been as long as a year?
17 A.  Maybe, I'm not sure.  I can't remember offhand.  I may
18     have gotten unemployment then, I'm not sure.  I can't
19     recall.
20 Q.  Is the information on your LinkedIn page accurate?
21 A.  That, I don't know because I haven't really checked it
22     to update anything on it.
23 Q.  Okay.  So it might not be updated, but is what's there
24     accurate for what it was?
25 A.  I'm not sure, I haven't looked at it to say.  My

CAUDLE, DAVID
05/15/2019

Page 53

1  fiancée set it up and it was sort of like flying by
2  air when she did it.
3  Q. Well, I thought you broke up with your fiancée before
4  you came back to Michigan?
5  A. No, my recent fiancée.
6  Q. You're currently engaged?
7  A. No, not anymore.
8  Q. Okay.  When -- I'm sorry, that's my confusion, not
9  yours.
10        When you went to Erie, Pennsylvania that
11  was with a fiancée; is that right?
12  A. Yes, that was my daughter's mother.
13  Q. And that relationship ended and you came back to
14  Michigan; is that right?
15  A. Yes.
16  Q. Okay.  When did you have another -- a new fiancée?
17  A. I had a girlfriend who -- I called her my fiancée
18  because she became my fiancée.
19  Q. Okay.  Let's start with when did she become your
20  girlfriend?
21  A. Say 2010.
22  Q. And were you living --
23  A. At the 21441.
24  Q. -- on Cambridge Avenue at that time?
25  A. Yes.

Page 54

1  Q. And then that girlfriend became your fiancée?
2  A. Yes.
3  Q. So she lived -- did she live there with you?
4  A. No.
5  Q. So was there ever a time when she lived there with
6  you?
7  A. No.
8  Q. Okay.  And when did that relationship end?
9  A. 2016.
10  Q. When in 2016?
11  A. November, December.
12  Q. And why did the relationship end?
13  A. Partly because of my losing my job at Nielsen, the
14  strain and everything it put on the relationship --
15  Q. And --
16  A. -- we were --
17  Q. -- what was the other part?
18  A. That was mostly it.  I got sick.  I was in the
19  hospital.  We were supposed to get married and we
20  started realizing we couldn't get married and people
21  got frustrated and -- she just couldn't take me being
22  sick and the hardship of the bills and we just
23  separated because it was better.
24  Q. And what's her name?
25  A. Raneshia Singleton.

Page 55

1  Q. R-A-N-I-S-H-A?
2  A. R-A-N-E-S-H-I-A?
3  Q. Okay.  And the last name?
4  A. Singleton.
5  Q. And where is Ms. Singleton?
6  A. You mean where she lives?
7  Q. Yeah.
8  A. Farmington Hills.
9  Q. Have you had any communication with her since you
10  broke up?
11  A. Yes.
12  Q. How often?
13  A. Here and there.
14  Q. Have you told her anything about what's at issue in
15  this lawsuit?
16  A. No.
17  Q. When you left Nielsen, what reason did you give her?
18  Did you tell her you were fired?
19  A. Yes.
20  Q. After leaving Nielsen, have you had any jobs other
21  than the Aerotek job?
22  A. Trying to recall.  I can't remember.
23  Q. If your LinkedIn page says that you worked at AT&T
24  from January 2007 until April 2010, do you have any
25  reason to dispute that?

Page 56

1  A. I can't be sure if it's right or not, like I said.
2  Q. Okay.  If it says that you were at Dish Network from
3  December 2010 until May 2011, do you have any reason
4  to dispute that?
5  A. I can't be sure on it.
6  Q. And if it says that you were at Nielsen from May 2012
7  until October 2016, do you have any reason to dispute
8  that?
9  A. That sounds correct.
10  Q. And if it says that you were at Prezio Health from
11  February 2017 until November 2017, do you have any
12  reason to dispute that?
13  A. Yes.
14  Q. Okay.  Why?
15  A. Because Prezio I didn't start until May of 2014 -- I
16  mean, 2018, I'm sorry.
17  Q. Okay.  And did you leave in November?
18  A. I believe that was that time.  I think it was a
19  six-month contract and it was not picked up.
20  Q. Did you get unemployment for that?
21  A. Yes.
22  Q. Any other jobs since leaving Nielsen?
23  A. Not that I can recall.
24  Q. You've told me about a couple of jobs from which you
25  were terminated.  Did you ever resign from a job

CAUDLE, DAVID
05/15/2019

Page 57

1    because you were going to be terminated?
2              MR. GALLAGHER:  Object to the form of that
3    question.
4              MS. NORRIS:  Well, he can answer.  If they
5    said we're going to fire you and he said he quit, he
6    knows if that happened or not.  He can answer.
7              MR. GALLAGHER:  I'm not telling him not to
8    answer.
9  A.  Not that I know of, no.
10  BY MS. NORRIS:
11  Q.  Okay.  Have you ever had your own business?
12  A.  No.
13  Q.  Did you file taxes in 2015, 2016 and 2017?
14  A.  I believe so.
15  Q.  Okay.  I'm not suggesting you didn't, don't look --
16    you looked at me like I'm accusing you of something.
17    I'm just entitled to see what documents exist and
18    that's one of my questions.
19           When did you first apply for a position
20    with Nielsen?
21  A.  I don't remember when I first applied.
22  Q.  Did you apply more than once?
23  A.  Not that I know of.
24  Q.  What did you have to do to get the job?  What was the
25    process?

Page 58

1  A.  I met Ryan Dinsmore at the Marriott in Southfield,
2    Michigan with a room full of other people.
3  Q.  Was it some kind of job fair?
4  A.  No, it wasn't a job fair.  It was a testing and it was
5    different test questions you have to answer.  And he
6    asked questions and depending on how you answered the
7    questions while doing the test, if he felt you were
8    customer relatable to someone he would want to hire
9    and not someone that was single-minded, that would --
10    like knew another customer -- if they were talking to
11    you, if they were home, he hired you.
12  Q.  So it's your understanding that Ryan based his
13    decision, in part, on how you did on the test and, in
14    part, on how you related?
15  A.  That's what he told me.
16  Q.  Okay.  Was anybody else involved in that other than
17    Mr. Dinsmore?
18  A.  I don't know.
19  Q.  As far as you know, did Ryan Dinsmore make the
20    decision to hire you?
21  A.  I believe so.
22  Q.  And did Mr. Dinsmore tell you that that was why he
23    hired you when he made the offer?
24  A.  Yes.
25  Q.  Did he make the offer there on site or did you have to

Page 59

1    wait?
2  A.  I had to wait.  I found all that information out
3    later.  I was not told any of that during the testing.
4  Q.  Throughout your employment with Nielsen, did
5    Mr. Dinsmore compliment you and give you good reviews
6    on your relationships with your homeowners?
7  A.  Yes.
8  Q.  Did you have to provide a resumé of any kind?
9  A.  Yes.
10  Q.  Do you know what that resumé showed about your prior
11    employment?
12  A.  I can't recall.
13  Q.  Do you know if it showed the gaps in the employment
14    that we've talked about?
15  A.  Yes.
16  Q.  Other than talking to Mr. Dinsmore at the Marriott,
17    did you have to talk to anybody else before you got
18    the job?
19  A.  I think I talked to someone in HR once.
20  Q.  Was that after the Marriott issue?
21  A.  I'm not sure if it was before or after.
22  Q.  And do you remember who that was?
23  A.  No.
24  Q.  Do you remember what they said?
25  A.  It was a brief -- I think it was asking me if I was

Page 60

1    interested in a job and then a couple of questions
2    about it.
3  Q.  Okay.  When you talked to Mr. Dinsmore at the
4    Marriott, I'm not familiar with this process, so
5    you're in a hotel conference area?
6  A.  Yes.
7  Q.  And there are many people; is that right?
8  A.  Yes.
9  Q.  Are all those people looking for jobs?
10  A.  Yes.
11  Q.  Are there people other than Mr. Dinsmore talking to
12    them?
13  A.  No.
14  Q.  So Mr. Dinsmore is kind of running this application
15    process; is that right?
16  A.  Yes.
17  Q.  And do you go up to a desk, are you sitting at a
18    table --
19  A.  Tables.
20  Q.  All right.  And then does he come around to you?
21  A.  No, he was sitting in front.
22  Q.  He's in the front?
23  A.  Yes.
24  Q.  And when -- he's in the front and you're taking a test
25    while he's doing this?

CAUDLE, DAVID
05/15/2019                                                                          Pages 61–64

---

Page 61

1   A.   Yes.
2   Q.   What kind of things are on that test?
3   A.   Problem solving questions.  I can't remember
4        everything.  Most of them was problem solving from
5        what I can remember.
6   Q.   Can you give me a kind of example?
7   A.   You were in a situation, blah, blah, blah, what would
8        you do, how would you react.
9   Q.   Okay.  Situational issues?
10  A.   Yes.
11  Q.   And then he's in the front.  Is he asking questions of
12       everybody or is he singling people out, are you
13       raising your hand, how is that working?
14  A.   I think he was just asking everybody questions and,
15       you know, then depending on how friendly you were and
16       personable he responded back.  Some people didn't talk
17       at all.
18  Q.   Okay.  But how did you know that it was your time to
19       talk, like did he say, okay, Mr. Dinsmore (sic),
20       here's a question for you or did he say here's a
21       general question and people shouted out or what did he
22       do?
23  A.   Just asked -- I think he just asked me a question
24       while I was taking the test.
25  Q.   While he was sitting up front?

Page 62

1   A.   Yes.
2   Q.   Then he asked other people questions?
3   A.   Uh-huh.  And they would ask questions about the test,
4        like if they didn't understand something, things like
5        that.
6   Q.   Okay.  Any other interview process before you got an
7        offer?
8   A.   No.
9   Q.   Did you have to go through a background check?
10                MR. GALLAGHER:  Objection, form.
11  A.   I believe so.
12  BY MS. NORRIS:
13  Q.   Did you have to take a drug test?
14  A.   No.
15                MR. GALLAGHER:  Same objection.
16  BY MS. NORRIS:
17  Q.   In the application process, did Mr. Dinsmore or HR or
18       anybody else in the application process say anything
19       to you to suggest that they had a problem with your
20       race?
21                MR. GALLAGHER:  Objection, form.
22                MS. NORRIS:  What's the objection to
23       whether they said anything about his race?
24                MR. GALLAGHER:  I mean --
25                MS. NORRIS:  What's the problem with the

Page 63

1        form?
2                 MR. GALLAGHER:  Somebody else saying
3        something.
4                 MS. NORRIS:  To him.
5                 MR. GALLAGHER:  Okay.
6                 MS. NORRIS:  Did anybody -- read my
7        question back.
8                 MR. GALLAGHER:  That's fine, sorry, I
9        misheard you.
10                (The following requested portion of the
11                record was read by the reporter at
12                10:31 a.m.:
13                Q.  In the application process, did
14                Mr. Dinsmore or HR or anybody else in the
15                application process say anything to you to
16                suggest that they had a problem with your
17                race?)
18                MR. GALLAGHER:  I stand corrected.
19  A.   No.
20  BY MS. NORRIS:
21  Q.   In the application process, was there any discussion
22       about your medical condition?
23                MR. GALLAGHER:  Objection, form.
24                MS. NORRIS:  Fair enough.
25  BY MS. NORRIS:

Page 64

1   Q.   Was there any discussion with you about your medical
2        condition?
3   A.   I don't remember.
4   Q.   Is that something you would remember if it had come
5        up?
6   A.   Not sure.  I can't remember.
7   Q.   Is there anything that would help you remember?
8   A.   I can't remember.  I guess if somebody said something,
9        you know, hurtful to me or something like that, maybe,
10       but I don't remember anything being --
11  Q.   Okay.
12  A.   Can't remember.
13  Q.   In the application process, other than submitting a
14       resumé, did you have any discussion with Mr. Dinsmore
15       or HR or anybody else about your prior employment
16       experience?
17  A.   Yes.
18  Q.   Okay.  Who did you talk to about that?
19  A.   Other than Mr. Dinsmore?
20  Q.   No, including Mr. Dinsmore.  Did you talk to anybody
21       else?
22  A.   No, not during the hiring process, no.
23  Q.   Okay.  What did you tell Mr. Dinsmore about your prior
24       employment?
25  A.   He just asked me about my background with AT&T

CAUDLE, DAVID
05/15/2019

Pages 65–68

Page 65

1    installing cable and he was telling me how it related
2    to Nielsen, how they had to do the multi-units and
3    things like that so I could catch on to it.  And
4    having to meter a VCR or TV, Nintendo, Xbox, if I had
5    experience doing that.
6    Q.   Did Mr. Dinsmore indicate to you that he thought that
7         the work that you did at AT&T and the work you did at
8         Dish would be helpful to your work at Nielsen?
9    A.   Yes.
10   Q.   Do you know if Mr. Dinsmore had your resumé?
11   A.   Yes.
12   Q.   Do you still have a copy of that resumé?
13   A.   I doubt it because it's so outdated.
14   Q.   Do you know if that resumé indicated that you had been
15        terminated?
16   A.   I'm not sure, I don't have it.
17   Q.   Okay.  Do you know if Mr. Dinsmore asked if you had
18        been terminated?
19   A.   I don't know if he asked that question.
20                MARKED FOR IDENTIFICATION:
21                DEPOSITION EXHIBIT 2
22                10:33 a.m.
23   BY MS. NORRIS:
24   Q.   You've been handed Deposition Exhibit 2, which is a
25        letter dated May 23, 2012.  Is this how you found out

Page 66

1         that you were getting an offer?
2    A.   No.
3    Q.   Okay.  How did you find out?
4    A.   Ryan called me.
5    Q.   Before you got this letter?
6    A.   Yes.
7    Q.   And what did he tell you?
8    A.   He told me -- asked me how my day was going, was
9         like -- we talked a little bit.  He said, well maybe I
10        can help your day go a little bit better and he told
11        me that he wanted to bring me aboard on Nielsen.  And
12        I was very -- I was in the car actually and I was very
13        excited.
14   Q.   Did you accept on the phone?
15   A.   Yes, I told him I was very excited, but I believe HR
16        called to make it official.
17   Q.   Did you receive this letter that's Exhibit 2?
18   A.   Yes, I did.
19   Q.   This letter lays out what your job would be, what your
20        pay would be, what your starting date would be, that
21        sort of thing; is this accurate?
22                MR. GALLAGHER:  Read that over before --
23   BY MS. NORRIS:
24   Q.   Yeah, take your time and look at it.
25   A.   Yes.

Page 67

1    Q.   The letter is signed by Lori, L-E-V-E-I-L-L-E?
2    A.   Yes.  She was the one that called me, yes.
3    Q.   Okay.  So she's the one that called you and confirmed
4         this?
5                 She's also the person that you talked to
6         during the hiring process?
7    A.   Yes.
8    Q.   Okay.  Seeing her name here, do you remember anything
9         else about what she said to you?
10   A.   No.
11   Q.   Do you know whether anybody other than Mr. Dinsmore
12        was involved in the hiring process, in terms of making
13        the decision?
14   A.   No, I don't know.
15   Q.   Did you start working full time on May 29, 2019
16        (sic) --
17   A.   Yes.
18   Q.   -- as a field representative?
19   A.   Yes.
20   Q.   What is Nielsen's product?  What does it sell?
21   A.   It sells data, the TV ratings.
22   Q.   And who does it sell it to?
23   A.   To the TV companies and to people that want to buy ad
24        time like to the Super Bowls or commercials.
25   Q.   So if I'm NBC and I want to know how my show is doing,

Page 68

1         Nielsen is one of the places I go to find out whether
2         my show is doing well or not?
3    A.   Yeah.  If your show -- is the demographic that you
4         had, if it hit what your show is supposed to be
5         targeting, you want to know if it hit that mark, that
6         demographic, reached that ratio.  Nielsen would tell
7         you if it hit that demographic, what age group, what
8         nationality was watching mostly.
9    Q.   And if I'm an advertiser and I want to advertise on
10        the Super Bowl, I want to know if certain people are
11        watching the Super Bowel; is that right?
12   A.   The people that were buying.
13                MR. GALLAGHER:  Objection to form.
14   A.   Ask it again.
15   BY MS. NORRIS:
16   Q.   If I'm advertising on the Super Bowl, I would want to
17        know if the people I'm interested in are watching the
18        Super Bowl?
19   A.   I can't answer that.  It was more so if you were doing
20        an ad, you wanted to make sure you put it in a time
21        slot where people were watching what you were buying,
22        more so than if people were watching during your ad.
23        You want to make sure you had the right time slot for
24        your commercial so the people would watch it.
25   Q.   So you understood that accurate data was very

CAUDLE, DAVID
05/15/2019

Pages 69–72

Page 69

1       important?
2   A.  Yes.
3   Q.  Because that's what Nielsen is selling, right?
4   A.  Uh-huh.
5   Q.  You have to say yes or no.
6   A.  Yes.
7   Q.  Do you know what happened if the data was wrong?
8   A.  Nielsen had to pay a rebate.
9   Q.  So it had to inform its customers and then pay money
10      back?
11  A.  After they did research to make sure it was their
12      fault, yes.
13  Q.  Do you know what it cost to do the research to
14      determine if the data was accurate or not?
15  A.  No.
16                  MARKED FOR IDENTIFICATION:
17                  DEPOSITION EXHIBIT 3
18                  10:38 a.m.
19  BY MS. NORRIS:
20  Q.  You've been handed what's been marked as Deposition
21      Exhibit 3, which is a job profile for field
22      representative.  Have you ever seen this document
23      before?
24  A.  Just reading it to make sure.
25  Q.  Yeah.

Page 70

1   A.  Yes, I think -- I believe I remember seeing this.
2   Q.  Do you think this accurately represents the job that
3       you were doing as a field representative?
4   A.  Yes, more or less.
5   Q.  Did you get this during some kind of orientation when
6       you were hired?
7   A.  Yes.
8   Q.  Is there anything -- I know you haven't had a chance
9       to read it line-by-line, you just glanced at it, but
10      you said accurate more or less.  Is there anything
11      that jumped out at you as being inaccurate?
12  A.  No, I mean, it just doesn't show everything that you
13      do at the job so --
14  Q.  Okay.  So there might be more that you did that's not
15      here?
16  A.  Yes.
17  Q.  Can you give me an example?
18  A.  Calling a customer and trying to get in at dinnertime
19      and smooth talking them or buying them dinner or doing
20      whatever it took to get in to fix a fault.
21  Q.  Okay.  So some of the techniques for getting into the
22      home?
23  A.  Yes, like some of the things you didn't know you had
24      to do.
25  Q.  And am I correct that during your employment with

Page 71

1       Nielsen, Mr. Dinsmore complimented you and gave you
2       favorable evaluations on your ability to get into the
3       homes?
4   A.  Yes.
5   Q.  Boiling everything that's in this long job profile
6       down, at its core what was it that you were supposed
7       to be doing for Nielsen?
8                   MR. GALLAGHER:  Objection; form,
9       foundation.
10  A.  My lawyer said objection.
11  BY MS. NORRIS:
12  Q.  Yeah, but he didn't tell you not to answer and he will
13      if you're not supposed to answer, he'll tell you not
14      to answer the question.
15                  MR. GALLAGHER:  Form and foundation
16      objections you can answer, if you know the answer.
17      But anything I say privilege-wise, that's when you
18      need to just stop.
19  A.  Ask the question again.
20  BY MS. NORRIS:
21  Q.  Sure.  At its core, what was it that you were doing
22      for Nielsen?
23  A.  Upholding the Nielsen values.
24  Q.  Right.  Is it fair to say that your job was to make
25      sure that what Nielsen had in the homes was working

Page 72

1       and accurate so that the Nielsen data was correct?
2   A.  That was part of the job, yes.
3   Q.  Okay.  If you were assigned to a home, was part of
4       your job to go in and see -- well, let me back up.
5           Am I right that people sign up to be a
6       Nielsen family?
7   A.  Yes.
8   Q.  And Nielsen wants to have Nielsen families of various
9       demographics, right?
10  A.  Yes.
11                  MR. GALLAGHER:  Objection, form and
12      foundation.
13  BY MS. NORRIS:
14  Q.  And Nielsen -- in your training did Nielsen talk to
15      you about what it was trying to accomplish?
16  A.  They gave us a broad idea.
17  Q.  Okay.  And so Nielsen needed to make sure that
18      homes -- that you knew equipment was in the homes; is
19      that right?
20  A.  Yes.
21  Q.  And Nielsen needed to make sure that the equipment was
22      working; is that right?
23  A.  Yes.
24  Q.  And Nielsen needed to make sure that the equipment was
25      accurately reflecting who was watching what, correct?

CAUDLE, DAVID
05/15/2019

Pages 73—76

1  A.  Correct.
2  Q.  And then if something went wrong, you needed to get
3     into the home and figure it out; is that right?
4  A.  Correct.
5        MR. GALLAGHER:  Objection, form and
6     foundation.
7  BY MS. NORRIS:
8  Q.  And am I correct that you got reports every day if
9     there was a fault someplace, you knew something wasn't
10    working in a home?
11 A.  Correct.
12 Q.  Did you also, in addition to fixing faults, did you
13    also periodically just try to visit each of your homes
14    and check things out?
15 A.  Only if they called saying they got something new.
16    You didn't periodically just go to a house for no
17    reason.
18 Q.  So you went to a house if there was a change or if
19    there was a problem?
20 A.  Yes, or if there was a review, the yearly review
21    needed.
22 Q.  Like an audit or something?
23 A.  Not an audit.  It was -- I guess it was an audit.  It
24    was just a yearly review to make sure whatever they
25    signed up for was still the same standards.

1  Q.  So even if there was no problem and even if you hadn't
2     been told about any change, once a year you were
3     supposed to see each home?
4  A.  Uh-huh.
5  Q.  You have to say --
6  A.  Yes, I'm sorry.
7  Q.  If you were assigned to home, were you required to
8     meter all of their devices?
9  A.  That were meterable, yes.
10 Q.  Is a television meterable?
11 A.  If it works.
12 Q.  So a working TV.  How about computers?
13 A.  Well, a working TV or a TV that they had stored.  If
14    you had a TV that just -- you just wasn't using, it
15    was somewhere, you didn't hook that up because it
16    wasn't being used.
17 Q.  Okay.  Who told you you don't do anything if a TV is
18    just stored?
19 A.  That was Nielsen protocol.  You tagged it and then you
20    put it in the notes that it was stored.
21 Q.  Okay.  So Nielsen would have a record of every device
22    in the house and would also know which ones are
23    working and which ones are not; is that right?
24 A.  A majority of the time.
25        MR. GALLAGHER:  Objection to foundation.

1  BY MS. NORRIS:
2  Q.  Is that what was supposed to happen?
3  A.  A majority of the time that was supposed to happen.
4  Q.  Was there ever a time when that wasn't supposed to
5     happen?
6  A.  People lie.
7  Q.  Sure.  So Nielsen might not know that something is in
8     the attic?
9  A.  Correct.
10 Q.  Okay.  But if you were aware that a TV was not in use,
11    if you saw a TV not in use or they told you there was
12    a TV not in use, you were supposed to tag that so it
13    would still show as existing but not in use?
14 A.  Yes.
15 Q.  Okay.  Other than televisions, any other devices?
16 A.  I can't remember everything.  VCRs, video games, DVD
17    players.
18 Q.  Computers?
19 A.  Computers.
20 Q.  Tablets?
21 A.  I think towards the end when I was there there was
22    tablets.  All tablets, I don't believe we were doing
23    it like that, didn't have the software.
24 Q.  Okay.  Was Ryan Dinsmore your supervisor when you
25    started?

1  A.  He's my manager.
2  Q.  Was his title field manager?
3  A.  Yes.
4  Q.  Did you have a supervisor between him and you?
5  A.  Yes.
6  Q.  Who?
7  A.  Dave Demmon.
8  Q.  Can you spell his last name, if you know?
9  A.  D-E-M-M-O-N, I believe.
10 Q.  And what was his title?
11 A.  Supervisor, field supervisor.
12 Q.  So your immediate supervisor was Dave Demmon and then
13    Ryan Dinsmore was above Dave?
14 A.  Yes.
15 Q.  Okay.  Did Dave Demmon ever say anything to you that
16    suggested he had any problems with race?
17 A.  No.  Dave was just a flat-out guy, he just said things
18    the way it was.  If it hurt your feelings, it hurt
19    your feelings, but --
20 Q.  Did he ever say anything suggesting he had a problem
21    with your medical condition?
22 A.  Not that I know of.
23 Q.  Sure, he could have said something to somebody else,
24    but you're not aware of it?
25 A.  Uh-huh.

CAUDLE, DAVID
05/15/2019

Page 77

1  Q.  Is that correct?
2  A.  Correct.
3  Q.  But nobody ever told you that he did that; is that
4      right?
5  A.  Right, to my knowledge.
6  Q.  Do you know who Ryan Dinsmore reported to?
7  A.  I'm not sure.
8  Q.  Do you know who Josh Hummel is?
9  A.  Yes, but there was somebody before Josh Hummel that
10     Ryan actually reported to that I couldn't remember his
11     name, but, yes, Josh Hummel was the last guy and I
12     believe when I left it was somebody else.
13 Q.  And do you know what Josh Hummel's title was?
14 A.  Regional manager, I think, or area manager.  I'm not
15     sure, can't remember.
16 Q.  But Mr. Hummel was in that position at the time you
17     were terminated?
18 A.  I believe so.
19 Q.  Did you ever have any conversations or communications
20     with Mr. Hummel?
21 A.  Yes.
22 Q.  How often?
23 A.  Not too often.
24 Q.  Did he ever say anything to suggest that he would
25     discriminate on the basis of race?

Page 78

1            MR. GALLAGHER:  Objection; form,
2       foundation.
3  A.  I can't recall.
4  BY MS. NORRIS:
5  Q.  Would you recall that, if he said something racial to
6      you would you remember that?
7  A.  Yes.
8  Q.  And if somebody else came and told you he said
9      something racist, would you remember that they told
10     you that?
11 A.  Yes.
12 Q.  Okay.  Those never happened, right?
13 A.  No.
14 Q.  Okay.  Did he ever say anything to you to suggest that
15     he had a problem with your medical condition,
16     Mr. Hummel?
17 A.  No.
18 Q.  Did your immediate supervisor ever change from Dave
19     Demmon to anybody else?
20 A.  Yes.
21 Q.  To who?
22 A.  Raul Mata.
23 Q.  And do you know when that change was?
24 A.  After Dave got fired.
25 Q.  What was Mr. Demmon fired for?

Page 79

1  A.  He was running my field area and not running calls
2      and -- I don't remember the full reason, I just
3      remember CliffsNotes that people told me.
4  Q.  What do you mean by not running calls?
5  A.  My area had field faults that were scheduled, quality
6      reviews, things that had to be done, and he
7      wouldn't -- he would reschedule them because he didn't
8      feel like running them.  There was too many faults, he
9      didn't feel like doing all that work.  So when I came
10     back I had over 200 faults that I was quoted as it was
11     my responsibility to do when I came back to the
12     market.
13 Q.  And when was that, when you came back to the market?
14     You mean when you started with the company or when you
15     came back from a leave?
16 A.  No, the market sent me to New York to test GTAM.  It
17     was a new software they were coming out with and there
18     was a test market area of New York, Washington --
19     well, the DMV area and Pennsylvania.  So I was gone
20     for four months from November until I think February.
21 Q.  What year?
22 A.  I want to say it was 2014.
23 Q.  And you came back and it was a mess and it was because
24     of Mr. Demmon?
25 A.  Yes.

Page 80

1  Q.  And do you know who made the decision to fire him?
2  A.  I think it might have been Mark Greenly.
3  Q.  Who is Mark Greenly?
4  A.  Mark Greenly.  I don't -- I think that was the
5      supervisor over Josh at the time.  All I remember was
6      we were at a scheduled lunch, team lunch.  Ryan got a
7      phone call saying he had to go to Demmon's house to
8      pick up his car and Matt Bennett, I believe that was
9      his last name, was the other manager that was already
10     there to let Dave know he had been fired.
11 Q.  Do you know if Mr. Hummel had anything to do with the
12     termination?
13 A.  I do not know.
14 Q.  Do you know if Mr. Dinsmore had anything to do with
15     the termination?
16 A.  From what I recall Ryan didn't know about it.
17 Q.  Until he was told to go do something?
18 A.  Yes.
19 Q.  Okay.  Mr. Demmon is white, I may have asked you that,
20     I don't recall?
21 A.  Yes.
22 Q.  And then your immediate supervisor is Raul Mata?
23 A.  Uh-huh.
24 Q.  Yes or no?
25 A.  Yes.

CAUDLE, DAVID
05/15/2019

Pages 81–84

---

Page 81

1  Q.  That's okay.  Did Mr. Mata ever say anything to
2      suggest that he would discriminate against you on the
3      basis of your race?
4  A.  No.
5  Q.  Did he ever say anything to suggest he had a problem
6      with your medical condition?
7          MR. GALLAGHER:  Objection; form,
8      foundation.
9  A.  I heard that him and Ryan talked about me.
10 BY MS. NORRIS:
11 Q.  Okay.  What did you hear?
12 A.  That I was sick all the time.  And then when I got
13     hurt because of Ryan and my back got thrown out, Raul
14     had made a statement saying, did he take off last
15     November and December last year?  Why does he always
16     do that?
17 Q.  Okay.  Who did you hear that from?
18 A.  They don't want their name disclosed, but two people
19     on the team.
20 Q.  I'm entitled to ask you and you have to answer that
21     question.
22 A.  They don't want their names disclosed.
23 Q.  They can not want it all they want.  I'm entitled to
24     know what evidence you have of discrimination in this
25     lawsuit and you've told me that two people accused

Page 82

1      somebody of making comments?
2  A.  I heard it once from -- what was his name?  Damen, he
3      was the warehouse guy.  And I heard it again from --
4      trying to think of his name.  Shermir.
5  Q.  Okay.  When did you hear this, what year?
6  A.  2015.
7  Q.  Okay.  So anything else that made you think that
8      Mr. Mata might have problems with your medical
9      condition?
10 A.  I don't believe Mr. Mata had a problem with it, he was
11     just in a conversation with Ryan because he was his
12     number two.
13 Q.  So you think Mr. Dinsmore had a problem and not
14     Mr. Mata?
15 A.  Uh-huh.
16 Q.  You have to say yes.
17 A.  Yes.
18 Q.  Okay.  Did Damen or Shermir tell you who was saying
19     what?
20 A.  They said Ryan and Raul were in the warehouse and Ryan
21     was talking to Raul saying it and then Raul made the
22     comment, did he take off last year at the same time?
23 Q.  Okay.  Did Mr. Mata remain your immediate supervisor
24     for rest of your employment?
25 A.  Yes.

Page 83

1  Q.  And did Mr. Dinsmore remain your field manager for the
2      rest of your employment?
3  A.  Yes.
4  Q.  And did Mr. Hummel, after he took over from the
5      previous person, did he remain --
6  A.  Yes.
7  Q.  -- the regional or area manager for the rest of your
8      employment?
9  A.  Yes.
10 Q.  Okay.  According to your offer letter you were paid
11     $17.50 an hour when you started.  Did that pay rate
12     ever change?
13 A.  Yes.
14 Q.  Do you know what it was when you were terminated?
15 A.  No.
16 Q.  If I said that you were making about $41,000 a year at
17     the time of your termination, does that sound about
18     right?
19 A.  Might be, I can't --
20 Q.  Not sure?
21 A.  Yes, not sure.
22 Q.  Okay.  Do you know what percentage raises you got each
23     year?
24 A.  I believe the highest you could get was a 4.  The
25     majority of the time I got a 3.

Page 84

1  Q.  Do you know who made that decision?
2  A.  Ryan Dinsmore.
3  Q.  Do you know who got higher?
4  A.  No.
5  Q.  Do you know who got lower?
6  A.  No.  Guys weren't -- we weren't supposed to talk about
7      that so -- and nobody really wanted to admit they got
8      a 1 or a 2 so --
9  Q.  Do you know if people did get 1s or 2s?
10 A.  No, because nobody admitted it and Ryan didn't tell
11     us.
12 Q.  Did you get benefits?
13 A.  Yes.
14 Q.  What benefits did you get?
15 A.  Full benefits.
16 Q.  Healthcare?
17 A.  Yes.  Medical, eye, dental.
18 Q.  Did you have to pay a portion of that?
19 A.  I believe it was free.  Actually, no, it wasn't free
20     because we had the health exam we took every year.
21     You would get money off your -- well, if you've passed
22     it.
23 Q.  When you went to work for Prezio, what were you paid
24     there?
25 A.  $14 an hour.

CAUDLE, DAVID
05/15/2019

Pages 85–88

Page 85

1   Q.   Did you get benefits there?
2   A.   No.
3   Q.   Before you were hired by Nielsen, did you know
4        anything about the company's employment policies?
5   A.   I had never heard of the company before.
6   Q.   After you were hired, were you given information about
7        the company's policies?
8   A.   Yes.
9   Q.   Were you given a handbook?
10  A.   Yes.
11  Q.   Were you given a hard copy or just something online or
12       both?
13  A.   Something online.
14  Q.   Okay.  Do you remember getting a hard copy of the
15       policies?
16  A.   I think we got one when we were out of town, but I
17       don't remember if they let us keep it.
18  Q.   But your understanding was that all of the policies
19       were available online?
20  A.   Yes.
21  Q.   Did you ever go online and look at the policies?
22  A.   No, because we looked at them in training class so
23       much I really didn't have a need to.
24  Q.   Did you go through an orientation at the beginning of
25       your employment?

Page 86

1   A.   Yes.
2   Q.   And were policies reviewed at that time?
3   A.   Not that I remember because it was more in-depth out
4        of town because we had our laptops and we could pull
5        up stuff and they did like a tutorial.
6   Q.   What do you mean by out of town?
7   A.   They sent us out of town for training in Florida.
8   Q.   Was that when you were first hired or later?
9   A.   That was when I was first hired.  Two weeks after I
10       was hired they sent me out of town.
11  Q.   And in Florida were there a number of new employees
12       there?
13  A.   Yes.
14  Q.   And they went through everything; is that right?
15  A.   Yes.
16  Q.   And that included how to do your job?
17  A.   Yes.
18  Q.   Your expectations, your job duties, all those sorts of
19       things?
20  A.   Yes.
21  Q.   And it also included policies and procedures?
22  A.   Yes.
23  Q.   And you were there for two weeks or how long?
24  A.   I think it was six weeks.
25  Q.   So everything you needed to know about the job,

Page 87

1        including policies, right?
2   A.   It wasn't everything you needed to know, but it was
3        enough to get you going.  And everything else you was
4        supposed to just catch on with or the other field reps
5        would help you out.
6   Q.   After that intensive six-week training at the
7        beginning of your job, did you have any additional
8        training at Nielsen?
9   A.   No.  Well, yes, when I did GTAM.
10  Q.   Okay.  You talked a little bit about GTAM before.  You
11       went to New York for that?
12  A.   Yeah, New York, Pennsylvania and the DMV.
13  Q.   And what were you learning to do?
14  A.   I learned how to install GTAM, how to fix it because
15       it had kinks in it because it was new software.  And
16       we got on the phone with engineering every night and
17       told them what issues we were having and they would
18       give us an update each week to update the system to
19       try to fix the problems.
20  Q.   So was this a new product?
21  A.   Yes.
22  Q.   And so it was being developed and you were kind of
23       learning it and testing it out and then giving
24       feedback?
25  A.   Yes, in the test market.

Page 88

1   Q.   Okay.  And then it would be revised and you'd test
2        that out?
3   A.   Uh-huh.
4   Q.   Yes or no?
5   A.   Yes, sorry.
6   Q.   And what was it that GTAM did?
7   A.   GTAM did the same thing that the old multiunit did,
8        but it was supposed to be a sleeker, smaller version
9        and faster so --
10  Q.   How long were you in New York and Pennsylvania doing
11       this?
12  A.   I believe three or four months.
13  Q.   Do you remember what year?
14  A.   I believe it was the end of 2014, going into 2015.
15  Q.   Any other training?
16  A.   No.
17            MS. NORRIS:  All right.  We're going to do
18       a bunch of exhibits hopefully quickly here.
19            (Off the record at 10:58 a.m.)
20            MARKED FOR IDENTIFICATION:
21            DEPOSITION EXHIBITS 4-8
22            10:58 a.m.
23            (Back on the record at 11:02 a.m.)
24  BY MS. NORRIS:
25  Q.   If you would look at Exhibit 4, please?

CAUDLE, DAVID
05/15/2019

Pages 89–92

Page 89

1          MR. GALLAGHER:  You're going to let him
2    look at the document, right?
3          MS. NORRIS:  Well, you don't know what I'm
4    going to ask him yet?
5          MR. GALLAGHER:  Exactly.  He gets an
6    opportunity to read a document.
7          MS. NORRIS:  If there's something he needs
8    to read to answer the question, he can have all the
9    time he needs to read it.  You don't even know what
10   I'm asking yet.
11         MR. GALLAGHER:  That's not fair.
12         MS. NORRIS:  Well, it's totally fair.
13   BY MS. NORRIS:
14   Q.   Could you look at Exhibit 4, please?
15   A.   Sure.
16         MR. GALLAGHER:  You're asking about a
17   document he hasn't even read.
18   BY MS. NORRIS:
19   Q.   Okay.  Exhibit 4, the cover says U.S. Employee Guide
20   to Nielsen Policies and Procedures; is that right?
21   A.   Yes.
22   Q.   If you look at Exhibit 4, it is not all of the pages.
23   You can see that the first page behind the cover is
24   number 5, the second page behind the cover is
25   number 9 --

Page 90

1    A.   Uh-huh.
2    Q.   -- this is not all the pages.
3          So I'm not telling you that this is all the
4    pages.  Do you recall in orientation or at any time
5    reviewing, either online, on your laptop or in hard
6    copy or some other way, something that was called the
7    U.S. Employee Guide to Nielsen Policies and
8    Procedures?
9    A.   Yes, we briefly went over it.
10   Q.   Okay.  Did you keep a copy of that?
11   A.   I'm not sure.  They told us to look it up online.
12   Q.   Is this something that you reviewed when you were in
13   orientation?
14   A.   Yes.
15   Q.   Did you ever ask anybody, either in orientation or
16   later in your employment, did you ever ask anybody any
17   questions about any of the policies or procedures that
18   were in the U.S. Employee Guide to Nielsen Policies
19   and Procedures?
20   A.   Yes, holidays and vacation time.  Because when I was
21   hired a holiday was coming up and I was trying to
22   figure out if I got paid.
23   Q.   Okay.  Who did you ask about holidays and vacation
24   times?
25   A.   The examine instructor.

Page 91

1    Q.   So this is during your orientation?
2    A.   Yes.
3    Q.   Do you remember what you were told?
4    A.   He had to look and make -- he had to find out.
5    Q.   Then did he give you an answer?
6    A.   I believe he told me that somebody would be calling me
7         to let me know for sure because --
8    Q.   And did that ever happen?
9    A.   Yes.
10   Q.   Okay.  So you got the answer that you needed?
11   A.   Yes.
12   Q.   Do you remember asking anybody any other questions
13   about the U.S. Employee Guide to Nielsen Policies and
14   Procedures?
15   A.   No.
16   Q.   Okay.  If you look at Exhibit 5 -- your attorney keeps
17   showing you something.
18         I'm just asking him if he asked people
19   questions.  He doesn't need to look at anything to
20   answer that.
21         MR. GALLAGHER:  Absolutely.  This is made
22   in 2014, so I -- these aren't even all the pages and
23   he wasn't --
24         MS. NORRIS:  I told him that they were not
25   all the pages.  I'm not asking him anything about any

Page 92

1    specific document behind this.  I'm asking if they
2    reviewed such a document in orientation.  He said yes.
3    I asked if he kept a copy of what he got.  He said no,
4    they were available --
5          MR. GALLAGHER:  Do you understand though
6    how that's not really fair when you give him a
7    document that's not complete, it's maybe 20 percent
8    and then you say did you review this?
9          MS. NORRIS:  I didn't ask if he reviewed
10   what's in front of him.  I asked, very clearly, if in
11   orientation they reviewed a document called what this
12   title is called, that's what I asked.  And I asked if
13   he still has what he got, because I don't know what he
14   got.  And he said no, that they were online.  And I
15   asked if he had any questions about what they
16   reviewed.  And he says yes and he told me what they
17   were.  None of that requires looking at anything other
18   than the cover page and the title.
19         MR. GALLAGHER:  I mean, it does.
20         MS. NORRIS:  It does not.
21         MR. GALLAGHER:  It absolutely does.  I
22   think you're asking him if he reviewed something
23   called this and there's things in there --
24         MS. NORRIS:  I didn't ask if he saw any of
25   these particular pages, and in fact told him that many

CAUDLE, DAVID
05/15/2019

Pages 93–96

Page 93

1        of the pages are not there.
2                MR. GALLAGHER:  I get it, but like -- so --
3                MS. NORRIS:  So you can conduct your
4        depositions the way you want.  This is the question
5        I'm asking him and he's answered them and he's
6        answered them clearly.
7                MR. GALLAGHER:  Again, I'm just trying to
8        be fair for him because it doesn't seem like a fair
9        thing when you throw six documents in front of him.
10               MS. NORRIS:  I could have gone through them
11       one by one so to -- put all the other ones aside and
12       just look at the one and then we'll go to others.  I
13       mean, I'm just trying to be efficient.
14               MR. GALLAGHER:  And I don't think that's a
15       fair representation of this document so -- okay,
16       continue.
17  BY MS. NORRIS:
18  Q.   Okay.  Could you look at Exhibit 5, please?
19  A.   **Okay.**
20  Q.   Exhibit 5, again, is a document that I'm not
21       purporting has all of the pages and I haven't asked
22       you if you've gotten this yet.  I'm looking at the
23       cover.  This is entitled Your Guide to Time Away from
24       Work.  Do you recall reviewing a document with that
25       title during orientation?

Page 94

1   A.   **Yes.**
2   Q.   Do you recall receiving in hard copy that document at
3        any time during your employment?
4   A.   **I guess.  I think we had it at training class --**
5   Q.   Okay.
6   A.   **-- but then we got our laptops and we looked at where**
7        **we can go get it online.**
8   Q.   Okay.  And do you, sitting here today, remember
9        anything about the policies and procedures that you
10       reviewed in the Your Guide to Time Away from Work?
11  A.   **Do I remember it as in?**
12  Q.   So let me ask the question differently in response to
13       your attorney's objections.  Do you know or would you
14       know, like if I gave you an hour to read everything,
15       would you know if what I've attached as part of
16       Exhibit 5 or attached as part of Exhibit 4, if those
17       are the same policies you reviewed or not; would you
18       know one way or the other?
19  A.   **Maybe.  I mean, in Exhibit 4 some of this says 2014**
20       **and I started in 2012 so I don't know if it was**
21       **amended or changed around, but for the most part,**
22       **yeah.**
23  Q.   If policies were changed online, would you get
24       notification that they were changed online or would
25       they just be changed and the next time you went to

Page 95

1        look at something you'd see the current policy?
2   A.   **I never received an update saying something was**
3        **changed that I can recall.**
4   Q.   Okay.  So do you know if policies were changed over
5        time?
6   A.   **Of course.**
7   Q.   And you were just told, go online and you can see the
8        policies, right?
9   A.   **I don't believe we were told just to go online and**
10       **look, but -- at least it wasn't told to us to do it.**
11  Q.   Well, what were you told?  When you were in
12       orientation I thought you were told you can find these
13       online?
14  A.   **They didn't say anything about updates, they just said**
15       **they can be found and read online.**
16  Q.   Okay.  Do you understand policies were updated from
17       time to time?
18  A.   **Yes.  I never thought about it.**
19  Q.   Okay.  And I believe you told me that you didn't get
20       an announcement of any kind, correct?
21  A.   **Not that I know of.**
22  Q.   Okay.  Exhibit 6 is entitled Policy Regarding
23       Discrimination, Harassment, Retaliation and Workplace
24       Relationships.  Do you recall seeing this policy?
25               MR. GALLAGHER:  Give him a moment to read

Page 96

1        this.  You're asking about this specific policy?
2                MS. NORRIS:  Yes, I am.
3   A.   **From what I remember about this policy, it was -- just**
4        **talked about sexual harassment, that was it.  It**
5        **was -- that was it.  That's all they really touched on**
6        **and they moved.**
7   BY MS. NORRIS:
8   Q.   Okay.  So when you were discussing the policies, you
9        remember them talking about sexual harassment?
10  A.   **That's the only thing they wanted to touch on and that**
11       **was the main issue that they wanted to put on.**
12  Q.   Okay.  Did you see this written policy?
13  A.   **Yes, they -- well, I can't say it was this exact one,**
14       **but I remember something like this.**
15  Q.   So there was a written policy and it looked like
16       Exhibit 6, but you don't know if Exhibit 6 is exactly
17       it; is that correct?
18  A.   **Yes.**
19  Q.   Okay.  Do you remember asking anybody questions about
20       the discrimination, harassment, retaliation policy?
21  A.   **It really wasn't a Q & A.  They wanted to get through**
22       **it because we had so much to cover in a day.  So it**
23       **was -- they targeted -- I remember them targeting**
24       **sexual harassment, telling us what was a no-go and**
25       **what the procedures were and then they moved on and**

CAUDLE, DAVID
05/15/2019

Page 97

1    said you can look at everything else at your leisure
2    online.
3    Q.   Do you recall during your employment asking anybody
4        any questions about the discrimination, harassment and
5        retaliation policy?
6    A.   Yes.
7    Q.   Okay.  Who?
8    A.   Ryan.
9    Q.   What did you ask?
10   A.   He gave me an unfair write-up and I told him I felt
11       like I was being discriminated against and I asked him
12       about it.  And he told me that it wasn't that, it was
13       because of my low PC percentage that he was writing me
14       up and it wasn't him, it was the people above him that
15       told him he had to do it and it was something that I
16       could come back from.
17   Q.   Okay.  When was this?
18   A.   I can't recall when he did it, to be honest.  I don't
19       know if it was 2013 or 2014.  I don't remember, to be
20       honest.
21   Q.   Early in your employment?
22   A.   Actually I don't know if it was early in my -- I know
23       it was after Dave Demmon got fired.
24   Q.   Okay.  But you think this was sometime in 2013 or
25       2014?

Page 98

1    A.   It could have been, I'm not sure.  I know it was after
2        Dave Demmon got fired, that's all I do remember,
3        because I felt like he was targeting me for Dave
4        Demmon being fired.
5    Q.   What was the write-up?
6    A.   It was a PIP.
7    Q.   So this was when you were placed on the PIP?
8    A.   Yes.
9    Q.   Did you specifically refer to the policy or did you
10       just say I think I'm being discriminated against?
11            MR. GALLAGHER:  Objection; form,
12       foundation.
13            MS. NORRIS:  I asked if he specifically
14       referred to something, how is there a form, foundation
15       question to that?
16            MR. GALLAGHER:  The policy -- and you
17       pointed to this policy and it's been -- half of these
18       policies were created after the dates we're talking
19       about.
20            MS. NORRIS:  But we're talking about the
21       discrimination, harassment and retaliation policy.
22            MR. GALLAGHER:  The one with 2016 on the
23       cover?
24            MS. NORRIS:  No, we're talking about the
25       discrimination, harassment and retaliation policy,

Page 99

1    that's the one he and I have been talking about, it's
2    the one right in the front of him and I asked if he
3    specifically referred to the policy --
4            MR. GALLAGHER:  May 2016, like I said.
5            MS. NORRIS:  I'm asking if he specifically
6    referred to the discrimination, harassment --
7            MR. GALLAGHER:  That wasn't in place at the
8    time?
9            MS. NORRIS:  -- policy -- we talked about
10   policies change.
11           He said the policy he saw looked like this,
12   he didn't know if this was exactly it, but this more
13   or less looked like it.
14   BY MS. NORRIS:
15   Q.   Is that correct, Mr. Caudle?
16   A.   Yes.
17   Q.   Okay.  So did you specifically refer to the policy,
18       did you say this is in violation of the harassment
19       policy or anything like that, or did you say it the
20       way you worded it to me, did you simply say I think
21       I'm being discriminated against?
22   A.   In a conversation, yes, I said it like that.
23   Q.   Like what I just said?
24   A.   Yes, I said it like that.  I asked him -- I feel like
25       I'm being discriminated against because of Dave Demmon

Page 100

1    being fired in my area.
2    Q.   Okay.  Do you recall asking anybody any questions
3        about the time-away-from-work policy, other than what
4        you told me before about how vacation pay and sick
5        days work?
6    A.   I was talked to about it by HR when I had to go on
7        short-term disability and they explained it to me.
8    Q.   Okay.  When you talked to Mr. Dinsmore about what you
9        thought was discrimination, did you say why you
10       thought it was discriminatory?
11   A.   Yes.
12   Q.   What did you say?
13   A.   I told him that I thought he was discriminating me
14       after Dave Demmon got fired for being in my field
15       area.
16   Q.   Did you say why you thought that?
17   A.   Because the minute after Dave Demmon got fired, he
18       became grossly invested in me more than anybody else.
19   Q.   What do you mean by that?
20   A.   A month or two months after that, during our E&Y
21       audits, I had 16 homes audited.  That was the most out
22       of everybody in the area and they're supposed to be
23       random.  Then I was told that Ryan, from the E&Y
24       audit, has selected the home -- because I had to be at
25       each home.

CAUDLE, DAVID
05/15/2019

Pages 101–104

Page 101

1    And the E&Y auditor said well, Ryan chose
2    this home because they had -- they went to a home
3    where they called a home and the home said they
4    wouldn't be there.  So they had to pick an alternative
5    and Ryan called this home.  And they said well, Ryan
6    chose the home, he called, they said we could get in
7    and it happened to be my home every time.
8  Q.  Okay.  So did you tell Mr. Dinsmore that you thought
9      you were being discriminated against because of your
10     race?
11 A.  That came later.
12 Q.  Okay.  So when -- I'm talking right now about when you
13     got the PIP and you said you thought you -- you
14     thought the write-up was unfair, you thought you were
15     being discriminated against because of Dave Demmon
16     being terminated.  Did you say what kind of
17     discrimination you thought this was at that time?
18 A.  I thought it was because he didn't do that to anybody
19     else.
20 Q.  Okay.  So you thought you were being treated
21     differently?
22 A.  Yes.
23 Q.  Did you say to him you thought you were being treated
24     differently because of your race?
25 A.  Yes.

Page 102

1  Q.  At the time of the PIP?
2  A.  Yes, because there were other people that were
3      performing low, as me, that didn't get put on PIP and
4      they were white.
5  Q.  Okay.  Did you raise that with him or did you just say
6      I'm being treated differently than other people?
7  A.  No, I said that exact question to him.  He told me I
8      was being insubordinate and told me that it wasn't
9      him, it was somebody higher up than him that told him
10     he had to write me up and --
11 Q.  Okay.  What was the exact question he just said?
12        MR. GALLAGHER:  Let him finish, please.
13 A.  He said that --
14 BY MS. NORRIS:
15 Q.  No, I'm asking what you said?
16        MR. GALLAGHER:  He gets to talk.
17 BY MS. NORRIS:
18 Q.  I'm asking what you said?
19 A.  I told him, when he put me on PIP, I asked him what
20     the PIP was for.
21 Q.  Okay.  And he gave you an answer?
22 A.  He said it was for --
23        MR. GALLAGHER:  He gets to talk.
24        MS. NORRIS:  No, I get to ask the question.
25        MR. GALLAGHER:  And he gets to answer it

Page 103

1      how he sees fit.
2  BY MS. NORRIS:
3  Q.  No, my question is what you said?
4        MR. GALLAGHER:  And he's explaining that.
5  BY MS. NORRIS:
6  Q.  No, I'm not asking for any explanation.  I'm asking
7      what did you say.  So you told me --
8        MR. GALLAGHER:  Without explaining
9      yourself, tell her what you said.
10       MS. NORRIS:  Listen, if I want to ask for
11     explanations, I can.  If I don't, I don't have to.
12       MR. GALLAGHER:  Well, how do you explain
13     yourself, like how do you explain something that
14     happened without explaining yourself?
15       MS. NORRIS:  I've not asked for any
16     explanation, I've asked for words that were said.
17       MR. GALLAGHER:  And he's giving you that.
18       MS. NORRIS:  Correct.  And then he starts
19     to tell me what Mr. Dinsmore said and I said I'm not
20     interested in that and that's my right.
21       MR. GALLAGHER:  Okay.  He gets to talk.  He
22     gets to finish his --
23 BY MS. NORRIS:
24 Q.  Okay.  Let me try this again.  You've got the PIP,
25     correct?

Page 104

1  A.  Correct.
2  Q.  And you said something to Mr. Dinsmore?
3  A.  Correct.
4  Q.  To the best of your memory, what did you say to
5      Mr. Dinsmore?
6  A.  I asked him why was I getting put on PIP.
7  Q.  Okay.  Then did Mr. Dinsmore give you a response to
8      that question?
9        MR. GALLAGHER:  He's going --
10 A.  Yes.
11       MR. GALLAGHER:  -- to have to be able to
12     answer the question, like full --
13 BY MS. NORRIS:
14 Q.  And what did you say -- please don't talk over me.
15     What did you say after he answered your
16     question?
17 A.  I asked him why.
18 Q.  And did he give you an answer to that?
19 A.  A roundabout -- a roundabout answer.
20 Q.  Okay.  And what did you then say?
21 A.  I got irritated and I asked him, has anybody else been
22     put on PIP for the same exact reason?  Because there
23     was other people that was suffering and they're not on
24     PIP.
25 Q.  Okay.  And what answer did he give you to that?

CAUDLE, DAVID
05/15/2019

Pages 105—108

Page 105

1   A.   He couldn't answer.
2   Q.   Then what did you say?
3   A.   I told him I felt like I was being discriminated
4        against because he couldn't tell me somebody else that
5        had been written up.
6   Q.   All right.  And did he respond to that in some way?
7   A.   No.
8   Q.   Okay.  Did you say anything else?
9   A.   Yes.
10  Q.   Okay.  What else did you say?
11  A.   I then began to ask why these certain individuals who
12       were white were not on PIP and were not getting their
13       bonuses taken away from them like I was.
14  Q.   Okay.  And when you said that to Mr. Dinsmore, did you
15       say, who are white, or are you just telling me that
16       they were white?
17  A.   I did say, who are white, and gave their names.
18  Q.   Okay.  And what did he respond to that?
19  A.   He said it wasn't his decision.
20  Q.   Okay.  And who were the white people who you thought
21       were being treated differently?
22  A.   James Hardy.  Brian, I can't remember his name --
23       Burkhardt I think was his last name.  And there was
24       somebody else who quit, I can't think of their name.
25  Q.   Okay.  Do you know what kind of evaluations those

Page 106

1        people got?
2   A.   Yes.
3   Q.   What did they get?
4   A.   They all got good evaluations.
5   Q.   How do you know that?
6   A.   Because I asked them, had they ever heard of anybody
7        getting written up for a low PC percentage and they
8        said no and they all laughed.  We have a weekly and a
9        daily generated score that comes out that everybody
10       sees on their phone.
11  Q.   In this conversation with Mr. Dinsmore about your PIP,
12       did you say anything about your medical condition?
13  A.   No.
14  Q.   Did he?
15  A.   No.
16  Q.   Okay.  Any other time prior to being terminated that
17       you raised with anybody at Nielsen, anybody in
18       supervision, so HR, your supervisors, that you raised
19       race discrimination?
20  A.   Before I got fired?
21  Q.   Before you got fired.
22  A.   No.
23  Q.   Okay.  Anytime before you got fired that you raised
24       any concern that you were being discriminated against
25       because of your medical condition?

Page 107

1   A.   No, because I didn't know I was.
2   Q.   If you could look at Exhibit 7, please?  And again,
3        this may or may not have been the policy that was in
4        place when you were there.  I'm not asking you about
5        the specifics behind the cover of Exhibit 7.  I'm
6        asking if during orientation you -- a code of conduct
7        was reviewed with you?
8   A.   Briefly.
9   Q.   Okay.  And did you understand that the code of conduct
10       was online?
11  A.   I knew that all of this was online.
12  Q.   Okay.  And in orientation do you recall any specific
13       conduct issues being discussed?
14  A.   No, because we basically flew through it.  Like I
15       said, it was -- wasn't really longwinded, it was
16       really short.  We maybe spent five or ten minutes on
17       it and moved to the next one.
18  Q.   And do you recall at any time during your employment
19       asking anybody any questions about the code of conduct
20       policy?
21  A.   No, not to my knowledge.
22  Q.   Okay.  Do you recall asking anybody any questions
23       about the harassment policy?  You've discussed to me
24       that you raised harassment with Mr. Dinsmore, but do
25       you recall asking anybody questions about how does

Page 108

1        this policy work, what does it cover, what am I
2        supposed to do if I think it's been violated, anything
3        like that?
4   A.   The manager that was before Josh, me and him talked
5        about it.
6   Q.   Okay.  So this is before Mr. Hummel came on board?
7   A.   Uh-huh.
8   Q.   You have to say yes or no.
9   A.   Yes.
10  Q.   And what was your discussion about the harassment
11       policy?
12  A.   I asked him how does harassment work.  I asked him
13       about -- just talking about it in general, how I felt.
14       He told me that Nielsen was a -- he had like an
15       open-door policy with his managers.  And he liked
16       things to be brought up to the managers first, then
17       escalated to him afterwards to -- instead, that's the
18       way he liked to handle it to try to -- some things
19       aren't as bad as people make them out to be, they
20       could just be cleared up.  And then he talked to me
21       about doing a mentoring.
22  Q.   In the time frame, when was this conversation with
23       this manager in relation to the conversation we've
24       just talked about regarding your PIP?
25  A.   I think it was the next month or the month after.  We

CAUDLE, DAVID
05/15/2019

Page 109

1      had an employee meeting and he was there.
2   Q.  Do you remember what year that was?
3   A.  I can't be sure.
4   Q.  Was it before or after your PIP?
5   A.  It was after the PIP.
6   Q.  Is it -- is it that it was about a month after the PIP
7       or that it was about a month after you had some
8       meeting?
9   A.  It was a month after the PIP.
10  Q.  Okay.  So you'd had the conversation with Mr. Dinsmore
11      and then there was a meeting at which Mr. Dinsmore's
12      manager was present, correct?
13  A.  Yeah, everybody was present.
14  Q.  And did you ask the questions during the meeting or
15      did you take him aside afterwards?
16  A.  Took him aside and just asked him.
17  Q.  All right.  And you said -- your words to me were
18      something like I asked him how does this harassment
19      work.  What did you mean by that, what was your
20      question?
21  A.  I asked him if I had an issue with somebody harassing
22      me or if I had an issue with somebody at work, how
23      does it actually -- how do you go about reporting it?
24  Q.  What should I do?
25  A.  Yes.

Page 110

1   Q.  Okay.  And my understanding from your answer before is
2       that he said I like people to talk to the immediate
3       person first and then if that doesn't work, escalate
4       it; is that right?
5   A.  Yes, uh-huh.
6   Q.  And you had already talked to Mr. Dinsmore; is that
7       right?
8   A.  Yes.
9   Q.  Did you, on the issue of the PIP, escalate it other
10      than this conversation you have just talked to me
11      about?
12  A.  No, because Ryan played it off saying that everything
13      was good, that I could get over it.  And then he
14      started giving me people to talk to to boost my PC
15      ratings and made like he was my best friend.
16  Q.  Okay.  If you look at Exhibit 8, this is called
17      Description of EY's Procedures.  Have you ever seen
18      this document before?
19  A.  Is this EY audits or -- I don't remember seeing this,
20      but I know what E&Y is.
21  Q.  Okay.  E&Y is Ernst & Young; is that right?
22  A.  I think so, yes.
23  Q.  While working at Nielsen, did you have a specific
24      territory?
25  A.  Yes.

Page 111

1   Q.  Was it geographic or something else?
2   A.  Sort of geographic.
3   Q.  What was your territory?
4   A.  I had -- it changed a lot, but originally most of the
5       time I had Hamtramck, Highland Park, part of Detroit,
6       a piece of Southfield, Warren, Sterling Heights and
7       Rochester Hills and Royal Oak and Oak Park.
8   Q.  How many homes?
9   A.  It fluctuated because it changed when Ryan would
10      visit -- revise the map of everybody, but at the most
11      or regularly I had between 69 and 73 homes.
12  Q.  And were these individual residents?
13  A.  Yes.
14  Q.  Did you sign up those homes as Nielsen participants or
15      did somebody else do that?
16  A.  Somebody else.
17  Q.  Who was responsible for that?
18  A.  Marketing team.
19  Q.  And if somebody no longer wanted to be a home, a
20      Nielsen home, did you deal with that or did somebody
21      else?
22  A.  I dealt with that and somebody else did too.
23  Q.  So what was your role?
24  A.  If I was at the home and somebody told me they didn't
25      want to be part of it anymore, I would have to call

Page 112

1       Ryan to try to save the home.  If I couldn't save the
2       home, I was responsible for taking the equipment out
3       of the home to return it back to Nielsen.
4   Q.  You said that you had part of Southfield and part of
5       Detroit; is that right?
6   A.  Yes.
7   Q.  What part of Southfield did you have?
8   A.  Eight Mile and Greenfield, Nine Mile and Greenfield,
9       from Greenfield to like Coolidge.  It was spread out a
10      little bit.
11  Q.  Okay.  And what part of Detroit did you have?
12  A.  Seven and Six Mile between Woodward to I would say
13      Greenfield.
14  Q.  Do you know who had the other parts of Southfield?
15  A.  At that time I think it was -- well, it changed
16      because they moved people around, but I think Tim
17      Franklin had it sometimes, Shermir and I can't recall
18      who else.
19  Q.  Who had the other parts of Detroit?
20  A.  Vikash had part of Detroit.  Matt.  James Hardy.
21      Brian.  I can't remember who else.
22  Q.  Okay.  What was a typical day?
23  A.  A typical day was -- if you didn't have your day
24      scheduled already, he would look at the faults, see
25      what homes you could get into to correct the hard

CAUDLE, DAVID
05/15/2019

Pages 113–116

1    faults that were hurting the market the most.  You
2    would try to get into that home, fix the faults, get
3    your market back up.  If not, you had installs or
4    de-installs you were doing or helping on.
5  Q.  Am I correct that you had scheduled visits with your
6    homeowners?
7  A.  Yes.
8  Q.  Did you generally go through this on your own or were
9    you working in tandem with another field
10   representative?
11 A.  They had the ROC (phonetic) that would help you
12   sometimes.  They would be able to call the homes if
13   you couldn't call all of them or if the home called in
14   and they had a fault or something already pending they
15   would try to make the appointment for you.
16 Q.  And did you ever have a supervisor go with you to a
17   home?
18 A.  Yes.
19 Q.  Was that regular or certain circumstances?
20 A.  It wasn't regular.
21 Q.  Okay.  When Mr. Demmon was your supervisor, about how
22   often did he go to a home with you?
23 A.  He started off training me, so he was there pretty
24   regularly.  Then after that, maybe -- I don't know,
25   maybe five times.  I can't really count.

1  Q.  Okay.  And Mr. Mata, how often did he go to a home
2    with you?
3  A.  I can't really count.  I mean, a lot.
4  Q.  All right.  How often did Mr. Dinsmore go to a home
5    with you?
6  A.  I was there almost four years, a lot.
7  Q.  And do you know how often he went to other people's
8    homes?
9  A.  I can't recall.
10 Q.  Do you know if it was more or less or the same?
11 A.  At the time he was messing with me, I was there more
12   because you had to put it in N-gage what you were
13   doing so his name was attached to mine a lot more than
14   anybody else's.
15 Q.  Okay.  Explain to me what that means, let's start with
16   at the time he was messing with me?
17            MR. GALLAGHER:  He has to be able to talk.
18            MS. NORRIS:  I'm allowed to break down what
19   he just said.
20            MR. GALLAGHER:  You're not allowed to
21   interrupt him in the middle of when he's talking,
22   which you've done repeatedly here.
23 BY MS. NORRIS:
24 Q.  Let's start with at the time he was messing with me,
25   what time was that?

1            MR. GALLAGHER:  Finish what you were saying
2    first.
3  A.  During the time of -- after I was upset about the PIP,
4    Ryan started to come to my homes more.  He started to
5    say he was coming to help me to get it done quicker
6    and just coming by and then doing the Q&R audits while
7    he was there.
8  BY MS. NORRIS:
9  Q.  And how long did that last?
10 A.  He said it was because I was under the PIP so it was a
11   corrective action so he wanted to make sure I was
12   doing everything right.  So I think that lasted maybe
13   two months.
14 Q.  Okay.  And then you said that his name was attached to
15   N-gage.  Am I right that N-gage is the letter N and
16   then G-A-G-E?
17 A.  Yes.
18 Q.  And is N-gage a scheduling function or something else?
19 A.  Scheduling function.
20 Q.  So when you made your own appointment with a home on
21   your own, are you supposed to put that in N-gage?
22 A.  It has to be in N-gage.  Well, it's supposed to be in
23   N-gage, sometimes it's not, then you have to update it
24   later.  You put in N-gage what you're doing so they
25   don't schedule something else there.

1  Q.  Right.  And if the ROC makes an appointment for you,
2    that's supposed to go in N-gage?
3  A.  Yes.
4  Q.  So you indicated that Mr. Dinsmore's name was
5    attached?
6  A.  Yes, to show what he was doing for that day.
7  Q.  Okay.  So I'm trying to understand what that means.
8    Let's say that you had an appointment and Mr. Dinsmore
9    said I'm coming with you.  You're on the PIP, I'm
10   going to come with you.  Did his name then show up in
11   N-gage along with yours?
12 A.  Yes.
13 Q.  And did he put that there or did you or somebody else?
14 A.  He had to put it there.  I didn't have the power to.
15 Q.  Okay.  After the approximately two months on the PIP,
16   did Mr. Dinsmore's home visits with you decrease to
17   what they had originally been?
18 A.  Yes, somewhat.  That was -- E&Y audits were coming up.
19 Q.  And E&Y audits, my understanding is that Ernst & Young
20   performed outside audits on homes?
21 A.  Yes.
22 Q.  And am I -- do I understand that there's also internal
23   audits, where auditors from Nielsen decide what homes
24   are going to be audited?
25 A.  They just started that, the -- that wasn't done when I

CAUDLE, DAVID
05/15/2019

Pages 117–120

Page 117

1    was there.
2  Q.  That's more recent?
3  A.  Yes.
4  Q.  All right.  So when you were there it was the Ernst &
5    Young audits?
6  A.  Yes.
7  Q.  And what do you know about how homes were chosen in
8    those audits?
9  A.  They were all supposed to be randomly selected and it
10    was supposed to be broken up into all the field reps.
11    Some guys might not get selected, but most of the
12    homes, it was supposed to be divided equally between
13    all the reps.
14  Q.  So did Ernst & Young have all territories?
15         MR. GALLAGHER:  Objection, form and
16    foundation.
17  A.  I don't know.
18         MS. NORRIS:  He can say he doesn't know,
19    that fine.
20  A.  I don't know.
21  BY MS. NORRIS:
22  Q.  Okay.  So do you know when -- do you know who, like
23    where -- was it an Ernst & Young person, a Nielsen
24    person, whatever, do you know who actually put the
25    homes on the list?

Page 118

1  A.  No.  E&Y audits, I know they selected the homes and
2    then once it was selected, the home was locked.  You
3    were no longer able to look at the home in the laptop
4    MSM, I think that's what it was called, or you could
5    not go to the home.  You couldn't call the home or
6    anything.
7  Q.  So, in other words, if I'm a Nielsen family and my
8    home got chosen in an audit, nobody can come in and
9    clean it up ahead of time or anything, the auditors
10    are going to come in and do their thing first?
11  A.  Yes.  But you don't know an audit is coming, they
12    don't tell you that you've been chosen to be an audit
13    home.
14  Q.  Right.  But Nielsen knows?
15  A.  Yes.
16  Q.  And so if that's one of your homes, you're told you
17    can't go there?
18  A.  Right.
19  Q.  Because the Ernst & Young people are going to go
20    there?
21  A.  Right.
22  Q.  All right.  So you indicated that there had been a
23    change, something had happened where a home wasn't
24    available, correct?
25  A.  Correct.

Page 119

1  Q.  So then it ended up being one of your homes; is that
2    right?
3  A.  Yes.
4  Q.  And it originally was not one of your homes?
5  A.  Correct.
6  Q.  Do you know how it ended up being one of your homes?
7  A.  Yes.
8  Q.  And how do you know that?
9  A.  The E&Y auditor told me that Ryan called the homes
10    they had selected as alternatives and the home he
11    selected was my home and they called and he got in.
12  Q.  All right.  So who selected the homes as alternatives?
13  A.  Ryan would call and if the home is available, it's
14    first available.  So if he calls the home -- he
15    selects the home and they call and say, yeah, you can
16    come at 6:00, that's it.
17  Q.  I'm trying to figure out who the she is with
18    everything, so let's back up a minute.
19    Who is the she?
20  Q.  So Ernst & Young has a list of, let's say 20 homes
21    that are going to get audited?
22  A.  Okay.
23  Q.  And those homes are locked?
24  A.  Yes.  Then they have a list of alternative homes in
25    case those homes can't be -- they're not available or

Page 120

1    something happens.
2  Q.  Okay.  And does Ernst & Young come up with that list
3    of alternative homes?
4         MR. GALLAGHER:  Objection, form and
5    foundation.
6  BY MS. NORRIS:
7  Q.  If you know?
8  A.  I don't know.  I guess so.
9  Q.  So you don't know if Ernst & Young says here's our
10    list A --
11  A.  I would say they would because they were in control of
12    all of the audits, so I would say they would come up
13    with the alternatives so --
14  Q.  Okay.  So Ernst & Young has a list of homes that are
15    locked.  Ernst & Young has a list of alternative
16    homes, are they also locked?
17  A.  No.
18  Q.  Okay.  So only if they actually end up getting chosen?
19  A.  Yes.
20  Q.  All right.  And then the Ernst & Young auditor, if I
21    understand you correctly, said that Mr. Dinsmore chose
22    which of the homes off of the alternative list were
23    going to replace a particular home; is that right?
24  A.  Yes.  They were in the car together.
25  Q.  Okay.  And do you know who the Ernst & Young auditor

CAUDLE, DAVID
05/15/2019

Pages 121–124

Page 121

1    was?

2  A.  No, I don't remember her name. But we were joking

3    because she said I seem to be seeing you a lot. And I

4    joked, I was like yeah. She was like well, yeah, you

5    know, a home wasn't available and Ryan called the next

6    home on the list that he could find and it happened to

7    be your home so --

8  Q.  Do you know if the alternative homes listed by Ernst &

9    Young are supposed to be called in order?

10          MR. GALLAGHER: Objection, form.

11  BY MS. NORRIS:

12  Q.  If you know?

13  A.  They can select any one from which -- there's no

14    order, you can just pick out a home.

15  Q.  Okay. So do you know if Ryan chose one from the

16    middle of the list or the top of the list or the

17    bottom of the list or anything like that? Do you

18    know?

19  A.  I don't know.

20  Q.  Okay. And then that home ended up getting audited; is

21    that right?

22  A.  Yes.

23  Q.  Do you know how many homes -- in that particular round

24    of audits how many homes had to go to the alternative

25    home as opposed to the original home?

Page 122

1  A.  I believe a lot because I went from like 6 to 13 or

2    16.

3  Q.  So originally you had six homes on that list?

4  A.  Yes.

5  Q.  And then you ended up having many more?

6  A.  Yes.

7  Q.  Do you know when they started the internal audits?

8  A.  I was notified about being on that team when they were

9    trying to form it and that was in 2016.

10  Q.  Do you know if they ever instituted internal audits

11    while you were there?

12  A.  No, they were still trying to get Nielsen to approve

13    it.

14  Q.  Do you know anything about how those internal audits

15    are conducted?

16  A.  I was told during the interview process they was still

17    trying to make up the guidelines for it. But you

18    would travel within your market, hopefully not having

19    to fly too far, just drive your company car to

20    somewhere near, like Ohio or somewhere near -- do

21    random audits, try to set up three audits to do a day.

22    Do those audits, then report what you found to the

23    manager and let the rep know what you found, what he

24    didn't do so it could be fixed and wouldn't be caught

25    by E&Y.

Page 123

1  Q.  When E&Y does an audit, do you know who gets the

2    information?

3  A.  No.

4  Q.  Okay. Do you know if they give the information to

5    customers?

6  A.  I don't know.

7  Q.  Am I correct that the time when the 13 properties were

8    selected for audit review was in 2014?

9  A.  I'm not sure, it could be.

10  Q.  Did you make any complaint about the number of

11    properties that were under review at that time?

12  A.  I didn't make a complaint because I didn't know the

13    rule of thumb. I asked why I was being audited -- why

14    my homes and the homes of the market -- it was only

15    the homes the marketing rep, Renie Jihad had assigned

16    to me were being audited.

17  Q.  And who did you ask?

18  A.  I was joking around with Ryan and the E&Y auditor when

19    I asked.

20  Q.  And what did they say?

21  A.  She didn't know and Ryan just said that they were the

22    names off the list.

23  Q.  So when the Ernst & Young person told you that Ryan

24    had chosen this house off the list, was Mr. Dinsmore

25    there at that time?

Page 124

1  A.  I'm not sure.

2  Q.  Do you recall speaking to the Ernst & Young auditor

3    privately at all?

4  A.  No, we were just in the home. She was always in the

5    homes talking -- trying to take care of business so it

6    was just a conversation with us sitting in front of

7    the TV.

8  Q.  Have you ever had any statistical training?

9  A.  No, I don't know what that means.

10  Q.  Okay.

11          MR. GALLAGHER: Off the record briefly.

12          (Recess taken at 11:38 a.m.)

13          (Back on the record at 11:44 a.m.)

14  BY MS. NORRIS:

15  Q.  Throughout your time at Nielsen did you have a good

16    relationship with your coworkers?

17  A.  Yes.

18  Q.  Other than this period of time around the PIP, which

19    you've described to me, what was your relationship

20    with Mr. Dinsmore like?

21  A.  Thought it was fairly good.

22  Q.  Both before and after the PIP, right?

23  A.  Yeah.

24  Q.  Okay. Did Mr. Dinsmore ever say anything to you to

25    suggest that he would discriminate on the basis of

CAUDLE, DAVID
05/15/2019

Page 125

1   race?
2   A.   This one time he got irritated with me.
3   Q.   Okay.  Tell me about that?
4   A.   Nielsen sent out an e-mail asking if Nielsen was a
5        nice place for African-Americans to work.  And I
6        showed him the e-mail and I told him like why should I
7        fill this out, this sounds sort of racist?  And he
8        told me, you know, just fill it out, it's no big deal.
9        And I said well, it sort of is.  If it said is Nielsen
10       an okay place for Indians or any ethnicity, why does
11       it say African-American?  Why are they just singling
12       out one race?  It didn't make much sense to me.
13              He said, Dave, why do you have to make
14       everything such a big issue?  He was like, you know,
15       I'm tired of you when you do that.  Just, you know,
16       fill out the survey or don't fill it out, I don't
17       really care.  He was like, you know, just do it or
18       don't do it.
19   Q.   About when was this?
20   A.   I can't remember when the e-mail came out.
21   Q.   Do you know what year?
22   A.   Probably was 2014.
23   Q.   Okay.  So he just wanted you to do whatever you were
24        going to do with the e-mail, but not bother him about
25        it?

Page 126

1              MR. GALLAGHER:  Objection, form.
2   BY MS. NORRIS:
3   Q.   Is that --
4   A.   His body language and anger was something different.
5   Q.   Okay.  Describe as best you can in words?
6   A.   He made the comment, you know, why you got to make
7        such a big deal about it, like you're the only person
8        that gives me this problem?  And I laughed and I said
9        I'm just asking a question.  And he said, you know, I
10       swear, you always ask a question like you're entitled.
11       And I laughed and I said I'm just asking for
12       clarification why Nielsen is just asking about just
13       black people.
14              And he said should it say you people or
15       what, what would make you feel more happy and he
16       giggled.  And I told him, I don't feel like that's
17       funny, like what does you people mean?  And he just
18       told me, he was like I'm not trying to be that way.
19       He said I'm just trying to say.  I said so why would
20       you make a joke like that?  If we're talking about it,
21       why would you say, you know, you people?  And you told
22       me, you know, you just make a big deal out of -- about
23       everything, either do it or don't do it, I don't
24       really care.
25   Q.   Okay.  Anything else that he did to suggest that he

Page 127

1        would discriminate on the basis of race?
2   A.   Not towards me, but what I saw.  When I moved to my
3        fiancée's apartment in Farmington Hills.  And
4        according to the Nielsen standards when you move into
5        a new area, your field area is supposed to switch to
6        closer to your home.  He wouldn't switch my field
7        area.  He kept me in Detroit, in the same area, 6272.
8              But James Hardy, he switched his field area
9        three times.  Once because he cried because a guy
10       whipped his son, an African-American male whipped his
11       son in front of him and he said he wasn't raised that
12       way, he couldn't watch something like that.  So he
13       switched him out of Detroit.  Then when he had Oak
14       Park, he said he was driving too far from his home so
15       he switched him out to -- no, it was Royal Oak, sorry.  He
16       switched him out of Royal Oak to closer to where he
17       was, but he wouldn't switch me any closer to my home.
18   Q.   Okay.  When did you make the request for the change?
19   A.   As soon as I -- as soon as we moved in together.  I
20       had to update the Nielsen -- I called him, asking him
21       how do I update my address change because I was moving
22       from the 21441 Cambridge home to the apartment in
23       Farmington Hills, I think that was --
24   Q.   Okay.  Of the addresses you gave me, you didn't give
25        me one in Farmington Hills?

Page 128

1   A.   I'm sorry.  In 2015 I moved in with my fiancée in
2        Farmington Hills.
3   Q.   Okay.  I thought you told me that you moved to
4        Cambridge in 2016?
5   A.   I moved back after I moved out from her.
6   Q.   So 2015 -- where were you living in 2014?
7   A.   Cambridge.
8   Q.   And then in 2015 you moved out to live with your
9        fiancée?
10   A.   Yes.
11   Q.   And what was that address?
12   A.   I don't remember the address.  Independence Drive.
13   Q.   In Farmington Hills?
14   A.   Yes.
15   Q.   And was that a home or apartment?
16   A.   Apartment.
17   Q.   And were you renting or buying?
18   A.   It was an apartment, was renting.
19   Q.   How much were you paying in rent?
20   A.   I think it was $1,100, not sure.
21   Q.   And then you moved out of there back to Cambridge in
22        2016?
23   A.   Yes.
24   Q.   All right.  So when you moved from the Cambridge
25        address to Farmington Hills in 2015 is when you asked

Page 129

1    for a change of territory?
2  A.  Yes.
3  Q.  And he said no?
4  A.  Yes.
5  Q.  Okay.  Did he tell you why?
6  A.  He couldn't give me a reason why.  He said -- no, he
7      told me he would have to change everybody's -- what
8      everybody was doing and it would be too hard to do at
9      the time.
10 Q.  Other than Mr. Hardy, are you aware of any other
11     people who moved and did not have their territory
12     changed -- or, I'm sorry, who moved and did have their
13     territory changed other than Mr. Hardy?
14 A.  Yeah.
15 Q.  Who else?
16 A.  Brian Burkhardt moved and he got his changed.
17 Q.  Anybody else?
18 A.  Anybody else?  I don't know if they moved, so I can't
19     really say.
20 Q.  Where in Detroit is Cambridge Avenue, 21441?
21 A.  Seven Mile and Lahser area.
22 Q.  Northwest side?
23 A.  Yes.
24 Q.  Okay.  And when you moved to Farmington Hills, where
25     did you move in Farmington Hills, not the address, but

Page 130

1      like physically?
2  A.  Off of Grand River and Halsted.
3  Q.  Okay.  Do you know where Mr. Hardy lived?
4  A.  Not off the top of my head.  I think he lived in --
5      what's that place called next to Inkster?  It starts
6      with a G.  I can't remember the name of it.
7  Q.  And where was his territory?
8  A.  His territory was up in Detroit, Royal Oak, that area.
9      Then he asked for something near -- he moved further
10     out, like towards Ecorse or Pinckney or somewhere and
11     he asked for an area out that way.  Like his area
12     touched Chicago -- or not Chicago, Ohio border.
13 Q.  Okay.  And where was Mr. Burkhardt's territory and
14     where did he ask to be moved?
15                 MR. GALLAGHER:  Objection, form and
16     foundation.
17 A.  Brian, I think he stayed in Detroit and then he
18     asked -- he was up towards Port Huron next, out that
19     way.
20 BY MS. NORRIS:
21 Q.  Anything else that Mr. Dinsmore did to suggest he
22     would discriminate on the basis of race?
23 A.  Not that I know of, no.
24 Q.  Okay.  Anything Mr. Dinsmore did to suggest he would
25     discriminate on the basis of your medical condition?

Page 131

1                 MR. GALLAGHER:  Objection, form and
2      foundation.
3  A.  Yeah.
4  BY MS. NORRIS:
5  Q.  Okay.  Tell me?
6  A.  He -- when I was sick, he would always call for
7      updates.  And the one time I was out sick, he was
8      calling me, asking me if I could call my homes to get
9      guys in because they weren't answering.  But he
10     specifically told me I can't contact my homes while
11     I'm out.
12                 And I made the comment that if I'm not
13     supposed to call my homes, period, why do you want me
14     to call them now to get somebody in?  He said it's
15     helping the market.  And I felt like it wasn't fair,
16     you know.  You don't want me to call my homes while
17     I'm out, have any contact with them, but to help you
18     out, do it -- you know, do me this favor.
19                 And the next day he called and he was like
20     so do you know when you're coming back?  And I was
21     like no, I'm going to the doctor.  And he was like
22     okay.  And when I called and told him, I was like I
23     might be able to come back next week.  He was all like
24     oh, good, because me and Josh were talking and we
25     might have had to look for somebody else to fill the

Page 132

1      position if you weren't coming back.  And I said how,
2      if I'm on long-term disability?  And he just was like,
3      you know, you've been out so long, you know, we have
4      to have somebody here.
5  Q.  Okay.  You've given me three things so far.  You've
6      given me that he called for updates when you were out
7      sick, that he asked about having you call the homes to
8      get people in even though you weren't supposed to have
9      to do that when you were out and he asked about when
10     you were coming back and said they might have to look
11     for somebody to fill the position.
12                 Anything else that he did to suggest that
13     he would discriminate on the basis of your disability?
14 A.  The other things were just what I heard through other
15     people.
16 Q.  Okay.  I'll come to those in a minute, but I want to
17     talk about these three first, all right?
18                 How many times did you go out -- during
19     your employment with Nielsen did you go out on like a
20     leave of absence; in other words, not just I'm off
21     sick for a day, but you were going to be off for a
22     number of days?
23 A.  I don't know.
24 Q.  More than one?
25 A.  Yes.

CAUDLE, DAVID
05/15/2019

Pages 133—136

1   Q.   More than five?
2   A.   I don't know the exact number.
3   Q.   Can you give me a range?
4   A.   To be honest, to give a fair amount, I don't know the
5        exact number, but I know it was kept track of.  I know
6        it was within my Nielsen allotted time off.
7   Q.   Okay.  In general, am I correct that if you were out
8        on a leave you weren't supposed to have to work?
9   A.   Correct.
10  Q.   And you were told that you shouldn't work, correct?
11  A.   Yes.
12  Q.   Okay.  How many times did he ask you to call to get
13       somebody in the home?
14  A.   A lot.  Detroit was a major market and he wanted demos
15       filled.  Since I had the majority of Detroit, it
16       needed to be addressed.
17  Q.   Do you know if you had homes where the people would
18       say they wouldn't deal with anybody but you?
19  A.   I had some homes like that.
20  Q.   And so if you were out that was a problem, right,
21       because those homes needed to be serviced?
22            MR. GALLAGHER:  Objection, form and
23       foundation.
24  A.   I don't think so because if I was out, they knew I
25       couldn't come.  They had other Nielsen reps that were

1        there.  I had homes that liked me because they knew
2        me.  They didn't like strangers in their homes.  But
3        there was times when -- like everybody had faults they
4        couldn't get to and other guys ran them for them so
5        another Nielsen guy was in a home.  So they would send
6        probably that person, somebody that had been to the
7        home previously.
8   BY MS. NORRIS:
9   Q.   Do you know if you had homes that refused to let
10       anybody in?
11  A.   To my knowledge, one.
12  Q.   Okay.  When was the leave where Mr. Dinsmore said we
13       might have to look for somebody to fill the position?
14  A.   That was the beginning of 2016, I think.
15  Q.   And how long had you been out?
16  A.   A month.
17  Q.   Do you know how much leave time you had left?
18  A.   Actually that one was workers' comp and it was sort of
19       Ryan's fault so I don't think that counted towards my
20       leave.
21  Q.   Do you know that?
22  A.   Do I know what?
23  Q.   If it counts towards your leave?
24  A.   I heard it was workers' comp so it was handled
25       differently.  It was handled through a different group

1        so I don't -- it was told to me that it was a vacation
2        and it turned over to workers' comp, but there was
3        something different than short-term and long-term
4        disability when they called me.
5   Q.   Do you know how long a company is required to allow
6        you to stay out?
7   A.   I did not know that.
8   Q.   Okay.  Do you know whether a company is allowed to
9        replace you at some point in time even if you're out
10       on a legitimate medical reason?
11  A.   I believe it's longer than a month.
12  Q.   Okay.  Do you know what that length of time is?
13            MR. GALLAGHER:  Object to all these legal
14       conclusions being asked.
15  A.   I don't know.
16  BY MS. NORRIS:
17  Q.   Okay.  When Mr. Dinsmore would call and ask you if you
18       could call the home and get somebody in, what did you
19       do?
20  A.   I asked him why first.  And he told me it was -- they
21       were really hard to get in touch with and that the
22       market was hurt.  And I was a team player so I told
23       him, you know, I have no problem calling and I would
24       get them in the home.
25  Q.   Okay.  You said before, that happened a lot.  Can you

1        give me some range of what a lot is?
2   A.   Every time I was out at the market -- when I went out,
3        my market dropped, the Detroit market.  And it was one
4        of the main things that the customer looked at, the
5        clients.  They would call having questions about why
6        the demos have dropped, so it was important to have
7        the demos up.  So if power faults need to be fixed and
8        it was in my area and I had the majority of Detroit,
9        they need to be fixed.  So literally every time I was
10       off, he was calling me.  He asked me, you know, can
11       you get us in this home, we tried calling and we
12       haven't been successful.
13  Q.   Do you know if he was telling the truth when he said
14       that?
15  A.   I have no idea.
16  Q.   Okay.  Am I correct that you received annual
17       performance reviews when you were at Nielsen?
18  A.   Yes.
19  Q.   All right.
20            MARKED FOR IDENTIFICATION:
21            DEPOSITION EXHIBIT 9
22            11:58 a.m.
23  BY MS. NORRIS:
24  Q.   You've been handed Deposition Exhibit Number 9.  I
25       believe that this is a performance review for the 2012

CAUDLE, DAVID
05/15/2019

Page 137

1     calendar year.  Is that what it looks like to you?
2  A.  Yeah.
3  Q.  And this was given to you in February of 2013; is that
4      right?
5  A.  Yes.
6  Q.  Who gave you this review?
7  A.  Ryan.
8  Q.  And how did you receive it, do you receive it online
9      or in the mail or in person?
10 A.  We set down at a restaurant.
11 Q.  Do you know if that's what he did with other people
12     when he was doing reviews?
13 A.  That's what he liked to do.  I don't know if he could
14     do it with everybody.
15 Q.  Okay.  The first section under objectives, it talks
16     about sets and persons.  Am I correct that sets are
17     televisions, VCRs, those other things that we talked
18     about?
19 A.  Yes.
20 Q.  Okay.  And so when it says in tab minimums maintained,
21     what does that mean?
22 A.  Under objectives?
23 Q.  Under objectives on the first page.
24 A.  Everybody had to be at 92.5 percent for the market to
25     stay balanced.

Page 138

1  Q.  But what does -- 92.5 percent of what, what does that
2      mean?
3  A.  That would be 92.5 percent of out of 100.
4  Q.  You know what you're talking about and I don't know so
5      I'm probably not asking the question well.  I'm trying
6      to understand, what is it that's being measured,
7      what --
8  A.  Out of all your homes, all your homes need to be
9      logged in and recording daily.
10 Q.  Okay.  So if something is down, it goes against that
11     number?
12 A.  Yes.
13 Q.  All right.  And then when it says persons, what's
14     that?
15 A.  Someone is not logging in.  So I have a home where
16     someone cut the TV on and just started watching TV and
17     never logged in, so we don't know who's watching.
18 Q.  Okay.  And the sets/person split, what's that?
19 A.  That was an average they came up with to sort of
20     balance things out.
21 Q.  Am I correct that during this 2012 period you went
22     through an audit?
23 A.  I am not sure if I did because I didn't come on until
24     like later on in that year.  I believe that -- I think
25     I did do an audit, but I'd never been in a home so it

Page 139

1      was sort of like -- it didn't count against me, if I
2      could say that much, because I'd never been in a home.
3      It was just coaching for the future.
4  Q.  This was your first evaluation, right?
5  A.  Yes.
6  Q.  If you look at page 2, down near the bottom you see
7      the paragraph that says AP and PC flag?  Do you see
8      that paragraph?
9  A.  On page 2?
10 Q.  Page 2.
11 A.  Okay.  Bottom of the paragraph?
12 Q.  Yeah.  And if you look just sort of right after that
13     line, it says this past year our market went through
14     the internal audit process.  Do you see that?
15 A.  Yeah.
16 Q.  So that's not an Ernst & Young audit, that's internal,
17     correct?
18 A.  I'm guessing so, yes.
19 Q.  Do you know who chooses the homes for the internal
20     audit?
21 A.  I have no idea.
22 Q.  And this says that your homes went well, correct?
23 A.  I believe so, yes.
24 Q.  And you also received good comments for your working
25     relationships with your team, right?

Page 140

1  A.  Yes.
2  Q.  And you got a 3.0, meets expectations, overall
3      evaluation; is that right?
4  A.  Yes.
5  Q.  Did anybody else -- was anybody else present when you
6      and Mr. Dinsmore met?
7  A.  No.
8  Q.  Did Mr. Dinsmore say anything to you other than what's
9      on this form when he gave you the evaluation?
10 A.  He basically asked me what goals did I have for the
11     next year.  This had been my first year, so sort of
12     rocky.  And he said that it takes a whole year for
13     somebody to get to know everything about the job so
14     don't get overwhelmed.  There was a lot going on with
15     me coming into a market that was really bad.  The
16     market I took over was really, really bad.  So there
17     was a lot going on that first year so he just told me
18     that, you know, keep my head up and keep doing the
19     things I was doing.
20 Q.  And did you have any problem with any part of this
21     review?
22 A.  Since it was my first review and I was sort of still
23     trying to find my feet, no.
24 Q.  Okay.  Did you complain to anybody about it?
25 A.  No.

CAUDLE, DAVID
05/15/2019

Page 141

1   Q.  Do you know how this evaluation compared to other
2      field reps working under Ryan Dinsmore?
3   A.  No, we didn't share what we got.
4   Q.  Did you understand that as you gained more experience
5      you'd be expected to do more and perform better?
6            MR. GALLAGHER:  Objection, form and
7      foundation.
8   A.  I guess.
9            MARKED FOR IDENTIFICATION:
10           DEPOSITION EXHIBIT 10
11           12:04 p.m.
12 BY MS. NORRIS:
13   Q.  I've handed you Deposition Exhibit Number 10, which is
14      your evaluation for 2013; is that right?
15   A.  Yes.
16   Q.  And this was given to you in February of 2014?
17   A.  Yes.
18   Q.  Again, by Mr. Dinsmore?
19   A.  Yes.
20   Q.  Was this, again, in person at a restaurant?
21   A.  Yes, I believe so.
22   Q.  Okay.  On the first page under the objectives it says
23      you're supposed to maintain a minimum of 60 percent
24      cooperation rate for all TV/PC homes or an increase of
25      4 percent.  Do you know what that means?

Page 142

1   A.  No, not at the moment.  I'm drawing a blank.
2   Q.  That's okay.  It says -- under status it says not
3      started and these are just objectives.  Do you know
4      what the not started means?
5   A.  No.
6   Q.  On the second page up near the top, maybe about four
7      or five bullets down, it says adhere to -- about five
8      or six, maybe more, adhere to all coaching and
9      security procedures.  Do you see that?
10   A.  Okay.
11   Q.  Do you know what that means?
12   A.  I probably would say coaching a household and -- I
13      don't know what the security part --
14   Q.  Okay.  And then when it says not started, do you know
15      what that means?
16   A.  No.
17   Q.  In this evaluation Mr. Dinsmore complimented you for
18      going to Oklahoma City to help out after the
19      tornadoes, didn't he?
20   A.  Yeah, I did go there, yeah.
21   Q.  Did others also go?
22   A.  No, nobody volunteered but me.
23   Q.  Is it common for Nielsen to move people around when
24      there's a special need?
25   A.  Yes, if somebody in the market can go.

Page 143

1   Q.  Does that -- that sometimes happens when there's a
2      severe outage of some kind, like a disaster, correct?
3   A.  Yes.
4   Q.  Like a tornado or something like that?
5   A.  Uh-huh.
6   Q.  Yes?
7   A.  Yes.
8   Q.  Does it also happen if an area is short-handed for an
9      extended period of time?
10   A.  If it's short-handed or if the faults are too high
11      that the market level isn't being met.
12   Q.  In this evaluation Mr. Dinsmore mentions that you won
13      FROTM awards.  What's that?
14   A.  Field rep of the month.
15   Q.  And how is that decided?
16   A.  Field rep of the month is decided by the field rep who
17      has the best overall homes in the market.  Meaning all
18      your homes are logging in, everything is documented,
19      everybody is logging in, all your installs are going,
20      all your de-installs are going, getting done on time,
21      all your paperwork is done correctly and on time.
22   Q.  Does somebody make the decision that you get that
23      award or is it just the numbers?
24   A.  I believe somebody higher up does it by each market.
25   Q.  Okay.  Do you know who made the decision for your

Page 144

1      market?
2   A.  No.  I believe it was done by the numbers, the person
3      with the highest numbers is selected, from what we've
4      been told.
5   Q.  When it says that you came in seventh place in
6      Detroit, this is under the bullet up in that top
7      section still on page 3, it says you came in seventh
8      place in your sets and persons performance.  Against
9      how many people?
10   A.  I guess it would be the field reps.  I don't remember
11      how many we had at the time.
12   Q.  Your FCE was the second lowest in the group.  What is
13      FCE?
14            MR. GALLAGHER:  Objection; form,
15      foundation.
16   A.  Where's that at?
17 BY MS. NORRIS:
18   Q.  I'm in this top section with the bullet points.  Do
19      you see the bullet points?  It's -- it looks to me
20      like the fourth bullet down, your FCE was
21      88.65 percent?
22   A.  I don't exactly remember what that is for.  I think
23      that was field coaching efficiency.
24   Q.  Your number was supposed to be higher?
25   A.  I'm guessing, yes, yeah.

Page 145

1    Q.   You're not questioning the statistics that are in this
2         evaluation, are you?
3    A.   No.
4    Q.   Okay.
5    A.   What I'm questioning is during -- it was -- it's all
6         in one year and it counts time that I wasn't there so
7         it was -- it was, you know --
8    Q.   It counts time when you were on a leave?
9    A.   It counts the whole year.  So when I was in Oklahoma
10        City, when I was helping out at GTAM, all that goes
11        into effect.
12   Q.   Okay.  It says that your CCE was the lowest in the
13        group.  What is CCE?
14   A.   I don't remember.
15   Q.   Okay.  And it says you did a good job coaching your
16        households, right?
17   A.   Uh-huh.
18   Q.   You have to say yes or no.
19   A.   Yes.
20   Q.   Did you take any leave in 2013?
21   A.   I'm not sure.  I know I was gone working, but --
22   Q.   Yes, in the places we talked about, right?
23   A.   Yes.  But I'm not sure if I was sick during the time
24        or not.
25   Q.   It says that you fell short in your PC co-op rate?

Page 146

1    A.   Yes.
2    Q.   And your PCs metered?
3    A.   Uh-huh.
4    Q.   Now what's the PC co-op rate?
5    A.   The number of people that join the computer sample,
6         getting their PC metered with the Nielsen software,
7         which at the time most people thought that was
8         intrusive.
9    Q.   Some people didn't want their computers on?
10   A.   Well, they didn't know what we were looking at and we
11        didn't have exactly a pamphlet saying what we were
12        metering.  So people watching things they didn't want
13        others knowing or banking information.
14   Q.   Do you know how these numbers compared to other
15        people?
16   A.   Again, no.
17   Q.   Then it says that your FA -- this is the last bullet
18        in this section that we've been looking at.  Your FA
19        saw the highest amount of PTO.  What's that?
20   A.   Turnover.
21   Q.   Mr. Dinsmore also talked to you about overtime
22        management, correct?
23   A.   Yes.
24   Q.   But you got a meets expectations, 3.0 rating, the same
25        as the year before; is that right?

Page 147

1    A.   Yes.
2    Q.   Did you have any problems with that evaluation?
3    A.   No, because we talked about it.  And he told me that
4         me not being there and he can only gauge it on the
5         time I was there, so that's what he gave me the 3 for.
6    Q.   So even though you had a number of numbers low, he
7         recognized that there were factors that played into
8         that and gave you a meets expectations evaluation; is
9         that right?
10   A.   Yes, because the areas just calculated for the whole
11        year doesn't show what field rep did what, it just
12        spits out the number.
13   Q.   Okay.  Did you complain to anybody about this
14        evaluation?
15   A.   No.
16   Q.   Do you know how this evaluation compared to anybody
17        else?
18   A.   No.
19                 MARKED FOR IDENTIFICATION:
20                 DEPOSITION EXHIBIT 11
21                 12:13 p.m.
22   BY MS. NORRIS:
23   Q.   You've been handed Exhibit 11.  This is the PIP that
24        we talked about earlier; is that right?
25   A.   Yes.

Page 148

1    Q.   And this was issued on July 7th, 2014; is that right?
2    A.   That sounds about right.
3    Q.   Did you understand that you were being put on this PIP
4         because of the July 3rd incident regarding the gender
5         discrepancy?
6    A.   No.
7    Q.   Mr. Dinsmore never told you that was the main thing?
8    A.   He told me it was because of my PC performance.
9    Q.   And the PC performance is what's reflected at the
10        bottom of the first page; is that right?
11   A.   Yes.
12   Q.   When did he tell you that?
13   A.   When he brought it up that he had to put me on PIP.
14        He took me out to lunch.  He came to the home, helped
15        me finish the home, then said let's go have lunch.  We
16        went to have lunch and then he brought up that he had
17        to put me on PIP.  He was sad he had to do it and
18        telling me because of my PC numbers that were the
19        lowest out of everybody, they need to come up.  That
20        was the reason he had to put me on PIP.
21   Q.   Did he tell you that anybody else told him to do it?
22   A.   He told me that it was coming down from higher-ups.
23        His bosses told him to do it, after I asked.
24   Q.   If you would read to yourself the paragraph about the
25        July 3rd incident?

CAUDLE, DAVID
05/15/2019

Page 149

1  A.  Uh-huh.
2  Q.  And then my question at the end of that is going to be
3      is there anything inaccurate in what was stated there?
4  A.  Yeah.
5  Q.  Okay.  What do you disagree with?
6  A.  I told him that -- because they played a joke on me.
7      When you go into N-gage -- or when you go to MSM to
8      make your contacts, it shows the female of the house
9      as Delmar.  So I said if they told me that her name --
10     they reversed the names on me and I select that name,
11     the female of the house who I was talking to, how
12     would I not know that it's the wrong name?
13 Q.  So I'm asking what's incorrect about what's written
14     here?
15 A.  What's incorrect is that he said that in -- inaccuracy
16     reporting the gender of any of your household members
17     is a huge mistake -- well, first, he said it looks
18     like that all your prior phone contacts in this
19     household were with Delmar, which leads me to believe
20     that you knew that Delmar was the lady of the house.
21         And I told him no.  Because when you click
22     on -- filling out your appointment is just a click
23     button.  You click to talk to the female and if it's
24     already populated that that female is Delmar --
25     because they played a joke on me saying well, yeah,

Page 150

1      Delmar is the female.
2  Q.  The household played a joke on you?
3  A.  Yes.  It was an elderly couple.  And I said okay.  I
4      didn't think much of it because we were just asking
5      questions.  If you tell me this is your name, okay,
6      who am I to question?
7  Q.  But did you understand that in fact the names were
8      incorrect in N-gage?
9  A.  I did not know that.
10 Q.  No, I'm asking when you got this PIP, did you
11     understand that in fact the names were incorrect in
12     N-gage?
13 A.  They were changed by the time I got this PIP.
14 Q.  Because somebody learned that they were wrong?
15 A.  Because the ROC had called and then they had told them
16     and they told them that they had made a joke, laughing
17     about it.  And then they made me go out to the home
18     and make the adjustments.
19 Q.  Right.  My question though is do you agree that what
20     you put in was incorrect?
21 A.  No.  What I put in was right at the time because I was
22     going off what I knew.
23 Q.  I'm not asking if it was because they played a joke on
24     you or because the household was telling you something
25     different.  I'm asking if in fact what you put in in

Page 151

1      N-gage for who was the male and who was the female was
2      not correct?
3          MR. GALLAGHER:  Asked and answered.
4  A.  I mean, I'm basing the answer off what I'm telling
5      you.  So basing off what I put in N-gage, it was
6      correct under my knowledge.
7  BY MS. NORRIS:
8  Q.  Okay.  Let me ask this --
9  A.  Now --
10 Q.  Now you know it's different?
11 A.  Now I know it's different.
12 Q.  Okay.  So let me ask the question differently.  I'm
13     not asking if you knew when you put it in that it was
14     wrong, that's not my question.
15         My question is in fact what you put in, the
16     statistics that were being generated, the data that
17     was being generated, was incorrect, right?
18 A.  Correct, correct.
19 Q.  Okay.  And then after the fact you learned the
20     household had given you the wrong names?
21 A.  Yes.
22 Q.  Okay.  Anything else that you think is incorrect here?
23         MR. GALLAGHER:  I'm not sure he finished
24     the first thing.
25         Did you finish?

Page 152

1          MS. NORRIS:  That will fall within anything
2      else.  He can tell me anything else that he thinks is
3      wrong.
4          MR. GALLAGHER:  Well, if he hasn't
5      finished --
6          MS. NORRIS:  I haven't limited him in any
7      way, except not to repeat what he already told me.
8          MR. GALLAGHER:  I mean, that's just not the
9      case, but okay.
10         MS. NORRIS:  What do you mean, it's not the
11     case?
12 A.  Yes, June 17th --
13         MR. GALLAGHER:  All day, he can't talk.
14         MS. NORRIS:  Just wait just a minute,
15     Mr. Caudle.
16         Counselor, I asked if there's anything he
17     thought was incorrect.  He identified something that
18     he thought was incorrect.  I asked him questions about
19     that issue.  I asked is there anything else you think
20     is incorrect and you're telling me I cut him off, he
21     wasn't finished with that one.  He told me one.  I
22     asked him about one.  Now I'm asking anything else.
23         MR. GALLAGHER:  Sure, we can go back there.
24     No, he didn't finish because he was in the middle of
25     talking about how when he put it in and it was already

Page 153

1  in there, the lady of the house every time since --
2  that when it came to Ryan being -- believe that you
3  knew that Delmar was the lady of the house, he was in
4  the middle of explaining something.
5        MS. NORRIS:  No, he told me that he thought
6  that was wrong.
7        MR. GALLAGHER:  Yeah, and then he's in the
8  middle of explaining there and then you cut him off
9  and you went somewhere else.
10       MS. NORRIS:  He told me what he thought was
11 wrong.
12       MR. GALLAGHER:  And he was in the middle of
13 the explanation.
14       MS. NORRIS:  So this is the thing, I can
15 ask for explanations or not.
16       MR. GALLAGHER:  And he can give you them in
17 the middle of --
18       MS. NORRIS:  No.
19       MR. GALLAGHER:  Yes, he can.  He can
20 testify how he wants.  I believe it was you that
21 jumped off at me about -- last week saying you can't
22 say yes or no, right?  He can --
23       MS. NORRIS:  I didn't ask him to say yes or
24 no.
25       MR. GALLAGHER:  He can explain himself.

Page 154

1        MS. NORRIS:  I did not ask --
2        MR. GALLAGHER:  That is a fair testimony.
3  He's allowed to put his testimony forward.  He cannot
4  be tricked into testifying other ways.
5        MS. NORRIS:  I'm not trying to trick him at
6  all, I'm asking him what the issues are.
7  BY MS. NORRIS:
8  Q.  Have you identified anything else that you think is
9     incorrect in Exhibit 11?
10 A.  The June 17th.  There was multiple people in the home
11     helping me meter the home.  What Ryan found that was
12     wrong, it wasn't done by me.  And when he told me to
13     go look for it to fix it, it was at the wrong site.
14     So when he went back in and fixed it, I told him, I
15     said, no, you told me it was in this bedroom.  He said
16     either way, you should have checked it and found it.
17        I said how would I check and find it if
18     everything was considered right?  Because we had
19     checkmarks if everything was connected correctly and
20     is green-lighted.  I said how would I know to look for
21     it if you're telling me to go look in X, Y, Z and it's
22     not there and I call you, you just go fix it and you
23     don't tell me?
24 Q.  Okay.  So I have a few follow-up questions about this
25     one.  So the -- when it refers to the field manager,

Page 155

1     that's Mr. Dinsmore; is that right?
2  A.  Yes.
3  Q.  And it says Mr. Dinsmore found some errors in devices.
4     Is it correct that he found some errors?
5  A.  Yes.
6  Q.  Okay.  And is it your testimony that other people made
7     those errors?
8  A.  On the second one?
9  Q.  We're looking at the June 17th entry.
10 A.  Yes.
11 Q.  Is it your testimony that other people made those
12     errors?
13 A.  Yes.
14 Q.  And who were those other people?
15 A.  I don't know who was in the home at the time helping
16     me meter, but we had went over it.  And he told me
17     since it was my install, that I should have made sure
18     it's correct.  And at this time when it had happened,
19     it was the first time it ever happened to me so I was
20     asking for clarification.  And I told -- when he told
21     me what room to look at, when I went to that room
22     nothing was wrong.  I called him about it and instead
23     of telling me no, it was this room, he just went and
24     fixed it so it could be updated.
25 Q.  Okay.  Anything else you think is incorrect?

Page 156

1  A.  Well, I feel like that was correct because he said he
2     had to go in N-gage and fix it and clarify it, when he
3     could have just told me and I could have did it.  And
4     I feel like that was wrong because I was asking him
5     for the info, so instead he did it and then chalked me
6     up for it.  And I'm like look, you gave me
7     misinformation and I'm asking you so I can go fix it
8     because I didn't see it.
9  Q.  Okay.
10 A.  He was just like well, I had to fix it because you
11     didn't do it and it needed to be done.  And I was like
12     well, we were doing it at the same time.  But for him
13     it was just like getting it done and getting it over
14     with.
15 Q.  Anything else?
16 A.  On that issue, no.
17 Q.  Okay.  Anything else on the first page of this
18     exhibit?
19 A.  The June 8th, about complete -- we had an issue with
20     N-gage because I was working more overtime than
21     everybody else.  So me doing my paperwork was done
22     late at night, so N-gage resolutions were done late.
23     And I told him if I'm working, I don't get home until
24     9:00, 10:00, I shower.  You know, I got to sleep
25     before I get up and start working at 8:00, it's hard

CAUDLE, DAVID
05/15/2019

Page 157

1    to do everything.
2              And he was telling me I need to work on my
3    overtime.  And I was telling him that I need to work
4    on the homes, had a lot of homes that were squatters
5    and, you know, people that just up and left Detroit.
6    So it was hard tracking down faults.  And I told him
7    it was hard for me to find a balance and we never
8    worked on a plan to find that balance.
9    Q.   Okay.  Anything else?
10   A.   The PC co-op rate I didn't know anything about.  So I
11   asked him -- that was the main thing he told me I was
12   getting wrote up for, then these other things popped
13   up.  So that was the main one I was upset about and
14   that's when I brought up that I felt like I was being
15   discriminated against.
16   Q.   That's the conversation we talked about earlier,
17   correct?
18   A.   Yes.
19   Q.   Anything else that you think is wrong here?
20   A.   No.  I have an issue because it seems like it's the
21   same thing on July 7th that was on June 8th and I
22   don't know about that.  I can't -- I don't recall that
23   being on here, but okay.
24   Q.   Did you actually sign the PIP?  The one in front of
25   you is not signed --

Page 158

1    A.   No, because I didn't agree with it.
2    Q.   Okay.
3    A.   So to my knowledge I don't believe I ever signed it.
4    Q.   Was the document that was presented to you the same as
5    the document that's in front of you right now?
6    A.   Yes.
7    Q.   Okay.
8    A.   But it didn't -- I remember asking him what PIP meant
9    and it wasn't written on here like you would lose your
10   bonus and all this other stuff, so that was something
11   else.
12   Q.   Do you know if anybody has ever been terminated for
13   having the demographic information incorrect?
14   A.   They said somebody had been, but, no, because I know
15   plenty of field reps that made that mistake.
16   Q.   Who said people have been terminated for this?
17   A.   Ryan.  You know, that's a typical scare tactic to tell
18   everybody.  You know, guys have been fired for doing
19   this and you, you know, we've got to make sure we don't do
20   this.
21   Q.   Who else made the mistake?
22   A.   Tim Franklin.  James Hardy.  Shermir told me he made a
23   mistake before.  Matt Bradley said he got dinged on a
24   house before.  I think Dave Shock told me it happened
25   to him once.

Page 159

1    Q.   Anybody else?
2    A.   Off the top of my head, that's all I remember.
3    Q.   Do you know what Tim Franklin mixed up?
4    A.   No.
5    Q.   Do you know what Shermir mixed up?
6    A.   No.  They just told me that -- when I was talking to
7    them about it, they said don't take it too hard, you
8    know, households have a tendency to lie.  And
9    sometimes they think without really talking, like they
10   don't listen to you, so don't worry about it.
11   Q.   You said that Matt Bradley got dinged for it?
12   A.   It happened to him is what I meant.
13   Q.   Okay.  Did he tell you if anything happened as a
14   result?
15   A.   No.  He said that Ryan was tagging along with him and
16   he did an audit and Ryan caught it and that was it.
17   Q.   Am I correct that you took a leave of absence in the
18   beginning of -- I'm sorry, late in 2014?
19   A.   Late, yes.
20   Q.   Okay.  This was for a work-related injury?
21   A.   Yes.
22   Q.   Am I correct that your leave started around
23   November 19th, 2014?
24   A.   Yes.
25   Q.   And am I correct that you hurt your back when you were

Page 160

1    turning while you were holding a TV?
2    A.   That's not how I hurt my back.
3    Q.   Tell me how you hurt your back?
4    A.   Well, first off, Ryan was at the house prior to.  It
5    was a TV that needed two people to lift.  And the TV
6    needed to be opened up to be metered, the speakers
7    needed to be metered on the inside.  It was upstairs
8    in the master bedroom.  And it was a Sony TV, like a
9    38-inch with the metal plates at the bottom
10   old -- with the tube on the back, the heavy ones.
11             Ryan knew that the entertainment stand that
12   it was on was wobbly and he said that's the reason why
13   he didn't take it down and try to meter it when he was
14   up there.  So he scheduled Raul to go out there and do
15   it.  Raul didn't want to do it because he had hockey.
16   He put me on it.  And when I went out there to do it,
17   I lifted the TV up, put it on the floor, opened it up
18   and metered it.  When I went to put it down, the stand
19   wobbled and the TV almost fell.  So I caught the TV so
20   it wouldn't smash my foot and I threw my back out.
21             I immediately called Ryan because I was
22   laying on the floor for like 15 minutes.  The lady
23   asked me if I was okay.  When I was able to get up, I
24   got to my car, called Ryan and told him I had hurt my
25   back at the house.  He asked what happened.  I told

CAUDLE, DAVID
05/15/2019

Pages 161–164

Page 161

1    him.  He said oh, man, that TV was heavy, I guess
2    there should have been two of you guys.
3              Then he said what are you going to do?  I
4    said I think I'm about to go to the hospital because
5    I'm feeling numb and my legs are feeling numb.  He
6    said okay, tell me what happens.  I went to the
7    hospital, told them it was work related.  Then Ryan
8    called me back saying -- no, Ryan didn't call me back.
9    Nielsen called me back and wondered why Ryan didn't do
10   an incident report at the time.
11             Ryan called me back like four days later to
12   do an incident report about what happened.  He didn't
13   do it right then and there.  Then they sent me to
14   Concentra to get checked out by their personnel and
15   they deemed that my back was messed up and that I was
16   on workers' comp and I had to go back and forth with
17   them getting treatment.
18   Q.   Did the company contest your workers' comp in any way?
19   A.   No.
20   Q.   Were you paid workers' comp?
21   A.   Yes.
22   Q.   Am I correct that you were originally scheduled to
23        return to work on November 26th?
24   A.   Yes.
25   Q.   And you did not return then, did you?

Page 162

1    A.   No.
2    Q.   Your leave was extended to December 1st?
3    A.   Yes.
4    Q.   You did not return on December 1st either, did you?
5    A.   No.  At that point Nielsen had a nurse coming to me --
6         to my appointments and the nurse saw how bad my back
7         was and said I couldn't come back to work.
8    Q.   Am I correct that you finally returned on
9         January 13th, 2015?
10   A.   That was the week before, where Ryan threatened,
11        saying they were going to find somebody else to
12        replace me because I was out.
13   Q.   Your doctor released you to return to work with
14        restrictions; is that right?
15   A.   Yes.  And there were no restrictions -- Nielsen didn't
16        have light duty.
17   Q.   So Nielsen found a position for you that met your
18        restrictions, didn't they?
19   A.   Ryan created a position that wasn't supposed to be
20        there.
21   Q.   What do you mean, it wasn't supposed to be there?
22   A.   Nielsen doesn't have light duty.  So Ryan created me
23        helping Damen, a part-time worker, in a position that
24        shouldn't have been there.  It allowed me to come in
25        and help, but I -- according to him, it wasn't a

Page 163

1    company position.
2    Q.   But it met your restrictions, correct?
3    A.   Correct.
4    Q.   Are you saying he shouldn't have done that, he
5         shouldn't have let you come back to work?
6    A.   According to what he told me, yes.
7    Q.   No, I'm asking --
8    A.   Yes.
9    Q.   Did you want to go back to work?
10   A.   If they met my restrictions, but at the time he told
11        me they didn't so he came up with that.
12   Q.   Right.  But the job that he gave you did meet your
13        restrictions, right?
14   A.   Yes.
15   Q.   Okay.  How long did you stay in that modified
16        position?
17   A.   I don't remember.  I think it was two weeks, something
18        like that.
19                   MARKED FOR IDENTIFICATION:
20                   DEPOSITION EXHIBIT 12
21                   12:30 p.m.
22   BY MS. NORRIS:
23   Q.   You've been handed Deposition Exhibit Number 12, which
24        is an e-mail exchange.  If you go to the second page,
25        you'll see that there's an e-mail from Mr. Dinsmore to

Page 164

1    you that says hi, Dave, your return to work is
2    effective and goes on with what the duties will be and
3    what your restrictions are; is that right?
4    A.   Uh-huh.
5    Q.   You have to say yes or no.
6    A.   Yes.
7    Q.   And then he told you that you could not work outside
8         your restrictions; is that right?
9    A.   Correct.
10   Q.   And then you responded, all caps, I fully agree, with
11        a bunch of explanations points and a bunch of thumbs
12        up emojis; is that right?
13   A.   Correct.
14                   MARKED FOR IDENTIFICATION:
15                   DEPOSITION EXHIBIT 13
16                   12:31 p.m.
17   BY MS. NORRIS:
18   Q.   I've handed you Deposition Exhibit Number 13, which is
19        your performance review for the year 2014; is that
20        right?
21   A.   Yes.
22   Q.   And you got this in February of 2015; is that right?
23   A.   Yes.
24   Q.   Was this, again, at a restaurant with Ryan?
25   A.   Yes.

CAUDLE, DAVID
05/15/2019

Pages 165–168

Page 165

1    Q.   If you look at, not the cover sheet, but the first
2        page that has writing on it, it looks to me like
3        there's a -- there's midyear review comments in the
4        middle of this, just looking at the -- what the
5        wording says and then your full review comes much
6        later.
7             If you take a minute to look at it and tell
8        me if you think I'm right about that?  If you
9        specifically -- if you look at the right-hand column,
10       it says Dave, I wanted to provide?  Do you see that?
11   **A.   Uh-huh.**
12    Q.   He talks about year to date as of July 14th, which
13        makes me think that it's midyear, but if -- you take a
14        look at whatever you need to take a look at to see if
15        you can confirm that or tell me what you think is
16        going on?
17   **A.   I don't know what was going on.  I think this is right**
18        **after he gave me the PIP so it was sort of like --**
19        **thought it was some --**
20    Q.   You think these comments on this page 2 are right
21        after the PIP?
22   **A.   Yes.**
23    Q.   And that was July of 2014, correct?
24   **A.   Yes.**
25    Q.   And in this section he says that everybody else's

Page 166

1        performance has improved so that he felt you have to
2        improve as well; is that right?
3   **A.   Yes.**
4           MR. GALLAGHER:  Can we have a second to
5        read this entire thing now, if we're going to ask
6        specifics?
7           MS. NORRIS:  He can have time.  I'll just
8        note that on Monday you didn't even give me copies of
9        exhibits to read, so I'm not worried about how much
10       time you have to read it, but he can take all the time
11       he wants to read it.
12          MR. GALLAGHER:  Sure.
13          MS. NORRIS:  I mean, it's a fact, I did not
14        have copies of exhibits that you questioned my clients
15        about.
16          MR. GALLAGHER:  You guys had one copy, I
17        had one copy, that's what it was.
18          MS. NORRIS:  Yeah, I'm giving you a copy,
19        I'm giving him a copy.  I'm not leaning over.
20          MR. GALLAGHER:  Sure, I'm more
21        eco-friendly, I agree.  I'm more worried about our
22        environment, I'm sorry that you don't share my
23        concerns, Counsel.
24   BY MS. NORRIS:
25    Q.   You take your time, Mr. Caudle.  When you're ready to

Page 167

1        answer, you just let me know.
2          MR. GALLAGHER:  I think that we're all
3        living in a shared biosphere that we --
4   **A.   Can you ask me the question again?**
5   BY MS. NORRIS:
6    Q.   Yes, I can.  So I'm -- what I'm looking at, but you
7        can look wherever you want, I'm looking at page 2,
8        which is the part that you indicated, and I think you
9        are correct, is around the time of the PIP?
10   **A.   Yes.**
11    Q.   Okay.  And so I'm looking at the comments on the
12        right-hand side.  It looks to me on the left-hand side
13        there are comments from you:  Over this year I have
14        grown, those kinds of comments.  The right-hand side I
15        believe are from Mr. Dinsmore.
16          And so my question is that he points out
17        that everybody else's performance has improved so
18        therefore you also have to improve --
19          MR. GALLAGHER:  Objection to form and
20        foundation.
21   **A.   I was upset with that because during our time, like I**
22        **said, I was gone with GTAM.  Dave Demmon was over my**
23        **area, I came back with flags overdue and all that**
24        **counted against me.**
25   BY MS. NORRIS:

Page 168

1    Q.   Okay.  So that also affected the AP flags?
2   **A.   Yes.**
3    Q.   So you thought that this -- that this midyear -- these
4        midyear comments were penalizing you for having been
5        gone and helping?
6   **A.   I felt like the whole review penalized me for what**
7        **everybody did while I was gone because it was my area,**
8        **so I got hit with it.  So if I wasn't there and when I**
9        **came back I had 200 flags and all my AP dropped, I was**
10       **still responsible for it --**
11    Q.   Okay.
12   **A.   -- because somebody has to take the heat for it, as he**
13        **said.**
14    Q.   All right.  If you go to page 4, I believe that what's
15        on page 4 is the year-end review, the one that you
16        would have talked about when you sat down in February.
17        Again, take your time to look at whatever you want to
18        look at.
19          My question is, do you think that's
20        correct?
21          MR. GALLAGHER:  What part?
22   BY MS. NORRIS:
23    Q.   That page 4 is the year-end review, page 4 or page 5,
24        those comments were made at year-end as opposed to in
25        February?

Page 169

1    A.    Yeah.
2                MR. GALLAGHER:  Object to the form and
3          foundation of that, but okay.
4    BY MS. NORRIS:
5    Q.    He complimented you for really turning things around
6          on your CCE; is that right?
7    A.    Yes.
8    Q.    That's something that the previous year he had
9          criticized you for, correct?
10   A.    Correct.
11   Q.    When he talks about your coaching numbers dropping
12         down, he notes that that might be because you had
13         missed so much time; is that right?
14   A.    Correct.
15   Q.    And am I correct that you were not disciplined for
16         your coaching numbers dropping down?
17   A.    Correct.
18               MR. GALLAGHER:  Objection; form,
19         foundation.
20   A.    Well, I was and I wasn't.
21   BY MS. NORRIS:
22   Q.    Okay.  Tell me what you mean by that?
23   A.    I got a 2.0 rating, so I was sort of disciplined for
24         it as far as my review.  He didn't directly give me
25         something, but he knocked my review down points for

Page 170

1          it.  It all came into consideration.
2    Q.    Do you know what -- how he weighted each particular
3          issue here in making his overall review?
4    A.    He said everything was being considered and gave me a
5          2.2 out of 4 rating when I asked him.  So for me not
6          being in the market, some of these things were out of
7          my control, I still got dinged for it.  And he said
8          because I got put on PIP, which I didn't think was my
9          fault, but whatever.  It was something I just didn't
10         agree with.
11   Q.    If you turn the page to page 5, do you see where it
12         says development areas?
13   A.    Yes.
14   Q.    Can you tell me what you're talking about here?
15         You're making comments and he's making comments.  Can
16         you tell me what the issue is?
17   A.    Ryan, when I first talked about the PC and he was
18         telling me it wasn't him, it was the higher-ups, he
19         had Chavonne and Molly come and talk to me about what
20         to say to customers about getting them to sign up the
21         PC that might help.  So I took that chance to learn
22         and I told him, you know, you had me work with
23         Chavonne and Molly and it helped me with my customer
24         service skills.  That was basically it because it was
25         something I touched on that I wanted to be made --

Page 171

1          highlighted in the review.
2    Q.    In your complaint you characterized this as a very
3          favorable review, didn't you?
4    A.    In my complaint where?
5                MR. GALLAGHER:  Objection.
6                MARKED FOR IDENTIFICATION:
7                DEPOSITION EXHIBIT 14
8                12:38 p.m.
9    BY MS. NORRIS:
10   Q.    You've been handed Deposition Exhibit 14, which is
11         your complaint in this lawsuit.  If you go to page 3,
12         you'll see that there's a paragraph marked
13         paragraph 23?
14   A.    Yes.
15   Q.    Do you see that?
16   A.    Yes.
17   Q.    And it says in Mr. Caudle's 2014 Nielsen performance
18         evaluation, Mr. Dinsmore gave Mr. Caudle a very
19         favorable review, correct?
20   A.    Yes.
21   Q.    So you think that a 2.0 evaluation is very favorable?
22               MR. GALLAGHER:  Objection, form and
23         foundation.
24   A.    I think that whoever wrote this took the words out of
25         context because I was talking about how I was treated

Page 172

1          unfairly about the PC ratings, how other people's PC
2          ratings were lower than mine and being put on PIP
3          and -- that's why 22 mentions that.  So I think it
4          wasn't necessarily any kind of --
5    BY MS. NORRIS:
6    Q.    Did you complain to anybody about this evaluation?
7    A.    I just talked to Ryan about it.  And then I made it a
8          point to work harder to -- when he said it wasn't his
9          real issue, I didn't think my issue was with him.  So
10         I worked hard to prove that I was a good field rep.
11   Q.    You thought Mr. Dinsmore was suggesting that people
12         above him had something to say about this?
13   A.    Yes.
14   Q.    Did he say who?
15   A.    He said the higher-ups.  He didn't give me names, he
16         just said it wasn't his call to do it.  Because when I
17         asked him about, you know, me not being there half the
18         year, how is that fair?  And he told me this is just
19         the way it is because your name is on the market, so
20         it goes towards you.
21               MARKED FOR IDENTIFICATION:
22               DEPOSITION EXHIBIT 15
23               12:40 p.m.
24   BY MS. NORRIS:
25   Q.    Am I correct that Exhibit 15 is your 2015 evaluation

CAUDLE, DAVID
05/15/2019

Pages 173—176

Page 173

1  given to you in February of 2016?
2  A.  Yes.
3  Q.  And is this, again, at a restaurant with Ryan?
4  A.  Yes.
5  Q.  It looks like the company moved to a different
6  evaluation format; is that right?
7  A.  I think it was still the same, they just printed out
8  different.
9  Q.  Okay.  If you go to page 4, it looks like that's where
10 the comments are, correct?
11 A.  Okay.
12 Q.  Mr. Dinsmore commended you for assisting in Dayton and
13 Columbus, didn't he?
14 A.  Yes.
15 Q.  What had happened in those areas?
16 A.  Josh came to me and asked me if I would be willing to
17 go to Dayton to help the guys out there that were --
18 some of the new techs weren't catching on. The faults
19 were getting high.  And he asked if I would go out
20 there and show them how I was doing my faults because
21 I was handling it at such a high rate and
22 quality-wise.
23 Q.  So people needed some training, some additional
24 training?
25 A.  Yes.

Page 174

1  Q.  And when you say Josh, you mean --
2  A.  Josh Hummel.
3  Q.  Thank you.  That was what I was going to ask.  How
4  long were you in Dayton and Columbus?
5  A.  I went back and forth so I think I went there almost a
6  month altogether.
7  Q.  And you went into other people's homes at that time?
8  A.  Yes.
9  Q.  Did you go with the other techs or on your own or
10 both?
11 A.  I shadowed the techs the first time to see what they
12 were doing and then I actually went on calls by myself
13 to try to fix faults to get them -- the market back
14 up.  So my job was to watch them and train them in
15 what they were doing, the way they were interacting
16 with the customer, things they weren't catching
17 because they weren't paying attention.
18 Q.  Did you have any difficulty getting into any of the
19 homes?
20 A.  No.
21 Q.  Did you ever have any problems with Mr. Hummel?
22 A.  No, never really ran into Josh.
23 Q.  Mr. Dinsmore also recognized that you'd improved on a
24 number of your metrics, correct?
25 A.  Correct.

Page 175

1  Q.  And that your homes really liked you, correct?
2  A.  Yes.
3  Q.  And you acknowledge that you needed to cut down on
4  overtime, right?
5  A.  Yes.
6  Q.  And you needed to get your PC number into the green,
7  correct?
8  A.  Yes.
9  Q.  What does that mean?
10 A.  That's what he was talking about the last month about
11 my PC numbers not being as high.  The green means
12 you're acceptable.
13 Q.  So it just is on the spectrum --
14 A.  Yes.
15 Q.  -- green is you're good enough, yellow is not quite so
16 good and red is bad?
17 A.  Correct.
18 Q.  Okay.  Even though you were on a leave at the
19 beginning of this year, you got your overall rating
20 back up to 3.0, correct?
21 A.  Yes.
22 Q.  Did you have any problems with this review?
23 A.  No.  I asked him how it was a little different.
24 Q.  What do you mean?
25 A.  He took into consideration me being out on my back

Page 176

1  injury, everything.  But when I was -- the previous
2  review when I was out, he didn't take consideration
3  for it.
4  Q.  So you thought he should have done so before and you
5  said that and then in this one he did?
6  A.  Yeah.
7  Q.  Okay.  You were pleased with that, right?
8  A.  Yeah, because at this point I thought me and him had a
9  good relationship.
10 Q.  And you did not complain to anybody about this, did
11 you?
12 A.  No.  I was told from the day I started that 4s are
13 rarely given out, so a 3 was like one of the best
14 things you could get.  I did have one critique on this
15 one.
16 Q.  Which was what?
17 A.  He said my strength was -- I wasn't afraid of working
18 overtime, working as much as it takes to get the job
19 done, but then he critiqued me on working too much
20 overtime at the same time.  So I told him it was a
21 sandwich comment.
22 Q.  What do you mean by that?
23 A.  You can't ding me saying I work too much overtime and
24 say it's one of my strengths that I do it.
25 Q.  Is it possible he meant that he thought you had a

CAUDLE, DAVID
05/15/2019

Page 177

1  ready good work ethic, but he also thought you needed
2  to not have so much overtime?
3          MR. GALLAGHER:  Objection; form,
4  foundation.
5  BY MS. NORRIS:
6  Q.  Yeah, you can --
7  A.  When I asked him to it, he told me that he liked it
8      because it helped the market and it showed my drive,
9      but at the same time, you know, he still dinged me on
10     it.
11 Q.  Am I correct you took another leave of absence in
12     2016?
13 A.  I did.
14 Q.  And what was that for?
15 A.  I think that was for my arm.
16 Q.  What happened to your arm?
17 A.  Actually I hurt it putting a TV into a customer's
18     entertainment stand and then I sort of woke up putting
19     pressure on it, you know, put your hand down to push
20     yourself up, and I dislocated the bone in it so I had
21     to put a cast on.
22 Q.  Was this workers' comp or was this something else?
23 A.  No, because it happened at home so they can't call it
24     workers' comp.
25 Q.  Okay.  You were doing -- you were doing this on your

Page 178

1  own TV?
2  A.  No, I hurt it at the customer's house, but I never
3      reported it.  It's like you smash something, you're
4      like ouch and as a guy you shake it off, it didn't
5      feel like it was hurt.  Then when I -- the next day
6      when I was at home, I was pushing up off the bed and
7      literally putting the pressure on my hand to push
8      myself up, I injured my arm.
9  Q.  So this was treated as a disability, but not workers'
10     comp?
11 A.  Yes.
12          MARKED FOR IDENTIFICATION:
13          DEPOSITION EXHIBIT 16
14          12:47 p.m.
15 BY MS. NORRIS:
16 Q.  You've been handed Deposition Exhibit 16, which is --
17     it looks to me like it's a letter from MetLife to you
18     saying that your leave is approved starting May 10th;
19     is that right?
20 A.  Correct.  That's the address I was living at.
21 Q.  The Farmington Hills address?
22 A.  Yes.
23 Q.  And this was treated as leave under the Family Medical
24     Leave Act; is that right?
25 A.  Correct.

Page 179

1  Q.  For Nielsen, if you had a nonworkers' comp injury, if
2      you --
3  A.  You know what, this is May, this is sickle cell.
4  Q.  You think this one is sickle cell?
5  A.  Uh-huh.
6  Q.  What makes you think that?
7  A.  Looking at the date.
8  Q.  Okay.  Do you know when the other -- the issue with
9      your arm was compared to this?
10 A.  I can't remember.
11 Q.  You don't know if it was before or after?
12 A.  It might have been before because it's getting close
13     to the time I got let go so -- to be honest, it could
14     be that time.
15 Q.  Okay.  Let me ask you this because you don't have to
16     guess.  When you hurt your arm, about how long were
17     you off for that?
18 A.  I want to say -- I think it was a month or two months.
19 Q.  And that was in 2016?
20 A.  Yeah, I'm pretty sure.
21 Q.  And when you went out for sickle cell in 2016, was
22     that the first time you'd taken leave for sickle cell
23     at Nielsen?
24 A.  Leave, no, I had been off sick.  I don't think I
25     took -- I was -- yeah, that was the first time I took

Page 180

1  off for that because the other times I just used sick
2  days.
3  Q.  Okay.  So when you took the leave for sickle cell in
4      2016, how long were you off for that?
5  A.  I think it was the end of August until -- I think it
6      was September-something when I came back and then Ryan
7      suspended me or was it October?
8  Q.  So the sickle cell leave was the last leave you took?
9  A.  Yeah.
10 Q.  Okay.
11 A.  The day I came back is the day Ryan suspended me.
12 Q.  All right.  So for right now, looking at Exhibit 16,
13     I'm not going to guess which of those leaves it was,
14     okay?
15          Am I correct that the leave was also
16     covered by the Family Medical Leave Act?
17 A.  Uh-huh.
18          MR. GALLAGHER:  Objection; form,
19     foundation.
20 BY MS. NORRIS:
21 Q.  You have to say --
22 A.  Yes.
23 Q.  Okay.  And was the process -- if you had a leave of
24     absence that was not work related, so it's something
25     personal, whether it's your arm or sickle cell or

Page 181

1     whatever, but it's not workers' comp, am I correct
2     that the process was that you would go through
3     MetLife?
4 A.  Yes.
5 Q.  Okay. Did you apply to anybody at the company or did
6     you just contact MetLife directly?
7 A.  MetLife was part of our disability, that was already a
8     part of Nielsen. They had a contract with them so --
9 Q.  Were you required to notify anybody at Nielsen or did
10    MetLife take care of that?
11          MR. GALLAGHER: Objection to form and
12    foundation.
13 A.  I contacted somebody in HR and they would tell me to
14    contact the person at MetLife and they took over the
15    case.
16 BY MS. NORRIS:
17 Q.  All right. When you contacted somebody in HR, do you
18    know who you spoke to?
19 A.  No.
20 Q.  Did you tell them what the medical issue was or just
21    that --
22 A.  Yes.
23 Q.  -- you needed leave?
24 A.  I told them the medical issue.
25 Q.  Okay. So whichever one it was in May, you would have

Page 182

1    told them about it?
2 A.  Yes, because they had to document it.
3 Q.  Once you contact MetLife for leave, do you know what
4    information MetLife provides Nielsen?
5 A.  No.
6 Q.  Do you know who decides if the leave is granted?
7 A.  No.
8 Q.  And this leave was granted, correct?
9 A.  Yes.
10 Q.  The letter, Exhibit 16, says it's granted through
11    June 6th. Do you know if you returned on June 7th?
12 A.  I'm not sure.
13          MARKED FOR IDENTIFICATION:
14          DEPOSITION EXHIBIT 17
15          12:51 p.m.
16 BY MS. NORRIS:
17 Q.  Okay. Exhibit 17 is also a MetLife letter. This one
18    is dated August 17th, 2016 and this talks about a
19    leave starting August 8th, 2016. Do you think that
20    was your last leave?
21 A.  No.
22 Q.  Okay. So you think there was another one after this?
23 A.  Or was continuing.
24 Q.  What do you mean?
25 A.  It was extended after the date.

Page 183

1 Q.  Okay. I'm not asking if this ended when this letter
2    says it ended --
3 A.  I'm not sure if this is the only one I had or if there
4    was another one, I just know --
5 Q.  Okay. Between Exhibit 16 and Exhibit 17, do you think
6    we covered both your arm and sickle cell?
7 A.  I believe so.
8 Q.  All right. And I think you told me that your arm was
9    one to two months; is that right?
10 A.  I believe so.
11 Q.  All right. And you think that sickle cell was your
12    last leave; is that right?
13 A.  Yes.
14 Q.  All right. Exhibit 17 initially says that the leave
15    is granted from August 8th through August 28th?
16 A.  Uh-huh.
17 Q.  Is that what you asked for at the time?
18 A.  No.
19 Q.  What did you ask for?
20 A.  I didn't ask for anything.
21 Q.  What do you mean, you just said I need to be out?
22 A.  It was a doctor's note and then it was approved by
23    MetLife. It was nothing that I went to them and said
24    I need time off.
25 Q.  Okay. So it was just whatever the doctor's note said?

Page 184

1 A.  Yeah.
2 Q.  Did you come back on August 28th?
3 A.  I'm not sure.
4 Q.  Do you recall taking more than one leave for sickle
5    cell in 2016?
6 A.  I'm not sure if I took another one, like I said, if it
7    was extended. I'm not sure.
8 Q.  Okay. Did you understand that while you were out
9    Brian Molnar from Jacksonville came to Michigan to
10    help?
11 A.  Yes. I didn't know his last name, but I knew his
12    first name.
13 Q.  And you thanked Brian for that; is that right?
14 A.  No, he lied on me.
15          MARKED FOR IDENTIFICATION:
16          DEPOSITION EXHIBIT 18
17          12:54 p.m.
18 BY MS. NORRIS:
19 Q.  I've handed you Deposition Exhibit 18, which, again,
20    is an e-mail. There's an e-mail dated September 9th
21    from Ryan Dinsmore telling people that Brian Molnar
22    was coming and then there's an e-mail from you saying
23    thanks a lot, Brian; is that right?
24 A.  I didn't know what he did. This is with him coming in
25    and I told him thank you, yes. He was supposed to be

Page 185

1  handling my field area.
2  Q.  Okay.  What did he lie about?
3  A.  He went to a home and asked them if I ever asked them
4    to lie about TVs not being metered, if there was any
5    un-metered devices in the home and something else.
6  Q.  So what did he lie about?
7  A.  He went to the home saying that -- first he said I
8    told the home that he could come there.  And he said
9    well, I just need to check -- you know, Dave needs to
10   know, is there any un-metered TVs in the home, that's
11   the first question he asked.
12 Q.  Okay.  Is that a lie?
13 A.  Yes, because I hadn't talked to him.  Other than this
14   e-mail, I didn't know him, so I didn't ask him to go
15   to any home.
16 Q.  Okay.
17           MR. GALLAGHER:  Can you please let him
18   finish talking?
19 BY MS. NORRIS:
20 Q.  Go ahead.
21 A.  The household called me, asking me did they -- did I
22   know this guy because he kept calling asking these
23   questions.  And I told them I was off sick.  And they
24   asked me if I knew a Brian.  I said yes, he's coming
25   in, he's supposed to be checking my field area.

Page 186

1           Then she said well, he's asking me these
2    questions about TVs in the home, if you ever lied, did
3    you ask us did we not have any TVs metered on purpose
4    and that she knew about.  And she said that she kept
5    asking like why would you ask me this if you're from
6    out of town?  And she said the manager -- he said that
7    the manager told him to ask these questions, and that
8    was Ryan.
9  Q.  Do you know if Ryan did that?
10 A.  I have no idea.  I know that the lady of the house
11   called the head of Nielsen field reps.  She e-mailed
12   them and she wrote something on the Better Business
13   Bureau about the situation.  When I came back to work,
14   I set a fault date to go to that home.  When I went to
15   that home -- or when I was on the way to that home,
16   Ryan took that home out of sample.  The lady of the
17   house got upset and at that time I found out I was
18   suspended later on that day.  And Ryan went back to
19   that home and gave them $700 for the incident because
20   he was wrong for it and he apologized for it.
21           MARKED FOR IDENTIFICATION:
22           DEPOSITION EXHIBIT 19
23           12:57 p.m.
24 BY MS. NORRIS:
25 Q.  I'm handing you Deposition Exhibit 19.  Is this the

Page 187

1  e-mail that the woman sent?
2  A.  Yeah, I guess, yes.
3  Q.  Okay.  If you go down about two-thirds, there's a
4    sentence that starts, we began getting harassing
5    calls.  Can you find that for me?
6  A.  Yes.
7  Q.  Do you see that?
8  A.  Yes.
9  Q.  It says we began getting harassing calls and texts
10   when Dave was out on leave.  A person named Brian
11   called and texted relentlessly attempting to gain
12   access to my home because one of our televisions, he
13   said, was not reporting.
14           Do you know if it is true that one of their
15   televisions was not reporting?
16 A.  I don't know because I wasn't supposed to be looking
17   at company stuff, so I was on a sick leave.
18 Q.  Okay.  All right.  She next says we unplugged all our
19   appliances, including Nielsen equipment, to protect it
20   during a storm and one of our children hadn't plugged
21   it back in.
22           If that's true, in other words, if they
23   unplugged everything and then they didn't plug
24   something back in, would that show that it was not
25   reporting?

Page 188

1  A.  Yes.
2  Q.  All right.  And that would be a problem, correct?
3  A.  It would be a problem to that date and it would fix
4    itself the next day.
5  Q.  Then it says Brian continued harassing us and finally
6    said Dave told him to call us and text us.
7           And your testimony, as I understand, is I
8    never talked to Brian, I didn't tell him to do
9    anything; is that right?
10 A.  Brian never called me.  And the lady of the house said
11   did you give Brian the okay to come over?  And I told
12   her that I was out sick and I haven't contacted
13   anyone, that's the only thing I told her.  And then
14   she said that --
15 Q.  Okay.  But just -- I haven't asked what she said,
16   except what I just read.
17           You told me, and I understand your
18   testimony to be that the statement that you told Brian
19   to call her was false, right?
20 A.  Yes.
21 Q.  All right.  And then when she says he claimed Dave was
22   the one who sent him specifically, that's false --
23 A.  Correct.
24 Q.  -- correct?
25           Okay.  She then says I called Dave and

CAUDLE, DAVID
05/15/2019

Page 189

1    asked who Brian was.  And Dave, not knowing that Brian
2    was attempting to gain access to my home, said he was
3    an out-of-town rep and that he didn't really know him.
4    Is that statement true?
5  A. Correct.
6  Q. All right.  You did understand that Brian had been
7    brought in to help cover your territory; is that
8    right?
9  A. He was doing other calls too.
10 Q. Sure, I'm not saying that was the only thing he was
11   doing, but you understood he was covering your
12   territory; is that right?
13 A. Correct.
14 Q. So he wasn't just a stranger, you knew he was somebody
15   that was supposed to be getting access to your homes?
16 A. She didn't ask me --
17       MR. GALLAGHER:  Objection, form and
18   foundation.
19 A. When she called me, she did not say Brian is trying to
20   get access to my home, do you know him.  She asked me
21   who Brian was, that's it.  And I told her I didn't
22   know him -- I told her he was an out-of-town field
23   rep.  I identified him as a Nielsen employee, but I
24   did not know him.  I hadn't talked to him.
25 BY MS. NORRIS:

Page 190

1  Q. Okay.
2  A. So I'm at home sick, sick-sick.  She calls me.  The
3    first thing out of my mouth is I know he's an
4    out-of-town rep, I just tell the truth.  I'm not
5    looking anything else.
6  Q. I'm simply asking, did you tell her he's supposed to
7    be helping with my homes, that's my question?
8  A. I didn't get that far into it.
9  Q. Okay.
10 A. I made the comment and then she went off on him
11   harassing her.
12 Q. Did you understand that the woman thought that Ryan
13   was trying to use this to take the family out of the
14   Nielsen homes?
15 A. I knew nothing.
16 Q. Okay.  So you didn't know one way or another if that's
17   what she was alleging?
18 A. No.
19 Q. All right.  Am I correct that if you are a Nielsen
20   home you get certain benefits?
21 A. Yes.
22 Q. Do you know whether what Ryan gave her were the
23   benefits she would get for being a Nielsen home?
24 A. If you're a Nielsen home and you get canceled you get
25   nothing.

Page 191

1  Q. Okay.
2  A. This home was canceled and got $700 in gift cards.
3  Q. Right.  Do you know that she alleged that she thought
4    they were canceling her to deprive her of those
5    benefits?
6        MR. GALLAGHER:  Asked and answered, form,
7    foundation.
8  BY MS. NORRIS:
9  Q. I'm asking what you know?
10 A. Can you ask the question again?
11 Q. Yeah.  Do you know --
12 A. In a different way, I'm asking?
13 Q. Yeah, I'll try, okay?  So I'll do it in little pieces
14   and you tell me if I'm right, okay?
15 A. Okay.
16 Q. Piece number one.  If you're an active Nielsen home,
17   not canceled, you get certain benefits; is that right?
18 A. Correct.
19 Q. And am I correct that those benefits can be gift
20   certificates or other things that have some cash
21   value?
22 A. At that time all they could be was a Visa gift card.
23   We were changed over to those.
24 Q. Okay.  A Visa gift card with cash value, correct?
25 A. Correct.

Page 192

1  Q. All right.  And am I correct that normally if you're
2    canceled you don't get anything?
3  A. Correct.
4  Q. Am I correct that one of the reasons you might get
5    canceled is because you never let anybody into your
6    home?
7  A. Sort of.  We have -- it all depends on the market.
8  Q. Okay.  Fair enough.
9  A. So I've seen homes that faulted for a month and we
10   didn't take them out.
11 Q. All right.  You understood that this woman made
12   complaints all over the place, up the ranks at Nielsen
13   and to the Better Business Bureau?
14 A. This was after the fact, so, no, I did not know that.
15 Q. Okay.  I'm asking now if you understand that?
16 A. Okay.  Yes.
17 Q. I mean, you testified to that, correct?
18 A. Yes.
19 Q. All right.  And did you know at any time, including
20   right now, did you know that the woman had said she
21   thought that she was being canceled to cheat her out
22   of her benefits?
23       MR. GALLAGHER:  Objection; form,
24   foundation.
25 A. No.

CAUDLE, DAVID
05/15/2019

Pages 193—196

BY MS. NORRIS:

Q.   So if in fact she said she thought she was being
     cheated out of her benefits, would there be any
     violation of policy of any kind to give her the
     benefits to take away that claim?

         MR. GALLAGHER:  Objection, foundation.

A.   Nielsen doesn't give any home $700 a month, so I don't
     know how that would equal in value and I don't think
     the home was even getting $100 a month.  So the
     monetary value doesn't add up.

         I've never seen a Nielsen home, unless it
     was a basic, get that amount of money, and I'm saying
     $100.  No home has ever gotten $700 for being
     canceled.  So in this situation, I'm the outside guy.
     When I found out everything that was going on and my
     name was being used and that Ryan had sent an outside
     rep who didn't know me and asked him to ask certain
     questions about me, I'm looking puzzled.

         And this is just by her conversation, then
     she told me she e-mailed the Nielsen VP guy and then
     she told me that Ryan was on the way out to her house
     to pick up the equipment and offered her the Visa gift
     cards for inconvenience and told her that he was very
     sorry for everything that happened.

BY MS. NORRIS:

Q.   Could you go to -- back to Exhibit 14 for me?

A.   Okay.

Q.   This is your complaint.  Could you go to paragraph 13
     on page 2?

A.   Okay.

Q.   It says that you suffered from sickle cell anemia and
     then paragraph 14 says you were -- in 2013 you were
     required to miss a short period of time due to
     disease.  Do you know how much time that was?

A.   I think it was two weeks, I'm not sure.

Q.   And do you think you just did that with sick days?

A.   Yes, I'm sure.  I had to use all my sick days up first
     before anything kicked in.

Q.   Do you know when in 2013 that was?

A.   No.

Q.   Did you ever request a leave of absence from Nielsen
     and have it denied?

A.   No.

Q.   We've talked -- I asked earlier whether Mr. Dinsmore
     ever said anything to suggest he had problems with
     your medical condition and you told me about some
     specific conversations you had with him and you also
     told me about some conversations that were related to
     you by other people.

         Is there anything else that he did to

     suggest that he had a problem with you being on leave
     that you haven't already told me about?

A.   He made a joke about -- we were all at a breakfast and
     somebody was sick and he was, oh, don't cough by Dave,
     you know, he'll be sick and be out and then you guys
     will have to cover.

Q.   When was that?

A.   It was sometime in 2015.  And the guys said, you know,
     yeah, y'all know we don't like covering for Dave.
     Because it meant them taking away from their job to
     cover for mine.  Because Brian was the only time --
     one of the only times they called somebody in to
     actually cover my field area.  So all the other times
     those guys had to do their work, plus mine.

Q.   I'm asking right now about comments specifically that
     Mr. Dinsmore made.  So you just related one to me,
     that he said don't cough by Dave or you'll be out,
     correct?

A.   And he said don't cough around me or I'll be out.

Q.   Like Dave?

A.   You know how Dave is.  He said don't cough around Dave
     or Dave will be out, you know how Dave is.

Q.   Any other comments by Mr. Dinsmore that you haven't
     told me about?

A.   Not that I can think of offhand, not that he made

     directly towards me.

Q.   Who did you tell at Nielsen that you had sickle cell
     anemia?

A.   Ryan and Dave Demmon when I first called off, told
     them why I needed to be off.

Q.   In 2013?

A.   Yes.

Q.   Other than time off, did you ever request an
     accommodation for sickle cell anemia?

A.   No.

         MR. GALLAGHER:  Off the record.

         (Recess taken at 1:07 p.m.)

         (Back on the record at 1:16 p.m.)

BY MS. NORRIS:

Q.   Mr. Caudle, I'd like to go back for a few minutes
     about -- and talk about the transfer request that we
     talked about earlier.

A.   Okay.

Q.   Am I correct that this request -- you made this
     request in mid 2016?

A.   No, 2015.

         MR. GALLAGHER:  I'm sorry, could you
     clarify, are you talking about geographic area or work
     position?

         MS. NORRIS:  When he wanted to move to a

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

CAUDLE, DAVID
05/15/2019

Page 197

1      new territory.
2              MR. GALLAGHER:  Thank you.
3   BY MS. NORRIS:
4   Q.   You think that was in 2015?
5   A.   Yes, when I first moved and I had to update my
6        address.
7   Q.   Okay.  If we could go back to Exhibit 14, please,
8        which is the complaint?
9   A.   Okay.  Thank you.  I did ask again in 2016 when we
10       were rezoning.
11  Q.   Okay.  If you go to paragraph 41, which is on page 5,
12       it says in early or middle of 2016 Mr. Caudle and his
13       fiancée moved to Farmington Hills and Mr. Caudle made
14       his transfer request to Mr. Dinsmore per company
15       policy?
16  A.   That was the second time I asked, yes.
17  Q.   Okay.  I don't see anything -- did you move at some
18       time other than early or middle 2016?
19  A.   No.
20  Q.   So your first transfer request I thought -- I'm sorry,
21       I thought your transfer request was because you were
22       moving?
23  A.   Yes.  But I'm saying I moved in 2015, that's wrong --
24       that statement is wrong.
25  Q.   So paragraph 41 is incorrect?

Page 198

1   A.   Yes.  As far as the time I moved, yes.
2   Q.   And then you requested again in 2016?
3   A.   Yes.  We were rezoning, it meant everybody's field
4        area was going to move a little bit.  So I asked if I
5        could get closer to my home since we were rezoning.
6        And that was the reason why I got denied the first
7        time, because he said it was going to be too hard to
8        move everybody around, so I figured since we were
9        moving --
10  Q.   Did you make the transfer request to Mr. Dinsmore?
11  A.   Yes.
12  Q.   Was there an open position?
13  A.   There's no such thing as an open position.  The field
14       areas move depending on how Ryan sees fit when he
15       rezones.  So if he wanted to slice up areas, he could
16       do it whenever he felt like doing it when he was
17       rezoning.
18  Q.   Did you submit anything in writing?
19  A.   I believe it was an e-mail or text when I asked him
20       and then the next time was a phone call.
21  Q.   Do you still have that e-mail or text?
22  A.   I don't have the company phone, so it was all on the
23       company e-mail.
24  Q.   In 2015 do you know when you found out that your
25       request was being denied?

Page 199

1   A.   Ryan said he had to think about it.  He told me -- he
2        just told me that it was going to be too hard moving
3        everybody around.  I think it was -- no, I know for a
4        fact it was around the time for a bonus and that would
5        have meant guys' bonuses would have been affected if
6        he moved them around.  I mean, like if you were doing
7        good in your area, you would have lost homes you were
8        doing good in and maybe got some bad ones so it would
9        have messed up somebody's bonus he said so --
10  Q.   When's bonus time, you said it was around bonus time?
11  A.   Every three months bonuses came out.
12  Q.   Okay.  But you don't know when in the year it was?
13  A.   It was late in the year so I would say -- August or
14       November I would say.
15  Q.   Okay.  And do you know in 2016 when you made the
16       request?
17  A.   It was when we were rezoning, sometime in the middle,
18       like the summer.
19  Q.   And do you know when you found out it was being
20       denied?
21  A.   When I saw the new map of our zones, I was still in
22       the same area.
23  Q.   Okay.  You were on leave during part of the summer of
24       2016, correct?
25  A.   Yes.

Page 200

1   Q.   Were you on leave when you made the request?
2   A.   No, before.  As a matter of fact, I think Ed Chesney,
3        he was just about to leave to go to Columbus and
4        that's the reason we were doing the rezoning and
5        that's why I asked him.  I believe so.
6   Q.   Did you apply for another position within Nielsen?
7   A.   Internal auditor.
8   Q.   When did you apply for that?
9   A.   The minute it came up.
10  Q.   Do you know when that was?
11  A.   No.
12  Q.   Do you know what year?
13  A.   2016, I believe, yes.
14  Q.   What was the application process?
15  A.   They announced they were looking for internal
16       auditors, people that did good in homes, had high-end
17       tabs and knew how to talk to customers and knew -- had
18       good audit -- good audits in the past.
19  Q.   But what did you have to do to get the job?  So you
20       knew the job was available, what was the process?
21  A.   Well, I got two interviews, then it was put on hold
22       because Nielsen was still trying to define the
23       position.  Then I got a call from HR.  They tell me
24       that I was still on the short list for Detroit because
25       the other guys -- it was Tim Franklin and Bill Fields,

CAUDLE, DAVID
05/15/2019

Pages 201–204

Page 201

1    they weren't going to take the position because it was
2    lateral and it wouldn't be more money.  So they
3    wouldn't take it because they were going to lose their
4    bonuses so -- which meant I was going to get the
5    position.
6              At that point I had heard -- that brings up
7    something else.  That's when I heard that Ryan was
8    saying he wasn't going to let me go.  He could make
9    the decision not to let me go if he felt like it was
10   going to hurt the market or -- he had the last say to
11   say yeah, he can go or no.
12 Q.  Who was the hiring manager?
13 A.  I don't know who because they told me Nielsen was
14   still trying to formulate everything and that's why it
15   was never a green light at the time I was there.
16 Q.  Who interviewed you?
17 A.  It was three managers, I can't recall who it was.  It
18   was like a panel telephone conference and they all
19   jumped on asking me questions.
20 Q.  Who told you that you were going to get the position,
21   that you were the only one left?
22 A.  HR.  They had called to tell me that the position was
23   still being considered because it had been so long
24   because Nielsen was trying to finalize it, but they
25   told me that it was between me, Tim and Bill Fields.

Page 202

1    But they said that after talking to them, since it was
2    a lateral move, that they wouldn't take the positions
3    and they didn't -- I found out they didn't take the
4    position, they're still there and somebody else took
5    it, Brian took it.
6 Q.  Who got the position?
7 A.  Brian Burkhardt.  He didn't interview for the
8    position, but when I got fired they had to have
9    another candidate and he put in and got it, but --
10 Q.  Do you know if Ryan Dinsmore had the right to not
11   allow you to transfer?
12 A.  He had the right -- as far as what I was -- as far as
13   what I heard, because he did the same thing to Ed
14   Chesney.  Ed said that they -- well, Ryan or the Ohio
15   manager denied him transferring back to his family in
16   Ohio.  And he told me that the managers can do that if
17   they feel like the market is going to hurt or
18   something like that, if it's an
19   inside-the-same-position move.
20 Q.  So he wouldn't let Ed Chesney transfer?
21 A.  At the time, that's what Ed said.  He made the comment
22   about it.  He said the managers have the right -- if
23   you're transferring within the field rep department, a
24   manager has a right to deny it.  But if you're
25   transferring outside the department, they can't.  So

Page 203

1    if I wanted to go to marketing or something like that,
2    that's something different, he has no control over it.
3 Q.  So audit is not considered outside the department?
4 A.  Because it's still dealing with field reps.  I'm
5    auditing field reps.
6 Q.  What's Ed Chesney's race?
7 A.  White.
8 Q.  Did you ever get anything in writing saying you got
9    the job?
10 A.  No, because they was still trying to finalize.  They
11   were just telling me I was on the short list and that
12   they were still coming up with all the terms and the
13   pay and everything for the position.
14 Q.  Do you know when Brian Burkhardt started in the job?
15 A.  After I quit.
16 Q.  Do you know how much longer?
17 A.  No, I found that out in passing.
18 Q.  Is it HR that told you that Mr. Dinsmore wouldn't let
19   you move or somebody else?
20 A.  HR, when I asked them, said that Ryan could deny me if
21   I can move.
22 Q.  Did they tell you that he was in fact doing that?
23 A.  No.  I found out from -- Raul was talking to James
24   Hardy while I was walking into the storage site and
25   Raul had said it.  He was saying that the market was

Page 204

1    so messed up right now, Ryan is not going to let
2    anybody move.  And I heard Dave was trying -- James
3    said that I heard Dave is trying to move up.  And as I
4    was walking in I stopped and he said yeah, I doubt
5    he's going to let him move because who is going to
6    fill 6272.
7 Q.  Okay.  Am I correct that Raul is a coworker?
8 A.  Raul is a supervisor, yes.
9 Q.  This is Mr. Mata?
10 A.  Yes.
11 Q.  Okay.  He's your immediate supervisor?
12 A.  Yes.  Him and James Hardy are best friends.
13 Q.  Okay.  Were they specifically talking about you and
14   your application or they were talking generally about
15   the area was a mess and Mr. Dinsmore wasn't letting
16   people move?
17 A.  They were talking general as to things was a mess
18   because at the time James Hardy was fatigued with the
19   job.  He was ready to quit.  He was like on the verge
20   of saying he was about to have a mental breakdown.
21   Then Raul made the comment about Ryan I guess heard
22   the comments about me interviewing for the new
23   position.  He had to know about it because I had to
24   ask him if I could apply for it.
25 Q.  And you did ask him?

CAUDLE, DAVID
05/15/2019

Pages 205–208

Page 205

1  A.  Yes.
2  Q.  And did he say yes?
3  A.  Yes.  You had to get permission from your manager
4     before you could apply for it, that was part of the
5     requirements.
6  Q.  Okay.  I want to go back to Raul and James Hardy's
7     conversation.  I want you to, in the best memory that
8     you have, tell me exactly what they said?
9  A.  When I was walking into the storage site, you know,
10    sound travels.  The first thing I heard was James
11    Hardy was having a rant, talking about man, I can't
12    stand it here anymore.  What about -- what can I do
13    about transferring, like getting out of being a field
14    rep?
15        And Raul said I don't know if anybody is
16    going to be able to do it because Vikash had just
17    left, he went over to marketing.  He left because he
18    couldn't handle it and James wanted to do it.  That
19    was the conversation being had.
20        And Mata said anybody trying to leave, like
21    being a field rep, Ryan is not going to let you do it
22    because the market can't handle somebody leaving.  And
23    he said as a matter of fact, I heard Dave is up for
24    the internal audit position and I know Ryan is not
25    going to let him leave.

Page 206

1  Q.  Okay.  When -- do you remember them saying anything
2     else about that?
3  A.  No, I walked in at that point.
4  Q.  All right.  So when he said Dave's up for the
5     position, it's clear that Mr. Mata knew that you had
6     applied for that position; is that right?
7  A.  Yes, uh-huh.
8  Q.  When he said -- I think your words, but I -- actually
9     can you read back what he said about no way he's going
10    to let him leave, read back that part of it?
11        (The following requested portion of the
12        record was read by the reporter at
13        1:28 p.m.:
14        A.  And he said as a matter of fact, I
15        heard Dave is up for the internal audit
16        position and I know Ryan is not going to
17        let him leave.)
18  BY MS. NORRIS:
19  Q.  Okay.  Do you know if Mr. Mata had actually spoken to
20    Mr. Dinsmore about letting you leave at all?
21        MR. GALLAGHER:  Objection, foundation.
22  A.  I don't know.  I know they had conversations so --
23  BY MS. NORRIS:
24  Q.  Okay.  You mentioned earlier today about a survey that
25    was sent to you that you and Mr. Dinsmore had a

Page 207

1     conversation about.  Do you recall that?
2  A.  Is Nielsen a great place for African-Americans?
3  Q.  Yes.
4  A.  Yes.
5  Q.  Do you know who issued that survey?
6  A.  Nielsen, I guess.  I'm saying it was on Nielsen
7     front-head so I believe Nielsen sent it out.
8  Q.  So it looked like a Nielsen document?
9  A.  Yes.  It was sent in our e-mail, not spam.
10  Q.  Okay.  And how do you know that it only went to
11    African-American employees?
12  A.  It stated was Nielsen a great place for
13    African-Americans and the CC was a bunch of people
14    that I knew were African-Americans.  I didn't see any
15    Caucasians.  It wouldn't be fair to ask them, is
16    Nielsen a great place for African-Americans.
17  Q.  Well, they could ask anybody, but it sounds like,
18    looking at the e-mail, it looked like it just went to
19    black people; is that right?
20  A.  Yes, correct.  So I was asking, was it right and was
21    one sent out to all Caucasians or Indians or --
22  Q.  Do you know who at Nielsen had that survey sent out?
23  A.  I do not know.
24  Q.  Did the survey have anything on it other than that one
25    question?

Page 208

1  A.  That and -- that question and then you clicked on it
2     and you got to answer other questions.
3  Q.  So it was like an online survey and that was the first
4     page?
5  A.  Yes.  And then it asked did Nielsen blah, blah, blah,
6     once you got into it.
7  Q.  Okay.  Did you go through it?
8  A.  I just wanted to see what the questions were.  I
9     didn't really go through it.
10  Q.  Do you remember any of the other questions?
11  A.  No, because I got really infuriated because I thought
12    it was unfair, so I wanted clarification before I
13    filled it out.
14  Q.  And decided you weren't going to do it?
15  A.  Right.  Well, I didn't make my mind up that I wasn't
16    going to do it then, I wanted to talk to Ryan and get
17    clarification first on what it was.
18  Q.  Was it a voluntary survey?
19        MR. GALLAGHER:  Objection; form,
20    foundation.
21  A.  I don't -- I don't know.
22  BY MS. NORRIS:
23  Q.  Am I correct you did not fill it out?
24  A.  I don't believe so.
25  Q.  And did you tell anybody you weren't going to fill it

CAUDLE, DAVID
05/15/2019

Page 209

```
1   out?
2   A.   Just Ryan.  I didn't feel like there was no need to
3        bring it up to anybody else because --
4   Q.   Did anybody tell you that you would be written up or
5        disciplined in any way for not completing it?
6   A.   No.  Ryan just told me to fill it out or not fill it
7        out, that was it.
8   Q.   Am I correct that you were on vacation on June 8th,
9        2016?
10  A.   I do not know.
11  Q.   Do you recall a time when you came back from your
12       medical leave and you went out on vacation and
13       Mr. Dinsmore drove by one of your homes?
14  A.   I'm not sure.
15  Q.   Okay.
16                  MARKED FOR IDENTIFICATION:
17                  DEPOSITION EXHIBIT 20
18                  1:31 p.m.
19  BY MS. NORRIS:
20  Q.   You've been handed Deposition Exhibit Number 20, which
21       is a package of e-mails from June 8th through
22       June 10th of 2016.  I think that the earlier ones are
23       at the back and then they work forward.  Why don't you
24       take a minute and review this?
25  A.   This says Vikash, is this still the same one?  The
```

Page 210

```
1        next page I've got Vikash, Raul --
2                  MR. GALLAGHER:  It starts there and then
3        goes up.
4   A.   Okay.  I believe me and Ryan had a telephone
5        conversation about this, but I don't really recall
6        this because I don't even see me replying at all to
7        anything he wrote.
8   BY MS. NORRIS:
9   Q.   Okay.  If you look at just page 5 of this, they're
10       numbered down at the bottom, do you see there's an
11       e-mail from you to Vikash and Ryan and Raul that says
12       wow, Ryan what happens now?
13  A.   Yeah.  That says 9:39 a.m., Ryan's e-mail says
14       10:52 a.m.
15  Q.   But if you look at -- if you look at Vikash's e-mail
16       from June 8th, Vikash's e-mail says I did the
17       drive-by, wasn't able to get into the home.  Do you
18       see that?
19  A.   Yeah, and I was asking Ryan wow, what happens now?
20  Q.   Correct.  So do you remember this, that incident?
21  A.   No, but I was tagged in it so I responded to it and
22       that's it.
23  Q.   Okay.  Is it fair to say that this is not jogging your
24       memory in any way and you don't remember what happened
25       here?
```

Page 211

```
1   A.   No.  I don't even know if this is my home because it
2        doesn't say Dave, this is your home, it just says I
3        did a drive-by by a home today for a withhold.  It
4        didn't say Dave, this is one of your homes or
5        anything.
6   Q.   Okay.  So you don't -- you're saying you're not sure
7        if Ryan's June 10 e-mail on the first page is related
8        to this at all?
9   A.   I don't know.
10  Q.   Okay.  Do you know what Ryan's e-mail -- the June 10th
11       e-mail, do you know what that one is about?
12  A.   No, because I didn't respond to it.
13  Q.   Okay.  But -- so I'm just asking, reading this, you
14       don't know what that was about?
15  A.   No.
16  Q.   Okay.
17  A.   Not off the top -- no, because every e-mail I ever got
18       I responded to.  Like if I saw something wrong, I
19       admitted I was wrong.  I don't see any --
20  Q.   Okay.
21                  MARKED FOR IDENTIFICATION:
22                  DEPOSITION EXHIBIT 21
23                  1:35 p.m.
24  BY MS. NORRIS:
25  Q.   I'll have you take a look at Exhibit Number 21.  Do
```

Page 212

```
1        you know what happened here?
2   A.   The household said they switched to Comcast and I
3        knew, but there's no -- nothing saying that I did
4        know.
5   Q.   Okay.  Do you have any memory of this?
6   A.   No.
7   Q.   You are not denying that you got this e-mail, are you?
8   A.   I don't remember this e-mail.
9   Q.   Okay.  That's -- you don't remember one way or
10       another, correct?
11  A.   No.  From looking at it, if I was out sick, I probably
12       wasn't paying attention to any e-mail associated with
13       me or if I was on vacation, I don't see --
14  Q.   Do you know if you were out sick or on vacation on
15       June 13th?
16  A.   No, you made the comment that I was on vacation.
17  Q.   That was with the previous e-mail.  That was a
18       different one that we were talking about.
19  A.   Okay.  So that was three days later.
20                  MR. GALLAGHER:  Yeah, it was the same time
21       period though.
22                  MARKED FOR IDENTIFICATION:
23                  DEPOSITION EXHIBIT 22
24                  1:37 p.m.
25  BY MS. NORRIS:
```

CAUDLE, DAVID
05/15/2019

Page 213

1    Q.   You've been handed Deposition Exhibit Number 22.  Take
2         a look at this packet?
3    A.   Okay.
4    Q.   Do you have any memory of this event?
5    A.   Yes, I do.
6    Q.   What do you remember about this?
7    A.   There was a back room of a home.  The lady had
8         somebody moving in, they were supposed to be bringing
9         a TV.  So I kept the equipment at the entertainment
10        stand.  When the lady called, I was either sick or on
11        vacation.  I believe I was sick at this time.
12             So she -- me and Ryan did the call and they
13        found everything in the middle of the room.  And the
14        lady told me she was painting so it wasn't -- I didn't
15        leave it in the middle of the room.  So Ryan had an
16        issue with it, but I told him it was something not in
17        my power because we leave equipment in homes all the
18        time.
19   Q.   Where did you leave the equipment when you left it?
20   A.   Behind the entertainment stand where the old TV was.
21   Q.   Was it hooked up when you left?
22   A.   It was not hooked up because there was no TV there.
23        The lady's friend that was moving in was bringing a
24        TV, that's why I left the equipment there.  She said
25        she would be moving in within a week, then I got sick,

Page 214

1         so the equipment stayed there.
2    Q.   In Ryan's e-mail, which is on the second page, he says
3         that there was equipment behind the TV, but that the
4         sites were messy.  Do you know if that's true?
5             MR. GALLAGHER:  Objection; form,
6         foundation.
7    A.   I don't know because somebody moved out and somebody
8         was moving in.  So I don't know if they junked it up
9         and moved my stuff around.  I have no intake (sic) on
10        if somebody is moving out or what they did prior to me
11        being there.
12   BY MS. NORRIS:
13   Q.   So you said we leave equipment in the homes all the
14        time?
15   A.   Yes.  If you have equipment and we sometimes run short
16        of equipment and you know -- let's say today is Monday
17        and next Tuesday they're buying a new TV, you're not
18        going to bring up -- take out that old equipment and
19        then bring in new equipment that Tuesday and have to
20        meter everything all over again.  You leave that
21        equipment in and you take it out the site, but you
22        leave the equipment there and then you just hook it
23        back up because it makes it easier on you, less time
24        in the home and you can get to more field calls.
25   Q.   When you left the equipment, did you know when they

Page 215

1         were going to have the new TV to hook it up?
2    A.   She told me, the lady of the house, was moving in
3         within a week or so, so I was going under the
4         impression that within seven days.  But then, again, I
5         got sick, so I don't know how long this is behind
6         that.
7    Q.   If you leave equipment in the home does that get
8         registered somewhere?
9    A.   Yes.  We leave it in the site drawing and say it's
10        out, like it's not hooked up to anything, but it's in
11        the home.
12   Q.   Do you know if this was registered?
13   A.   Yes.
14             MARKED FOR IDENTIFICATION:
15             DEPOSITION EXHIBIT 23
16             1:40 p.m.
17   BY MS. NORRIS:
18   Q.   Exhibit 23 is another set of e-mails, also
19        September 7th.  Take a minute and look at these?
20   A.   Okay.
21   Q.   Do you have any reason to dispute what Mr. Mata says?
22   A.   I don't know what he's talking about.  I mean, he says
23        master bedroom, he doesn't say what home.  I -- I
24        don't know, it could be anything.  But he's not
25        talking to me, he's talking to Ryan so --

Page 216

1    Q.   I'm asking --
2             MR. GALLAGHER:  Can he please finish his --
3    A.   I'm trying to understand.  Like you asked me do I know
4         anything about this.  I was never told about it, so I
5         don't know what it's talking about.
6    BY MS. NORRIS:
7    Q.   Okay.  So you don't know if it's right or wrong?
8    A.   Right.  I was never contacted about it.
9    Q.   What is Mr. Mata's race?
10   A.   Mexican, Mexican-American.  But I would like to bring
11        up --
12   Q.   Go ahead.
13   A.   I'm seeing all these comments, but I was never like
14        brought up like, Dave, you need to fix this, this and
15        that.  It's -- it's talk, but it's never anything set
16        up to say, Dave, we need you to -- there's questions
17        asked, but it's never, Dave, you need to do this.
18   Q.   Were you on a leave on September 7th, 2016?
19   A.   I'm not sure.
20   Q.   Reading the first page, what Mr. Mata says --
21   A.   Yeah, I was because the last page was September 7th
22        and it is Shermir and Ryan at the house and I was on
23        leave at that time, that's why Shermir was doing the
24        call.
25   Q.   Okay.  So you wouldn't expect to be contacted to tell

CAUDLE, DAVID
05/15/2019

Page 217

```
1       you what you need to improve while you are out on a
2       leave, would you?
3   A.  They did it all the time.
4   Q.  They called you up and told you you have to fix
5       something?
6   A.  Ryan called me, asked me to contact homes.
7   Q.  Okay.  I'm asking if you would expect to have somebody
8       give you a --
9   A.  Yes.
10  Q.  -- discipline or a reprimand or something like that
11      while you've out on a leave?
12  A.  Yes.
13  Q.  Were you ever disciplined while you were out on a
14      leave?
15  A.  I don't know disciplined.  They asked me what's going
16      on with this home or --
17  Q.  Okay.  That's asking for information, right?
18  A.  No, that's -- could be discipline.  It could be what's
19      going on with this home, we found this out, and
20      they're asking a question.  It starts off as
21      discipline, but then when I give a clarification it's
22      not because they need insight to fix it.
23  Q.  Do you understand that if there were six MUs scanned
24      to the home and there were only four sites that would
25      be a problem?
```

Page 218

```
1                   MR. GALLAGHER:  Objection, form and
2       foundation.
3   A.  Again, I don't know what this home is so I can't say.
4       I could see it being an issue, but I don't know if I
5       actually did it or not.
6   BY MS. NORRIS:
7   Q.  Okay.  I'm not asking if you did it or not.  I'm
8       asking if you understand that that would be a problem?
9                   MR. GALLAGHER:  Same objection.
10  A.  I could see it's a problem if -- somebody that did it,
11      but I don't know what the premise is behind it so --
12      and actually, some of this stuff is 2010, 2016 it was
13      scanned to the home, 2015.  So I don't -- really can't
14      recall.  Since I wasn't contacted, I don't know.
15                  MARKED FOR IDENTIFICATION:
16                  DEPOSITION EXHIBIT 24
17                  1:44 p.m.
18  BY MS. NORRIS:
19  Q.  You've been handed Deposition Exhibit Number 24, which
20      is a September 27th, 2016 e-mail to Ryan Dinsmore from
21      Ryan Dinsmore regarding an incident that Dave Shock
22      was involved in.  Do you know anything about this?
23  A.  Yes.
24  Q.  Tell me what you know.
25  A.  This lady, partially blind, her TV went out.  Her flat
```

Page 219

```
1       screen went out in the back.  It wasn't working.  We
2       unplugged it, put the TV up.  She only had a TV in the
3       front.  The TV in the front went out.  And as I
4       coached her, per Nielsen policy, she was supposed to
5       call and let Nielsen know.  So she called, let Nielsen
6       know that the TV was out, but she also told them that
7       she hooked the TV up -- the flat screen back up and
8       that one started working.  So that's when Dave Shock
9       went out there to try to see what was going on.  He
10      made a bigger deal about it to Ryan, his
11      brother-in-law, trying to paint me in a picture --
12      paint me in a bad picture.
13  Q.  Did Ryan ever get married to Dave's sister?
14  A.  Yes.
15  Q.  How do you know that?
16  A.  Dave Shock told me.
17  Q.  That they were married?
18  A.  Yeah, because they -- it was casual conversation.  We
19      were at the picnic and their kids were talking.  And I
20      was like, Dave, you and Ryan know each other like
21      that?  He said yeah.  He told me the situation.
22  Q.  He said they were married?
23  A.  Yeah.
24  Q.  If Ryan testified under oath that he was never
25      married, do you have any reason to disbelieve that?
```

Page 220

```
1   A.  I don't know if they were married or they had a kid
2       together, it was one or the other.
3   Q.  Okay.  But he's not his brother-in-law if they're not
4       married, right?
5   A.  I'm going by what Dave Shock told me, so I don't know.
6       Or Dave Shock married --
7   Q.  If he was --
8                   COURT REPORTER:  Hold on.
9   A.  -- Ryan's sister, it's either one way or another.
10                  He was saying they were related, I forget.
11  BY MS. NORRIS:
12  Q.  I'm asking if you personally know if they're related?
13  A.  I'm going by what --
14                  MR. GALLAGHER:  He testified --
15  A.  -- Dave Shock was telling me, so that's my own
16      personal instance on it at the company picnic when I
17      saw their kids playing and he told me.
18  BY MS. NORRIS:
19  Q.  If you look at the second paragraph, it says they went
20      to the bedroom and she told the FR -- what does FR
21      stand for?
22  A.  Field rep.
23  Q.  Okay.  That Dave Caudle had been out there to fix our
24      equipment on her TV, but wasn't able to so he asked
25      her not to use the TV and unplugged the MU from the
```

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

CAUDLE, DAVID
05/15/2019

Page 221

1    wall.  Is that true?
2  **A.   Yes.**
3  Q.   Okay.  Then it says --
4              MR. GALLAGHER:  Do you want to answer the
5       question?
6  **A.   Yeah.**
7              MR. GALLAGHER:  He --
8              MS. NORRIS:  He said it's true.
9              MR. GALLAGHER:  I know, then he was about
10      to talk and you -- like you've been doing this entire
11      deposition, you began and -- you talked over him and
12      began your next question.  He's going to finish his
13      answer.
14 **A.   Per Nielsen protocol, the TV wasn't working so I**
15 **unplugged the TV because it couldn't get any channels**
16 **on it.  I unplugged the MU because the MU would have**
17 **been giving out false codes because nothing was hooked**
18 **up to it.**
19             MS. NORRIS:  Okay.  I want to be clear.  My
20      question was, is that true.  I did not ask for an
21      explanation --
22             MR. GALLAGHER:  Okay.
23             MS. NORRIS:  -- okay?
24             So when he said yes, that's the answer to
25      the question.

Page 222

1              MR. GALLAGHER:  That you're looking for and
2       then he's continuing talking.  He has testimony.  He
3       can give his testimony.
4              MS. NORRIS:  So you can ask him all the
5       questions you want --
6              MR. GALLAGHER:  Sure, and I will.
7              MS. NORRIS:  -- and he can talk as much as
8       he wants.
9              My question was, is it true.  He does not
10      have a right to just start talking about any subject
11      he wants to.
12             MR. GALLAGHER:  It's not any subject.  It's
13      in context to your exact question.  Is it true, yes,
14      but is a completely -- actually it's the preferred
15      answer because then we get clear testimony because
16      that's all we're here to do today, right?
17             MS. NORRIS:  I'm here to get the answers to
18      the questions that --
19             MR. GALLAGHER:  That you want.
20             MS. NORRIS:  No.  The questions that I'm
21      interested in asking.
22             MR. GALLAGHER:  And he's trying to give you
23      that, but you're talking over him every -- whenever he
24      does this entire day.  This transcript is going to be
25      a mess because every single time he's trying -- when

Page 223

1       he starts talking about stuff you don't want to hear,
2       you just cut him off and start asking your next
3       question.
4              MS. NORRIS:  Right.  It's my right to
5       determine what topics I want to ask about.
6              MR. GALLAGHER:  Sure.  But he has a right
7       to give testimony as a person in a fair way and this
8       is not that.
9  BY MS. NORRIS:
10 Q.   Mr. Caudle, do you think that anything that you've
11      said to me today is incorrect?
12 **A.   I don't think it's fully my whole comment, but**
13 **that's -- let's continue on.**
14 Q.   All right.  Am I correct -- I think that the answer is
15      yes, but I want to make sure.  Am I correct that you
16      agree that you asked the woman not to use the TV and
17      unplugged it?
18 **A.   I did not ask her not to use the TV.  I told her we**
19 **couldn't get any channels on the TV so we couldn't use**
20 **it --**
21 Q.   Okay.
22 **A.   -- that's a difference.**
23 Q.   Did you tag the TV?
24 **A.   Yes.**
25 Q.   So when this statement says, but did not unplug the TV

Page 224

1       or tag it, that's incorrect?
2  **A.   Yes.**
3  Q.   Do you know if Dave Shock told Mr. Dinsmore that you
4       did not tag the TV?
5              MR. GALLAGHER:  Objection.
6  **A.   Probably so because Dave Shock wanted to get me fired**
7  **so --**
8  BY MS. NORRIS:
9  Q.   Why did Dave Shock want to get you fired?
10 **A.   Because he's full of it.**
11 Q.   What do you mean?
12 **A.   He has an issue with me and I don't know why.**
13 Q.   Okay.  Would Nielsen records show if a TV was tagged
14      or not?
15             MR. GALLAGHER:  Objection, form and
16      foundation.
17 **A.   It's a piece of paper tagged on a TV, so it wouldn't**
18 **be Nielsen -- it's up to protocol.  It could have been**
19 **on there and he took it off, so that's up to**
20 **assumption.**
21 BY MS. NORRIS:
22 Q.   Okay.  Does it get logged somewhere, if you tag
23      something does it get logged in the system?
24 **A.   It should be logged saying TV tagged, but that can be**
25 **amended in the computer too.  So there's nothing**

Page 225

1    hardcore to say something is tagged.  That's
2    admissible to say you tagged it.
3  Q.  Do you know whether when Mr. Dinsmore got this, the
4    records reflected that it was tagged or not?
5  A.  It should have said that it was tagged, but I have no
6    idea what it says now.  Because N-gage, your notes can
7    be deleted, it can be erased, you can amend them at
8    will.
9  Q.  Do you have any evidence that anybody tampered with
10   the records?
11 A.  I did not have access to Nielsen to check my work to
12   say that so -- I know that for a fact I tagged the TV.
13   I know for a fact when I talked to the lady of the
14   house there was no channels and that's the whole
15   reason why the lady called Nielsen.  She didn't call
16   me -- or she didn't wait for me to come back, she did
17   exactly as she was coached.  She called up Nielsen,
18   let them know that her TV went out and that she had a
19   TV in the back that started working and that's when
20   somebody came out.
21 Q.  If you look at the last paragraph, it says --
22            MR. GALLAGHER:  Okay.  He was in the middle
23   of talking again.
24 BY MS. NORRIS:
25 Q.  If you look at the last paragraph, it says the

Page 226

1    contacts showed that Dave Caudle was at the home on
2    7-13 and 7-16, but the lady of the house said he was
3    only there once that week.
4            Do you know if you were in fact at the home
5    both days?
6  A.  I did a drive-by and that's what Nielsen does when you
7    go to the home, trying to see if the customer is
8    there.  You ring the doorbell.  Then we're supposed to
9    log in by N-gage by Wi-Fi to show that we're there.
10 Q.  All right.  Does N-gage differentiate between whether
11   you stopped by the home and whether you actually gain
12   entry?
13 A.  No, but it shows us accessing the system.  Because you
14   have to access the system to send a call out to say
15   that you're there.
16 Q.  But there's no difference between I actually visited
17   the home and I was out front?
18            MR. GALLAGHER:  Objection, form and
19   foundation.
20 A.  You put the notes in there that you did a drive-by.
21 BY MS. NORRIS:
22 Q.  Okay.  And do you know what notes you put in on this
23   date?
24 A.  I do not know because when HR called, Ryan made a
25   comment about it and I'd told him that that didn't

Page 227

1    sound right.  And since I was locked out, I couldn't
2    see it.
3            MR. GALLAGHER:  Were we provided the other
4    string of this?  It looks like it's a message
5    forwarded to himself?
6            MS. NORRIS:  That's all I have.
7            MR. GALLAGHER:  Okay.  Well, that doesn't
8    make sense, right?  Forward it to himself, that means
9    it's coming from somewhere?
10           MS. NORRIS:  I think he could be like
11   writing it on his phone and sending it to his work
12   computer or something like that.  I mean, I do that.
13   I did that --
14           THE WITNESS:  But usually when it's
15   something from a phone, it says sent from an iPhone at
16   the bottom.
17           MS. NORRIS:  I mean, he could just be
18   making a note to himself.  I don't know that this is a
19   chain, I think he's --
20           THE WITNESS:  I mean, at this point when
21   this happened, this was when Ryan was making a paper
22   trail trying to get me fired.
23           MS. NORRIS:  I don't think it's part of a
24   chain.  I think Mr. Dinsmore is making a note to
25   himself, but I haven't specifically asked him that.

Page 228

1    But it doesn't look like a chain to me, it looks --
2            MR. GALLAGHER:  I don't know.  Yeah, it
3    seems like it's coming from somewhere if he sent it to
4    himself, but, okay, nonetheless.  It just seems like
5    there's more e-mail to this.  That seems like a very
6    odd thing to just e-mail yourself out of nowhere a
7    conversation with somebody else.
8            MS. NORRIS:  I do it all the time.  So I
9    might be odd, but I do it all the time.
10           MR. GALLAGHER:  I know I am so --
11           MS. NORRIS:  That's a way to keep a record.
12           MR. GALLAGHER:  While we're on the
13   subject -- I can wait, sorry.
14 BY MS. NORRIS:
15 Q.  When you returned to work, am I correct you returned
16   to work on October 5th, 2016?
17 A.  I believe that's right.
18 Q.  Am I correct that you were suspended pending
19   investigation as soon as you came back?
20           MR. GALLAGHER:  Objection; form,
21   foundation.
22 A.  Yes.
23 BY MS. NORRIS:
24 Q.  Who told you that?
25 A.  Ryan called me.  I talked to him earlier, telling him

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

CAUDLE, DAVID
05/15/2019

Pages 229–232

Page 229

1  when I was coming back to work.  Then he called me
2  after I was about to run a call to the Rusnichan
3  house.  I called him to ask him why the house was
4  taken out of sample.  He couldn't give me an answer.
5  He said let me call to find out what happened.
6          Then I called to let them know I wasn't
7  going to be able to come out so they could free up
8  their time.  And then the next thing I know Ryan
9  called to let me know that I was suspended, called me
10  back to let me know that I was suspended, with HR on
11  the phone.
12  Q.  Okay.  So you had actually started working, you
13      started going to a home --
14  A.  Yes.
15  Q.  -- and you were told never mind, you're suspended?
16  A.  No.  I went to the home -- on my way to the home and
17      when I pulled it up, to try to see what was going on
18      in the home, I noticed that the home said taken out of
19      sample.  So I called Ryan, like I just made this
20      appointment yesterday, so why is the home taken out of
21      sample?  He said I don't know who did it, let me find
22      out.
23          So I was like okay.  I called Ms. Rusnichan
24      to let her know that I wouldn't be coming out because
25      the home was taken out of sample, there was no reason,

Page 230

1  so to free up her time.  I told her.  She was very
2  upset.  I told her, I'll find out what's going on,
3  I'll call you back.  The next time I got a phone call,
4  it was Ryan and HR, and he let me know that I was
5  suspended pending an investigation.
6  Q.  Who at HR was on the phone, if you know?
7  A.  Denise-something and somebody else.
8  Q.  Do you think there were two other people?
9  A.  Yes, I believe so.
10  Q.  Did you ever clear errors without investigating the
11      issue at the house?
12  A.  What house?
13  Q.  Any house.  Did you ever clear an error without
14      actually going to look at it?
15          MR. GALLAGHER:  Objection; form,
16      foundation.
17  A.  We -- all field techs have, depending on what the
18      error was.
19  BY MS. NORRIS:
20  Q.  Under what circumstances would you clear an error
21      without going to look at it?
22  A.  Let's say the MU just needs to be rebooted.  You pull
23      up to the home, you force a reboot, then everything
24      goes green, everything is working and you do checkouts
25      and everything passes.

Page 231

1  Q.  Okay.
2  A.  At that point, you would clear the error saying that
3      it was a malfunction of the equipment.  You didn't
4      have to bother the household because they weren't
5      there and you fixed it.
6  Q.  But am I correct in that case you went to the house
7      and fixed it from outside?
8  A.  Yes.
9  Q.  Okay.  Would there ever be a situation where you would
10      clear an error without going to the house at all?
11  A.  Depending if the error was old.  Let's say the error
12      was three days ago and the error hasn't happened since
13      then, you could clear it.
14          Or if the error was already a
15      household-known behavior.  Say somebody fell asleep
16      watching the TV and it was the man of the house.  And
17      you saw the man of the house watching TV and then it
18      was two hours of just nobody watching, nobody was
19      logged in, but the last person there was the man of
20      the house at 10:00 p.m.  So you know his known
21      behavior was watching TV, falling asleep with it on.
22      So you would write, known behavior, man of the house
23      fell asleep watching TV.
24  Q.  Okay.  So you would write that down?
25  A.  Yes.  It's already noted, you talked to the household

Page 232

1  to let you know.
2  Q.  How many homes did you try to see in a day when you
3      were making your calls?
4          MR. GALLAGHER:  Objection; form,
5      foundation.
6          MS. NORRIS:  What's wrong with that?
7  A.  I don't know.
8          MS. NORRIS:  What's wrong with how many
9      homes would you see in a day when you were making your
10      calls?  What form and what foundation is the problem?
11          MR. GALLAGHER:  Foundation?
12          MS. NORRIS:  Yeah.
13          MR. GALLAGHER:  That he would -- okay.
14      Foundational?
15          MS. NORRIS:  Yeah.  He's making the calls.
16      I'm asking him, how many homes would you see in a day
17      when you were making the calls.  What is wrong with
18      that question?
19          MR. GALLAGHER:  Okay.  Yeah,
20      foundational-wise?
21          MS. NORRIS:  Yeah.
22          MR. GALLAGHER:  We haven't established that
23      he makes these calls, we haven't established that he
24      goes every day, we haven't established --
25          MS. NORRIS:  I haven't said anything every

Page 233

1    day.  We certainly established he makes calls to the
2    house, he's testified that's part of his job.
3                MR. GALLAGHER:  Okay.
4                MS. NORRIS:  So what's foundational with
5    how many calls -- homes do you try to see in a day
6    when you're making your calls?
7                MR. GALLAGHER:  The word try as well, yeah.
8    It's a bad question, sure.
9                If you can answer it, go ahead.
10   BY MS. NORRIS:
11   Q.   Mr. Caudle, do you understand the question?
12   A.   Yes.  It was random.  It would all depend, so I
13        couldn't give an exact estimate.
14   Q.   Okay.  Well, what would be the most?
15   A.   That I wouldn't be able to tell because I don't know
16        what happened in the home.  It could be easy faults
17        where you went and you were done in 30 minutes or you
18        got in more homes and it might be one where you were
19        there four or five hours.  So it all depends on what
20        the fault was and the issue in the home.
21   Q.   Do you know how many you averaged a day?
22   A.   No.
23   Q.   Do you know how many other people averaged a day?
24   A.   No.  I mean, I know some people got in trouble because
25        they maybe only did like three calls in a full day,

Page 234

1         but I know some guys ran four or five calls and did
2         seven.  So it all depends on what you get done, how
3         many faults you had in your area.  So, I mean, it
4         was -- all depend on your workload and what you can
5         get in and what you couldn't get in.
6    Q.   Did you ever tell Denise Fantarella that you went into
7         a home with your lawyer?
8    A.   My lawyer?
9    Q.   Yes.
10   A.   How could I go in a home with my lawyer?
11   Q.   That's why I'm asking if you ever said that?
12   A.   No.
13   Q.   How did you learn you were being terminated?
14   A.   Ryan.
15   Q.   Did he tell you in person or over the phone?
16   A.   Over the phone.
17   Q.   Was anybody else on the phone?
18   A.   HR.
19   Q.   Do you know who from HR?
20   A.   Denise, maybe somebody else, I'm not sure.
21   Q.   Do you know if Mr. Hummel was on the phone?
22   A.   I'm not sure.  I don't believe so.  I think only HR.
23        Josh didn't speak, I know that much.  So if he was on
24        the phone, he didn't say so.
25   Q.   Am I correct this was on October 12th, 2016?

Page 235

1    A.   Yes.
2                     MARKED FOR IDENTIFICATION:
3                     DEPOSITION EXHIBIT 25
4                     2:00 p.m.
5    BY MS. NORRIS:
6    Q.   I'm handing you Exhibit 25.  It's a letter dated
7         October 12, 2016.  Did you receive this letter?
8    A.   Later on.
9    Q.   Okay.  This is after your call?
10   A.   Yes.
11   Q.   Did this come by --
12   A.   FedEx.
13   Q.   -- e-mail --
14   A.   FedEx.
15   Q.   Okay.  What did they say on the call?
16   A.   Ryan did all the talking.  He said based off his -- I
17        can't remember word-for-word, but basically it was his
18        determination to let me know.  And I was upset.  And I
19        later, after the call, I called HR.  Well, first I
20        called both households and nobody was called.
21             Nobody said they were called because I
22        still had my Nielsen phone.  None of them said they
23        got a phone call from Ryan or HR at the time and they
24        were waiting for a phone call.  So I called HR and
25        asked them what type of investigation was done if none

Page 236

1         of the households were called.
2    Q.   Okay.  I want to focus right now on the call where
3         you're told about the termination.  We'll talk about
4         the follow-up calls in a minute.
5    A.   Okay.
6    Q.   So the call of the termination, my understanding is
7         that Ryan Dinsmore did most of the talking; is that
8         right?
9    A.   Yes, to my memory.
10   Q.   Okay.  That's the best you can give me?
11   A.   Yes.
12   Q.   And what did he say, to the best of your memory, about
13        how the decision was made?
14   A.   Basically it was his determination.  I didn't hear
15        that it was by Nielsen policy, it was his
16        determination to let me go.
17   Q.   Okay.  Did he -- you said basically.  So I'm just
18        trying to understand what you mean by basically he
19        said that?
20   A.   From what I can recall, him -- when I'm -- best of my
21        memory, what I remember him saying is it was his
22        determination based off everything that happened to
23        let me go.
24   Q.   Okay.  Did he tell you about problems with any recent
25        incidents in homes?

CAUDLE, DAVID
05/15/2019

Page 237

1   A.   That was the call beforehand, him telling me I was
2        suspended.
3   Q.   All right.  So the day that you came back?
4   A.   The 5th, yes.
5   Q.   Right.  And the day that you came back when he told
6        you about problems in homes, how many homes did he
7        tell you about?
8   A.   Two.  The Mills home that you just talked about and
9        then -- I can't remember -- Carbajo home.
10  Q.   Do you know who made the decision to terminate you
11       other than what Mr. Dinsmore said to you on the phone?
12  A.   He didn't tell me.  The way he made it sound, like it
13       was his decision.
14  Q.   Okay.  The reason I keep asking is that you're saying
15       things like basically and the way he made it sound
16       like and I'm trying to get to the best of your
17       memory --
18  A.   When he said --
19  Q.   -- exactly what he said?
20  A.   I remember him saying it's my decision, I have to let
21       you go.  So I didn't hear him say anything about Josh
22       and, blah, blah, blah, and me and this person in HR
23       had decided to let you go.
24  Q.   Okay.  Do you know if Mr. Dinsmore terminated anybody
25       else?

Page 238

1   A.   Not while I was -- wait.  Not while I was there that I
2        know of.
3   Q.   Do you know who made the decision to terminate
4        Mr. Demmon?
5   A.   I know it wasn't Ryan.
6   Q.   How do you know that?
7   A.   Because Ryan told everybody it was a surprise to him
8        when he got the phone call.  And I was told that
9        Demmon was doing all this stuff under Ryan's
10       management and Ryan didn't do anything about it, so
11       the call was made from upper management to fire Demmon
12       for not running calls and everything else.
13  Q.   Earlier today we talked about a conversation you had
14       with Mr. Dinsmore around the time of your PIP where
15       you thought that it was discrimination?
16  A.   Yes.
17  Q.   Other than that conversation, did you complain to
18       anybody at Nielsen about race discrimination before
19       you were terminated?
20  A.   No.  Because, like I said, me and Ryan were back on
21       good footing and I thought everything was okay.  Like
22       I said, my reviews were good.  Me and him never had
23       any altercations, any other write-ups, any other real
24       instances other than the ones where I was sick or when
25       I brought up the African-American survey.

Page 239

1   Q.   Prior to your termination, did you ever complain to
2        anyone at Nielsen about disability discrimination?
3   A.   No, because --
4   Q.   Did you ever request an accommodation from Nielsen
5        that was not granted?
6   A.   No, because I didn't need one.
7   Q.   Did you ever complain to anybody at Nielsen about
8        retaliation before you were terminated?
9   A.   No, because at the time after -- like I said, talking
10       to Ryan, I didn't feel like it was -- I thought we got
11       past the situation so I thought it was okay.  So I
12       didn't think it was like a two-year span of things
13       going on.
14  Q.   Am I correct that after you were terminated with
15       Nielsen you had several communications with HR?
16  A.   Yes.
17  Q.   And am I correct that the first one was on
18       October 12th with Denise Fantarella?
19  A.   Yes.  She told me if I had anything to say, to give
20       her a call.
21  Q.   And did you do that?
22  A.   Yes.  I asked her that -- out of all the times I was
23       out, it's funny to me that a relative of Ryan's will
24       find something wrong with two of my homes and those
25       are the two homes I'm supposedly getting fired over,

Page 240

1        but there's no evidence.  And that nobody called the
2        lady of the house to talk to her to get her statements
3        in a suspension that I was going on.  And the lady of
4        the house, Ryan bantered (sic) her into an asthma
5        attack and she told him to de-install the equipment.
6             They didn't even get a chance to install
7        the TVs.  I said in both cases the ladies of the house
8        called Nielsen, per policy, telling them the Nielsen
9        protocols, doing what was supposed to be done by
10       coaching.  So I said how could I be wrongdoing, if
11       people are doing what they're coached to do?  And they
12       said okay, duly noted and why do you feel this way?
13       And I went on about how I felt like I was treated
14       unfairly and all these things that had been going on
15       prior to, now this, it was too much.
16            MARKED FOR IDENTIFICATION:
17            DEPOSITION EXHIBIT 26
18            2:06 p.m.
19  BY MS. NORRIS:
20  Q.   You've been handed Deposition Exhibit 26.  Are these
21       e-mails that you had back and forth with Denise
22       Fantarella?
23  A.   Yes, that's when Ms. Rusnichan was -- called me back,
24       trying to figure out why she was taken out of the
25       sample.  I told her that I was let go, I couldn't give

Page 241

1    her any information.  And I found out what she had did
2    on her end and I let her know.  And how was that fair,
3    because that was one of the things Ryan mentioned on
4    the call about something I did.  So told them it was
5    like a witch hunt and this was evidence of such.
6  Q.    What makes you think it was a witch hunt?
7  A.    How does an out-of-town rep know my name and go to a
8    customer's home asking if I unplugged devices, if I
9    asked him to lie about anything?  And then the two
10   homes I'm fired for are the exact same things he asked
11   that home about.
12  Q.   What makes you believe that's a witch hunt as opposed
13   to somebody trying to figure out what's going on?
14  A.   Because it was weeks apart.  So you're telling me you
15   have an out-of-town rep go to a customer's house,
16   bring up a field rep's name, ask them if he ever lied
17   about -- had you lie about unhooking a TV or lie about
18   the devices to the point where this household is upset
19   and is calling the head of the field rep division and
20   making a report to the Better Business Bureau and then
21   two weeks later you have your, quote/unquote,
22   brother-in-law go into a home and he finds something
23   in one home and in the other home he goes into that
24   has Direct TV and it shows how many TVs are hooked up
25   to the DVR and that's the only reason he knew that the

Page 242

1    customer had other TVs in the home and the customer
2    lets him know, I never let Dave go upstairs or in the
3    basement because we only wanted the TVs on the main
4    floor metered, so nobody has been in the basement or
5    upstairs --
6  Q.   So if -- if a house has TVs in the basement and
7    they're not tagged, they're in the basement, they
8    exist, they're not tagged, aren't you supposed to go
9    down there and find the TVs?
10  A.   If I don't know a TV is in the basement, I don't have
11   access to the basement, I can't go down there.  The
12   lady of the house, when I got the home from the
13   marketing rep and we did the install, there were only
14   two TVs; in the living room and in the front room.
15   They said that's the only TVs they had in their house.
16   They didn't allow us to go upstairs or downstairs.
17   They said these are the only TVs we have, so that's
18   the only area we had access to.  So that's the only
19   TVs I metered.
20       When Dave Shock went out to the home to
21   install the new cable box, he went to the living room.
22   The DVR, he noticed that more TVs were hooked up to
23   the DVR.  He asked her if she had any more TVs.  The
24   lady of the house said yes, we have TVs upstairs,
25   downstairs.  We never told Dave about them.  This is

Page 243

1    what she told him verbatim.  Dave Shock said I do not
2    have the equipment for this, so I have to come back.
3        Dave Shock left.  He waited two weeks --
4    no, three weeks from that time to the point where I
5    came back from sick leave to go back out to that home
6    on that day and suspend me when I went to that home.
7    So to me, that sounds like a witch hunt when they
8    could have went out two days later, three days later
9    when they had the equipment.
10       He waited until I came back off sick leave
11   to go to that home to get a first-eye look at it and
12   then say okay, Dave, you did this.  Even on a call
13   when he suspended me, he said, Dave, there's a TV in
14   the basement, I think you knew about it.  I said no, I
15   didn't know about it.  He said well, how did the TV
16   get moved in the basement?  I said the family must
17   have moved it in the basement.  He said well, are you
18   sure you didn't know about it?  I said no.
19       He said then how did it get documented in
20   the basement?  I said the ROC had called the house,
21   the ROC could have updated and said it got moved in
22   the basement.  There's no evidence saying I did it or
23   I knew about it.  He said I think you knew about it.
24   I said no, sir, I didn't.  He said Dave, well, I think
25   you did.  I saw it.

Page 244

1        I said you only saw it because the lady of
2    the house told you.  She did not tell me and she told
3    you she didn't tell me.  Because her and the man of
4    the house didn't want those TVs metered, so how is it
5    my fault when customers lie all the time?  He said oh,
6    okay, that's hard for me to believe.
7  Q.   Okay.  If you would look at Exhibit 26, the second
8    page?  Up at the top is an e-mail from you to Denise
9    Fantarella and you say hi, Denise, question for you.
10   I do not know Nielsen policy on this matter, and then
11   you relate an incident.
12       What policy are you -- do you not know
13   about?
14  A.   Ryan said that per Nielsen policy, if something is
15   un-metered, it's automatic termination.  That's what
16   he used to fire me.  In this instance, Dave Demmon
17   was -- while I was out of town, installed a home in
18   Oak Park.  It was him, Chavonne and Renie.  There was
19   a TV in the front room that was not noticed.  It
20   wasn't metered.  They came in through the garage, back
21   door.  They didn't come in through the front door.
22       Later on when the quality review was done,
23   Dave Shock went out there, but he came in through the
24   front door.  When you come in through the front door,
25   you can see the TV.  He asked about the TV.  They

Page 245

1    called Ryan.  The lady said it was her son's TV.  He
2    didn't want it metered.
3           It was a back and forth and at the end of
4    the day they just de-installed the home and cut it.
5    Dave Demmon was not fired for that.  Renie and
6    Chavonne were not fired for it and they were the
7    marketing -- Chavonne was the marketing rep manager,
8    Renie was the marketing rep.
9  Q.  Okay.  This incident took about year and a half to two
10    years before you wrote this e-mail in October 2016?
11  A.  Because I never heard of anybody getting fired for it.
12    People lie all the time and we find devices in homes
13    and nobody has ever been terminated.
14  Q.  I'm just asking about the date.  Am I correct that --
15           MR. GALLAGHER:  He's adding context to your
16    question.
17           MS. NORRIS:  To the date?
18           MR. GALLAGHER:  Yes.  You know exactly what
19    you're trying to elicit by that and he's explaining
20    that.
21           MS. NORRIS:  I'm asking if --
22           MR. GALLAGHER:  Why are you asking for the
23    date?
24           MS. NORRIS:  Because it matters to me.
25           MR. GALLAGHER:  And it matters to him to

Page 246

1    then give context to that answer.  And that's what
2    you've been doing all day and this is why -- sure,
3    this testimony, sure, it's going to be on paper, but
4    what does it mean?  Nothing.  It's just random acts of
5    his starts of sentences and then stops.
6  BY MS. NORRIS:
7  Q.  Mr. Caudle, am I correct that the incident that you
8    just told me about, which I did not cut you off and
9    tell me about, you gave me -- you said everything you
10    want to say about it.
11           Am I correct that that incident took one
12    and a half to two years before you wrote your
13    October 13, 2016 e-mail?
14  A.  Yes, because Ryan --
15  Q.  Okay.  That's just a yes-or-no question.
16           MR. GALLAGHER:  You cannot force him to
17    just yes or no --
18  A.  There was reason behind --
19           MR. GALLAGHER:  -- he's allowed to --
20           COURT REPORTER:  Hold on, I can't write you
21    both.
22           MR. GALLAGHER:  Go ahead.  Please answer
23    the question, as you were going to.
24  A.  Ryan made the comment that per Nielsen policy, if you
25    un-metered -- if it's an un-metered device, that's

Page 247

1    terms for termination.  That's what he used for saying
2    I was being fired.  Because of that, I asked why is
3    this valid and why is other reasons -- like people do
4    E&Y audits and get caught with un-metered devices
5    don't get fired?
6  BY MS. NORRIS:
7  Q.  Okay.  For the record, that's already been stated and
8    I understand that.  That has nothing to do with the
9    simple question of the timing of the incident.
10    There's no explanation necessary --
11  A.  You asked why --
12  Q.  -- to confirm -- no, my question -- and I'll ask it
13    again, please listen carefully.
14           My question is, am I correct that the
15    incident that you talk about in your October 13, 2016
16    e-mail took place one and a half to two years before
17    you wrote that e-mail?
18           MR. GALLAGHER:  Objection --
19  A.  Yes.
20           MR. GALLAGHER:  -- the document speaks for
21    itself.
22  BY MS. NORRIS:
23  Q.  Okay.  And so one and a half to two years before
24    October 13, 2016, would mean somewhere between the
25    fall of 2014 and early 2015; is that correct?

Page 248

1  A.  I guess.
2  Q.  Okay.  When was Mr. Demmon terminated?
3  A.  2014.
4  Q.  In other words, around the time of this incident,
5    correct?
6  A.  Two years ago?  It would be.
7  Q.  All right.  So do you know why Mr. Demmon was
8    terminated?
9           MR. GALLAGHER:  Asked and answered.
10  A.  From what I heard from upper management, for not doing
11    calls.  It wasn't for this.
12  BY MS. NORRIS:
13  Q.  Do you know?
14           MR. GALLAGHER:  Asked and answered.
15  A.  Yes, because Chavonne would have been fired too
16    because she was in the home.  As the marketing rep
17    that's assigned the home, she would have been fired
18    for the same offense.  She didn't get fired for that.
19    That would have been telling me that Dave Demmon is
20    responsible, but the marketing rep who is assigned the
21    home is not responsible.  And Renie Jihad, who was the
22    field rep in the home, she would have been fired for
23    the same incident and she wasn't.
24           MARKED FOR IDENTIFICATION:
25           DEPOSITION EXHIBIT 27

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

CAUDLE, DAVID
05/15/2019                                                        Pages 249–252

Page 249

1                        2:15 p.m.
2   BY MS. NORRIS:
3   Q.   You've been handed Exhibit Number 27.  Am I correct
4        that this is the EEOC charge that you filed?
5   A.   Yes.
6   Q.   And this charge was dismissed with a finding of no
7        violation; is that right?
8                   MR. GALLAGHER:  Objection; form,
9        foundation.
10  A.   That's not what I was told.  It was told that there
11       was too many man-hours, EEOC wouldn't put that much
12       into it.  So that's why I had the right to sue.
13  BY MS. NORRIS:
14  Q.   Who told you that?
15  A.   The EEOC officer.
16                  MARKED FOR IDENTIFICATION:
17                  DEPOSITION EXHIBIT 28
18                  2:16 p.m.
19  BY MS. NORRIS:
20  Q.   You've been handed Exhibit 28.  Did you receive this
21       notice?
22  A.   Yes.
23  Q.   Who at the EEOC told you that the reason it was
24       dismissed is it would take too long to investigate?
25  A.   Basically Steven -- I can't say his last name.  He's a

Page 250

1        paraplegic.  And he told me basically what it means is
2        the EEOC doesn't have that much -- that many hours to
3        dig into something.  So you have the right to sue
4        because you do have a case.  So he told me that's what
5        this means in layman's terms, don't get upset, it
6        doesn't mean you don't have a case, what it means
7        is --
8   Q.   Do you know who James Fee is?
9   A.   No.
10  Q.   Do you know who David Fair is?
11  A.   No.
12  Q.   Do you know who Jeff Gibbs is?
13  A.   No.
14  Q.   Do you know who Jarwal Jacques is?
15  A.   No.
16  Q.   Do you know who John Vandenberghe is?
17  A.   No.
18  Q.   Duane Larkin?
19  A.   No.
20  Q.   Fred Merrill?
21  A.   No.
22  Q.   Paul Riddle?
23  A.   I've heard the name Riddle.  Paul Riddle?
24  Q.   Yes.
25  A.   I took his field area, I believe that's his name,

Page 251

1        because it was -- yeah, because I remembered it
2        because it was something like Harry Potter.
3   Q.   What do you mean by -- oh, Riddle?
4   A.   Yeah.
5   Q.   Do you know why Mr. Riddle was no longer employed at
6        Nielsen?
7   A.   I heard multiple stories, I don't know.  The last I
8        heard was that he was at home saying that he was doing
9        stuff and putting in N-gage and he was sitting at
10       home.
11  Q.   Did you understand he was terminated?
12  A.   Yes.
13  Q.   Do you know his race?
14  A.   White.
15  Q.   Do you know who made the decision to terminate him?
16  A.   No.
17  Q.   Do you know who Steve Schipper is?
18  A.   No.  That was before my time.
19  Q.   Do you know who Rob Roney is?
20  A.   No.
21  Q.   Do you know who Chris Carlos is?
22  A.   No.
23  Q.   Adam Burstein?
24  A.   No.  I never met Paul so -- I only knew his name
25       because of the Riddle part.

Page 252

1   Q.   How are you spending your time now?
2   A.   Trying to go back to school if I can find funding.
3   Q.   Do you have any hobbies?
4   A.   I like to read and keep up on current events.
5                   MS. NORRIS:  I don't have any other
6        questions.
7                   MR. GALLAGHER:  Give me a few minutes to
8        get my stuff together.
9                   (Off the record at 2:20 p.m.)
10                  (Back on the record at 2:22 p.m.)
11                  EXAMINATION
12  BY MR. GALLAGHER:
13  Q.   How are you doing today, Mr. Caudle?
14  A.   Okay.
15  Q.   So earlier you referred to David Demmon as a flat-out
16       guy.  What did you mean by that?
17  A.   Dave Demmon?  He hurt a lot of field reps' feelings
18       because he said things -- he'd cuss at you, whatever,
19       to get his point across.  And he always said he only
20       wanted to have one conversation with you.  If he had
21       to have another conversation with you, you know, he
22       was going to write you up.
23  Q.   Okay.
24  A.   It was basically like the father that was strict
25       that -- like I don't want you to get a mixed idea of

Page 253

1    what I'm saying.  You know what I'm saying, get it,
2    fix it.
3  Q.  Would he ever make those straight comments or
4    conversations about your race or your disability?
5  A.  He's made it about other people, so probably.  I mean,
6    he was just that type of guy.
7  Q.  Can you give me some examples of what he said to other
8    people?
9  A.  You'd walk into a Spanish home and him and Ryan would
10    make a joke and say, Mata, what are they saying?  You
11    know, things like that.  Like if you got a thick skin,
12    it's an internal joke, everybody would laugh.  If you
13    like -- you know, dang, man, why you got to make that
14    about me?  It's sort of like, okay, it's a racial
15    joke.  So it all depends on the person, how they deem
16    it.
17  Q.  Sure.  When you asked to move geographic territories,
18    did -- I believe today you said you did it once when
19    you moved and then once again when it was rezoned,
20    correct?
21  A.  Twice, yes.
22  Q.  Okay.  Did he ever give a justification as to why to
23    either of those, why he was not allowing you to?
24  A.  No, he didn't give me a real reason.
25  Q.  Okay.  What was the reason he gave you?

Page 254

1  A.  Just told me that he couldn't move me.
2  Q.  Okay.
3  A.  Basically nobody wanted Detroit, that was the real
4    reason.  Detroit was not the friendliest area.
5  Q.  Okay.  I'm going to just point your attention quickly
6    to Exhibits 4, 5, 6 and 7.  Take a look at Exhibits 4
7    through 7, please?
8  A.  Okay.
9  Q.  Can you identify -- I believe earlier your testimony
10    was something like this was reviewed at one point with
11    you in Florida, correct?
12  A.  Yes.
13  Q.  Okay.  Do you know whether or not these were the
14    actual documents that you reviewed though?
15  A.  I'm not sure.
16  Q.  Okay.  Do you know if any of them were not the
17    documents you reviewed?
18  A.  Again, I'm not sure.
19  Q.  Okay.  Have you ever posted anything to any social
20    media accounts about your job and your lawsuit?
21  A.  No.
22  Q.  So I believe you testified earlier that you reached
23    out after the -- you -- either after your termination
24    or after your suspension pending investigation, I'm
25    sorry, I'm not sure which one, and essentially asked

Page 255

1    what the investigation was that happened; is that the
2    case?
3  A.  Yes, because I had -- after I was terminated I called
4    the households because I still had my Nielsen phone,
5    it wasn't cut off yet.  And the ladies of the house
6    told me that they were still waiting on Nielsen to
7    call, saying nobody had called them yet.
8        So I wondered at the time what type of
9    investigation was done if both households hadn't been
10    called?  And Ms. Carbajo had told me that Ryan had
11    talked to her, gave her an asthma attack because he
12    was berating her about stuff to the point where she
13    said just de-install the equipment and that's why the
14    equipment was de-installed and out the home.
15        Ms. Mills said she was waiting to clarify
16    what she said, because she told Dave Shock that she
17    didn't say those words to Dave Shock that Ryan had
18    told me.  And that she told him that she plugged the
19    TV back in because the other one had died because she
20    wanted a TV to watch and it started working.  But the
21    whole reason she called was, you know, to let them
22    know and that wasn't what was documented.
23  Q.  So can you think of anybody else that left equipment
24    in a house after -- extra equipment in a house?
25  A.  Yeah, everybody does it.  Shermir, Tim Franklin, Brian

Page 256

1    Burkhardt, Dave Shock.  Just about every rep has left
2    equipment in the home.
3  Q.  Okay.  And can you think of anybody that had a device
4    that was not metered in their home?
5  A.  Yeah.  Dave Shock failed an E&Y audit because he left
6    something un-metered in a closet.  Shermir said he
7    failed one.  Tim failed one.  Brian failed one and had
8    a channel lineup that was messed up.  And James had
9    one household that didn't tell him about a TV the kids
10    had a game on.
11  Q.  Okay.  So I believe you testified that your -- that
12    you oversaw -- how many houses did you oversee?
13  A.  Anywhere from 69 to 73, somewhere around there.
14  Q.  Okay.  And that's -- you said I believe -- is that
15    average, a little bit above average -- or what is that
16    compared to the rest of the field techs in your --
17  A.  It's little bit above.
18  Q.  Okay.  And what geographic area do you guys cover,
19    your entire field tech team?
20  A.  Most of Michigan -- metro Michigan.  Not Upper
21    Peninsula, but everywhere else.  Like East China to
22    Pinckney.
23  Q.  And how many people are on that team?
24  A.  I believe seven at the time.  I don't know how many
25    now.

CAUDLE, DAVID
05/15/2019

Pages 257—260

1  Q.  Okay.  So I'm just going to -- so seven or so people
2      with seven -- with 60 to 70 or so houses covering that
3      geographic area?
4  A.  Yeah.
5  Q.  Okay.  Were you ever talked -- did Ryan ever reach out
6      to you or anybody in HR reach out to you to hear your
7      side of the story?
8  A.  No.
9  Q.  What happened with those two houses, why don't you
10     tell us?
11 A.  The Mills house, I don't know because Dave Shock's
12     story was something totally different.  I went to the
13     home.  I did a drive-by.  I saw the unit was out.  I
14     did the call out, adjusted the diagram.  The second
15     time I went to the home, I got access.
16             I went in, I saw the TV wasn't working.  So
17     me and the lady of the household talked.  I told her
18     her TV wasn't working like she liked it -- you know,
19     the noise because she was trying to get a channel to
20     come in.  I told her we weren't receiving any channels
21     so if it can't receive any channels, it can't be in a
22     Nielsen sample.  So we had to unplug it.  I had to tag
23     it.
24             I left the equipment there because she said
25     well, maybe my daughter will buy me a new TV or

1   whatever when her monthly check came in and it was
2   like towards the end of the month at that time.  So I
3   left the equipment there.  Unplugged it, left it there
4   so it wasn't calling out.  I updated the MSM to show
5   that that system was out and they only had one TV.  I
6   coached her again on what to do, you know, calling
7   Nielsen if you get a new TV or anything like that.
8   And I went through the coaching we usually do, did a
9   call out and left.
10          The second home, Carbajo, I had been out
11  there, but previous to me being out there Raul had
12  went out there to run a call for me and he never saw
13  the TVs either.  And I think Shermir had been out
14  there by the time they were in sample.
15          So for me, when I told -- you know, when I
16  talked to Ryan, I don't understand how -- I'm not the
17  only field rep in the home -- that's been to that home
18  and they didn't let you upstairs, they didn't let
19  people in the basement and we don't bogart through
20  people's homes saying I have to see every room.  So
21  for me, if you don't tell me you got TVs there, I
22  don't know.  And Dave Shock had an advantage because
23  Dish Network, the genie shows you TVs hooked up to the
24  DVR and that's the reason why he saw the extra TVs and
25  that's the reason why he knew.

1  Q.  Okay.  So earlier I believe you said one of your
2      doctors told you that -- or I'll just ask you.
3              Did one of your doctors --
4  A.  Zekman?
5  Q.  Thank you.  Did Dr. Zekman -- or did one of your
6      doctors relate the stress from you being terminated to
7      the fact that you were going on disability?
8              MS. NORRIS:  Objection, asked and answered.
9  BY MR. GALLAGHER:
10 Q.  You can answer.
11 A.  Sickle cell can be triggered by stress.  So the stress
12     of losing my job, trying to figure out how to do a
13     wedding threw me into a crisis and put me in the
14     hospital, yes.
15 Q.  Okay.  What kind of crisis?
16 A.  Sickle cell crisis.
17 Q.  Okay.  Can you explain that, what that means?
18 A.  Sickle cell crisis is your blood turns to S's, your
19     muscles stop getting oxygen so your body starts to
20     contract and your muscles start to spasm.  You get
21     unbearable pain, your -- make your temperature -- your
22     immune system is lowered so you're susceptible to cold
23     and your body starts to basically turn on itself.
24 Q.  Okay.  So in your opinion, how did your termination
25     affect that?

1  A.  I lost my family due to the stress of me being in the
2      hospital.  It was something that my fiancée wasn't
3      able to deal with.  I was mad that I got unfairly
4      fired from a job I loved, so that stressed me out.
5      And trying to find a job wasn't easy at the time
6      because the market -- wasn't a lot of places hiring.
7              So you got a marriage coming up, you got
8      things already paid for.  And you are looking at
9      things you're about to put a payment on and you got to
10     call people saying, yeah, we can't make this payment.
11     When you got bills due and you like, well, how can we
12     pay this?
13             So I -- actually I sent another e-mail to
14     Denise asking if I was going to get my bonus check
15     because I was stressed out about my money, trying to
16     figure out how can we pay for stuff just to get by
17     until like the next month?  And she let me know that
18     if I qualified for any bonuses, I would get paid that
19     amount.  And I told her thank you because that was the
20     first thing I'm worried about because, you know, your
21     bills coming up and you just got terminated, there's
22     no money.
23 Q.  I'm going to draw your attention to Exhibit Number 11,
24     I believe it's the performance improvement plan.  Are
25     these generally signed?

CAUDLE, DAVID
05/15/2019

Pages 261–264

Page 261

1   A.   I think so, yeah, from what I remember.
2   Q.   Okay.
3   A.   I think, I'm not sure.  I think Ryan just -- I don't
4        think it was digitally, not 100 percent sure.
5   Q.   Okay.  You're not sure?
6   A.   It was -- no, it wasn't signed actually, no.
7   Q.   Have you had any conversations with Ryan since your
8        termination?
9   A.   No.
10              MR. GALLAGHER:  Okay.  That's all I have
11       for you, sir, I appreciate it.
12                   RE-EXAMINATION
13  BY MS. NORRIS:
14  Q.   I have a few follow-up questions.
15       Mr. Demmon never said anything racial to
16       you, did he?
17  A.   No.
18  Q.   You never heard him say anything negative about
19       African-Americans, did you?
20  A.   Yes and no.
21  Q.   What do you mean by that?
22  A.   He made a joke about the -- you know, the stereotypes.
23       Black people and Mexicans are lazy, but Jamaicans,
24       they work like five or six jobs so we should hire a
25       bunch of them.

Page 262

1   Q.   Okay.  When did he make that?
2   A.   Like 2012.  I think I was just hired, I was riding
3        along with him.
4   Q.   Okay.  So about four years before your termination?
5   A.   Yeah.
6   Q.   Okay.  You never complained about race discrimination
7        or race harassment because of anything Mr. Demmon
8        said, did you?
9   A.   No, that was the only time he said something.
10  Q.   In fact, you never made a complaint of race
11       discrimination or racial harassment at any time while
12       you were employed by the company to anybody in HR, did
13       you?
14  A.   No.
15  Q.   Your communication with Ryan Dinsmore, which we
16       discussed, where you asked if you were being
17       discriminated against or said you thought maybe you
18       were being discriminated against is the only time you
19       even mentioned discrimination to anybody in
20       supervision in any way while you were employed; is
21       that correct?
22              MR. GALLAGHER:  Objection.
23  A.   Based on how I was feeling, yes.
24  BY MS. NORRIS:
25  Q.   Do you know what action, if any, was taken against

Page 263

1   people who failed audits?
2              MR. GALLAGHER:  Beyond the scope.
3       MS. NORRIS:  You asked him about people
4   that he talked about who left equipment in the home
5   and failed audits.  It's not --
6              MR. GALLAGHER:  It's not -- I never said
7   audits, I never discussed audits.
8       COURT REPORTER:  Hold on, hold on.
9       MS. NORRIS:  He just answered it.
10              MR. GALLAGHER:  No, he didn't.  That's
11  beyond the scope.  You could have asked that --
12       MS. NORRIS:  I need you to go back.  I need
13  you to go back and look.
14       (The following requested portion of the
15       record was read by the reporter at
16       2:38 p.m.:
17       Q.   So can you think of anybody else that
18       left equipment in a house after -- extra
19       equipment in a house?
20       A.   Yeah, everybody does it.  Shermir, Tim
21       Franklin, Brian Burkhardt, Dave Shock.
22       Just about every rep has left equipment in
23       the home.
24       Q.   Okay.  And can you think of anybody
25       that had a device that was not metered in

Page 264

1              their home?
2       A.   Yeah.  Dave Shock failed an E&Y audit
3       because he left something un-metered in a
4       closet.  Shermir said he failed one.  Tim
5       failed one.  Brian failed one and had a
6       channel lineup that was messed up.)
7   BY MS. NORRIS:
8   Q.   Do you recall talking to your attorney about other
9       people --
10              MR. GALLAGHER:  Whoa, whoa.
11              MS. NORRIS:  He can answer -- I can ask my
12       question.
13              MR. GALLAGHER:  Do you recall talking to
14       your attorney?
15  BY MS. NORRIS:
16  Q.   Here today in the deposition, do you recall today in
17       your deposition talking to your attorney in response
18       to his question about other people who did things and
19       did not have action taken against them?
20  A.   Yes.
21  Q.   Okay.  And do you recall that you talked about people
22       who left things in homes?
23  A.   Yes.
24  Q.   Do you recall that you talked about people who left
25       things un-metered?

CAUDLE, DAVID
05/15/2019

Pages 265–267

Page 265

1   A.   Yes.
2   Q.   And do you recall that you identified several people
3        who failed audits?
4   A.   Audits and left things in homes un-metered.
5   Q.   Okay.  Do you know what action was taken against them
6        as a result?
7   A.   Most of them, yes.
8   Q.   Okay.  What do you know?
9   A.   None of them had action taken against them.
10  Q.   How do you know that?
11  A.   Brian laughed and told me that he missed a channel
12       lineup, Ryan caught it and he told him look, man,
13       don't do it again, this will get you in real trouble.
14       He used it as a learning experience.
15  Q.   Do you know what action --
16            MR. GALLAGHER:  He's answering your
17       question.
18  BY MS. NORRIS:
19  Q.   Do you know what action was taken --
20            MR. GALLAGHER:  Finish answering, how do
21       you know that?
22  A.   Nothing was done.  He said Ryan just really, in so
23       many words, bitched him out.  But there was no action,
24       nothing on paper.
25  BY MS. NORRIS:

Page 266

1   Q.   Do you know what action was taken against any of the
2        people who failed the audit?
3   A.   They told me nothing was done.  Because they told me
4        when I was scared about how many audits I had, don't
5        worry about it, it's just an audit.  Just make sure
6        you get it done -- you know, get yourself right and
7        don't get too many of them wrong.
8   Q.   Did you ever fail an audit?
9   A.   Yes.
10  Q.   Okay.  Was any action taken against you when you
11       failed an audit?
12  A.   No.  It was an un-metered device, but --
13  Q.   You testified that your physician told you that your
14       sickle cell could be aggravated by stress, including
15       losing your job; is that right?
16  A.   He told me -- he said stress and I said yeah, losing
17       my job was a stressor.
18  Q.   Okay.  Am I correct that you were employed by Nielsen
19       longer than any other job you had?
20  A.   Four years, yeah.
21            MS. NORRIS:  Okay.  I don't have anything
22       further.
23            (The deposition was concluded at 2:40 p.m.
24       Signature of the witness was not requested by
25       counsel for the respective parties hereto.)

Page 267

1                  CERTIFICATE OF NOTARY
2   STATE OF MICHIGAN )
3                    ) SS
4   COUNTY OF OAKLAND )
5
6            I, BECKY JOHNSON, certify that this
7        deposition was taken before me on the date
8        hereinbefore set forth; that the foregoing questions
9        and answers were recorded by me stenographically and
10       reduced to computer transcription; that this is a
11       true, full and correct transcript of my stenographic
12       notes so taken; and that I am not related to, nor of
13       counsel to, either party nor interested in the event
14       of this cause.
15
16
17
18
19
20
21            BECKY JOHNSON, CSR-5395
22            Notary Public,
23            Oakland County, Michigan
24  My Commission expires:  January 28, 2026
25