IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID CAUDLE,                  )

                     )  CIVIL ACTION NO. 2:17-cv-13737

       PLAINTIFF,         )

                     )  HON. MARK A. GOLDSMITH

     vs.                    )

                     )

THE NIELSEN COMPANY (US), L.L.C.  )

                     )

       DEFENDANTS.      )

                     )

**PLAINTIFF'S RESPONSE BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

**ORAL ARGUMENT REQUESTED**

## **TABLE OF CONTENTS**

INDEX OF AUTHORITIES.................................................................................................. 3

INDEX OF EXHIBITS ...................................................................................................... 4

QUESTIONS PRESENTED................................................................................................. 5

COUNTER-STATEMENT OF MATERIAL FACTS ................................................................ 6

STATEMENT OF ADDITIONAL MATERIAL FACTS........................................................... 12

STANDARD OF REVIEW ................................................................................................ 19

ARGUMENT ................................................................................................................. 20

CONCLUSION............................................................................................................... 28

# INDEX OF AUTHORITIES

**Cases**

*AMTRAK v. Morgan*, 536 U.S. 101 (2002)......................................................................... 14

*Bryson v. Regis Corp.,* 498 F.3d 561 (6th Cir. 2007) ........................................................ 18

*Chattman v. Toho Tenax Am., Inc.,* 686 F.3d 339 (6th Cir. 2012............................................ 16

*Crawford v. Metro. Gov't of Nashville & Davidson County*, 555 U.S. 271 (2009).................. 19

*DeBrow v. Century 21 Great Lakes,* Inc., 463 Mich. 534 (2001).................................. 15

*Dixon v. Gonzales*, 481 F.3d 324 (6th Cir. 2007) ........................................................ 15

*Hazle v. Ford Motor Co*., 464 Mich. 456 (2001)........................................................ 15

*Killian v. Yorozu Auto. Tenn., Inc*., 454 F.3d 549(6th Cir. 2006).................................. 17

*Laster v. City of Kalamazoo*, 746 F.3d 714 (6th Cir. 2014) ...................................... 20

*Lytle v. Malady*, 458 Mich. 153 (1998) .................................................................. 16

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).................. 13

*McFarland v. Henderson,* 307 F.3d 402 (6th Cir 2002)........................................ 15

*Meek v. Michigan Bell Telephone Co.,* 193 Mich. App. 340 (1991). ............................ 15

*Reeder v. City of Wayne,* 177 F. Supp. 3d 1059 (E.D. Mich. 2016)............................ 19

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000)........................ 14

*Schaffer v. A.O. Smith Harvestore Prod.*, 74 F.3d 722 (6th Cir. 1996)........................ 13

*Smith v. Perkins Bd. of Educ*., 708 F.3d 821 (6th Cir. 2013).................................. 19

*Staub v. Proctor Hospital*, 131 S. Ct. 1186 (March 1, 2011) .................................... 21

*Tennial v. United States Parcel Service, Inc., et. al.* 840 F.3d 292 (6th Cir. 2016) .......... 16

**Rules**

Fed. R. Civ. P. 56(c) ................................................................................................ 13

## <u>INDEX OF EXHIBITS</u>

Exhibit A: Deposition of David Caudle

Exhibit B: Deposition of Ryan Dinsmore

Exhibit C: September '16 e-mail Dinsmore to Plaintiff.

Exhibit D: August 2016 Internal Company E-Mail

Exhibit E: August 29, 2016 Internal Company E-Mail

Exhibit F: May 2016 Internal Company E-Mail String

Exhibit G: Deposition of Denise Fantarella

## QUESTIONS PRESENTED

1. Whether Plaintiff stated a prima facie case of discrimination on the basis of his disability of sickle cell anemia?

> Plaintiff answers "Yes."

> Defendant would answer "No."

2. Whether Plaintiff has presented a question of fact as to whether he was retaliated against for complaining about his manager, Ryan Dinsmore?

> Plaintiff answers "Yes."

> Defendant would answer "No."

3. Whether Plaintiff's claims under state law should survive summary judgment on the basis that he proved the above as to his federal claims?

> Plaintiff answers "Yes."

> Defendant would answer "No."

## COUNTER-STATEMENT OF MATERIAL FACTS

1.   Plaintiff is not in the position to testify as to the Defendant's internal workings, however, if this paragraph seeks to imply Plaintiff was terminated because of errors in data, Plaintiff notes that multiple and continuous errors of his co-workers went undisciplined.  *Exhibit A* at 182, 244-245, and 266.

2.   Plaintiff is not in the position to state whether or not Defendant has these policies, however, in his deposition, it is clear that the policies were never given to him as an employee, nor were any policies other than sexual harassment in the workplace ever discussed.  *Exhibit A: Deposition of David Caudle* at 96.  Moreover, with respect to each specific instance of harassment Plaintiff ever raised, this policy was not followed.  Plaintiff was either directly retaliated against (*id.* at 102), or, in the case of his termination, Denise Fantarella testified that the only action taken regarding his allegations was to talk to Ryan Dinsmore; the same individual Plaintiff alleged harassed him. *Exhibit G: Deposition of Denise Fantarella* at 35-36.

3.   Again, this was not the policy or practice that was followed at the workplace of Defendant.  Plaintiff testified that he was never given any of these policies and that they were only discussed with regard to sexual harassment in the workplace. *Exhibit A* at 94-96.

4.   Plaintiff was retaliated against and treated differently by management, at least in part, because of his disability and the necessity for him to take sick leave.  *See* Exhibit C, Exhibit D, Exhibit E, Exhibit F, and this Response; generally.

5.   Plaintiff did not admit he was given a handbook; he was referencing where the material was supposed to be stored online.  *Exhibit A* at 85.

6.   Plaintiff's is not alleging any illegal workplace practices in his hiring.

7.  Plaintiff testified that Mr. Demmon had over 200 faults; in comparison, Plaintiff was allegedly terminated for a fault at two households. *See Exhibit A* at 79 and *Exhibit B: Deposition of Ryan Dinsmore* at 77.

8.  Plaintiff is not alleging illegal workplace practices in his training in Florida.

9.  Having household information accurately reported was part of Plaintiff's job duties; however, his numbers were directly impacted by having to take leave to treat his illness, a policy which had a disparate impact on individuals with sickle cell anemia.  *Exhibit A* at 136 and 168.  Also, Ryan Dinsmore testified that at times every individual field representative had faults.  *Exhibit B* at 33.

10.  Plaintiff explained multiple reasons why one may not need to go to a house to clear a fault, and that testimony is uncontradicted.  *Exhibit A* at 231.  Further, this paragraph is a red-herring, because it was not the reason given for Plaintiff's termination. *Exhibit B* at 77.

11.  Plaintiff did complain about his write-up and alleges that he was directly retaliated against for alleging this write-up constituted harassment.  *Exhibit A* at 97.

12.  After this write-up, Plaintiff complained to Defendant's management about the fact that he felt that he was being discriminated against as he explained at his deposition:

> [Ryan Dinsmore] gave me an unfair write-up and I told him I felt like I was being discriminated against and I asked him about it…because Dave Demmon [Plaintiff's old boss] being fired in [his] area…I was talked to about it by HR…I told [them] that I thought he was discriminant me after Dave Demmon got fired…because the minute after Dave Demmon got fired, [Ryan] became grossly invested in me more than anybody else.

*Id. at* 77, 97 and 100.  Plaintiff went on to testify as to the dissimilar treatment that he "asked [James Hardy, Brian Burkhardt, and [a gentleman he couldn't recall the name of] had they ever heard of anybody getting written up for a low PC percentage and they said no and they

all laughed." *Id.* at 106.   As a result, and as can be clearly seen, it is this type of different and unfair treatment that Plaintiff has alleged as part of his complaint.

13. Again, however, Plaintiff testified he was the only individual that was ever punished or disciplined for this behavior that was commonplace, even getting laughed at when he asked if any of his co-workers had been written up for similar issues. *Id.* at 106.

14.  Again, this was not one of the incidents that was alleged to be reason for Plaintiff's termination.  *Exhibit B* at 77.  However, Plaintiff's full testimony, to accurately and fairly portray what he said, was:

> …There was multiple people in the home helping me meter the home.  What Ryan found that was wrong, it wasn't done by me.  And when he told me to go look for it to fix it, it was at the wrong site.  So when he went back in and fixed it, I told him, I said, no, you told me it was in this bedroom.  He said either way, you should have checked it and found it.
>
> I said how would I check and find it if everything was considered right?  Because we had checkmarks if everything was connected correctly and is green-lighted.  I said how would I know to look for it if you're telling me to go look in X, Y, Z and it's not there and I call you, you just go fix it and you don't tell me?

*Exhibit A* at 154.  As can be clearly seen from Plaintiff's complete testimony, Plaintiff was, again, explaining the unjustness of this discipline and not admitting to substandard performance.

15. Plaintiff felt that this was an unfair representation of his performance because it held him accountable for time he was off because of either sickness or injury.  *Exhibit A* at 145 and 168.

16. When Plaintiff worked the entire year and his management was happy with that fact, his scores and reviews showed accordingly.  *Exhibit A* at 168 and 176.

17. Plaintiff was injured at work and followed his doctors' recommendations, yet was eager to return to work. *Id.* at 160-163.

18. Plaintiff has not acknowledged any favorable treatment and leaves Defendant to its proofs.  These are not the only allegations of retaliation, harassment, different treatment, disparate treatment that Plaintiff alleges, as discussed further, *infra*.

19. Ryan Dinsmore testified that this was not a terminable offense.  *Exhibit B* at 77. Moreover, Plaintiff testified that:

> There was a back room of a home.  The lady had somebody moving in, they were supposed to be bringing a TV.  So, I kept the equipment at the entertainment stand.  When the Lady called, I was either sick or on vacation… the lady told me she was painting so it wasn't. – I didn't leave it in the middle of the room.  So Ryan had an issue with it, but I told him it was something not in my power because we leave equipment in homes all the time.

*Exhibit A* at 213.  However, importantly, this was not a cause of termination and the only reasons given for the same by Dinsmore were provided at  ¶¶ 20-21 of his deposition.

20.  The second cause for termination, according to Mr. Dinsmore, was the alleged unmetered television in an elderly family's home.  *Id.* at 77-78.  Plaintiff explained this situation completely differently at his deposition:

> This lady, partially blind, her TV went out.  Her flat screen went out in the back.  It wasn't working.  We unplugged it, put the TV up.  She only had a TV in the front.  The TV in the front went out. And as I coached her, per Nielsen policy, she was supposed to call and let Nielsen know.  So she called, let Nielsen know that the TV was out, but she also told them that she hooked the TV up -- the flat screen back up and that one started working.  So that's when Dave Shock went out here to try to see what was going on.

*Exhibit A* at 218-19.   Again, it is important to note that Mr. Dinsmore specifically ordered Plaintiff to not work on break, during this time, so any attempt to fix this issue would have resulted in an infraction of some sort.  *See Exhibit C.*

21.  At his deposition, Mr. Dinsmore testified that, at the time of termination, he was terminated for two main infractions, and a tertiary, less important, third infraction.  *Id.* at 77.  The first was the fact that there was an unmetered television in the basement of one of his customer's homes that was found by Dave Shock.  *Id.* at 84; *Exhibit A* at 241-44.  The customer was switching over to a different cable provider and Dave Shock had access to the DVR; as a result, he could see all of the TVs that were connected which included one in the basement.  *Id.* Plaintiff testified to the conversation he had with Mr. Dinsmore:

> [Ryan] waited until I came back off sick leave to go to that home to et a first-eye look at it and then say okay, Dave, you did this [(the first e-mail citing the potential issue was sent in late August)]. Even on a call when he suspended me, he said, Dave , there's a TV in the basement, I think you knew about it.  I said no, I didn't know about it.  He said well, how did the TV get moved in the basement? I said the family must have moved it in the basement.  He said well, are you sure you didn't know about it?  I said no.
> He said then how did it get documented in the basement?  I said the ROC had called the house, the ROC could have updated and said it got moved to the basement…He said I think you knew about it...
> …I said you only saw it because the lady of the house told you about it, She did not tell me and she told you she didn't tell me…

21.    This paragraph is a truism, not a basis for termination, and Plaintiff is hard-pressed to find the relevance of the paragraph to this motion.

22.    This paragraph egregiously misstates the facts.  There was no investigation and Ryan Dinsmore did not consult with anyone besides legal counsel and his bosses to make sure he could terminate Plaintiff without repercussions.  It is important to note that after Mr.

Dinsmore's deposition, it was clear that the decision to terminate Plaintiff had already been made, and no investigation commenced, even though Defendant purports that it placed him on a suspension pending investigation. *Exhibit B: Deposition of Ryan Dinsmore* at *124* and *126*. Instead, Plaintiff was simply terminated:

> Q: Was there any explanation that David could have entered with the suspension meeting      that would have justified not terminating him?
> A: Not – not that I'm aware of, no.

*Id.* at 126.

23.     Following his termination, Plaintiff attempted to file a claim of harassment with Defendant. *Exhibit G: Deposition of Denise Fantarella at* 35-36.  However, as testified to by Defendant's human resources representative, Denise Fantarella, the harassment investigation consisted exclusively of talking to Ryan Dinsmore – the same person against whom Plaintiff was filing said complaint. *Id*

24.     Fanterella came to her conclusion by exclusively speaking with the same person against whom Plaintiff was alleging wrongdoing. *Id*.

25.      The documents speak for themselves.

## STATEMENT OF ADDITIONAL MATERIAL FACTS

1.      Plaintiff was hired by Defendant as a field representative in May of 2012. *Exhibit A*:

*Deposition of David Caudle* at 56.  Plaintiff enjoyed a near perfect work record in the over four

years of employment, at times even winning Field Representative of the Month awards.  *Id.* at

143.  Defendant did have one blemish on his work history, however, and that was one write-up

in July of 2014.  *Id.* at 97.   However, even this write-up was discriminatory and forced him to

achieve standards that his co-workers did not have.  *Id.* at 151-156.  Specifically, Plaintiff stated

at his deposition:

> Q: Who else made the mistake [of entering incorrect demographic
> information]?
> A: Tim Franklin, James Hardy, Shemir told me he made a mistake
> before.  Matt Bradley said he got dinged on a house before.  I think
> Dave Shock told me it happened to him once.
> …
> Q: You said that Matt Bradley got dinged for it?
> A: It happened to him is what I meant.
> Q: Okay.  Did he tell you if anything happened as a result?
> A: No. He said that Ryan was tagging along with him and he did
> an audit and Ryan caught it and that was it.

*Id.* at 158-159.  Plaintiff was not accused of entering incorrect demographic information as part

of his termination; however, this write-up exemplifies the dissimilar treatment and different

standards applied to him.  Moreover, in this write-up, Plaintiff was disciplined for not having

enough of his customers signed up to allow Defendant to monitor their internet traffic.  *Id.* at 97.

In fact, according to Plaintiff's understanding, this was the only infraction that Mr. Dinsmore

verbally relayed to him regarding the write-up.  *Id.*   Plaintiff went on to testify as to the

dissimilar treatment that he "asked [James Hardy, Brian Burkhardt, and [a gentleman he couldn't

recall the name of] had they ever heard of anybody getting written up for a low PC percentage

and they said no and they all laughed." *Id.* at 106.

2.    After this write-up, Plaintiff complained to Defendant's management about the fact that

he felt that he was being discriminated against as he explained at his deposition:

> [Ryan Dinsmore] gave me an unfair write-up and I told him I felt
> like I was being discriminated against and I asked him about
> it…because Dave Demmon [Plaintiff's old boss] being fired in
> [his] area…I was talked to about it by HR…I told [them] that I
> thought he was discriminant me after Dave Demmon got
> fired…because the minute after Dave Demmon got fired, [Ryan]
> became grossly invested in me more than anybody else.

*Id. at* 77, 97 and 100.

3.    Conveniently, directly after Plaintiff's complaints, when random audits were being

divided up amongst the field technicians, Plaintiff had the most audits of anyone in the last

twenty years, when he "randomly" had approximately twelve houses selected for inspection.  *See*

Exhibit B: Deposition of Ryan Dinsmore at 33.  For comparison, pointing to the unlikelihood

that it was in fact random, that is 240% more than Plaintiff's manager, Mr. Dinsmore, stated was

the second most, at approximately five. *Id.*  Moreover, despite Mr. Dinsmore's denials, there is

testimony that Mr. Dinsmore specifically chose which houses would be audited, which was why

Plaintiff had so many audits after accusing him of being discriminatory.  *Exhibit A* at 118.  In his

deposition, Plaintiff stated, "The E[rnst & Young] auditor told me that Ryan called the homes

they had selected as alternatives and the home he selected was my home and they called and got

in."  *Id.*

4.    During his tenure of employment with Defendant, Plaintiff was forced to take extended

leaves of absence because of his disability: sickle cell anemia.  *Id.* at 183.  Sickle cell anemia, as

Plaintiff described it, "is [when] your blood turns to S's, your muscles stop getting

oxygen…your body starts to contract and your muscles start to spasm.  You get unbearable pain, your…temperature [goes up] your immune system is lowered so you're susceptible to cold and your body starts to basically turn on itself."  *Id.* at 259.   Plaintiff was also to miss numerous stretches of work using the Family Medical Leave Act ("FMLA"), the Intermittent Family Medical Leave Act ("iFMLA"), and his sick days to treat his sickle cell anemia, as well. *Id.* at 180 and 194. Moreover, there were at least two occasions in which Plaintiff missed one to two-month long periods of work because of work place injuries.  *Id.* at 132.

5.      This point is highlighted when considering Plaintiff's final months of employment with Defendant.   In May of 2016, Plaintiff missed the entire month because of a work-place injury, in which Defendant told him that because he did not report the injury immediately, he was not entitled to any workers' compensation benefits. *Id.* at 177-78.   Plaintiff did not return to work until the middle of June because of a scheduled vacation and this injury. *See Defendant's Motion for Summary Judgment* at *Exhibit 7.*   About three weeks later, on or around August 8, 2016, Plaintiff was forced to take another extended leave through FMLA at the mandate of his physician because of his sickle cell anemia. *Exhibit A* at 182.  Plaintiff did not return to work until October 6, 2016, which is the exact same day that his manager, Mr. Dinsmore, informed him that Plaintiff was being placed on suspension pending investigation.  *Id.* 228   Six days later, on October 12, 2016, without contacting Plaintiff nor any of the households he serviced, Plaintiff was told by Mr. Dinsmore during a phone meeting that he had been terminated.  As can be seen from the months of May 2016 to his termination in October 2016 Plaintiff worked in total two-three weeks.

6.      While Plaintiff's health situation was volatile because of his illness, there were a few consistencies that Defendant displayed in connection with his illness.  First, it is undisputed that

Plaintiff's statistics would suffer when he was forced to take medical leave. *Exhibit A* at 136. This point can be seen in Plaintiff's deposition at page 168. In Plaintiff's role as a field representative one of his tasks, while he was not on sick leave, was to ensure that every TV, internet, and/or streaming device ("devices") were equipped with Defendant's equipment ("metering"). It is undisputed from the testimony of the parties that when Plaintiff went out on extended sick leave, the percentage of Plaintiff's metered devices would not be as high.

7.      Second, and consistently, whenever Plaintiff would go out on leave, Mr. Dinsmore would berate him with calls, sometimes on a daily basis, asking him to contact different customers and perform certain menial tasks. *Id.* at 217. This was despite the fact that it is clear Nielsen policy – and statutory federal law – that when someone cannot work because of their health, their manager is not supposed to call that individual at home and make that individual work. Making the situation even more of a lose-lose situation for Plaintiff, Mr. Dinsmore himself e-mailed and informed Plaintiff not to work while on sick leave. *See Exhibit C: September 2016 e-mail from Dinsmore to Plaintiff.* Moreover, this was despite the fact that Mr. Dinsmore had specific knowledge at that moment that some of Plaintiff's houses were metered incorrectly, and this was Mr. Dinsmore specifically telling him not to fix this issue. *Id.*

8.      Third, Ryan Dinsmore and Plaintiff's co-workers would become hostile because they were forced to cover Plaintiff's zone while he was out. The disdain Mr. Dinsmore felt for Plaintiff is evident from certain internal company e-mails that Mr. Caudle was not privy to until discovery in this matter. For example, in Exhibit D, when discussing the facts that eventually led to Plaintiff's termination, Mr. Dinsmore simply referred to him as, "**Th[e] guy who is out on leave a few months/year**." *See Exhibit D: August 2016 Internal Company E-Mail* (emphasis added). At Mr. Dinsmore's deposition, when asked why he referred to Plaintiff by the amount

15

of time he was out, Mr. Dinsmore could not explain it, but said, "[i]t might have been based on a recent conversation"; however, he could not recall a specific conversation. *Exhibit B* at 63.

9.      The disdain can be seen in other e-mails as well.  For example, in *Exhibit E: August 29, 2016 Internal Company E-Mail*, Mr. Dinsmore characterized Plaintiff's sick cell crisis as, Plaintiff, "c[oming] odwn with a cold and then somehow there were complications that kept him at the hospital for an extended period."  This is right after Mr. Dinsmore opines, "I do not exactly know why he was out for this long." *Id.*  Finally, Mr. Dinsmore's attempt to "play doctor" reached its most bizarre moment in an internal company e-mail, where Mr. Dinsmore stated that Plaintiff had a mental health problem over what seemed to have been a misunderstanding related to an injury. *See Exhibit F: May 2016 Internal Company E-Mail String*.  At his deposition, Mr. Dinsmore unequivocally stated that he never reached back out to either Plaintiff or MetLife, however, he thought that it was appropriate to send an e-mail to many of Plaintiff's superiors informing them of unsubstantiated allegations of Plaintiff's mental health issues. *Id.*  Maybe most concerning, Mr. Dinsmore felt it necessary to state in the affirmative for only Plaintiff that, "When he returns, I will manage him in the same way that I do others unless I am told otherwise." *Id.*

10.     As discussed briefly earlier, while Plaintiff was out on FMLA treating a sickle cell crisis, Defendant began to target different locations of Plaintiff's territories, performing essential audits. *Exhibit B* at 75.  Concerningly, Mr. Dinsmore testified that this is just how it goes if one goes on leave to treat a disability. *Id.*

11.     At his deposition, Mr. Dinsmore testified that, at the time of termination, he was terminated for two main infractions, and a tertiary, less important, third infraction. *Id.* at 77. The first was the fact that there was an unmetered television in the basement of one of his

customer's homes that was found by Dave Shock.  *Id.* at 84; *Exhibit A* at 241-44.  The customer

was switching over to a different cable provider and Dave Shock had access to the DVR; as a

result, he could see all of the TVs that were connected which included one in the basement.  *Id.*

Plaintiff testified to the conversation he had with Mr. Dinsmore:

> [Ryan] waited until I came back off sick leave to go to that home
> to et a first-eye look at it and then say okay, Dave, you did this
> [(the first e-mail citing the potential issue was sent in late August)].
> Even on a call when he suspended me, he said, Dave , there's a TV
> in the basement, I think you knew about it.  I said no, I didn't know
> about it.  He said well, how did the TV get moved in the basement?
> I said the family must have moved it in the basement.  He said
> well, are you sure you didn't know about it?  I said no.
>
> He said then how did it get documented in the basement?  I
> said the ROC had called the house, the ROC could have updated
> and said it got moved to the basement…He said I think you knew
> about it...
> …I said you only saw it because the lady of the house told you
> about it, She did not tell me and she told you she didn't tell me…

*Exhibit A* at 243.  Perhaps most concerning, Mr. Dinsmore even admitted that if one was not

given permission to enter a portion of the home, such as the basement, then the technician is not

permitted to enter.  *Exhibit B* at 131.

12.     The second cause for termination, according to Mr. Dinsmore, was the alleged unmetered

television in an elderly family's home.  *Id.* at 77-78.  Plaintiff, explained this situation

completely differently at his deposition:

> This lady, partially blind, her TV went out.  Her flat screen went
> out in the back.  It wasn't working.  We unplugged it, put the TV
> up.  She only had a TV in the front.  The TV in the front went out.
> And as I coached her, per Nielsen policy, she was supposed to call
> and let Nielsen know.  So she called, let Nielsen know that the TV
> was out, but she also told them that she hooked the TV up -- the
> flat screen back up and that one started working.  So that's when
> Dave Shock went out here to try to see what was going on.

*Exhibit A* at 218-19.   Again, it is important to note that Mr. Dinsmore specifically ordered Plaintiff to not work on break, during this time, so any attempt to fix this issue would have resulted in an infraction of some sort.  *See Exhibit C.*

13.     Despite the fact that it is Plaintiff's contention that he did not have knowledge of either issue because he was out due to taking FMLA and forbidden from work activities by Mr. Dinsmore himself, the common theme of dissimilar treatment towards Plaintiff remained true. At his deposition, Plaintiff testified:

> Q: Okay. And can you think of anybody that had a device that was not metered in their home?
> A: Yeah.  Dave Shock failed an E&Y audit because he left something un-metered in a closet.  Shemir said he failed one.  Tim failed one.  Brian failed one and had a channel lineup that was messed up.

*Exhibit A* at 264.  Moreover, Plaintiff went on to recall one specific instance where upper management failed to meter a TV that could be see from the front door, and no one was punished for these infractions.  *Id.* at 244.

14.     Third, and admittedly less important according to Mr. Dinsmore, Defendant alleged that Plaintiff left extra equipment at a house.  *Exhibit B* at 86 and 128.   Plaintiff explained the situation, and, again, Plaintiff believed that his consecutive time-off seeking treatment of various disabilities was the cause for this issue.  *Exhibit A* at 213.  Plaintiff testified, "there was a back room of a home.  The lady had somebody moving in, they were supposed to be bringing a TV.  So, I kept the equipment at the entertainment stand.  When the lady called… I believe I was sick at this time."  *Id*. However, even then, Plaintiff was not being treated the same and he testified that "everybody does it.  Shemir, Tim Franklin, Brian Burkhardt, Dave Shock.  Just about every rep has left equipment in the home."  *Exhibit A*. at 263.

15.     It is important to note that after Mr. Dinsmore's deposition, it was clear that the decision to terminate Plaintiff had already been made and no investigation commenced, even though Defendant purports that it placed him on a suspension pending investigation. *Exhibit B: Deposition of Ryan Dinsmore at 124 and 126.* Instead, Plaintiff was simply terminated:

> Q: Was there any explanation that David could have entered with the suspension meeting     that     would     have     justified     not terminating him?
> A: Not – not that I'm aware of, no.

*Id.* at 126.

16.    As a result, Plaintiff was fired six days after being placed on suspension pending an investigation that did not happen. Following his termination, Plaintiff attempted to file a claim of harassment with Defendant. *Exhibit G: Deposition of Denise Fantarella at 35-36.* However, as testified to by Defendant's human resources representative, Denise Fantarella, the harassment investigation consisted exclusively of talking to Ryan Dinsmore – the same person against whom Plaintiff was filing said complaint. *Id.* As a result, Plaintiff then filed a questionnaire with the Equal Employment Opportunity Commission on October 16, 2016. After receiving a charge of discrimination and a notice of right to sue letter, on November 15, 2017, Plaintiff filed suit against Defendant alleging various violations of employment law in the handling of his employment, and, ultimately, Plaintiff's termination.

## **STANDARD OF REVIEW**

In deciding a motion for summary judgment, the court should determine whether there is no genuine issue as to any material fact such that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court must consider the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file. *Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 587 (1986). The facts are to be considered in a light most favorable

to the non-moving party, and "... all justifiable inferences are to be drawn in his favor." *Schaffer*

*v. A.O. Smith Harvestore Prod.*, 74 F.3d 722, 727 (6th Cir. 1996) (citations omitted).

In *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000), the Supreme

Court explained the standard that a court must apply when it is reviewing a motion for judgment

as a matter of law or a motion for summary judgment:

> In doing so, however, the court must draw all reasonable inferences in favor of the
> nonmoving party, and it may not make credibility determinations or weigh the
> evidence. Credibility determinations, the weighing of the evidence, and the
> drawing of legitimate inferences from the facts are jury functions, not those of a
> judge. Thus, although the court should review the record as a whole, it must
> disregard all evidence favorable to the moving party that the jury is not required
> to believe. That is, the court should give credence to the evidence favoring the
> nonmovant as well as that evidence supporting the moving party that is
> uncontradicted and unimpeached, at least to the extent that that evidence comes
> from disinterested witnesses.  *Id.* at 150-51(citations omitted)

## **ARGUMENT**

### I.   **STATUTE OF LIMITATIONS**

*A. Title VII*

At the outset, it is important to establish a few dates to combat Defendant's implicit and

explicit statute of limitations arguments presented throughout its motion.  Plaintiff signed and

filled his Equal Employment Opportunity Commission Intake ("EEOC") questionnaire on or

about October 16, 2016.  As a result, for Title VII purposes, distinct instances of harassment,

retaliation, or discrimination that occurred 300 days before October 16, 2016, or after December

21, 2015 are timely within in the meaning of Title VII.

For Plaintiff's hostile workplace claim, however, it is treated differently.  The Supreme

Court held in *AMTRAK v. Morgan*, 536 U.S. 101 (2002), that hostile workplace claims are

treated differently for purposes of the statute of limitations. As long as one actionable instance of a hostile workplace environment is present within the 300-day window, conduct outside that 300-day window is also actionable. *McFarland v. Henderson,* 307 F.3d 402, 408 (6th Cir 2002) (citing *Morgan*, 536 U.S. 101 at 409).

      *B. PWDCRA/ELCRA*

As to Plaintiff's state law claims, the Elliott-Larsen Civil Rights Act ("ELCRA") certainly applies. There is no exhaustion requirement, and "[t]he statute of limitations for ELCRA claims is the same three-year period applicable to personal injury actions…." *Meek v. Michigan Bell Telephone Co.,* 193 Mich. App. 340,343 (1991).

## II.    PLAINTIFF HAS PRESENTED DIRECT EVIDENCE OF DISABILITY DISCRIMINATION, AS A RESULT, THE *MCDONNELL-DOUGLAS* CIRCUMSTANTIAL BURDEN SHIFTING ANALYSIS IS INAPPLICABLE AND DEFENDANT'S POSITION IS WITHOUT MERIT

As stated by Defendant, courts readily apply the *McDonnell-Douglas* test in discrimination cases regarding circumstantial evidence. *Hazle v. Ford Motor Co*., 464 Mich. 456, 461 (2001). Under the *McDonnell-Douglas* approach, Plaintiff must "present a rebuttable prima facie case on the basis of proofs from which a factfinder could infer that the plaintiff was the victim of unlawful discrimination." *DeBrow v. Century 21 Great Lakes,* Inc., 463 Mich. 534, 538 (2001). "The burden of proof at the prima facie stage is minimal" and therefore, Plaintiff need only put forth some credible evidence that would allow the court to assume that discrimination occurred. *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007). If Plaintiff successfully presents a prima facie case of discrimination "the defendant has the opportunity to articulate a legitimate, nondiscriminatory reason for its employment decision." *Ford Motor Co.,* 464 Mich. at 463. If Defendant successfully shows a legitimate cause for terminating Plaintiff, then he must

demonstrate the reason for his termination was pretextual; "[he] must demonstrate that the evidence in the case, when construed in [his] favor, is 'sufficient to permit a reasonable trier of fact to conclude that discrimination was a motivating factor for the adverse action taken by the employer toward the plaintiff.'" *Id.* at 465[1]

### III.    <u>PLAINTIFF HAS A VALID CLAIM FOR ADA/PWDCRA DISCRIMINATION</u>

"An employer becomes liable under Title VII when the plaintiff 'establish[es] that the defendant had a discriminatory intent or motive for taking a job-related action.'" *Chattman v. Toho Tenax Am., Inc.,* 686 F.3d 339, 346 (6th Cir. 2012). The plaintiff may show this discriminatory intent through the use of either direct or circumstantial evidence. *Id.* In the Sixth Circuit, this same analysis was applied to discrimination or harassment on the basis of one's disability as is the case in *Tennial v. United States Parcel Service, Inc., et. al.* 840 F.3d 292 (6th Cir. 2016).

Defendant, in its Motion for Summary Judgment, went through the McDonnell-Douglas circumstantial evidence burden shifting analysis for each of its positions. While Plaintiff believes there are genuine issues of fact even under that analysis, it is imperative to note, and not mentioned by Defendant, that the *McDonnell-Douglas* burden shifting analysis would be inapplicable to Plaintiff's claim because he has presented direct evidence of Ryan Dinsmore's discriminatory intent.

First, Plaintiff has presented Exhibit C, where Ryan Dinsmore only refers to Plaintiff, not by name, but instead by the amount of time he has missed because he was out sick. Second, the other e-mails show disdain and improper handling of Plaintiff's illness, at one point, even accusing Plaintiff of having a mental health problem to Plaintiff's bosses. Third, Plaintiff

---

[1] *Citing Lytle v. Malady*, 458 Mich. 153, 176 (1998).

testified that he specifically heard Ryan Dinsmore discussing Plaintiff and how his missing work was having a negative impact. *Exhibit B* at 63. Next, Plaintiff specifically testified to a time where Ryan Dinsmore instructed no one cough by Plaintiff, because then he will be sick and everyone will have to cover for him. *Exhibit A* at 195. Finally, Plaintiff testified to the fact that Ryan Dinsmore would consistently call and tell him he needed to hurry back, and at one point even told Plaintiff that his job may not be waiting for him if he is not back soon enough. *Id.* As a result, considering the facts presented, and the obligation to take Plaintiff's allegations as true, Plaintiff's claims must stand and continue to the jury because there are far more examples of direct discriminatory intent in the case at bar than in the *Chattman* case.

IV. **PLAINTIFF HAS A VALID CLAIM OF FMLA RETALIATION**

In order to establish a prima facie case of retaliation under FMLA based on circumstantial evidence, Plaintiff "must show that: (1) he was engaged in a statutorily protected activity; (2) [Defendant] knew that he was exercising his FMLA rights; (3) he suffered an adverse employment action; and (4) a causal connection existed between the protected FMLA activity and the adverse employment action. *Killian v. Yorozu Auto. Tenn., Inc*., 454 F.3d 549, 556 (6th Cir. 2006). As stated previously, "the burden of proof at the prima facie stage is minimal." *Dixon* 481 F.3d 333. The plaintiff need only put forth some credible evidence that would allow the court to assume that there is a causal connection between the protected activity and the adverse employment action. *Id.* If the plaintiff can do so, then the burden under the *McDonnell-Douglas* framework would shift to the Defendant to prove that they terminated Mr. Caudle for a "legitimate, nondiscriminatory reason." *Donald*, 667 F.3d at 761. If the Defendant can successfully do so, then Mr. Caudle's claims "could survive summary judgment only if [he] can show that [Defendant's] stated reasons are a pretext for unlawful discrimination. *Id.*

23

There should be no dispute that in August of 2016, Mr. Caudle was engaging in a statutorily protected activity when he went on FMLA. It is also apparent that Defendant knew about this leave given the fact that Mr. Caudle promptly notified Defendant of his request to take leave, per his doctor's consultation, and that he was terminated shortly after returning from his leave. Based on Sixth Circuit precedent, courts have "held that proximity in time between the protected activity and the adverse employment action may constitute evidence of a causal connection." *Bryson v. Regis Corp.,* 498 F.3d 561, 571 (6th Cir. 2007). This is so even if a few months have elapsed after the protected leave was requested. *Id* (stating that termination three months after a request for FMLA can show a causal connection). Moreover, Plaintiff has previously stated that Mr. Dinsmore made passing comments about being sick of Plaintiff taking sick leave and that Plaintiff was "the guy who is on leave a few months/year."[2] Given this evidence and the minimal threshold that a plaintiff must meet in order to establish a prima facie case of discrimination based on FMLA, the burden should then shift to Defendant to prove that it terminated Plaintiff for a nondiscriminatory reason.

Defendant claims that it had legitimate cause to terminate Plaintiff "after recording significant errors regarding the data in his homes, despite previously being given a second chance and placed on a PIP."[3] This would then shift the burden back to Plaintiff to show that the reason for termination given by Defendant was pretext for his unlawful termination. At this stage, the Court should consider whether Plaintiff has shown evidence that "would enable a factfinder to conclude that [Defendant's] stated reason for terminating [him] is not the true reason and is simply a pretext for unlawful retaliation." *Bryson*, 498 F.3d at 572. If there "are genuine issues of material fact as to what information [Defendant] relied upon in deciding to

[2] *See Exhibit 11* of Defendant's Motion for Summary Judgment.
[3] Defendant's Motion for Summary Judgment at 23.

24

terminate [Mr. Caudle] . . . summary judgment is improper. *Id.* "A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Smith v. Perkins Bd. of Educ.*, 708 F.3d 821, 825 (6th Cir. 2013). In this instance, as noted throughout the facts section, Plaintiff has presented evidence to suggest that Defendant terminated him based on retaliation for him taking FMLA, as evidenced by Mr. Dinsmore's hostile comments about and to him regarding his leave and the unreasonable expectations he placed upon Plaintiff to work while he was on leave. Due to this, a reasonable juror could conclude that Plaintiff was actually terminated for discriminatory reasons.

V.   **PLAINTIFF HAS A VALID CLAIM OF TITLE VII, ELCRA, ADA, PWDCRA RETALIATION**

In order to establish a prima facie case of retaliation in violation of Title VII, ELCRA, and PWDCRA, Plaintiff must show that: (1) he engaged in a protected activity under Title VII; (2) the protected activity was known to Defendant; (3) Defendant took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. *Reeder v. City of Wayne,* 177 F. Supp. 3d 1059, 1081 (E.D. Mich. 2016).

Defendant suggests in its motion that Plaintiff has not shown that he was engaging in a protected activity. It is readily apparent that Plaintiff did allege in his complaint that he was engaging in FMLA, which was supported by his deposition testimony.  Such would constitute protected activity under Title VII.   Plaintiff also properly supported through his testimony that Defendant had knowledge of this activity through direct notice to his supervisors that he was taking FMLA.

Essentially, Title VII, through the opposition clause, makes it an unlawful employment practice to discriminate against an employee because he has opposed any practice made unlawful by Title VII. *Crawford v. Metro. Gov't of Nashville & Davidson County*, 555 U.S. 271 (2009). Defendant suggests in its motion that Mr. Caudle has not shown that he was engaging in a protected activity. It is readily apparent that Mr. Caudle did allege in his complaint that he was engaging in FMLA, which is a protected activity under Title VII. Mr. Caudle also properly alleges that Defendant had knowledge of this activity through direct notice to his supervisors that he was taking FMLA.   Moreover, when Plaintiff complained about the discriminatory treatment, before and after his termination, this was quite clearly protected activity.

## VI.    <u>PLAINTIFF HAS A VALID CLAIM FOR RACIAL DISCRIMINATION/HARASSMENT</u>

In order to establish a prima facie case of race discrimination, a plaintiff must show that: 1) he is a member of a protected class; 2) he was qualified for the job and performed it satisfactorily; 3) despite his qualifications and performance, he suffered an adverse employment action; and 4) he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside of his protected class. *Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014).   Here, Plaintiff was attempting to move to a position with the audit team; however, the position was given to a white employee who did not even apply.   Further, direct evidence of discrimination has been presented in the form of Plaintiff's deposition testimony, when Ryan Dinsmore asked Plaintiff if he would be angrier if a survey sent to only African American employees was instead addressed to "you people." Moreover, becoming hostile and calling Plaintiff "insubordinate" when he exclaimed his displeasure for this comment is not only more direct evidence, but also another example of classic protected activity.

26

VII.    **THE CAT'S PAW THEORY OF LIABILITY APPLIES TO PLAINTIFF'S CLAIM**

In *Staub v. Proctor Hospital*, 131 S. Ct. 1186 (March 1, 2011), the United States Supreme Court unanimously held that employers may be held liable for adverse employment decisions that were proximately caused by a manager or supervisor who had an unlawful motive, even if the motives of the "ultimate decisionmaker" were not unlawful and the "ultimate decisionmaker" performed what the employer characterizes as an "independent investigation." The Supreme Court characterized the issue before it as whether animus is a "motivating factor in the employer's action" when the official who makes the decision being challenged "has no discriminatory animus but is influenced by previous company action that is the product of a like animus in someone else." *Id.* at 1191.

Thus, the majority in *Staub* rejected the position taken by concurring Justices Alito and Thomas, as urged by Defendant here, that an "independent investigation" by the employer's "ultimate decisionmaker" should automatically shield the employer from liability. *Id.* at 1193-94. Further, the Court went on to say, "if the independent investigation relies on facts provided by the biased supervisor - as is necessary in any case of cat's-paw liability - then the employer (either directly or through the ultimate decisionmaker) will have effectively delegated the factfinding portion of the investigation to the biased supervisor." *Id.*

Here, as admitted by Ryan Dinsmore in his deposition, Amanda Culver would not be able to identify Plaintiff. *Exhibit B* at 63. Further, as Denise Fanterella stated in her deposition, the only other person who had any say in Plaintiff's termination had no day-to-day interaction with Plaintiff. *Exhibit G* at 20. As a result, as in *Staub*, all facts relied upon by the individual who fired Plaintiff came from Ryan Dinsmore, the individual with multiple examples of direct evidence of discriminatory animus in the form of Exhibit C and Plaintiff's deposition testimony

27

at 81, when Plaintiff testified that he heard Mr. Dinsmore talk disparagingly about Plaintiff's medical condition. Moreover, it is the clear uncontroverted testimony that there was in fact no investigation at all, along with the other direct evidence of discriminatory animus presented, *supra*. As a result, the claim at bar is even worse than *Staub* because Defendant exclusively relied on Mr. Dinsmore. Compounding matters, as testified to by Denise Fanterella, Mr. Dinsmore exclusively handled the proceeding harassment complaint levied against himself by Plaintiff. Thus, Plaintiff has presented a valid claim for discrimination under the "cat's paw" theory, and his claims should survive summary judgment.

## CONCLUSION

WHEREFORE, Plaintiff, DAVID CAUDLE, respectfully requests that this honorable Court deny Defendant's Motion for Summary Judgment and grant any other relief this honorable Court deems equitable and just.

Respectfully Submitted,

/s/ Connor B. Gallagher
Connor B. Gallagher (P82104)
*Attorneys for Plaintiff*

Dated: July 30, 2019

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing instrument was served upon all parties to the above cause to each of the attorneys of record herein at their respective addresses as directed on the pleadings on July 30, 2019, by:

/s/ Carla D. Aikens