**28**

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN SOUTHERN DIVISION

DAVID CAUDLE,

               Plaintiff,             Case No.: 17-CV-13737
                                        HON. MARK A. GOLDSMITH

-vs-

THE NIELSEN COMPANY (US), L.L.C.,

               Defendant.
_____/

**DEPOSITION OF RYAN DINSMORE**

Taken by Plaintiff at the Law Offices of Miller, Canfield, Paddock and Stone, P.L.C., 150 West Jefferson, Suite 2500, Detroit, MI 48226, on Friday, May 10, 2019, commencing at 10:00 a.m.

**APPEARANCES:**

For the Plaintiff:     **CONNOR GALLAGHER (P82104)**
                            615 Griswold Street, Suite 709
                            Detroit, MI 48226
                            (844) 835-2993

For the Defendant:     **MEGAN P. NORRIS (P39318)**
                            **JESSICA PASK (P82212)**
                            150 W. Jefferson, Suite 2500
                            Detroit, MI 48226
                            (313) 963-6420

**RECORDED BY:**         **REGENCY COURT REPORTING**
                            3133 Union Lake Road, Ste. A
                            Commerce Township, MI 48382
                            (248) 360-2145

```
 1        tough depending on the year.  Last year was a very
 2        busy year.
 3   Q    Okay.  So, average 30, 40.  Some years some more,
 4        some years some less?
 5   A    Sure.
 6   Q    Okay.  Audits.  Can you explain the audit process for
 7        me?
 8        So, in audits is when we visit a home, either with an
 9        in -- internal audit or an external audit, or -- to
10        verify the quality of our work, make sure that we're
11        auditing whether or not the equipment was set
12        properly, whether or not the demographic information
13        that we collected from the home the last time was
14        accurate, and to make sure that the household knows
15        how to log in correctly.
16   A    Okay.  Who's getting audited?
17   Q    We are.  The company is.  We're -- the audit -- there
18        are different types of audits, and I kind of consider
19        anytime I go to a home with a rep, it's my own little
20        audit, right, for my market.
21   A    That's fine.  Internal auditing, we'll look at our
22        homes to audit the rep in the market.  Right.  So,
23        it's to verify the quality of the -- of the data
24        we're getting from the market itself.  If it's an
25        external audit, an Ernst and Young audit, it's the --
```

| | | |
|---|---|---|
| 1 | | the market and the -- the company itself that's being |
| 2 | | audited. |
| 3 | Q | Okay.  So, in the external audit, are people actually |
| 4 | | going to homes? |
| 5 | A | Yes. |
| 6 | Q | Okay.  Are Field Techs judged -- judged or graded in |
| 7 | | the external audit? |
| 8 | A | Yes. |
| 9 | Q | Okay.  How many external audits do you guys generally |
| 10 | | have; is it per year, bi-yearly? |
| 11 | A | The way I understand it, Nielsen pays Ernst and Young |
| 12 | | to surprise us randomly from market to market. |
| 13 | Q | Okay. |
| 14 | A | So, they're not scheduled.  We don't know -- we don't |
| 15 | | -- we can't control when we get chosen.  Sometimes |
| 16 | | it's every other year, sometimes it's -- it might go |
| 17 | | three years. |
| 18 | Q | Okay.  And who is getting audited then in the |
| 19 | | external?  I understand you said, "It's all of us", |
| 20 | | but are you talking about your -- your geographic |
| 21 | | market, your -- the State of Michigan? |
| 22 | A | The external is market level.  They will select a |
| 23 | | market at a time.  Sometimes several markets at once |
| 24 | | -- |
| 25 | Q | Oh. |

1   A   Okay.

2   Q   Could you -- but let's move to -- so that -- are

3       there anything other than those two things that you

4       used to measure performance?

5   A   Yes.

6   Q   Okay.  And what else would that be?

7   A   So, I'm not sure if we have a form that we can review

8       for -- but we have maybe 15 metrics or so that we'll

9       -- that we'll look at.  So, we'll look at the

10      percentage of people that we've coached in a home.

11      We'll -- we'll review the percentage of people

12      coached -- been coached within the first two weeks,

13      within the first six weeks, within the first six

14      months.  We'll -- we have metrics for PCU recruiting

15      and our -- our success doing that.  So, we have -- we

16      -- we recruit homes to -- to allow us to measure

17      their internet activity.  And if they say yes to at

18      least one computer, that is how we measure Cooperate

19      -- PC Cooperate.  And then we have eligible PCUs

20      metered, which is of the homes that said yes, you can

21      meter one computer.  What percentage of actually --

22      of their computers are actually installed with our

23      software.

24  Q   Okay.  And everybody gets a score on this?

25  A   Oh, yeah.

```
1   Q    What happens if someone's deficient on all these

2        scores?

3   A    We work on -- work on improving to get to where we

4        want to be or we should be.

5   Q    Okay.  So, I think at one point you wrote up my

6        client for a PC meter thing, right?  A little issue

7        with his PC meter.  Attempted to write him up or --

8        use your words.  What happened there?

9   A    No.  I -- I -- well, so, I wrote him up for a -- for

10       a pretty severe policy violation.

11  Q    Okay.  What was that severe policy violation?

12  A    It was a situation where -- first off, the

13       demographic information that we collect from our

14       homes is greatly important.  Greatly important.  If

15       we don't get the demographic information correct,

16       then it really doesn't matter for finding out

17       accurately what a home watches on TV if we don't get

18       the who part right.  So, in one particular situation

19       he visited a that had two household members, one male

20       and one female.  He had the genders of these two

21       household members swapped.

22  Q    Okay.

23  A    You and your wife in this particular home, girlfriend

24       in this particular home, then --

25  Q    Take it easy with those words.
```

```
 1    A    While you're watching TV, we would have you listed as

 2         a female.

 3    Q    Okay.

 4    A    And whatever you would watch on TV gets reported in

 5         the ratings as a female watching.

 6    Q    Okay.

 7    A    And when she watches TV, she would be reported as a

 8         male.

 9    Q    So, my (Inaudible) document.  Just so we're on the

10         same page.  Is this the write up we're both talking

11         about?

12    A    Yes.  This is it.

13    Q    Okay.

14    A    Yeah.

15                   MR. GALLAGHER:  Okay.  If you give me

16         a Bates number, you can keep that.  But I can -- I

17         have one here actually.

18                   MS. NORRIS:  000329.

19                   MR. GALLAGHER:  Okay.

20                   MS. NORRIS:  Are we making this an

21         exhibit or no?  Just talking about it?

22                   MR. GALLAGHER:  Oh, not yet.

23                   MS. NORRIS:  Okay.

24                   MR. GALLAGHER:  We may.  Let's see

25         where it takes us.  Yeah, might as well mark it.  It
```

1          would just be easier to reference.  Gonna mark that

2          as Exhibit One.  Is that okay?

3                         (WHEREUPON, Exhibit Number One was

4          marked for the record at 11:10 a.m.)

5     BY MR. GALLAGHER:

6     Q    So, I just handed you and your Counsel -- I'm sorry.

7                         MR. GALLAGHER:  Did you say 3339?

8                         MS. NORRIS:  329.

9                         MR. GALLAGHER:  Okay.  Let's go off

10         the record for a second --

11                        MS. NORRIS:  Sure.

12                        MR. GALLAGHER:  -- while I try to find

13         this.

14                        (WHEREUPON, a brief recess in the

15         proceeding took place at 11:10 am.)

16                        MR. GALLAGHER:  Okay.  Thank you for

17         being patient with me.

18    BY MR. GALLAGHER:

19    Q    I did find the Performance Improvement Plan that we

20         had marked as Exhibit One.  So, if I reference

21         Exhibit One, that's just what I'm referring to.  We

22         just do that so I don't have to trip over my words.

23         So, what else did you include in this plan?

24    A    What else did I include?  So, I included some other

25         issues that we were having at the time.

46

```
 1   Q   Okay.

 2   A   One was a -- an issue of not completing Ngage

 3       resolutions in a timely manner.  So, End-Gauge

 4       (phonetic) Resolutions.  End-Gauge is our scheduling

 5       program where you -- as a Field Rep you would look at

 6       your schedule, review your schedule, where you're

 7       going --

 8   Q   Okay.

 9   A   -- over the next couple weeks.  And as you complete

10       calls, you go into End-Gauge and you document whether

11       or not that call was completed, whether it was

12       rescheduled, postponed, whatever it might be.

13   Q   Uh huh.

14   A   That was tied to our bonus structure at the time for

15       the Field Reps, whether or not they were completing

16       the calls or not.  Since he wasn't regularly entering

17       those resolutions, it was impacting the potential

18       amount of money that you could get in this -- in

19       these bonuses.  The next thing that I added was a

20       home that I worked with Dave.  We found some errors

21       in what we had -- that would -- between what was in

22       the home versus what we had in our MSM database.  So,

23       in the home we do all the things that we do to take

24       notes and document the changes that need to take

25       place so we can transpose into the MSM database to
```

47

Case 2:17-cv-13737-MAG-MKM ECF No. 46-2 PageID.4471 Filed 08/13/19 Page 10 of 30
Case 2:17-cv-13737-MAG-MKM ECF No. 45-2 PageID.3710 Filed 07/30/19 PageID.1189 Page 49 of
148

```
 1          make sure that it's all correct.  He didn't render

 2          all those changes until (Inaudible) afterwards when I

 3          checked his paperwork later.  So, the next thing that

 4          I added was a conversation -- these are counseling

 5          records.  These are -- so, this was a conversation

 6          about more -- so on June 8th we -- I talked with him

 7          about End-Gauge Resolutions.  On July 7th I'm still

 8          talking with him about End-Gauge Resolutions.  And

 9          then June 17th (sic) it says here, "PC Cooperate was

10          currently low."

11     Q    I'm sorry.  You said June 7th?

12     A    I'm sorry.  July 17th.  I apologize.  Yeah.  "Your PC

13          Cooperate's currently 36 percent", so which -- which

14          was low because the target for that was 65 percent.

15          And the eligible PCs metered performance is 65.5

16          percent.  And the tar -- and that target's 80

17          percent.  As you can see, the next sentence says --

18          it said, "This is (Inaudible) performance

19          improvements need to be made" (Inaudible) that -- but

20          the -- the meat and potatoes of this Performance

21          Improvement Plan is the issue that occurred on July

22          3rd, which is the very serious issue.  These other

23          things that were added are things that were important

24          for him to work on.

25     Q    Are these usually signed by employees?
```

48

Case 2:17-cv-13737-MAG-MKM ECF No. 46-2 PageID.478 Filed 08/13/19 Page 11 of 30
Case 2:17-cv-13737-MAG-MKM ECF No. 43-2 PageID.1190 Filed 07/30/19 Page 50 of
148

```
 1    A    Yes.

 2    Q    Do you know why this one is not?

 3    A    This is the one that I had printed from -- I would

 4         have printed this, taken it to him.  So, this came --

 5         this is an original.  This is from before he had

 6         signed it.

 7    Q    So, you -- do you know if a signed copy exists?

 8    A    I don't know.  I would normally always have these

 9         signed, but I don't have proof of that.

10    Q    Okay.  Can you tell me why the occurrence says 2012

11         to 2013 on the front of Exhibit One?

12    A    Yeah.  It's probably because I used in bold -- you

13         know, I always update from an old form and change the

14         data.  So, it might have been a different employee's

15         Performance Improvement Plan, and I changed their

16         name to Dave Caudle, I changed today's date to the

17         7/7, which would have probably been the day I started

18         writing this.  I changed the -- you know, wherever I

19         needed to.  So, I wasn't starting from a blank.  I

20         was probably starting from someone else's.  So, I for

21         -- looks liked like I forgot to change that

22         obviously.

23    Q    Do you know -- do you know if Dave was -- David was

24         the only one that did not have his PC Cooperate above

25         80 percent?  Or between 65 and 80 percent or above --
```

49

Case 2:17-cv-13737-MAG-MKM ECF No. 46-2 PageID.479 Filed 08/13/19 Page 12 of 30
Case 2:17-cv-13737-MAG-MKM ECF No. 49-2 PageID.730 Filed 08/13/19 PageID.1193 Page 53 of 30
148

| 1 | | Of course not under the circumstances, right, but you |
|---|---|---|
| 2 | | know, it's -- it would have been nice to see him. I |
| 3 | | like -- I did like Dave a lot. |
| 4 | BY MR. GALLAGHER: | |
| 5 | Q | Okay. Did you have anything to do with hiring him? |
| 6 | A | Yeah. |
| 7 | Q | Okay. What did you have to do with his hiring? |
| 8 | A | I hired him. |
| 9 | Q | Okay. Do you remember when he hired? |
| 10 | A | Not specifically, no. But he worked here for three |
| 11 | | or four years, so -- |
| 12 | Q | Okay. So, May of 2012 sounds about right? |
| 13 | A | Yeah. |
| 14 | Q | I won't hold you to that date or anything. Okay. |
| 15 | | What did you see in Dave when you hired him that made |
| 16 | | you want to hire him? |
| 17 | A | He's -- he's outgoing, he's -- he's fun. He had good |
| 18 | | experience, you know, prior to, and most of it I felt |
| 19 | | was relevant. I can't remember if he worked for AT&T |
| 20 | | Universe or if it was DirectTV, but he was a -- he |
| 21 | | was a cable installer prior to -- and we hire a lot |
| 22 | | of people that -- that come from that type of |
| 23 | | background, 'cause the job's very different but |
| 24 | | similar in a way, I think. So, he was just that type |
| 25 | | of person that you would invite into your house over |

1    and over again.  The type of person that you kind of

2    look forward to seeing if he was your service tech

3    unlike a random cable technician that you might meet

4    once and never see again.  Probably did make a big

5    impression on ya.

6    Q    How do you explain Dave's employment at Nielsen as a

7         hold?

8                   MS. NORRIS:  What do you mean by how

9         do you explain?

10                  MR. GALLAGHER:  How would you explain?

11                  MS. NORRIS:  Right.  But --

12                  MR. GALLAGHER:  Yeah.

13                  MS. NORRIS:  -- how -- how do you

14        describe it?  How would he explain why he's there?  I

15        don't understand, how would you explain --

16                  MR. GALLAGHER:  His general

17        employment.

18   BY MR. GALLAGHER:

19   Q    What do you think of his employment there?

20                  MS. NORRIS:  Okay.

21                  THE WITNESS:  So, his general

22        employment, so I'm taking that as was he a good

23        employee; is that what you're asking?  Or is -- are

24        you asking --

25                  MR. GALLAGHER:  Yeah.  Sure.

Case 2:17-cv-13737-MAG-MKM ECF No. 46-2 PageID.1481 Filed 08/13/19 Page 14 of 30
Case 2:17-cv-13737-MAG-MKM ECF No. 43-2 filed 07/30/19 PageID.1205 Page 69 of 30
148

 1        would be foundation, please.

 2                    THE WITNESS:  Because I was using that

 3        to -- to explain which person it was.  And if I would

 4        have just said, "Dave Caudle", she wouldn't -- may

 5        not have remembered which person it was until I

 6        clarified what -- what we might have talked about in

 7        our -- our most recent discussion.

 8   BY MR. GALLAGHER:

 9   Q    So, are you saying that by referencing him as -- as

10        you referenced him, that's how she can identify him?

11   A    Well, not -- that wouldn't be the only way.  She --

12        that's not -- so --

13   Q    (Talking over) --

14   A    -- that wouldn't be the way that I would say who he

15        was every time I talked with her.

16   Q    Sure.  But that's what you said there, so I'm trying

17        to figure out why you said it there.

18   A    Because I may have had, you know, a couple other

19        employees that I was talking with her about.  This is

20        this person's situation that I'm dealing with, this

21        is this person's situation.  Or this is the -- the

22        person whose leave just got extended in this

23        particular case, or -- or whatever it might be.

24   Q    Sure.  My question is, so that's how she identified

25        Dave Caudle?

```
 1   Q   Sure.  And I won't hold you to those year things, but
 2       I'm just trying to differentiate it for you.  But --
 3   A   I had more people get promoted recently, so I'm not
 4       -- I'm not -- I'm struggling here.  I had to hire a
 5       bunch for an expansion.  I don't really recall.
 6   Q   All right.  About how many have you fired in your
 7       term as a Field Manager?
 8   A   How many in 14 years?
 9   Q   About.
10   A   (No verbal response)
11   Q   Let's try it this way.  How many have you fired since
12       my client?
13   A   I'll tell you, if I was able to get out my computer
14       and look at it, I'd be able to give you a really good
15       number.  But I don't -- off the top of my head, I --
16       I couldn't tell you.  My mind's just absolutely
17       drawing a blank right now.
18   Q   So, other than Rob Roney and Chris Carlos, are there
19       -- can you think of any other people that you fired
20       in the last five years other than my client?
21   A   It's the thing, I know I have.
22           MS. NORRIS:  Just tell him what you
23       remember.
24           THE WITNESS:  I just think only Chris
25       Carlos and Rob Roney, now that I think about it.  But
```

67

Case 2:17-cv-13737-MAG-MKM ECF No. 46-2 PageID.1482 Filed 08/13/19 Page 16 of 30
Case 2:17-cv-13737-MAG-MKM ECF No. 43-2 filed 07/30/19 PageID.1209 Page 69 of 30
148

```
 1         I'm not 100 percent sure.
 2                     MR. GALLAGHER:  Okay.  That's fine.
 3    BY MR. GALLAGHER:
 4    Q    And what did Rob Roney do?
 5    A    (No verbal response)
 6    Q    What was the cause of his termination?  I'll
 7         rephrase.
 8    A    Rob Rowing had a lot of -- a lot of quality issues, a
 9         lot of paperwork issues.  There were visits that I --
10         I don't believe he was making, but he was putting
11         them in the schedule.  He was making a lot of -- a
12         lot of -- a lot of paperwork mistakes.  He wasn't
13         doing his -- his paperwork on time for his calls, his
14         field calls.  We -- we found some pretty serious
15         quality infractions with him in his work too.
16    Q    Okay.  How did you find those?
17    A    By going into the homes with -- working with him.
18    Q    He was there?
19    A    Was he there?  In -- in some cases, yeah, in some
20         cases, no.
21    Q    Okay.  What about Chris Carlos?
22    A    Chris Carlos, same thing.  He was making a lot of
23         paperwork mistakes.  We were running into some pretty
24         serious quality issues with his -- his -- his homes
25         too.  Quality data that -- that -- that we were
```

Case 2:17-cv-13737-MAG-MKM ECF No. 46-2 PageID.1484 Filed 08/13/19 Page 17 of 30
Case 2:17-cv-13737-MAG-MKM ECF No. 43-2 Filed 07/30/19 PageID.1210 Page 70 of 80

148

| | | |
|---|---|---|
| 1 | | getting. Whether or not sites were metered that |
| 2 | | should have been, that -- that -- that weren't. |
| 3 | Q | So, the same thing as far as your quality inspection, |
| 4 | | he was there sometimes and he was not there others? |
| 5 | A | From memory, that -- I -- I don't -- I don't recall. |
| 6 | | I mean, when we do Field Quality Reviews, when I'm |
| 7 | | looking -- when I identify these areas, these issues, |
| 8 | | sometimes it's me that identifies the situation |
| 9 | | because I'm in the home. Maybe Chris was the last |
| 10 | | person that was in the house, but now I'm in the |
| 11 | | house with a different rep and I can see the work |
| 12 | | that was performed before we got there, whether or |
| 13 | | not it met our standards or not. Sometimes I'm with |
| 14 | | Chris and the work wasn't -- that he was doing wasn't |
| 15 | | up to par or he didn't do the paperwork correctly |
| 16 | | afterwards. That sort of thing. |
| 17 | Q | Sure. And what ethnicity is Mr. Roney? |
| 18 | A | He's -- he's Caucasian. |
| 19 | Q | Okay. What about Mr. Carlos? |
| 20 | A | Pardon me? |
| 21 | Q | What about Mr. Carlos? |
| 22 | A | He's Hispanic. |
| 23 | Q | Okay. Do you remember what area of -- what |
| 24 | | geographic area Mr. Carlos was assigned? |
| 25 | A | Southfield. His area -- the center of his area was |

69

Case 2:17-cv-13737-MAG-MKM ECF No. 46-2 PageID.7485 Filed 08/13/19 Page 18 of 30
Case 2:17-cv-13737-MAG-MKM ECF No. 43-2 PageID.3015 Filed 07/30/19 PageID.1211 Page 70 of 30
148

| | | |
|---|---|---|
| 1 | | probably in Southfield. |
| 2 | Q | Okay.  Okay.  Now, what did you -- why did you decide |
| 3 | | to terminate my client? |
| 4 | A | I don't know that I actually, you know, made the -- |
| 5 | | the decision because it was something that I -- I |
| 6 | | wanted to do. |
| 7 | Q | Sure.  So, why did you want to terminate my client? |
| 8 | | MS. NORRIS:  I -- I'm not sure that's |
| 9 | | what he meant.  But you can explain. |
| 10 | | MR. GALLAGHER:  Oh, I'm sorry. |
| 11 | | THE WITNESS:  Yeah.  No.  I actually |
| 12 | | -- |
| 13 | BY MR. GALLAGHER: | |
| 14 | Q | I thought you said, "It was something I wanted." |
| 15 | A | No.  Not that -- not that it was -- it wasn't |
| 16 | | something that I -- there are some -- some -- |
| 17 | Q | I misheard it.  I apologize. |
| 18 | A | Right.  So, there's some situations where, you know, |
| 19 | | if we make certain mistakes or if we make certain |
| 20 | | choices, we can't -- we don't -- as a manager, even I |
| 21 | | don't get a chance to say, "Well, no.  Let's just -- |
| 22 | | let's just keep him.  That's -- that's fine."  So, |
| 23 | | overall, the performance -- his -- his performance, |
| 24 | | his -- the measurable metrics in regards to the |
| 25 | | person's performance really wasn't a -- a problem. |

Case 2:17-cv-13737-MAG-MKM ECF No. 46-2 PageID.1486 Filed 08/13/19 Page 19 of 30
Case 2:17-cv-13737-MAG-MKM ECF No. 43-2 filed 07/30/19 PageID.1212 Page 72 of
148

```
 1          They weren't exactly where they needed to be, or

 2          where he would have wanted or we would have wanted

 3          them to be.  That's not why.  It was the quality of

 4          the work that he was doing while he was here.  That

 5          was the reason why he was separated from the company.

 6   Q      Okay.  So, what does that mean?

 7   A      What does that mean?  That means -- so, in order to

 8          manage a successful market, in order to be a

 9          successful Field Rep, you have to be able to meet the

10          performance metrics --

11   Q      Uh huh.

12   A      -- right, while following the rules, while acting

13          with integrity, while doing the right thing.  We felt

14          the quality -- the performance metrics don't really

15          mean a whole lot.  You can -- as a Field Rep -- and

16          I'm just speaking in general, not about Dave -- as a

17          Field Rep you can kind of cheat the system in a way

18          that allows you to have a better performance metric.

19          Right?  But now the data that we're collecting is --

20          is not accurate anymore.  In the event that we're

21          audited, especially by an external auditing firm,

22          they'll audit the market, they'll randomly select

23          homes, they'll go out to those homes, they find out

24          if Nielsen's doing the job in which -- in the way in

25          which they promised their clients.  And then they
```

Case 2:17-cv-13737-MAG-MKM ECF No. 46-2 PageID.1487 Filed 08/13/19 Page 20 of 30
Case 2:17-cv-13737-MAG-MKM ECF No. 43-2 filed 07/30/19 PageID.1213 Page 73 of
148

1     report the results of what they find directly to our

2     clients and say, "You know, you're paying all this

3     money and this is what you're getting." You know,

4     most of the time they're following the rules, but in

5     these instances they weren't. And these are the

6     situations that we found. Right? So, as a manager,

7     I have to protect the integrity of the sample itself,

8     and as a company we have to protect the integrity of

9     the sample itself.

10 Q   Sure. But what -- but what specific instances caused

11     the termination of Dave Caudle?

12 A   So, the -- the -- it's all the instances that add up

13     to a point where you have, this has happened, this

14     has happened, this has happened. Now we can't --

15     there's nothing else we can do. We have to -- we

16     have to do something. We have to make a decision.

17     Right? So, a lot of it starts with the Performance

18     Improvement Plan, things that had happened, you know,

19     over the prior year or two. Right? So, you

20     establish a performance -- the quality problems that

21     may have occurred in the past, and you work your way

22     through a Performance Improvement Plan hopefully

23     successfully.

24 Q   I'm gonna ask you to look at Exhibit One, which is

25     the Performance Improvement I believe you're

Case 2:17-cv-13737-MAG-MKM ECF No. 46-2 PageID.1488 Filed 08/13/19 Page 21 of 30
Case 2:17-cv-13737-MAG-MKM ECF No. 43-2 filed 07/30/19 PageID.1214 Page 74 of 90
148

| | | |
|---|---|---|
| 1 | | referencing. |
| 2 | A | Uh huh. |
| 3 | Q | Are you -- you saying some of these issues were the |
| 4 | | same things that you based your termination on for |
| 5 | | David? |
| 6 | A | No.  This is -- well, first of all, this one on July |
| 7 | | 3rd, 2014, this is something that Field Reps can be |
| 8 | | terminated first occurrence. |
| 9 | Q | Sure. |
| 10 | A | Right off the bat. |
| 11 | Q | Sure.  I'm sorry.  Just your testimony made it seem |
| 12 | | that some of these issues were reoccurring problems |
| 13 | | in Exhibit One.  Is that what you're saying? |
| 14 | A | Some of the other ones were, yes. |
| 15 | Q | Okay.  So, what was reoccurring? |
| 16 | A | So, June 8th, July 7th, these were both issues where |
| 17 | | Ngage resolutions, the paperwork problems, weren't -- |
| 18 | Q | I'm sorry.  I'll clear it up.  I could be wrong, but |
| 19 | | I thought your testimony was saying that tiers of |
| 20 | | issues that were not fixed led to his termination |
| 21 | | essentially.  Is that what -- your testimony or no? |
| 22 | A | Can you rephrase the question? |
| 23 | Q | Is there any -- like did any of these issues in |
| 24 | | Exhibit One, were any of those the cause -- were any |
| 25 | | of those claims the cause of my client's termination? |

Case 2:17-cv-13737-MAG-MKM ECF No. 46-2 PageID.1489 Filed 08/13/19 Page 22 of 30
Case 2:17-cv-13737-MAG-MKM ECF No. 43-2 filed 07/30/19 PageID.1218 Page 79 of 80
148

```
 1                    MR. GALLAGHER:  And that's fine.

 2                    MS. NORRIS:  But I'm happy to stop --

 3                    MR. GALLAGHER:  But he was testifying.

 4                    MS. NORRIS:  Yup.  Go right ahead.

 5                    THE WITNESS:  So, there were

 6        performance -- there were -- there were issues that

 7        came up before he went -- he went on leave, and then

 8        there were issues that while he was on leave, we were

 9        identifying.  And -- and then a lot of that -- a lot

10        of -- a lot of that comes from, you know, if you're -

11        - if you're out on leave, and then other reps or

12        other people are -- are covering the work for you.

13        So, they go on into your homes and in some cases

14        they're finding quality problems, quality issues.

15        And one of the very specific instances I had a rep,

16        Dave Shock, who went into one of the homes --

17   BY MR. GALLAGHER:

18   Q    And which home?

19   A    I wish I could remember the name off the -- right off

20        the top of my head.  I don't remember the name.  I

21        remember the situation though.  The situation was --

22        was an elderly woman who Dave -- she had called into

23        the office and said their cable or satellite, or

24        whatever it would have been, was shut off.  And so we

25        thought, oh, no.  We're gonna lose a home from the
```

Case 2:17-cv-13737-MAG-MKM ECF No. 46-2 PageID.1480 Filed 08/13/19 Page 23 of 30
Case 2:17-cv-13737-MAG-MKM ECF No. 43-2 PageID.1219 Filed 07/30/19 Page 79 of
148

1    sample because without cable or satellite you can't

2    be a Nielsen home, right, without a signal, without

3    an antenna or anything, you -- you can't be a Nielsen

4    home.  So, the Field Rep went out to the home -- Dave

5    Shock went out to the home to -- to remove our

6    equipment.  And we -- part of the process, we ask

7    them how they're going to watch television in the

8    future.  And she said, "Well, just, you know, if it's

9    okay, I'll start using the TV in my bedroom again."

10   And the TV had a -- an antenna.  But she had told the

11   rep that Dave had previously told her not to use that

12   TV.  And it -- and she was really frustrated.  She

13   was upset.  And she hadn't been able to use this TV

14   for quite some time.

15   Q   So, she wasn't using that TV?

16   A   She wasn't using that TV.  The reason --

17   Q   So, wouldn't that affect the Nielsen numbers?

18   A   Oh, absolutely.

19   Q   Okay.  How --

20   A   It would affect the Nielsen numbers.  All right.  So,

21       you have a TV in the living room that has cable, and

22       a TV in the bedroom that has bunny ears, right, over

23       the air --

24   Q   Sure.

25   A   -- antenna.  We are not allowed to bias the sample in

Case 2:17-cv-13737-MAG-MKM ECF No. 46-2 PageID.401 Filed 08/13/19 Page 24 of 30
Case 2:17-cv-13737-MAG-MKM ECF No. 45-2 PageID.330 Filed 07/30/19 PageID.1220 Page 80 of 30
148

1     any way, shape, or form.  So, what that means is if

2     you now have -- if we walk into your home and you

3     have the ability to watch TV in the living room, and

4     your ability to watch TV in the -- in the bedroom, we

5     cannot change that.  Right?  We have to have both of

6     those TVs metered.  By saying, "Don't use that TV",

7     now channels like Channel 2, Channel 4, Channel 7,

8     20, 50, 56, they're not gonna get any ratings there

9     from that TV because we told them not to use that TV.

10    She can no longer watch TV in her bedroom.  All the

11    shows she would have normally watched in her bedroom

12    are no longer getting counted in the ratings.

13 Q  Okay.

14 A  So, we just completely skewed the ratings data

15    because we biased it and told her not to.

16 Q  Okay.  So, outside of that, were there any other

17    situations that you can remember that led to his

18    termination?  Specific instances?

19 A  That situation actually gets worse, because he had

20    unplugged the equipment, because he wasn't able to

21    get it to work.  He was supposed to come back.

22 Q  Okay.  How do you know he unplugged the equipment?

23 A  Because it wasn't plugged and she told us that she --

24    he had unplugged it, and that she couldn't get to

25    access where it was plugged in.

Case 2:17-cv-13737-MAG-MKM   ECF No. 46-2   PageID.1482   Filed 08/13/19   Page 25 of 30
Case 2:17-cv-13737-MAG-MKM   ECF No. 43-2   PageID.1121   Filed 07/30/19   Page 81 of
148

```
 1   Q    Okay.

 2   A    He said that he had returned to the home to fix the

 3        problem, but she told us that he did not come back to

 4        the house to fix the problem.

 5   Q    Say that one more time.  I'm sorry.  I didn't hear.

 6   A    He had put in MSM a contact report that said that he

 7        went back to the home to fix the problem on Saturday.

 8   Q    Okay.

 9   A    But he did not return to the house on that Saturday

10        and actually fixed the problem.  Did not get -- did

11        not access her home, did not get into her home to fix

12        the problem.

13   Q    Okay.  The entry says that the problem was fixed?

14   A    Yes.  That's what he said.  He said that he fixed the

15        problem.

16   Q    When did he say that?

17   A    He said that he replaced a 7-port hub, which is a

18        piece of equipment that would be attached to that

19        computer.

20   Q    Okay.

21   A    So, she said that he was only at her house once that

22        week, not twice.  But we did see that he removed that

23        TV from our system in MSM when he went back that

24        second day, which we're assuming is from the street

25        because she said he didn't get into the house.  You
```

80

Case 2:17-cv-13737-MAG-MKM ECF No. 46-2 PageID.1483 Filed 08/13/19 Page 26 of 30
Case 2:17-cv-13737-MAG-MKM ECF No. 45-2 PageID.1431 Filed 07/30/19 PageID.1222 Page 82 of 30
148

| | | |
|---|---|---|
| 1 | | can access the computer through Wi-Fi, your laptop |
| 2 | | and connect to our network that's in the home. |
| 3 | Q | That's terrifying. |
| 4 | A | Through Wi-Fi.  Well, it's only our network.  It |
| 5 | | doesn't connect to yours. |
| 6 | Q | Well -- |
| 7 | A | But so -- |
| 8 | Q | -- I'm sure that's a -- |
| 9 | A | -- from the -- well, yeah -- no, it's not.  It's -- |
| 10 | | it's not -- it's not a scary, evil thing. But so from |
| 11 | | the home you could -- you can -- I'm sorry, from the |
| 12 | | -- from the street or from the driveway.  Say, he |
| 13 | | knocked on the door, maybe she wasn't there.  Now I'm |
| 14 | | developing a story for this small section of the -- |
| 15 | | but he could have removed that from the system and |
| 16 | | now it's not going to fault anymore and hurt his |
| 17 | | performance. |
| 18 | Q | Okay. |
| 19 | A | So, he told her that he was going to follow up and go |
| 20 | | back, but he never did. |
| 21 | Q | Well, it sounds like he did go back, right, you're |
| 22 | | saying?  If he connected from the Wi-Fi.  He might |
| 23 | | not have got in, but it sounds like he went back. |
| 24 | A | Yeah. |
| 25 | Q | Okay. |

Case 2:17-cv-13737-MAG-MKM ECF No. 46-2 PageID.1404 Filed 08/13/19 Page 27 of 30
Case 2:17-cv-13737-MAG-MKM ECF No. 43-2 PageID.1123 Filed 07/30/19 Page 83 of 90
148

| 1 | A | He -- he could have, yeah.  It looks like he did. |
| 2 | Q | Okay. |
| 3 | A | But he didn't put it in the schedule, he didn't put |
| 4 | | it in our scheduling program. |
| 5 | Q | Okay. |
| 6 | A | And as a Field Rep, you wouldn't do that.  You |
| 7 | | wouldn't go to a call on a Saturday -- |
| 8 | Q | Well -- |
| 9 | A | -- and not show that you didn't go.  You would want |
| 10 | | to take credit for that call that you ran on a |
| 11 | | weekend, which we don't usually do. |
| 12 | Q | I'm sorry.  I'm confused.  So, you're saying he |
| 13 | | didn't put the call on the scheduling for that? |
| 14 | A | No.  He didn't put it in the schedule. |
| 15 | Q | So, what implication are you talking about? |
| 16 | A | That the pro -- the pro -- process and procedure was |
| 17 | | not followed. |
| 18 | Q | Okay.  Is that a terminable offense? |
| 19 | A | Yes. |
| 20 | Q | Okay. |
| 21 | A | Yes.  Absolutely. |
| 22 | Q | So, not putting in the schedule is a terminable |
| 23 | | offense? |
| 24 | A | No. |
| 25 | Q | Okay.  Okay.  Did you learn anything else at that |

```
1    BY MR. GALLAGHER:

2    Q    So, at some point did you become aware that there's a

3         harassment complaint leveled against you?

4    A    Yeah.

5    Q    Okay.  And when did you become aware?

6    A    Harassment complaint, I knew that there was a com --

7         that Dave was -- was challenging being terminated.  I

8         knew that.

9    Q    Okay.

10   A    If that's what you're -- I don't know if it's the

11        same thing or that it's different.

12   Q    Sure.

13   A    That's -- that's what I was made aware of.  Yeah.

14   Q    Okay.  Sure.

15   A    That -- that -- that Dave was gonna challenge in

16        Court -- or potentially challenge legally his -- his

17        termination.

18   Q    Okay.  How did you take that?

19   A    Well, I was, you know, a little bummed out, I guess,

20        just because, you know, Dave's a good guy and, you

21        know, I unfortunately had to terminate him and, you

22        know --

23   Q    Okay.  Did you have to do anything, provide any

24        information to people in -- anybody in regards to

25        what I just handed you, Exhibit Five?
```

130

```
 1   A     I was sent an email, some sort of email saying that,
 2         again, I had to put any emails or documents into a
 3         shared file, and that I wasn't to delete anything.
 4         That's all I remember.
 5   Q     Okay.
 6   A     As far as notification goes, if -- if anything.
 7   Q     Okay.  So, the -- I'm not sure -- there's never -- no
 8         formal meeting or anything held about the
 9         allegations, the investigation?
10                     MS. NORRIS:  With him?
11   BY MR. GALLAGHER:
12   Q     That you were -- that you were present at.
13   A     No.  Not until we came here for this.
14   Q     Fair enough.  Fair enough.
15   A     Okay.
16   Q     So, when a tech visits a house, what do you do if a
17         -- a homeowner decides -- bars you from a certain
18         area of the house?
19   A     Well, it depends.  So, if -- if there's work that
20         needs to be done in that home and you're not able to
21         verify, then we shouldn't be using the information
22         from that home until we get back into that room and
23         -- and -- to make sure the equipment's working
24         properly or to meter it the correct way, or whatever
25         that might be.
```

131

```
1    Q    So, is it possible -- strike that.  What if I'm the
2         homeowner and I say you're not allowed in the
3         basement?
4    A    Sure.  If you're the homeowner and -- and you say
5         that, then -- and I'm the Field Rep, I would, you
6         know, of course do my best to convince you to let me
7         in if there's work that I needed to do down there.
8         But if I -- if I wasn't able to do that, then I would
9         try to set -- do my best to set a return appointment
10        and -- and complete the work when -- when you'll
11        allow me to.  And in the meantime, if there's
12        anything that I need to do in regards to make sure
13        that we should or shouldn't be using the data, I'm
14        either gonna put the home on withhold so we don't use
15        the information from the home until I can get back
16        in, or I know that I don't need to based on our
17        conversation, and I just note in a contact report
18        what we talked about.
19   Q    Sure.  So, I say there's nothing down there that
20        needs to be metered.  "You're not allowed down
21        there."
22   A    Yeah, then -- then I take your word for it.  I'm not
23        gonna force my way past you and run down your stairs.
24   Q    I appreciate (Inaudible).  Okay.  What about this
25        transferring geographic regions?  We discussed very
```