# 30

# In the Matter Of:

# CAUDLE vs THE NIELSEN COMPANY (US), LLC

## DAVID CAUDLE

### May 15, 2019



Prepared for you by

Bingham Farms/Southfield • Grand Rapids

Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw • Troy

Page 69

1     important?
2  A. Yes.
3  Q. Because that's what Nielsen is selling, right?
4  A. Uh-huh.
5  Q. You have to say yes or no.
6  A. Yes.
7  Q. Do you know what happened if the data was wrong?
8  A. Nielsen had to pay a rebate.
9  Q. So it had to inform its customers and then pay money
10    back?
11 A. After they did research to make sure it was their
12    fault, yes.
13 Q. Do you know what it cost to do the research to
14    determine if the data was accurate or not?
15 A. No.
16           MARKED FOR IDENTIFICATION:
17           DEPOSITION EXHIBIT 3
18           10:38 a.m.
19 BY MS. NORRIS:
20 Q. You've been handed what's been marked as Deposition
21    Exhibit 3, which is a job profile for field
22    representative. Have you ever seen this document
23    before?
24 A. Just reading it to make sure.
25 Q. Yeah.

Page 70

1  A. Yes, I think -- I believe I remember seeing this.
2  Q. Do you think this accurately represents the job that
3     you were doing as a field representative?
4  A. Yes, more or less.
5  Q. Did you get this during some kind of orientation when
6     you were hired?
7  A. Yes.
8  Q. Is there anything -- I know you haven't had a chance
9     to read it line-by-line, you just glanced at it, but
10    you said accurate more or less. Is there anything
11    that jumped out at you as being inaccurate?
12 A. No, I mean, it just doesn't show everything that you
13    do at the job so --
14 Q. Okay. So there might be more that you did that's not
15    here?
16 A. Yes.
17 Q. Can you give me an example?
18 A. Calling a customer and trying to get in at dinnertime
19    and smooth talking them or buying them dinner or doing
20    whatever it took to get in to fix a fault.
21 Q. Okay. So some of the techniques for getting into the
22    home?
23 A. Yes, like some of the things you didn't know you had
24    to do.
25 Q. And am I correct that during your employment with

Page 71

1     Nielsen, Mr. Dinsmore complimented you and gave you
2     favorable evaluations on your ability to get into the
3     homes?
4  A. Yes.
5  Q. Boiling everything that's in this long job profile
6     down, at its core what was it that you were supposed
7     to be doing for Nielsen?
8          MR. GALLAGHER: Objection; form,
9     foundation.
10 A. My lawyer said objection.
11 BY MS. NORRIS:
12 Q. Yeah, but he didn't tell you not to answer and he will
13    if you're not supposed to answer, he'll tell you not
14    to answer the question.
15         MR. GALLAGHER: Form and foundation
16    objections you can answer, if you know the answer.
17    But anything I say privilege-wise, that's when you
18    need to just stop.
19 A. Ask the question again.
20 BY MS. NORRIS:
21 Q. Sure. At its core, what was it that you were doing
22    for Nielsen?
23 A. Upholding the Nielsen values.
24 Q. Right. Is it fair to say that your job was to make
25    sure that what Nielsen had in the homes was working

Page 72

1     and accurate so that the Nielsen data was correct?
2  A. That was part of the job, yes.
3  Q. Okay. If you were assigned to a home, was part of
4     your job to go in and see -- well, let me back up.
5          Am I right that people sign up to be a
6     Nielsen family?
7  A. Yes.
8  Q. And Nielsen wants to have Nielsen families of various
9     demographics, right?
10 A. Yes.
11         MR. GALLAGHER: Objection, form and
12    foundation.
13 BY MS. NORRIS:
14 Q. And Nielsen -- in your training did Nielsen talk to
15    you about what it was trying to accomplish?
16 A. They gave us a broad idea.
17 Q. Okay. And so Nielsen needed to make sure that
18    homes -- that you knew equipment was in the homes; is
19    that right?
20 A. Yes.
21 Q. And Nielsen needed to make sure that the equipment was
22    working; is that right?
23 A. Yes.
24 Q. And Nielsen needed to make sure that the equipment was
25    accurately reflecting who was watching what, correct?

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

**CAUDLE, DAVID**
05/15/2019

Pages 157–160

Page 157

```
 1    to do everything.
 2              And he was telling me I need to work on my
 3    overtime.  And I was telling him that I need to work
 4    on the homes, had a lot of homes that were squatters
 5    and, you know, people that just up and left Detroit.
 6    So it was hard tracking down faults.  And I told him
 7    it was hard for me to find a balance and we never
 8    worked on a plan to find that balance.
 9 Q. Okay.  Anything else?
10 A. The PC co-op rate I didn't know anything about.  So I
11    asked him -- that was the main thing he told me I was
12    getting wrote up for, then these other things popped
13    up.  So that was the main one I was upset about and
14    that's when I brought up that I felt like I was being
15    discriminated against.
16 Q. That's the conversation we talked about earlier,
17    correct?
18 A. Yes.
19 Q. Anything else that you think is wrong here?
20 A. No.  I have an issue because it seems like it's the
21    same thing on July 7th that was on June 8th and I
22    don't know about that.  I can't -- I don't recall that
23    being on here, but okay.
24 Q. Did you actually sign the PIP?  The one in front of
25    you is not signed --
```

Page 158

```
 1 A. No, because I didn't agree with it.
 2 Q. Okay.
 3 A. So to my knowledge I don't believe I ever signed it.
 4 Q. Was the document that was presented to you the same as
 5    the document that's in front of you right now?
 6 A. Yes.
 7 Q. Okay.
 8 A. But it didn't -- I remember asking him what PIP meant
 9    and it wasn't written on here like you would lose your
10    bonus and all this other stuff, so that was something
11    else.
12 Q. Do you know if anybody has ever been terminated for
13    having the demographic information incorrect?
14 A. They said somebody had been, but, no, because I know
15    plenty of field reps that made that mistake.
16 Q. Who said people have been terminated for this?
17 A. Ryan.  You know, that's a typical scare tactic to tell
18    everybody.  You know, guys have been fired for doing
19    this and, you know, we've got to make sure we don't do
20    this.
21 Q. Who else made the mistake?
22 A. Tim Franklin.  James Hardy.  Shermir told me he made a
23    mistake before.  Matt Bradley said he got dinged on a
24    house before.  I think Dave Shock told me it happened
25    to him once.
```

Page 159

```
 1 Q. Anybody else?
 2 A. Off the top of my head, that's all I remember.
 3 Q. Do you know what Tim Franklin mixed up?
 4 A. No.
 5 Q. Do you know what Shermir mixed up?
 6 A. No.  They just told me that -- when I was talking to
 7    them about it, they said don't take it too hard, you
 8    know, households have a tendency to lie.  And
 9    sometimes they think without really talking, like they
10    don't listen to you, so don't worry about it.
11 Q. You said that Matt Bradley got dinged for it?
12 A. It happened to him is what I meant.
13 Q. Okay.  Did he tell you if anything happened as a
14    result?
15 A. No.  He said that Ryan was tagging along with him and
16    he did an audit and Ryan caught it and that was it.
17 Q. Am I correct that you took a leave of absence in the
18    beginning of -- I'm sorry, late in 2014?
19 A. Late, yes.
20 Q. Okay.  This was for a work-related injury?
21 A. Yes.
22 Q. Am I correct that your leave started around
23    November 19th, 2014?
24 A. Yes.
25 Q. And am I correct that you hurt your back when you were
```

Page 160

```
 1    turning while you were holding a TV?
 2 A. That's not how I hurt my back.
 3 Q. Tell me how you hurt your back?
 4 A. Well, first off, Ryan was at the house prior to.  It
 5    was a TV that needed two people to lift.  And the TV
 6    needed to be opened up to be metered, the speakers
 7    needed to be metered on the inside.  It was upstairs
 8    in the master bedroom.  And it was a Sony TV, like a
 9    38-inch with the metal plates at the bottom with
10    old -- with the tube on the back, the heavy ones.
11              Ryan knew that the entertainment stand that
12    it was on was wobbly and he said that's the reason why
13    he didn't take it down and try to meter it when he was
14    up there.  So he scheduled Raul to go out there and do
15    it.  Raul didn't want to do it because he had hockey.
16    He put me on it.  And when I went out there to do it,
17    I lifted the TV up, put it on the floor, opened it up
18    and metered it.  When I went to put it down, the stand
19    wobbled and the TV almost fell.  So I caught the TV so
20    it wouldn't smash my foot and I threw my back out.
21              I immediately called Ryan because I was
22    laying on the floor for like 15 minutes.  The lady
23    asked me if I was okay.  When I was able to get up, I
24    got to my car, called Ryan and told him I had hurt my
25    back at the house.  He asked what happened.  I told
```

Page 173

1   given to you in February of 2016?
2 A. Yes.
3 Q. And is this, again, at a restaurant with Ryan?
4 A. Yes.
5 Q. It looks like the company moved to a different
6   evaluation format; is that right?
7 A. I think it was still the same, they just printed out
8   different.
9 Q. Okay. If you go to page 4, it looks like that's where
10  the comments are, correct?
11 A. Okay.
12 Q. Mr. Dinsmore commended you for assisting in Dayton and
13  Columbus, didn't he?
14 A. Yes.
15 Q. What had happened in those areas?
16 A. Josh came to me and asked me if I would be willing to
17  go to Dayton to help the guys out there that were --
18  some of the new techs weren't catching on. The faults
19  were getting high. And he asked if I would go out
20  there and show them how I was doing my faults because
21  I was handling it at such a high rate and
22  quality-wise.
23 Q. So people needed some training, some additional
24  training?
25 A. Yes.

Page 174

1 Q. And when you say Josh, you mean --
2 A. Josh Hummel.
3 Q. Thank you. That was what I was going to ask. How
4   long were you in Dayton and Columbus?
5 A. I went back and forth so I think I went there almost a
6   month altogether.
7 Q. And you went into other people's homes at that time?
8 A. Yes.
9 Q. Did you go with the other techs or on your own or
10  both?
11 A. I shadowed the techs the first time to see what they
12  were doing and then I actually went on calls by myself
13  to try to fix faults to get them -- the market back
14  up. So my job was to watch them and train them in
15  what they were doing, the way they were interacting
16  with the customer, things they weren't catching
17  because they weren't paying attention.
18 Q. Did you have any difficulty getting into any of the
19  homes?
20 A. No.
21 Q. Did you ever have any problems with Mr. Hummel?
22 A. No, never really ran into Josh.
23 Q. Mr. Dinsmore also recognized that you'd improved on a
24  number of your metrics, correct?
25 A. Correct.

Page 175

1 Q. And that your homes really liked you, correct?
2 A. Yes.
3 Q. And you acknowledge that you needed to cut down on
4   overtime, right?
5 A. Yes.
6 Q. And you needed to get your PC number into the green,
7   correct?
8 A. Yes.
9 Q. What does that mean?
10 A. That's what he was talking about the last month about
11  my PC numbers not being as high. The green means
12  you're acceptable.
13 Q. So it just is on the spectrum --
14 A. Yes.
15 Q. -- green is you're good enough, yellow is not quite so
16  good and red is bad?
17 A. Correct.
18 Q. Okay. Even though you were on a leave at the
19  beginning of this year, you got your overall rating
20  back up to 3.0, correct?
21 A. Yes.
22 Q. Did you have any problems with this review?
23 A. No. I asked him how it was a little different.
24 Q. What do you mean?
25 A. He took into consideration me being out on my back

Page 176

1   injury, everything. But when I was -- the previous
2   review when I was out, he didn't take consideration
3   for it.
4 Q. So you thought he should have done so before and you
5   said that and then in this one he did?
6 A. Yeah.
7 Q. Okay. You were pleased with that, right?
8 A. Yeah, because at this point I thought me and him had a
9   good relationship.
10 Q. And you did not complain to anybody about this, did
11  you?
12 A. No. I was told from the day I started that 4s are
13  rarely given out, so a 3 was like one of the best
14  things you could get. I did have one critique on this
15  one.
16 Q. Which was what?
17 A. He said my strength was -- I wasn't afraid of working
18  overtime, working as much as it takes to get the job
19  done, but then he critiqued me on working too much
20  overtime at the same time. So I told him it was a
21  sandwich comment.
22 Q. What do you mean by that?
23 A. You can't ding me saying I work too much overtime and
24  say it's one of my strengths that I do it.
25 Q. Is it possible he meant that he thought you had a

Page 177

1  ready good work ethic, but he also thought you needed
2  to not have so much overtime?
3         MR. GALLAGHER: Objection; form,
4  foundation.
5  BY MS. NORRIS:
6  Q. Yeah, you can --
7  A. When I asked him to it, he told me that he liked it
8     because it helped the market and it showed my drive,
9     but at the same time, you know, he still dinged me on
10    it.
11 Q. Am I correct you took another leave of absence in
12    2016?
13 A. I did.
14 Q. And what was that for?
15 A. I think that was for my arm.
16 Q. What happened to your arm?
17 A. Actually I hurt it putting a TV into a customer's
18    entertainment stand and then I sort of woke up putting
19    pressure on it, you know, put your hand down to push
20    yourself up, and I dislocated the bone in it so I had
21    to put a cast on.
22 Q. Was this workers' comp or was this something else?
23 A. No, because it happened at home so they can't call it
24    workers' comp.
25 Q. Okay. You were doing -- you were doing this on your

Page 178

1  own TV?
2  A. No, I hurt it at the customer's house, but I never
3     reported it. It's like you smash something, you're
4     like ouch and as a guy you shake it off, it didn't
5     feel like it was hurt. ==Then when I -- the next day==
6     ==when I was at home, I was pushing up off the bed and==
7     ==literally putting the pressure on my hand to push==
8     ==myself up, I injured my arm.==
9  Q. So this was treated as a disability, but not workers'
10    comp?
11 A. Yes.
12        MARKED FOR IDENTIFICATION:
13        DEPOSITION EXHIBIT 16
14        12:47 p.m.
15 BY MS. NORRIS:
16 Q. You've been handed Deposition Exhibit 16, which is --
17    it looks to me like it's a letter from MetLife to you
18    saying that your leave is approved starting May 10th;
19    is that right?
20 A. Correct. That's the address I was living at.
21 Q. The Farmington Hills address?
22 A. Yes.
23 Q. And this was treated as leave under the Family Medical
24    Leave Act; is that right?
25 A. Correct.

Page 179

1  Q. For Nielsen, if you had a nonworkers' comp injury, if
2     you --
3  A. You know what, this is May, this is sickle cell.
4  Q. You think this one is sickle cell?
5  A. Uh-huh.
6  Q. What makes you think that?
7  A. Looking at the date.
8  Q. Okay. Do you know when the other -- the issue with
9     your arm was compared to this?
10 A. I can't remember.
11 Q. You don't know if it was before or after?
12 A. It might have been before because it's getting close
13    to the time I got let go so -- to be honest, it could
14    be that time.
15 Q. Okay. Let me ask you this because you don't have to
16    guess. When you hurt your arm, about how long were
17    you off for that?
18 A. I want to say -- I think it was a month or two months.
19 Q. And that was in 2016?
20 A. Yeah, I'm pretty sure.
21 Q. And when you went out for sickle cell in 2016, was
22    that the first time you'd taken leave for sickle cell
23    at Nielsen?
24 A. Leave, no, I had been off sick. I don't think I
25    took -- I was -- yeah, that was the first time I took

Page 180

1  off for that because the other times I just used sick
2  days.
3  Q. Okay. So when you took the leave for sickle cell in
4     2016, how long were you off for that?
5  A. I think it was the end of August until -- I think it
6     was September-something when I came back and then Ryan
7     suspended me or was it October?
8  Q. So the sickle cell leave was the last leave you took?
9  A. Yeah.
10 Q. Okay.
11 A. The day I came back is the day Ryan suspended me.
12 Q. All right. So for right now, looking at Exhibit 16,
13    I'm not going to guess which of those leaves it was,
14    okay?
15        Am I correct that the leave was also
16    covered by the Family Medical Leave Act?
17 A. Uh-huh.
18        MR. GALLAGHER: Objection; form,
19    foundation.
20 BY MS. NORRIS:
21 Q. You have to say --
22 A. Yes.
23 Q. Okay. And was the process -- if you had a leave of
24    absence that was not work related, so it's something
25    personal, whether it's your arm or sickle cell or

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

### Page 181

1  whatever, but it's not workers' comp, am I correct
2  that the process was that you would go through
3  MetLife?
4  A. Yes.
5  Q. Okay. Did you apply to anybody at the company or did
6     you just contact MetLife directly?
7  A. MetLife was part of our disability, that was already a
8     part of Nielsen. They had a contract with them so --
9  Q. Were you required to notify anybody at Nielsen or did
10    MetLife take care of that?
11         MR. GALLAGHER: Objection to form and
12    foundation.
13 A. I contacted somebody in HR and they would tell me to
14    contact the person at MetLife and they took over the
15    case.
16 BY MS. NORRIS:
17 Q. All right. When you contacted somebody in HR, do you
18    know who you spoke to?
19 A. No.
20 Q. Did you tell them what the medical issue was or just
21    that --
22 A. Yes.
23 Q. -- you needed leave?
24 A. I told them the medical issue.
25 Q. Okay. So whichever one it was in May, you would have

### Page 182

1  told them about it?
2  A. Yes, because they had to document it.
3  Q. Once you contact MetLife for leave, do you know what
4     information MetLife provides Nielsen?
5  A. No.
6  Q. Do you know who decides if the leave is granted?
7  A. No.
8  Q. And this leave was granted, correct?
9  A. Yes.
10 Q. The letter, Exhibit 16, says it's granted through
11    June 6th. Do you know if you returned on June 7th?
12 A. I'm not sure.
13         MARKED FOR IDENTIFICATION:
14         DEPOSITION EXHIBIT 17
15         12:51 p.m.
16 BY MS. NORRIS:
17 Q. Okay. Exhibit 17 is also a MetLife letter. This one
18    is dated August 17th, 2016 and this talks about a
19    leave starting August 8th, 2016. Do you think that
20    was your last leave?
21 A. No.
22 Q. Okay. So you think there was another one after this?
23 A. Or was continuing.
24 Q. What do you mean?
25 A. It was extended after the date.

### Page 183

1  Q. Okay. I'm not asking if this ended when this letter
2     says it ended --
3  A. I'm not sure if this is the only one I had or if there
4     was another one, I just know --
5  Q. Okay. Between Exhibit 16 and Exhibit 17, do you think
6     we covered both your arm and sickle cell?
7  A. I believe so.
8  Q. All right. And I think you told me that your arm was
9     one to two months; is that right?
10 A. I believe so.
11 Q. All right. And you think that sickle cell was your
12    last leave; is that right?
13 A. Yes.
14 Q. All right. Exhibit 17 initially says that the leave
15    is granted from August 8th through August 28th?
16 A. Uh-huh.
17 Q. Is that what you asked for at the time?
18 A. No.
19 Q. What did you ask for?
20 A. I didn't ask for anything.
21 Q. What do you mean, you just said I need to be out?
22 A. It was a doctor's note and then it was approved by
23    MetLife. It was nothing that I went to them and said
24    I need time off.
25 Q. Okay. So it was just whatever the doctor's note said?

### Page 184

1  A. Yeah.
2  Q. Did you come back on August 28th?
3  A. I'm not sure.
4  Q. Do you recall taking more than one leave for sickle
5     cell in 2016?
6  A. I'm not sure if I took another one, like I said, if it
7     was extended. I'm not sure.
8  Q. ==Okay. Did you understand that while you were out==
9     ==Brian Molnar from Jacksonville came to Michigan to==
10    ==help?==
11 A. ==Yes. I didn't know his last name, but I knew his==
12    ==first name.==
13 Q. And you thanked Brian for that; is that right?
14 A. No, he lied on me.
15         MARKED FOR IDENTIFICATION:
16         DEPOSITION EXHIBIT 18
17         12:54 p.m.
18 BY MS. NORRIS:
19 Q. ==I've handed you Deposition Exhibit 18, which, again,==
20    ==is an e-mail. There's an e-mail dated September 9th==
21    ==from Ryan Dinsmore telling people that Brian Molnar==
22    ==was coming and then there's an e-mail from you saying==
23    ==thanks a lot, Brian; is that right?==
24 A. ==I didn't know what he did. This is with him coming in==
25    ==and I told him thank you, yes. He was supposed to be==

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

Page 185

1   handling my field area.
2   Q.   Okay.  What did he lie about?
3   A.   He went to a home and asked them if I ever asked them
4        to lie about TVs not being metered, if there was any
5        un-metered devices in the home and something else.
6   Q.   So what did he lie about?
7   A.   He went to the home saying that -- first he said I
8        told the home that he could come there.  And he said
9        well, I just need to check -- you know, Dave needs to
10       know, is there any un-metered TVs in the home, that's
11       the first question he asked.
12  Q.   Okay.  Is that a lie?
13  A.   Yes, because I hadn't talked to him.  Other than this
14       e-mail, I didn't know him, so I didn't ask him to go
15       to any home.
16  Q.   Okay.
17           MR. GALLAGHER:  Can you please let him
18       finish talking?
19  BY MS. NORRIS:
20  Q.   Go ahead.
21  A.   The household called me, asking me did they -- did I
22       know this guy because he kept calling asking these
23       questions.  And I told them I was off sick.  And they
24       asked me if I knew a Brian.  I said yes, he's coming
25       in, he's supposed to be checking my field area.

Page 186

1        Then she said well, he's asking me these
2        questions about TVs in the home, if you ever lied, did
3        you ask us did we not have any TVs metered on purpose
4        and that she knew about.  And she said that she kept
5        asking like why would you ask me this if you're from
6        out of town?  And she said the manager -- he said that
7        the manager told him to ask these questions, and that
8        was Ryan.
9   Q.   Do you know if Ryan did that?
10  A.   I have no idea.  I know that the lady of the house
11       called the head of Nielsen field reps.  She e-mailed
12       them and she wrote something on the Better Business
13       Bureau about the situation.  When I came back to work,
14       I set a fault date to go to that home.  When I went to
15       that home -- or when I was on the way to that home,
16       Ryan took that home out of sample.  The lady of the
17       house got upset and at that time I found out I was
18       suspended later on that day.  And Ryan went back to
19       that home and gave them $700 for the incident because
20       he was wrong for it and he apologized for it.
21            MARKED FOR IDENTIFICATION:
22            DEPOSITION EXHIBIT 19
23            12:57 p.m.
24  BY MS. NORRIS:
25  Q.   I'm handing you Deposition Exhibit 19.  Is this the

Page 187

1        e-mail that the woman sent?
2   A.   Yeah, I guess, yes.
3   Q.   Okay.  If you go down about two-thirds, there's a
4        sentence that starts, we began getting harassing
5        calls.  Can you find that for me?
6   A.   Yes.
7   Q.   Do you see that?
8   A.   Yes.
9   Q.   It says we began getting harassing calls and texts
10       when Dave was out on leave.  A person named Brian
11       called and texted relentlessly attempting to gain
12       access to my home because one of our televisions, he
13       said, was not reporting.
14           Do you know if it is true that one of their
15       televisions was not reporting?
16  A.   I don't know because I wasn't supposed to be looking
17       at company stuff, so I was on a sick leave.
18  Q.   Okay.  All right.  She next says we unplugged all our
19       appliances, including Nielsen equipment, to protect it
20       during a storm and one of our children hadn't plugged
21       it back in.
22           If that's true, in other words, if they
23       unplugged everything and then they didn't plug
24       something back in, would that show that it was not
25       reporting?

Page 188

1   A.   Yes.
2   Q.   All right.  And that would be a problem, correct?
3   A.   It would be a problem to that date and it would fix
4        itself the next day.
5   Q.   Then it says Brian continued harassing us and finally
6        said Dave told him to call us and text us.
7            And your testimony, as I understand, is I
8        never talked to Brian, I didn't tell him to do
9        anything; is that right?
10  A.   Brian never called me.  And the lady of the house said
11       did you give Brian the okay to come over?  And I told
12       her that I was out sick and I haven't contacted
13       anyone, that's the only thing I told her.  And then
14       she said that --
15  Q.   Okay.  But just -- I haven't asked what she said,
16       except what I just read.
17           You told me, and I understand your
18       testimony to be that the statement that you told Brian
19       to call her was false, right?
20  A.   Yes.
21  Q.   All right.  And then when she says he claimed Dave was
22       the one who sent him specifically, that's false --
23  A.   Correct.
24  Q.   -- correct?
25           Okay.  She then says I called Dave and

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

Page 201

1  they weren't going to take the position because it was
2  lateral and it wouldn't be more money.  So they
3  wouldn't take it because they were going to lose their
4  bonuses so -- which meant I was going to get the
5  position.
6          At that point I had heard -- that brings up
7  something else.  That's when I heard that Ryan was
8  saying he wasn't going to let me go.  He could make
9  the decision not to let me go if he felt like it was
10  going to hurt the market or -- he had the last say to
11  say yeah, he can go or no.
12 Q. Who was the hiring manager?
13 A. I don't know who because they told me Nielsen was
14  still trying to formulate everything and that's why it
15  was never a green light at the time I was there.
16 Q. Who interviewed you?
17 A. It was three managers, I can't recall who it was.  It
18  was like a panel telephone conference and they all
19  jumped on asking me questions.
20 Q. Who told you that you were going to get the position,
21  that you were the only one left?
22 A. HR.  They had called to tell me that the position was
23  still being considered because it had been so long
24  because Nielsen was trying to finalize it, but they
25  told me that it was between me, Tim and Bill Fields.

Page 202

1  But they said that after talking to them, since it was
2  a lateral move, that they wouldn't take the positions
3  and they didn't -- I found out they didn't take the
4  position, they're still there and somebody else took
5  it, Brian took it.
6 Q. Who got the position?
7 A. Brian Burkhardt.  He didn't interview for the
8  position, but when I got fired they had to have
9  another candidate and he put in and got it, but --
10 Q. Do you know if Ryan Dinsmore had the right to not
11  allow you to transfer?
12 A. He had the right -- as far as what I was -- as far as
13  what I heard, because he did the same thing to Ed
14  Chesney.  Ed said that they -- well, Ryan or the Ohio
15  manager denied him transferring back to his family in
16  Ohio.  And he told me that the managers can do that if
17  they feel like the market is going to hurt or
18  something like that, if it's an
19  inside-the-same-position move.
20 Q. So he wouldn't let Ed Chesney transfer?
21 A. At the time, that's what Ed said.  He made the comment
22  about it.  He said the managers have the right -- if
23  you're transferring within the field rep department, a
24  manager has a right to deny it.  But if you're
25  transferring outside the department, they can't.  So

Page 203

1  if I wanted to go to marketing or something like that,
2  that's something different, he has no control over it.
3 Q. So audit is not considered outside the department?
4 A. Because it's still dealing with field reps.  I'm
5  auditing field reps.
6 Q. What's Ed Chesney's race?
7 A. White.
8 Q. Did you ever get anything in writing saying you got
9  the job?
10 A. No, because they was still trying to finalize.  They
11  were just telling me I was on the short list and that
12  they were still coming up with all the terms and the
13  pay and everything for the position.
14 Q. Do you know when Brian Burkhardt started in the job?
15 A. After I quit.
16 Q. Do you know how much longer?
17 A. No, I found that out in passing.
18 Q. Is it HR that told you that Mr. Dinsmore wouldn't let
19  you move or somebody else?
20 A. HR, when I asked them, said that Ryan could deny me if
21  I can move.
22 Q. Did they tell you that he was in fact doing that?
23 A. No.  I found out from -- Raul was talking to James
24  Hardy while I was walking into the storage site and
25  Raul had said it.  He was saying that the market was

Page 204

1  so messed up right now, Ryan is not going to let
2  anybody move.  And I heard Dave was trying -- James
3  said that I heard Dave is trying to move up.  And as I
4  was walking in I stopped and he said yeah, I doubt
5  he's going to let him move because who is going to
6  fill 6272.
7 Q. Okay.  Am I correct that Raul is a coworker?
8 A. Raul is a supervisor, yes.
9 Q. This is Mr. Mata?
10 A. Yes.
11 Q. Okay.  He's your immediate supervisor?
12 A. Yes.  Him and James Hardy are best friends.
13 Q. Okay.  Were they specifically talking about you and
14  your application or they were talking generally about
15  the area was a mess and Mr. Dinsmore wasn't letting
16  people move?
17 A. They were talking general as to things was a mess
18  because at the time James Hardy was fatigued with the
19  job.  He was ready to quit.  He was like on the verge
20  of saying he was about to have a mental breakdown.
21  Then Raul made the comment about Ryan I guess heard
22  the comments about me interviewing for the new
23  position.  He had to know about it because I had to
24  ask him if I could apply for it.
25 Q. And you did ask him?

**CAUDLE, DAVID**
05/15/2019

Pages 213–216

Page 213

1  Q. You've been handed Deposition Exhibit Number 22. Take
2     a look at this packet?
3  A. Okay.
4  Q. Do you have any memory of this event?
5  A. Yes, I do.
6  Q. What do you remember about this?
7  A. There was a back room of a home. The lady had
8     somebody moving in, they were supposed to be bringing
9     a TV. So I kept the equipment at the entertainment
10    stand. When the lady called, I was either sick or on
11    vacation. I believe I was sick at this time.
12           So she -- me and Ryan did the call and they
13    found everything in the middle of the room. And the
14    lady told me she was painting so it wasn't -- I didn't
15    leave it in the middle of the room. So Ryan had an
16    issue with it, but I told him it was something not in
17    my power because we leave equipment in homes all the
18    time.
19 Q. Where did you leave the equipment when you left it?
20 A. Behind the entertainment stand where the old TV was.
21 Q. Was it hooked up when you left?
22 A. It was not hooked up because there was no TV there.
23    The lady's friend that was moving in was bringing a
24    TV, that's why I left the equipment there. She said
25    she would be moving in within a week, then I got sick,

Page 214

1     so the equipment stayed there.
2  Q. In Ryan's e-mail, which is on the second page, he says
3     that there was equipment behind the TV, but that the
4     sites were messy. Do you know if that's true?
5           MR. GALLAGHER: Objection; form,
6     foundation.
7  A. I don't know because somebody moved out and somebody
8     was moving in. So I don't know if they junked it up
9     and moved my stuff around. I have no intake (sic) on
10    if somebody is moving out or what they did prior to me
11    being there.
12 BY MS. NORRIS:
13 Q. So you said we leave equipment in the homes all the
14    time?
15 A. Yes. If you have equipment and we sometimes run short
16    of equipment and you know -- let's say today is Monday
17    and next Tuesday they're buying a new TV, you're not
18    going to bring up -- take out that old equipment and
19    then bring in new equipment that Tuesday and have to
20    meter everything all over again. You leave that
21    equipment in and you take it out the site, but you
22    leave the equipment there and then you just hook it
23    back up because it makes it easier on you, less time
24    in the home and you can get to more field calls.
25 Q. When you left the equipment, did you know when they

Page 215

1     were going to have the new TV to hook it up?
2  A. She told me, the lady of the house, was moving in
3     within a week or so, so I was going under the
4     impression that within seven days. But then, again, I
5     got sick, so I don't know how long this is behind
6     that.
7  Q. If you leave equipment in the home does that get
8     registered somewhere?
9  A. Yes. We leave it in the site drawing and say it's
10    out, like it's not hooked up to anything, but it's in
11    the home.
12 Q. Do you know if this was registered?
13 A. Yes.
14          MARKED FOR IDENTIFICATION:
15          DEPOSITION EXHIBIT 23
16          1:40 p.m.
17 BY MS. NORRIS:
18 Q. Exhibit 23 is another set of e-mails, also
19    September 7th. Take a minute and look at these?
20 A. Okay.
21 Q. Do you have any reason to dispute what Mr. Mata says?
22 A. I don't know what he's talking about. I mean, he says
23    master bedroom, he doesn't say what home. I -- I
24    don't know, it could be anything. But he's not
25    talking to me, he's talking to Ryan so --

Page 216

1  Q. I'm asking --
2           MR. GALLAGHER: Can he please finish his --
3  A. I'm trying to understand. Like you asked me do I know
4     anything about this. I was never told about it, so I
5     don't know what it's talking about.
6  BY MS. NORRIS:
7  Q. Okay. So you don't know if it's right or wrong?
8  A. Right. I was never contacted about it.
9  Q. What is Mr. Mata's race?
10 A. Mexican, Mexican-American. But I would like to bring
11    up --
12 Q. Go ahead.
13 A. I'm seeing all these comments, but I was never like
14    brought up like, Dave, you need to fix this, this and
15    that. It's -- it's talk, but it's never anything set
16    up to say, Dave, we need you to -- there's questions
17    asked, but it's never, Dave, you need to do this.
18 Q. Were you on a leave on September 7th, 2016?
19 A. I'm not sure.
20 Q. Reading the first page, what Mr. Mata says --
21 A. Yeah, I was because the last page was September 7th
22    and it is Shermir and Ryan at the house and I was on
23    leave at that time, that's why Shermir was doing the
24    call.
25 Q. Okay. So you wouldn't expect to be contacted to tell

Page 217

1   you what you need to improve while you are out on a
2   leave, would you?
3   A.  They did it all the time.
4   Q.  They called you up and told you you have to fix
5       something?
6   A.  Ryan called me, asked me to contact homes.
7   Q.  Okay.  I'm asking if you would expect to have somebody
8       give you a --
9   A.  Yes.
10  Q.  -- discipline or a reprimand or something like that
11      while you've out on a leave?
12  A.  Yes.
13  Q.  Were you ever disciplined while you were out on a
14      leave?
15  A.  I don't know disciplined.  They asked me what's going
16      on with this home or --
17  Q.  Okay.  That's asking for information, right?
18  A.  No, that's -- could be discipline.  It could be what's
19      going on with this home, we found this out, and
20      they're asking a question.  It starts off as
21      discipline, but then when I give a clarification it's
22      not because they need insight to fix it.
23  Q.  Do you understand that if there were six MUs scanned
24      to the home and there were only four sites that would
25      be a problem?

Page 218

1            MR. GALLAGHER:  Objection, form and
2       foundation.
3   A.  Again, I don't know what this home is so I can't say.
4       I could see it being an issue, but I don't know if I
5       actually did it or not.
6   BY MS. NORRIS:
7   Q.  Okay.  I'm not asking if you did it or not.  I'm
8       asking if you understand that that would be a problem?
9            MR. GALLAGHER:  Same objection.
10  A.  I could see it's a problem if -- somebody that did it,
11      but I don't know what the premise is behind it so --
12      and actually, some of this stuff is 2010, 2016 it was
13      scanned to the home, 2015.  So I don't -- really can't
14      recall.  Since I wasn't contacted, I don't know.
15           MARKED FOR IDENTIFICATION:
16           DEPOSITION EXHIBIT 24
17           1:44 p.m.
18  BY MS. NORRIS:
19  Q.  You've been handed Deposition Exhibit Number 24, which
20      is a September 27th, 2016 e-mail to Ryan Dinsmore from
21      Ryan Dinsmore regarding an incident that Dave Shock
22      was involved in.  Do you know anything about this?
23  A.  Yes.
24  Q.  Tell me what you know?
25  A.  This lady, partially blind, her TV went out.  Her flat

Page 219

1   screen went out in the back.  It wasn't working.  We
2   unplugged it, put the TV up.  She only had a TV in the
3   front.  The TV in the front went out.  And as I
4   coached her, per Nielsen policy, she was supposed to
5   call and let Nielsen know.  So she called, let Nielsen
6   know that the TV was out, but she also told them that
7   she hooked the TV up -- the flat screen back up and
8   that one started working.  So that's when Dave Shock
9   went out there to try to see what was going on.  He
10  made a bigger deal about it to Ryan, his
11  brother-in-law, trying to paint me in a picture --
12  paint me in a bad picture.
13  Q.  Did Ryan ever get married to Dave's sister?
14  A.  Yes.
15  Q.  How do you know that?
16  A.  Dave Shock told me.
17  Q.  That they were married?
18  A.  Yeah, because they -- it was casual conversation.  We
19      were at the picnic and their kids were talking.  And I
20      was like, Dave, you and Ryan know each other like
21      that?  He said yeah.  He told me the situation.
22  Q.  He said they were married?
23  A.  Yeah.
24  Q.  If Ryan testified under oath that he was never
25      married, do you have any reason to disbelieve that?

Page 220

1   A.  I don't know if they were married or they had a kid
2       together, it was one or the other.
3   Q.  Okay.  But he's not his brother-in-law if they're not
4       married, right?
5   A.  I'm going by what Dave Shock told me, so I don't know.
6       Or Dave Shock married --
7   Q.  If he was --
8            COURT REPORTER:  Hold on.
9   A.  -- Ryan's sister, it's either one way or another.
10           He was saying they were related, I forget.
11  BY MS. NORRIS:
12  Q.  I'm asking if you personally know if they're related?
13  A.  I'm going by what --
14           MR. GALLAGHER:  He testified --
15  A.  -- Dave Shock was telling me, so that's my own
16      personal instance on it at the company picnic when I
17      saw their kids playing and he told me.
18  BY MS. NORRIS:
19  Q.  If you look at the second paragraph, it says they went
20      to the bedroom and she told the FR -- what does FR
21      stand for?
22  A.  Field rep.
23  Q.  Okay.  That Dave Caudle had been out there to fix our
24      equipment on her TV, but wasn't able to so he asked
25      her not to use the TV and unplugged the MU from the

Page 221

1   wall.  Is that true?
2   **A.   Yes.**
3   Q.   Okay.  Then it says --
4            MR. GALLAGHER:  Do you want to answer the
5   question?
6   **A.   Yeah.**
7            MR. GALLAGHER:  He --
8            MS. NORRIS:  He said it's true.
9            MR. GALLAGHER:  I know, then he was about
10  to talk and you -- like you've been doing this entire
11  deposition, you began and -- you talked over him and
12  began your next question.  He's going to finish his
13  answer.
14  **A.   Per Nielsen protocol, the TV wasn't working so I**
15  **unplugged the TV because it couldn't get any channels**
16  **on it.  I unplugged the MU because the MU would have**
17  **been giving out false codes because nothing was hooked**
18  **up to it.**
19           MS. NORRIS:  Okay.  I want to be clear.  My
20  question was, is that true.  I did not ask for an
21  explanation --
22           MR. GALLAGHER:  Okay.
23           MS. NORRIS:  -- okay?
24           So when he said yes, that's the answer to
25  the question.

Page 222

1            MR. GALLAGHER:  That you're looking for and
2   then he's continuing talking.  He has testimony.  He
3   can give his testimony.
4            MS. NORRIS:  So you can ask him all the
5   questions you want --
6            MR. GALLAGHER:  Sure, and I will.
7            MS. NORRIS:  -- and he can talk as much as
8   he wants.
9            My question was, is it true.  He does not
10  have a right to just start talking about any subject
11  he wants to.
12           MR. GALLAGHER:  It's not any subject.  It's
13  in context to your exact question.  Is it true, yes,
14  but is a completely -- actually it's the preferred
15  answer because then we get clear testimony because
16  that's all we're here to do today, right?
17           MS. NORRIS:  I'm here to get the answers to
18  the questions that --
19           MR. GALLAGHER:  That you want.
20           MS. NORRIS:  No.  The questions that I'm
21  interested in asking.
22           MR. GALLAGHER:  And he's trying to give you
23  that, but you're talking over him every -- whenever he
24  does this entire day.  This transcript is going to be
25  a mess because every single time he's trying -- when

Page 223

1   he starts talking about stuff you don't want to hear,
2   you just cut him off and start asking your next
3   question.
4            MS. NORRIS:  Right.  It's my right to
5   determine what topics I want to ask about.
6            MR. GALLAGHER:  Sure.  But he has a right
7   to give testimony as a person in a fair way and this
8   is not that.
9   BY MS. NORRIS:
10  Q.   Mr. Caudle, do you think that anything that you've
11  said to me today is incorrect?
12  **A.   I don't think it's fully my whole comment, but**
13  **that's -- let's continue on.**
14  Q.   All right.  Am I correct -- I think that the answer is
15  yes, but I want to make sure.  Am I correct that you
16  agree that you asked the woman not to use the TV and
17  unplugged it?
18  **A.   I did not ask her not to use the TV.  I told her we**
19  **couldn't get any channels on the TV so we couldn't use**
20  **it --**
21  Q.   Okay.
22  **A.   -- that's a difference.**
23  Q.   Did you tag the TV?
24  **A.   Yes.**
25  Q.   So when this statement says, but did not unplug the TV

Page 224

1   or tag it, that's incorrect?
2   **A.   Yes.**
3   Q.   Do you know if Dave Shock told Mr. Dinsmore that you
4   did not tag the TV?
5            MR. GALLAGHER:  Objection.
6   **A.   Probably so because Dave Shock wanted to get me fired**
7   **so --**
8   BY MS. NORRIS:
9   Q.   Why did Dave Shock want to get you fired?
10  **A.   Because he's full of it.**
11  Q.   What do you mean?
12  **A.   He has an issue with me and I don't know why.**
13  Q.   Okay.  Would Nielsen records show if a TV was tagged
14  or not?
15           MR. GALLAGHER:  Objection, form and
16  foundation.
17  **A.   It's a piece of paper tagged on a TV, so it wouldn't**
18  **be Nielsen -- it's up to protocol.  It could have been**
19  **on there and he took it off, so that's up to**
20  **assumption.**
21  BY MS. NORRIS:
22  Q.   Okay.  Does it get logged somewhere, if you tag
23  something does it get logged in the system?
24  **A.   It should be logged saying TV tagged, but that can be**
25  **amended in the computer too.  So there's nothing**

Page 229

```
 1      when I was coming back to work.  Then he called me
 2      after I was about to run a call to the Rusnichan
 3      house.  I called him to ask him why the house was
 4      taken out of sample.  He couldn't give me an answer.
 5      He said let me call to find out what happened.
 6              Then I called to let them know I wasn't
 7      going to be able to come out so they could free up
 8      their time.  And then the next thing I know Ryan
 9      called to let me know that I was suspended, called me
10      back to let me know that I was suspended, with HR on
11      the phone.
12  Q.  Okay.  So you had actually started working, you
13      started going to a home --
14  A.  Yes.
15  Q.  -- and you were told never mind, you're suspended?
16  A.  No.  I went to the home -- on my way to the home and
17      when I pulled it up, to try to see what was going on
18      in the home, I noticed that the home said taken out of
19      sample.  So I called Ryan, like I just made this
20      appointment yesterday, so why is the home taken out of
21      sample?  He said I don't know who did it, let me find
22      out.
23              So I was like okay.  I called Ms. Rusnichan
24      to let her know that I wouldn't be coming out because
25      the home was taken out of sample, there was no reason,
```

Page 230

```
 1      so to free up her time.  I told her.  She was very
 2      upset.  I told her, I'll find out what's going on,
 3      I'll call you back.  The next time I got a phone call,
 4      it was Ryan and HR, and he let me know that I was
 5      suspended pending an investigation.
 6  Q.  Who at HR was on the phone, if you know?
 7  A.  Denise-something and somebody else.
 8  Q.  Do you think there were two other people?
 9  A.  Yes, I believe so.
10  Q.  Did you ever clear errors without investigating the
11      issue at the house?
12  A.  What house?
13  Q.  Any house.  Did you ever clear an error without
14      actually going to look at it?
15          MR. GALLAGHER:  Objection; form,
16      foundation.
17  A.  We -- all field techs have, depending on what the
18      error was.
19  BY MS. NORRIS:
20  Q.  Under what circumstances would you clear an error
21      without going to look at it?
22  A.  Let's say the MU just needs to be rebooted.  You pull
23      up to the home, you force a reboot, then everything
24      goes green, everything is working and you do checkouts
25      and everything passes.
```

Page 231

```
 1  Q.  Okay.
 2  A.  At that point, you would clear the error saying that
 3      it was a malfunction of the equipment.  You didn't
 4      have to bother the household because they weren't
 5      there and you fixed it.
 6  Q.  But am I correct in that case you went to the house
 7      and fixed it from outside?
 8  A.  Yes.
 9  Q.  Okay.  Would there ever be a situation where you would
10      clear an error without going to the house at all?
11  A.  Depending if the error was old.  Let's say the error
12      was three days ago and the error hasn't happened since
13      then, you could clear it.
14              Or if the error was already a
15      household-known behavior.  Say somebody fell asleep
16      watching the TV and it was the man of the house.  And
17      you saw the man of the house watching TV and then it
18      was two hours of just nobody watching, nobody was
19      logged in, but the last person there was the man of
20      the house at 10:00 p.m.  So you know his known
21      behavior was watching TV, falling asleep with it on.
22      So you would write, known behavior, man of the house
23      fell asleep watching TV.
24  Q.  Okay.  So you would write that down?
25  A.  Yes.  It's already noted, you talked to the household
```

Page 232

```
 1      to let you know.
 2  Q.  How many homes did you try to see in a day when you
 3      were making your calls?
 4          MR. GALLAGHER:  Objection; form,
 5      foundation.
 6          MS. NORRIS:  What's wrong with that?
 7  A.  I don't know.
 8          MS. NORRIS:  What's wrong with how many
 9      homes would you see in a day when you were making your
10      calls?  What form and what foundation is the problem?
11          MR. GALLAGHER:  Foundation?
12          MS. NORRIS:  Yeah.
13          MR. GALLAGHER:  That he would -- okay.
14      Foundational?
15          MS. NORRIS:  Yeah.  He's making the calls.
16      I'm asking him, how many homes would you see in a day
17      when you were making the calls.  What is wrong with
18      that question?
19          MR. GALLAGHER:  Okay.  Yeah,
20      foundational-wise?
21          MS. NORRIS:  Yeah.
22          MR. GALLAGHER:  We haven't established that
23      he makes these calls, we haven't established that he
24      goes every day, we haven't established --
25          MS. NORRIS:  I haven't said anything every
```