UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


DAVID CAUDLE,

          Plaintiff,                              Case No. 17-13737

vs.                                              HON. MARK A. GOLDSMITH

THE NIELSEN COMPANY (US), LLC,

          Defendant.

_____/

## OPINION & ORDER
## GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Dkt. 36)

Defendant The Nielsen Company ("Nielsen") has filed a motion for summary judgment on Plaintiff David Caudle's nine-count complaint. Nielsen Am. Mot. for Summ. J. (Dkt. 36). In the complaint, Caudle alleged that he experienced harassment, discrimination, retaliation, and intentional infliction of emotional distress while working at, and being discharged from, Nielsen. Am. Compl. (Dkt. 10). Several of these counts have been conceded or lack sufficient basis in law or fact. However, Caudle has presented sufficient evidence to create a genuine dispute of material fact on his claims of disability discrimination and retaliation for use of leave guaranteed by the Family and Medical Leave Act ("FMLA"). Therefore, Nielsen's motion is granted in part and denied in part.[1]

---

[1] The motion has been fully briefed. Because oral argument will not assist in the decisional process, the motions will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b).

# I. BACKGROUND

## A. Caudle's History at Nielsen

Nielsen hired Caudle as a field representative in May 2012. Statement of Additional Material Facts ¶ 1 ("SAMF") (Dkt. 43); Caudle Dep., Ex. A to Resp., at 56 (Dkt. 43-1). He serviced "Nielsen homes," which are homes in which Nielsen installs equipment and software to monitor consumers' viewing habits on televisions and other viewing devices. Am. Mot. at 1; Statement of Facts ¶¶ 1, 8-10 ("SOF") (Dkt. 36). The data collected from homes in Nielsen's samples produce the Nielsen ratings, which are sold to producers of television content and advertisers. Am. Mot. at 1.

Caudle claims that he had a "near perfect work record" and won Field Representative of the Month awards, although he received a "write-up" in the form of a Performance Improvement Plan ("PIP") in July 2014. SAMF ¶ 1; see also July 2014 PIP, Ex. 10 to Am. Mot. (Dkt. 36-11). The PIP highlighted Caudle's failure to resolve data and equipment errors concerning his Nielsen homes, a discrepancy in the reported gender of two members of a household, and a low rate of "metering" personal computers (installing Nielsen software to track computer use). July 2014 PIP; SOF ¶¶ 11-14. Caudle, an African-American man, has alleged that the imposition of the PIP was racially discriminatory, and he testified that other field representatives had made similar mistakes without receiving a PIP or discipline. SAMF ¶ 1; Caudle Dep. at 100-107, 151-160. He testified that other employees laughed when asked if they had ever heard of someone being disciplined for having a low personal computer enrollment percentage. SAMF ¶¶ 12-13; Caudle Dep. at 106. At year-end evaluations, Caudle scored a 3.0 (meets expectations) for his 2012 and 2013 performances, a 2.0 (partially meets expectations) for 2014, and a 3.0 (meets expectations) for 2015. 2012 Nielsen Performance Evaluations, Ex. 8 to Am. Mot. (Dkt. 36-9); 2013 Nielsen Performance Evaluations, Ex. 9 to Am. Mot. (Dkt. 36-10); 2014 Nielsen Performance Evaluations,

Ex. 11 to Am. Mot. (Dkt. 36-12); 2015 Nielsen Performance Evaluations, Ex. 12 to Am. Mot. (Dkt. 36-13).

Caudle has sickle cell anemia and has taken several leaves of absence from Nielsen due to the restrictions the disease places on his ability to work and the need to receive treatment. SAMF ¶¶ 4-5. Caudle could not remember precisely how many leaves of absence he took related to sickle cell anemia. Caudle Dep. at 132-133.

The record also reflects two leaves of absence for injuries unrelated to sickle cell. In November 2014, he experienced a back injury while on the job, for which he received workers' compensation. Caudle Dep. at 159-162. He was on leave until January 13, 2015. Id. When Caudle returned from this injury, Field Supervisor Ryan Dinsmore, created a "light duty" position for the approximately two weeks Caudle worked under restrictions. Id. at 163. Caudle also took a leave of absence sometime around May 2016 related to an arm injury that he claims stemmed from an on-the-job injury, for which he did not received workers' compensation. Id. at 177-184.[2]

Caudle went out on leave related to sickle cell anemia on August 8. Id. at 182. He appears not to have returned until October 6, 2016, when he was suspended pending an investigation that resulted in his termination. Id. at 182-184; SAMF ¶ 5.

Caudle was terminated on October 12, 2016. Termination Letter, Ex. 20 to Am. Mot. (Dkt. 36-21). On and after October 12, 2016, Caudle contacted individuals at Nielsen, in part to ask how Nielsen handled harassment claims. See Investigation Summary, Ex. 21 to Am. Mot., at 2 (Dkt. 36-22); October 2016 Email Thread (Caudle and Fantarella), Ex. 22 to Am. Mot (Dkt. 36-23). Denise Fantarella, a human resources manager, investigated Caudle's allegations of discrimination. See Investigation Summary; October 2016 Email Thread (Caudle and Fantarella).

---

[2] Caudle took two leaves of absence around May 2016—one for his arm injury and one for sickle cell—but his deposition testimony did not establish which was which.

Apparently, her investigation consisted largely of a conversation with Dinsmore and reached the conclusion that no discrimination occurred. Fantarella Dep., Ex. G to Resp., at 15-16 (Dkt. 43-7).

Caudle filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on October 24, 2016, alleging retaliation and discrimination based on race and disability between October 7, 2016, and October 12, 2016. EEOC Charge, Ex. 31 to Reply (Dkt. 46-5). The EEOC closed its file and informed Caudle of his right to sue on August 18, 2017. EEOC Dismissal and Notice of Rights, Ex. 23 to Am. Mot. (Dkt. 36-24).

### B. Nielsen's Purported Basis for Termination

The parties present competing narratives of the circumstances leading up to Caudle's termination. In Nielsen's version of events, its employees discovered numerous errors while servicing the homes Caudle usually serviced. See SOF ¶¶ 19-23.[3]

Household #1

On September 6, 2016, two Nielsen employees visited a house and reported finding a messy "prepack" of equipment. 9/7/2016 Emails, Ex. 15 to Am. Mot., at 3 (Dkt. 36-16). Caudle explained that he left the prepack there intentionally because the household was expecting a new television when a new person moved into the household. Caudle Dep. at 213-214. He attributed the mess to the fact that the room was being painted and that a new resident was moving in. Id.

Household #2

In a second incident, an employee named Dave Shock serviced Household #2 on August 19, 2016, after the household's cable service was shut off. 9/27/16 Email, Ex. 17 to Am. Mot.

---

[3] Nielsen appears to have assigned numbers to the four households at which incidents leading to Caudle's termination occurred. See, e.g., Investigation Summary at 2. The Court adopts these designations and refers to the households described in SMF ¶¶ 19, 20, 21, and 22 as Households #1, #2, #3, and #4, respectively.

(Dkt. 36-18).[4]  The household member told Shock, and later Dinsmore, that she had a television in her bedroom in addition to the metered television in her main room.  Id.  This contradicted Caudle's report that she only had one television.  Id.  The household member said that Caudle had attempted to fix equipment on her television but had been unable to, so Caudle instructed her not to use that television.  Id.  Dinsmore's email also noted a discrepancy in the records of how many times Caudle had visited the home in July 2016.  Id.[5]

Household #3

In reference to a third home, Dinsmore reported that Shock told him that he visited one of Caudle's homes and learned that the household had six televisions, only two of which were metered and known to Nielsen.  September-October 2016 Email Thread, Ex. 18 to Am. Mot. (Dkt. 36-19); Investigation Summary.  Caudle testified that he did not know about these televisions, that he had not been granted access to the areas where the unmetered televisions were located, and that residents of Nielsen homes frequently lie about the number of televisions they have.  Caudle Dep. at 240-244.  Caudle also named Nielsen employees who had not been terminated for similar incidents.  Id. at 245.

Household #4

_____

[4] David Shock is the brother of Ryan Dinsmore's former girlfriend.  Dinsmore Dep., Ex. B to Resp., at 129-130 (Dkt. 43-2).  Caudle apparently thought that Dinsmore and Shock were brothers-in-law, Caudle Dep. at 219, but Dinsmore testified that he and Shock's sister were never married, Caudle Dep. at 129-130.

[5] In reference to this incident, Nielsen writes, "Plaintiff admits that he was told an un-metered TV in a home meant automatic termination."  SMF ¶ 20 (citing Caudle Dep. at 244); see also October 2016 Email Thread (Caudle and Fantarella) (referenced as Dep. Ex. 26 in Caudle Dep. at 244).  But this "admission" deserves more context.  Caudle said at his deposition that Dinsmore told him that "if something is un-metered, it's automatic termination."  Caudle Dep. at 244.  However, the deposition question was in reference to an email in which Caudle told Fantarella that he did not know whether that was actually Nielsen policy.  October 2016 Email Thread (Caudle and Fantarella) at 3.  In that email, Caudle also asked why other individuals whose houses contained unmetered televisions had not been fired.  Id.

5

The final incident cited as a cause for termination involved a Nielsen home that employee Brian Molner covered for Caudle. See SOF ¶ 22; Investigation Summary at 2-3; Nielsen Complaint Email Thread, Ex. 19 to Am. Mot. (Dkt. 36-20). The Nielsen family reported that it began receiving harassing calls and texts from Molner when Caudle was out on sick leave. Id. at 2. They reported calling Caudle to confirm Molner's contention that Caudle had sent Molner to cover for him. Id. Caudle testified that he told the family that Molner was a representative from out of town who was covering his field area, but that he did not know him. Caudle Dep. at 184-192. Upon learning this information, the household member found that it was "very clear" Molner lied when he told the family that Caudle had personally sent him to service the house. Nielsen Complaint Email Thread at 2.

The household complained about the incident to Nielsen and filed a Better Business Bureau Report. Id. According to Nielsen, the household was pulled from the sample of Nielsen homes early and paid $425. Investigations Summary at 3. Caudle said that Molner asked the family whether Caudle had ever lied to the family and whether the family had any unmetered televisions. Caudle Dep. at 186. The household member largely confirmed Caudle's allegations that Molner encouraged or pressured the family to offer evidence of wrongdoing by Caudle. The household member wrote, "[Molner] attempted to bribe me with Visa gift cards to gain access to my home. Brian [Molner] also began asking insulting questions, like if Dave [Caudle] had ever offered us money or if Dave had ever asked us if we had any televisions we didn't want metered." Nielsen Complaint Email Thread at 3.

### C. Caudle's Allegations of Discrimination

Caudle alleges that he was fired because of his disability and as retaliation for exercising his rights under the FMLA, the Elliot-Larsen Civil Rights Act ("ELCRA"); Title VII of the Civil Rights Act of 1964 ("Title VII"), Michigan's Persons with Disabilities Civil Rights Act

("PWDCRA"), and the Americans with Disabilities Act ("ADA").  He also alleges a history of discriminatory treatment at Nielsen based on his race and disability.

Caudle's allegations of discrimination are largely focused on Dinsmore.  In the response, Caudle mentions two instances that he claims constitute direct evidence of racial discrimination.  Resp. at 26.  In one instance, Caudle claims that he was called "insubordinate" by Dinsmore.  Resp. at 26; Caudle Dep. at 102.  This appears to have occurred in 2013 or 2014.  Caudle Dep. at 97-104.  Caudle felt that he was being discriminated against after Caudle's former supervisor, Dave Demmon, was fired.  Id. at 100.  Caudle thought he was being targeted unfairly by audits that were supposed to be conducted at random.  Id. at 100-101.  These audits led to the PIP, and when Caudle complained about the PIP and the discriminatory audits, Dinsmore called him "insubordinate."  Caudle Dep. at 102.

The second incident involved another interaction with Dinsmore.  Caudle described the incident as follows:

> Nielsen sent out an e-mail asking if Nielsen was a nice place for African-Americans to work.  And I showed him the e-mail and I told him like why should I fill this out, this sounds sort of racist?  And he told me, you know, just fill it out, it's no big deal.  And I said well, it sort of is.  If it said is Nielsen an okay place for Indians or any ethnicity, why does it say African-American?  Why are they just singling out one race?  It didn't make much sense to me.  He said, Dave, why do you have to make everything such a big issue?  He was like, you know, I'm tired of you when you do that.  Just, you know, fill out the survey or don't fill it out, I don't really care.  He was like, you know, just do it or don't do it.

Caudle Dep. at 125.  He estimated that this event occurred in 2014.  Id.  Caudle continued with the following:

> He made the comment, you know, why you got to make such a big deal about it, like you're the only person that gives me this problem?  And I laughed and I said I'm just asking a question.  And he said, you know, I swear, you always ask a question like you're entitled.  And I laughed and I said I'm just asking for clarification why Nielsen is just asking about just black people.  And he said should it say you people or what, what would make you feel more happy and he giggled.  And I told him, I don't feel like that's funny, like what does you people mean?  And he just told me, he was like I'm not trying to be that way.  He said I'm just trying to say.  I said so why would you make a joke like that?  If we're talking about it,

why would you say, you know, you people?  And you told me, you know, you just make a big deal out of—about everything, either do it or don't do it, I don't really care.

Id. at 130.

Caudle also alleges that he was discriminated against because of his disability and his use of FMLA leave.  The crucial evidence is a series of email exchanges.  After receiving David Shock's report on Household #2, Dinsmore sent an email describing significant problems with one of the homes for which Caudle was responsible.  August-September Email Thread, Ex. D to Resp. (Dkt. 43-4).  Amanda Culver, a Human Resources Business Partner, wrote, "Remind me, is he out on some kind of leave right now?"  In response, Dinsmore wrote, "Yes he is.  This is the guy who is out on leave a few months/year."  Id.  Nielsen states in a footnote that Dinsmore's comments was untrue.  Am. Mot. at 19 n.11 ("In fact, Plaintiff was on leave for a few months in 2014-2015 and again in 2016, Dinsmore was simply identifying for HR who Plaintiff was on the list of individuals they were discussing").  After a few more emails, this thread concluded in an email from Dinsmore stating, "Since Dave Caudle is returning to work next Wednesday (10/5), how do we proceed?  Are we proceeding with Termination and if so, should I set up a meeting with Dave when he returns?"  August-September Email Thread at 1.

Caudle argues that Dinsmore's email reflects disdain for Caudle's disability and use of FMLA leave, particularly because of other comments Dinsmore had made in the past.  Caudle alleges that Dinsmore had made jokes about his disability, like saying to other co-workers, "You know how Dave is . . . don't cough around Dave or Dave will be out."  Caudle Dep. at 195.  This "joke," which Caudle heard, included the statement that other employees would have to cover for Caudle if he became sick.  Id.  In a series of internal email sent in May 2016, Dinsmore voiced suspicion to fellow management employees that Caudle was committing fraud and that he had a mental illness.  May 2016 Emails at 7.  Caudle alleges that Dinsmore sent mixed messages concerning whether Caudle should work while on leave, further supporting the claim that

8

Dinsmore did not respect the legitimacy of Caudle's disability. Caudle testified that Dinsmore would sometimes ask for Caudle to perform certain tasks while on leave. Caudle Dep. at 217. At other times, however, he told Caudle not to work while on leave. See Sept. 4, 2016 Email, Ex. C to Resp. (Dkt. 43-3). According to Caudle, Dinsmore's disdain for Caudle, rather than poor performance, motivated Dinsmore's decision to fire Caudle.

## II.    STANDARD OF REVIEW

A motion for summary judgment under Federal Rule of Civil Procedure 56 shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Once the movant satisfies its initial burden of demonstrating the absence of any genuine issue of material fact, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact. Scott, 550 U.S. at 380; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," Scott, 550 U.S. at 380 (quoting Matsushita, 475 U.S. at 586), as the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," id. (quoting Anderson, 477 U.S. at 247-248) (emphasis in original); see also Babcock & Wilcox Co. v. Cormetech, Inc., 848 F.3d 754, 758 (6th Cir. 2017) ("A mere scintilla of evidence or some metaphysical doubt as to a material fact is insufficient to forestall summary judgment.").

# III.    ANALYSIS

Nielsen has moved for summary judgment on all nine counts in the complaint.  For the reasons discussed below, its motion is granted with respect to six of these counts.  Those six counts will be discussed first, followed by a discussion of Caudle's disability discrimination and FMLA retaliation counts, which may proceed to trial.

## A.  Caudle's Title VII (Count I), ELCRA (Count II), and PWDCRA (Count VI) Retaliation Claims

Caudle has invoked the protections against retaliation guaranteed by the ELCRA, Mich. Comp. Laws. § 37.2701; Title VII, 42 U.S.C. § 2000e-3; and PWDCRA, Mich. Comp. Laws § 37.1602.  See Am. Compl. Counts I, II, and VI.[6]  As Caudle acknowledges, the first step of establishing a prima facie case of retaliation in violation of these statutes is showing that the plaintiff engaged in a protected activity.  Resp. at 25 (citing Reeder v. Cty. of Wayne, 177 F. Supp. 3d 1059, 1081 (E.D. Mich. 2016)).  Caudle claims that taking FMLA leave is a protected activity under these statutes, but he cites no law to support this proposition.  By contrast, Nielsen cites numerous cases holding that the use of FMLA leave does not constitute a protected activity under Title VII.  See Reply at 8 n.8 (citing, inter alia, Sotomayor v. City of New York, 862 F. Supp. 2d 226, 262 (E.D.N.Y. 2012), aff'd, 713 F.3d 163 (2d Cir. 2013)).

Caudle cites Title VII's opposition clause and argues that his complaints about discriminatory treatment, before and after his termination, constitute protected activity under Title VII.  Resp. at 26.  "The opposition clause of Title VII makes it 'unlawful . . . for an employer to discriminate against any . . . employe[e] . . . because he has opposed any practice made . . . unlawful

---

[6] In his response brief, Caudle also argues a retaliation claim under the ADA, 42 U.S.C. § 12203. Resp. at 25-26.  However, the complaint contains no allegation of ADA retaliation.  "A plaintiff may not expand his claims to assert new theories for the first time in response to a summary judgment motion."  Desparois v. Perrysburg Exempted Vill. Sch. Dist., 455 F. App'x 659, 666 (6th Cir. 2012).  His ADA argument is, therefore, dismissed.

. . . by this subchapter." Laster v. City of Kalamazoo, 746 F.3d 714, 729 (6th Cir. 2014) (citing 42 U.S.C. § 2000e-3(a)). But Title VII and the FMLA are distinct civil rights statutes, protecting different rights. Title VII makes it unlawful to discriminate against individuals based on their "race, color, religion, sex or national origin" and makes no mention of their use of FMLA leave. 42 U.S.C. § 2000e-2. Similarly, the ELCRA protects against discrimination based on "religion, race, color, national origin, age, sex, height, weight, or marital status." Mich. Comp. Laws § 37.2202. Nothing in the text of Title VII or the ELCRA suggests an intent to protect individuals who use FMLA leave. Because Caudle identifies no protected activity, his ELCRA and Title VII retaliation claims fail.

As to the PWDCRA retaliation claims, Nielsen cites Michigan case law holding that the PWDCRA does not require employers to grant any medical leave as an accommodation or a right to reinstatement at the conclusion of leave. Am. Mot. at 21 (citing Lamoria v. Health Care & Retirement Corp., 593 N.W.2d 699 (Mich. Ct. App. 1999); Kerns v. Dura Mechanical Components, Inc., 618 N.W.2d 56, 64 (Mich. Ct. App. 2000)). The PWDCRA's anti-retaliation provision prohibits retaliation or discrimination "against a person because the person has opposed a violation of" the act. Mich. Comp. Laws § 37.1602. Caudle makes no effort to rebut Lamoria or Kerns or to explain how engagement in an unprotected activity constitutes opposition to a protected activity. Therefore, Caudle has failed to show that he engaged in a protected activity under the PWDCRA.

Nielsen is granted summary judgment on Caudle's Title VII, ELCRA, and PWDCRA claims (Counts I, II, and VI).

**B. Caudle's Negligent Infliction of Emotional Distress Claim (Count IX)**

Nielsen argues that Caudle cannot establish negligent infliction of emotional distress because Michigan only recognizes this tort when a plaintiff witnesses negligent injury to a third party and suffers a mental disturbance as a result. Am. Mot. at 26 (citing Teadt v. Lutheran Church

11

Missouri Synod, 603 N.W.2d 816, 823 (Mich. Ct. App. 1999). Nielsen further argues that the Michigan Workers Disability Compensation Act would provide the exclusive remedy for such a claim. Id. (citing Hesse v. Ashland Oil, Inc., 642 N.W.2d 330 (Mich. 2002)). Caudle provides no response to these arguments. A plaintiff's failure to address certain arguments in a brief opposing a dispositive motion may be treated as a concession of the argument left unaddressed. Cunningham v. Tenn. Cancer Specialists, PLLC, 957 F. Supp. 2d 899, 921 (E.D. Tenn. 2013). Accordingly, Nielsen is granted summary judgment on Caudle's claim of negligent infliction of emotional distress (Count IX).

### C. Caudle's Race Discrimination Claims (Counts VII and VIII)

In the complaint, Caudle alleges that he was subjected to offensive communications or conduct on the basis of his membership in a protected class (African-American). Am. Compl. ¶¶ 151-163. Specifically, he refers to unwelcomed conduct or communication that substantially interfered with his employment and created an intimidating, hostile, or offensive work environment. Id. ¶¶ 158-161.[7]

In the response brief, Caudle's argument shifts from hostile work environment to allegations of disparate treatment. First, he attempts to establish a prima facie case of discrimination under a disparate-treatment theory by showing that (1) he is a member of a protected class; (2) he was qualified for the job and performed it satisfactorily; (3) despite his qualifications and performance, he suffered an adverse employment action; and (4) he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside his protected class. Resp. at 26 (citing Laster, 746 F.3d at 727)). Specifically, he argues that he

---

[7] Parallel claims under the ELCRA track the Title VII claims. Am. Compl. ¶¶ 164-174. Cases brought pursuant to the ELCRA are analyzed under the same evidentiary framework used in Title VII cases." Humenny v. Genex Corp., 390 F.3d 901, 906 (6th Cir. 2004).

applied for a position within the internal audit team and that the position went to a white employee who did not even apply.  See Am. Compl. ¶ 51; Caudle Dep. at 200-204; Dinsmore Dep. at 137-138.

The argument is threadbare and beyond the scope of the pleadings.  "A plaintiff may not expand his claims to assert new theories for the first time in response to a summary judgment motion."  Desparois v. Perrysburg Exempted Vill. Sch. Dist., 455 F. App'x 659, 666 (6th Cir. 2012).  By shifting from one Title VII theory to another, Caudle has arguably violated this rule.

But the argument would face a significant problem, even if Caudle had made it properly.  The position was filled after Caudle was terminated.  See Caudle Dep. at 202.  He was not, therefore, "similarly situated" to Brian Burkhardt, the individual hired for the position.  Caudle was no longer an employee, and Burkhardt was one.  Caudle cannot establish a prima facie case of discrimination based on a disparate-treatment theory, because he cannot satisfy the fourth element—that he was treated less favorably than a similarly situated employee outside of his protected class.

Additionally, Caudle's racial discrimination claims concerning earlier events occurring are time barred.  As evidence of racial discrimination, Caudle describes the events surrounding the PIP and the survey allegedly sent only to African-Americans.  Resp. at 26.  Both incidents occurred in 2014.  Caudle concedes that for a hostile-work-environment claim to reach back more than 300 days prior to his filing an EEOC complaint, he would have to show at least one actionable instance occurring within the 300-day window.  See Resp. at 20-21 (citing McFarland v. Henderson, 307 F.3d 402, 408 (6th Cir. 2002)).  He has not done so.

Although Caudle has presented some evidence of racial animus, he has not presented a timely, cognizable claim under Title VII or the ELCRA.  Therefore, Nielsen is granted summary judgment on Counts VII and VIII.

### D. Caudle's Disability Discrimination Claims (Counts IV, V)

Caudle presents viable claims of disability discrimination under the ADA and the PWDCRA. A plaintiff may overcome the barrier of summary judgment on an ADA discrimination claim in one of two ways: by presenting direct evidence of discrimination, or by presenting a prima facie case of discrimination under the familiar framework of McDonnell Douglas v. Green, 411 U.S. 792, 802 (1973). Ferrari v. Ford Motor Co., 826 F.3d 885, 891 (6th Cir. 2016).

Caudle presents his case under the direct evidence framework. See Resp. at 22. But he also "believes there are genuine issues of fact" if the McDonnell Douglas test is applied. Id. The Court construes these statements as arguments in the alternative for the direct and indirect evidence routes.[8] Caudle has not presented sufficient direct evidence of disability discrimination to defeat summary judgment, but he has done so with respect to indirect evidence.

### 1. Direct Evidence

Caudle's primary evidence of disability discrimination is the email in which Dinsmore wrote, "This is the guy who is out on leave a few months/year." August-September Email Thread at 2. Caudle argues that Dinsmore's comment displays prejudice because it refers to him "not by name, but instead by the amount of time he has missed because he was out sick." Resp. at 22. Caudle's argument fails because a factfinder would need to draw inferences to determine from that statement that Nielsen fired Caudle because of Dinsmore's prejudice against persons with disabilities.

---

[8] The decision to construe Caudle's argument in this manner does not prejudice Nielsen. In its motion for summary judgment, Nielsen briefed its case on the assumption that Caudle needed to prove a prima facie case of disability discrimination, a hallmark of the indirect evidence route. See Am. Mot. at 18-19. Furthermore, Caudle's indirect disability discrimination claim relies on the same evidence as the direct discrimination claim and the FMLA retaliation claim. Thus, Nielsen has had a fair opportunity to present its arguments opposing the conclusion that Caudle has presented sufficient evidence to defeat summary judgment on a disability discrimination claim proved by indirect evidence.

"Direct evidence of disability discrimination does not require the fact finder to draw any inferences [to conclude] that the disability was at least a motivating factor." Fisher v. Nissan N. Am., Inc., 951 F.3d 409, 416 (6th Cir. 2020) (citations omitted, modifications in original).[9] Nielsen argues that "[t]o come to the conclusion that there is direct evidence that Plaintiff's disability prompted his termination, a trier of fact would have to first infer that Dinsmore's statements and action show disdain for Plaintiff's illness, and then that such disdain may have played a role in the decision to terminate Plaintiff." Reply at 7 (citing Rowan v. Lockheed Martin Energy Sys., Inc., 360 F.3d 544, 550 (6th Cir. 2004)).

Whether a factfinder's need to draw those two inferences forecloses Caudle's direct evidence theory is a matter of some dispute. The Sixth Circuit has noted "some tension in [its] precedent on the issue of when direct evidence can be based on discriminatory statements that are not temporally proximate to an employment decision." Chattman v. Toho Tenax Am., Inc., 686 F.3d 339, 347 (6th Cir. 2012). And at least in certain cases, the Sixth Circuit has held or expressed through dicta that the process of gleaning a speaker's attitude from the words he or she uses does not qualify as an "inference" for the purpose of determining whether a direct evidence route is available. See, e.g., id.; Talley v. Bravo Pitino Rest., Ltd., 61 F.3d 1241, 1249 (6th Cir. 1995), overruled on other grounds by Gross v. FBL Fin. Servs., Inc., 557 U.S. 167 (2009); Tennial v. United Parcel Serv., Inc., 840 F.3d 292, 302 (6th Cir. 2016).[10]

---

[9] On the ultimate issue of liability, Caudle must prove that discrimination was the "but for" cause of his termination. See Lewis v. Humboldt Acquisition Corp., 681 F.3d 312, 318 (6th Cir. 2012) (en banc).

[10] In Tennial, for example, the plaintiff alleged that the defendant company's district president called another employee the N word and used the word "boys" in reference to Tennial's black coworkers. The court acknowledged, at the plaintiff's urging, that "the use of the word 'boy' can be discriminatory, based on factors such as context, tone, and local custom." Tennial, 840 F.3d at 302. But the court's refusal to categorize these statements as "direct evidence" had nothing to do with the need to "infer" the derogatory meaning from among many possible meanings of the word "boy." It refused to label the comment as direct evidence because doing so would require

It is beyond dispute, however, that vague, isolated, or ambiguous remarks cannot form the basis of a direct evidence case. See Peters v. Lincoln Elec. Co., 285 F.3d 456, 478 (6th Cir. 2002); Preston v. Great Lakes Specialty Fin., Inc., No. 1:15-cv-114, 2017 WL 1382814, at *5 (S.D. Ohio Apr. 18, 2017) (applying Peters to an ADA case), aff'd, 724 F. App'x 453 (6th Cir. 2018). Here, Caudle argues that Dinsmore's choice to identify him by his use of FMLA leave—leave his disability made necessary—unambiguously demonstrates Dinsmore's disdain. Resp. at 22.

Caudle's argument finds some support in the case law. In a case involving an employer who labeled an employee a "back case," the Sixth Circuit wrote the following:

> We also conclude that the district court too easily dismissed the 'back case' memo as direct evidence of discrimination by the employer. Not only does the note identify Ross as a 'problem person,' a comment which cannot be taken in a positive light, but it also identifies him as a 'back case.' The ADA was enacted, in part, to eliminate the sort of stereotyping that allowed employers to see their employees primarily as their disabilities and not as persons differentlyabled from themselves. That the note's author would think to identify Ross with the scrawled post-script 'back case' demonstrates that there is at least a genuine issue of material fact that Campbell Soup Co. regarded Ross through the lens of his medical condition. It is precisely this sort of limited vision that the ADA seeks to eliminate.

Ross v. Campbell Soup Co., 237 F.3d 701, 707 (6th Cir. 2001). And in a case cited by Nielsen, the Sixth Circuit accepted the equation of a racial slur with a comment referring to an individual as "the mentally ill the guy on Prozac that's going to shoot the place up." Hopkins v. Elec. Data Sys. Corp., 196 F.3d 655, 658, 661 (6th Cir. 1999).[11]

Identifying an individual by or with his disability—or one of its implications, such as the need to use FMLA leave—will be direct evidence of discrimination in some cases. E.g. Ross, 237 F.3d at 707. But employers will sometimes have innocent reasons to refer to their employees'

---

inferences that animus demonstrated in a different context motivated the adverse employment action. Id.

[11] Hopkins ultimately dismissed the direct evidence case because this statement was isolated and ambiguous. 196 F.3d at 661.

medical conditions.  See, e.g., Hedrick v. W. Reserve Care System, 355 F.3d 444, 455 (6th Cir. 2004) (finding that an allegedly discriminatory comment was "clearly an expression of concern" for the plaintiff's ability to perform the job rather than the sort of "clearly discriminatory" comment at issue in Ross).

Here, Dinsmore defended his email by testifying that when he wrote that email, "that was more or less to let [Culver] know which person I was referring to."  Dinsmore Dep. at 63.  "That would bring familiarity, I guess, to it.  This was just a quick email response to her, just to say remind me as to who this is—which—which person this is, you know."  Id. at 65.

A finder of fact need not accept this explanation, for reasons discussed below.  But a jury could reasonably credit Dinsmore's explanation and find his comment innocent, so the email does not <u>require</u> the conclusion that unlawful discrimination motivated Dinsmore's adverse employment action.  See Martin v. Huron Valley Ambulance, Inc., 226 F. Supp. 3d 871, 881-882 (E.D. Mich. 2016).  Therefore, Caudle's direct evidence case is not viable.

## 2.  Indirect Evidence

A plaintiff seeking to establish his or her case indirectly, without direct proof of discrimination, may do so using the McDonell Douglas framework.  First, the plaintiff must set forth a prima facie case of discrimination.  Ferrari, 826 F.3d at 891.  "Once the plaintiff establishes a prima facie case under the indirect method, the burden shifts to the defendant to offer a legitimate explanation for its action. . . . If the defendant does so, the burden then shifts back to the plaintiff, who must introduce evidence showing that the proffered explanation is pretextual."  Id. (citations omitted).

First, Caudle must establish a prima facie case of discrimination by showing the following five elements:

1) he or she is disabled; 2) otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the

17

position remained open while the employer sought other applicants or the disabled individual was replaced.

Monette v. Elec. Data Sys. Corp., 90 F.3d 1173, 1186 (6th Cir. 1996), abrogated on other grounds by Lewis v. Humboldt Acquisition Corp., 681 F.3d 312 (6th Cir. 2012); see also Ferrari, 826 F.3d at 894 (confirming that the five-element test, not the three-element test cited by Nielsen, applies).

Caudle has established a prima facie case. In the course of arguing for summary judgment using the three-element test, Nielsen effectively concedes the first two elements of the five-element test. Am. Mot. at 18-19. There is no reasonable dispute that Caudle was terminated, and that Nielsen was aware of Caudle's disability, so Caudle has satisfied the third and fourth elements. Because Nielsen applied the incorrect test, it did not address whether the position remained open while the employer sought other applicants or the disabled individual was replaced. Thus, Nielsen has failed to show that there is no genuine dispute as to the that element. Caudle has, therefore, set forth a prima facie case of disability discrimination.

Nielsen has satisfied its burden of offering legitimate, nondiscriminatory explanations for its actions. Nielsen's burden is one of production, not persuasion. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253-255 (1981). Nielsen says that it terminated Caudle because of the incidents involving Households #1, #2, #3, and # 4, and the incidents giving rise to the PIP. Having met its burden of production, the burden shifts back to Caudle to prove that Nielson's proffered reasons are instead pretext for discrimination.

"[A] plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." Ferrari, 826 F.3d at 895 (citations omitted). Caudle's argument touches each of these methods, but he focuses primarily on the second method, by arguing that Dinsmore's disdain for Caudle's sickle cell anemia and use of FMLA drove his decision to fire Caudle.

Caudle has offered sufficient evidence that Nielsen's explanations are pretextual and that he can survive summary judgment. A reasonable jury could find that Dinsmore's email in which he labeled Caudle by his use of FMLA leave, taken in context, demonstrates Dinsmore's bias. Dinsmore responded to an email from Culver in which Culver asked if Caudle was currently on leave. See August-September Email Thread. Culver's email seems to imply that she knew whom she was asking about and merely wanted to know whether he was then on leave—a question Dinsmore had answered before identifying Caudle by the frequency of his use of leave. Id. Seen in the light most favorable to Caudle, Dinsmore's comment appears superfluous, bolstering the case that Dinsmore viewed Caudle through the lens of his disability. See Ross, 237 F.3d at 707. Furthermore, Nielsen has admitted that Dinsmore actually used FMLA leave less frequently, Am. Mot. at 19 n.11, raising the question of why an exaggerated description of Caudle's use of leave was such a useful way of identifying him. Additionally, Dinsmore's defense of his comment— that he was using the frequency of Caudle's leave to identify him—may not persuade a jury that he was free of animus. See Dinsmore Dep. at 63-65. Identifying an individual by or with his disability, rather than by his name, demonstrates prejudice. See Ross, 237 F.3d at 707. Because of the email's proximity to the decision to fire Caudle—the email thread included a discussion of whether Nielsen would proceed with termination—a jury could reasonably conclude that Dinsmore's prejudice drove his decision to fire Caudle. See August-September Email Thread at 2.[12]

---

[12] Caudle advocates for the application of the cat's paw theory of liability, which renders employers liable for adverse employment actions proximately caused by a manager or supervisor who was not the ultimate decisionmaker. Resp. at 27. However, the argument is moot because Nielsen has admitted that Dinsmore "made the decision to terminate Plaintiff," in consultation with Human Resources personnel and Dinsmore's immediate supervisor, Josh Hummell. Def. Supp. Resp. to Pls. Interrogatories, Ex. 24 to Am. Mot., at 3-4 (Dkt. 36-25); Am. Mot. at 18.

Furthermore, the email should not be viewed in isolation. According to Caudle's testimony, Dinsmore made callous jokes about Caudle's disability. Caudle Dep. at 195. As shown in the May 2016 emails, Dinsmore suspected that Caudle's use of FMLA was fraudulent, although he later admitted that the need for leave was substantiated. Dinsmore Dep. at 104-106. And he sent mixed messages about whether Caudle should work while on leave.

Finally, Caudle has alleged that fellow employees made similar errors without being terminated, supporting the inference that Nielsen's proffered explanation did not actually motivate its actions. See SAMF ¶ 13; Caudle Dep. at 244, 264. Nielsen concedes that the allegations in SAMF ¶ 13 are presumed true at this stage. Reply at 1. Dinsmore's true and operative motivation cannot be determined without assessing his credibility, a task reserved for the jury.

Summary judgment is denied on Caudle's ADA and PWDCRA discrimination claims (Counts IV and V).

### E. Caudle's FMLA Retaliation Claim (Count III)

Caudle pursues an FMLA retaliation claim under the circumstantial evidence route. He uses essentially the same evidence as with the disability discrimination claim. He argues that Nielsen's proffered reason for firing him—the discovery of numerous errors at a home he serviced—was pretextual, based on Dinsmore's hostile comments and the "unreasonable expectations he placed upon Plaintiff to work while he was on leave." Resp. at 25.

Employees can invoke the protection against retaliation for use of FMLA leave under the following standard:

> A plaintiff can prove an FMLA retaliation claim using direct or circumstantial evidence. . . . To establish a prima facie case of FMLA retaliation under the indirect method, a plaintiff must show that (1) he or she engaged in an activity protected by the FMLA; (2) the employer knew that he or she was exercising FMLA rights; (3) he or she suffered an adverse employment action; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action. . . . Once a plaintiff has established a prima facie case of FMLA retaliation, the analysis follows the familiar McDonnell Douglas burden-shifting framework.

Ferrari, 826 F.3d at 897 (citations omitted).

Nielsen disputes causation and pretext, apparently conceding the first three elements of the prima facie case. Nielsen argues that "proximity alone" is insufficient to establish a case of retaliation, particularly where an intervening event leads to the termination. Mot. at 22 (citing, inter alia, Smeigh v. Johns Manville, Inc., 643 F.3d 554 (7th Cir. 2011)). However, Caudle's case is not merely built on "proximity," but also on comments by Dinsmore arguably displaying contempt for Caudle's use of FMLA leave. Based on the emails and Nielsen's statement of facts, SOF ¶ 23, it appears that the decision to fire Caudle was not made until after Dinsmore wrote his email about Caudle's use of leave. This creates a genuine question of material fact as to whether Nielsen's decision to fire Caudle was motivated by Caudle's use of FMLA leave or by his errors on the job.

The other phases of the McDonell Douglas analysis follow the previous section's discussion of disability discrimination, because Dinsmore's comments related both to Caudle's disability and the leave Caudle took as a result. Therefore, for the reasons stated above, summary judgment is denied on Caudle's FMLA retaliation claim (Count III).

## IV. CONCLUSION

Caudle has presented sufficient evidence to defeat summary judgment on his disability discrimination claims (Counts IV and V) and his FMLA retaliation claim (Count III). However, summary judgment is granted in favor of Nielsen on the remaining claims (Counts I, II, VI, VII, VII, and IX).

SO ORDERED

Dated: March 31, 2020                                    s/Mark A. Goldsmith
     Detroit, Michigan                              MARK A. GOLDSMITH
                                       United States District Judge