Page 13

1  Q.  And have you ever filed a lawsuit against anybody
2      else?
3  A.  No.
4  Q.  Has anybody ever filed a lawsuit against you?
5  A.  Yes.
6  Q.  Okay.  How many times?
7  A.  I've had my wages garnished twice.  That was it.
8  Q.  All right.  Do you remember approximately when the
9      first time your wages were garnished?
10 A.  Last year by the State of -- Detroit, the City of
11     Detroit.
12 Q.  So sometime in 2018?
13 A.  Yes.
14 Q.  And when was the second time?
15 A.  That would be two years ago from Beaumont Hospital for
16     unpaid hospital bills.
17 Q.  So 2017?
18 A.  Yes.
19 Q.  Do you remember how much the Beaumont Hospital bills
20     were?
21 A.  I don't remember the total amount.  I think they
22     offered me a settlement of $4,000-something.
23 Q.  Did you settle?
24 A.  I wasn't able to settle.  I didn't have that much
25     money.

Page 14

1  Q.  Did they get a judgment against you?
2  A.  They're trying to, but I'm on Social Security so they
3      can't really garnish it.
4  Q.  Okay.  So they have a judgment, but they can't get the
5      money?
6  A.  Yes, right.
7  Q.  Okay.  Do you know what the total amount they are
8      trying to get was?
9  A.  I'd have to look it up.  I don't know off the top of
10     my head.
11 Q.  Was it something more than $4,000, if they were trying
12     to settle for 4?
13 A.  Yes, it was -- I know it was more than $100,000.
14 Q.  And the City of Detroit, do you know how much that one
15     was?
16 A.  No.
17 Q.  Was that for taxes?
18 A.  Yes.
19 Q.  And what happened with that one?
20 A.  That was -- I never received a notice from it and then
21     it showed up that it was behind.  It was due when --
22     after I filed and it went into judgment.
23 Q.  So did they have a judgment against you?
24 A.  Yeah, saying I owed.  Gave me -- when I finally got
25     the notice, I think it was a ten-day notice to pay.

Page 15

1  Q.  I've had one of those.  The City of Detroit is very
2      aggressive.
3  A.  But when I got it, it was a month later.
4  Q.  Yep, or more, yes, I understand that one.  And am I
5      correct they haven't been able to collect that either?
6  A.  Yes.
7  Q.  Did you ever have any action brought against you by
8      Cash Now X?
9  A.  Yes.
10 Q.  Okay.  Do you remember about when that was?
11 A.  That was, I want to say 2008, 2007.
12 Q.  Okay.  And what was that for?
13 A.  I had a loan.  I took a loan out because I was behind
14     on child support.
15 Q.  And how much did they get a judgment against you?
16 A.  They did a judgment.  It was messy because I paid a
17     check to pay it off and they said they never received
18     it.  I couldn't find the receipt so it went in their
19     favor and I don't remember how much it was.  It ended
20     up being paid off.  They took my taxes to pay it off.
21 Q.  Do you know about how much it was, was it in the
22     hundreds or in the thousands or in the ten thousands?
23 A.  I think it was like 6 or $700.  I wasn't allowed to
24     take more than $600 out, so I think with interest it
25     was like that.

Page 16

1  Q.  Okay.  And did you ever have anything brought against
2      you by Approved Cash Advance?
3  A.  Approved Cash Advance?  Yes.
4  Q.  Do you remember what that was for?
5  A.  That was a cash loan I took out for my father and I
6      was told it was paid off and it wasn't.
7  Q.  Did that get garnished as well?
8  A.  I think so because I was working at AT&T and I was out
9      of town so I didn't get any mail so it was missed and
10     I was told it was paid, so between everything --
11 Q.  Do you still pay child support?
12 A.  Yes.
13 Q.  How much?
14 A.  It's two times.  It's $543 and then she gets money
15     because I'm on Social Security.
16 Q.  Okay.  So she gets her own Social Security money
17     through you?
18 A.  Yes.
19 Q.  Right.  So, in other words, Social Security pays that,
20     but it's because you're on Social Security?
21 A.  No, she gets paid a certain amount.  She gets paid
22     $750 from Social Security and then she gets $543 from
23     my Social Security.
24 Q.  They just take it out of your check?
25 A.  Yes, so she gets two.

Page 25

1  A.  Yes.
2  Q.  Do you still have those notes?
3  A.  I think so, I'm not sure.
4  Q.  Did you bring them with you today?
5  A.  No.
6  Q.  Have you ever kept a diary or journal?
7  A.  No.
8  Q.  Do you maintain a calendar that you write notes on
9      about what you're doing?
10 A.  No.
11 Q.  Did you ever record any conversations between yourself
12     and anybody at Nielsen?
13 A.  No.
14          MARKED FOR IDENTIFICATION:
15          DEPOSITION EXHIBIT 1
16          9:48 a.m.
17 BY MS. NORRIS:
18 Q.  Mr. Caudle, I'm handing you what's been marked as
19     Deposition Exhibit Number 1, which was the notice for
20     today's deposition which was originally scheduled for
21     Monday at 10:00 and then was adjourned until today.
22     Previously there was an earlier notice when this
23     deposition was scheduled to take place in January and
24     the attorneys agreed to adjourn it -- the discovery at
25     that time.

Page 26

1          Have you ever seen this document?
2  A.  No.
3  Q.  Okay.  Has anybody asked you to look for the documents
4      that are listed here?
5          MR. GALLAGHER:  Objection.
6          MS. NORRIS:  Okay.  What's the basis for
7      your objection?
8          MR. GALLAGHER:  If there's any
9      attorney/client communication within the answer --
10         MS. NORRIS:  Okay.  Then you can say
11     object, attorney/client privilege, and then I'll know.
12         MR. GALLAGHER:  Sure.
13         MS. NORRIS:  Okay.  I'll address this to
14     you, Mr. Gallagher.  This deposition was originally
15     noticed in January.  It was noticed again in May.  My
16     understanding is that the witness has not brought any
17     of the documents he was supposed to bring to the
18     deposition?
19         MR. GALLAGHER:  Okay.
20         MS. NORRIS:  So I'm entitled to have those
21     documents and I'm entitled to have those documents
22     here today.  So what I'll do is I'll continue my
23     questioning and I'll ask that you produce those
24     documents immediately and if I need to ask follow-up
25     questions as a result, I will reserve my right to do

Page 27

1      that.  Generally it's not necessary, usually the
2      documents speak for themselves, but he says that he
3      has notes and I don't have those notes.
4          MR. GALLAGHER:  I don't think that was his
5      testimony.  I think his testimony was at one point
6      that he kept notes.  He's not sure if they still
7      exist.  I don't think there's been any testimony that
8      a certain document exists actually yet.
9          MS. NORRIS:  Okay.  Then we can go through
10     each line-by-line and I can determine what exists or
11     you can --
12         MR. GALLAGHER:  I mean, sure, like if
13     that's -- like you said, it's your deposition, you can
14     handle it how you'd like.  I will -- I'm more than
15     happy to produce anything we can for you in a timely
16     manner though, I'm not trying to update that, but
17     particularized to the notes, we're not sure if those
18     exist.
19         MS. NORRIS:  Okay.  That's fine.  These
20     were due now, so a timely manner would be soon and I
21     reserve my right to bring the witness back, if
22     necessary, to answer any questions that might be
23     raised by those documents.  As I said, generally
24     that's not necessary, generally documents speak for
25     themselves, but I'll reserve that right.

Page 28

1          MR. GALLAGHER:  Sure.
2  BY MS. NORRIS:
3  Q.  Have you ever been seen by a psychologist or
4      psychiatrist?
5  A.  No.
6  Q.  Have you ever had counseling with a priest, social
7      workers or other counselors?
8  A.  No.
9  Q.  Have you been hospitalized at all in the last
10     15 years?
11 A.  Yes.
12 Q.  Okay.  My understanding is that you have sickle cell
13     anemia; is that correct?
14 A.  I have sickle cell SC, yes.
15 Q.  Okay.  Do you have any other medical conditions other
16     than sickle cell anemia?
17 A.  Yes.
18 Q.  Okay.  What other conditions do you have?
19         MR. GALLAGHER:  Do you mind, Counsel, if I
20     put a standing objection to any kind of testimony that
21     might be elicited where he's not a medical expert?
22         MS. NORRIS:  No, that's a fine objection.
23 BY MS. NORRIS:
24 Q.  In other words, I'm not asking you to play doctor, I'm
25     asking you what your understanding is of your medical

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

Page 29

```
 1      conditions and that's all that you can give.
 2             So, yes, your standing objection is noted,
 3      that's fine.
 4             MR. GALLAGHER:  Thank you.
 5  BY MS. NORRIS:
 6  Q.  So other than sickle cell anemia, are you aware of any
 7      other medical conditions that you have other than just
 8      waking up with a cold or a sore throat or something
 9      like that?
10  A.  Sleep apnea and type 2 diabetic, controlled diabetic.
11  Q.  Other than sickle cell anemia, sleep apnea and type 2
12      controlled diabetes, anything else?
13  A.  No.
14  Q.  When were you first diagnosed with diabetes?
15  A.  2014.
16  Q.  Okay.  And when were you first diagnosed with sleep
17      apnea?
18  A.  2015.
19  Q.  And when were you first diagnosed with sickle cell
20      anemia?
21  A.  At birth.
22  Q.  So that's something you've been living with?
23  A.  Yes.
24  Q.  All right.  So let's start with type 2 diabetes.  Have
25      you ever been hospitalized as a result of diabetes?
```

Page 30

```
 1  A.  No.
 2  Q.  Have you ever been hospitalized as a result of the
 3      sleep apnea?
 4  A.  No.
 5  Q.  Have you ever been hospitalized as a result of sickle
 6      cell anemia?
 7  A.  Yes.
 8  Q.  Approximately how many times?
 9  A.  Can't count.
10  Q.  More than you can count?
11  A.  Yes.
12  Q.  All right.  Let's start with -- can you tell me how
13      many times in the last 15 years or is that also more
14      than you can count?
15  A.  More than I can count.
16  Q.  Okay.  Can you tell me how often in the last ten
17      years?
18  A.  More than I can count.
19  Q.  Last five years?
20  A.  More than I can count.
21  Q.  Last year?
22  A.  Four times.
23  Q.  And was last year, in terms of the amount of times
24      that you were hospitalized, about the same, more or
25      less than the previous few years?
```

Page 31

```
 1  A.  No, I'm sorry, I'm thinking of last year.  It's 2019.
 2  Q.  So four times in 2019?
 3  A.  Yes.
 4  Q.  Do you know about how many times in 2018?
 5  A.  To be honest, no.
 6  Q.  Again, more than you can count?
 7  A.  Yes.
 8  Q.  When's the last time you were hospitalized?
 9  A.  Last week.  That's why I couldn't make it Monday.
10  Q.  Okay.  From when to when last week were you
11      hospitalized?
12  A.  I want to say the 4th until the 10th.
13  Q.  When you've been hospitalized since you've been back
14      in Michigan, so I'm not talking about when you were in
15      Erie, Pennsylvania or before that, but since you've
16      been back in Michigan have you gone to the same
17      medical treaters for this?
18  A.  No.
19  Q.  Okay.  Let's start, again, with your diabetes.  Who is
20      your current doctor for your diabetes?
21  A.  Dr. Abigail Deland.
22  Q.  Deland?
23  A.  Deland.
24  Q.  Can you spell --
25  A.  D-E-L-A-N-D.
```

Page 32

```
 1  Q.  And where is Dr. Deland?
 2  A.  She's -- Farmington West Village on Grand River in
 3      Farmington Hills.
 4  Q.  What kind of doctor is Dr. Deland, if you know?
 5  A.  She's my internal medicine doctor.
 6  Q.  Okay.  And has she sent you to anybody else for your
 7      diabetes?
 8  A.  No.
 9  Q.  Who is your doctor for your sleep apnea?
10  A.  I don't remember her name.  I only see her once a year
11      to get, what you call it, a script to get my supplies.
12  Q.  Okay.  Is there someplace you could look to find that
13      name?
14  A.  Yeah, she's part of Beaumont, I know that much.
15  Q.  At which Beaumont?
16  A.  Just Beaumont, period.  I'm not going to get reception
17      to --
18  Q.  No, that's okay, you're not required to do homework
19      during the exam.  I can follow up with questions to
20      your attorney later.
21             Sickle cell anemia, who is your primary
22      treater for that?
23  A.  Dr. Richard Zekman.
24  Q.  Z-U-C-K?
25  A.  Z-E-K-M-A-N.
```

Page 41

1  Q.  Were you looking in a particular pay area?
2  A.  No.
3  Q.  In 2018 when you were looking for work, were you
4      ready, willing and able to work at that time?
5  A.  The times I was looking, yes.
6  Q.  Were there periods in 2018 when you could work and
7      periods when you could not?
8  A.  Technically I couldn't work at all, I just didn't
9      know.  I wanted to work.
10 Q.  Okay.  When you say you just didn't know, what do you
11     mean?
12 A.  I found out medically I couldn't work and that's why
13     they told me to go for disability.
14 Q.  Okay.  We talked earlier, I believe you told me that
15     you found out medically you could not work in late
16     2018; is that right?
17 A.  Yes.
18 Q.  All right.  So earlier in 2018 you had the same
19     medical problems, but you were not aware that you
20     shouldn't be working; is that right?
21 A.  Yes.
22 Q.  So up until you applied for disability, were you
23     looking for work throughout 2018?
24 A.  Yes.
25 Q.  Okay.  Do you know how many jobs you applied for in

Page 42

1      2018?
2  A.  No.
3  Q.  Did you get any offers?
4  A.  Can't remember.  2018?
5  Q.  Yeah.
6  A.  Yes.
7  Q.  Okay.
8  A.  Yes.
9  Q.  How many offers did you get?
10 A.  One.
11 Q.  Where?
12 A.  Aerotek.
13 Q.  Doing what?
14 A.  Medical repair technician.
15 Q.  Where would that have physically been?
16 A.  At Prezio Health in Novi.
17 Q.  Do you know what that would have paid?
18 A.  $14 an hour.
19 Q.  Did you accept that offer?
20 A.  Yes.
21 Q.  And then did you go to work there?
22 A.  Yes.
23 Q.  Okay.  We'll talk about that in a few minutes.  In
24     2017 were you looking for work?
25 A.  Yes.

Page 43

1  Q.  Same kinds of jobs?
2  A.  Yes.
3  Q.  Looking in the same places?
4  A.  Yes.
5  Q.  Did you get any offers in 2017?
6  A.  2017?  Trying to think.  I know I was on unemployment.
7  Q.  Were you on unemployment for a period of time after
8      you left Nielsen?
9  A.  Yes.
10 Q.  After you got off unemployment do you remember getting
11     any offers in 2017?
12 A.  No, because if you got offers they kicked you off for
13     not taking it.
14 Q.  Did you stay on your unemployment and not look for
15     work until your unemployment expired, so that -- for
16     that reason?
17 A.  No, they made you look for jobs, unemployment.  You
18     had to submit it each week.
19 Q.  Okay.  And did you get any offers through any of that?
20 A.  No.  If you got any offers, they kicked you off
21     unemployment for not taking it.
22 Q.  Right.  So does that mean you weren't really trying to
23     get offers?
24 A.  No, I submitted every offer I got.  So if a job said
25     they offered it and they called and they found out I

Page 44

1      didn't accept it, I would have got kicked off.  So I
2      was looking.
3  Q.  All right.  I'm trying to find out if you actually got
4      offers?
5  A.  No, I didn't get offers.
6  Q.  Okay.  Okay.  I want to go back to when you graduated
7      from high school.  You went to O.C.C.  Were you
8      working while you were at O.C.C.?
9  A.  I don't remember.
10 Q.  Then you went to ITT.  Do you remember if you were
11     working after ITT?
12 A.  After ITT?
13 Q.  I'm sorry, thank you.  While you were at ITT?
14 A.  No, because I was concentrating on going, just getting
15     back to school.
16 Q.  Okay.  And then you found out that your girlfriend was
17     pregnant.  Did you go to work then?
18 A.  No, I moved to Erie, then I went to work.
19 Q.  Okay.  So when you moved to Erie where did you go to
20     work?
21 A.  Target.
22 Q.  Was that in Erie, Pennsylvania?
23 A.  Yes.
24 Q.  What did you do there?
25 A.  Stock.

Page 53

1  fiancée set it up and it was sort of like flying by
2  air when she did it.
3  Q. Well, I thought you broke up with your fiancée before
4     you came back to Michigan?
5  A. No, my recent fiancée.
6  Q. You're currently engaged?
7  A. No, not anymore.
8  Q. Okay. When -- I'm sorry, that's my confusion, not
9     yours.
10          When you went to Erie, Pennsylvania that
11     was with a fiancée; is that right?
12 A. Yes, that was my daughter's mother.
13 Q. And that relationship ended and you came back to
14    Michigan; is that right?
15 A. Yes.
16 Q. Okay. When did you have another -- a new fiancée?
17 A. I had a girlfriend who -- I called her my fiancée
18    because she became my fiancée.
19 Q. Okay. Let's start with when did she become your
20    girlfriend?
21 A. Say 2010.
22 Q. And were you living --
23 A. At the 21441.
24 Q. -- on Cambridge Avenue at that time?
25 A. Yes.

Page 54

1  Q. And then that girlfriend became your fiancée?
2  A. Yes.
3  Q. So she lived -- did she live there with you?
4  A. No.
5  Q. So was there ever a time when she lived there with
6     you?
7  A. No.
8  Q. Okay. And when did that relationship end?
9  A. 2016.
10 Q. When in 2016?
11 A. November, December.
12 Q. And why did the relationship end?
13 A. Partly because of my losing my job at Nielsen, the
14    strain and everything it put on the relationship --
15 Q. And --
16 A. -- we were --
17 Q. -- what was the other part?
18 A. That was mostly it. I got sick. I was in the
19    hospital. We were supposed to get married and we
20    started realizing we couldn't get married and people
21    got frustrated and -- she just couldn't take me being
22    sick and the hardship of the bills and we just
23    separated because it was better.
24 Q. And what's her name?
25 A. Raneshia Singleton.

Page 55

1  Q. R-A-N-I-S-H-A?
2  A. R-A-N-E-S-H-I-A?
3  Q. Okay. And the last name?
4  A. Singleton.
5  Q. And where is Ms. Singleton?
6  A. You mean where she lives?
7  Q. Yeah.
8  A. Farmington Hills.
9  Q. Have you had any communication with her since you
10    broke up?
11 A. Yes.
12 Q. How often?
13 A. Here and there.
14 Q. Have you told her anything about what's at issue in
15    this lawsuit?
16 A. No.
17 Q. When you left Nielsen, what reason did you give her?
18    Did you tell her you were fired?
19 A. Yes.
20 Q. After leaving Nielsen, have you had any jobs other
21    than the Aerotek job?
22 A. Trying to recall. I can't remember.
23 Q. If your LinkedIn page says that you worked at AT&T
24    from January 2007 until April 2010, do you have any
25    reason to dispute that?

Page 56

1  A. I can't be sure if it's right or not, like I said.
2  Q. Okay. If it says that you were at Dish Network from
3     December 2010 until May 2011, do you have any reason
4     to dispute that?
5  A. I can't be sure on it.
6  Q. And if it says that you were at Nielsen from May 2012
7     until October 2016, do you have any reason to dispute
8     that?
9  A. That sounds correct.
10 Q. And if it says that you were at Prezio Health from
11    February 2017 until November 2017, do you have any
12    reason to dispute that?
13 A. Yes.
14 Q. Okay. Why?
15 A. Because Prezio I didn't start until May of 2014 -- I
16    mean, 2018, I'm sorry.
17 Q. Okay. And did you leave in November?
18 A. I believe that was that time. I think it was a
19    six-month contract and it was not picked up.
20 Q. Did you get unemployment for that?
21 A. Yes.
22 Q. Any other jobs since leaving Nielsen?
23 A. Not that I can recall.
24 Q. You've told me about a couple of jobs from which you
25    were terminated. Did you ever resign from a job

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy